MARY H. HAAS (State Bar No. 149770)
  maryhaas@dwt.com
JOHN D. FREED (State Bar No. 261518)
  jakefreed@dwt.com
MATTHEW E. LADEW (State Bar No. 318215)
  mattladew@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

JOSEPH VANLEUVEN (*pro hac vice pending*)
  joevanleuven@dwt.com
DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
Telephone:  (503) 778-5325
Fax:  (503) 701-0023

Attorneys for Plaintiff
U.S. BANK NATIONAL ASSOCIATION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, <br><br> Plaintiff, <br><br> vs. <br><br> TOUCHSTONE PISTACHIO COMPANY, LLC; FARSHID ASSEMI; FARID ASSEMI; DARIUS ASSEMI; NEEMA ASSEMI; MELISSA LAYNE; SONIA ROSEMARY ASSEMI; MARICOPA ORCHARDS, LLC; C&A FARMS, LLC; ACDF, LLC; CANTUA ORCHARDS, LLC; LINCOLN GRANTOR FARMS, LLC; PANOCHE PISTACHIOS, LLC; ADAMS GRANTOR LAND, LLC; GRANVILLE FARMS, LLC; SAGEBERRY FARMS, LLC; GRADON FARMS, LLC; MANNING AVENUE PISTACHIOS, LLC; ASSEMI AND SONS, INC.; WINSTON FARMS, LLC; FFGT FARMS, LLC; FAVIER RANCH, LLC; GRANTLAND FARMS, LLC; WHITESBRIDGE FARMS, LLC; ACAP FARMS, LLC; BEAR FLAG FARMS, LLC; COPPER AVNEUE INVESETMENTS, LLC; WILLOW AVENUE INVESTMENTS, LLC; ASHLAN & HAYES INVESTMENTS, LLC; ASSEMI BROTHERS, LLC, <br><br> Defendants. | Case No. 1:24-cv-01105 SKO <br><br> **PLAINTIFF U.S. BANK'S *EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER, TEMPORARY RESTRAINING ORDER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> ***[Declarations of Karen Boyer, Evan Blum, Joseph VanLeuven, and David P. Stapleton; [Proposed] Order filed concurrently]*** <br><br> Action Filed:  September 18, 2024 |

### *EX PARTE* MOTION FOR APPOINTMENT OF RECEIVER, TEMPORARY RESTRAINING ORDER, AND ORDER TO SHOW CAUSE

Plaintiff U.S. Bank National Association ("U.S. Bank"), will and hereby does move *ex parte*:

(1)     For an order appointing a temporary receiver, *see* L.R. 232(a)(1), and instructing the temporary receiver to take possession and control of the assets of Defendant Touchstone Pistachio Company, LLC ("Touchstone"), including a pistachio processing plant, vacant land, equipment, inventory, general intangibles and other personal assets, and accounts receivable (collectively, the "Receivership Property"); to conserve, maintain, and manage the Receivership Property; to pay debt service due to U.S. Bank as the receiver has funds available therefor; to operate the Receivership Property pending any sale of such property; to sell inventory and collect accounts in the ordinary course of operations; to liquidate the Receivership Property, in whole or in part, by auction or by private sale subject to Court approval; and to perform all other acts consistent with the terms of the order entered by the Court.

(2)     For a temporary restraining order, *see* L.R. 231(a), restraining and enjoining Touchstone and its agents, partners, property managers, employees, assignees, successors, representatives, and all persons acting under and/or in concert with it from committing or permitting waste of the Receivership Property, including any misuse of cash from the operations of Touchstone that are part of the Receivership Property; from removing, transferring, encumbering, or otherwise disposing of the Receivership Property; and from interfering with the receiver in the discharge of the temporary receiver's duties.

(3)     For an order directing Touchstone and anyone in possession of the Receivership Property to deliver possession of same to the temporary receiver.

(4)     For an order calendaring a hearing on the continuation of the receivership and an order to show cause as to why a preliminary injunction should not issue.  *See* L.R. 232(c); L.R. 231(d).

(5)     For an order appointing a receiver at the hearing on the continuation of the receivership.  *See* L.R. 232(d).

(6)     For a preliminary injunction, restraining and enjoining Touchstone and its agents, partners, property managers, employees, assignees, successors, representatives, and all persons acting under and/or in concert with it from committing or permitting waste of the Receivership Property, including any misuse of cash from the operations of Touchstone that are part of the Receivership Property; from removing, transferring, encumbering, or otherwise disposing of the Receivership Property; and from interfering with the receiver in the discharge of the receiver's duties.

Touchstone is a pistachio processor.  As alleged in the Complaint and established by the Declarations of Karen Boyer and Evan Blum, Touchstone is in default on approximately $72 million in secured principal loan obligations stemming from two loans.  U.S. Bank has made written demand for payment, but the loans remain in default.  The loans are guaranteed by Defendants Farshid Assemi; Farid Assemi, Darius Assemi, Neema Assemi, Melissa Layne, Sonia Rosemary Assemi, Maricopa Orchards, LLC, C&A Farms, LLC, ACDF, LLC, Cantua Orchards, LLC, Lincoln Grantor Farms, LLC, Panoche Pistachios, LLC, Adams Grantor Land, LLC, Granville Farms, LLC, Sageberry Farms, LLC, Gradon Farms, LLC, Manning Avenue Pistachios, LLC, Assemi and Sons, Inc., Winston Farms, LLC, FFGT Farms, LLC, Favier Ranch, LLC, Grantland Farms, LLC, Whitesbridge Farms, LLC, ACAP Farms, LLC, Bear Flag Farms, LLC, Copper Avenue Investments, LLC, Willow Avenue Investments, LLC, Ashlan & Hayes Investments, LLC, and Assemi Brothers, LLC.

As further alleged in the Complaint and established by the Boyer and Blum Declarations, the loans are secured via a Deed of Trust on real property (a pistachio processing plant located at 19570 Ave. 88, Terra Bella, CA  93270 ("Facility" or "Terra Bella Plant") and via a Security Agreement covering essentially all of Touchstone's personal property and assets, including, without limitation, the Facility's inventory, equipment, accounts, general intangibles and other personal assets, and proceeds thereof.

As further alleged in the Complaint and established by the Boyer and Blum Declarations, Touchstone has defaulted on its obligations, and it expressly agreed to a default-triggered appointment of a receiver in the relevant agreement.  Appointing a receiver is necessary to

protect, manage, and dispose of the Receivership Property, which is being wasted by Touchstone and the Assemis.

As further established by the Boyer and Blum Declarations, an order appointing a temporary receiver should issue on an *ex parte* basis because Touchstone is seriously delinquent in payments on the Loans, its inventory (consisting of the remains of the 2023 pistachio crop) is seriously depleted, its account receivable collections have dwindled, it does not have funds or funding to acquire new inventory from the 2024 crop that is now being harvested, it owes its primary nut supplier $112 million for last year's crop, that supplier is delivering its 2024 nuts to other processors, and Touchstone has diverted substantial amounts of cash and resources from the Receivership Property to expressly unauthorized, costly, and failed business ventures.

Touchstone is grossly insolvent. For all practical purposes, it is out of business, because its little remaining inventory does not meet the quality requirements of its regular customers. Moreover, Touchstone has rejected offers to buy its assets that would have generated sufficient proceeds to pay the Loans at issue, as well as other claims. There are still opportunities to sell the business assets, but only if it can be done quickly. Instead of pursuing those opportunities, Touchstone continues to try to resurrect a failed refinancing transaction that counsel for the putative new lender refers to as a "pipe dream." The Receivership Property will continue to be wasted if this motion is heard on regular notice. Accordingly, U.S. Bank moves on an *ex parte* basis to ensure that its rights to the Receivership Property are protected.

Pursuant to L.R. 231(a) and 232(b), and Section 1.C.4 of this Court's Standing Order in Civil Cases, U.S. Bank has provided notice to Touchstone's counsel of this application as stated in the Declaration of Joseph VanLeuven. As further stated in the VanLeuven Declaration, U.S. Bank has made a good faith, concerted effort to meet and confer with Defendants in an effort to reach a stipulation obviating the need for this *ex parte* application in accordance with Section 1.C.4 of the Standing Order. As established by the VanLeuven, Boyer, and Blum declarations, U.S. Bank cannot seek relief through a formal noticed motion under L.R. 230.

U.S. Bank requests that the Court appoint the firm of Stapleton Group, Inc. ("Stapleton"), acting by and through its principal David P. Stapleton, as temporary receiver and, ultimately,

receiver for the Receivership Property.  Stapleton has substantial experience acting as a receiver and is qualified to serve as receiver in this case, as established by the Declaration of David P. Stapleton.  Pursuant to L.R. 232(b), if the Court appoints a temporary receiver *ex parte*, U.S. Bank will give notice forthwith of the temporary receiver's appointment, any terms and conditions pertaining thereto, and the date calendared for subsequent hearing on the question of continuance of the receivership.

This Motion is based on U.S. Bank's Complaint in this action; the Declarations of Karen Boyer, Evan Blum, Joseph VanLeuven, and David P. Stapleton; Federal Rules of Civil Procedure 65 and 66,  Local Rules 231 and 232, and Section 1.C.4 of the Standing Order; this Notice of Motion and Motion and the accompanying Memorandum of Points and Authorities; the complete files and records in this action; and all other oral and documentary evidence and argument that may be presented at or before the hearing on this Motion.  U.S. Bank does not anticipate the need for oral testimony at the hearing on the order show cause as to why a preliminary injunction should not issue.  *See* L.R. 231(d)(3).

U.S. Bank expects an opposition will be filed.

Pursuant to the Standing Order (ECF No. 14 at 4), the Standing Order has been served on all parties.  U.S. Bank also provided notice to the Court and opposing parties before filing.  *See* ECF No. 14 at 3.

DATED: September 20, 2024                    Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP
MARY H. HAAS
JOSEPH VANLEUVEN
JOHN D. FREED
MATTHEW E. LADEW


By: */s/ John D. Freed*
        John D. Freed

Attorneys for Plaintiff
U.S. BANK, NATIONAL ASSOCIATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Defendant Touchstone Pistachio Company, LLC ("Touchstone") is a failed pistachio-processing business.  Touchstone is now in default on approximately $71 million in secured debt obligations owed to U.S. Bank and a consortium of four other lenders (the "Lenders").  It owes over $112 million to an affiliated company that supplied it with nuts, which it has no way to repay.  Touchstone wasted tens of millions of dollars on a failed expansion project and still owes $50 million on a loan it took to finance construction of that project.  It has used the Lenders' cash collateral (account receivable collections) to pay the bills of affiliated companies in violation of its loan agreement.  It has failed in a months-long effort to obtain new financing or a buyer for its business and is now insolvent and out of business.  It has no equity in its assets.  Its leadership is in turmoil.

Touchstone agreed in multiple loan documents to allow U.S. Bank to obtain the appointment of a general receiver following an event of default under its loan agreements "to take possession of and operate and/or dispose of [its] business and assets."  Touchstone's collapse is now happening in real time.  The Court should appoint a receiver to wind-down the Touchstone business and liquidate its assets for the benefit of its creditors, and enjoin Touchstone from interfering with the receiver or wasting receivership assets.  The Court should do so on an *ex parte* basis because U.S. Bank will be irreparably harmed as Touchstone dissipates U.S. Bank's collateral operating a business that is now incapable of generating revenue.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are alleged in the Complaint and/or are verified by the declarations on file and accompanying exhibits.

### A.     Touchstone and Its Owners

Touchstone owns an operating pistachio processing plant in Terra Bella, California.  Boyer Decl. ¶ 2.  Touchstone is owned and controlled by three brothers:  Farid, Farshid, and Darius Assemi, through their family trusts.  *Id.*  The Assemi brothers and their trusts (collectively, the "Assemis"), along with related entities, guaranteed the Loans at issue.  *Id.*

*EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER,
TRO, AND OSC RE: PRELIMINARY INJUNCTION
Case No. 1:24-cv-01105 SKO

The Assemis' farming entities, many of which are Guarantor Defendants here (*see* Dkt. 1 (Compl.) at 9 n.4 & ¶ 47), are referred to as "Maricopa" and are Touchstone's primary nut suppliers.[1]  For years, Maricopa sold its pistachios to cooperatives associated with The Wonderful Company ("Wonderful").  In or around 2018, the Assemis formed Touchstone in order to enter the processing business.  Touchstone's initial effort to build a processing plant (the "Kamm Plant") was thwarted in litigation filed by Wonderful under CEQA—but not until Touchstone had spent millions of dollars in legal costs, construction soft costs, and in purchasing equipment for the new plant.  In desperate need of somewhere to process the Maricopa nuts, Touchstone purchased its current plant in Terra Bella, California (the "Terra Bella Plant" or "Facility").

Although U.S. Bank's loan to Touchstone was increased in 2021 to provide funds for Touchstone to upgrade the Terra Bella Plant, Farid and his management team were already looking for another place to build a new plant.  Boyer Decl. 15.  As discussed in more detail below, they concocted a complicated arrangement for a third-party called Dry Ranch to expand its plant using a loan from Touchstone, and sell it to Touchstone.  *Id*. at ¶ 16–18.  They called this "Project X."  After Touchstone had invested millions of dollars into Project X, it defaulted and lost its interest in that plant.  *Id*.

**B.    The Loans and Guaranty**

On or about March 20, 2020, Touchstone entered into a secured Credit Agreement (as amended and supplemented periodically, the "Credit Agreement") with U.S. Bank (through its predecessor-in-interest) and four other lenders (collectively, the "Lenders").  Boyer Decl. ¶ 3.  U.S. Bank is the Administrative Agent and Collateral Agent for the Loans.  There are two loan facilities under the Credit Agreement: a term loan (the "Equipment Loan") and a line of credit (the "Revolving Loan," and together with the Equipment Loan, the "Loans").  The Loans are

---

[1]  The Maricopa entities are defendants Maricopa Orchards, LLC, C&A Farms, LLC, ACDF, LLC, Cantua Orchards, LLC, Lincoln Grantor Farms, LLC, Panoche Pistachios, LLC, Adams Grantor Land, LLC, Granville Farms, LLC, Sageberry Farms, LLC, Gradon Farms, LLC, Manning Avenue Pistachios, LLC, Assemi and Sons, Inc., Winston Farms, LLC, FFGT Farms, LLC, Favier Ranch, LLC, Grantland Farms, LLC, Whitesbridge Farms, LLC, ACAP Farms, LLC, Bear Flag Farms, LLC, Copper Avenue Investments, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC , and, on information and belief, A&H Investments, LLC.

secured by substantially all of Touchstone's real and personal property, pursuant to (a) a Security Agreement covering all of Touchstone's inventory, equipment, accounts, general intangibles and other personal assets as described therein, and proceeds thereof (collectively or individually the "Collateral"); and (b) a deed of trust in favor of U.S. Bank, encumbering the Terra Bella Plant (the "Deed of Trust").  Further, the Defendant Guarantors executed a Continuing Guaranty ("Guaranty"), guaranteeing payment and performance of all Loan obligations.

Crucially, Section 12.4 of the Credit Agreement provides:

> Receiver.  In addition to any other remedy available to it, ***Administrative Agent*, upon the request of the Required Lenders, shall have the absolute right, during the existence of an Event of Default, to seek and obtain the appointment and obtain the appointment of a receiver** to take possession of and operate and/or dispose of the business and asserts of the Borrower and any Subsidiaries, and the Borrower hereby consents (for themselves and on behalf of the Subsidiaries) to such rights and such appointment and hereby waive[s] any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent or any Lender in connection therewith.

Boyer Decl., Ex. 1 ¶ 11 (emphasis added).  U.S. Bank similarly has a contractual right to the appointment of a receiver under the Security Agreement and the Deed of Trust.  *Id.*, Exs. 3 & 4.

## C.  Project X

As noted above, in 2022, Touchstone entered a series of agreements to purchase Dry Ranch's existing plant after Dry Ranch had expanded that plant to Touchstone's specifications using a construction loan from Touchstone.  The Assemis spent tens of millions of dollars, including money from their own asset sales, money from Touchstone, and borrowed funds, to fund Project X.  Most importantly, Touchstone: (a) borrowed $50 million from Maricopa (which had borrowed that money from its own lender, Prudential); (b) used that and other money to make the construction loan to Dry Ranch; and (c) equipped the new plant in part with $14.5 million of equipment Touchstone had purchased several years earlier for the aborted Kamm plant ("Kamm Equipment")—which equipment was U.S. Bank's Collateral.

Notably, this $50 million loan by Maricopa to Touchstone required U.S. Bank's written consent under the terms of a separate crop loan from U.S. Bank to Maricopa, and moving

equipment into Project X required the bank's consent under the Touchstone loan agreements. U.S. Bank warned the Assemi team not to proceed without the bank's consent, which would be conditioned, among other things, on an evaluation of the economics of the project and acknowledgment by Dry Ranch that any of Touchstone's equipment installed in the expansion remained subject to the bank's senior security interest.  Touchstone ignored U.S. Bank's directives and proceeded with Project X, without U.S. Bank's knowledge or consent.  Boyer Decl. ¶¶ 16–18.

In the course of construction, again without U.S. Bank's knowledge or consent, Touchstone contributed the Kamm Equipment to Dry Ranch.  As noted above, Touchstone had purchased this equipment for the Kamm Plant several years earlier for about $14.5 million (using funds borrowed from U.S. Bank), and had been holding it in storage since the Kamm Plant was aborted.  Unfortunately, Touchstone failed to close its purchase of Project X and ultimately lost its interest in the partially-completed plant and all the money it had invested.  U.S. Bank was forced to negotiate an agreement under which Dry Ranch paid for the Kamm Equipment.  Boyer Decl. ¶¶ 16–18.

**D.    The Loan Defaults**

In early 2023, Touchstone defaulted on the Loans here at issue.  U.S. Bank allowed Touchstone to continue operations, but reserved all rights and remedies while the parties engaged in lengthy negotiations re: the terms of a forbearance agreement.  Multiple forbearance term sheets were exchanged.

In November 2023, Touchstone, U.S. Bank, the Lenders, and the Guarantors finally entered into a formal Forbearance, Waiver and Amendment Agreement (the "Forbearance Agreement").  Boyer Decl., Ex. 2.  Under the Forbearance Agreement, Touchstone and each Guarantor admitted an extensive series of monetary and non-monetary Events of Default under the Credit Agreement and confirmed that they had no offsets, defenses, deductions, or counterclaims of any kind or character to enforcement of U.S. Bank's rights and remedies.  As had been agreed in an earlier term sheet, the Forbearance Agreement gave Touchstone until November 30, 2023, to repay the Equipment Loan, which Touchstone had told U.S. Bank would

be accomplished through a major refinancing by Prudential.  The promised refinancing failed, Touchstone failed to repay the Equipment Loan by the November 30 maturity date, and Touchstone remains in default today.  Moreover, as a result of the failed Prudential financing, Touchstone could not close its purchase of Project X and lost its interest in the partially completed plant as noted above.  Boyer Decl. ¶¶ 6–7, 16–18.

On December 1, 2023, U.S. Bank sent Touchstone a letter entitled "Notice of Events of Default; Reservation of Rights," providing Touchstone with formal notice of the Equipment Loan payment default and other events of default, including the cross-default under the Revolving Loan resulting from the payment default on the Equipment Loan.  Boyer Decl. ¶ 7.

The parties thereafter attempted to negotiate an extension of the Forbearance Agreement, without success.  On March 4, 2024, U.S. Bank notified Touchstone in writing that it was accelerating and invoking the default rate of interest, effective March 5, 2024, on the Equipment Loan.  Boyer Decl. ¶ 8.  On September 13, 2024, U.S. Bank notified Touchstone in writing that it was accelerating and invoking the default rate of interest, effective September 16, 2024, on the Revolving Loan.    Boyer Decl. ¶ 9 & Ex. 6.

**E.    The Assemi Entities' Financial Distress and Insolvency**

As evidenced by the facts set forth above and described in  more detail in the Declaration of U.S. Bank's financial advisor Evan Blum, Touchstone is in extreme financial distress.  It is in default of approximately $72 million in bank loan principal, is running out of inventory, has no financing to buy new inventory, and owes over $112 million to its main grower/supplier, Maricopa, for nuts supplied last year.  To make matters worse, Maricopa is itself in severe financial distress.  Maricopa does not have a crop loan for the 2024 crop year, its existing payables are already stretched to the breaking point, it has nearly run out of money to farm, and it is delivering its 2024 pistachio crop to other processors.  Blum Decl. ¶¶ 5–11, 19–20.  As Mr. Blum concludes:  "The upshot of all of this is that Touchstone has no realistic prospect of obtaining pistachios from Maricopa this year.  It has no realistic source of funding to buy replacement inventory from other growers, or to process any such inventory.  It is, for all practical purposes, out of business,  and it either needs to be sold as soon as possible to someone with the

resources to enable it to operate, or its assets need to be otherwise liquidated for the benefit of its creditors." *Id.* ¶ 12.

Touchstone is grossly insolvent on a balance sheet basis. Blum Decl. ¶¶ 5–11, 22–23 There are other internal problems at Touchstone. It has recently lost key employees, including its Chief Operations Officer, Executive Director of Finance, and Chief Financial Officer, along with the Chief Operating Officer of Maricopa (who was also heavily involved in Touchstone's management). Meanwhile, Farid Assemi—the eldest of the three Assemi brothers, who was the dealmaker and primary decision-maker for the farming business and Touchstone—has stepped down from his role and has been absent from U.S. Bank's meetings and discussions with Touchstone's management and advisors. Blum Decl. ¶ 26.

Project X has been an ongoing disaster for Touchstone. As explained above, Touchstone proceeded with its Project X plan notwithstanding warnings from U.S. Bank that proceeding without consent would be a default, and that U.S. Bank would not consent without further information. The construction took longer and cost more than anticipated. The closing deadline was extended several times, ultimately to November 30, 2023. Touchstone was counting on a loan from Prudential to enable it to close its purchase of Project X, complete the construction, and repay the Equipment Loan. Based on that anticipated refinancing, U.S. Bank agreed in the Forbearance Agreement to a November 30, 2023 due date for the Equipment Loan. When the Prudential loan fell through, Touchstone could not pay the Equipment Loan or close its purchase of Project X and ultimately lost its interest in the partially-completed plant and all the money it had invested. Boyer Decl. ¶ 16-18.

The Assemis have already begun liquidating Touchstone, but without much success. They hired an investment banker, who conducted an extensive sale process that failed to produce a single offer they would accept. Boyer Decl. ¶ 19.

Since Touchstone's ability to borrow on the Revolving Loan was suspended in late 2023, it has been paying for operations using (a) U.S. Bank's cash collateral and (b) cash infusions from its owners. This has been possible only because U.S. Bank permitted it. U.S. Bank's patience is at an end. As described in Karen Boyer's Declaration, if a receiver is not appointed, U.S. Bank

11

will "turn off the spigot" of cash collateral by sending notices to Touchstone's customers requiring them to make all future payments to the bank.  Boyer Decl. ¶¶ 27-28.  When customers receive such notices, they either pay the lender or they do not pay anyone, because they know if they pay their vendor, they remain liable to the lender for the amount of the invoice.  *Ibid.*; Blum Decl. ¶ 13.  Absent the use of cash collections, ***Touchstone will be unable to remain in business***. *Id.* at. ¶¶ 22–25.

On September 13, 2024, Plaintiff notified Touchstone in writing that it was accelerating the Revolving Loan and invoking the default rate of interest on the Revolving Loan, effective September 16, 2024, as a consequence of the failure to pay the Equipment Loan at maturity and other Events of Default under the Loan Documents.  Boyer Decl. ¶ 9.  The balances on the Loans are reflected accurately in Plaintiffs' Complaint.  Boyer Decl. ¶ 10.

## III.   ARGUMENT

### A.   U.S. Bank Is Entitled to the Appointment of a Receiver.

Federal courts may appoint a receiver under their inherent equitable powers, which appointment shall not be disturbed absent an abuse of discretion.  *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 843–44 (9th Cir. 2009).  Courts consider several factors in their analysis, including: (1) whether the moving party has a valid claim and is likely to succeed in the action; (2) whether the property interest at issue "is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (3) the possibility of irreparable injury to the moving party's interest in property; (4) whether the defendant is of doubtful financial standing; and (5) whether a receiver is necessary to protect the property or property interest of Plaintiff and other parties.  *Id.* at 844; *see also N.Y. Life Ins. Co. v. Watt West Inv. Corp.*, 755 F. Supp. 287, 292 (E.D. Cal. 1991) (same).[2]  The chief factors are the adequacy of the security serving as collateral and financial state of the defendant.  *N.Y. Life*, 755 F. Supp. at 292.

---

[2] The factors considered in California state courts are closely analogous.  Under California state law, Code of Civil Procedure Section 564 principally governs, and at least three provisions of Section 564 would be applicable to this Motion:

In an action … on the application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds of the property or fund, is probable, and where it is shown that

California law provides where, as here, there is an agreement between a creditor and a debtor providing that the creditor "shall be entitled to the appointment of a receiver" in the event of the debtor's default, "such a recital [] has some evidentiary weight" and "presents a prima facie, but rebuttable, evidentiary showing of the [creditor's] entitlement to the appointment of a receiver." *Barclays Bank of Cal. v. Superior Ct.*, 69 Cal. App. 3d 593, 602 (1977). Federal courts have thus upheld the validity of receiverships based on an express agreement between creditor and debtor. *See Okura & Co. (Am.), Inc. v. Careau Grp.*, 783 F.Supp. 482, 499 (C.D. Cal. 1991) ("the appointment of receiver, as provided for in the Deed of Trust and Security Agreement, for the defendants' property is necessary to protect the plaintiff's interest").

> **1.     The Parties' Written Agreements Establish U.S. Bank's Prima Facie Entitlement to a Receiver.**

Touchstone expressly agreed in writing—on no fewer than three occasions—that U.S. Bank is entitled to the appointment of a receiver in the present circumstances:

***First***, as noted above, in the Credit Agreement, Touchstone agreed that U.S. Bank "shall have the absolute right, during the existence of an Event of Default, to seek and obtain the appointment of a receiver to take possession of and operate and/or dispose of the business and assets of" Touchstone. Boyer Decl., Ex. 1 § 12.4. Touchstone gave its unequivocal "consent[]" to the appointment, and "waive[d]" both objections to both the appointment of a receiver and the "right to have a bond or other security posted by" U.S. Bank. *Id.* Touchstone is undisputedly in default under the Credit Agreement, for having failed to pay the Equipment Loan at maturity, having failed to pay the Revolving Loan after it was accelerated, and breaching an extensive list of non-monetary requirements, as it admitted in the Forbearance Agreement and as outlined in Plaintiff's reservation of rights letters attached as exhibits to the Boyer Declaration. U.S. Bank is thus entitled to a receiver under the Credit Agreement.

---

the property or fund is in danger of being lost, removed, or materially injured. Cal. Code Civ. Proc. § 564(b)(1).
…
Where a corporation is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights. *Id.* § 564(b)(6).
…
In all other cases where necessary to preserve the property or rights of any party. *Id.* § 564(b)(9).

*EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER,
TRO, AND OSC RE: PRELIMINARY INJUNCTION
Case No. 1:24-cv-01105 SKO

***Second***, in the Security Agreement, Touchstone agreed that it "expressly consents upon the occurrence of an Event of Default to the appointment of [] a receiver."  Boyer Decl., Ex. 3 § 9. The Security Agreement provides that an "Event of Default" under the Credit Agreement constitutes an "Event of Default" under the Security Agreement.  *Id.* § 8.

***Third***, in the Deed of Trust securing the loans, Touchstone "irrevocably consent[ed] to … appointment" of a receiver "[u]pon the occurrence of any Event of Default."  Boyer Decl., Ex. 4 § 7.2(c).  As with the Security Agreement, an "Event of Default" under the Credit Agreement constitutes an "Event of Default" under the Deed of Trust.  *Id.* § 7.1.

Touchstone's repeated, express agreements to the appointment of a receiver constitute "a prima facie … evidentiary showing of [U.S. Bank's] entitlement to the appointment of a receiver."  *Barclays Bank*, 69 Cal. App. 3d at 602.  For the reasons explained below, Touchstone cannot meet its burden to rebut U.S. Bank's prima facie case, as U.S. Bank's entitlement to a receivership is clear.

## 2.   U.S. Bank Will Prevail on the Merits.

A receiver is proper here, as U.S. Bank is overwhelmingly likely to succeed on the merits of its claims for breach of the underlying lending agreements.  *See N.Y. Life*, 755 F. Supp. at 292 ("[I]n appointing receivers federal courts consider … plaintiff's probable success in the action"). U.S. Bank's evidence establishes a plain breach of the underlying Credit Agreement and Forbearance Agreement by Defendants, including the Touchstone's express admissions to multiple Events of Default in the Forbearance Agreement.  The Blum and Boyer Declarations comprehensively address Touchstone's several breaches of the lending agreements and further failure to timely pay Plaintiff in response to the September 13, 2024 notice that it was accelerating the Revolving Loan and invoking the default rate of interest on that Loan.  U.S. Bank's evidence will remain uncontroverted—its claims are valid, and it will prevail on the merits.

## 3.   U.S. Bank Is Entitled to a Receiver to Protect Its Property Interests and Collateral From Irreparable Harm.

A court is "well within its discretion" to appoint a receiver where property constituting collateral is "in danger of substantial waste and risk of loss" or "may become insufficient to

*EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER,
TRO, AND OSC RE: PRELIMINARY INJUNCTION
Case No. 1:24-cv-01105 SKO

discharge the debt which it secures." *Canada Life Assur. Co.*, 563 F.3d at 845. As detailed in the following paragraphs, U.S. Bank's Collateral is in danger. If Touchstone is not sold soon, it will be forced to close its doors, eliminating any going concern value it may have, to the material detriment of U.S. Bank.

Touchstone has been in substantial default since early 2023. It is now September 2024, and the principal balance due under the Loans is now $71,750,000. As a business, Touchstone lost $56 million in calendar year 2023. Despite months of de-facto forbearance, an agreed forbearance term-sheet, a formal Forbearance Agreement and U.S. Bank's numerous good-faith attempts to negotiate an extension of the Forbearance Agreement, Touchstone defaulted on ***that*** agreement as well. Touchstone's final "hail mary"—a proposed refinancing—has fallen short. Touchstone also now owes the higher default rate on both Loans due to its defaults. Touchstone has no realistic prospect of obtaining pistachios from Maricopa or any other grower and no money to pay for such nuts if it could obtain them. All of this is exacerbated by the loss of several key Touchstone officers and Farid Assemi's withdrawal from managing the business.

Touchstone is now simply selling-off Plaintiff's inventory and spending the proceeds, with no prospect of ever being able to repay Plaintiff's Loans. A receivership is immediately necessary to prevent Defendants from further eroding Plaintiff's Collateral and undermining prospects for repayment.

### 4. Touchstone's Insolvency Requires the Court Appoint a Receiver.

A "foremost factor" in whether a receiver should be appointed is the defendant's doubtful financial standing and imminent insolvency. *Canada Life Assur. Co.*, 563 F.3d at 844–45; *N.Y. Life*, 755 F. Supp. at 292 ("Most important among the factors are the adequacy of the security and the financial position of the mortgagor"). Touchstone is grossly insolvent. The market has spoken. Touchstone engaged in an extensive investment banker-led effort to sell its assets that failed to generate any offer or combination of offers that came close to allowing it to pay all its debts. It has no financing and no way to pay the $112 million it owes Maricopa and approximately $72 million in principal it owes U.S. Bank, absent immediate steps to liquidate the Property and the Collateral by a disinterested receiver.

Defendants have mismanaged Touchstone, and its business is collapsing in real time. Its lead decisionmaker is no longer active in the business, and key managers are fleeing the company. Behind Plaintiff's back, in violation of the loan agreements and despite Plaintiff's explicit warning not to do so, the Assemi Brothers gambled Touchstone's, Maricopa's, and their creditors' futures on Project X—and lost. U.S. Bank gave Touchstone almost a year to find a business solution via a refinance, sale of assets, or otherwise, but Touchstone has failed. Touchstone owes approximately $185 million to its secured creditors (Plaintiff and the growers), has no equity in its assets, and no way to purchase new inventory. Its historical nut supplier, Maricopa, is itself in severe financial distress, and is delivering its 2024 harvest to other processors.

The Court should appoint a receiver to manage, operate and wind-down the Touchstone business while facilitating the orderly sale of assets. This is the only realistic way to preserve the Collateral securing U.S. Bank's eight-figure Loans and leave any hope for payment of at least some of the money Touchstone owes to Maricopa for last year's crop.

**B.      U.S. Bank Nominates Stapleton Group, Inc. as a General Receiver.**

U.S. Bank hereby nominates the firm of Stapleton Group, Inc. ("Stapleton"), acting by and through its principal David P. Stapleton, as receiver for the Receivership Property. Stapleton has substantial experience acting as a receiver and is qualified to serve as receiver in this case. Stapleton's qualifications are set forth in the Stapleton declaration, which establishes his extensive experience as a receiver for agricultural businesses.

Stapleton is a proper and competent receiver here. Stapleton is neither a party nor an attorney for a party to this action; has no interest in the action; and is not related to any judge of this Court. *Cf.* Cal. Code Civ. Proc. § 566(a). It will accordingly act as an agent of the Court and not of any party, carrying out its receivership duties neutrally and "for the benefit of all who may have an interest in the receivership property," and it will hold "assets for the court," not for any party. *Cf.* Cal. R. Ct. 3.1179(a). Stapleton will provide, as necessary, an inventory, monthly reports, and a final report. *See* L.R. 232(e)(1)–(2); *cf.* Cal. R. Ct. 3.1181, 3.1182, 3.1184.

///

///

**C.      U.S. Bank Is Entitled to Injunctive Relief.**

In determining whether to grant a temporary restraining order or preliminary injunction, courts in this Circuit consider four factors:  (1) whether the applicant is likely to succeed on the merits of their claim; (2) whether the applicant is likely to suffer irreparable harm absent the preliminary injunction; (3) whether the equities weigh in favor of the proposed injunction; and (4) whether the preliminary injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc*. (2008) 555 U.S. 7, 20.  The evidence laid out above establishes each factor weighs in favor of U.S. Bank and the Court's issuance of immediate injunctive relief.

First, U.S. Bank's evidence establishes a plain breach of the underlying Credit Agreement and Forbearance Agreement by Defendants—default and breach are undeniable.  Second, the collapse of Touchstone's business and its lack of adequate assets poses an immediate risk that the inventory and accounts receivable will be dissipated by the time U.S. Bank prevails on its claims. Defendants have illustrated their willingness to shed Touchstone's assets—U.S. Bank's Collateral—as a stop-gap measure, and are likely to further reduce the value of Plaintiff's Collateral unless restrained by this Court.  Finally, the balance of equities favors Plaintiff. Defendants have mismanaged Touchstone at every turn.  For all intents and purposes, the Touchstone business is dead as an operating entity; the only thing that can happen now is continued dissipation of U.S. Bank's Collateral while this litigation proceeds.  Touchstone's collapse is a direct result of Touchstone's own mismanagement.  There is no inequity in restraining Defendants from further eroding what remains of  U.S. Bank's Collateral.

**D.      Bond Issues**

Security is required for appointment of an *ex parte* receiver and issuance of a temporary restraining order.  Fed. R. Civ. P. 65(c).

**1.      The Court Should Order a Nominal Undertaking.**

In light of Touchstone's insolvency, U.S. Bank proposes a nominal undertaking to redress Defendants from any damage that may result from the Court's appointment of a temporary receiver and issuance of a TRO.  Touchstone's remaining assets are U.S. Bank's Collateral.  Any damage those assets may suffer as a result of the Court's appointment of a temporary receiver and

issuance of a TRO would not harm Defendants, but U.S. Bank.  A nominal undertaking is therefore appropriate.

**2.      Receiver's Bond.**

Under L.R. 232(i), the receiver must maintain an undertaking.  Pursuant to L.R. 151(h), U.S. Bank, upon issuance of the Court's order appointing the receiver, proposes it post a cash deposit and submit a proposed written instrument, "executed and acknowledged by the party, setting forth the conditions on which the deposit is made, and the fact that the Clerk may collect or sell the obligations and apply … the cash deposited[] in the case of default."  L.R. 151(h).

## IV.     CONCLUSION

For the reasons set forth above, U.S. Bank requests entry of:

(1)      An order appointing a temporary receiver, and instructing the receiver to take possession and control of the Receivership Property; to conserve, maintain, and manage the Receivership Property; to pay debt service due to U.S. Bank as the receiver has funds available therefor; to sell the Receivership Property to an appropriate bidder and to pay the net proceeds to creditors in accordance with their interests in the Forbearance Agreement; and to perform all other acts consistent with the terms of the proposed order submitted herewith.

(2)      For a temporary restraining order restraining and enjoining Touchstone and its agents, partners, property managers, employees, assignees, successors, representatives, and all persons acting under and/or in concert with it from committing or permitting waste of the Receivership Property, including any misuse of cash from the operations of Touchstone that are part of the Receivership Property; from removing, transferring, encumbering, or otherwise disposing of the Receivership Property; and from interfering with the receiver in the discharge of the temporary receiver's duties. For an order directing Defendants and anyone in possession of the Receivership Property to deliver possession of same to the receiver.

(3)      For an order calendaring a hearing on the continuation of the receivership and order to show cause as to why a preliminary injunction should not issue.  *See* L.R. 232(c); L.R. 231.

1     (4)    For an order appointing a receiver at the hearing on the continuation of the

2 receivership.

3     (5)    For a preliminary injunction, restraining and enjoining Touchstone and its agents,

4 partners, property managers, employees, assignees, successors, representatives, and all persons

5 acting under and/or in concert with it from committing or permitting waste of the Receivership

6 Property, including any misuse of cash from the operations of Touchstone that are part of the

7 Receivership Property; from removing, transferring, encumbering, or otherwise disposing of the

8 Receivership Property; and from interfering with the receiver in the discharge of the receiver's

9 duties.

10     (6)    For such other and further relief as the Court deems just and equitable.

11

12 DATED: September 20, 2024        Respectfully submitted,

13         DAVIS WRIGHT TREMAINE LLP
        MARY H. HAAS

14         JOSEPH VANLEUVEN
        JOHN D. FREED

15         MATTHEW E. LADEW

16         By:  */s/ John . Freed*

17           John D. Freed

18         Attorneys for Plaintiff
        U.S. BANK, NATIONAL ASSOCIATION

19

20

21

22

23

24

25

26

27

28

*EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER,
TRO, AND OSC RE: PRELIMINARY INJUNCTION
Case No. 1:24-cv-01105 SKO