MARY H. HAAS (State Bar No. 149770)
maryhaas@dwt.com
JOHN D. FREED (State Bar No. 261518)
jakefreed@dwt.com
MATTHEW E. LADEW (State Bar No. 318215)
mattladew@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Fax: (213) 633-6899

JOSEPH VANLEUVEN (*admitted pro hac vice*)
joevanleuven@dwt.com
DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
Telephone: (503) 778-5325
Fax: (503) 701-0023

Attorneys for Plaintiff
U.S. BANK NATIONAL ASSOCIATION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

U.S. BANK NATIONAL ASSOCIATION,

Plaintiff,

vs.

TOUCHSTONE PISTACHIO COMPANY, LLC; FARSHID ASSEMI; FARID ASSEMI; DARIUS ASSEMI; NEEMA ASSEMI; MELISSA LAYNE; SONIA ROSEMARY ASSEMI; MARICOPA ORCHARDS, LLC; C&A FARMS, LLC; ACDF, LLC; CANTUA ORCHARDS, LLC; LINCOLN GRANTOR FARMS, LLC; PANOCHE PISTACHIOS, LLC; ADAMS GRANTOR LAND, LLC; GRANVILLE FARMS, LLC; SAGEBERRY FARMS, LLC; GRADON FARMS, LLC; MANNING AVENUE PISTACHIOS, LLC; ASSEMI AND SONS, INC.; WINSTON FARMS, LLC; FFGT FARMS, LLC; FAVIER RANCH, LLC; GRANTLAND FARMS, LLC; WHITESBRIDGE FARMS, LLC; ACAP FARMS, LLC; BEAR FLAG FARMS, LLC; COPPER AVNEUE INVESETMENTS, LLC; WILLOW AVENUE INVESTMENTS, LLC; ASHLAN & HAYES INVESTMENTS, LLC; ASSEMI BROTHERS, LLC,

Defendants.

Case No. 1:24-cv-01105 JLT-SKO

**DECLARATION OF KAREN BOYER IN SUPPORT OF U.S. BANK NATIONAL ASSOCIATION'S *EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER, TEMPORARY RESTRAINING ORDER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Action Filed : September 18, 2024

# DECLARATION OF KAREN BOYER

I, Karen Boyer, under penalty of perjury, make the following declaration in support of Plaintiff U.S. Bank, National Association's ("**Plaintiff**" or "**U.S. Bank**")[1] motion for an order for appointment of a receiver in this case:

1. I am a Senior Vice President in Plaintiff's Special Assets Group. As such I am responsible for the collection of the Loans (defined below) at issue in this case, and I am familiar with the Loan files and history. I have engaged in extensive workout negotiations with Defendant Touchstone Pistachio Company, LLC ("**Touchstone**"), and I have first-hand knowledge of the matters covered in this declaration. The following facts are of my own personal knowledge, and if called upon to testify, I would competently testify to the facts set forth herein.

## I. THE LOANS.

2. Touchstone owns and operates a pistachio processing plant located at 19570 Ave. 88, Terra Bella, California ("**Terra Bella Plant**"). Touchstone claims it has no employees. Instead, it "leases" its employees from a sister company, Assemi Group Inc. The workforce consists of approximately 160 full-time employees and approximately 100 contract laborers. Touchstone is owned and managed by three brothers (Farid, Farshid and Darius Assemi—the "**Assemi Brothers**"), through their family trusts. They, their trusts, and other entities they own (collectively, the "**Guarantors**"), guaranteed the Loans at issue.

3. Touchstone obtained funding for its operations under a secured credit agreement with a group of five lenders (the "**Lenders**") dated as of March 20, 2020, which has been amended periodically, including most recently by that certain Amendment No. 6 to Credit Agreement dated as of October 6, 2022 (as so amended and supplemented, the "**Credit Agreement**"), and by that certain Forbearance, Waiver and Amendment Agreement made as of November 17, 2023 (the "**Forbearance Agreement**"). A true and correct copy of the Credit Agreement, as amended, including only Annex A is attached as Exhibit 1. A true and

[1] By a bank merger in 2022, U.S. Bank succeeded to the interest of MUFG Union Bank, National Association under the Credit Agreement and other loan documents described below. In referring to "Plaintiff" in this declaration, I mean either U.S. Bank or MUFG Union Bank, as the context requires.

correct copy of the Forbearance Agreement is attached as Exhibit 2 to this Declaration. Plaintiff is both a Lender and the administrative and collateral agent for the other Lenders under the Credit Agreement, with the express authority to file this case to enforce all remedies under the Credit Agreement and other loan documents.

4. There are two loan facilities under the Credit Agreement: a term loan (the "**Equipment Loan**") and a line of credit (the "**ABL**," and together with the Equipment Loan, the "**Loans**"). The balances due on the Loans are set forth accurately in Plaintiff's Complaint.

5. As security for the Loans, Touchstone executed a Security Agreement dated as of March 20, 2020 (the "**Security Agreement**"), granting to Plaintiff, as collateral agent for the Lenders, a security interest in the assets described therein (the "**Collateral**"), including of all of Touchstone's inventory, equipment, accounts, general intangibles and other personal assets, and proceeds thereof. A true and correct copy of the Security Agreement is attached as Exhibit 3 hereto. Plaintiff perfected its security interests by filing UCC-1 financing statements with the California Secretary of State. In addition, the Loans are currently secured by a deed of trust in favor of Plaintiff, covering the Terra Bella Plant (the "**Trust Deed**"). A true and correct copy of the Trust Deed is attached as Exhibit 4 hereto.

6. The Loans went into default in the spring of 2023. Plaintiff allowed Touchstone to continue operations, but reserved all default rights and remedies. After extensive negotiations, Touchstone, Plaintiff, the Lenders, and the Guarantors entered into the Forbearance Agreement to address the then-existing defaults. The Forbearance Agreement gave Touchstone until November 30, 2023 to repay the Equipment Loan via an anticipated refinance with another lender, which I will refer to as "Prudential." *See* Ex. 2. Unfortunately, the refinancing failed, and Touchstone failed to pay the Equipment Loan on the November 30 due date (or thereafter).

7. On December 1, 2023, Plaintiff sent Touchstone a letter entitled "Notice of Events of Default; Reservation of Rights," a true copy of which is attached as Exhibit 5 hereto, providing Touchstone with formal notice of the Equipment Loan payment default and other outstanding events of default, and reserving all rights and remedies.

8. The parties attempted to negotiate an extension of the Forbearance Agreement,

without success. The Forbearance Agreement was never extended.

9. Plaintiff ultimately notified Touchstone in writing that it was invoking the default rate of interest on the matured Equipment Loan, effective March 5, 2024, as a consequence of the failure to pay that loan at maturity. On September 13, 2024, Plaintiff notified Touchstone in writing that it was accelerating the ABL and invoking the default rate of interest on the ABL, effective on September 16, as a consequence of the cross- default resulting from the failure to pay the Equipment Loan at maturity and other Events of Default under the Loan Documents. A true copy of that notice is attached as <u>Exhibit 6</u> hereto.

10. Touchstone has made some payments on the Loans, but U.S. Bank accepted all payments under a strict reservation of its default rights and remedies. The balances due on the Loans are set forth accurately in Plaintiff's Complaint.

11. Under the Credit Agreement, including but not limited to Sections 12.4 and 13.1(a), Plaintiff, as Administrative and Collateral Agent, has standing and authority to pursue the subject litigation and seek appointment of a receiver on behalf of the Lenders, and Touchstone has <u>consented</u> to the appointment of a receiver. Section 12.4 of the Credit Agreement provides: "*In addition to any other remedy available to it, Administrative Agent… shall have the absolute right, during the existence of an Event of Default, to seek and obtain the appointment of a receiver to take possession of and operate and/or dispose of the business and assets of the Borrower and any Subsidiaries, and the Borrower hereby consents (for themselves and on behalf of the Subsidiaries) to such rights and such appointment and hereby waive any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent or any Lender in connection therewith.*" Ex. 1 § 12.4.

**II. <u>THE BUSINESS</u>.**

12. The Assemis, through companies they own, have substantial farm holdings, including tens of thousands of acres of pistachio and almond orchards, which they have been farming for decades. Independent of the Loans here at issue, U.S. Bank made annual crop loans to many of these farming entities (collectively, "**Maricopa**") for a number of years. The 2023 crop loan is also in default and has been accelerated. The Maricopa entities guaranteed the Loans

to Touchstone and are named as Defendant Guarantors in this action. Until this year, Maricopa sold all of its pistachios to Touchstone and was by far Touchstone's largest supplier.

13. Another Assemi company called Assemi Group, Inc. ("**AGI**") provides what the Assemis refer to as "cash management" for their businesses, serving as a conduit and clearing house for numerous transfers of funds among their companies, including Touchstone. As one example, as noted above, Touchstone claims to have no employees. The people who operate the plant are employees of AGI, which pays their wages and is reimbursed by Touchstone. Separate from the Loans here at issue, U.S. Bank made loans to AGI.

14. For years, Maricopa sold its nuts to the Wonderful Growers Cooperative and the Wonderful Almond Cooperative (together, "**Wonderful**"). Maricopa and the Wonderful co-ops had a falling-out in 2018, and the Assemis decided to start their own processing and sales operations. They notified Wonderful that they intended to build a processing plant to handle the Maricopa nut crop for the 2020 crop year and thereafter, and they formed Touchstone to build the new plant.

15. Touchstone first attempted to build a large pistachio processing plant in western Fresno County (the "**Kamm**" plant). It used funds from the Loans to purchase equipment for that plant (the "**Kamm Equipment**"). Those plans were thwarted in litigation filed by Wonderful. Touchstone then acquired the Terra Bella Plant. The Terra Bella Plant primarily processes nuts supplied by Maricopa. (The Kamm Equipment largely remained in storage and was not installed at Terra Bella.)

16. After purchasing the Terra Bella Plant, the Assemis continued their efforts to find a way to build a new, larger plant. They have told me that a key consideration was that transaction be structured so it wouldn't be obvious who the expanded plant was for. In the spring of 2022, Touchstone reached agreement with a third-party ( "**Dry Ranch**"), under which Dry Ranch would expand its plant to Touchstone's specifications, and sell it to Touchstone when it was completed. The deal included a construction loan from Touchstone to Dry Ranch. Touchstone spent tens of millions of dollars funding the construction of this new plant expansion, which the Assemis referred to as "**Project X**."

17. In particular, Touchstone borrowed $50 million from Maricopa, (which had borrowed that money from its own lender, Prudential), and used that and other money to make the construction loan to Dry Ranch and buy equipment for the new plant. Touchstone also delivered the Kamm Equipment to Dry Ranch, which installed it in the new plant. This was all done without Plaintiff's knowledge or consent, and left Touchstone in an exposed position, dependent on the hoped-for Prudential financing, which ultimately failed. U.S. Bank did not find out what had happened until a year later, after the Touchstone Loans had gone into default.

18. Because the Prudential financing fell through, Touchstone could not pay the Equipment Loan on the maturity date, which had been extended until November 30, 2023 under the Forbearance Agreement. Further, it could not close its purchase of Project X and ultimately lost its interest in the partially-completed plant and all the money it had invested. U.S. Bank was ultimately forced to negotiate a deal with Dry Ranch to pay for the Kamm Equipment.

## III. FAILED SALE EFFORTS AND FAILED CONTERRA REFINANCE

19. In December of 2023, in the face of mounting financial difficulties, the Assemi Brothers engaged an investment banker to sell Touchstone's assets and a number of the Maricopa farm properties, ideally as a vertically-integrated package. The investment banker ran an extensive sales process. There were several letters of intent from potential buyers, but the Assemis did not seriously pursue any of them. Instead, they focused on obtaining a global refinancing from one of Maricopa's existing real estate lenders, Conterra Agricultural Capital, LLC ("Conterra").

20. Negotiations with Conterra went on throughout the spring and summer of 2024. U.S. Bank ultimately reached agreement with the Assemis and Conterra to sell its Touchstone ABL and its Maricopa crop loan to Conterra as part of a global financing transaction between Touchstone, Maricopa, Conterra, and multiple other Maricopa lenders. As part of the deal, U.S. Bank agreed (effective only upon closing) to extend its Touchstone Equipment Loan for a year. Multiple documents were negotiated and drafted to document these agreements.

21. The Conterra refinance would have provided a new operating loan for Touchstone and new crop financing for Maricopa. It was originally set to close in mid-July, 2024, a target

that was extended multiple times. Had it closed, Maricopa would have had funding for its farming operations and the 2024 harvest. Maricopa would have sold its 2024 pistachio crop to Touchstone. Touchstone would have had the means to continue operating and process that crop.

22. Conterra's negotiations for accommodations from Maricopa's other major secured lenders, including Prudential (which were a condition to its refinancing), continued to drag on through the summer and into September of 2024. U.S. Bank continued to support the Conterra transaction, instead of pursuing its remedies on its defaulted loans to Touchstone and Maricopa. As late as September 11, 2024, we were assured that the Conterra transaction would close the next day. Thus, it came as a shock when we were told by both Conterra and Prudential on September 12 that the Conterra refinancing was not going to go forward.

23. Both Maricopa and Touchstone have been in financial distress for months. The Assemis were counting on the Conterra refinancing to save the businesses. Failure of that refinancing has put Touchstone into financial crisis:

a. First, as noted, Maricopa has been Touchstone's primary nut supplier. Maricopa was counting on the new loan from Conterra to pay for its 2024 pistachio harvest. Maricopa delayed the start of its main harvest as long as possible, but the harvest started in earnest on Monday, September 8, 2024. Maricopa's counsel advised us on September 12 that Maricopa did not have money to continue operations beyond September 20. In any event, because Touchstone has no funding to pay for the new crop, Maricopa has advised the bank it is delivering the crop to third-party processors.

b. Moreover, Prudential has filed suit against Maricopa, seeking the appointment of a receiver for the orchards that secure Prudential's loans. There is almost no chance Maricopa (or anyone else) will deliver any nuts to Touchstone this year.

c. Meanwhile, Touchstone's processing operations have been dwindling as its existing raw nut inventory has been depleted down to the lower-grade remains of prior-years' crops, which would normally be blended with nuts

from the new crop for resale in order to meet the grade standards for Touchstone's regular customers. On September 18, 2024, Eric Pollard, Touchstone's new CFO, advised me "the operation is basically at a standstill…"

24. In sum, Touchstone is effectively out of business. Its remaining plant, equipment and other assets should be liquidated in order to repay its loans.

## IV. **ADDITIONAL FACTS SUPPORTING APPOINTMENT OF A RECEIVER**.

25. Throughout 2024, U.S. Bank has allowed Touchstone to operate using the proceeds from the sale of its inventory, which are part of Plaintiff's Collateral (so-called "Cash Collateral"). I have discovered that without Plaintiff's prior knowledge or consent, Touchstone has used Cash Collateral to pay some $3.1 million in interest on its loan from Maricopa so far this year, in direct violation of a subordination agreement with Plaintiff prohibiting such payment.

26. Touchstone has insufficient remaining inventory to continue operating even if Plaintiff would allow it to continue using cash collateral. In essence, the Assemis "put all their eggs in one basket" with Conterra, continuing to operate both Touchstone and Maricopa until they virtually ran out of money, without any "plan B." The failure of the Conterra refinancing has left both Touchstone and Maricopa in severe financial crisis. As of the morning of September 20, 2024, Touchstone had only about $21,300 in its bank account.

27. I have learned that Touchstone delivered some of its raw nut inventory to a processor called Meridian for custom processing. In late August, Meridian's lawyer advised us that "*they* [Touchstone] *are very delinquent in paying for the packing and shipping charges on their remaining inventory. Until they get current, no further shipments and no further services will be provided… the delinquent packing and shipping charges already exceed $500,000.*" On September 18, I learned from Touchstone that Meridian was indeed delaying shipments of the Touchstone nuts back to Touchstone until it is paid. These nuts are U.S. Bank's collateral and have been put at risk.

28. Touchstone does have some outstanding accounts receivable to collect, but in the current circumstances, with the failure of the Conterra transaction and no prospects for the future,

Plaintiff is no longer willing to allow Touchstone to continue spending such collections (which constitute cash collateral) operating its business to no real purpose. Any money that can be collected should be used to pay for an orderly liquidation by a receiver, with the balance applied to Plaintiff's loans.

29. If a receiver is not appointed (or a restraining order issued preventing Touchstone from spending Plaintiff's cash collateral), Plaintiff intends to send notices (the "**Direction Letters**") to Touchstone's customers directing them to pay all invoices directly to Plaintiff, as allowed by the Credit Agreement and Section 9-607(a) of the UCC, as codified at California Commercial Code § 9607(a). That statute provides that if customer receiving a Direction Letter pays Touchstone, it will remain liable to Plaintiff for the amount at issue. In the course of my career, I have learned that customers who receive such letters either suspend payment while they evaluate what to do, or pay the secured lender.

30. On the other hand, if a receiver is appointed, Plaintiff is prepared to negotiate terms for the receiver to use Plaintiff's Cash Collateral (pursuant to an acceptable budget) to fund the cost of the receivership.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on this 20th day of September, 2024 at Greenwich, CT 06830.

Karen Boyer

Karen Boyer

# EXHIBIT 1

  

---

**AMENDMENT NO. 6 TO CREDIT AGREEMENT**

dated as of October 6, 2022,

among

**TOUCHSTONE PISTACHIO COMPANY, LLC,**
as the Borrower,

**MUFG UNION BANK, N.A.,**
as Administrative Agent and Collateral Agent,

and

THE LENDERS FROM TIME TO TIME PARTIES THERETO

**MUFG UNION BANK, N.A.**
and
**RABO AGRIFINANCE LLC,**
as Joint Lead Arrangers

**MUFG UNION BANK, N.A.,**
as Sole Book Manager

---

McGuireWoods

**AMENDMENT NO. 6 TO CREDIT AGREEMENT**
among
**TOUCHSTONE PISTACHIO COMPANY, LLC,** as Borrower,
and
**MUFG UNION BANK, N.A.,** as Administrative Agent

**Closing Date: October 6, 2022**

MW CM#: 2066057-0033

**DOCUMENTS:** **TAB NOS:**

***I. Loan Documents***

1.1 Amendment No. 6 to Credit Agreement ........................................ 1

Annex A – Amended Credit Agreement

Annex B – Amended Schedules to Credit Agreement
1.1(a) Commitments

Annex C – Amended and Restated Exhibits to Credit Agreement
*Form of:*
A Revolving Note
B-1 Equipment Term Note
B-2 Real Estate Term Note
C Assignment and Assumption
D-1 Notice of Revolving Borrowing
D-2 Notice of Term Borrowing
E Notice of Conversion/Continuation
F Borrowing Base Certificate
G Compliance Certificate
H Collateral Disclosure Certificate
I-1 U.S. Tax Compliance Certificate (Non-Partnership Foreign Lenders/Participants)
I-2 U.S. Tax Compliance Certificate (Partnership Foreign Lenders/Participants)
J Assignment of Construction Contract
K Assignment of Plans and Specifications

Annex D – Post-Closing Matters

1.2 Revolving Notes *(as requested)* ........................................ 2

1.3 Equipment Term Notes *(as requested)* ........................................ 3

***II. Closing Certificates, Legal Opinions and Other Documents***

2.1 Secretary's Certificate of Touchstone Pistachio Company, LLC, with the following attachments. 4
(a) Resolutions
(b) Certificate of Status

**DOCUMENTS:** **TAB NOS:**

2.2 Secretary's Certificate of ACDF, LLC, with the following attachments ........ 5
(a) Operating Agreement
(b) Resolutions
(c) Certificate of Status

2.3 Secretary's Certificate of Assemi Brothers, LLC, with the following attachments ........ 6
(a) Resolutions
(b) Certificate of Status

2.4 Secretary's Certificate of C & A Farms, LLC, with the following attachments ........ 7
(a) Resolutions
(b) Certificate of Status

2.5 Secretary's Certificate of Cantua Orchards, LLC, with the following attachments ........ 8
(a) Articles of Organization
(b) Operating Agreement
(c) Resolutions
(d) Certificate of Status

2.6 Secretary's Certificate of Lincoln Grantor Farms, LLC, with the following attachments ........ 9
(a) Resolutions
(b) Certificate of Status

2.7 Secretary's Certificate of Maricopa Orchards, LLC, with the following attachments ........ 10
(a) Resolutions
(b) Certificate of Status

2.8 Secretary's Certificate of Panoche Pistachios, LLC, with the following attachments ........ 11
(a) Resolution
(b) Certificate of Status

2.9 Secretary's Certificate of Sageberry Farms, LLC, with the following attachments ........ 12
(a) Operating Agreement
(b) Resolutions
(c) Certificate of Status

2.10 Officer's Certificate ........ 13

2.11 Certification of Trust of the Third Amended and Restated Farid Assemi Revocable Trust ........ 14

2.12 Certification of Trust of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust ........ 15

2.13 Certification of Trust of the Amended and Restated Darius Assemi Revocable Trust ........ 16

2.14 Certification of Trust of The Farshid Assemi 1997 Ranch Trust ........ 17

2.15 Certification of Trust of The Farid Assemi 2010 Grantor Trust ........ 18

2.16 Certification of Trust of The Farshid and Sonia Assemi 2010 Grantor Trust ........ 19

**DOCUMENTS:** **TAB NOS:**

2.17 Certification of Trust of The Farid Assemi 1997 Ranch Trust .................... 20

2.18 Legal Opinion of King & Spalding LLP, as counsel to Credit Parties .................... 21

***III. Collateral Matters***

3.1 Lien Searches (UCC) .................... 22

3.2 Insurance Certificates and Endorsements .................... 23

3.3 Collateral Disclosure Certificate .................... 24

3.4 AGI Subordination Agreement .................... 25

3.5 Amended and Restated Grower Subordination Agreement .................... 26

3.6 Notice of Security Interest in Trademarks .................... 27

***IV. Real Estate Matters***

4.1 Amendments to Deeds of Trust:
(a) Madera County .................... 28A
(b) Tulare County .................... 28B

***V. Miscellaneous & Post-Closing***

5.1 Notice of Borrowing .................... 29

5.2 UCC-3 Termination State (First Western) .................... 30

5.3 Copy of Subordinated Promissory Note dated August 31, 2022 (AGI) .................... 31

**AMENDMENT NO. 6 TO CREDIT AGREEMENT**

This Amendment No. 6 (this "Agreement") to the Credit Agreement (as defined below) is dated as of October 6, 2022, and effective in accordance with Section 3 below, by and among TOUCHSTONE PISTACHIO COMPANY, LLC, a California limited liability company (the "Borrower"), the Lenders party hereto, the Guarantors and MUFG UNION BANK, N.A. ("MUFG Union Bank"), as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

STATEMENT OF PURPOSE:

The Borrower, the Lenders, MUFG Union Bank, as the Collateral Agent, the Swingline Lender, and the Administrative Agent are parties to that certain Credit Agreement dated as of March 20, 2020 (as previously amended by that certain Amendment No. 1 to Credit Agreement dated as of July 10, 2020, that certain Amendment No. 2 to Credit Agreement dated as of October 20, 2020, that certain Amendment No. 3 to Credit Agreement dated as of December 14, 2020, that certain Amendment No. 4 to Credit Agreement dated as of May 31, 2021, supplemented by that certain Limited Waiver and Consent dated as of July 26, 2021, amended by that certain Amendment No. 5 to Credit Agreement dated as of December 29, 2021, supplemented by that certain Second Limited Waiver and Consent dated as of March 15, 2022 and as further amended, supplemented or otherwise modified as of the date hereof, the "Credit Agreement").

Certain Events of Default have occurred and are continuing under Section 12.1(c) of the Credit Agreement due to the Borrower's failure to maintain a Balance Sheet Leverage Ratio less than or equal to that required pursuant to Section 10.14(c) of the Credit Agreement for the fiscal quarters ended December 31, 2021, March 31, 2022 and June 30, 2022 (such Events of Default, the "Specified Defaults").

As a result of the Specified Defaults, the Administrative Agent, the Collateral Agent and the Lenders have the right to exercise all rights and remedies available to them under the Credit Agreement, the other Loan Documents and applicable law.

The Borrower has requested that the Administrative Agent and the Lenders agree to (i) amend the Credit Agreement and (ii) waive the Specified Defaults, each as more specifically set forth herein.

Subject to the terms and conditions set forth herein, the Administrative Agent and each of the Lenders (including, if applicable, each financial institution identified on the signature pages hereto that is becoming a Lender pursuant to this Agreement, each, a "New Lender") party hereto have agreed to grant such requests of the Borrower.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Capitalized Terms. Except as otherwise provided herein, all capitalized undefined terms used in this Agreement (including, without limitation, in the introductory paragraph and the statement of purpose hereto) shall have the meanings assigned thereto in the Credit Agreement.

2. Amendments. Subject to the terms and conditions set forth herein and the effectiveness of this Agreement in accordance with its terms, the parties hereto agree that:

(a) the Credit Agreement is hereby amended to (i) delete the stricken text (indicated textually in the same manner as the following example: ~~red stricken text~~), (ii) add the blue double-underlined text (indicated textually in the same manner as the following example: blue double-underlined text) and (iii) move the green double-underlined text (indicated textually in the same

manner as the following example: green double-underlined text), in each case, as set forth in the redline of the Credit Agreement attached hereto as Annex A (the "Amended Credit Agreement");

(b) Schedule 1.1(a) to the Credit Agreement, solely as it relates to the Revolving Commitments, is hereby amended and restated in its entirety as set forth on Annex B; and

(c) the exhibits to the Credit Agreement are hereby amended and restated in their entireties as set forth on Annex C.

3. Conditions to Effectiveness. Subject to Section 13 below, this Agreement shall be deemed to be effective upon (the date of satisfaction or waiver of the following conditions, the "Effective Date"):

(a) the Administrative Agent's receipt of the following in each case in form and substance reasonably satisfactory to the Administrative Agent:

(i) counterparts of this Agreement executed by the Administrative Agent, each of the Lenders (including each New Lender) and each of the Credit Parties;

(ii) Notes in favor of each Lender requesting the same (including, without limitation, amended and restated Notes replacing the Notes issued to such Lender under the Credit Agreement);

(iii) a duly executed and completed Collateral Disclosure Certificate;

(iv) the AGI Subordination Agreement (as defined in the Amended Credit Agreement) and an amendment and restatement of the Grower Subordination Agreement;

(v) a certificate, in form and substance satisfactory to it, from a Senior Officer of the Borrower certifying that, after giving effect to any Loans to be made on the Effective Date, the waiver contemplated by Section 12 hereof and the transactions hereunder, (A) the Borrower is, and the Borrower and the Subsidiary Guarantors on a consolidated basis are, Solvent; (B) no Default exists; and (C) the representations and warranties set forth in Section 8 of the Amended Credit Agreement and the other Loan Documents are true and correct;

(vi) a certificate of a duly authorized officer of each Credit Party (other than any Credit Party that is a natural person or a trust), certifying (A) that either (1) attached to such certificate are copies of such Credit Party's Organizational Documents that are true and complete, and in full force and effect, without amendment except as shown (which in the case of any articles of incorporation or organization or other equivalent charter documents shall be certified as of recent date by the Secretary of State or other appropriate official of such Credit Party's jurisdiction of organization) or (2) that such Credit Parties Organizational Documents have not been amended, restated, supplemented or otherwise modified in any respect since the Original Closing Date or such later date as the Administrative Agent may approve in its sole discretion; (B) that attached thereto is a copy of resolutions authorizing execution, delivery and performance this Agreement, the Amended Credit Agreement and the other Loan Documents (as amended by this Agreement) and that such copy is true, correct and complete, and that such resolutions are in full force and effect, were duly adopted by the appropriate governing body, have not been amended, modified, or revoked, and constitute all resolutions adopted with respect to the credit facilities contemplated in this Agreement and the other Loan Documents; (C) the

title, name, and signature of each Person authorized to sign the Loan Documents on behalf of such Credit Party; and (D) attached to such certificate are good standing certificates for each such Credit Party (other than any Credit Party that is a natural person or a trust) issued by the Secretary of State or other appropriate official and to the extent available, a certificate indicating payment of all corporate or other franchise taxes by such Credit Party, certified by the appropriate taxing Governmental Authority, in each case in such Credit Party's jurisdiction of organization;

(vii)     trust certifications in form and substance reasonably satisfactory to the Administrative Agent completed and executed by the trustees of each trust that is a Guarantor;

(viii)     a written opinion of King & Spalding LLP, as well as any local counsel to the Borrower, in form and substance satisfactory to the Administrative Agent;

(ix)     a Borrowing Base Certificate (and all supporting reports as the Administrative Agent may require) prepared as of August 31, 2022; and

(x)     certificates of insurance for the insurance policies carried by the Borrower and its Subsidiaries, all of which shall be in compliance with the Loan Documents, together with such lender's loss payable or additional insured endorsements as the Collateral Agent shall require, with respect to the insurance policies carried by the Borrower, showing the Collateral Agent as agent for the Secured Parties, each of which shall be in form and substance satisfactory to the Agents;

(b)     the Administrative Agent shall have (i) completed all legal, tax, accounting, business, financial, environmental and ERISA due diligence concerning each element of the transactions contemplated hereby and under the other Loan Documents and the Borrower and its Subsidiaries, in each case in scope and with results in all respects satisfactory to the Administrative Agent in its sole discretion, (ii) to the extent not previously received under the Credit Agreement, acknowledgments of all filings or recordations necessary to perfect or otherwise evidence its Liens in the Collateral, (iii) UCC, Lien, and Intellectual Property searches, and all other searches and other evidence satisfactory to the Administrative Agent that the Collateral Agent's Liens are the only Liens upon the Collateral (other than Permitted Liens) and (iv) to the extent not previously received under the Credit Agreement, (A) original stock certificates or other certificates evidencing the certificated Equity Interests pledged pursuant to the Security Documents, together with an undated stock power for each such certificate duly executed in blank by the registered owner thereof and (B) each original promissory note pledged pursuant to the Security Documents together with an undated allonge for each such promissory note duly executed in blank by the holder thereof;

(c)     the Administrative Agent shall have received certified or executed (as applicable) copies of all governmental, shareholder, and third party consents and approvals and Third Party Agreements which it has reasonably deemed necessary in connection with the transactions contemplated hereby and, to the extent applicable, all waiting periods relating thereto shall have expired and no investigation or inquiry by any Governmental Authority regarding this Agreement or any other Loan Document or any transaction contemplated herein or therein shall be ongoing;

(d)     since December 31, 2021, there shall not have occurred any event or condition that has had or could be reasonably expected, either individually or in the aggregate, to have Material Adverse Effect;

(e)      there shall be no action, suit, investigation, litigation or proceeding pending or, to the knowledge of the Borrower, threatened in any court or before any arbitrator or Governmental Authority that could reasonably be expected to have a Material Adverse Effect or a material adverse effect on the properties of any Credit Party or the transactions contemplated by this Agreement and the other Loan Documents;

(f)      the Borrower shall repay all Debt not otherwise permitted under Section 10.10 of the Amended Credit Agreement and, in connection therewith, provide to the Administrative Agent complete and final, fully executed payoff letters, in form and substance satisfactory to the Administrative Agent, evidencing such repayment and the termination of any Liens in connection therewith;

(g)      (i) upon the reasonable request of the Administrative Agent or any Lender (including any New Lender) made at least five Business Days prior to the Effective Date, the Borrower shall have provided to the Administrative Agent or such Lender (including any New Lender), as the case may be, at least three Business Days prior to the Effective Date, reasonably satisfactory documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and (ii) if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Borrower shall deliver, at least three Business Days prior to the Effective Date, a Beneficial Ownership Certification in relation to the Borrower to the Administrative Agent and each Lender (including any New Lender) that has requested a Beneficial Ownership Certification at least five Business Days prior to the Effective Date;

(h)      the Administrative Agent shall have received such other information, documents, instruments, and agreements as it deems appropriate in its reasonable discretion in connection with the transactions contemplated by this Agreement and the other Loan Documents;

(i)      the Borrower shall have (i) paid all fees and expenses to be paid to MUFG Union Bank, the Administrative Agent, the Collateral Agent and the Lenders (including any New Lender) on the Effective Date (including pursuant to the Fee Letter (as defined in the Amended Credit Agreement)) or the Administrative Agent shall be satisfied with all arrangements made to pay such fees and expenses on the Effective Date with the proceeds of Loans to be made on the Effective Date, including all fees, expenses and disbursements of counsel for MUFG Union Bank and each Agent to the extent invoiced prior to the Effective Date or set forth in a funds flow statement approved by the Borrower, together with such additional amounts as shall constitute such counsel's reasonable estimate of expenses and disbursements to be incurred by such counsel in connection with post-closing matters; provided, that, such estimate shall not thereafter preclude further settling of accounts between the Borrower and the Administrative Agent and/or the Collateral Agent and (ii) reimbursed the Administrative Agent and the Collateral Agent for each of their respective out-of-pocket costs in connection with closing this Agreement and the other Loan Documents, including but not limited to appraisal expenses and documentation expenses; and

(j)      with respect to any Real Estate that is subject to a Mortgage, the Administrative Agent and each Lender (including any New Lender) shall have received, in each case at least two Business Days prior to the Effective Date or such later date as the Administrative Agent may approve in its sole discretion, (i) special flood hazard determinations and, if applicable, flood insurance in an amount, with endorsements and by an insurer reasonably acceptable to the Administrative Agent, if such Real Estate is within a flood plain; and (ii) such other documents, instruments, or agreements as the Administrative Agent may reasonably require with respect to such Real Estate or Mortgage and the Flood Insurance Laws; and

(k)      the Administrative Agent shall have received, in form and substance satisfactory to it, (i) cash flow forecasts with respect to each applicable Plant Property and (ii) with respect to the Guarantors, copies of satisfactory audited statements of financial condition for the fiscal year most recently ended for which financial statements are available and/or copies of the most recently filed state and federal tax returns.

4.      Effect of this Agreement.  Except as expressly provided herein, the Credit Agreement and the other Loan Documents shall remain unmodified and in full force and effect.  Except as expressly set forth herein, this Agreement shall not be deemed (a) to be a waiver of, or consent to, a modification or amendment of, any other term or condition of the Credit Agreement or any other Loan Document, (b) to prejudice any other right or rights which the Administrative Agent or the Lenders (including any New Lender) may now have or may have in the future under or in connection with the Credit Agreement or the other Loan Documents or any of the instruments or agreements referred to therein, as the same may be amended, restated, supplemented or otherwise modified from time to time, (c) to be a commitment or any other undertaking or expression of any willingness to engage in any further discussion with the Borrower, any Guarantor or any other Person with respect to any waiver, amendment, modification or any other change to the Credit Agreement or the Loan Documents or any rights or remedies arising in favor of the Lenders (including any New Lender), the Administrative Agent, or any of them, under or with respect to any such documents or (d) to be a waiver of, or consent to or a modification or amendment of, any other term or condition of any other agreement by and among the Credit Parties, on the one hand, and the Administrative Agent or any other Lender, on the other hand.  References in the Credit Agreement to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein", and "hereof") and in any Loan Document to the "Credit Agreement" shall be deemed to be references to the Credit Agreement as modified hereby.

5.      Representations and Warranties/No Default.  By its execution hereof,

(a)      the Borrower represents and warrants to the Agents and the Lenders (including any New Lender) that (i) after giving effect to the waiver in Section 12 hereof, the representations and warranties contained in the Credit Agreement and each other Loan Document (including this Agreement) are true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) on and as of the date hereof (except for representations and warranties that expressly relate to an earlier date, in which case, they shall have been true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of such date), and (ii) no Default or Event of Default has occurred and is continuing as of the Effective Date (other than the Specified Defaults) or will occur after giving effect to this Agreement;

(b)      each Credit Party hereby certifies, represents and warrants to the Agents and the Lenders (including any New Lender) that:

(i)      it has the power and authority enter into this Agreement and to execute and deliver it and all other documents contemplated hereby and to perform its obligations hereunder;

(ii)      this Agreement and all things required by this Agreement and each other document executed in connection herewith have been duly authorized by all necessary action by such Credit Party, and each such document represents a legal, valid, binding and enforceable obligation against such Credit Party except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability; and

(iii)      such Credit Party has received all third party and Governmental Authority consents, authorizations and approvals necessary in connection with the execution,

delivery, performance, validity and enforceability of this Agreement and the transactions contemplated hereby.

6. Acknowledgment and Consent. By its execution hereof, each Credit Party (a) acknowledges and consents to all of the terms and conditions of this Agreement, (b) affirms all of its obligations under the Loan Documents and acknowledges that the covenants, representations, warranties and other obligations set forth in the Credit Agreement and the other Loan Documents to which it is a party remain in full force and effect, (c) affirms that each of the Liens granted in or pursuant to the Loan Documents are valid and subsisting, (d) agrees that this Agreement and the other transactions completed hereby shall in no manner impair or otherwise adversely affect any of the Liens granted in or pursuant to the Loan Documents and (e) agrees that this Agreement and all documents executed in connection herewith and the consummation of the other transactions contemplated hereby do not operate to reduce or discharge such Person's obligations under the Loan Documents.

7. Miscellaneous. Except as expressly provided herein, the Credit Agreement and the other Loan Documents shall remain unmodified and in full force and effect. This Agreement is the entire agreement, and supersedes any prior agreements and contemporaneous oral agreements, of the parties concerning its subject matter. This Agreement shall be binding on and inure to the benefit of the parties and their heirs, beneficiaries, successors and permitted assigns. This Agreement is a Loan Document and is subject to the terms and conditions of the Amended Credit Agreement.

8. Governing Law; Submission to Jurisdiction; Waiver of Venue; Service of Process; Waiver of Jury Trial. THIS AGREEMENT AND ANY CLAIM, CONTROVERSY, DISPUTE, CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES OR OTHER RULE OF LAW WHICH WOULD CAUSE THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE LAW OF THE STATE OF NEW YORK (BUT GIVING EFFECT TO FEDERAL LAWS RELATING TO NATIONAL BANKS). The submission to jurisdiction, waiver of venue, service of process and waiver of jury trial provisions set forth in Sections 17.16 and 17.17(a) of the Credit Agreement shall apply to this Agreement, *mutatis mutandis*.

9. Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement. The execution and delivery of this Agreement shall be deemed to include electronic signatures on electronic platforms approved by the Administrative Agent, which shall be of the same legal effect, validity or enforceability as delivery of a manually executed signature, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that, upon the request of any party hereto, such facsimile transmission or electronic mail transmission shall be promptly followed by the original thereof.

10. Existing Loans.

(a) All LIBOR Loans (as defined in the Credit Agreement) outstanding under the Credit Agreement shall continue as LIBOR Loans under the Amended Credit Agreement (and, notwithstanding anything in this Agreement including Annex A hereto to the contrary, subject to the terms and conditions and applicable interest rate terms (including breakage) with respect to LIBOR

Loans under the Credit Agreement) solely for the remainder of the Interest Periods applicable thereto immediately prior to the effectiveness of this Agreement; it being understood that such LIBOR Loans and Interest Periods are not being renewed or extended as a result of this Agreement and, upon the expiration or earlier termination of such Interest Periods, such LIBOR Loans shall be (i) repaid or (ii) converted to Reference Rate Loans or SOFR Loans (each as defined in the Amended Credit Agreement) as the Borrower may elect (which election in the case of clause (ii) shall be made in accordance with the notice requirements set forth in Section 4.1 of the Credit Agreement as though the Borrower were requesting a borrowing to be made on the effective date of such conversion); provided that if the Borrower fails to submit a timely Notice of Borrowing requesting a SOFR Loan, such LIBOR Loan shall be automatically converted to a Reference Rate Loan as of the last day of such Interest Period.

(b)     Upon the effectiveness of this Agreement, the aggregate principal amount of the Revolving Commitments shall be increased to $125,000,000.  The Revolving Commitment of each Lender (including each New Lender) on the Effective Date is set forth opposite the name of such Lender on the restated Schedule 1.1(a) to the Amended Credit Agreement as set forth on Annex B hereto.  Each Lender party hereto (including any New Lender) agrees that the Administrative Agent may reallocate any outstanding Revolving Loans and the Applicable Revolving Percentages of Swingline Loans on the Effective Date amongst the Revolving Lenders (including any New Lender) in accordance with their respective revised Applicable Revolving Percentages and the Revolving Lenders (including any New Lender) agree to make all payments and adjustments necessary to effect such reallocation. Each party hereto agrees that (x) any of the reallocations described in this Section 10 shall be deemed to have been made via assignments amongst Lenders (including the New Lenders) such that each Lender's (including any New Lender's) respective resulting Revolving Commitments are as set forth in the new Schedule 1.1(a) to the Amended Credit Agreement set forth on Annex B hereto and that all outstanding Loans (if any) shall be held by the Lenders (including the New Lenders) in accordance with their respective Applicable Percentages based on such Commitment amounts and (y) as consideration for such assignment each assigning Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it under the Credit Agreement and under the other Loan Documents (including any amounts under Section 15.5 of the Credit Agreement) from the Borrower. Notwithstanding anything to the contrary contained in this Agreement, the Amended Credit Agreement or any other Loan Document, each party hereto consents to the transactions set forth in this Section 10.

11. New Lender Joinder. By its execution of this Agreement, each New Lender hereby acknowledges, agrees and confirms that, on and after the Effective Date:

(a)     it will be deemed to be a party to the Amended Credit Agreement as a "Lender" and a "Revolving Lender" for all purposes of the Amended Credit Agreement and the other Loan Documents, and shall have all of the obligations of, and shall be entitled to the benefits of, a Lender and a Revolving Lender under the Amended Credit Agreement as if it had executed the Credit Agreement;

(b)     it has received a copy of the Amended Credit Agreement, copies of the most recent financial statements delivered pursuant to Section 10.2 thereof and such other documents and information as it deems appropriate, independently and without reliance upon any Agent, the Arranger, any other Lender or any of their respective Affiliates or other Related Parties, to make its own credit analysis and decision to enter into this Agreement and become a Lender and a Revolving Lender under the Amended Credit Agreement; and

(c) it will provide any additional documentation to evidence its status as a Lender and a Revolving Lender as of the Effective Date or as required to be delivered by it pursuant to the terms of the Amended Credit Agreement.

12. Limited Waiver. Pursuant to Section 17.2 of the Credit Agreement, and upon, and subject to, the occurrence of the Effective Date, the Lenders party hereto hereby waive the Specified Defaults. The waiver in this paragraph shall not be deemed to permanently modify the provisions of the Credit Agreement or any other Loan Document through course of conduct, course of dealing or otherwise. Neither the Administrative Agent nor any Lender consents to, or waives, any other action by the Borrower or any other Credit Party other than as expressly set forth in this paragraph.

13. Post-Closing Covenant. The Borrower hereby agrees to execute and deliver the documents, take the actions and complete the tasks set forth on Annex D hereto in each case within the applicable corresponding time limits specified on such annex and that the failure to do so within such time limits shall constitute an immediate Event of Default.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date and year first above written.

**BORROWER:**

TOUCHSTONE PISTACHIO COMPANY, LLC,
as Borrower

By: ______________________________
Name: Farid Assemi
Title: Manager

**GUARANTOR:**

Farid Assemi

**GUARANTOR:**

Farshid Assemi

Darius Assemi

Darius Assemi, as trustee of the Amended and Restated Darius Assemi Revocable Trust dated March 2, 2010

Farid Assemi, as trustee of the Third Amended and Restated Farid Assemi Revocable Trust dated April 28, 2021

Farid Assemi, as trustee of The Farshid Assemi 1997 Ranch Trust dated June 30, 1997

Neema Assemi, as trustee of The Farid Assemi 2010 Grantor Trust dated December 30, 2010

Ashley Whelan, as trustee of The Farshid and Sonia Assemi 2010 Grantor Trust dated December 30, 2010

Neema Assemi, as trustee of The Farid Assemi 1997 Ranch Trust dated June 30, 1997

Sonia Rosemary Assemi, as trustee of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated March 2, 2010

Farshid Assemi, as trustee of The Farid Assemi 1997 Ranch Trust dated June 30, 1997, as amended

Farshid Assemi, as trustee of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated March 2, 2010

**GUARANTOR:**

______________________________
Farid Assemi

______________________________
Darius Assemi

______________________________
Farid Assemi, as trustee of the Amended and Restated Farid Assemi Revocable Trust dated March 2, 2010

______________________________
Neema Assemi, as trustee of The Farid Assemi 2010 Grantor Trust dated December 30, 2010

______________________________
Neema Assemi, as trustee of The Farid Assemi 1997 Ranch Trust dated June 30, 1997

______________________________
Farshid Assemi, as trustee of The Farid Assemi 1997 Ranch Trust dated June 30, 1997, as amended

**GUARANTOR:**

______________________________
Farshid Assemi

______________________________
Darius Assemi, as trustee of the Amended and Restated Darius Assemi Revocable Trust dated March 2, 2010

______________________________
Farid Assemi, as trustee of The Farshid Assemi 1997 Ranch Trust dated June 30, 1997

______________________________
Ashley Whelan, as trustee of The Farshid and Sonia Assemi 2010 Grantor Trust dated December 30, 2010

______________________________
Sonia Rosemary Assemi, as trustee of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated March 2, 2010

______________________________
Farshid Assemi, as trustee of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated March 2, 2010

**GUARANTOR:**

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By: ______________________
Farid Assemi, Manager

By: ______________________
Farshid Assemi, Manager

By: ______________________
Darius Assemi, Manager

**ACDF, LLC,**
a California limited liability company

By: ______________________
Farid Assemi, Manager

By: ______________________
Farshid Assemi, Manager

By: ______________________
Darius Assemi, Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: ______________________
Nader Assemi, Manager

By: ______________________
Neema Assemi, Manager

**GUARANTOR:**

**C & A FARMS, LLC,**
a California limited liability company

By: ______________________
Farid Assemi, Manager

By: ______________________
Farshid Assemi, Manager

By: ______________________
Darius Assemi, Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company

By: ______________________
Farid Assemi, Manager

By: ______________________
Farshid Assemi, Manager

By: ______________________
Darius Assemi, Manager

**PANOCHE PISTACHIOS, LLC,**
a California limited liability company

By: ______________________
Neema Assemi, Manager

By: ______________________
Darius Assemi, Manager

By: ______________________
Nader Assemi, Manager

**GUARANTOR:**

**SAGEBERRY FARMS, LLC,**
a California limited liability company

By: ______________________________
Neema Assemi, Manager

By: ______________________________
Darius Assemi, Manager

By: ______________________________
Nader Assemi, Manager

**GUARANTOR:**

**ASSEMI BROTHERS, LLC,**
a California limited liability company

By: ______________________________
Farid Assemi, Manager

By: ______________________________
Farshid Assemi, Manager

By: ______________________________
Darius Assemi, Manager

**ADMINISTRATIVE AGENT:**

MUFG UNION BANK, N.A., as Administrative Agent

By: ______________________________
Name: Scott D. Lisle
Title: Director

**LENDERS:**

MUFG UNION BANK, N.A., as a Lender

By: ______________________________
Name: Scott D. Lisle
Title: Director

RABO AGRIFINANCE LLC, as a Lender

By: ____________________
Name: Jessup S. Wiley
Title: SVP/ BDM.

COMPEER FINANCIAL, PCA/FLCA, as a Lender

By: ______________________________

Name: Graham J. Dee
Title: Director, Capital Markets

FIFTH THIRD BANK, NATIONAL ASSOCIATION,
as a Lender

By: ______________________________
Name: David Patterson
Title: Senior Vice President

AMERICAN AGCREDIT, PCA, as a Lender

By: ______________________________
Name: John Flinn
Title: Vice President

ANNEX A

AMENDED CREDIT AGREEMENT

ANNEX A
(TO AMENDMENT NO. 6 TO CREDIT AGREEMENT)

---

CREDIT AGREEMENT

Dated as of March 20, 2020
(as amended by Amendment No. 1 to Credit Agreement dated as of July 10, 2020, Amendment No. 2 to Credit Agreement dated as of October 20, 2020, Amendment No. 3 to Credit Agreement dated as of ~~July 10~~December 14, 2020, Amendment No. 4 to Credit Agreement dated as of May 31, 2021, supplemented by that certain Limited Waiver and Consent dated as of July 26, 2021~~ and~~, amended by Amendment No. 5 to Credit Agreement dated as of December 29, 2021, supplemented by that certain Second Limited Waiver and Consent dated as of March 15, 2022 and amended by Amendment No. 6 to Credit Agreement)

among

TOUCHSTONE PISTACHIO COMPANY, LLC,
as the Borrower,

MUFG UNION BANK, N.A.,
as Administrative Agent and Collateral Agent,

and

The Lenders from Time to Time Parties Hereto,

MUFG UNION BANK, N.A.
and
RABO AGRIFINANCE LLC,
as Joint Lead Arrangers

MUFG UNION BANK, N.A.,
as Sole Book Manager

---

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **SECTION 1** | **DEFINITIONS; RULES OF CONSTRUCTION** | **1** |
| 1.1 | Definitions | 1 |
| 1.2 | Accounting Terms and Accounting Changes | ~~38~~40 |
| 1.3 | Uniform Commercial Code | ~~38~~41 |
| 1.4 | Terms Generally | ~~38~~41 |
| 1.5 | Certain Matters of Construction | ~~39~~41 |
| 1.6 | Time of Day; Business Day | ~~39~~42 |
| 1.7 | Divisions | ~~40~~42 |
| 1.8 | Rates | 42 |
| 1.9 | Agreement Regarding Borrowing Base Reporting | 42 |
| **SECTION 2** | **THE CREDIT FACILITIES** | **~~40~~43** |
| 2.1 | Revolving Commitments | ~~40~~43 |
| 2.2 | Protective Advances | ~~40~~43 |
| 2.3 | Term Loan Commitments | ~~41~~44 |
| 2.4 | Swingline Loans; Settlement | ~~43~~46 |
| 2.5 | [Reserved] | ~~44~~47 |
| 2.6 | [Reserved] | ~~44~~47 |
| 2.7 | Bank Services and Hedging Agreements | ~~44~~47 |
| **SECTION 3** | **INTEREST, FEES, AND CHARGES** | **~~45~~48** |
| 3.1 | Interest | ~~45~~48 |
| 3.2 | Fees | ~~47~~50 |
| 3.3 | Maximum Interest | ~~47~~51 |
| **SECTION 4** | **LOAN ADMINISTRATION** | **~~48~~51** |
| 4.1 | Manner of Borrowing and Funding Loans | ~~48~~51 |
| 4.2 | Defaulting Lender | ~~49~~52 |
| 4.3 | Defaulting Lender Cure | ~~50~~54 |
| 4.4 | New Swingline Loans | ~~51~~54 |
| 4.5 | [Reserved] | ~~51~~54 |
| 4.6 | [Reserved] | ~~51~~54 |
| 4.7 | Effect of Termination | ~~51~~54 |
| **SECTION 5** | **PAYMENTS** | **~~51~~55** |
| 5.1 | General Payment Provisions | ~~51~~55 |
| 5.2 | Repayment of Revolving Loans | ~~51~~55 |
| 5.3 | Repayment of Term Loans | ~~52~~55 |
| 5.4 | Payment of Other Obligations | ~~54~~58 |
| 5.5 | Post-Default Allocation of Payments | ~~54~~58 |
| 5.6 | Sharing of Payments | ~~55~~59 |
| 5.7 | Taxes | ~~56~~59 |
| **SECTION 6** | **SECURITY** | **~~59~~63** |
| 6.1 | Security Interest | ~~59~~63 |
| **SECTION 7** | **CONDITIONS PRECEDENT** | **~~60~~63** |
| 7.1 | Conditions Precedent to Initial Loans | ~~60~~63 |
| 7.2 | Conditions Precedent to All Extensions of Credit | ~~60~~63 |
| 7.3 | Conditions Precedent to Real Estate Term Advances | ~~60~~64 |

TABLE OF CONTENTS
(continued)

Page

7.4 Conditions Precedent to Final Subsequent Real Estate Term Advance 6467
7.5 Additional Conditions Precedent to Acquisition Equipment Term Advances 6568

**SECTION 8 REPRESENTATIONS AND WARRANTIES 6872**

8.1 Affiliates; Subsidiaries and Capitalization 6972
8.2 Organization and Qualification 6972
8.3 Power and Authorization; Enforceability 6973
8.4 Non-Contravention 6973
8.5 Compliance with Laws 6973
8.6 Title 6973
8.7 Litigation 7073
8.8 Regulation T, U and X; Investment Company Act 7074
8.9 No Event of Default 7074
8.10 Tax Liability 7074
8.11 Hazardous Materials 7074
8.12 Employee Matters 7174
8.13 Fiscal Year 7174
8.14 Insurance Premiums 7174
8.15 Solvency 7174
8.16 Affiliate Indebtedness 7175
8.17 Disclosure 7175
8.18 Leases and Personal Property 7175
8.19 Material Adverse Effect 7275
8.20 Flood 7275
8.21 Certain Real Property Matters 7276

8.22 Additional Guarantors and Collateral 72

**SECTION 9 [RESERVED] 7376**

**SECTION 10 COVENANTS 7376**

10.1 Notice of Certain Events 7376
10.2 Financial and Other Reporting 7477
10.3 Existence 7579
10.4 Insurance 7679
10.5 Books and Records 7679
10.6 Laws 7680
10.7 Loans, Guaranties and Pledges 7680
10.8 Investments 7680
10.9 Liens 7780
10.10 Borrowings 7882
10.11 Fundamental Changes 7983
10.12 Business Activities 8083
10.13 Affiliate Transactions 8084
10.14 Financial Covenants 8084
10.15 Interest Rate Protection Agreement 8184
10.16 Field Exams and Asset Based Examinations 8184
10.17 Use of Proceeds 8185
10.18 Further Negative Pledges 8285

135719669_8
152434621_2
152434621_7

**TABLE OF CONTENTS**
(continued)

**Page**

10.19 ARO PSA, Chowchilla Lease and Option and Chowchilla PSA ~~82~~85
10.20 Lien Priority ~~82~~85
10.21 Construction Start and Completion ~~82~~86
10.22 Change Orders ~~83~~86
10.23 Detailed Cost Breakdown ~~83~~86
10.24 Contractor Covenants ~~83~~86
10.25 Construction Contract Only ~~83~~87
10.26 Paid Vouchers ~~83~~87
10.27 Defect Corrections ~~84~~87
10.28 Application of Disbursements of Real Estate Term Loans ~~84~~87
10.29 Foundation Completion ~~84~~87
10.30 Restricted Payments ~~84~~87
10.31 Approval of Easements and Other Documents ~~85~~88
10.32 Stop Notices; Mechanic's Liens ~~85~~88
10.33 Set Aside Letters ~~85~~88
10.34 Management of Property ~~86~~89
10.35 Further Assurances ~~86~~89
10.36 Required Occupancy ~~86~~89
10.37 Leases ~~86~~90
10.38 Additional Subsidiary Guarantors and Collateral 90
10.39 Additional Non-Subsidiary Guarantors 90

**SECTION 11 [RESERVED]** ~~**87**~~**91**

**SECTION 12 EVENTS OF DEFAULT; REMEDIES UPON DEFAULT** ~~**87**~~**91**

12.1 Events of Default ~~87~~91
12.2 Remedies upon Default ~~89~~93
12.3 License ~~91~~95
12.4 Receiver ~~91~~95
12.5 Deposits; Insurance ~~91~~95
12.6 Remedies Cumulative ~~91~~95
12.7 Borrower's Right to Cure 95

**SECTION 13 AGENTS** ~~**91**~~**96**

13.1 Appointment, Authority and Duties of Agents; Professionals ~~91~~96
13.2 Agreements Regarding Collateral and Field Examination Reports ~~94~~99
13.3 Action Upon Default ~~95~~100
13.4 Indemnification of Agent Indemnitees ~~95~~100
13.5 Limitation on Responsibilities of Agents ~~96~~100
13.6 Resignation; Successor Agents ~~96~~101
13.7 Due Diligence and Non-Reliance ~~97~~102
13.8 Remittance of Payments ~~97~~102
13.9 Rights as a Lender ~~98~~103
13.10 Agent Titles ~~98~~103
13.11 Administrative Agent May File Proofs of Claim ~~98~~103
13.12 No Third Party Beneficiaries ~~99~~104

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| **SECTION 14** | **ASSIGNMENTS AND PARTICIPATIONS; REPLACEMENT OF LENDERS** | **~~99~~104** |
| 14.1 | Successors and Assigns Generally | ~~99~~104 |
| 14.2 | Assignments by Lenders | ~~100~~104 |
| 14.3 | Register | ~~102~~106 |
| 14.4 | Participations | ~~102~~107 |
| 14.5 | Certain Pledges | ~~103~~108 |
| 14.6 | Replacement of Lenders | ~~103~~108 |
| 14.7 | Electronic Execution of Assignments | ~~103~~108 |
| **SECTION 15** | **YIELD PROTECTION** | **~~104~~109** |
| 15.1 | Illegality | ~~104~~109 |
| 15.2 | Inability to Determine Rates | ~~104~~109 |
| 15.3 | Increased Costs | ~~111~~113 |
| 15.4 | Mitigation | ~~112~~114 |
| 15.5 | Funding Losses | ~~112~~114 |
| **SECTION 16** | **[RESERVED]** | **~~113~~115** |
| **SECTION 17** | **MISCELLANEOUS** | **~~113~~115** |
| 17.1 | Notices | ~~113~~115 |
| 17.2 | Amendments | ~~116~~118 |
| 17.3 | Indemnity; Expenses | ~~119~~121 |
| 17.4 | Reimbursement Obligations | ~~119~~121 |
| 17.5 | Performance of the Borrower's Obligations | ~~119~~121 |
| 17.6 | Setoff | ~~120~~122 |
| 17.7 | Severability | ~~120~~122 |
| 17.8 | Cumulative Effect; Conflict of Terms | ~~120~~122 |
| 17.9 | Counterparts | ~~120~~122 |
| 17.10 | Fax or Other Transmission | ~~121~~123 |
| 17.11 | Entire Agreement | ~~121~~123 |
| 17.12 | Relationship with Lenders | ~~121~~123 |
| 17.13 | No Advisory or Fiduciary Responsibility | ~~121~~123 |
| 17.14 | Confidentiality; Credit Inquiries | ~~121~~123 |
| 17.15 | Governing Law | ~~122~~124 |
| 17.16 | Submission to Jurisdiction | ~~122~~124 |
| 17.17 | Waivers; Limitation on Damages; Limitation on Liability | ~~123~~125 |
| 17.18 | Limitation on Liability; Presumptions | ~~124~~126 |
| 17.19 | PATRIOT Act Notice | ~~124~~126 |
| 17.20 | Powers | ~~124~~126 |
| 17.21 | No Tax Advice | ~~124~~126 |
| 17.22 | Survival of Representations and Warranties, etc | ~~125~~127 |
| 17.23 | Time is of the Essence | ~~125~~127 |
| 17.24 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | ~~125~~127 |
| 17.25 | Acknowledgement Regarding Any Supported QFCs | ~~125~~127 |

**EXHIBITS AND SCHEDULES**

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Revolving Note |
| Exhibit B-1 | Form of Equipment Term Note |
| Exhibit B-2 | Form of Real Estate Term Note |
| Exhibit C | Form of Assignment and Assumption |
| Exhibit D-1 | Form of Notice of Revolving Borrowing |
| Exhibit D-2 | Form of Notice of Term Borrowing |
| Exhibit E | Form of Notice of Conversion/Continuation |
| Exhibit F | Form of Borrowing Base Certificate |
| Exhibit G | Form of Compliance Certificate |
| Exhibit H | Form of Collateral Disclosure Certificate |
| Exhibit I-1 | Form of U.S. Tax Compliance Certificate |
| Exhibit I-2 | Form of U.S. Tax Compliance Certificate |
| Exhibit J | Form of Assignment of Construction Contract |
| Exhibit K | Form of Assignment of Plans and Specifications |
| Exhibit L | Form of Guaranty |

SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Commitments |
| Schedule 1.1(b) | Chowchilla Plant Real Property |
| Schedule 1.1(c) | Fresno Plant Real Property |
| Schedule 1.1(d) | Tulare Plant Real Property |
| Schedule 8.1 | Affiliates |
| Schedule 8.7 | Litigation |
| Schedule 8.16 | Affiliate Debt |
| Schedule 10.9 | Existing Liens |
| Schedule 10.18 | Restrictive Agreements |

# CREDIT AGREEMENT

This **CREDIT AGREEMENT** (this "Agreement") is dated as of March 20, 2020 (as amended by that certain Amendment No. 1 to Credit Agreement dated as of July 10, 2020 ~~and~~, that certain Amendment No. 2 to Credit Agreement dated as of October 20, 2020, that certain Amendment No. 3 to Credit Agreement dated as of December 14, 2020, that certain Amendment No. 4 to Credit Agreement dated as of May 31, 2021, supplemented by that certain Limited Waiver and Consent dated as of July 26, 2021, amended by that certain Amendment No. 5 to Credit Agreement dated as of December 29, 2021, supplemented by that certain Second Limited Waiver and Consent dated as of March 15, 2022 and amended by that certain Amendment No. 6 to Credit Agreement dated as of October 6, 2022), by and among **TOUCHSTONE PISTACHIO COMPANY, LLC**, a California limited liability company (the "Borrower"), the financial institutions or entities party to this Agreement from time to time as Lenders (as defined below), **MUFG UNION BANK, N.A.**, a national banking association ("MUFG Union Bank"), in its capacity as the Swingline Lender (as defined below), MUFG Union Bank, in its capacity as collateral agent for the lenders (in such capacity, the "Collateral Agent") and MUFG Union Bank, in its capacity as administrative agent for the Lenders (in such capacity, "Administrative Agent").

## W I T N E S E T H:

WHEREAS, the Borrower has requested that the Administrative Agent and the Lenders establish a revolving credit facility, a real estate construction term loan facility and certain other term loan facilities, all for the purposes set forth herein; and

WHEREAS, the Administrative Agent and the Lenders are willing to provide such credit facilities, subject to the terms and conditions set forth herein.

NOW, THEREFORE, the Borrower, the Administrative Agent and each Lender, intending to be legally bound, hereby agree as follows:

## SECTION 1

## DEFINITIONS; RULES OF CONSTRUCTION

1.1 Definitions. Capitalized terms that are not otherwise defined herein shall have the meanings set forth in this Section 1.1. As used in this Agreement, the following terms shall have the following meanings:

"Accounting Change" refers to a change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants or, if applicable, the Securities and Exchange Commission, including any change in accounting principles that would require operating leases entered into in the Ordinary Course of Business to be treated as a capital or finance lease under GAAP.

"Accounts" means all presently existing and hereafter arising "accounts" as defined in the UCC, including all: accounts, accounts receivable, chattel paper, rights to payment and all other forms of obligations owing to the Borrower (whether or not earned by performance) and payable in Dollars for: property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; services rendered or to be rendered and all credit insurance, guaranties and other security therefor, as well as all merchandise returned to or reclaimed by the Borrower and the Borrower's books and records relating to any of the foregoing.

"Acquisition" means (whether by purchase, exchange, issuance of stock, or other equity or debt securities, merger, reorganization, amalgamation, or any other method and whether by a single transaction or a series of related or unrelated transactions) any acquisition by the Borrower or any Subsidiary of (a) any other Person, which Person shall then become consolidated with the Borrower or any Subsidiary in accordance with GAAP; (b) Equity Interests issued by any other Person, but only if such acquisition results in the Borrower or any Subsidiary owning more than 50% of the Equity Interests of such Person entitled to vote in the election of the board of directors or other governing authority of such Person; (c) all or substantially all of the assets of any other Person; or (d) the assets which constitute all or any substantial part of any plant, division or operating unit of the business of any other Person (in each case, whether by purchase, exchange, issuance of Equity Interests or debt securities (other than securities having such power only by reason of the happening of a contingency), merger, reorganization, amalgamation or any other method).

"Acquisition Equipment Term Advance" means an Acquisition Equipment Term Advance (Chowchilla) or an Acquisition Equipment Term Advance (Tulare).

"Acquisition Equipment Term Advance (Chowchilla)" means an Equipment Term Loan made pursuant to Section 2.3(a) that is identified as an Acquisition Equipment Term Advance (Chowchilla) in the applicable Notice of Term Borrowing the proceeds of which are used solely to finance the Chowchilla Acquisition.

"Acquisition Equipment Term Advance (Tulare)" means an Equipment Term Loan made pursuant to Section 2.3(a) that is identified as an Acquisition Equipment Term Advance (Tulare) in the applicable Notice of Term Borrowing, the proceeds of which are used solely to finance the ARO Acquisition.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Ad Valorem Reserve" means, as of any date of determination, a reserve determined by the Administrative Agent in its Permitted Discretion in respect of ad valorem taxes payable by any Credit Party to any Governmental Authority that are subject to or may result in a Lien on any asset of a Credit Party that is prior to any Lien of the Collateral Agent.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Advance" means, each disbursement of proceeds of any Term Loan made pursuant to this Agreement.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Affiliated Tenant" has the meaning assigned to such term in Section 10.36(a).

"Agent Indemnitees" means each of the Administrative Agent, the Collateral Agent and their respective officers, directors, employees, Affiliates, agents, consultants, and attorneys.

"Agent Parties" has the meaning assigned to such term in Section 17.1(j).

"Agent Professionals" means attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Administrative Agent or the Collateral Agent, as the case may be.

"Agents" means each of the Administrative Agent and the Collateral Agent.

"AGI" means Assemi Group, Inc., a California corporation.

"AGI Subordinated Debt" means any (a) payables or notes entered into in the ordinary course of business or (b) other Debt entered into in connection with a Specified Contribution pursuant to Section 12.7, in each case that is owing to AGI by the Borrower or its Subsidiaries on terms and conditions reasonably satisfactory to the Administrative Agent that is subordinated in right and time of payment to the Obligations pursuant to the AGI Subordination Agreement.

"AGI Subordination Agreement" means a subordination agreement, in form and substance satisfactory to the Administrative Agent, executed by AGI in respect of any AGI Subordinated Debt.

"Amendment No. 1" means that certain Amendment No. 1 to Credit Agreement dated as of the Amendment No. 1 Effective Date by and among the Borrower, the Guarantors, the Lenders party thereto and the Administrative Agent.

"Amendment No. 1 Effective Date" means July 10, 2020.

"Amendment No. 2" means that certain Amendment No. 2 to Credit Agreement dated as of the Amendment No. 2 Effective Date by and among the Borrower, the Guarantors, the Lenders party thereto, MUFG Bank, Ltd. and the Administrative Agent.

"Amendment No. 2 Effective Date" means October 20, 2020.

"Amendment No. 6" means that certain Amendment No. 6 to Credit Agreement dated as of the Amendment No. 6 Effective Date by and among the Borrower, the Guarantors, the Lenders party thereto, MUFG Union Bank and the Administrative Agent.

"Amendment No. 6 Effective Date" means October 6, 2022.

"Anti-Corruption Laws" means the FCPA, the UK Bribery Act of 2010, and the rules and regulations promulgated thereunder, and all other laws, rules, and regulations of any jurisdiction applicable to each Credit Party or any of its Subsidiaries or the Transactions or in which the proceeds of the Loans will be used, concerning or relating to bribery or corruption.

"Anti-Money Laundering Laws" means the PATRIOT Act, the Money Laundering Control Act of 1986, the Bank Secrecy Act, and the rules and regulations promulgated thereunder, and corresponding laws of the jurisdictions in which any Credit Party or any of its Subsidiaries operates or that are otherwise applicable to any Credit Party or any of its Subsidiaries or that are applicable to the Transactions or in which the proceeds of the Loans will be used.

"Anti-Terrorism Laws" means any laws relating to the prevention of terrorism that are applicable to any of the Credit Parties or any of their respective Subsidiaries, the Transactions or the use of proceeds of the Loans.

"Applicable Law" means all laws, rules, regulations, and governmental guidelines applicable to the Person, conduct, transaction, agreement, or matter in question, including all applicable statutory law, common law, and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders, and decrees of Governmental Authorities.

"Applicable Margin" means as to (a) any Revolving Loan, or portion thereof, that is a Daily Floating ~~LIBOR~~SOFR Loan, 2.00%, (b) any Revolving Loan, or portion thereof, that is a Reference Rate Loan, 1.00%, (c) any portion of the Term Loan that is a ~~Floating LIBOR Loan or a Fixed LIBOR~~Term SOFR Loan, 2.25%, and (d) any portion of the Term Loan that is a Reference Rate Loan, 1.25%.

"Applicable Equipment Term Percentage" means, subject to Section 4.2 and with respect to any Equipment Term Loan Lender, the percentage of (carried out to the ninth decimal place), (a) with respect to Equipment Term Loan Commitments, the total Equipment Term Loan Commitments represented by such Lender's Equipment Term Loan Commitment at such time and (b) with respect to Equipment Term Loans, the total outstanding Equipment Term Loans represented by such Lender's outstanding Equipment Term Loans at such time.

"Applicable Percentage" means, subject to Section 4.2 and with respect to any Lender, the percentage of (carried out to the ninth decimal place), (a) with respect to Revolving Loans, Swingline Loans or Protective Advances, the Applicable Revolving Percentage of such Lender, (b) with respect to Equipment Term Loan Commitments or Equipment Term Loans, the Applicable Equipment Term Percentage of such Lender, and (c) with respect to Real Estate Term Loan Commitments or Real Estate Term Loans, the Applicable Real Estate Term Percentage of such Lender.

"Applicable Real Estate Term Percentage" means, subject to Section 4.2 and with respect to any Real Estate Term Loan Lender, the percentage of (carried out to the ninth decimal place), (a) with respect to Real Estate Term Loan Commitments, the total Real Estate Term Loan Commitments represented by such Lender's Real Estate Term Loan Commitment at such time and (b) with respect to Real Estate Term Loans, the total outstanding Real Estate Term Loans represented by such Lender's outstanding Real Estate Term Loans at such time.

"Applicable Revolving Percentage" means, subject to Section 4.2 and with respect to any Revolving Lender, the percentage of (carried out to the ninth decimal place), of the total Revolving Commitments represented by such Revolving Lender's Revolving Commitment at such time, or if the Revolving Commitments have terminated or expired, such Revolving Lender's percentage of Total Revolving Exposure represented by such Revolving Lender's Revolving Credit Exposure at such time.

"Appraised Value (Fresno)" means the "as complete" market value of the Fresno Plant Real Property and the Improvements as reflected in the Fresno Approved Appraisal.

"Approved Appraisal" means (a) in the case of the Fresno Plant Property, an appraisal in form and substance satisfactory to the Administrative Agent of the Fresno Plant Real Property, the Improvements and the other items relating thereto, prepared by an independent third party appraiser that is acceptable to the Administrative Agent (the "Fresno Approved Appraisal"), (b) in the case of the Chowchilla Plant Property, an appraisal in form and substance satisfactory to the Administrative Agent of the Chowchilla Plant Real Property, the improvements thereon and the other items relating thereto, prepared by an independent third party appraiser that is acceptable to the Administrative Agent (the

"Chowchilla Approved Appraisal") and (c) in the case of the Tulare Plant Property, an appraisal in form and substance satisfactory to the Administrative Agent of the Tulare Plant Real Property, the improvements thereon and the other items relating thereto, prepared by an independent third party appraiser that is acceptable to the Administrative Agent (the "Tulare Approved Appraisal").

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Architect" means Gerald Mele & Associates, Inc., a California corporation or such other architect as may be approved by the Administrative Agent.

"Architect's Agreement" means the agreement between the Borrower and Architect relating to the design and construction of the Improvements.

"ARO Acquisition" means the Acquisition by the Borrower of the Tulare Plant contemplated by the ARO PSA.

"ARO Assumed Leases" means each of the leases identified in Schedules 4 and 9 of the ARO PSA (as in effect on the Amendment No. 1 Effective Date) and assumed by the Borrower in connection with the ARO Acquisition.

"ARO PSA" means that certain Purchase and Sale Agreement and Escrow Instructions (Pistachio Plant) dated as of May 27, 2020 among ARO Pistachios, Inc. ("ARO Pistachios") and Adam Orandi ("Adam" and, collectively with ARO Pistachios, "Tulare Seller"), as seller, and Wolfgang Farms, LLC (and, upon assignment to the Borrower, the Borrower as its assignee), as buyer.

"ARO Perpetual Easement" means that certain Encroachment Easement Agreement dated as of December 10, 2020 by and between Kamm Pistachios, LLC, a California limited liability company, as grantor and the Borrower, as grantee, pursuant to which the grantor granted the grantee a perpetual non-exclusive easement and right of use with respect to a portion of the grantor's fee estate identified as Tulare County Assessor's Parcel No. 319-130-23 subject to the terms and conditions set forth therein.

"ARO Transferred Equipment" means up to $8,287,234.00 of Eligible Equipment (based on the cost thereof based on the most recent expenditure lists and invoices received and approved by the Administrative Agent) to be relocated to the Tulare Plant after the Amendment No. 1 Effective Date.

"Arranger" means each of MUFG Union Bank and Rabo AgriFinance LLC, in its capacity as the sole lead arranger hereunder.

"Asset Disposition" means, with respect to the Borrower and its Subsidiaries, a sale, issuance, assignment, lease, license, consignment, transfer, abandonment, or other disposition of such Credit Party's Property, including a disposition of Property in connection with a sale and leaseback transaction, or similar arrangement, including any disposition of property to a Delaware Divided LLC pursuant to a Delaware LLC Division; provided that an "Asset Disposition" shall not include any such sale, transfer or other disposition amongst the Borrower and a Subsidiary Guarantor or amongst Subsidiary Guarantors.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 14), and accepted by the Administrative Agent, in substantially the form of Exhibit C or any other form approved by the Administrative Agent.

"Assignment of Construction Contract" means each Assignment of Construction Contract by the Borrower, in favor of the Collateral Agent, and consented to by the applicable Contractor in substantially the form of Exhibit J or any other form approved by the Administrative Agent.

"Assignment of Plans and Specifications" means that certain Assignment of Plans and Specifications dated as of the date of the Initial Real Estate Term Advance by the Borrower, in favor of the Collateral Agent, and consented to by the Architect in substantially the form of Exhibit K or any other form approved by the Administrative Agent.

"Availability Reserves" means the sum of (without duplication) (a) the Dilution Reserve, (b) the Bank Services Reserve, (c) Inventory Reserves, (d) Ad Valorem Reserves, (e) reserves determined by the Administrative Agent in its Permitted Discretion based on events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base or the Collateral (or its value) including reduction in Eligible Accounts, and Eligible Inventory since the delivery of the most recently delivered Borrowing Base Certificate, and (f) without limiting the generality of clause (e), such other reserves that Administrative Agent may establish from time to time in its Permitted Discretion, including reserves for Secured Hedging Obligations; provided that all such reserves set forth in clauses (b) through (f) shall be determined by the Administrative Agent in its Permitted Discretion.

"Available Tenor" has the meaning assigned to such term in Section 15.2(g).

"Bail-In Action" means, the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Balance Sheet Leverage Ratio" means, as of any date of determination, the ratio of (a) total liabilities of the Borrower and its Subsidiaries on a consolidated basis less the total amount of outstanding AGI Subordinated Debt to (b) Tangible Net Worth plus the total amount of AGI Subordinated Debt.

"Bank Service Provider" means any Person party to an agreement with the Borrower or any Subsidiary Guarantor pursuant to which such Person will provide Bank Services to the Borrower or such Subsidiary Guarantor.

"Bank Services" means all bank, banking, financial, and other similar or related products, services and facilities, including, without limitation, (a) merchant card services, credit or stored value cards, and corporate purchasing cards; (b) cash management, treasury and related products and services, including, without limitation, the automated clearinghouse ("ACH") transfers of funds and any other ACH services, remote deposit capture services, account reconciliation and information reporting services, lockbox services, depository and checking services, deposit accounts (whether operating, money market, investment, collections, payroll, trust, disbursement, or other deposit accounts), securities accounts, controlled disbursement services, and wire and other electronic funds transfers, e-payable, overdraft protection and stop payment services (all of the products and services described in this clause

(b), collectively, "Treasury Services"); and (c) bankers' acceptances, drafts, letters of credit, documentary services, and foreign currency exchange services.

"Bank Services Obligations" means Debt and other fees, charges, interest, commissions, expenses, liabilities and obligations of the Borrower, any Subsidiary Guarantor or any of its Subsidiaries arising from, related to, or on account of, Bank Services.

"Bank Services Reserve" means the aggregate amount of reserves established by the Administrative Agent from time to time in its Permitted Discretion with respect to the Secured Bank Services Obligations.

"Bankruptcy Code" means Title 11 of the United States Code.

"Benchmark" has the meaning assigned to such term in Section 15.2(g).

"Benchmark Replacement" has the meaning assigned to such term in Section 15.2(g).

"Benchmark Replacement Adjustment" has the meaning assigned to such term in Section 15.2(g).

"Benchmark Replacement Date" has the meaning assigned to such term in Section 15.2(g).

"Benchmark Transition Event" has the meaning assigned to such term in Section 15.2(g).

"Benchmark Transition Start Date" has the meaning assigned to such term in Section 15.2(g).

"Benchmark Unavailability Period" has the meaning assigned to such term in Section 15.2(g).

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Board of Governors" means the Board of Governors of the Federal Reserve System.

"Bonded Work" means offsite, common area, or other improvements required by a Governmental Authority or for which bonds may be required in connection with the development of the Fresno Plant Real Property.

"Borrower's Equity Contribution" means the contribution by the Borrower of capital into the Project, which such contribution consists of (a) cash, (b) unencumbered readily marketable assets, (c) development expenses paid by the Borrower out of pocket and/or (d) the "as-is" appraised value of any real property or improvements contributed to the Project, in each case as reasonably approved by the Administrative Agent, equal to at least fifteen percent (15%) of the Appraised Value (Fresno) of the Project.

"Borrower's Funds" means all funds of the Borrower to be disbursed in payment of Construction Costs as more particularly set forth in this Agreement.

"Borrowing" means (a) Revolving Loans of the same Type, made, converted or continued on the same date, (b) a Term Loan of the same Class and Type made on the same date and, in the case of ~~Fixed~~

~~LIBOR~~Term SOFR Loans, as to which a single Interest Period is in effect, (c) a Swingline Loan and (d) a Protective Advance.

"Borrowing Base" means, on any date of determination, an amount, calculated in Dollars, equal to:

(a) 75% of the Eligible Accounts; plus

(b) 70% of the value of Eligible Inventory; minus

(c) the total amount of standing grower payables and any notes or note payables owing to growers by the Borrower and its Subsidiaries, the Lien of which has not been subordinated to the Lien securing the Secured Obligations pursuant to a Grower Subordination Agreement; minus

(d) without duplication of clause (c) above or any deduction in the definitions of "Eligible Accounts" and "Eligible Inventory", Availability Reserves.

"Borrowing Base Certificate" means a borrowing base certificate substantially in the form of Exhibit F or such other form as may be acceptable to Administrative Agent from time to time in its discretion.

"Business Day" means ~~(a)~~ any day other than a Saturday, Sunday, or other day that is a legal holiday under the laws of the State of New York or is a day on which commercial banks are authorized to close under the laws of, or are in fact closed in, Fresno, California~~, or New York, New York, and (b) if such day relates to a LIBOR Loan, any such day on which dealings in Dollar deposits are conducted between banks in the London interbank Eurodollar market~~.

"Cash Equivalents" has the meaning assigned to such term in Section 10.8.

"Certification of Project Plans and Specifications" means a certification of project plans and specifications in the form of previously provided to the Borrower by the Administrative Agent or such other form as may be approved by the Administrative Agent.

"Change in Law" means the occurrence, after the Original Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Change Order" means any change or supplement to the Project Plans, Construction Contract, if any, or subcontract as permitted by this Agreement.

"Chowchilla Acquisition" means the Acquisition by the Borrower of the Chowchilla Plant contemplated by the Chowchilla Lease and Option and the Chowchilla PSA.

"Chowchilla Approved Appraisal" has the meaning assigned to such term in the definition of Approved Appraisal.

"Chowchilla Lease and Option" means that certain Lease and Option to Purchase dated as of February 28, 2020 among the Chowchilla Seller, as landlord and the Borrower (as assignee of Nader Malakan).

"Chowchilla Plant" means that certain hulling and drying facility located in Chowchilla, California that is to be sold to the Borrower pursuant to the Chowchilla PSA.

"Chowchilla Plant Property" means the collective reference to the Chowchilla Plant Real Property, the Chowchilla Plant~~.~~, all other improvements on the Chowchilla Plant Real Property and the related Personal Property located at the Chowchilla Plant Real Property.

"Chowchilla Plant Real Property" means that certain real property described on Schedule 1.1(b).

"Chowchilla PSA" means the purchase agreement to be executed in connection with the Borrower's exercise of the option to purchase set forth in the Chowchilla Lease and Option.

"Chowchilla Seller" means Chowchilla Pistachio Company, Inc.

"Chowchilla Transferred Equipment" means up to $1,523,621.00 of Eligible Equipment (based on the cost thereof based on the expenditure lists and invoices received and approved by the Administrative Agent in connection with the financing of such Eligible Equipment) financed under this Agreement and to be installed at the Chowchilla Plant after the Amendment No. 1 Effective Date.

"Claims" means all liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs, disbursements, and expenses of any kind (including fees, costs, and expenses of attorneys and paralegals, experts, agents, consultants, and advisors, and Extraordinary Expenses) at any time (including before or after the Original Closing Date, after Payment in Full of the Obligations, or resignation or replacement of any Agent) incurred by or asserted against or imposed on any Indemnitee as a result of, or arising from or in connection with, (a) any Loans, Loan Documents, or the use thereof or transactions relating thereto; (b) any action taken or omitted to be taken by any Indemnitee in connection with any Loan Documents; (c) the existence or perfection of any Liens, or realization upon any Collateral; (d) exercise of any rights or remedies under any Loan Documents or Applicable Law; or (e) failure by any Credit Party to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration, or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto.

"Class" means, with respect to any Term Loan, whether such Term Loan is an Equipment Term Loan or Real Estate Term Loan.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all Property in which the Collateral Agent is granted a Lien as security for any Secured Obligations, including all Property described in any Security Documents as security for any Secured Obligations, and all other Property which now or hereafter secures (or is intended to secure) any Secured Obligations.

"Collateral Disclosure Certificate" means each collateral disclosure certificate substantially in the form of Exhibit H (or such other form as may be approved by the Administrative Agent from time to time), executed and delivered by a Credit Party as of the Amendment No. 2 Effective Date or thereafter in accordance with Section 10.2(j).

"Commitment" means, for any Lender, the aggregate amount of such Lender's Revolving Commitment, Equipment Term Loan Commitment and Real Estate Term Loan Commitment. "Commitments" means the aggregate Revolving Commitments, Equipment Term Loan Commitments and Real Estate Term Loan Commitments.

"Commitment Fee Rate" means, on any day, a rate per annum equal to 0.10% per annum; provided that if the average Total Revolving Exposure (other than Protective Advances and Swingline Loans) for any month is less than or equal to 50% of the Revolving Commitments, the Commitment Fee Rate for such month shall be a rate per annum equal to 0.15% per annum.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute

"Communications" has the meaning assigned to such term in Section 17.1(j).

"Completion Date" means June 30, 2023, the date by which construction of the Improvements must be completed and all licenses and permits necessary for the occupancy, use or sale thereof obtained.

"Completion Guaranty" means each separate guarantee of the construction of the Improvements, dated as of the date of the Initial Real Estate Term Advance, in such form as may be reasonably acceptable to the Administrative Agent, delivered by each Guarantor in favor of the Agents for the benefit of the Secured Parties.

"Compliance Certificate" means a certificate in the form of Exhibit G or such other form approved by Administrative Agent from time to time.

"Conforming Changes" means, with respect to either the use or administration of Adjusted Term SOFR or Daily Floating SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Reference Rate," the definition of "Daily Floating SOFR", the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 15.5 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Construction Contract" means the agreement between the Borrower and the Contractor relating to the construction of the Improvements.

"Construction Costs" means all costs approved by the Administrative Agent relating to the construction of the Improvements or otherwise pertaining to the Fresno Plant Property, as set forth in the Detailed Cost Breakdown.

"Contractor" means Morris General Contracting, Inc., or such other contractor as may be approved by the Administrative Agent, or the Borrower acting in the capacity of general contractor; Dirty Ernie's Landscaping, Inc. (for landscaping); Velosio, LLC (for information technology); AQMS, LLC (for air permit application); Jim Gartung, PE-CE (wastewater pump/pipeline design services); Spectrum Energy Solutions (for energy service design and implementation); Table Mountain Rancheria's Cultural Department (for archeological assessment); Stephanie Catron Design Collaborative, LLC (for interior design and space planning services); and Fence Masters Contractors, Inc. (for fencing and gate installation).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Account" means each DDA that is subject to an account control agreement that is sufficient to grant the Administrative Agent or the Collateral Agent, as the case may be, "control" within the meaning of the UCC.

"Credit Insurance Policy" means a credit insurance policy issued by Euler Hermes or another financially sound and reputable insurance company that is reasonably acceptable to the Administrative Agent covering Borrower's Accounts in amounts with deductibles and on terms and conditions reasonably satisfactory to the Administrative Agent naming the Collateral Agent as the beneficiary thereof, loss payee or additional insured.

"Credit Party" means the Borrower, each Guarantor, or other Person that is liable for payment of any Obligations or that has granted a Lien in favor of any Agent on its assets to secure any Secured Obligations.

"~~Daily One Month LIBOR" means, for each day, (i) the greater of (a) (i) in the case of Revolving Loans, 0.25% per annum and (ii) in all other cases, 0% per annum and (b) a per annum rate of interest, equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion), determined at approximately 11:00 a.m. (Pacific time) two Business Days prior to such date of determination as the rate for Dollar deposits in the London interbank market with a maturity of one month or (ii) in the event the rates referenced in the preceding clauses (i) are not available, the rate per annum equal to the quotation rate offered to first class banks in the London interbank market as determined by the Administrative Agent for deposits (for delivery on such date) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Borrowing, for which the Daily One Month LIBOR is then being determined with a maturity of one month as of approximately 11:00 a.m., (Pacific time) time on such determination date.~~ Crop Line

Credit Agreement" means that certain Second Amended and Restated Loan and Security Agreement dated March 25, 2019 by and between MUFG Union Bank and Maricopa Orchards, LLC, et al, as the same may be amended, restated, amended and restated, refinanced, renewed, replaced, extended, supplemented or otherwise modified from time to time.

"Crop Line Entities" means each of the following: (a) Adams Grantor Land, LLC, a California limited liability company, (b) Granville Farms, LLC, a California limited liability company, (c) FNF Farms, LLC, a California limited liability company, (d) Kamm South, LLC, a California limited liability company, (e) Gradon Farms, LLC, a California limited liability company, (f) Manning Avenue Pistachios, LLC, a California limited liability company, (g) Assemi and Sons, Inc., a California corporation, (h) Winston Farms, LLC, a California limited liability company, (i) FFGT Farms, LLC, a California limited liability company, (j) Favier Ranch, LLC, a California limited liability company, (k) Grantland Farms, LLC, a California limited liability company, (l) Whitesbridge Farms, LLC, a California limited liability company, (m) ACAP Farms, LLC, a California limited liability company, (n) Ashlan & Hayes Farms, LLC, a California limited liability company, (o) Bear Flag Farms, LLC, a California limited liability company, (p) Copper Avenue Investments, LLC, a California limited liability company, (q) Willow Avenue Investments, LLC, a California limited liability company and (r) A&H Investments, LLC, a California limited liability company.

"Daily Floating SOFR" means, for any day, a rate per annum equal to the greater of (a) Adjusted Term SOFR for a one month tenor in effect on such day, and (b) the Floor.  Any change in Daily Floating SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.

"Daily Floating SOFR Loan" means each Revolving Loan bearing interest based on the Daily Floating SOFR (other than pursuant to clause (c) of the definition of "Reference Rate") plus the Applicable Margin.

"Daily Term SOFR Determination Day" has the meaning assigned to such term in the definition of "Term SOFR".

"DDAs" means any checking or other demand deposit account maintained by the Borrower.  All funds in such DDAs shall be conclusively presumed to be Collateral and proceeds of Collateral and no Agent nor any of the Lenders shall have any duty to inquire as to the source of the amounts on deposit in the DDAs.

"Debt" means, with respect to any Person and without duplication as to such Person, any liability, whether or not contingent, (a) which (i) arises in respect of borrowed money, (ii) is evidenced by bonds, notes, debentures, or similar instruments, or (iii) accrues interest or is a type upon which interest or finance charges are customarily paid (excluding trade payables owing in the Ordinary Course of Business), (b) representing the balance deferred and unpaid of the purchase price of any Property or services (other than an account payable to a trade creditor incurred in the Ordinary Course of Business of such Person and payable in accordance with customary trade practices), (c) all obligations as lessee under leases which have been, or should be, in accordance with GAAP recorded as capital or finance leases, (d) any contractual obligation, contingent or otherwise, of such Person to pay or be liable for the payment of any debt described in this definition of another Person, including any such debt, directly or indirectly Guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such debt, or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition, (e) all obligations with respect to redeemable stock and redemption or repurchase obligations under any Equity Interests or other equity securities issued by such Person, (f) all reimbursement obligations and other liabilities of such Person with respect to surety bonds

(whether bid, performance, or otherwise), letters of credit, bankers' acceptances, drafts or similar documents or instruments issued for such Person's account, (g) all debt of such Person in respect of debt of another Person for borrowed money or debt of another Person otherwise described in this definition which is, in either case, secured by any Lien on any Property of such Person, whether or not such debt is assumed by or is a personal liability of such Person, (h) all net obligations, liabilities, and debt of such Person arising under Hedging Agreements to the extent required to be reflected as a liability in such Person's balance sheet as of the date of determination, (i) all debt of any partnership or joint venture in which such Person is a general partner or a joint venturer to the extent such person is liable therefor as a result of such Person's ownership interest in such entity, except to the extent that the terms of such debt expressly provide that such Person is not liable therefor or such Person has no liability therefor under Applicable Law, (j) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, and (k) all obligations of such Person under take or pay or similar arrangements.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or which upon, notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means for any Obligation (including, to the extent permitted by Applicable Law, interest not paid when due), two percent (2%) per annum plus the interest rate (including the Applicable Margin) otherwise applicable thereto.

"Defaulting Lender" subject to Section 4.3, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the Swingline Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in any Swingline Loans or Protective Advances) within two Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent or the Swingline Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a

Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 4.3) upon delivery of written notice of such determination to the Borrower and each Lender.

"Delaware Divided LLC" means any Delaware LLC which has been formed upon the consummation of a Delaware LLC Division.

"Delaware LLC" means any limited liability company organized or formed under the laws of the State of Delaware.

"Delaware LLC Division" means the statutory division of any Delaware LLC into two or more Delaware LLCs pursuant to Section 18-217 of the Delaware Limited Liability Company Act.

"Detailed Cost Breakdown" means an itemized schedule on a component, unit and trade breakdown basis showing all costs and expenses required for construction of the Improvements in accordance with the Project Plans, which has been submitted to and approved by the Administrative Agent.

"Dilution Factors" means, without duplication, the aggregate amount of all deductions, credit memos, returns, adjustments, allowances, bad debt write-offs and other non-cash credits which are recorded to reduce Accounts in a manner consistent with current and historical accounting practices of the Borrower.

"Dilution Ratio" means, the greater of (a) for the trailing twelve month period ending on the last day of any fiscal month, the amount (expressed as a percentage) equal to (i) the aggregate amount of the applicable Dilution Factors for such period divided by (ii) total gross sales for such period, and (b) for the trailing three month period ending on the last day of any fiscal month, the amount (expressed as a percentage) equal to (i) the aggregate amount of the applicable Dilution Factors for such period divided by (ii) total gross sales for such period.

"Dilution Reserve" means, at any date of determination, (a) the amount by which the Dilution Ratio exceeds five percent (5%), multiplied by (b) the Eligible Accounts on such date.

"Disbursement Schedule" means the schedule or schedules for disbursement of the Advances of the Real Estate Term Loans and of Borrower's Funds, if any, delivered pursuant to Section 7.3(a)(iv), which may be amended from time to time by reallocations made in accordance with Section 2.3(b).

"Dollars" means lawful money of the United States.

"ECA" means that certain Environmental Compliance Agreement dated as of the date of the Initial Real Estate Term Advance and made by the Borrower for the benefit of the Agents and the Secured Parties.

"EEA Financial Institution" means (a) any credit institution or investment firm established in an EEA Member Country that is subject to the supervision of an EEA Resolution Authority; (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) above; or

(c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in the foregoing clauses and is subject to consolidated supervision with its parent.

"EEA Member Country" means, any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means, any public administrative authority or any Person entrusted with public administrative authority of an EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Record" has the meaning assigned to that term in, and shall be interpreted in accordance with, 15 U.S.C. 7006.

"Electronic Signature" has the meaning assigned to that term in, and shall be interpreted in accordance with, 15 U.S.C. 7006.

"Eligible Account" means, at any time, an Account owing to the Borrower and set forth on the most recent Borrowing Base Certificate and which the Administrative Agent, in its Permitted Discretion deems to be an Eligible Account, in each case net of (i) finance charges and any Debt secured by a priority Lien established by law, (ii) sales, excise, or similar taxes which are not reserved in the Borrowing Base, and (iii) returns, discounts, claims, credits, allowances, accrued rebates, offsets, deductions, counterclaims, disputes, and other defenses of any nature at any time issued, owing, granted, outstanding, available or claimed in each case calculated and determined in Dollars.  Without limiting Administrative Agent's discretion provided herein, Eligible Accounts shall not include any Account:

        (a)     with respect to which the Account Debtor is an officer, shareholder, director, employee or agent of the Borrower;

        (b)     with respect to which the Account Debtor is a Subsidiary of, related to, an Affiliate of, or other has common managers, officers or directors, with the Borrower;

        (c)     relates to goods placed on consignment, guaranteed sale, a sale on a bill-and-hold, sale-and-return, sale on approval, cash-on-delivery or any other repurchase or return basis or any other terms by which the payment by the Account Debtor thereof may be conditional;

        (d)     with respect to which the Account Debtor is located outside the United States or Canada (with the exception of Quebec) unless the payment of such Account is supported by a letter of credit, in form and substance reasonably satisfactory to the Administrative Agent that is issued by a financial institution that is reasonably satisfactory to the Administrative Agent in its sole discretion and which is in the possession of, and is directly drawable by, the Administrative Agent or is otherwise covered by a Credit Insurance Policy and such Account conforms to the requirements of the applicable Credit Insurance Policy;

        (e)     with respect to which the Account Debtor is (i) any Governmental Authority of any country other than the United States unless such Account is backed by a letter of credit acceptable to the Administrative Agent which is in the possession of, and is directly drawable by, the Administrative Agent, or (ii) any Governmental Authority of the United States, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the Lien of the Administrative Agent in such Account have been complied with to the Administrative Agent's satisfaction;

(f)      with respect to which the Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to the Borrower;

(g)      with respect to which the Account Debtor has asserted any defense, counterclaim, discount or setoff, whether well-founded or otherwise, and Accounts from Account Debtors to which the Borrower owes any accounts payable or other "contra" amounts, to the extent of such offsets and "contra" amounts;

(h)      owing by an Account Debtor which is (i) a Sanctioned Person, (ii) not Solvent or (iii) subject to an Insolvency Proceeding;

(i)      that is not paid within ~~ninety (90) days from invoice date if terms are 30 days or over 60 days from due date, but no more than~~ one hundred twenty (120) days from invoice date;

(j)      which when aggregated with other Accounts owing by such Account Debtor and its Affiliates, it exceeds 20% of the aggregate Eligible Accounts (or such higher percentage as Administrative Agent may establish for such Account Debtor from time to time);

(k)      which (i) does not arise from the sale of goods or performance of services in the Ordinary Course of Business, (ii) is not evidenced by a paper invoice or other equivalent documentation that is reasonably satisfactory to the Administrative Agent which has been sent to the Account Debtor, (iii) represents a progress billing or other advance billing, (iv) is contingent upon the Borrower's completion of any further performance, (v) relates to payments of interest, (vi) is a customer deposit or a customer prepayment, or (vii) is an unapplied credit memo or chargeback;

(l)      [Reserved];

(m)      which (i) is not subject to a valid, duly perfected, first priority Lien in favor of the Collateral Agent and (ii) is subject to any other Lien;

(n)      as to which any of the representations, and warranties or covenants in this Agreement or the other Loan Documents respecting Eligible Accounts shall be, in the case of representations and warranties, untrue or misleading, or in the case of covenants, in default; provided, however, that this clause (n) shall not (i) be deemed a waiver by the Required Lenders of any Default which occurs under this Agreement or any other Loan Document as a result of any such representation, warranty, or covenant being untrue or misleading, or in default or (ii) limit the ability of Administrative Agent to institute Availability Reserves in connection therewith to the extent provided in this Agreement;

(o)      which is owing by an Account Debtor for which more than 20% or more of the Accounts owing by such Account Debtor and its Affiliates are not Eligible Accounts hereunder;

(p)      (i) as to which the Goods giving rise to such Account, (A) have not been delivered or provided to the Account Debtor; (B) have not been accepted by the Account Debtor; or (C) have been returned, rejected, repossessed, lost, or damaged, which results in the Account Debtor being relieved of any payment obligation on such Account; (ii) which does not represent a final sale to the Account Debtor (except for sales subject to repurchase as to which a reserve has been established) or (iii) for which the services giving rise to such Account have not been fully performed by the Borrower;

(q) which is evidenced by Chattel Paper or an Instrument of any kind (unless the same has been pledged to Administrative Agent and the original thereof delivered to Administrative Agent) or has been reduced to judgment;

(r) which is a credit balance that has aged past its eligibility period; or

(s) for which the Account Debtor has made advance deposits or prepayments or against which there are unapplied credit memos or chargebacks, in each case to the extent of those deposits, prepayments, credit memos or chargebacks.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 14.2(c), (e) and (f) (subject to such consents, if any, as may be required under Section 14.2(c)).

"Eligible Contract Participant" means an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder.

"Eligible Equipment" means the items set forth in an Approved Appraisal or otherwise described on a schedule of expenditures provided by the Borrower to the Administrative Agent and approved by the Administrative Agent in its Permitted Discretion (which such approval may be subject to the receipt by the Administrative Agent of such supporting information as may be reasonably requested by the Administrative Agent); provided that any such item (other than any such item which is located at a location or site owned and controlled by the Borrower) shall (i) be located at a location or site that is a Permitted Location and (ii) unless waived by the Administrative Agent in its discretion, be located at a Permitted Location for which the Administrative Agent has received from the Person owning or controlling such Permitted Location a Third Party Agreement; provided further that prior to December 31, 2020 (or such later date as may be agreed to by the Administrative Agent), the ARO Transferred Equipment and the Chowchilla Transferred Equipment shall not be deemed to be ineligible solely as a result of the failure to satisfy the requirements set forth in the foregoing proviso to this definition.

"Eligible Inventory" means, at any time, the Inventory of the Borrower consisting of raw and processed pistachios which is (i) owned by the Borrower free and clear of all Liens (other than Liens in favor of growers that have been deducted in determining in the Borrowing Base or are subject to a Grower Subordination Agreement and Liens in favor of the Collateral Agent to secure the Secured Obligations (or any portion thereof)), (ii) held for sale or lease by the Borrower and normally and currently saleable in the Ordinary Course of Business, (iii) of good and merchantable quality, free from defects, (iv) located only at locations of which the Administrative Agent has been notified in writing and (v) subject to a first priority security interest in favor of the Collateral Agent and which the Administrative Agent, in its Permitted Discretion otherwise deems to be Eligible Inventory. Without limiting the Administrative Agent's discretion provided herein, Eligible Inventory shall not include any Inventory (other than Inventory in an aggregate amount of up to $15,000,000 which is either in transit or being processed which would otherwise constitute Eligible Inventory if not in transit or being processed, so long as such Inventory is insured by an insurance company rated "A" by AM Best or otherwise adequately insured in the Administrative Agent's Permitted Discretion):

(a) which constitutes work-in-process, spare parts, returned items, processing, obsolete or un-merchantable items;

(b) which consists of items used as salesperson's samples or demonstrators;

(c) which is held in stock past June 30 of the second year following the year of harvest of such Inventory;

(d) which is Inventory aboard ocean going vessels;

(e) which is not subject to a valid, duly perfected, first priority Lien in favor of the Collateral Agent;

(f) as to which any of the representations and warranties or covenants in this Agreement or the other Loan Documents respecting Eligible Inventory shall be, in the case of representations and warranties, untrue or misleading, or in the case of covenants, in default; provided, however, that this clause (f) shall not (i) be deemed a waiver by the Required Lenders of any Default which occurs under this Agreement or any other Loan Document as a result of any such representation, warranty, or covenant being untrue or misleading, or in default or (ii) limit the ability of Administrative Agent to institute Availability Reserves in connection therewith to the extent provided in this Agreement;

(g) which is on consignment (i.e., where the Borrower is the consignee) from any seller, vendor, or supplier or subject to any agreement whereby the seller, vendor, or supplier has retained any title to such Inventory or the right to repurchase such Inventory;

(h) which is on consignment (i.e., where the Borrower is the consignor) to any other Person;

(i) which fails to meet standards of any Governmental Authority or Applicable Law regarding the storage, use, or sale of such Inventory;

(j) which is subject to any negotiable Document (unless the same has been pledged to the Collateral Agent and the original thereof delivered to the Collateral Agent);

(k) which is located at a Permitted Location not owned and controlled by the Borrower, unless (i) the Administrative Agent has received from the Person owning or controlling such Permitted Location a Third Party Agreement or (ii) if the Administrative Agent agrees to do so in lieu of a Third Party Agreement, the Administrative Agent has instituted an Availability Reserve in an amount determined by the Administrative Agent in its Permitted Discretion;

(l) which consists of any packaging or shipping materials, supplies, catalogs, labels, samples, display items or floor models, tooling, or promotional materials (except for packaging that is an integral part of finished goods);

(m) which is not adequately insured for loss as determined by the Administrative Agent in its Permitted Discretion;

(n) which may only be sold under license or permit, except to the extent that such licenses or permits are readily accessible to the Administrative Agent as determined in its sole discretion;

(o) which represents the cost of freight-in; and

(p) which is covered by non-negotiable documents of title, unless the negotiable document representing such Inventory has been delivered to the Administrative Agent.

"Enforcement Action" means any action to collect any Secured Obligations or enforce any Loan Document or to realize upon any Collateral (whether by judicial action, self-help, notification of Account Debtors, exercise of setoff or recoupment, or otherwise).

"Environmental Laws" means all federal, state, provincial, local and foreign laws (including without limitation common law), statutes, regulations and rules whether now or hereinafter in effect relating in any way to the protection of the environment or the management, release or threatened release of any Hazardous Material, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act and the Toxic Substances Control Act, in each case as amended, and all rules, regulations, judgments, decrees, orders and licenses arising under all such laws.

"Equipment Term Loan" means a loan made pursuant to Section 2.3(a).

"Equipment Term Loan Availability Termination" means December 31, 2021.

"Equipment Term Loan Commitment" means, with respect to each Lender, the obligation of such Lender to make an Equipment Term Loan hereunder, up to the principal amount shown on Schedule 1.1(a).

"Equipment Term Loan Commitment Termination Date" means the earliest to occur of (a) the Equipment Term Loan Maturity Date; (b) the date on which the Equipment Term Loan Commitments terminate pursuant to Section 2.3(a)(i); and (c) the date on which the Equipment Term Loan Commitments are terminated pursuant to Section 12.2.

"Equipment Term Loan Commitments" means the aggregate amount of Equipment Term Loan Commitments of all Lenders.

"Equipment Term Loan Lender" means any Lender with an Equipment Term Loan Commitment or outstanding Equipment Term Loans.

"Equipment Term Loan Maturity Date" means October 20, 2025.

"Equipment Term Note" means a promissory note to be executed by the Borrower in favor of any Equipment Term Loan Lender in the form of Exhibit B-1 attached hereto and made a part hereof, which shall be in the amount of such Equipment Term Loan Lender's Equipment Term Loan Commitment and shall evidence the Equipment Term Loan made by such Equipment Term Loan Lender.

"Equity Interest" means the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability, or joint venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest in any other Person.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"EU Bail-In Legislation Schedule" means, the EU Bail-In Legislation Schedule published by the Loan Market Association, as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 12.1.

"Excess Availability" means, at any time of determination, the amount, if any, by which (a) the lesser of the Borrowing Base and the Revolving Commitments exceeds (b) the Total Revolving Exposure (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Applicable Revolving Percentage of all outstanding Borrowings of Revolving Loans).

"Excluded Swap Obligation" means, with respect to any Guarantor individually determined on a Guarantor by Guarantor basis, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an Eligible Contract Participant at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 14.6) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 5.7, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 5.7(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Extraordinary Expenses" means all costs, expenses, or advances that any Agent may incur during a Default or during the pendency of an Insolvency Proceeding of the Borrower or any Subsidiary Guarantor, including those relating to (a) any audit, inspection, field examination, repossession, storage, repair, appraisal, insurance, manufacture, preparation, or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against any Agent, any Lender, the Borrower, any Subsidiary Guarantor, any representative of creditors of the Borrower, any Subsidiary Guarantor or any other Person) in any way relating to any Collateral (including the validity, perfection, priority, or avoidability of the Collateral Agent's Liens with respect to any Collateral), Loan Documents, or Secured Obligations, including any lender liability or other Claims; (c) the exercise, protection or enforcement of any rights or remedies of any Agent in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges, or Liens with respect to any Collateral; (e) any Enforcement Action; (f) negotiation and documentation of any amendment, restatement, supplement, modification, waiver, workout, restructuring, or forbearance with respect to any Loan Documents or Secured Obligations; and (g) Protective Advances. Such costs, expenses, and advances include transfer fees, Other Taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, turnaround and financial consultants and experts' fees, environmental study fees and remedial response costs, wages and salaries paid to employees of the Borrower or any Subsidiary Guarantor or independent contractors in liquidating any Collateral, and travel expenses.

"FATCA" means Sections 1471 through 1474 of the Code, as of the Original Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"FDIC" means the Federal Deposit Insurance Corporation.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal, for each day during such period, to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations at approximately 12:00 p.m. for such day on such transactions received by Administrative Agent from three Federal Funds brokers of recognized standing selected by it in its discretion.

"Fee Letter" means the fee letter agreement dated September ~~25~~13, ~~2020~~2022 between MUFG Union Bank and the Borrower.

~~"Fixed LIBOR Loan" means each set of Term Loans bearing interest based on LIBOR that is fixed for the applicable Interest Period plus the Applicable Margin and having a common length and commencement of Interest Period.~~

~~"Floating LIBOR Loan" means each Loan bearing interest based on the Daily One Month LIBOR plus the Applicable Margin.~~

"Flood Insurance Laws" means, collectively, (a) the National Flood Insurance Act of 1968, (b) the Flood Disaster Protection Act of 1973, (c) the National Flood Insurance Reform Act of 1994, (d) the Flood Insurance Reform Act of 2004 and (e) the Biggert-Waters Flood Insurance Reform Act of 2012, as each of the foregoing is now or hereafter in effect and any successor statute to any of the foregoing.

"Floor" means a rate of interest equal to 0%.

"Foreign Subsidiary" means a Subsidiary that is not organized under the laws of the United States, any State thereof or the District of Columbia.

"Fresno Approved Appraisal" has the meaning assigned to such term in the definition of Approved Appraisal.

"Fresno Deed of Trust" means that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (Construction Deed of Trust) dated as of the date of the Initial Real Estate Term Advance by and among Ventana South, LLC, a California limited liability company, as trustor, UnionBanCal Mortgage Corporation, as trustee, and the Collateral Agent, as beneficiary, pursuant to which the Collateral Agent is granted Liens upon the Fresno Plant Property as security for the Secured Obligations.

"Fresno Plant Property" means the Fresno Plant Real Property, the Improvements and the related Personal Property located at the Fresno Plant Real Property.

"Fresno Plant Real Property" means that certain real property described on Schedule 1.1(c).

"Fresno Title Policy" means an ALTA LP-10 Policy of Title Insurance or its equivalent acceptable to the Administrative Agent, naming the Collateral Agent as insured, with a liability limit of not less than the amount of the Real Estate Term Loan, issued by the Title Insurer, insuring that the Fresno Deed of Trust constitutes a valid first lien on the Fresno Plant Property, with only such exceptions from its coverage as shall have been approved in writing by the Administrative Agent, with such

reinsurance or coinsurance agreements or endorsements to such policy as the Administrative Agent may require.

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to the Swingline Lender, such Defaulting Lender's Applicable Revolving Percentage of outstanding Swingline Loans made by such Swingline Lender other than Swingline Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" has the meaning assigned to such term in Section 10.14.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Governmental Requirement" means any law, statute, order, ordinance, rule, regulation, permit or act of a Governmental Authority.

"Grower Subordination Agreement" means each subordination agreement, in form and substance satisfactory to the Administrative Agent, executed by an Affiliate or other third party supplier of Inventory to the Borrower or its Subsidiaries, which, amongst other things subordinates any grower payables owing by the Borrower or its Subsidiaries to the Obligations.

"Guarantee" of or by any Person (in this definition, the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Debt or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Debt or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Debt or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means, collectively, the Borrower (with respect to the Secured Obligations of each Subsidiary Guarantor), each Non-Subsidiary Guarantor and each Subsidiary, if any, party to a Guaranty on or after the Original Closing Date.

"Guaranty" means each separate Guarantee of the Secured Obligations substantially in the form of Exhibit L hereto or such other form as may be reasonably acceptable to the Administrative Agent, delivered by each Guarantor in favor of the Agents for the benefit of the Secured Parties.

"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (a) designated a "pollutant," "hazardous substance," "extremely hazardous substance" or "toxic chemical" under any Environmental Law, or (b) regulated as hazardous or toxic in any way under the regulations of any state where the Borrower or any of its Subsidiaries conducts its business or owns any real property or has any leasehold or in which any relevant property is located.

"Hedging Agreement" has the meaning for swap agreement as defined in 11 U.S.C. § 101, as in effect from time to time, or any successor statute, and includes any rate swap agreement, forward rate agreement, commodity swap, commodity option, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option and any other similar agreement, in each case, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Hedging Obligations" of the Borrower or a Subsidiary Guarantor means any and all obligations of the Borrower or such Subsidiary Guarantor, whether absolute or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Hedging Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Hedging Agreement transaction.

"High Volatility Commercial Real Estate Loan" means a loan classified as a "High Volatility Commercial Real Estate Exposure" as set forth in 12 C.F.R. §3.2, as the same may be amended from time to time.

"HVCRE ADC Loan" has the meaning assigned to such term in the Economic Growth, Regulatory Relief, and Consumer Protection Act, P.L. 115-174, Sec. 214, as the same may be amended from time to time.

"Illegality Notice" has the meaning assigned to such term in Section 15.1.

"Improvements" means a sixty million pound capacity pistachio processing plant under construction on 315.76 acres at Kamm Avenue and Highway 33, in western Fresno Country, including without limitation building, fixtures and equipment.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" means, collectively, the Agent Indemnitees and the Lender Indemnitees.

"Initial Real Estate Term Advance" means the initial Advance of Real Estate Term Loans made pursuant to this Agreement by the Lenders to the Borrower on the date of satisfaction of the conditions set forth in Section 3 of Amendment No. 2 and Sections 7.2 and 7.3(a).

"Insolvency Proceeding" means any case or proceeding commenced by or against a Person under any state, federal, or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other Debtor Relief Law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator, or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

"Intellectual Property" means all intellectual and similar Property of a Person including (a) inventions, designs, patents, patent applications, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software, and databases; (b) all embodiments or fixations thereof and all related documentation, applications, registrations, and franchises; (c) all licenses or other rights to use any of the foregoing; and (d) all books and records relating to the foregoing.

"Interest Payment Date" means (a) as to any Reference Rate Loan and Daily Floating SOFR Loan, the last Business Day of each calendar month and the Maturity Date and (b) as to any Term SOFR Loan, the last day of each Interest Period therefor and the Maturity Date.

"Interest Period" means with respect to any ~~Fixed LIBOR~~Term SOFR Loan, an interest period of one (1) month commencing on the date of making of, conversion to, or continuation of such ~~Fixed LIBOR~~Term SOFR Loan.

"Interest Rate Protection Agreement" has the meaning assigned to such term in Section 10.15.

"Inventory" means all present and hereafter acquired inventory of the Borrower wherever located, including but not limited to, inventory as defined in the UCC and, in any event, includes (a) all Goods intended for sale, lease, display, or demonstration and (b) all work in process and all raw materials and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease, or furnishing of such Goods, or Goods otherwise used or consumed in the Borrower's business (but excluding Equipment) and (c) all proceeds and products of any of the foregoing, all guaranties and other security therefor, and all of the Borrower's present and future books and records relating thereto (including computer-stored information and all software relating thereto) and all contract rights with third parties relating to the maintenance of any such books, records and information.

"Inventory Reserves" means such reserves as may be established from time to time by the Administrative Agent, in its Permitted Discretion, with respect to the saleability of the Eligible Inventory or which reflect such other factors as negatively affect the value of the Eligible Inventory.

"Investment" means, with respect to any Person, any loan, advance, or extension of credit by such Person to, or any Guarantee with respect to the Equity Interests, Debt, or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase, or other acquisition by such Person of any Equity Interests of any other Person, other than any Acquisition. In determining the aggregate amount of Investments outstanding at any particular time, (a) the amount of any Investment represented by a Guarantee shall be the higher of (i) the stated or determinable amount of the obligation Guaranteed and (ii) the maximum amount for which the guarantor may be liable pursuant to the terms of the instrument embodying such Guarantee (and, if such amounts are not determinable, the maximum reasonably anticipated liability in respect thereof, as determined by the Person providing such guaranty in good faith); (b) there shall be deducted in respect of each such Investment any amount received as a return of principal or capital (including by repurchase, redemption, retirement, repayment, liquidating, or other dividend or distribution); (c) there shall not be deducted in respect of any Investment any amounts received as earnings on such Investment, whether as dividends, interest, or otherwise; (d) there shall not be deducted from or added to the aggregate amount of Investments any decrease or increases, as the case may be, in the market value thereof; and (e) the amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, forgiveness or conversion to equity of Debt, or write-ups, write-downs, or write-offs with respect to such Investment.

"IRS" means the United States Internal Revenue Service.

"Leases" has the meaning assigned to such term in Section 8.18.

"Lender Indemnitees" means each of the Lenders and their respective officers, directors, employees, Affiliates, agents, consultants, and attorneys.

"Lenders" means the Persons listed on Schedule 1.1(a) and any other Person that shall have become party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.  Unless the context requires otherwise, the term "Lenders" includes the Swingline Lender.

"Lending Office" means, with respect to any Lender, the office designated by such Lender at the time it becomes party to this Agreement or thereafter by notice to the Administrative Agent and the Borrower.

"Lessor Waiver" means that certain Lessor Waiver of Rights and Interests in and to Equipment and Fixtures dated as of the Original Closing Date and executed by Ventana South, LLC, a California limited liability company, in favor of the Agents, for the benefit of themselves and the other Secured Parties.

~~"LIBOR" means, for any Interest Period, (i) the greater of (a) 0% per annum and (b) a per annum rate of interest, equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion), determined at approximately 11:00 a.m. (Pacific time) two Business Days prior to the commencement of the applicable Interest Period as the rate for Dollar deposits in the London interbank market with a maturity equal to such Interest Period or (ii) in the event the rates referenced in the preceding clauses (i) are not available, the rate per annum equal to the quotation rate offered to first class banks in the London interbank market as determined by the Administrative Agent for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Borrowing, for which LIBOR is then being determined with maturities comparable to such Interest Period as of approximately 11:00 a.m., (Pacific time) time on such determination date.  If the Board of Governors imposes a Reserve Percentage with respect to LIBOR deposits and the applicable rate is determined by reference to the foregoing clause (i), then LIBOR shall be (x) the foregoing rate, divided by (y) the sum of 1 minus the Reserve Percentage.~~

~~"LIBOR Loan" means a Fixed LIBOR Loan or a Floating LIBOR Loan.~~

"Licensor" means any Person from whom a Credit Party obtains the right to use any Intellectual Property.

"Lien" has the meaning assigned to such term in Section 10.9.

"Loan" means a Revolving Loan or Term Loan.

"Loan Documents" means this Agreement, the Fee Letter, the Fresno Deed of Trust, each Note, each Security Document, each Third Party Agreement, each Collateral Disclosure Certificate, each Grower Subordination Agreement, each Borrowing Base Certificate, Compliance Certificate, each document delivered pursuant to Section 7.3(a)(vii), any other report, and other documents, instruments,

agreements, certificates, and schedules executed or delivered pursuant to or in connection herewith or any other Loan Document, or the transactions contemplated herein, whether now existing or hereafter arising, together with all exhibits, schedules, annexes, addenda, and other attachments thereto, in each case, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Loan-to-Value Ratio" means the ratio of (a) the indebtedness evidenced by this Agreement (or the Real Estate Term Notes) with respect to the Real Estate Term Loans and any secondary financing permitted with respect thereto pursuant to the Loan Documents to (~~ii~~b) the Appraised Value (Fresno).

"Loan Year" means each twelve-month period commencing on the Amendment No. 2 Effective Date and ending on each anniversary of the Amendment No. 2 Effective Date.

"Loss" means, with respect to any Property, (a) the loss, theft, damage, or destruction thereof or other casualty with respect thereto or (b) the condemnation or taking by eminent domain thereof by any Governmental Authority.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect on, the business, operations, performance, liabilities, condition (financial or otherwise) or properties of the Borrower and the Subsidiary Guarantors, taken as a whole, (b) a material impairment of the ability of the Borrower and the Subsidiary Guarantors, taken as a whole, to perform their payment or other material obligations under the Loan Documents, or (c) a material adverse effect on (1) the rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders under the Loan Documents, (2) the legality, validity, binding effect or enforceability against any Credit Parties, taken as a whole, of any material Loan Document, or of the Loan Documents, taken as a whole, or (3) the perfection or priority of the Liens granted under the Loan Documents.

"Maturity Date" means, (a) with respect to a Revolving Loan or Swingline Loan, the Revolving Commitment Maturity Date, (b) with respect to an Equipment Term Loan, the Equipment Term Loan Maturity Date and (c) with respect to a Real Estate Term Loan, the Real Estate Term Loan Maturity Date.

"Moody's" means Moody's Investors Service, Inc., and its successors.

"Mortgage" means the Fresno Deed of Trust and each other mortgage, deed of trust, or deed to secure debt pursuant to which a Credit Party grants to the Collateral Agent Liens upon the Real Estate owned by such Credit Party as security for the Secured Obligations.

"Net Proceeds" means:

(a) in connection with any Asset Disposition (whether pursuant to a sale, transfer, assignment or other disposition of Equity Interests of a Subsidiary or otherwise), by the Borrower or any Subsidiary, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Asset Disposition, but only as and when so received, over (ii) the sum of (A) the out-of-pocket expenses incurred by the Borrower or Subsidiary in connection with such Asset Disposition, (B) all legal, title and recording expense and all federal, state, provincial, foreign and local Taxes required to be accrued as a liability under GAAP as a consequence of such Asset Disposition (after taking into account any available tax credits or deductions and any tax sharing arrangements), (C) all distributions and other payments required to be made to minority interest holders in Subsidiaries as a result of such sale, (D) the deduction of appropriate amounts provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the Property disposed of and retained by the Borrower or

Subsidiary after such Asset Disposition, and (E) any portion of the purchase price from such sale placed in escrow, whether as a reserve for adjustment of the purchase price, for satisfaction of indemnities in respect of such Asset Disposition or otherwise in connection with such Asset Disposition; provided, however, that upon the termination of such escrow, Net Proceeds will be increased by any portion of funds in the escrow that are released to the Borrower or such Subsidiary;

(b) with respect to any sale, issuance or other incurrence by the Borrower or Subsidiary of any Debt (other than Debt permitted under Section 10.10) or, solely for the purposes of Section 12.7 and, without requiring any prepayment hereunder under Sections 5.3(a) and 5.3(b), any AGI Subordinated Debt or any Equity Interests (other than of a Subsidiary of the Borrower), the difference between (i) the aggregate amount of cash or Cash Equivalents received in connection with the sale, issuance or other incurrence of such Debt or Equity Interests (as applicable) and (ii) the aggregate amount of any reasonable transaction costs actually incurred in connection therewith, including all reasonable fees and expenses of attorneys, accountants, and other consultants, all reasonable underwriting or placement agent fees and reasonable fees and expenses of any trustee, registrar or transfer agent;

(c) in connection with the receipt by the Borrower or Subsidiary, or by Administrative Agent as loss payee as provided in Section 10.4 or any Mortgage, of any cash proceeds (including proceeds of insurance, other than business interruption insurance, paid with respect to or awards or compensation arising from any Loss) in an amount equal to the aggregate amount of cash or Cash Equivalents received by the Borrower or Subsidiary or any Agent in connection with such Loss; and

(d) with respect to the receipt by the Borrower or Subsidiary, or by Administrative Agent as loss payee as provided in Section 10.4, of any cash proceeds (other than any such cash proceeds that the Administrative Agent in its reasonable discretion, after consultation with the Lenders, permits to be retained by the Borrower) under any business interruption insurance policy maintained by the Borrower or any Subsidiary, the amount of cash proceeds received by the Borrower or Subsidiary, or by any Agent as loss payee.

"New Equipment Term Advance" means an Advance of an Equipment Term Loan made pursuant to Section 2.3(a) that is identified as a "New Equipment Term Advance" in the applicable Notice of Term Borrowing, the proceeds of which are used solely to finance the purchase of equipment (other than any equipment purchased in connection with the Chowchilla Acquisition or the ARO Acquisition) to be located at, and used in connection with the operations of, any Plant Property.

"Non-Consenting Lender" means, any Lender whose consent or approval of any consent, amendment, or waiver (including any forbearance of any Agent's or Lender's rights and remedies), was required pursuant to Section 17.2 but which, for any reason, such Lender failed to provide such consent or approval before the later to occur of (a) the end of the period of time established by the Administrative Agent for the obtaining of such consent from the Lenders and (b) five days after the Required Lenders shall have provided such consent.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Subsidiary Guarantor" means each Guarantor that is not a Subsidiary Guarantor.

"Non-U.S. Lender" means a Lender that is not a U.S. Person.

"Not Otherwise Applied" means, with reference to any amount of proceeds of any transaction or event, that such amount (a) was not previously (and is not concurrently being) applied in determining the permissibility of a transaction under the Loan Documents where such permissibility was or is (or may have been) contingent on receipt of such amount or the utilization of such amount for a specified purpose or (b) was not previously applied to another transaction under the Loan Documents.

"Notes" means each Revolving Note, Swingline Note, Equipment Term Note, Real Estate Term Note or other promissory note executed by the Borrower to evidence any Obligations, as amended, restated, supplemented, or otherwise modified from time to time.

"Notice of Borrowing" means, as the context requires, a Notice of Revolving Borrowing or a Notice of Term Borrowing.

"Notice of Conversion/Continuation" means a notice substantially in the form of Exhibit E or in such other form acceptable to the Administrative Agent from time to time.

"Notice of Revolving Borrowing" means a Notice of Borrowing in the form of Exhibit D-1 or such other form acceptable to the Administrative Agent from time to time.

"Notice of Term Borrowing" means a Notice of Borrowing in the form of Exhibit D-2 or such other form acceptable to the Administrative Agent from time to time.

"Obligations" means all (a) principal of and premium, if any, on the Loans; (b) interest, expenses, charges, fees, and other sums payable by the Credit Parties under this Agreement or the other Loan Documents (including any interest on pre-petition Obligations accruing after the commencement of any Insolvency Proceeding by or against any Credit Party, whether or not allowable in such Insolvency Proceeding); (c) obligations of the Credit Parties under any indemnity for Claims; (d) Extraordinary Expenses; and (e) other Debts, obligations, covenants, and liabilities of any kind owing by the Credit Parties pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification, or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, joint or several; provided however, that Obligations of a Credit Party shall not include any Excluded Swap Obligation of such Credit Party.

"OFAC" means The Office of Foreign Assets Control of the United States Department of the Treasury or any successor thereto.

"Offsite Materials" means materials to be incorporated into the Improvements or used in connection with the construction of the Improvements that are stored at a location other than the Fresno Plant Real Property.

"Onsite Materials" means materials to be incorporated into the Improvements or used in connection with the construction of the Improvements that are stored on the Fresno Plant Real Property.

"Ordinary Course of Business" means the ordinary course of business of the Borrower or any Subsidiary, consistent with past practices and undertaken in good faith.

~~"Original Closing Date" means March 20, 2020.~~

"Organizational Documents" means, with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement,

members agreement, shareholders agreement, partnership agreement, certificate of partnership, certificate of formation, voting trust agreement, or similar agreement or instrument governing the formation or operation of such Person.

"Original Closing Date" means March 20, 2020.

"Other Connection Taxes" means with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 14.6 or Section 15.4).

"Participant" has the meaning assigned to such term in of Section 14.4(a).

"Participant Register" has the meaning assigned to such term in of Section 14.4(b).

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"Payment Event of Default" means an Event of Default described in subsection (b) of Section 12.1.

"Payment Item" means each check, draft, or other item of payment payable to the Borrower, including those constituting Proceeds of any Collateral.

"Payment in Full" means, with respect to any Obligations, (a) the full cash payment thereof (other than any contingent indemnification Obligations with respect to which no claim has been made), including any interest, fees, and other charges and charges accruing during an Insolvency Proceeding (whether or not allowed in the proceeding); (b) with respect to undrawn letters of credit or other similar contingent Obligations, cash collateralization thereof in a manner and pursuant to documentation satisfactory to the Administrative Agent in its discretion (or delivery of a standby letter of credit acceptable to Administrative Agent in its discretion, in the amount of required cash collateral); and (c) a release of any Claims of all Credit Parties against each Agent and the Lenders arising on or before the payment date.

"Periodic Term SOFR Determination Day" has the meaning assigned to such term in the definition of "Term SOFR".

"Permitted Acquisition" means any Acquisition that meets all of the following requirements:

(a)       no less than fifteen (15) Business Days prior to the proposed closing date of such Acquisition (or such shorter period as may be agreed to by the Administrative Agent), the Borrower shall have delivered written notice of such Acquisition to the Administrative Agent and the Lenders, which notice shall include the proposed closing date of such Acquisition;

(b) the board of directors or other similar governing body of the Person to be acquired shall have approved such Acquisition (and, if requested, the Administrative Agent shall have received evidence, in form and substance reasonably satisfactory to the Administrative Agent, of such approval);

(c) the Person or business to be acquired shall be in a line of business permitted pursuant to this Agreement or, in the case of an Acquisition of assets, the assets acquired are useful in the business of the Borrower and its Subsidiaries as conducted immediately prior to such Acquisition or permitted pursuant to this Agreement;

(d) if such Acquisition is a merger or consolidation, the Borrower or a Subsidiary Guarantor shall be the surviving Person, and such surviving Person shall become, if required, a Subsidiary Guarantor in accordance with this Agreement; and no change of ownership of the Borrower of fifty percent (50%) or more shall have been effected thereby;

(e) no later than five (5) Business Days prior to the proposed closing date of such Acquisition (or such shorter period as may be agreed to by the Administrative Agent), the Borrower shall have delivered to the Administrative Agent a Compliance Certificate demonstrating, in form and substance reasonably satisfactory to the Administrative Agent, that the Borrower is in compliance on a pro forma basis (based on the most recently completed fiscal year or fiscal quarter, as applicable) with each covenant contained in Section 10.14 (assuming for this purpose that for any covenant that has not yet commenced testing that such covenant is then in effect and that the initial required ratio or level is then in effect);

(f) no later than five (5) Business Days prior to the proposed closing date of such Acquisition (or such shorter period as may be agreed to by the Administrative Agent) the Borrower, to the extent requested by the Administrative Agent, (i) shall have delivered to the Administrative Agent promptly upon the finalization thereof copies of substantially final Permitted Acquisition Documents, which shall be in form and substance reasonably satisfactory to the Administrative Agent, and (ii) shall have delivered to, or made available for inspection by, the Administrative Agent substantially complete Permitted Acquisition Diligence Information, which shall be in form and substance reasonably satisfactory to the Administrative Agent;

(g) no Default or Event of Default shall have occurred and be continuing both before and after giving effect to such Acquisition and any Debt incurred in connection therewith;

(h) the Borrower shall have obtained the prior written consent of the Administrative Agent and the Required Lenders prior to the consummation of such Acquisition if the Permitted Acquisition Consideration for such Acquisition (or series of related Acquisitions), together with all other Acquisitions consummated during the term of this Agreement exceeds $2,500,000 in the aggregate;

(i) the Borrower shall demonstrate, in form and substance reasonably satisfactory to the Administrative Agent, that the entity to be acquired had positive profitability for the most recently completed fiscal year prior to the proposed closing date of such Acquisition; and

(j) the Borrower shall have (i) delivered to the Administrative Agent a certificate of a Senior Officer certifying that all of the requirements set forth above have been satisfied or will be satisfied on or prior to the consummation of such purchase or other Acquisition and (ii) provided such other documents and other information as may be reasonably requested by the Administrative Agent or the Required Lenders (through the Administrative Agent) in connection with such purchase or other Acquisition.

"Permitted Acquisition Consideration" means the aggregate amount of the purchase price, including, but not limited to, any assumed debt, earn-outs (valued at the maximum amount payable thereunder), deferred payments, or Equity Interests of the Borrower, to be paid on a singular basis in connection with any applicable Permitted Acquisition as set forth in the applicable Permitted Acquisition Documents executed by the Borrower or any of its Subsidiaries in order to consummate the applicable Permitted Acquisition.

"Permitted Acquisition Diligence Information" means with respect to any applicable Acquisition, to the extent applicable, all material financial information, all material contracts, all material customer lists, all material supply agreements, and all other material information, in each case, reasonably requested to be delivered to the Administrative Agent in connection with such Acquisition (except to the extent that any such information is (a) subject to any confidentiality agreement, unless mutually agreeable arrangements can be made to preserve such information as confidential, (b) classified or (c) subject to any attorney-client privilege).

"Permitted Acquisition Documents" means with respect to any Acquisition proposed by the Borrower or any Subsidiary Guarantor, final copies or substantially final drafts if not executed at the required time of delivery of the purchase agreement, sale agreement, merger agreement or other agreement evidencing such Acquisition, including all schedules, exhibits and annexes thereto and each other material document executed, delivered, contemplated by or prepared in connection therewith and any amendment, modification or supplement to any of the foregoing.

"Permitted Discretion" means reasonable credit or business judgment (from the perspective of a secured asset-based lender) exercised in good faith in accordance with customary business practices of the Administrative Agent.

"Permitted Lien" means any Lien permitted by Section 10.9.

"Permitted Location" means (a) any location in the United States and described in the Collateral Disclosure Certificate and (b) any other location in the United States consented to by the Administrative Agent in writing before such location's being a "Permitted Location."

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Personal Property" means any tangible or intangible personal property described in the Mortgages or any other Security Documents which is security for the Secured Obligations.

"Pistachio Affiliate" has the meaning assigned to such term in Section 8.1.

"Plant Property" means, as the context requires, the Chowchilla Plant Property, the Fresno Plant Property or the Tulare Plant Property.

"Platform" has the meaning assigned to such term in Section 17.1(j).

"Project" means the construction of the Improvements.

"Project Budget" means the cost itemization of the total amount needed by the Borrower to construct the Improvements and to perform the Borrower's other obligations under the Loan Documents, delivered pursuant to Section 7.3(a)(iv), which itemization may be amended from time to time in accordance with Section 2.3(b).

"Project Plans" means the final plans and specifications for construction of the Improvements (including any applicable general conditions), prepared by the Architect and approved by the Administrative Agent as required herein, and all amendments and modifications thereof made pursuant to Change Orders.

"Property" means any interest in any kind of property or asset, whether real, personal, or mixed or tangible or intangible.

"Protective Advance" has the meaning assigned to such term in Section 2.2.

"Qualified Appraisal" means, with respect to any Property, an appraisal of such Property conducted in a manner and with such scope and using such methods as are reasonably acceptable to Administrative Agent by an appraiser selected by, or reasonably acceptable to, Administrative Agent.

"Real Estate" means all right, title, and interest (whether as owner, lessor, or lessee) in any Property which constitutes real property and all improvements thereon or thereto.

"Real Estate Documents" means, with respect to any Real Estate subject to a Mortgage, the following, in form and substance reasonably satisfactory to the Administrative Agent and received by the Administrative Agent for review at least 15 days before the effective date of the Mortgage (or such shorter period which may be agreed to from time to time by the Administrative Agent in writing): (a) a mortgagee title policy (or binder therefor) covering the Collateral Agent's interest under such Mortgage, in a form and amount and by an insurer reasonably acceptable to the Administrative Agent, the premium and other costs of issuance of which must be fully paid by the Borrower on such effective date; (b) the Lessor Waiver and such other assignments of leases, estoppel letters, attornment agreements, consents, waivers, and releases as the Administrative Agent may require with respect to other Persons having an interest in such Real Estate; (c) a current, as-built survey of such Real Estate, containing a metes-and-bounds property description and flood plain certification, certified by a licensed surveyor reasonably acceptable to the Administrative Agent; (d) special flood hazard determinations and, if applicable, flood insurance in an amount, with endorsements and by an insurer reasonably acceptable to the Administrative Agent, if such Real Estate is within a flood plain; (e) a current Qualified Appraisal of such Real Estate; (f) an environmental assessment regarding such Real Estate, prepared by environmental engineers reasonably acceptable to the Administrative Agent, and accompanied by such reports, certificates, studies, or data as the Administrative Agent may reasonably require, or, if permitted by the Administrative Agent, environmental insurance pursuant to a policy, and issued by an underwriter, reasonably acceptable to the Administrative Agent; (g) if applicable, a UCC-1 fixture financing statement; (h) an opinion from counsel licensed to practice in the jurisdiction in which such Real Estate is located, addressing, among other things, the enforceability of such Mortgage and the attachment and perfection of Collateral Agent's Lien in and to such Real Estate; (i) the ECA or another environmental indemnity agreement covering such Real Estate; and (j) such other documents, instruments, or agreements as the Administrative Agent may reasonably require with respect to such Real Estate or Mortgage.

"Real Estate Term Advance Draw Request" means the certified invoice to be delivered by the Borrower to Administrative Agent as a condition to the Lenders making an Advance of Real Estate Term Loans, in such form and certified by such parties as required by the Administrative Agent, together with such schedules, affidavits, releases, waivers, statements, invoices, bills, and other documents, certificates and information as may be required by the Administrative Agent.

"Real Estate Term Loan" means a loan made pursuant to Section 2.3(b).

"Real Estate Term Loan Availability Termination" means June 30, 2023.

"Real Estate Term Loan Commitment" means, with respect to each Lender, the obligation of such Lender to make a Real Estate Term Loan hereunder, up to the principal amount shown on Schedule 1.1(a). "Real Estate Term Loan Commitments" means the aggregate amount of such commitments of all Lenders.

"Real Estate Term Loan Commitment Termination Date" means the earliest to occur of (a) the Real Estate Term Loan Maturity Date; (b) the date on which the Real Estate Term Loan Commitments terminate pursuant to Section 2.3(b)(i); and (c) the date on which the Real Estate Term Loan Commitments are terminated pursuant to Section 12.2.

"Real Estate Term Loan Lender" means any Lender with a Real Estate Term Loan Commitment or outstanding Real Estate Term Loans.

"Real Estate Term Loan Maturity Date" means October 20, 2025.

"Real Estate Term Note" means a promissory note to be executed by the Borrower in favor of any Real Estate Term Loan Lender in the form of Exhibit B-2, attached hereto and made a part hereof, which shall be in the amount of such Real Estate Term Loan Lender's Real Estate Term Loan Commitment and shall evidence the Real Estate Term Loan made by such Real Estate Term Loan Lender.

"Real Property Collateral" has the meaning assigned to such term in Section 8.18.

"Recipient" means (a) the Administrative Agent and (b) any Lender.

"Reference Bank" means MUFG Union Bank.

"Reference Rate" means, for any day, the rate per annum equal to the highest of (a) the Federal Funds Rate in effect on such day plus ½ of 1%; (b) the rate of interest most recently announced by the Reference Bank at its corporate headquarters as the "MUFG Union Bank, N.A. Reference Rate," with the understanding that the "MUFG Union Bank, N.A. Reference Rate" is one of MUFG Union Bank's index rates and merely serves as a basis upon which effective rates of interest are calculated for loans making reference thereto and may not be the lowest or best rate at which MUFG Union Bank calculates interest or extends credit; and (c) Daily ~~One Month LIBOR~~Floating SOFR in effect on such day plus 1%. If for any reason Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable, after due inquiry, to ascertain the Federal Funds Rate or Daily ~~One Month LIBOR~~Floating SOFR for any reason, including the inability or failure of Administrative Agent to obtain sufficient quotations in accordance with the terms hereof, the Reference Rate shall be determined without regard to clause (a) or clause (c), as applicable, of the first sentence of this definition until the circumstances giving rise to such inability no longer exist. Any change in the Reference Rate due to a change in the MUFG Union Bank, N.A. Reference Rate, Federal Funds Rate, or Daily ~~One Month LIBOR~~Floating SOFR shall be effective on the effective date of such change in the MUFG Union Bank, N.A. Reference Rate, Federal Funds Rate, or Daily ~~One Month LIBOR~~Floating SOFR, respectively, automatically and without notice to any Person.

"Reference Rate Loan" means any Loan which bears interest at a rate based on the Reference Rate plus the Applicable Margin.

"Reference Rate Revolving Loan" means a Revolving Loan which bears interest at a rate based on the Reference Rate plus the Applicable Margin.

"Reference Rate Term Loan" means a Term Loan which bears interest at a rate based on the Reference Rate plus the Applicable Margin.

"Register" has the meaning assigned to such term in Section 14.3.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Removal Effective Date" has the meaning assigned to such term in Section 13.6(b).

"Report" has the meaning assigned to such term in Section 13.2(c).

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Required Equipment Term Loan Lenders" means at any time, Equipment Term Loan Lenders having (a) unused Equipment Term Loan Commitments and outstanding Equipment Term Loans in excess of 50% of the aggregate unused Equipment Term Loan Commitments and outstanding Equipment Term Loans and (b) if all of the Equipment Term Loan Commitments have terminated, Equipment Term Loans in excess of 50% of all outstanding Equipment Term Loans; provided, however, that if there are only two (2) non-Affiliated Equipment Term Loan Lenders under the Loan Documents, then Required Equipment Term Loan Lenders shall be comprised of at least two non-Affiliated Equipment Term Loan Lenders. The Equipment Term Loan Commitments and Equipment Term Loans of any Defaulting Lender shall be disregarded in determining Required Equipment Term Loan Lenders at any time.

"Required Lenders" means, at any time, Lenders having (a) unused Commitments and Loans in excess of 50% of the aggregate unused Commitments and Loans and (b) if all of the Commitments have terminated, Loans in excess of 50% of all outstanding Loans; provided, however, that if there are only two (2) non-Affiliated Lenders under the Loan Documents, then Required Lenders shall be comprised of at least two non-Affiliated Lenders. The Commitments and Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Required Real Estate Term Loan Lenders" means at any time, Real Estate Term Loan Lenders having (a) unused Real Estate Term Loan Commitments and outstanding Real Estate Term Loans in excess of 50% of the aggregate unused Real Estate Term Loan Commitments and outstanding Real Estate Term Loans and (b) if all of the Real Estate Term Loan Commitments have terminated, Real Estate Term Loans in excess of 50% of all outstanding Real Estate Term Loans; provided, however, that if there are only two (2) non-Affiliated Real Estate Term Loan Lenders under the Loan Documents, then Required Real Estate Term Loan Lenders shall be comprised of at least two non-Affiliated Real Estate Term Loan Lenders. The Real Estate Term Loan Commitments and Real Estate Term Loans of any Defaulting Lender shall be disregarded in determining Required Real Estate Term Loan Lenders at any time.

"Required Revolving Lenders" means, at any time, Revolving Lenders having (a) unused Revolving Commitments and Revolving Loans in excess of 50% of the aggregate unused Revolving Commitments and Revolving Loans and (b) if all of the Resolving Commitments have terminated, Revolving Loans in excess of 50% of all outstanding Revolving Loans; provided, however, that if there are only two (2) non-Affiliated Revolving Lenders under the Loan Documents, then Required Revolving Lenders shall be comprised of at least two non-Affiliated Revolving Lenders. The Revolving Commitments and Revolving Loans of any Defaulting Lender shall be disregarded in determining Required Revolving Lenders at any time.

~~"Reserve Percentage" means the reserve percentage (expressed as a decimal) applicable to member banks under regulations issued from time to time by the Board of Governors for determining the maximum reserve requirement (including any emergency, supplemental, or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "Eurocurrency liabilities").~~

"Resignation Effective Date" has the meaning assigned to such term in Section 13.6(a).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted Payment" means (a) any payment of a dividend or other distribution (whether in cash, securities, or other Property), direct or indirect, on account of any Equity Interests issued by the Borrower or any of its Subsidiaries, as the case may be, now or hereafter outstanding; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests issued by the Borrower or any Subsidiary now or hereafter outstanding, as the case may be; or (c) any cash payment made to redeem, purchase, repurchase, or retire, or obtain the surrender of, any outstanding warrants, options, or other rights to acquire, exchangeable or exercisable for or convertible into, any Equity Interests issued by the Borrower or any Subsidiary now or hereafter outstanding.

"Revolving Commitment" means, at any time of determination and with respect to each Lender, such Lender's obligation to make Revolving Loans and participate in Swingline Loans up to the maximum principal amount shown on Schedule 1.1(a) or as hereafter determined pursuant to each Assignment and Assumption to which it is a party, as such amount may be decreased as provided herein. "Revolving Commitments" means, at any time of determination, the aggregate amount of such commitments of all Lenders.

"Revolving Commitment Maturity Date" means October 20, 2025.

"Revolving Commitment Termination Date" means the earliest to occur of (a) the Revolving Commitment Maturity Date; (b) the date on which the Borrower terminates the Revolving Commitments pursuant to Section 2.1(c); and (c) the date on which the Revolving Commitments are terminated pursuant to Section 12.2.

"Revolving Credit Exposure" means, as to any Lender at any time, the sum of the aggregate principal amount at such time of its outstanding Revolving Loans and such Lender's participation in Swingline Loans and Protective Advances at such time.

"Revolving Lender" means each Lender with a Revolving Commitment.

"Revolving Loan" means a loan made pursuant to Section 2.1, and, as the context may require, any Swingline Loan or Protective Advance.

"Revolving Note" means a promissory note executed by the Borrower in favor of any Revolving Lender in the form of Exhibit A, which note shall be in the amount of such Revolving Lender's Revolving Commitment and shall evidence the Revolving Loans made by such Revolving Lender.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors.

"Sanctioned Country" means (a) a country, territory or government of a country; or (b) an agency of the government of a country, in each case, that is subject to a U.S. sanctions program that broadly prohibits dealings with that country, territory, government, or agency.

"Sanctioned Person" means, at any time, any person (a) that is listed on the Specially Designated Nationals and Blocked Persons list or the Consolidated Sanctions list maintained by OFAC, or any similar list maintained by OFAC, the U.S. Department of State, the European Union, any European Union member state or the United Nations Security Council; (b) that is fifty-percent or more owned, directly or indirectly, in the aggregate by one or more Persons described in clause (a) above; (c) that is operating, organized or resident in a Sanctioned Country or (d) with whom a U.S. Person is otherwise prohibited or restricted by Sanctions Laws from engaging in trade, business or other activities.

"Sanctions Laws" means the laws, rules, regulations and executive orders promulgated or administered to implement economic sanctions or anti-terrorism programs by (a) any U.S. Governmental Authority (including, without limitation, OFAC), including Executive Order 13224, the PATRIOT Act, the Trading with the Enemy Act, the International Emergency Economic Powers Act and the laws, regulations, rules and/or executive orders relating to restrictive measures against Iran; (b) the European Union in pursuit of the Common Foreign and Security Policy objectives set out in the Treaty on European Union; (c) the United Nations Security Council or any other legislative body of the United Nations; and (d) any jurisdiction in which the Borrower or any of its Subsidiaries operates or in which the proceeds of the Loans will be used or from which repayments of the Obligations under this Agreement or related Loan Documents will be derived.

"Secured Bank Services Obligations" means Bank Services Obligations owing to a Secured Bank Service Provider.

"Secured Bank Service Providers" means (a) MUFG Union Bank or any of its Affiliates; and (b) any Person that is an Agent, an Arranger, a Lender or Affiliate of an Agent, an Arranger or Lender at the time the agreement to provide Bank Services to the Borrower or a Subsidiary Guarantor is entered into (with any such agreement in effect on the Amendment No. 2 Effective Date being deemed to have been entered into on the Amendment No. 2 Effective Date), in each case in its respective capacity as a Bank Services Provider of Bank Services to the Borrower or any Subsidiary Guarantor, to the extent such Lender, such Arranger or Affiliate ~~of a Lender~~ has complied with Section 2.7.

"Secured Hedging Obligations" means Hedging Obligations owing to any Agent, any Arranger, any Lender or any of their respective Affiliates or to any other Person provided such Person was an Agent, an Arranger, a Lender or an Affiliate of an Agent, an Arranger or a Lender at the time such Hedging Obligation was initially incurred regardless of whether such Person is no longer an Agent, an Arranger, a Lender or Affiliate of an Agent, an Arranger or a Lender and, in each case, subject to Section 2.7; provided however, that Secured Hedging Obligations shall not include any Excluded Swap Obligations of such Credit Party.

"Secured Obligations" means all Obligations, together with (a) all Secured Bank Services Obligations and (b) all Secured Hedging Obligations owing to one or more Agent, Lenders or their respective Affiliates.

"Secured Parties" means the Administrative Agent, the Collateral Agent, the Lenders, the Secured Bank Service Providers and all holders of Secured Hedging Obligations.

"Security Agreement" means that certain Security Agreement among the Collateral Agent and the Borrower.

"Security Documents" means the Guaranties, Mortgages, the Security Agreement, security agreements and notices of security interests in Intellectual Property filed or to be filed with any applicable filing office or registry, and all other documents, instruments, and agreements now or hereafter executed or delivered by a Credit Party for purposes of securing (or intending to secure), or perfecting (or intending to perfect) Liens securing, any Secured Obligations.

"Senior Officer" means, with respect to any Credit Party or Subsidiary, the manager, chairman of the board, president, chief executive officer, or chief financial officer of such Person.

"Set Aside Letter" means any letter or letters to any Governmental Authority or Surety whereby the Administrative Agent agrees to allocate proceeds of the Real Estate Term Loan for construction of Bonded Work.

"Setoff Parties" has the meaning assigned to such term in Section 17.6.

"Settlement Report" means a report delivered by the Administrative Agent to the Revolving Lenders summarizing the Revolving Loans outstanding as of a given settlement date, allocated among the Revolving Lenders based on the Applicable Revolving Percentages.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Term SOFR Loan or a Daily Floating SOFR Loan.

"Solvent" has the meaning assigned to such term in Section 8.15.

"Specified Contribution" has the meaning assigned to such term in Section 12.7.

"Subordinated Grower Payables" means standing grower payables and any notes or note payables owing to growers by the Borrower and its Subsidiaries, the Lien of which has been expressly subordinated to the Lien securing the Secured Obligations pursuant to a Grower Subordination Agreement.

"Subsequent Real Estate Term Advance" means each Advance of Real Estate Term Loans made by the Real Estate Term Loan Lenders to the Borrower after the Initial Real Estate Term Advance pursuant to this Agreement.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the Equity Interests or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.  Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of the Borrower.

"Subsidiary Guarantors" means each Guarantor that is a Subsidiary.

"Supplement Date" has the meaning assigned to such term in Section 10.2(j).

"Surety" means the applicable bonding company that issues the surety bonds covering the applicable Bonded Work.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swingline Lender" means MUFG Union Bank, in its capacity as lender of Swingline Loans hereunder.

"Swingline Loan" means any Borrowing of Reference Rate Revolving Loans funded with Swingline Lender's funds pursuant to Section 2.4, until such Borrowing is settled among Revolving Lenders pursuant to Section 2.4(b).

"Swingline Note" has the meaning assigned to such term in Section 2.4(a).

"Swingline Sublimit" means $5,000,000.

"Tangible Net Worth" means, with respect to the Borrower and its Subsidiaries on a consolidated basis, as of any date of determination, (a) total assets as of such date minus (b) the sum of total liabilities and any intangible assets (including goodwill, franchises, licenses, patents, trademarks, trade names, copyrights, service marks and brand names) as of such date, determined in accordance with GAAP.

"Tax Distributions" means during any period in which the Borrower is treated as a partnership, disregarded entity, or other pass-through entity for U.S. federal income tax purposes, any dividends or distributions by the Borrower not in excess of the product of (i) the amount of taxable income of the Borrower (and any Subsidiary of the Borrower that is treated as a partnership, disregarded entity, or other pass-through entity for U.S. federal income tax purposes) for such period, computed by reducing such taxable income by any taxable losses of the Borrower (or such Subsidiary) in the current and any prior taxable year to the extent such losses have not previously been taken into account in determining the amount distributable as a Tax Distribution for the current or any prior year as an offset against such taxable income (and, for the avoidance of doubt, taking into account, if applicable, for purposes of determining such taxable income and taxable loss any adjustment to the basis of the Borrower's property pursuant to Section 734, 743, or 754 of the Code and any comparable provision of state and local income tax law), multiplied by (ii) the highest combined marginal federal, state and local income tax rate applicable to an individual resident in the State of California for the relevant taxable year (reflecting any reduced rate applicable to any special class of income that is in effect for such taxable year with respect to an individual).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any income, excise, ad valorem, payroll, and sales taxes, together, in each case, all interest, penalties, fees, charges, and additions applicable thereto.

"Term Loan" means any of the Equipment Term Loans or Real Estate Term Loans and "Term Loans" means all of such Loans collectively.

"Term Loan Commitment" means, for any Lender, the aggregate amount of such Lender's Equipment Term Loan Commitment and Real Estate Term Loan Commitment. "Term Loan Commitments" means the aggregate Equipment Term Loan Commitments and Real Estate Term Loan Commitments.

"Term SOFR" means,

(a) for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b) for any calculation with respect to a Daily Floating SOFR Loan or Reference Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Daily Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Daily Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Daily Term SOFR Determination Day;

provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Adjustment" means a percentage equal to 0.10% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Loan" means a Term Loan that bear interest at a rate based on Adjusted Term SOFR plus the Applicable Margin.

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"The Assemi Group" means that certain group of entities referenced in that certain Review Report of Independent Accountants and Combined Financial Statements with Supplementary Information – The Assemi Group – dated as of December 31, 2021 and prepared by MossAdams LLP, as such group may be supplemented or modified from time to time in a manner satisfactory to the Administrative Agent to reflect the group of entities to be covered in the reviewed financial statements delivered pursuant to Section 10.2(c).

"Third Party" means any (a) lessor, mortgagee, mechanic or repairman, warehouse operator or warehouseman, processor, packager, consignee, shipper, customs broker, freight forwarder, bailee, or other third party which may have possession of any Collateral or lienholders' enforcement rights against any Collateral; or (b) Licensor whose rights in or with respect to any Collateral limit or restrict or may, in Administrative Agent's reasonable determination, limit or restrict Borrower's or any Agent's rights to sell or otherwise dispose of such Collateral.

"Third Party Agreement" means an agreement in form and substance reasonably satisfactory to Administrative Agent pursuant to which a Third Party, as applicable and as required by any Agent, among other things, (a) waives or subordinates in favor of such Agent any Liens such Third Party may have in and to any Collateral or any setoff, recoupment, or similar rights such Third Party may have against any Credit Party; (b) grants the Collateral Agent access to Collateral which may be located on such Third Party's premises or in the custody, care, or possession of such Third Party for purposes of allowing the Collateral Agent to inspect, remove or repossess, sell, store, or otherwise exercise its rights under this Agreement or any other Loan Document with respect to such Collateral; (c) authorizes the Collateral Agent (with or without the payment of any royalty or licensing fee, as determined by Administrative Agent) to (i) complete the manufacture of work-in-process (if the manufacturing of such Goods requires the use or exploitation of a Third Party's Intellectual Property) and (ii) dispose of Collateral bearing, consisting of, or constituting a manifestation of, in whole or in part, such Third Party's Intellectual Property; (d) agrees to hold any negotiable Documents in its possession relating to the Collateral as agent or bailee of the Collateral Agent for purposes of perfecting the Collateral Agent's Lien in and to such Collateral under the UCC; (e) with respect to Third Parties other than landlords, agrees to deliver the Collateral to the Collateral Agent upon request or, upon payment of applicable fees and charges to deliver such Collateral in accordance with the Collateral Agent's instructions; or (f) agrees to terms regarding Collateral held on consignment by such Third Party.

"Title Insurer" means Old Republic Title Company or another title insurance company acceptable to the Administrative Agent.

"Total Credit Exposure" means, as to any Lender at any time, the unused Revolving Commitments, Revolving Credit Exposure, unused Term Loan Commitments and outstanding Term Loans of such Lender at such time.

"Total Revolving Exposure" means, at any time, the aggregate amount of Revolving Credit Exposure of all Lenders at such time.

"Transactions" has the meaning assigned to such term in Section 10.17.

"Transferee" means any actual or potential Eligible Assignee, Participant, or other Person acquiring an interest in any Obligations.

"Treasury Services" has the meaning assigned to such term in the definition of "Bank Services."

"Tulare Approved Appraisal" has the meaning assigned to such term in the definition of Approved Appraisal.

"Tulare Plant" means that certain pistachio processing plant located in Tulare County, State of California that is to be sold to the Borrower pursuant to the ARO PSA, including, without limitation, the rights granted pursuant to the ARO Perpetual Easement.

"Tulare Plant Property" means the collective reference to the Tulare Plant Real Property, the Tulare Plant, all other improvements on a the Tulare Plant Real Property and the related Personal Property located at the Tulare Plant Real Property.

"Tulare Plant Real Property" means that certain real property described on Schedule 1.1(d).

"Tulare Seller" means the collective reference to ARO Pistachios, Inc. and Adam Orandi.

"Type" means any type of a Loan (i.e., Reference Rate Loan, Fixed LIBOR Loan or Floating LIBOR Loan) that has the same interest option and, in the case of Fixed LIBOR Loans, the same Interest Period, means, when used in reference to any Loan, Borrowing or Advance, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing or Advance, is determined by reference to Daily Floating SOFR, Adjusted Term SOFR or the Reference Rate.

"UCC" means the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" means the United States of America.

"Unused Commitments" at any time, the excess of (a) the Revolving Commitments at such time minus (b) the Total Revolving Exposure (other than Protective Advances and Swingline Loans) at such time.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 5.7(g).

"Value of Eligible Equipment" means (a) with respect to the New Equipment Term Advances for purposes of Section 2.3(a)(i)(C), the cost of Eligible Equipment located at any Plant Property as

evidenced by a list of the expenditures and invoices, in each case in form and substance reasonably satisfactory to the Administrative Agent, with respect to the Eligible Equipment located at any Plant Property and financed by a New Equipment Term Advance and (b) with respect to Acquisition Equipment Term Advances for purposes of Section 2.3(a)(i)(D) and Section 2.3(a)(i)(E), the value of the Eligible Equipment acquired pursuant to the Chowchilla Acquisition as set forth in the Chowchilla Approved Appraisal or acquired pursuant to the ARO Acquisition as set forth in the Tulare Approved Appraisal, as the case may be.

"Withholding Agent" means the Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2 Accounting Terms and Accounting Changes. Under the Loan Documents (except as otherwise specified herein), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial statements shall be prepared, in accordance with GAAP applied on a basis consistent with the most recent financial statements of the Borrower delivered to the Administrative Agent before the Original Closing Date and using the same inventory valuation method as used in such financial statements, except for any change required or permitted by GAAP if the Borrower's certified public accounts concur in such change, and Section 10.14 is amended in a manner satisfactory to Required Lenders to take into account the effects of the change; provided that in the event any Accounting Change occurs and results in a change in the method of calculation of financial covenants, requirements or terms in this Agreement, then the Borrower and the Administrative Agent will enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change, with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not occurred. Until such time as such an amendment has been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, requirements and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred; provided further that with respect to any Accounting Change that would require operating leases entered into in the Ordinary Course of Business to be treated in a manner similar to capital or finance leases under GAAP, all financial covenants, requirements and terms in the Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.

1.3 Uniform Commercial Code. Any term used in this Agreement or in any financing statement filed in connection herewith which is defined in the UCC and not otherwise defined in this Agreement or in any other Loan Document shall have the meaning given such term in the UCC, including "Account Debtor," "Chattel Paper," "Consignment," "Deposit Account," "Document," "Equipment," "Fixtures," "General Intangibles," "Goods," "Instrument," "Proceeds" and "Securities Account."

1.4 Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including"

shall be deemed to be followed by the phrase "without limitation" regardless of whether "without limitation" is included in some instances and not in others (and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters to matters similar to the matters specifically mentioned). The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein (including the Loan Documents) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or any other Loan Document), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (but this clause shall not be construed as any consent to any transaction or circumstance giving rise to any successor or assign), (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (g) except with respect to any references to Permitted Discretion of the Administrative Agent, discretion of any Agent or any Lender means the sole and absolute discretion of such Person.

1.5 Certain Matters of Construction. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding." The section titles, table of contents, and list of exhibits appear as a matter of convenience only and shall not affect the interpretation of this Agreement or any Loan Document. All calculations of value of any Property, fundings of Loans, and payments of Obligations shall be in Dollars and, unless the context otherwise requires, all determinations (including calculations of Borrowing Base and financial covenants) made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time. Borrowing Base calculations shall be consistent with historical methods of valuation and calculation of the Borrower and its Subsidiaries, or such other methods or calculations (including any modifications to historical methods and calculations) that are reasonably satisfactory to the Administrative Agent (and not necessarily calculated in accordance with GAAP). The Borrower shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by any Agent or any Lender under any Loan Documents. No provision of any Loan Documents shall be construed or interpreted to the disadvantage of any party hereto by reason of such party's having, or being deemed to have, drafted, structured, or dictated such provision. Whenever the phrase "to the best of Borrower's knowledge" or words of similar import are used in any Loan Documents, it means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter to which such phrase relates. A Default or an Event of Default shall be deemed "to continue," be "continuing," "exist," or be "in existence" at all times during the period commencing on the date that such Default occurs to the date on which such Default is waived in writing in accordance with this Agreement or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement.

1.6 Time of Day; Business Day. Unless otherwise specified, all references herein to time of day shall be references to Pacific time in the United States (daylight or standard, as applicable). Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall

be included in the computation of the payment of interest hereunder; provided that in the event that the Revolving Commitment Maturity Date, the Equipment Term Loan Maturity Date or the Real Estate Term Loan Maturity Date falls on a day that is not a Business Day, all payments due on such day shall be made on the immediately preceding Business Day.

1.7    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

1.8    Rates.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Reference Rate, the Term SOFR Reference Rate, Daily Floating SOFR, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Reference Rate, the Term SOFR Reference Rate, Daily Floating SOFR, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Reference Rate, the Term SOFR Reference Rate, Daily Floating SOFR, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Reference Rate, the Term SOFR Reference Rate, Daily Floating SOFR, Adjusted Term SOFR, Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any Adjusted Term SOFR rate (or component thereof) provided by any such information source or service.

1.9    Agreement Regarding Borrowing Base Reporting.  Notwithstanding anything to the contrary herein or in any other Loan Document, during the period from August 31st of any given year through January 31st of the immediately succeeding year, the Borrower shall be permitted (but not required) to deliver to the Administrative Agent an interim (i.e., intra-month) Borrowing Base Certificate as of the day ended immediately prior to the delivery of such interim Borrowing Base Certificate and the Borrower shall ensure that such interim Borrowing Base Certificate accurately reports the amounts of the Borrower's Accounts, Eligible Accounts, Inventory and Eligible Inventory as of such date and is signed by a manager or Senior Officer of the Borrower, together, if requested by the Administrative Agent, with a copy of the Borrower's detailed accounts receivable aging report, and accounts payable report as of such date, in each case in a form reasonably acceptable to the Administrative Agent.  Upon delivery of such interim Borrowing Base Certificate, all references herein to the most recent Borrowing Base Certificate shall be deemed to be refer to such interim Borrowing Base Certificate until the delivery of the next succeeding Borrowing Base Certificate pursuant to Section 10.2(h).

## SECTION 2

## THE CREDIT FACILITIES

2.1 Revolving Commitments.

(a) Revolving Loans. Subject to the terms and conditions of this Agreement, each Revolving Lender agrees to make Revolving Loans to the Borrower from time to time on any Business Day from the Amendment No. ~~2~~6 Effective Date to the Revolving Commitment Termination Date in an aggregate principal amount that will not result in (i) such Revolving Lender's Revolving Credit Exposure exceeding such Revolving Lender's Revolving Commitment or (ii) the Total Revolving Exposure exceeding the lesser of (A) the Borrowing Base and (B) the aggregate Revolving Commitments of all Revolving Lenders. Subject to the terms and conditions of this Agreement, the Revolving Loans may be repaid and reborrowed.

(b) Revolving Notes. Any Revolving Lender may request that Revolving Loans made by it be evidenced by a Revolving Note. In such event, the Borrower shall prepare, execute and deliver to such Revolving Lender a Revolving Note payable to such Revolving Lender and in the form attached hereto as Exhibit A with appropriate insertions. Thereafter, the Loans evidenced by such Revolving Note and interest thereon shall at all times (including after assignment pursuant to Section 14) be represented by one or more Revolving Notes in such form payable to the Revolving Lender named therein.

(c) Termination and Voluntary Reductions of Revolving Commitments. The Revolving Commitments shall terminate on the Revolving Commitment Termination Date. The Borrower may terminate or from time to time reduce the Revolving Commitments by giving not less than five (5) Business Days' prior written notice to the Administrative Agent. Any request from the Borrower for the reduction of the Revolving Commitments must specify the amount of the requested reduction. Each reduction shall be in a minimum amount of $1,000,000 or any greater integral increment of $250,000 or such other amount as reflects the entire unused balance of the applicable Commitment. The Borrower may not reduce the Revolving Commitments to an amount less than $5,000,000, except in connection with the termination of the Revolving Commitments. All reductions of the Revolving Commitments shall be made ratably among the Lenders in accordance with their respective Revolving Commitments. Except to the extent otherwise agreed in writing by the Administrative Agent and the Required Revolving Lenders, any request from the Borrower for the termination or reduction of the Revolving Commitments shall be irrevocable.

2.2 Protective Advances. From time to time, the Administrative Agent may, in its discretion (but without obligation to do so), make one or more Reference Rate Revolving Loans up to an aggregate amount outstanding at any time not to exceed five percent (5%) of the lesser of the Borrowing Base then in effect and the Revolving Commitments then in effect and so long as such Loans do not cause the Total Revolving Exposure to exceed the Revolving Commitments, to (i) preserve, protect, or defend any material Collateral or to increase or improve the likelihood of collecting or obtaining repayment of any Secured Obligations (in each case, if the Administrative Agent determines that doing so is necessary or desirable) and (ii) pay any amounts chargeable to any Credit Party under any Loan Documents, including, costs, fees, and expenses (each such Loan made under this Section 2.2, a "Protective Advance"). Subject to the immediately preceding sentence, the Administrative Agent may make a Protective Advance without regard to the Revolving Commitments, or the satisfaction of any condition precedent to the making of Loans, unless the Required Lenders have, in writing, revoked the Administrative Agent's authority to do so. If the Required Lenders have not revoked such authority, then the Administrative Agent's determination that funding of a Protective Advance is appropriate shall be conclusive. Each Revolving Lender shall participate in each Protective Advance in accordance with its

Applicable Revolving Percentage thereof. The provisions of this Section 2.2 are solely for the benefit of the Agents and the Lenders, and none of the Credit Parties may rely on this Section 2.2 or have any standing to enforce its terms.

2.3 Term Loan Commitments.

(a) Equipment Term Loan.

(i) Subject to the terms and conditions of this Agreement, each Equipment Term Loan Lender agrees to make one or more Advances of Equipment Term Loans to the Borrower from time to time on any Business Day during the period from the Amendment No. 2 Effective Date to the Equipment Term Loan Availability Termination so long as the same does not result in (A) the total of all Advances of Equipment Term Loans made by such Equipment Term Loan Lender exceeding its respective Equipment Term Loan Commitment, (B) the total of all Advances of Equipment Term Loans exceeding the aggregate Equipment Term Loan Commitments of the Equipment Term Loan Lenders, (C) the total of all New Equipment Term Advances exceeding 100% of the Value of Eligible Equipment at the Plant Properties; (D) the Acquisition Equipment Term Advance (Chowchilla) exceeding 70% of the Value of Eligible Equipment purchased in the Chowchilla Acquisition and (E) the Acquisition Equipment Term Advance (Tulare) exceeding 70% of the Value of Eligible Equipment purchased in the ARO Acquisition. No Advance of Equipment Term Loans shall be made unless the applicable conditions precedent under Section 3 of Amendment No. 2 and Sections 7.2 and, if applicable, 7.5 have been met with respect to such Advance. Each Equipment Term Loan Lender's Equipment Term Loan Commitment shall be permanently reduced upon the making of any Advance of an Equipment Term Loan by such Lender (in an amount equivalent to the principal amount of such Lender's ratable share of such Advance) and any portion of the Equipment Term Loan Commitments that has not been borrowed as of the Equipment Term Loan Availability Termination shall expire on such date. The principal amount of the Equipment Term Loans, once paid, may not be reborrowed.

(ii) The Equipment Term Loans made by each Equipment Term Loan Lender and interest accruing thereon shall be evidenced by the records of the Administrative Agent and such Equipment Term Loan Lender. Promptly upon any Equipment Term Loan Lender's request, the Borrower shall execute and deliver an Equipment Term Note to such Lender. Thereafter, the Equipment Term Loans evidenced by such Equipment Term Note and interest thereon shall at all times (including after assignment pursuant to Section 14) be represented by one or more Equipment Term Notes in such form payable to the Equipment Term Loan Lender named therein.

(b) Real Estate Term Loans.

(i) Subject to the terms and conditions of this Agreement, each Real Estate Term Loan Lender agrees to make one or more Advances of Real Estate Term Loans to the Borrower on any Business Day during the period from the date of satisfaction of the conditions precedent under Section 3 of Amendment No. ~~2~~6 and Sections 7.2 and 7.3(a) to the Real Estate Term Loan Availability Termination in accordance with this Section 2.3(b) so long as (A) the total of all Advances of Real Estate Term Loans made by each Real Estate Term Loan Lender hereunder shall not exceed its respective Real Estate

Term Loan Commitment, (B) the total of all Advances of Real Estate Term Loans shall not exceed the least of (1) the Real Estate Term Loan Commitments of all the Real Estate Term Loan Lenders, (2) an amount which would cause the Loan-to-Value Ratio to exceed 0.70:1.00 and (3) the aggregate budgeted amount for the Project as set forth in the most recent ~~Construction~~Project Budget delivered to the Administrative Agent. No more than one such Advance of Real Estate Term Loans shall be made per month. Each Real Estate Term Loan Lender's Real Estate Term Loan Commitment shall be permanently reduced upon the making of any Advance of a Real Estate Term Loan by such Lender (in an amount equivalent to the principal amount of such Lender's ratable share of such Advance) and any portion of the Real Estate Term Loan Commitments that has not been borrowed as of the Real Estate Term Loan Availability Termination shall expire on such date. The principal amount of the Real Estate Term Loans, once paid, may not be reborrowed.

(ii) The Real Estate Term Loans made by each Real Estate Term Loan Lender and interest accruing thereon shall be evidenced by the records of the Administrative Agent and such Lender. Promptly upon any Real Estate Term Loan Lender's request, the Borrower shall execute and deliver a Real Estate Term Note to such Real Estate Term Loan Lender. Thereafter, the Loans evidenced by such Real Estate Term Note and interest thereon shall at all times (including after assignment pursuant to Section 14) be represented by one or more Real Estate Term Notes in such form payable to the Real Estate Term Loan Lender named therein.

(iii) The Initial Real Estate Term Advance shall be made upon satisfaction of the conditions set forth in Section 3 of Amendment No. ~~2~~6 and Sections 7.2 and 7.3(a).

(iv) Each Subsequent Real Estate Term Advance shall be made on or about the first Business Day of each calendar month following commencement of construction of the Improvements upon satisfaction of the conditions set forth in Section 7.3(b) and, in the case of the final Subsequent Real Estate Term Advance, the conditions set forth in Section 7.4. In connection with each such Subsequent Real Estate Term Advance the Contractor shall submit information and evidence (which information and evidence the Borrower shall provide to the Administrative Agent) showing the estimated cost of labor performed on and the materials incorporated into the Improvements, a pro-rata portion of Contractor's profit and that pro-rata portion of overhead of Contractor attributable to the construction of the Improvements. The original of the applicable Real Estate Term Advance Draw Request with respect to such Advance, certified true and correct by the Contractor and approved by the Borrower, shall be submitted to the Administrative Agent for payment. Upon verification of the accuracy of the Real Estate Term Advance Draw Request by inspection of the Fresno Plant Property (if required by the Administrative Agent), the Administrative Agent shall notify the Real Estate Term Loan Lenders thereof and each of the Real Estate Term Loan Lenders shall disburse its Applicable Real Estate Term Percentage of the amount of the respective approved Real Estate Term Advance Draw Request in accordance with the Disbursement Schedule and this Agreement to the Administrative Agent which in turn shall disburse such amounts (i) directly to the Borrower or, upon the occurrence and during the continuance of an Event of Default, directly to the Contractor or to such Persons as have actually supplied labor, materials or services in connection with the construction of the Improvements (at the Administrative Agent's option as to whom and in what amounts payments are to be made), or (ii) if specifically required by the Administrative Agent, through a fund

control service acceptable to the Administrative Agent under a fund control agreement in form and content acceptable to the Administrative Agent.

(v) The Real Estate Term Loan Lenders reserve and shall have the right (but not the obligation) to make Advances which are allocated to any line items in the Project Budget for such other purposes or in such different proportions as the Administrative Agent may, in its sole discretion, deem necessary or advisable. The Borrower shall have no right whatsoever to reallocate Advances from one line item in the Project Budget to another or otherwise amend the Project Budget without the prior consent of the Administrative Agent and the Required Real Estate Term Loan Lenders. Neither the Administrative Agent nor the Lenders shall be required to make any Advance for any Construction Costs or any other purpose that is not set forth in the Project Budget nor shall the Administrative Agent or the Lenders be required to make any Advance for any line item in the Project Budget in an amount which when added to the sum of all prior Advances for that line item would exceed the sum allocated in the Project Budget for that line item.

(vi) All Advances of Real Estate Term Loans shall be made in accordance with the applicable provisions of the Project Budget and the Disbursement Schedule. All funds of Real Estate Term Loans disbursed to the Borrower shall be received by the Borrower in trust and the Borrower agrees that such funds shall be used only for the payment of those items contemplated by the particular Advance of Real Estate Term Loans.

(vii) Neither the Administrative Agent nor the Lenders shall be required to disburse an aggregate amount of the proceeds of the Real Estate Term Loans for labor furnished to and materials incorporated into the Improvements during any stage of construction which exceeds the lesser of (A) the value of such labor and materials, and (B) the amount allocated to that stage of construction in the Project Budget. In any event, neither the Administrative Agent nor the Lenders shall be required to disburse any amount which, in opinion of the Administrative Agent or the Required Real Estate Term Loan Lenders (as notified in writing to the Administrative Agent), will reduce that portion of the undisbursed proceeds of the Real Estate Term Loan Commitments designated for completion of the Improvements below the amount needed to pay for the labor and materials necessary to complete the Improvements.

2.4 Swingline Loans; Settlement.

(a) Unless otherwise specifically requested by the Borrower in writing, the Swingline Lender may (but shall not be obligated to) fund any requested Reference Rate Loan that is a Revolving Loan with a Swingline Loan, but only if (i) such Swingline Loan is otherwise permitted to be made hereunder; (ii) such Reference Rate Loan is not specifically required to be made by all Revolving Lenders hereunder; and (iii) after giving effect to such Swingline Loan, the aggregate principal amount of all Swingline Loans would not exceed the Swingline Sublimit. Each Swingline Loan shall constitute a Revolving Loan for all purposes, except that payments thereon shall be made to the Swingline Lender for its own account and all Swingline Loans shall bear interest only at the Reference Rate plus the Applicable Margin. The obligation of the Borrower to repay Swingline Loans shall be evidenced by the records of the Swingline Lender. Promptly upon the Swingline Lender's request, the Borrower shall execute and deliver to the Swingline Lender a promissory note (in form and substance reasonably satisfactory to the Swingline Lender) to evidence the Swingline Loans (and such promissory note, as the same may

be amended, restated, supplemented, or otherwise modified from time to time, the "Swingline Note").

(b) To facilitate administration of the Loans, the Swingline Lender and the other Revolving Lenders agree that settlement among them with respect to the Swingline Loans shall take place (i) on a weekly basis (or more frequently in the Swingline Lender's discretion) and (ii) on the Revolving Commitment Termination Date. On each settlement date, settlement shall be made (such settlement to be effected by a deemed Borrowing of Revolving Loans made by all of the Revolving Lenders in accordance with their respective Applicable Revolving Percentages (which Revolving Loans shall not constitute Swingline Loans), and in the event such Revolving Loans cannot be made, such Revolving Loans shall be funded as deemed participations by the Revolving Lenders as set forth below) with each Revolving Lender in accordance with the Settlement Report delivered by the Swingline Lender to the other Revolving Lenders. Between settlement dates, the Administrative Agent may apply payments on Revolving Loans to Swingline Loans, regardless of any designation by the Borrower or any provision herein to the contrary. If, due to an Insolvency Proceeding with respect to a Credit Party or otherwise, any Swingline Loan may not be settled as provided herein, then each Revolving Lender shall be deemed to have purchased from the Swingline Lender a participation in each unpaid Swingline Loan in an amount equal to its Applicable Revolving Percentage thereof and shall transfer the amount of such participation to the Swingline Lender in immediately available funds within one Business Day after the Swingline Lender's request therefor; provided that no Revolving Lender shall be required to purchase any such participation to the extent (and only to the extent) that such Revolving Lender's Revolving Credit Exposure would exceed its Revolving Commitment as a result thereof. Each Revolving Lender's obligations under this Section 2.4(b) are absolute, unconditional, and irrevocable and are not subject to any counterclaim, setoff, defense, qualification, or exception, and each Revolving Lender shall perform such obligations, as applicable, regardless of whether the Revolving Commitments have terminated, or any condition precedent to the making of Loans has not been satisfied. The provisions of this Section 2.4(b) are solely for the benefit of the Swingline Lender and the other Revolving Lenders, and none of the Credit Parties may rely on this Section 2.4(b) or have any standing to enforce its terms.

2.5 [Reserved].

2.6 [Reserved].

2.7 Bank Services and Hedging Agreements. Each Lender (other than MUFG Union Bank) or Affiliate thereof providing Bank Services for, or having Hedging Agreements with, the Borrower or any of its Subsidiaries shall deliver to the Administrative Agent, promptly after entering into such Bank Service agreement or Hedging Agreement, written notice setting forth the aggregate amount of all Bank Services Obligations and Hedging Obligations of the Borrower or such Subsidiary to such Lender or Affiliate (whether matured or unmatured, absolute or contingent). In furtherance of that requirement, each such Lender or Affiliate thereof shall furnish the Administrative Agent, from time to time after a significant change therein or upon a request therefor, a summary of the amounts due or to become due in respect of such Bank Services Obligations and Hedging Obligations.

## SECTION 3

## INTEREST, FEES, AND CHARGES

3.1 Interest.

(a) The Obligations shall bear interest (i) with respect to Reference Rate Loans, at the Reference Rate plus the Applicable Margin; (ii) solely in the case of Term Loans, with respect to ~~Fixed LIBOR~~Term SOFR Loans, at ~~LIBOR~~Adjusted Term SOFR for the applicable Interest Period plus the Applicable Margin; (iii) solely in the case of Revolving Loans, with respect to any Daily Floating ~~LIBOR~~SOFR Loans, at the Daily ~~One Month LIBOR~~Floating SOFR plus the Applicable Margin and (iv) with respect to any other Obligations which are then due and payable (including, to the extent permitted by Applicable Law, interest not paid when due), at the Reference Rate plus the Applicable Margin for Reference Rate Revolving Loans; provided, however, the Obligations shall bear interest at the Default Rate (whether before or after any judgment) (A) at all times during the existence of a Payment Event of Default, any Credit Party's Insolvency Proceeding or any of the events specified in any of clauses (e) through (g) of Section 12.1 or upon an acceleration under Section 12.2(b) and (B) if so elected by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), at any time during the existence of any other Event of Default. The Borrower acknowledges that the cost and expense to the Administrative Agent, the Collateral Agent and the Lenders due to an Event of Default are difficult to ascertain and that the Default Rate is a fair and reasonable estimate to compensate the Agents and the Lenders therefor.

(b) Interest shall accrue from the date the Loan is advanced or an Obligation is incurred or payable until paid by the Borrower. If a Loan is repaid on the day it was made, one day's interest shall accrue.

(c) Interest accrued on the Loans shall be due and payable in arrears ~~(i)~~ on the ~~last Business Day of each calendar month for the immediately preceding calendar month for all Loans; (ii) on any date of prepayment, with respect to the principal amount of Loans being prepaid; (iii) with respect to Revolving Loans, on the Revolving Commitment Termination Date; (iv) with respect to Equipment Term Loans, on the Equipment Term Loan Maturity Date; and (v) with respect to Real Estate Term Loans, on the Real Estate Term Loan Maturity~~Interest Payment Date. Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents or, if no payment date is provided, **ON DEMAND**. Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable **ON DEMAND**.

(d) [Reserved].

(e) Certain Provisions Regarding Conversions and Continuations.

(i) The Borrower may on any Business Day, subject to delivery of a Notice of Conversion/Continuation, elect to (A) convert any portion of the Reference Rate Loans, solely in the case of a Revolving Loan, to a Daily Floating ~~LIBOR~~SOFR Loan or, solely in the case of a Term Loan, to a ~~Fixed LIBOR~~Term SOFR Loan (as selected in such Notice of Conversion/Continuation); (B) convert any portion of a ~~Fixed LIBOR~~Term SOFR Loan to a ~~Floating LIBOR Loan or~~ Reference Rate Loan (as selected in such Notice of Conversion/Continuation), (C) convert any portion of a Daily Floating ~~LIBOR~~SOFR Loan to a Reference Rate ~~Loan or, solely in the case of a Term Loan, to a Fixed LIBOR~~ Loan (as selected in such Notice of Conversion/Continuation) or (D) continue any ~~Fixed LIBOR~~Term SOFR Loan at the end of its Interest Period as a ~~Fixed LIBOR~~Term SOFR Loan. During any Default, the Administrative Agent may (and, at the direction of the Required Lenders, shall) declare that no Loan may be made, converted, or continued as a ~~Fixed LIBOR~~Term SOFR Loan or Daily Floating ~~LIBOR~~SOFR Loan.

(ii) Whenever the Borrower desires to convert any Loans or continue any Fixed LIBORTerm SOFR Loan, the Borrower shall give the Administrative Agent a Notice of Conversion/Continuation or, subject to Section 17.1(c), provide telephonic or electronic mail notice thereof no later than 11:00 a.m. at least three (3) Business Days before the requested date of such conversion to a Daily Floating SOFR Loan or Reference Rate Loan and at least three (3) U.S. Government Securities Business Days before the requested date of any conversion to, or continuation of, a Term SOFR Loan. Promptly after receiving any such notice, the Administrative Agent shall notify each applicable Lender thereof. Each Notice of Conversion/Continuation or telephonic or electronic mail request shall be irrevocable, and shall specify the amount of Loans to be converted or continued, the date of such conversion or continuation (which date shall be a Business Day, and, solely in the case of a conversion to, or continuation of, a Term SOFR Loan, a U.S. Government Securities Business Day) and in the case of a conversion, the Type of Loan such Loan is to be converted into. If, upon the expiration of any Interest Period of any Fixed LIBORTerm SOFR Loan, the Borrower shall have failed to deliver a Notice of Conversion/Continuation or a telephonic or electronic mail request with respect to such Fixed LIBORTerm SOFR Loan, the Borrower shall be deemed to have elected to convert such Fixed LIBORTerm SOFR Loan into a Reference Rate Loan.

(f) Interest Periods. In connection with the making, conversion, or continuation of any Fixed LIBORTerm SOFR Loan:

(i) each Interest Period shall commence on the date the Loan is made or continued as, or converted into, a Fixed LIBORTerm SOFR Loan, and shall expire on the numerically corresponding day in the last calendar month of such Interest Period;

(ii) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(iii) any Interest Period pertaining to a Fixed LIBOR Loan that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period;

(iv) no Interest Period with respect to an Equipment Term Loan shall extend beyond the Equipment Term Loan Maturity Date; and

(v) no Interest Period with respect to a Real Estate Term Loan shall extend beyond the Real Estate Term Loan Maturity Date; and

(vi) no tenor that has been removed from the definition of Interest Period pursuant to Section 15.2(e) shall be available for specification in such Notice of Borrowing or Notice of Conversion/Continuation, as applicable.

For purposes hereof, the date of a Loan or Advance initially shall be the date on which such Loan or Advance is made and thereafter shall be the effective date of the most recent conversion or continuation of such Loan or Advance.

(g) Number and Amount of ~~LIBOR~~Term SOFR Loans; Determination of Rate. Each Borrowing of ~~Fixed LIBOR~~Term SOFR Loans when made shall be in a minimum amount of $1,000,000 or any greater integral multiple of $500,000 or such other amount as reflects the entire unused balance of the applicable Commitment. No more than eight (8) Borrowings of ~~Fixed LIBOR~~Term SOFR Loans may be outstanding at any time, and all ~~Fixed LIBOR~~Term SOFR Loans having the same length and beginning date of their Interest Periods shall be aggregated together and considered one Borrowing for this purpose. Upon determining ~~LIBOR~~Adjusted Term SOFR for any Interest Period requested by the Borrower, the Administrative Agent shall promptly notify the Borrower thereof by telephone or electronic mail and, if requested by the Borrower, shall confirm any telephonic notice in writing.

(h) ~~Closing Date Loans. All Loans made on the Amendment No. 2 Effective Date shall be made as Reference Rate Loans or Floating LIBOR Loans (as selected by the Borrower)~~ SOFR Conforming Changes. In connection with the use or administration of Adjusted Term SOFR or Daily Floating SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Adjusted Term SOFR or Daily Floating SOFR.

3.2 Fees.

(a) Certain Fees. On the Amendment No. ~~2~~6 Effective Date, the Borrower shall pay to (i) the Administrative Agent, (A) for the account of the Lenders, the fees as set forth in the Fee Letter, and (B) for its own account or the account of the Collateral Agent, the fees payable to the Administrative Agent or the Collateral Agent set forth in the Fee Letter, and (ii) the Arranger, for its own account, the fees payable to the Arranger as set forth in the Fee Letter, all of which shall be due and payable in the amounts and at the times set forth therein.

(b) Unused Commitment Fee. On the first Business Day of each calendar month ending after the Amendment No. 2 Effective Date and on the Revolving Commitment Termination Date, the Borrower shall pay to the Administrative Agent, in arrears and for the account of the Revolving Lenders (except as otherwise provided in Section 4.2) a commitment fee determined on a daily basis by applying the Commitment Fee Rate to such Lender's Applicable Revolving Percentage of the Unused Commitments determined at the end of each day during the period from the Amendment No. 2 Effective Date to the Revolving Commitment Termination Date.

(c) [Reserved].

(d) Calculation and Distribution of Interest, Fees, Charges, and Other Amounts. Unless otherwise specifically provided herein or in any other Loan Document, all interest, fees, charges, and other amounts which are calculated on a per annum basis shall be computed based on a presumed year of 360 days, except that interest computed by reference to the Reference Rate (other than interest computed by reference to the Daily ~~One Month LIBOR~~Floating SOFR prong of the Reference Rate) shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed. The applicable Reference Rate, ~~LIBOR~~Adjusted Term SOFR, the Daily ~~One Month LIBOR~~Floating SOFR and Commitment Fee Rate shall be determined by the Administrative Agent, and such

determination shall be conclusive absent manifest error. Each determination by the Administrative Agent of any interest, fees, or interest rate hereunder or under any other Loan Document shall be final, conclusive, and binding for all purposes, absent manifest error. All fees payable under this Section 3.2 are compensation for services and, to the extent of Applicable Law, are not, and shall not be deemed to be, interest or any other charge for the use, forbearance, or detention of money. A certificate as to amounts payable by the Borrower under Sections 5.7, 15.2, 15.3, 15.5, and 17.4, timely submitted to the Borrower by the Administrative Agent or the affected Lender, as applicable, shall be final, conclusive, and binding for all purposes, absent manifest error, and the Borrower shall pay such amounts to the applicable Person within ten days following receipt of such certificate. All fees shall be fully earned when due and shall not be subject to rebate, refund, or proration, in whole or in part. Unless otherwise specifically provided herein, all fees paid to the Administrative Agent for the account of the Lenders or any other Person shall be paid by the Administrative Agent to such Persons promptly upon its receipt thereof and, with respect to fees payable for the account of the Lenders, in accordance with each such Lender's Applicable Percentage thereof.

3.3 Maximum Interest. Any term or provision in this Agreement or in any other Loan Document to the contrary notwithstanding, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law (the "maximum rate"). If any Agent or any Lender shall receive interest in an amount that exceeds the maximum rate, then such excess shall be applied, first, to the principal of the Obligations, and then to the Borrower or such other Person lawfully entitled thereto. In determining whether the interest contracted for or charged or received by any Agent or a Lender exceeds the maximum rate, such Person may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**SECTION 4**

**LOAN ADMINISTRATION**

4.1 Manner of Borrowing and Funding Loans.

(a) Notice of Borrowing. The Borrower may request new Loans by delivering to the Administrative Agent a Notice of Revolving Borrowing in the case of Revolving Loans or a Notice of Term Borrowing in the case of Term Loans, in each case executed by a Senior Officer of the Borrower or a designee thereof disclosed in writing to the Administrative Agent or, subject to Section 17.1(c), by notifying the Administrative Agent of such request via telephone or electronic mail. If the requested Loan is to be a Reference Rate Loan, then such Notice of Borrowing or telephonic request must be received by the Administrative Agent at or before 9:00 a.m. on the Business Day on which the Borrower desires such Loan to be made. If the requested Loan is to be a Daily Floating ~~LIBOR~~SOFR Loan or ~~Fixed LIBOR~~Term SOFR Loan, then such Notice of Borrowing or telephonic or electronic mail request must be received by the Administrative Agent at or before 11:00 a.m. ~~on the third~~at least three U.S. Government Securities Business ~~Day preceding~~Days prior to the date on which the Borrower desires such Loan to be made. Any Notice of Borrowing or telephonic or electronic mail request received by the Administrative Agent after the times set forth above shall be deemed to have been received on the immediately following Business Day. Each Notice of Borrowing and telephonic or electronic mail request for a Loan shall specify (i) the amount of the Borrowing; (ii) the requested funding date (which must be a Business Day); (iii) (A) in the case of Notice of

~~152434621_2~~
152434621_7

Revolving Borrowing whether such Borrowing is of a Revolving Loan or Swingline Loan and (B) in the case of Notice of Term Borrowing whether such Borrowing is of Real Estate Term Loan or Equipment Term Loan and if a Real Estate Term Loan whether such Advance is an Initial Real Estate Term Advance or a Subsequent Real Estate Term Advance and if an Equipment Term Loan whether such Advance is a New Equipment Term Advance or an Acquisition Equipment Term Advance (and in the case of an Acquisition Equipment Term Advance, whether such Acquisition Equipment Term Advance is an Acquisition Equipment Term Advance (Chowchilla) or an Acquisition Equipment Term Advance (Tulare)); and (iv) whether the Borrowing is to be made as (A) Reference Rate Loans, (B) solely in the case of Revolving Loans, Daily Floating ~~LIBOR~~SOFR Loans or~~,~~ (C) solely in the case of ~~a~~ Term ~~Loan~~Loans, ~~Fixed LIBOR~~Term SOFR Loans. Each Notice of Borrowing and telephonic or electronic mail request for a Loan received by the Administrative Agent shall be irrevocable and if a telephonic request, shall be promptly confirmed by electronic communications in accordance with Section 17.1(c).

(b) Deemed Requests for Funding.

(i) The becoming due of any Obligations shall be deemed to be a request for Reference Rate Revolving Loans on the due date therefor in the amount of such Obligations, and, upon the making of such Revolving Loan, the Administrative Agent shall apply the proceeds thereof in direct payment of such Obligations. In addition, the Administrative Agent may, at its option, debit any of Borrower's DDAs maintained at the Administrative Agent (or any of its Affiliates) by the amount of any Obligations which are then due and apply the proceeds thereof to the payment of such Obligations.

(ii) If the Borrower has established a controlled disbursement DDA with the Administrative Agent (or any of its Affiliates), then the presentation for payment of any check or other Payment Item drawn on such DDA at a time when there are insufficient funds on deposit therein to pay the same shall be deemed to be a request for Reference Rate Revolving Loans on the date of such presentation in the amount of the checks and such other Payment Items presented for payment. The proceeds of such Revolving Loans may be disbursed directly to the controlled disbursement DDA or other appropriate DDA.

(c) Fundings by Lenders. Except for Borrowings of Revolving Loans which the Swingline Lender elects to make as Swingline Loans, the Administrative Agent shall endeavor to notify the applicable Lenders of each Notice of Borrowing (or deemed request for a Borrowing) by 10:00 a.m. on the Business Day that is the requested funding date for Reference Rate Loans or by 12:00 noon at least ~~two~~one Business ~~Days~~Day before any requested funding of Daily Floating ~~LIBOR~~SOFR Loans or ~~Fixed LIBOR~~Term SOFR Loans. Each Lender shall fund to the Administrative Agent such Lender's Applicable Percentage of each requested Borrowing to the account specified by the Administrative Agent in immediately available funds no later than 11:00 a.m. on the requested funding date, unless Administrative Agent's notice is received after the times provided above, in which case each Lender shall fund its Applicable Percentage by 11:00 a.m. on the next Business Day following the proposed borrowing date. Subject to its receipt of such amounts from the applicable Lenders, the Administrative Agent shall disburse the proceeds of the applicable Loans in the lawful manner directed by the Borrower. Unless the Administrative Agent shall have received written notice from a Lender prior to the proposed date of any Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's Applicable Percentage of such Borrowing, the Administrative Agent may assume that such Lender has made or promptly will make its Applicable Percentage of such

Borrowing available on such date in accordance with this Section 4.1(c) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If all or a portion of a Lender's Applicable Percentage of any Borrowing is not in fact received by the Administrative Agent, then the Borrower agrees to repay to the Administrative Agent **ON DEMAND** the amount of any deficiency, together with interest thereon from the date disbursed until repaid, at the rate applicable to such Borrowing.

4.2 Defaulting Lender. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(a) Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of Required Lenders, Required Revolving Lenders, Required Real Estate Term Loan Lenders and Required Equipment Term Loan Lenders, as applicable;

(b) Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 12 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 17.6 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Collateral Agent or the Swingline Lender hereunder; third, as the Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fourth, if so determined by the Administrative Agent and the Borrower, to be held in a Controlled Account and released on a pro rata basis to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fifth, to the payment of any amounts owing to the Lenders, or the Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender or the Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; sixth, so long as no Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and seventh, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the applicable conditions set forth in Section 7 were satisfied or waived, such payment shall be applied solely to pay the Loans of, all Non-Defaulting Lenders ratably among the Non-Defaulting Lenders in accordance with their Applicable Percentage of such Loans (calculated without including the Defaulting Lender's Applicable Percentage) prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans and funded and unfunded participations in Swingline Loans are held by the Lenders in accordance with their Applicable Percentages without giving effect to Section 4.2(d). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 4.2(b) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(c) Certain Fees. No Defaulting Lender shall be entitled to receive the fees described in Section 3.2(b) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(d) Reallocation of Participations to Reduce Fronting Exposure. All or any part of such Defaulting Lender's participation in Swingline Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Revolving Percentages (calculated without regard to such Defaulting Lender's Revolving Commitment) but only to the extent that (x) the applicable conditions set forth in Section 7 are satisfied at the time of such reallocation (and, unless the Borrower shall have otherwise notified the Administrative Agent at such time, the Borrower shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the aggregate Revolving Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Commitment. Unless expressly agreed by the Borrower and the Administrative Agent, or as expressly provided herein with respect to Bail-In Actions and related matters, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(e) Repayment of Swingline Loans. If the reallocation described in Section 4.2(d) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, prepay Swingline Loans in an amount equal to the Swingline Lenders' Fronting Exposure.

4.3 Defaulting Lender Cure. If the Borrower, the Administrative Agent, the Collateral Agent and the Swingline Lender agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Swingline Loans to be held by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 4.2(d)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

4.4 New Swingline Loans. So long as any Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loans unless it is satisfied that it will have no Fronting Exposure after giving effect to such Swingline Loan.

4.5 [Reserved].

4.6 [Reserved].

4.7 Effect of Termination. On the latest to occur of the Revolving Commitment Termination Date, the Equipment Term Loan Commitment Termination Date, and the Real Estate Term Loan

Commitment Termination Date, all Obligations shall be immediately due and payable, and each Lender may terminate its and its Affiliates' Bank Services (including, but only with the consent of Administrative Agent, any Treasury Services). All undertakings of the Borrower contained in the Loan Documents shall survive any termination, and the Collateral Agent shall retain its Liens in the Collateral and each Agent shall retain all of its rights and remedies under the Loan Documents, until Payment in Full of all Obligations and payment of all other Secured Obligations. Sections 2.4, 5.7, 13, 15.2, 15.3, 15.5, 17.3, 17.4, and 17.23, this Section 4.7, the obligation of each Credit Party and each Lender with respect to each indemnity given by it in any Loan Document, and each other term, provision, or section of this Agreement or any other Loan Document which states as much, shall survive Payment in Full of the Obligations and any release or termination relating to this Agreement, the other Loan Documents, or the credit facility established hereunder or thereunder.

## SECTION 5

## PAYMENTS

5.1 General Payment Provisions. All payments of Obligations shall be made in Dollars, without offset, counterclaim, or defense of any kind, free of (and without deduction for) any Taxes, and in immediately available funds, not later than 11:00 a.m. on the due date. Any payment after such time shall be deemed made on the next Business Day. Any payment of a ~~Fixed LIBOR~~Term SOFR Loan before the end of its Interest Period shall be accompanied by all amounts due under Section 15.5. All payments and prepayments of Loans shall be applied first to Reference Rate Loans and then to Daily Floating ~~LIBOR~~SOFR Loans and then to ~~Fixed LIBOR~~Term SOFR Loans. Unless otherwise specifically provided herein, all payments of Obligations (other than fees which shall be subject to Section 3.2(d)) paid to the Administrative Agent for the account of the Lenders or any other Person shall be distributed by the Administrative Agent to such Persons following its receipt thereof and, with respect to amounts payable for the account of the Lenders, in accordance with each such Lender's Applicable Percentage thereof.

5.2 Repayment of Revolving Loans.

(a) Revolving Loans shall be due and payable in full on the Revolving Commitment Termination Date. Revolving Loans may be prepaid from time to time, without penalty or premium. All Net Proceeds, as applicable, shall be applied to the Revolving Loans (i) at all times after the Term Loans have been paid in full and (ii) at all other times in an amount equal to the greater of (A) the net book value of any Accounts and Inventory which were subject to the corresponding Asset Disposition and (B) the reduction in the Borrowing Base upon giving effect to such Asset Disposition.

(b) [Reserved].

(c) Any amount by which the Total Revolving Exposure exceeds the lesser of the Borrowing Base and the Revolving Commitments shall (A) be immediately due and payable **ON DEMAND** and, once paid to the Administrative Agent, shall be applied, first, to the payment of any Swingline Loans; second, to all other Revolving Loans which are Reference Rate Loans; and third to Revolving Loans which are Daily Floating ~~LIBOR~~SOFR Loans; (B) constitute Obligations secured by the Collateral; and (C) be entitled to all benefits of the Loan Documents.

(d) The Borrower shall also pay the Revolving Loans to the extent otherwise required pursuant to the terms of this Agreement (including Section 5.3(b)) and the other Loan Documents.

5.3 Repayment of Term Loans.

(a) Payment of Principal.

(i) Equipment Term Loans. The principal amount of the Equipment Term Loans shall be due and payable in equal quarterly installments on the last Business Day of each March, June, September and December commencing January 31, 2022 based on a 10-year straight-line amortization of the outstanding principal amount of the Equipment Term Loan as of January 31, 2022, until the Equipment Term Loan Maturity Date, on which date all principal, interest, and other amounts owing with respect to the Equipment Term Loans shall be due and payable in full. Each installment shall be paid to the Administrative Agent for the account of the Equipment Term Loan Lenders. Once repaid, Equipment Term Loans may not be reborrowed, regardless of whether such repayment is voluntary or required.

(ii) Real Estate Term Loans. The principal amount of the Real Estate Term Loans shall be due and payable in monthly installments on the last Business Day of each calendar month commencing the earlier of (~~i~~A) July 31, 2023 and (~~ii~~B) the last Business Day of the first full calendar month following the making of the final Subsequent Real Estate Term Advance based upon a 20-year "mortgage style" amortization of the outstanding principal amount of the Real Estate Term Loan as of the earlier of (~~i~~1) July 31, 2023 and (~~ii~~2) the last Business Day of the first full calendar month following the making of the final Subsequent Real Estate Term Advance, until the Real Estate Term Loan Maturity Date, on which date all principal, interest, and other amounts owing with respect to the Real Estate Term Loans shall be due and payable in full. Each installment shall be paid to the Administrative Agent for the account of the Real Estate Term Loan Lenders. Once repaid, Real Estate Term Loans may not be reborrowed, regardless of whether such repayment is voluntary or required.

(b) Mandatory Prepayments. The Borrower shall:

(i) Within three Business Days following receipt by the Borrower or any Subsidiary or the Administrative Agent of any Net Proceeds arising from a Loss or in connection with an Asset Disposition, subject to any payment of the Revolving Loans required in accordance with Section 5.2(a), prepay the Term Loans (ratably between them) and, after the Term Loans have been paid in full, the Revolving Loans, together with any accrued interest on the portion thereof prepaid, in an amount equal to such Net Proceeds; provided, however, that, if the Borrower delivers a certificate executed by a Senior Officer of the Borrower to the Administrative Agent prior to the date such Net Proceeds are to be used by the Borrower or such Subsidiary to prepay the Loans as specified in this clause (i) stating that the Borrower intends to use such Net Proceeds, within 180 days after receipt of such Net Proceeds, to acquire (or replace or rebuild) real property, equipment or other tangible assets (excluding Inventory) to be used in the business of the Borrower, and certifying that no Default has occurred and is continuing then, instead of prepaying the Term Loans as indicated above, to extent any Revolving Loans are outstanding, the Borrower shall repay the Revolving Loans in the amount of such Net Proceeds and the Administrative Agent shall establish an Availability Reserve against Excess Availability in the amount of such Net Proceeds received until such time as the mandatory prepayment required under this clause (i) or such permitted usages are made, as applicable. Any Net Proceeds in excess of outstanding Revolving Loans may be retained by the Borrower to reinvest in accordance with this clause (i). So long as

the conditions set forth in Section 7.2 have been met and the Notice of Revolving Borrowing states that it is a request to use Net Proceeds pursuant to this Section, the Lenders shall make the applicable Borrowing and upon the funding of such Borrowing the Availability Reserve established with respect to such Net Proceeds shall be reduced by the amount of such Borrowing; provided that to the extent of any such Net Proceeds therefrom have not been so applied by the end of such 180-day period, a prepayment shall be required in an amount equal to such Net Proceeds that have not been so applied.

(ii) On the earlier of (A) the date that is three Business Days following the termination or expiration of the ARO PSA (as in effect on the Amendment No. 1 Effective Date) and (B) January 31, 2021 (or such later date as may be agreed by the Administrative Agent in its sole discretion), in either case, without the completion of the ARO Acquisition to the extent that any of the ARO Transferred Equipment is not returned (or scheduled to be promptly returned in a manner and time period reasonably acceptable to the Administrative Agent) to the Borrower, together with a written disclaimer and release, in form and substance reasonably satisfactory to the Administrative Agent, of all claims (including, any Liens or retention rights) by the Tulare Seller (and such ARO Transferred Equipment that is either not returned or not expressly covered by such release and disclaimer, the "ARO Retained Equipment") prepay the Equipment Term Loans, based on the outstanding principal amounts thereof, together with any accrued interest on the portion thereof prepaid, in an amount equal to the cost of such ARO Retained Equipment, as evidenced by expenditure lists and invoices previously received and approved by the Administrative Agent in connection with the financing of such Eligible Equipment.

(iii) Contemporaneously upon receipt by the Borrower or any Subsidiary of any Net Proceeds of the type described in clause (b) of the definition of "Net Proceeds", prepay Term Loans (ratably between them) and, after the Term Loans have been fully paid, the Revolving Loans, together with any accrued interest on the portion thereof prepaid, in an amount equal to 100% of the Net Proceeds.

(iv) Within three Business Days following receipt by the Borrower or any Subsidiary or the Administrative Agent of any Net Proceeds in connection with any business interruption event, prepay the Term Loans (ratably between them), together with any accrued interest on the portion thereof repaid or prepaid, as applicable, in an amount equal to 100% of the Net Proceeds as shall be applied to prepay the Term Loans and, after the Term Loans have been fully paid, the Revolving Loans provided, however, that, if the Borrower delivers a certificate executed by a Senior Officer of the Borrower to the Administrative Agent prior to the date such Net Proceeds are to be used by the Borrower or such Subsidiary to prepay the Loans as specified in this clause (iv) stating that the Borrower intends to use such Net Proceeds, within 180 days after receipt of such Net Proceeds, to acquire (or replace or rebuild) real property, equipment or other tangible assets (excluding Inventory) to be used in the business of the Borrower, and certifying that no Default has occurred and is continuing then, instead of prepaying the Term Loans as indicated above, to extent any Revolving Loans are outstanding, the Borrower shall repay the Revolving Loans in the amount of such Net Proceeds and the Administrative Agent shall establish an Availability Reserve against Excess Availability in the amount of such Net Proceeds received until such time as the mandatory prepayment required under this clause (iv) or such permitted usages are made, as applicable. Any Net Proceeds in excess of outstanding Revolving Loans may be retained by the Borrower to reinvest in accordance with this clause (iv). So long as the

conditions set forth in Section 7.2 have been met and the Notice of Revolving Borrowing states that it is a request to use Net Proceeds pursuant to this Section, the Lenders shall make the applicable Borrowing and upon the funding of such Borrowing the Availability Reserve established with respect to such Net Proceeds shall be reduced by the amount of such Borrowing; provided that to the extent of any such Net Proceeds therefrom have not been so applied by the end of such 180-day period, a prepayment shall be required in an amount equal to such Net Proceeds that have not been so applied.

(c) Optional Prepayments. The Borrower may, at its option and from time to time, prepay any of the Term Loans, without premium or penalty, in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000 and (ii) the Borrower shall give written notice to the Administrative Agent setting forth the proposed date and amount of any such prepayment of Term Loans at least three (3) Business Days (or solely in the case of a prepayment of Term SOFR Loans, three (3) U.S. Government Securities Business Days) before the proposed date of such payment. Any notice of prepayment received by the Administrative Agent shall be irrevocable and subject to any compensation payable pursuant to Section 15.5.

(d) Interest; Application of Prepayments. All voluntary prepayments on any of the Term Loans and all prepayments of the Term Loans is accordance with Section 5.3(b) shall be applied, first, to the accrued and unpaid interest on the applicable Term Loans and, then, to the remaining scheduled amortization payments thereof (including the bullet at maturity) on a pro rata basis.

5.4 Payment of Other Obligations. Obligations other than Loans, including Extraordinary Expenses, shall be paid by the Borrower as provided in the Loan Documents or, if no payment date is specified, **ON DEMAND**.

5.5 Post-Default Allocation of Payments.

(a) Allocation. Notwithstanding anything herein to the contrary, during an Event of Default, if so directed by the Required Lenders or at Administrative Agent's discretion, monies to be applied to the Secured Obligations, whether arising from payments by Credit Parties, realization on Collateral, setoff, or otherwise, shall be allocated as follows:

(i) first, to all costs and expenses, including Extraordinary Expenses, owing to any Agent in its capacity as an Agent

(ii) second, to all amounts owing to the Swingline Lender on Swingline Loans;

(iii) third, to all Obligations constituting fees (other than Secured Bank Services Obligations);

(iv) fourth, to all Obligations constituting interest (other than Secured Bank Services Obligations);

(v) fifth, to all Loans, and to Secured Hedging ~~Agreements~~Obligations (including cash collateralization thereof) up to the amount of Availability Reserves existing therefor;

(vi) sixth, to all Secured Bank Services Obligations and any other Secured Hedging Obligations; and

(vii)    last, to all remaining Obligations.

Amounts shall be applied to each of the foregoing categories of Secured Obligations in the order presented above before being applied to the following category.  Where applicable, all amounts to be applied to a given category will be applied on a pro rata basis among those entitled to payment in such category. Amounts distributed with respect to any Secured Bank Services Obligations or Secured Hedging Obligations shall be the lesser of the applicable amount of Secured Bank Services Obligations or Secured Hedging Obligations last reported to the Administrative Agent or the actual Secured Bank Services Obligations as calculated by the methodology reported to the Administrative Agent for determining the amount due.  The Administrative Agent shall have no obligation to calculate the amount to be distributed with respect to any Secured Bank Services Obligations or Secured Hedging Obligations, but may rely upon written notice of the amount (setting forth a reasonably detailed calculation) from the applicable Secured Party.  In the absence of such notice, the Administrative Agent may assume the amount to be distributed is the amount of Secured Bank Services Obligations and Secured Hedging Obligations last reported to it.  The allocations set forth in this Section 5.5(a) are solely to determine the rights and priorities of each Agent and the Lenders as among themselves, and may be changed by agreement among them without the consent of any Credit Party. No Credit Party is entitled to any benefit under this Section 5.5(a) or has any standing to enforce this Section 5.5(a).

(b)    Erroneous Application.  No Agent shall be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount ought to have been made shall be to recover the amount from the Person which actually received it (and, if such amount was received by any Secured Party, then such Secured Party, by accepting the benefits of this Agreement, agrees to return it).

5.6    Sharing of Payments.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such Obligations greater than its Applicable Percentage thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans and such other Obligations of the other Lenders, or make such other adjustments as shall be equitable (as determined by the Administrative Agent in its commercially reasonable judgment), so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided, however, that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this paragraph shall not be construed to apply to (A) any payment made by a Credit Party pursuant to and in accordance with the express terms of this Agreement or any other Loan Document (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Commitments, Loans, or participations in Swingline Loans to any Transferee.

Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements

may exercise against each Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Credit Party in the amount of such participation.

5.7 Taxes.

(a) Defined Terms. For purposes of this Section 5.7, the term "Applicable Law" includes FATCA.

(b) Payments Free of Taxes. Any and all payments by or on account of any Obligations of the Credit Parties shall be made without deduction or withholding for any Taxes, except as required by Applicable Law. If Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 5.7) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c) Payment of Other Taxes. The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d) Indemnification by the Credit Parties. The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.7) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the applicable Credit Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e) Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.4 relating to the maintenance of a Participant Register, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 5.7(e).

(f) Evidence of Payments. As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 5.7, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g) Status of Lenders.

(i) Any Non-U.S. Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in clauses (ii)(A), (ii)(B) and (ii)(D) of this Section 5.7(g)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed originals of IRS Form W-8ECI;

(3) in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, a tax certificate substantially in the form of Exhibit I-1 to the effect that such Non-U.S. Lender is not (a) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (b) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (c) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(4) to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-1, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit I-2 on behalf of each such direct and indirect partner;

(C) any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment under FATCA. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the Original Closing Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 5.7 (including by the payment of additional amounts pursuant to this Section 5.7), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 5.7 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 5.7(h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 5.7(h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 5.7(h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 5.7(h) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i) Survival. Each party's obligations under this Section 5.7 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the Payment in Full of all Obligations under any Loan Document.

## SECTION 6

## SECURITY

6.1 Security Interest. The Secured Obligations shall be secured by the Collateral in accordance with the Security Documents.

## SECTION 7

## CONDITIONS PRECEDENT

7.1 Conditions Precedent to Initial Loans. [Reserved.]

7.2 Conditions Precedent to All Extensions of Credit. In addition to any other conditions set forth in Section 3 of Amendment No. 2 and Sections 7.3, 7.4 and 7.5, the Administrative Agent and the Lenders shall not be required to fund any Loans, make any Advance or grant any other financial accommodation to or for the benefit of the Borrower, unless each of the following conditions precedent are satisfied or waived in accordance with the terms hereof:

(a) No Default. No Default or Event of Default shall exist at the time of, or result from, such funding, issuance, or grant;

(b) Notice of Borrowing; Real Estate Term Advance Draw Request. The Borrower shall have delivered to Administrative Agent, a Notice of Borrowing (for the making of Loans) and, with respect to any Advance of a Real Estate Term Loan, a Real Estate Term Advance Draw Request, together with such other information the Administrative Agent may request;

(c) Accuracy of Representations and Warranties. The representations and warranties of each Credit Party in this Agreement and the other Loan Documents shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) on the date of, and after giving effect to, such funding, issuance, or grant (except for representations and warranties that expressly relate to an earlier date, in which case, they shall have been true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of such date);

(d) [Reserved];

(e) Equipment Term Loans. With respect to any New Equipment Term Advance of Equipment Term Loans, the Administrative Agent shall have received (i) a list of the expenditures and invoices, in each case in form and substance reasonably satisfactory to the Administrative Agent, with respect to the Eligible Equipment financed thereby and (ii) satisfactory results of collateral appraisals and field exams of the Borrower's and its Subsidiaries' books and records performed by the Administrative Agent or a third party reasonably acceptable to the Administrative Agent; and

(f) Real Estate Term Loans. After giving effect to any Advance of the Real Estate Term Loan, the Loan-to-Value Ratio shall not exceed 0.70:1.00.

7.3 Conditions Precedent to Real Estate Term Advances. In addition to any other applicable conditions set forth in Section 7.2 and Section 7.4 (with respect to the final Subsequent Real Estate Term Advance), the Administrative Agent and the Lenders shall not be required to make:

(a) the Initial Real Estate Term Advance unless each of the following conditions precedent are satisfied or waived in accordance with the terms hereof:

(i) The Fresno Deed of Trust granting the Collateral Agent a valid, first priority (subject to Permitted Liens) Lien over the Fresno Plant Real Property and the Improvements shall have been duly executed and delivered to the Administrative Agent by each of the signatories thereto, and each Credit Party shall be in compliance with all terms thereof.

(ii) The Administrative Agent shall have received the Real Estate Documents for each parcel of Real Estate relating to the Fresno Plant Property subject to the Fresno Deed of Trust.

(iii) The Administrative Agent shall have received such mortgagee endorsements as Collateral Agent shall require, with respect to the insurance policies carried by the Borrower, showing the Collateral Agent as agent for the Secured Parties (including, without limitation, if requested by the Administrative Agent, an agreement to furnish insurance, in form and substance satisfactory to the Administrative Agent and executed by the Borrower and Ventana South, LLC, a California limited liability company), each of which shall be in form and substance satisfactory to the Agents.

(iv)     The Administrative Agent shall have completed all due diligence related to the Fresno Plant Real Property and the construction of the Improvements, including review and approval of the Project Plans, Construction Contract, Disbursement Schedule, Project Budget, soils reports, zoning, entitlement, environmental review, engineering inspections, seismic studies, financial analysis, and other issues related to construction of the Improvements, in each case in scope and with results in all respects satisfactory to the Administrative Agent in its sole discretion.

(v)     The Administrative Agent shall have received an inspection report prepared by an independent third party hired by the Administrative Agent to verify completion of work for the amounts requested and its conformance to the Project Plans and any Governmental Requirement based upon such third party's periodic physical inspections of the Fresno Plant Real Property and Improvements.

(vi)     The Administrative Agent shall have received satisfactory results of collateral appraisals and field exams of the Borrower's and its Subsidiaries' books and records performed by the Administrative Agent or a third party reasonably acceptable to the Administrative Agent.

(vii)     The Borrower shall have (i) paid all fees and expenses to be paid to the Arranger, the Administrative Agent, the Collateral Agent and the Lenders on the date of the Initial Real Estate Term Advance (including pursuant to the Fee Letter) or the Administrative Agent shall be satisfied with all arrangements made to pay such fees and expenses on such date with the proceeds of Loans to be made on such date including all fees, expenses and disbursements of counsel for the Arranger and each Agent to the extent invoiced prior to such date or set forth in a funds flow statement approved by the Borrower, together with (A) all title insurance premiums and recording costs and taxes and (B) such additional amounts as shall constitute such counsel's reasonable estimate of expenses and disbursements to be incurred by such counsel in connection with the recording and filing of the Fresno Deed of Trust and financing statements; provided, that, such estimate shall not thereafter preclude further settling of accounts between the Borrower and the Administrative Agent and/or the Collateral Agent and (ii) reimbursed the Administrative Agent and the Collateral Agent for each of their respective out-of-pocket costs in connection with such Initial Real Estate Term Advance, including but not limited to appraisal and environmental expenses, title expenses, and documentation expenses.

(viii)     The Administrative Agent shall have received each of the following in form and substance reasonably satisfactory to the Administrative Agent:

(A)     copies of the Fresno Approved Appraisal, the Project Budget, the Disbursement Schedule, the Project Plans, the Construction Contract (if any), the Detailed Cost Breakdown, the Architect's Agreement, the Completion Guaranty, the Assignment of Construction Contract, the Assignment of Plans and Specifications, a Certification of Project Plans and Specifications, the ECA, and any other agreements that the Administrative Agent determines are material to construction of the Improvements (and the Administrative Agent shall have approved of the same in its sole discretion), all certified by a Senior Officer of the Borrower;

(B) copies of the building permits and any other permits or authorizations required from any Governmental Authority in connection with construction of the Improvements;

(C) if required by the Administrative Agent, letters from local utility companies and any Governmental Authority stating that electric, gas, sewer, water and telephone facilities are or will be available to the Fresno Plant Real Property upon completion of the Improvements;

(D) if required by the Administrative Agent, a list of the names and addresses of all suppliers, laborers and subcontractors with whom agreements have been made with Contractor and/or Borrower to deliver materials and/or perform work on the Improvements; and

(E) evidence that the Borrower has made at least the Borrower's Equity Contribution, as reasonably determined by the Administrative Agent.

(ix) Real Estate Term Notes shall have been executed by the Borrower and delivered to each Lender (or to the Administrative Agent or its counsel for distribution to such Lender) that has requested the issuance of a Note.

(b) any Subsequent Real Estate Term Advance unless each of the following conditions precedent are satisfied or waived in accordance with the terms hereof:

(i) Inspection Reports. The Administrative Agent shall have received an inspection report prepared by an independent third party hired by the Administrative Agent to verify completion of work for the amounts requested and its conformance to the Project Plans and any Governmental Requirement based upon such third party's periodic physical inspections of the Fresno Plant Real Property and Improvements.

(ii) Disbursement Schedule. All specific requirements for the disbursement set forth in the Disbursement Schedule shall have been satisfied.

(iii) Status of Improvements. The Improvements shall not have been damaged by fire or other casualty unless the Administrative Agent has determined that the Collateral Agent will receive insurance proceeds sufficient in the Administrative Agent's judgment to effect the satisfactory restoration of the Improvements and to permit the completion of the Improvements prior to the Completion Date.

(iv) Construction of Improvements. If required by the Administrative Agent, the Administrative Agent shall have received confirmation to its reasonable satisfaction that (A) to date, the Improvements have been constructed in accordance with the Project Plans and the Construction Contract (if any), and (B) the present state of construction of the Improvements will, barring then unforeseen and unknown delays, permit completion of construction of the Improvements on or before the Completion Date.

(v) Title Policy. If reasonably required by the Administrative Agent, (A) Title Insurer shall have issued its continuation endorsement to the Fresno Title Policy indicating that since the last preceding disbursement, there (1) has been no change in the condition of title to the Fresno Plant Real Property; and (2) are no intervening Liens

which may now or hereafter take priority over the disbursement to be made, and (B) upon completion of the foundation, Title Insurer shall have issued its foundation endorsement to the Fresno Title Policy insuring the Administrative Agent that the foundation is constructed wholly within the boundaries of the Fresno Plant Real Property and does not encroach on any easements or violate any covenants, conditions or restrictions or any Governmental Requirement.

(vi) Subdivision Map. If required by the Administrative Agent, the Administrative Agent shall have approved the subdivision map in final form as it was filed of record.

(vii) Offsite Materials. In the event any Real Estate Term Advance Draw Request includes the cost of Offsite Materials, such Real Estate Term Advance Draw Request shall include each of the following: (i) evidence that the Offsite Materials have been purchased by the Borrower, have been segregated from other materials in the facility where they are stored and have been appropriately marked to indicate the Borrower's ownership thereof and the Collateral Agent's security interest therein; (ii) evidence that the Offsite Materials are insured as required by this Agreement; and (iii) at the Administrative Agent's reasonable request, a security agreement, financing statement, acknowledgment, and/or subordination agreement in form and content reasonably satisfactory to the Administrative Agent executed by the supplier of the Offsite Materials, and/or such other Persons as the Administrative Agent reasonably determines may have an interest in or claim to the Offsite Materials, together with such other additional documentation and evidence as the Administrative Agent may reasonably require to confirm that it or the Collateral Agent, as applicable, has a perfected first priority lien on the Offsite Materials.

(viii) Onsite Materials. In the event any Real Estate Term Advance Draw Request includes the cost of Onsite Materials, such Real Estate Term Advance Draw Request shall include each of the following: (i) evidence that the Onsite Materials have been purchased by the Borrower; (ii) evidence that the Onsite Materials are insured as required hereunder; and (iii) evidence that the Onsite Materials are stored in an area on the Fresno Plant Real Property for which adequate security is provided against theft and vandalism.

(ix) Additional Real Estate Deliverables. If reasonably required by the Administrative Agent, the Administrative Agent shall have received each of the following in form and substance reasonably satisfactory to the Administrative Agent:

(A) bills, invoices, documents of title, vouchers, statements, receipts and any other documents evidencing the total amount expended, incurred or due for any requested line item shown in the Project Budget;

(B) evidence of the Borrower's use of a lien release, joint check or voucher system reasonably acceptable to the Administrative Agent for payments or disbursements to Contractor or to such Persons as have actually supplied labor, materials or services in connection with the construction of the Improvements;

(C) waivers and releases of any mechanic's lien, stop notice claim, equitable lien claim or other lien claim rights;

(D) evidence that any goods, materials, supplies, fixtures or other work in progress for which disbursement is requested have been incorporated into the Improvements; and

(E) any other documents, requirements, evidence or information that the Administrative Agent may reasonably request under any provision of the Loan Documents.

7.4 Conditions Precedent to Final Subsequent Real Estate Term Advance. In addition to any other conditions set forth in Section 7.2 and Section 7.3, the Administrative Agent and the Lenders shall not be required to make the final Subsequent Real Estate Term Advance unless each of the following conditions precedent are satisfied or waived in accordance with the terms hereof:

(a) Completion of Improvements. The Administrative Agent shall have received confirmation to its reasonable satisfaction that the Improvements have been completed in accordance with the Project Plans and the Construction Contract (if any).

(b) Certificate of Occupancy. If required by the Administrative Agent, the Administrative Agent shall have received a copy of the final certificate of occupancy (or its equivalent as determined by the Administrative Agent) issued by the appropriate Governmental Authority with respect to the Improvements.

(c) Notice of Completion. The Administrative Agent shall have received evidence that the Borrower has recorded a notice of completion (or its equivalent as determined by the Administrative Agent) with respect to the Improvements.

(d) Title Policy Endorsements/Additions. The Administrative Agent shall have received (A) such endorsements to the Fresno Title Policy as the Administrative Agent may reasonably require which shall insure that the Improvements have been completed free of all mechanic's and materialmen's liens or claims thereof, or (B) such additional title policies with endorsements as the Administrative Agent may require, with a liability limit of not less than the principal amount of the Real Estate Term Loan, issued by Title Insurer, with coverage and in form reasonably satisfactory to the Administrative Agent, insuring the Collateral Agent's interest under the Fresno Deed of Trust as a first lien on the Fresno Plant Real Property, excepting only such items as shall have been approved in writing by the Administrative Agent.

The final Subsequent Real Estate Term Advance shall consist of the payment of any monies retained from progress payments or disbursements as set forth in this Agreement.

7.5 Additional Conditions Precedent to Acquisition Equipment Term Advances. In addition to any other conditions set forth in Section 7.2 and Section 3 of Amendment No. 2, the Administrative Agent and the Lenders shall not be required to make any Acquisition Equipment Term Advance unless each of the following conditions precedent are satisfied or waived in accordance with the terms hereof:

(a) In the case of an Acquisition Equipment Term Advance (Tulare):

(i) The ARO Acquisition shall have been consummated substantially concurrently with the funding of such Acquisition Equipment Term Advance (Tulare) in accordance with Applicable Law and the ARO PSA without giving effect to any amendments, modifications or waivers thereof that are materially adverse to the Lenders (as reasonably determined by the Administrative Agent) unless such amendments, modifications or waivers are approved in writing by the Administrative Agent.

(ii)      Receipt by the Administrative Agent of a certificate, in form and substance reasonably satisfactory to the Administrative Agent, of a Senior Officer of the Borrower certifying, as of the date of such Acquisition Equipment Term Advance (Tulare), that (A) the board of directors or other similar governing body of the Tulare Seller shall have approved the ARO Acquisition (and, if requested by the Administrative Agent, attaching supporting evidence of such approval); (B) the Tulare Plant Property and the related business and assets to be acquired in the ARO Acquisition are useful in the business of the Borrower and its Subsidiaries as conducted immediately prior to the ARO Acquisition or as permitted pursuant to this Agreement; (C) attached thereto are true, correct and complete fully executed copies of the ARO PSA, including all schedules, exhibits and annexes thereto and each other material document executed, delivered, contemplated by or prepared in connection with the ARO Acquisition (including, without limitation, each of the documents required to be delivered pursuant to Section 5(b) of Amendment No. 1 (other than any ARO Assumed Leases) or confirmation by the Borrower that such documents were not entered into) and any amendment, modification, assignment or supplement to any of the foregoing, in each case in form and substance reasonably satisfactory to the Administrative Agent; and (D) the ARO Acquisition satisfies each of the requirements set forth in the definition of "Permitted Acquisition" (other than clause (e) thereof).

(iii)      Receipt by the Administrative Agent of a Compliance Certificate demonstrating, in form and substance reasonably satisfactory to the Administrative Agent, that the Borrower is in compliance on a pro forma basis (based on the most recently completed fiscal quarter) after giving effect to the ARO Acquisition and any Debt (including, without limitation, the Acquisition Equipment Term Advance (Tulare)) with each covenant contained in clauses (a) and (b) of Section 10.14 (assuming for this purpose that for any covenant that has not yet commenced testing that such covenant is then in effect and that the initial required ratio or level is then in effect).

(iv)      The Administrative Agent shall have received, in each case in form and substance reasonably satisfactory to the Administrative Agent, evidence of property, business interruption and liability insurance covering each Credit Party and the Tulare Plant (with appropriate endorsements naming the Administrative Agent as lender's loss payee (and mortgagee, as applicable) on all policies for property hazard insurance and as additional insured on all policies for liability insurance), and if requested by the Administrative Agent, copies of such insurance policies.

(v)      The Administrative Agent shall have received the results of a Lien search (including, if requested, a search as to judgments and tax matters), in form and substance reasonably satisfactory thereto, made against the Tulare Seller under the Uniform Commercial Code (or applicable judicial docket) as in effect in each jurisdiction in which filings or recordations under the Uniform Commercial Code are necessary to be made to perfect security interests in the Tulare Plant Property and the other assets sold to the Borrower pursuant to the ARO PSA, indicating among other things that such assets are free and clear of any Lien (except for Permitted Liens).

(vi)      A Mortgage granting the Collateral Agent a valid, first priority (subject to Permitted Liens) Lien over the Tulare Plant Property shall have been duly executed and delivered to the Administrative Agent by each of the signatories thereto, and each Credit Party shall be in compliance with all terms thereof.

(vii) The Administrative Agent shall have received the following, in each case in form and substance reasonably satisfactory to the Administrative Agent: (A) the Real Estate Documents for each parcel of Real Estate relating to the Tulare Plant Property subject to a Mortgage (other than the items described in clauses (c) and (h) of the definition of Real Estate Documents and it being understood and agreed that the Mortgage with respect to the Tulare Plant Property satisfies the requirements of clause (i) of the definition of Real Estate Documents for purposes of this clause (vii)) and (B) a duly executed copy of the ARO Perpetual Easement.

(viii) The Administrative Agent shall have completed all due diligence related to the Tulare Plant Property, including review and approval of soils reports, zoning, entitlement, environmental review, engineering inspections, seismic studies, financial analysis, and other issues related thereto, in each case in scope and with results in all respects satisfactory to the Administrative Agent in its sole discretion.

(ix) The Administrative Agent shall have received the Tulare Approved Appraisal.

(x) The Administrative Agent shall have received satisfactory results of collateral appraisals and field exams of the Borrower's and its Subsidiaries' books and records performed by the Administrative Agent or a third party reasonably acceptable to the Administrative Agent.

(xi) The Borrower shall have (A) paid all fees and expenses to be paid to the Arranger, the Administrative Agent, the Collateral Agent and the Lenders on the date of such Acquisition Equipment Term Advance (Tulare) (including pursuant to the Fee Letter) or the Administrative Agent shall be satisfied with all arrangements made to pay such fees and expenses on such date with the proceeds of Loans to be made on such date including all fees, expenses and disbursements of counsel for the Arranger and each Agent to the extent invoiced prior to such date or set forth in a funds flow statement approved by the Borrower, together with (x) all title insurance premiums and recording costs and taxes and (y) such additional amounts as shall constitute such counsel's reasonable estimate of expenses and disbursements to be incurred by such counsel in connection with the recording and filing of Mortgages and financing statements; provided, that, such estimate shall not thereafter preclude further settling of accounts between the Borrower and the Administrative Agent and/or the Collateral Agent and (B) reimbursed the Administrative Agent and the Collateral Agent for each of their respective out-of-pocket costs in connection with such Acquisition Equipment Term Advance (Tulare), including but not limited to appraisal and environmental expenses, title expenses, and documentation expenses.

(b) In the case of an Acquisition Equipment Term Advance (Chowchilla):

(i) The Chowchilla Acquisition shall have been consummated substantially concurrently with the funding of such Acquisition Equipment Term Advance (Chowchilla) in accordance with Applicable Law and the Chowchilla PSA and the Chowchilla Lease and Option without giving effect to any amendments, modifications or waivers thereof that are materially adverse to the Lenders (as reasonably determined by the Administrative Agent) unless such amendments, modifications or waivers are approved in writing by the Administrative Agent.

(ii)    Receipt by the Administrative Agent of a certificate, in form and substance reasonably satisfactory to the Administrative Agent, of a Senior Officer of the Borrower certifying, as of the date of such Acquisition Equipment Term Advance (Chowchilla), that (A) the board of directors or other similar governing body of the Chowchilla Seller shall have approved the Chowchilla Acquisition (and, if requested by the Administrative Agent, attaching supporting evidence of such approval); (B) the Chowchilla Plant Property and the related business and assets to be acquired in the Chowchilla Acquisition are useful in the business of the Borrower and its Subsidiaries as conducted immediately prior to the Chowchilla Acquisition or as permitted pursuant to this Agreement; (C) attached thereto are true, correct and complete fully executed copies of the Chowchilla PSA and the Chowchilla Lease and Option, including in each case all schedules, exhibits and annexes thereto and each other material document executed, delivered, contemplated by or prepared in connection with the Chowchilla Acquisition (including, without limitation, each of the documents required to be delivered pursuant to Section 5(b) of Amendment No. 1) and any amendment, modification, assignment or supplement to any of the foregoing, in each case in form and substance reasonably satisfactory to the Administrative Agent; and (D) the Chowchilla Acquisition satisfies each of the requirements set forth in the definition of "Permitted Acquisition" (other than clause (e) thereof).

(iii)    Receipt by the Administrative Agent of a Compliance Certificate demonstrating, in form and substance reasonably satisfactory to the Administrative Agent, that the Borrower is in compliance on a pro forma basis (based on the most recently completed fiscal quarter) after giving effect to the Chowchilla Acquisition and any Debt (including, without limitation, the Acquisition Equipment Term Advance (Chowchilla) to be made in connection with the Chowchilla Acquisition) with each covenant contained in clauses (a) and (b) of Section 10.14 (assuming for this purpose that for any covenant that has not yet commenced testing that such covenant is then in effect and that the initial required ratio or level is then in effect).

(iv)    The Administrative Agent shall have received, in each case in form and substance reasonably satisfactory to the Administrative Agent, evidence of property, business interruption and liability insurance covering each Credit Party and the Chowchilla Plant Property (with appropriate endorsements naming the Administrative Agent as lender's loss payee (and mortgagee, as applicable) on all policies for property hazard insurance and as additional insured on all policies for liability insurance), and if requested by the Administrative Agent, copies of such insurance policies.

(v)    The Administrative Agent shall have received the results of a Lien search (including, if requested, a search as to judgments and tax matters), in form and substance reasonably satisfactory thereto, made against the Chowchilla Seller under the Uniform Commercial Code (or applicable judicial docket) as in effect in each jurisdiction in which filings or recordations under the Uniform Commercial Code are necessary to be made to perfect security interests in the Chowchilla Plant Property and the other assets sold to the Borrower pursuant to the Chowchilla PSA, indicating among other things that such assets are free and clear of any Lien (except for Permitted Liens).

(vi)    A Mortgage granting the Collateral Agent a valid, first priority (subject to Permitted Liens) Lien over the Chowchilla Plant Property shall have been duly executed and delivered to the Administrative Agent by each of the signatories thereto, and each Credit Party shall be in compliance with all terms thereof.

(vii) The Administrative Agent shall have received, in each case in form and substance reasonably satisfactory to the Administrative Agent, the Real Estate Documents for each parcel of Real Estate relating to the Chowchilla Plant Property subject to a Mortgage (other than the items described in clauses (c) and (h) of the definition of Real Estate Documents and it being understood and agreed that the Mortgage with respect to the Chowchilla Plant Property satisfies the requirements of clause (i) of the definition of Real Estate Documents for purposes of this clause (vii)).

(viii) The Administrative Agent shall have completed all due diligence related to the Chowchilla Plant Property, including review and approval of soils reports, zoning, entitlement, environmental review, engineering inspections, seismic studies, financial analysis, and other issues related thereto, in each case in scope and with results in all respects satisfactory to the Administrative Agent in its sole discretion.

(ix) The Administrative Agent shall have received the Chowchilla Approved Appraisal.

(x) The Administrative Agent shall have received satisfactory results of collateral appraisals and field exams of the Borrower's and its Subsidiaries' books and records performed by the Administrative Agent or a third party reasonably acceptable to the Administrative Agent.

(xi) The Borrower shall have (A) paid all fees and expenses to be paid to the Arranger, the Administrative Agent, the Collateral Agent and the Lenders on the date of such Acquisition Equipment Term Advance (Chowchilla) (including pursuant to the Fee Letter) or the Administrative Agent shall be satisfied with all arrangements made to pay such fees and expenses on such date with the proceeds of Loans to be made on such date including all fees, expenses and disbursements of counsel for the Arranger and each Agent to the extent invoiced prior to such date or set forth in a funds flow statement approved by the Borrower, together with (x) all title insurance premiums and recording costs and taxes and (y) such additional amounts as shall constitute such counsel's reasonable estimate of expenses and disbursements to be incurred by such counsel in connection with the recording and filing of Mortgages and financing statements; provided, that, such estimate shall not thereafter preclude further settling of accounts between the Borrower and the Administrative Agent and/or the Collateral Agent and (B) reimbursed the Administrative Agent and the Collateral Agent for each of their respective out-of-pocket costs in connection with such Acquisition Equipment Term Advance (Chowchilla), including but not limited to appraisal and environmental expenses, title expenses, and documentation expenses.

## SECTION 8

## REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to, as applicable, enter into this Agreement, provide their respective Commitments, make Loans and permit them to remain outstanding, and make any other extension of credit or financial accommodation provided for herein or in the other Loan Documents, the Borrower makes the following representations and warranties (and each request for a disbursement of the proceeds of any of the Loans shall be deemed to be a making of the following representations and warranties on the date of such request):

8.1     Affiliates; Subsidiaries and Capitalization.  As of the Amendment No. 2 Effective Date, the names and addresses of the Borrower's Pistachio Affiliates are as provided on Schedule 8.1.  For purposes of this Agreement, "Pistachio Affiliates" of the Borrower are (a) those entities in which the Borrower has either a controlling interest or a 25% or more ownership interest and (b) any persons or entities owning 5% or more of the Equity Interests of the Borrower.

8.2     Organization and Qualification.  The Borrower and each Subsidiary Guarantor is duly organized and existing under the laws of the state of its organization, is duly qualified and in good standing in (x) its jurisdiction of organization, (y) in the case of the Borrower, the jurisdiction where each Plant Property is located and (z) any other jurisdiction where such qualification is required to carry out its business and operations (except, with respect to this clause (z), where the failure to be so qualified, individually or in the aggregate, has not had and could not reasonably be expected to have a Material Adverse Effect) and has the power and authority to carry on the business in which it is engaged and/or proposes to engage.

8.3     Power and Authorization; Enforceability.  The Borrower and each Subsidiary Guarantor has the power and authority to enter into the Loan Documents to which it is a party and to execute and deliver it and all other documents contemplated hereby and to perform its Obligations under each of the Loan Documents to which it is a party.  This Agreement and all things required by this Agreement and the other Loan Documents have been duly authorized by all necessary action by the Borrower and each Subsidiary Guarantor.  This Agreement and each other Loan Document represents a legal, valid, binding and enforceable obligation against the Borrower except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

8.4     Non-Contravention.  The execution, delivery and performance of this Agreement and all other Loan Documents are not in contravention of (a) its Organizational Documents or (b) any of the terms of any indenture, agreement or undertaking to which the Borrower or any Subsidiary Guarantor is a party or by which it or any of its property is bound or affected, except in the case of this clause (b), to the extent that any such violation or default, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

8.5     Compliance with Laws.  The Borrower and each Subsidiary Guarantor is in compliance with all (a)  applicable laws, rules, ordinances or regulations which affect the operations or financial condition of the Borrower or such Subsidiary Guarantor, except where the failure to so comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect and (b) Anti-Corruption Laws, Anti-Money Laundering Laws and Anti-Terrorism Laws.   Neither the Borrower nor any Subsidiary Guarantor has received any written notice from any Governmental Authorities alleging that Borrower or such Subsidiary Guarantor has breached any laws, rules, ordinances or regulations applicable to it except for any such breaches or alleged breaches that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any Subsidiary Guarantor is in violation of any of the country or list-based economic and trade sanctions administered and enforced by OFAC.

8.6     Title.  Except for assets which have been disposed of in the Ordinary Course of Business or that are otherwise expressly permitted under this Agreement, each of the Borrower and each Subsidiary Guarantor has good and marketable title to all property reflected in the applicable financial statements most recently delivered to the Administrative Agent and to all property acquired by it since the date of said financial statements, free and clear of all Liens, except Liens that are otherwise expressly permitted by this Agreement and minor defects in title that, individually or in the aggregate, do not materially detract from the value of the affected property or interfere with the intended use of such affected property or the ordinary conduct of business of the Borrower and the Subsidiary Guarantors.

8.7    Litigation.  Except as set forth on Schedule 8.7, as of the Amendment No. 2 Effective Date, there is no litigation or proceeding pending or threatened against the Borrower and any of its Subsidiaries or any of their respective properties.  Since the Amendment No. 2 Effective Date, there has been no (a) material development in any of the matters set forth on Schedule 8.7 that has not been disclosed in writing to the Administrative Agent or  (b) litigation or proceeding pending or threatened against the Borrower and any of its Subsidiaries or any of their respective properties that could reasonably be expected, individually or in the aggregate with all other litigation or proceedings pending or threatened against the Borrower or any of its Subsidiaries, to have a Material Adverse Effect. Except as set forth on Schedule 8.7 or as disclosed to the Administrative Agent in writing, no litigation or proceeding pending or threatened against the Borrower or any of it is Subsidiaries or their respective properties is reasonably likely to affect the financial condition, property or business of such Person in a materially adverse manner or result in liability in excess of such Person's insurance coverage.

8.8    Regulation T, U and X; Investment Company Act.  No part of the proceeds of the Loans made hereunder will be used to purchase or carry, or to extend credit to others for the purpose of purchasing or carrying, any margin stock or for any related purpose governed by Regulations T, U, or X of the Board of Governors.  Following the application of the proceeds of each Loan or Advance, not more than twenty-five percent (25%) of the value of the assets (either of the Borrower only or of the Borrower and its Subsidiaries on a consolidated basis) subject to the provisions of Section 10.9 or Section 10.11(b) or subject to any restriction contained in any agreement or instrument between the Borrower and any Lender or any Affiliate of any Lender relating to Debt in excess of the threshold set forth in Section 12.1(j) will be "margin stock".  Neither the Borrower nor any of its Subsidiaries is required to be registered as an "investment company" under the Investment Company Act of 1940.

8.9    No Event of Default.  There exists no Event of Default, and no condition, event or act which with notice or lapse of time, or both, would constitute an Event of Default.

8.10    Tax Liability.  The Borrower and each of its Subsidiaries has filed all tax returns which it is required by Applicable Law to file, and has paid, or made provision for the payment of, all taxes with respect to the periods, property or transactions covered by said returns, or pursuant to any assessment received by such Person, except (a) such taxes, if any, as are being contested in good faith by appropriate proceedings and as to which adequate reserves have been established and maintained and (b) immaterial taxes so long as no material asset of such Person is at impending risk of being seized, levied upon or forfeited.

8.11    Hazardous Materials.  (a) Neither the Borrower nor any Subsidiary has, at any time, disposed of, discharged, released or threatened the release of any Hazardous Materials on, from or under any real property in violation of any Environmental Laws that would individually or in the aggregate constitute a Material Adverse Effect, (b) no condition exists that violates any Environmental Laws affecting any real property except for such violations that would not individually or in the aggregate have a Material Adverse Effect, (c) no real property or any portion thereof is or has been utilized by the Borrower or any Subsidiary as a site for the manufacture of any Hazardous Materials and (d) to the extent that any Hazardous Materials are used, generated or stored by the Borrower or any Subsidiary on any real property, or transported to or from such real property by the Borrower or any Subsidiary, such use, generation, storage and transportation are in compliance with all Environmental Laws except for such non-compliance that would not constitute a Material Adverse Effect or be materially adverse to the interests of the Agents or the Lenders.

8.12    Employee Matters.  There is no strike, work stoppage or labor dispute with any union or group of employees pending or overtly threatened involving the Borrower or any Subsidiary that would have a Material Adverse Effect. Neither the Borrower nor any Subsidiary is an entity deemed to hold

"plan assets" within the meaning of Section 3(42) of ERISA, and neither the execution of this Agreement nor the making of any credit extensions hereunder will give rise to a prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.

8.13 Fiscal Year. The Borrower operates on a fiscal year that ends on December 31.

8.14 Insurance Premiums. All insurance premiums due and owing under the current casualty and liability insurance policies of the Borrower and its Subsidiaries have been paid.

8.15 Solvency. After giving effect to this Agreement and the other Loan Documents (including after giving effect to the initial and each subsequent advance under this Agreement), the Borrower will be Solvent. "Solvent" means on any date of determination, that on such date (a) the fair value of the property of the Borrower is greater than the total amount of liabilities, including contingent liabilities, of the Borrower, (b) the present fair saleable value of the assets of the Borrower is not less than the amount that will be required to pay the probable liability of the Borrower on its debts as they become absolute and matured, (c) the Borrower does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay such debts and liabilities as they mature, (d) the Borrower is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute an unreasonably small capital, and (e) the Borrower is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

8.16 Affiliate Indebtedness. Other than Subordinated Grower Payables, Debt of the Borrower owed to a Subsidiary Guarantor or other Debt outstanding on the Amendment No. 2 Effective Date and disclosed on Schedule 8.16, the Borrower has no Debt owing to any Pistachio Affiliate.

8.17 Disclosure. The Borrower has disclosed to the Agents and the Lenders all agreements, instruments and corporate or other restrictions to which it or its Subsidiaries are subject, and all other matters that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. No written statement made by an agent of the Borrower or any of its Subsidiaries to the Arranger, any Agent or any Lender in connection with this Agreement, or in connection with any advance, as of the date thereof, when take as a whole with all other information disclosed by the Borrower and its Subsidiaries, contained any untrue statement of a material fact or omitted a material fact necessary to make the statement made not misleading in light of all the circumstances existing at the date the statement was made. All information set forth in the Collateral Disclosure Certificates is true and correct in all material respects as of the Amendment No. 2 Effective Date, and all information in any Collateral Disclosure Certificate delivered to any Agent after the Amendment No. 2 Effective Date shall be true and correct in all material respects as of the date thereof. As of the Amendment No. 2 Effective Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

8.18 Leases and Personal Property. All leases, if any, including all amendments, guaranties and subleases (collectively, the "Leases"), of Real Estate securing any of the Obligations described in this Agreement (the "Real Property Collateral"), are in full force and effect, and there are no defaults under any of the Leases. The Borrower holds title to all personal property and fixtures necessary for the operation and management of the Real Property Collateral for the uses presently being conducted thereon.

8.19 Material Adverse Effect. Since December 31, 2019, there has been no material adverse change in the properties, business, operations or condition (financial or otherwise) of the Borrower and its Subsidiaries (taken as a whole) and no event has occurred or condition arisen, either individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.

8.20 Flood. From and after the date that any Mortgage is entered into, no portion of the Real Estate or any improvements thereon that is subject to a Mortgage is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws, except to the extent that the Borrower has provided the Administrative Agent with (i) written notice that such real property (or any specified portion thereof) is within a flood plain and (ii) evidence that the Borrower has obtained flood insurance in an amount, with endorsements and by an insurer reasonably acceptable to the Administrative Agent.

8.21 Certain Real Property Matters. Notwithstanding any timing or effectiveness stated elsewhere in this Agreement, the representations and warranties of this Section 8.21 shall not be required to be made or effective unless and until Borrower requests a draw on the Real Estate Term Loan. The Borrower is authorized to construct the Improvements and to own and operate the Fresno Plant Property. The Borrower has made no contract or arrangement of any kind, the performance of which by the other party thereto would rise to a Lien on the Fresno Plant Property, except for its arrangements with the Architect, the Contractor or the subcontractors if there is no Contractor. The Fresno Plant Real Property and the Improvements and the actual use thereof by the Borrower complies in all material respects with all Governmental Requirements. No Person is or may be entitled to any finder's fee, brokerage commission, loan commission or other sum in connection with the execution of this Agreement, consummation of the transactions completed hereby or the making of the Loans by the Lenders to the Borrower. Except as otherwise disclosed in writing to the Administrative Agent and approved by the Administrative Agent in writing prior to the Original Closing Date, the Borrower has not received other financing for either the acquisition of the Fresno Plant Property or the construction and installation of the Improvements. The Project Plans are satisfactory to the Borrower, and to the extent required by any Governmental Requirement or any effective restrictive covenant, have been approved by all applicable Governmental Authorities and the beneficiaries of any such covenant respectively; the Project Plans so approved have been approved by the Borrower and the Contractor as set forth in the Certification of Project Plans and Specifications delivered to the Administrative Agent by the Borrower. All utility services necessary for the construction of the Improvements and the operation thereof for their intended purpose are either available at the boundaries of the Fresno Plant Real Property or all necessary steps have been taken by the Borrower and the applicable Governmental Authorities to assure the complete construction and installation thereof, including water supply, storm drain and sanitary sewer facilities, and gas, electric and telephone facilities. All roads necessary for the full use of the Improvements for their intended purposes have been completed or the necessary rights-of-way therefore have either been acquired by the applicable Governmental Authority or dedicated to public use and accepted by such Governmental Authority. All necessary steps have been taken by the Borrower and such Governmental Authority to assure the complete construction thereof. The Borrower has examined, is familiar with, and the Improvements will in all respects conform to and comply with, all covenants, conditions, restrictions, reservations and zoning ordinances affecting the Fresno Plant Property.

~~8.22 Additional Guarantors and Collateral. Promptly notify the Administrative Agent of the creation or acquisition (including by division) of a Person that becomes a Subsidiary and, within thirty (30) days after such event, as such time period may be extended by the Administrative Agent in its sole discretion, cause such Subsidiary to (A) become a Subsidiary Guarantor by delivering to the Administrative Agent a duly executed joinder agreement or such other document as the Administrative Agent shall deem appropriate for such purpose, (B) grant a security interest in all Collateral (subject to~~

~~the exceptions specified in the Security Agreement) owned by such Subsidiary by delivering to the Administrative Agent a duly executed joinder agreement and a supplement to each applicable Security Document or such other document as the Administrative Agent shall deem appropriate for such purpose and comply with the terms of each applicable Security Document, (C) deliver to the Administrative Agent such opinions, documents and certificates of the type referred to in Section 3 of Amendment No. 2 as may be reasonably requested by the Administrative Agent, (D) if such Equity Interests are certificated, deliver to the Administrative Agent such original certificated Equity Interests or other certificates and stock or other transfer powers evidencing the Equity Interests of such Person, (E) deliver to the Administrative Agent such updated Schedules to the Security Documents or a revised Collateral Disclosure Schedule as requested by the Administrative Agent with respect to such Subsidiary, and (F) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent, all in form, content and scope reasonably satisfactory to the Administrative Agent.~~

**SECTION 9**

**[RESERVED]**

**SECTION 10**

**COVENANTS**

Until Payment in Full of the Obligations and termination of the Commitments, the Borrower and each Subsidiary Guarantor (and, with respect to clauses (c) and (d) of Section 10.2, each Non-Subsidiary Guarantor) shall, and shall cause each Subsidiary, as applicable, to:

10.1 Notice of Certain Events. Give written notice to the Administrative Agent within fifteen (15) days (or such later date as may be approved by the Administrative Agent in its sole discretion) after the occurrence of any of the following:

(a) The commencement of any litigation or arbitration proceeding (i) against the Borrower or any Subsidiary where the amount in controversy is $500,000 or more or (ii) affecting any Plant Property or the Improvements.

(b) Any written notice (i) by any government regulatory body or other law enforcement body to the Borrower or any Subsidiary of a material dispute arising between the Borrower or any Subsidiary and any government regulatory body or law enforcement body or (ii) of a material dispute which may affect any Plant Property or the Improvements.

(c) Any Event of Default or breach under any of the terms or provisions of this Agreement or any other Loan Document, any inaccuracy or error in any Borrowing Base Certificate delivered to the Administrative Agent or the Lenders, any litigation which is reasonably expected to have a Material Adverse Effect, and any other matter which has resulted in, or is likely to result in, a Material Adverse Effect.

(d) Any change in (i) the Borrower's Managers (as defined in its Organizational Documents), (ii) the Borrower's or any Subsidiary Guarantor's name or state of organization, or (iii) the location of the Borrower's or any Subsidiary Guarantor's assets having a fair market value in excess of $1,000,000.

(e) The occurrence of any other matter which has resulted or is likely to result in a material adverse change in the physical condition or operation of any Plant Property or the Improvements.

(f) The termination of the Chowchilla Lease and Option without the execution of the Chowchilla PSA, the termination of the ARO PSA or the Chowchilla PSA without the closing of the ARO Acquisition or Chowchilla Acquisition, respectively, or any amendment, restatement, supplementation or other modification of the ARO PSA, the Chowchilla Lease and Option or the Chowchilla PSA.

(g) The transfer of (i) any ARO Transferred Equipment to the Tulare Plant or (ii) any Chowchilla Transferred Equipment to the Chowchilla Plant (which such notice shall, in each case, identify such equipment with reasonable detail, including the cost thereof).

10.2 Financial and Other Reporting. Furnish to the Administrative Agent, or cause each Guarantor of the Loans to furnish to the Administrative Agent:

(a) As soon as practicable, and in any event within forty-five (45) days[1] after the end of each fiscal quarter (other than the last fiscal quarter of any fiscal year), the consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated and consolidating statements of income for such fiscal quarter, and the portion of the fiscal year ended with such fiscal quarter, all in reasonable detail and in a form substantially consistent with that provided to the Administrative Agent prior to the Amendment No. 2 Effective Date. Such financial statements shall be certified by a manager of the Borrower as fairly presenting the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP (other than footnote disclosures), consistently applied, as at such date and for such periods, subject only to normal year-end accruals and audit adjustments.

(b) Within (i) two hundred and forty (240) days after the close of the fiscal year ended December 31, 2020 and (ii) one hundred fifty (150) days after the close of each subsequent fiscal year, the consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as of the close of such fiscal year, and the related consolidated and consolidating income statement, and statement of cash flows for such fiscal year, all prepared on an "audited" basis by independent certified public accountants selected by the Borrower and reasonably satisfactory to the Administrative Agent, in accordance with GAAP, using the accrual basis of accounting, along with any management letter provided by such accountants.

(c) Within one hundred fifty (150) days after the close of each fiscal year, (i) for each of the Guarantors which is not an individual or a trust and is not otherwise included in the consolidating financial statements of the Borrower provided pursuant to clause (b) of this Section, a copy of such Guarantor's statement of financial condition, including at least such Guarantor's balance sheet as of the close of such fiscal year, such Guarantor's income and expense statement, and such Guarantor's retained earnings statement for such fiscal year, ~~all~~and (ii) the consolidated balance sheet of The Assemi Group as of the close of such fiscal year and the related consolidated income statement and statement of cash flows for such fiscal year, in each case of (i) and (ii) prepared on a "reviewed" basis by independent certified public accountants selected by such Guarantor or, in the case of clause (ii), the Assemi family or its designees, as applicable, and reasonably satisfactory to the Administrative Agent, in accordance with GAAP.

~~[1] NOTE: Extended to 60 days for the June 30, 2021 period per the Limited Waiver and Consent dated July 26, 2021.~~

(d) Within ~~one hundred~~ one hundred eighty (180) days after the close of each fiscal year, for each of the Guarantors which is an individual or a trust, a copy of such Guarantor's statement of financial condition, including at least such Guarantor's balance sheet as of the close of such fiscal year, such Guarantor's income and expense statement, and such Guarantor's retained earnings statement for such fiscal year, all prepared on a "reviewed" basis by independent certified public accountants selected by such Guarantor and reasonably satisfactory to the Administrative Agent, in accordance with GAAP.

(e) Concurrently with the furnishing of the financial statement(s) required by clauses (a) and (b) above, a duly completed Compliance Certificate, executed by a manager or Senior Officer of the Borrower.

(f) Promptly upon the request of the Administrative Agent, copies of state and federal tax returns for the Borrower and each Guarantor.

(g) Within fifteen (15) days after the Borrower or any Subsidiary Guarantor knows or has reason to know that any Reportable Event or Prohibited Transaction (as defined in ERISA) has occurred with respect to any defined benefit pension plan of such Person, a statement of an authorized officer of such Person describing such event or condition and the action, if any, which such Person proposes to take with respect thereto.

(h) As soon as practicable, and in any event within thirty (30) days after the end of each fiscal month of the Borrower, a Borrowing Base Certificate as of the end of such fiscal month, accurately reporting the amounts of the Borrower's Accounts, Eligible Accounts, Inventory and Eligible Inventory signed by a manager or Senior Officer of the Borrower, together with a copy of the Borrower's detailed accounts receivable aging report, and accounts payable report in each case in a form reasonably acceptable to the Administrative Agent.

(i) Within one hundred fifty (150) days after the end of each fiscal year, the Borrower will supply to the Administrative Agent an annual operating budget for the Borrower's current fiscal year, in a format reasonably satisfactory to the Administrative Agent.

(j) Within 30 days after the commencement of each fiscal year, the Borrower shall (i) execute and deliver to the Administrative Agent a Collateral Disclosure Certificate with then current information which shall be in substantially in the form delivered on the Amendment No. 2 Effective Date or such other form as may be satisfactory to the Administrative Agent and (ii) supplement Schedule 8.1 (each such date the foregoing schedule is supplemented, a "Supplement Date"), with respect to any matter hereafter arising that, if existing or occurring at the Amendment No. 2 Effective Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby, and, in each case such Collateral Disclosure Certificate or Schedule shall be appropriately marked to show the changes made therein; provided that neither such Collateral Disclosure Certificate nor such supplement to any Schedule or representation or warranty shall be deemed a waiver of any Default resulting from the matters disclosed therein, except as consented to by the Administrative Agent and the Required Lenders or Lenders, as applicable in accordance with Section 17.2.

(k) Promptly after the sending thereof, the Borrower shall deliver to the Administrative Agent copies of any financial and other material information provided to holders, agents and trustees of any material Debt of any of the Borrower or any Subsidiary Guarantor.

(l) Such other information and financial statements concerning the Borrower and its Subsidiaries as the Administrative Agent or the Collateral Agent may reasonably request from time to time.

10.3 Existence. Except as expressly permitted by Section 10.11, maintain and preserve its existence, present form of business and all rights privileges and franchises necessary or desirable in the normal course of its business and keep all of its properties in good working order and condition, except as such failure (other than any such failure with respect to the existence of the Borrower or a Subsidiary Guarantor) could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

10.4 Insurance. Keep all of its insurable property, whether real, personal or mixed, insured by financially sound and reputable insurance companies against fire and such other risks, and in such amounts as is customarily obtained by companies conducting similar business with respect to like properties. On an annual basis, within thirty (30) days prior to expiration of any such policy and promptly following the Administrative Agent's reasonable request, the Borrower will furnish to the Administrative Agent statements of the insurance coverages of the Borrower and the Subsidiary Guarantors; will promptly upon the Administrative Agent's reasonable request furnish other or additional insurance deemed necessary by the Administrative Agent to the extent that such insurance may be available; and hereby assigns to the Collateral Agent, as security for the Secured Obligations, Collateral proceeds of any such insurance. Prior to any loan disbursement, the Collateral Agent will be named lender's loss payable and/or mortgagee (as applicable) on all policies maintained by the Borrower for property hazard insurance and as additional insured on all policies maintained by the Borrower for liability insurance. Each such policy shall include endorsements satisfactory to the Administrative Agent showing the Collateral Agent as lender's loss payable and/or mortgagee (as applicable) on all policies maintained by the Borrower for property hazard insurance and as additional insured on all policies maintained by the Borrower for liability insurance. The Borrower will maintain adequate workers compensation insurance and adequate insurance against liability for damages to persons or property. All policies shall require at least ten days written notice to the Collateral Agent before alteration or cancellation.

10.5 Books and Records. Maintain adequate books, accounts and records and prepare all financial statements required hereunder in compliance with the regulations of any governmental regulatory body having jurisdiction over the Borrower or the Borrower's business and permit employees or agents of the Administrative Agent at any reasonable time to inspect the Borrower's assets and properties, and at the Administrative Agent's expense to examine or audit the Borrower's books, accounts and records and make copies and memoranda thereof. Lenders may participate in any such visit or inspection at their own expense. Neither the Administrative Agent nor any Lender shall have any duty to the Borrower or any Subsidiary to make any inspection nor to share any results of any inspection, appraisal, or report with the Borrower or any Subsidiary. The Borrower acknowledges that all inspections, appraisals, and reports are prepared by the Agents and Lenders for their own purposes and neither the Borrower nor any Subsidiary shall be entitled to rely upon them.

10.6 Laws. Comply with, or cause to be complied with, all laws, statutes, rules, regulations, orders and directions of any Governmental Authority having jurisdiction over it or its business, and all material agreements to which it is a party, except where any failure to so comply could not reasonably be expected to have a Material Adverse Effect.

10.7 Loans, Guaranties and Pledges. Except as provided in this Agreement and the other Loan Documents, or in the Ordinary Course of Business, or to the Borrower or any Subsidiary Guarantor or in the ordinary course of providing advances to growers, not make any loans or advances, become a guarantor or surety, pledge its credit or properties in any manner, or extend credit.

10.8 Investments. Other than Investments in the Borrower or a Subsidiary Guarantor, not purchase the debt or equity of another person or entity or make any other Investment, except for (a)(i) savings accounts and certificates of deposit maintained in the Ordinary Course of Business, and (ii) direct United States government obligations and commercial paper issued by corporations with the highest ratings (except as otherwise permitted by this Agreement) of Moody's or S&P and (iii) shares of any money market fund which has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000, and has the highest rating obtainable from either Moody's or S&P (clauses (i), (ii) and (iii), collectively, "Cash Equivalents"), provided that all of such permitted investments shall mature within one (1) year of purchase, (b) loans, advances or guaranties permitted by Section 10.7, (c) Guaranties and Hedging Agreements permitted by Section 10.10, (d) purchases of assets in the Ordinary Course of Business and (e) Permitted Acquisitions.

10.9 Liens. Not create, assume or suffer to exist any mortgage, encumbrance, security interest, pledge or lien (collectively, "Liens," and individually, a "Lien") on such Person's Property, whether now owned or hereafter acquired, or upon the income or profits thereof, except the following:

(a) Liens created pursuant to the Loan Documents;

(b) Liens for taxes not due or Liens for taxes being contested in good faith and by proper proceedings diligently pursued, provided that (i) adequate reserves shall have been provided therefor on the applicable financial statement, (ii) the Lien shall not be senior to the Collateral Agent's security interest in any collateral pledged by the Borrower in favor of the Collateral Agent and (iii) a stay of enforcement of any such Lien shall be in effect;

(c) reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases or other similar title exceptions affecting real property which do not in the aggregate materially detract from the value of the real property or materially interfere with their use in the Ordinary Course of Business;

(d) any Lien on any property or asset of the Borrower or any Subsidiary Guarantor existing on the Original Closing Date and listed on Schedule 10.9, provided that (i) such Lien shall not apply to any other property or asset of such Person, (ii) such Lien shall secure only those obligations which it secures on the Original Closing Date, and any extensions, renewals and replacements thereof which do not increase the outstanding principal amount thereof; and (iii) such Lien shall not be senior to the Collateral Agent's security interest in the collateral pledged in connection herewith;

(e) Liens against reasonable and customary security deposits under leases entered into in the Ordinary Course of Business;

(f) interests in deposits under worker's compensation, unemployment insurance, social security and other similar laws applicable to such Person;

(g) Liens relating to statutory obligations of such Person with respect to surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business;

(h) Liens arising from the filing of precautionary UCC financing statements relating solely to personal property leased pursuant to operating leases entered into in the ordinary course of business;

(i)        Liens securing Debt permitted under Section 10.10(c); provided that (i) such Liens shall be created within one hundred twenty (120) days of the acquisition, repair, construction, improvement or lease, as applicable, of the related Property, (ii) such Liens do not at any time encumber any property other than the Property financed or improved by such Debt, (iii) the amount of Debt secured thereby is not increased and (iv) the principal amount of Debt secured by any such Lien shall at no time exceed one hundred percent (100%) of the original price for the purchase, repair, construction, improvement or lease amount (as applicable) of such Property at the time of purchase, repair, construction, improvement or lease (as applicable);

(j)        Liens securing judgments for the payment of money not constituting an Event of Default under Section 12.1(l) or securing appeal or other surety bonds relating to such judgments;

(k)        Liens on Property (i) of a Person that becomes a Subsidiary existing at the time that such Person becomes a Subsidiary in connection with an acquisition permitted hereunder and (ii) of the Borrower or any of its Subsidiaries existing at the time such Property is purchased or otherwise acquired by the Borrower or such Subsidiary pursuant to a transaction permitted hereunder and, in each case any modification, replacement, renewal and extension thereof; provided that, with respect to each of the foregoing clauses (i) and (ii), (A) such Liens are not incurred in connection with, or in anticipation of, such Acquisition, purchase or other acquisition, (B) such Liens do not encumber any Property other than Property encumbered at the time of such acquisition or such Person becoming a Subsidiary and the proceeds and products thereof and are not all asset Liens, (C) such Liens do not attach to any other Property of the Borrower or any of its Subsidiaries and (D) such Liens will secure only those obligations which it secures at the time such acquisition or purchase occurs;

(l)        (i) Liens of a collecting bank arising in the ordinary course of business under Section 4-210 of the Uniform Commercial Code in effect in the relevant jurisdiction, (ii) Liens of any depositary bank in connection with statutory, common law and contractual rights of setoff and recoupment with respect to any deposit account of the Borrower or any Subsidiary thereof and (iii) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the Ordinary Course of Business;

(m)        (i) Liens of landlords arising in the ordinary course of business to the extent relating to the property and assets relating to any lease agreements with such landlord, and (ii) Liens of suppliers (including sellers of goods) or customers arising in the Ordinary Course of Business to the extent limited to the property or assets relating to such contract;

(n)        carriers', warehousemen's, mechanics' materialmen's, repairmen's and other like liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or ERISA or a violation of Section 436 of the Code or grower's Liens) arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in good faith by appropriate proceedings promptly and diligently conducted, if adequate reserves with respect thereto are maintained by the applicable Person in conformity with GAAP;

(o)        grower's Liens arising by operation of law in the Ordinary Course of Business and securing obligations that are not overdue or are being contested in good faith by appropriate proceedings promptly and diligently conducted, if adequate reserves with respect thereto are maintained by the applicable Person in conformity with GAAP; and

(p) Liens not otherwise permitted hereunder on assets other than the Collateral securing Debt or other obligations in the aggregate principal amount not to exceed $1,000,000 at any time outstanding.

10.10 Borrowings. Not create, incur, assume or suffer to exist any Debt except:

(a) the Obligations;

(b) Debt (i) owing under Hedging Agreements entered into in order to manage existing or anticipated interest rate, exchange rate or commodity price risks and not for speculative purposes and (ii) in respect of Bank Services entered into in the Ordinary Course of Business;

(c) Debt with respect to (i) the ARO Assumed Leases and (ii) other capital or finance leases and purchase money Debt in an aggregate principal amount not to exceed $2,000,000 at any time outstanding;

(d) Debt of a Person existing at the time such Person became a Subsidiary or assets were acquired from such Person in connection with an Investment permitted pursuant to Section 10.8; provided that (i) such Debt was not incurred in connection with, or in contemplation of, such Person becoming a Subsidiary or the acquisition of such assets, (ii) neither the Borrower nor any Subsidiary thereof (other than such Person or any other Person that such Person merges with or that acquires the assets of such Person) shall have any liability or other obligation with respect to such Debt and (iii) the aggregate principal amount of such Debt does not exceed $500,000 at any time outstanding;

(e) Guarantees by the Borrower or any Subsidiary Guarantor of Debt of the Borrower or any other Subsidiary Guarantor not otherwise prohibited pursuant to this Section 10.10;

(f) Debt arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the ordinary course of business;

(g) Debt under performance bonds, surety bonds, release, appeal and similar bonds, statutory obligations or with respect to workers' compensation claims, in each case incurred in the Ordinary Course of Business, and reimbursement obligations in respect of any of the foregoing;

(h) Debt owed to the Borrower or a Subsidiary Guarantor;

(i) to the extent constituting Debt, any AGI Subordinated Debt; and

(j) ~~(i)~~ Debt of the Borrower or any Subsidiary thereof not otherwise permitted pursuant to this Section in an aggregate principal amount not to exceed $1,000,000 at any time outstanding.

10.11 Fundamental Changes.

(a) Without the prior written consent of the Administrative Agent, neither (i) liquidate, (ii) dissolve, (iii) enter into any consolidation, merger, partnership or other combination in which the Borrower or the current ownership (determined as of the Original

Closing Date) of such Credit Party does not, directly or indirectly, have voting control of the reorganized or new entity; nor (iv) convey, sell or lease all or the greater part of such Credit Party's assets or business to a buyer or lessee in which the Borrower or the current ownership (determined as of the Original Closing Date) of such Credit Party does not have, directly or indirectly, voting control of the buyer or lessee. For purposes hereof, "voting control" means the power to control the management, operations, activities and policies of the reorganized or new entity, buyer or lessee.

(b) Not make any Asset Disposition except:

(i) the sale of inventory in the Ordinary Course of Business;

(ii) the transfer of assets to the Borrower or any Subsidiary Guarantor;

(iii) the write-off, discount, sale or other disposition of defaulted or past-due receivables and similar obligations in the Ordinary Course of Business and not undertaken as part of an accounts receivable financing transaction;

(iv) the disposition, termination or unwinding of any Hedging Agreement;

(v) dispositions of cash and Cash Equivalents;

(vi) the sale or other disposition of obsolete, worn-out or surplus assets no longer used or useful in the business of the Borrower or any of its Subsidiaries;

(vii) non-exclusive licenses and sublicenses of intellectual property rights in the ordinary course of business not interfering, individually or in the aggregate, in any material respect with the business of the Borrower and its Subsidiaries;

(viii) leases, subleases, licenses or sublicenses of real or personal property granted by the Borrower or any of its Subsidiaries to others in the Ordinary Course of Business not detracting from the value of such real or personal property or interfering in any material respect with the business of the Borrower or any of its Subsidiaries;

(ix) Asset Dispositions in connection with Losses; provided that the requirements of Section 5.3(b) are complied with in connection therewith; and

(x) Asset Dispositions not otherwise permitted pursuant to this Section; provided that (A) at the time of such Asset Disposition, no Default or Event of Default shall exist or would result from such Asset Disposition, (B) such Asset Disposition is made for fair market value and the consideration received shall be no less than 75% in cash, (C) the aggregate fair market value of all property disposed of in reliance on this clause (x) shall not exceed $500,000 in any fiscal year and (D) the requirements of Section 5.3(b) are complied with in connection therewith.

10.12 Business Activities. Not engage in any business activities or operations substantially different from or unrelated to such Person's present business activities and operations.

10.13 Affiliate Transactions. None of the Borrower nor any Subsidiary Guarantor will transfer any property to any Affiliate (other than the Borrower or a Subsidiary Guarantor), except for value received in the normal course of business and for an amount, including any management or similar fees, as would be conducted and charged with an unrelated or an affiliated entity. None of the Borrower nor

any Subsidiary Guarantor will pay any management fee or similar fee to any Affiliate (other than the Borrower or a Subsidiary Guarantor) without the Administrative Agent's prior written consent.

10.14 Financial Covenants. Maintain or achieve in accordance with generally accepted accounting principles ("GAAP"):

(a) Profitability. Net profit after taxes (including any Tax Distributions) for the Borrower and its Subsidiaries, on a consolidated basis, of not less than one dollar ($1.00) to be measured as of the close of each fiscal year of Borrower for the one-year period immediately preceding the date of measurement and with the first measurement date being December 31, 2020.

(b) Cash Flow to Debt Service Ratio. A ratio of Cash Flow to Debt Service of not less than 1.25:1.00 to be measured as of the close of each fiscal year of the Borrower with the first date of calculation being December 31, 2022. As used herein, "Cash Flow" means, without duplication, net profit after taxes (including any Tax Distributions) for the Borrower and its Subsidiaries, on a consolidated basis, to which depreciation, amortization, other noncash items (other than non-cash items reserved for a future cash charge), and interest expense on all obligations, are added for the twelve (12) month period immediately preceding the date of calculation. As used herein "Debt Service" means that portion of long-term indebtedness and capital or finance leases of the Borrower and its Subsidiaries, plus interest expense on all obligations, on a consolidated basis, for twelve (12) month period immediately preceding the date of calculation.

(c) Maximum Balance Sheet Leverage Ratio. Commencing with the fiscal quarter ending December 31, 2021, a Balance Sheet Leverage Ratio as of the last day of any fiscal quarter of the Borrower ending during the periods specified below, of not greater than the corresponding ratio set forth below:

| **Period** | **Maximum Balance Sheet Leverage Ratio** |
|---|---|
| December 31, 2021 through March 30, 2023 | 4.00:1.00 |
| March 31, 2023 and thereafter | 3.50:1.00 |

10.15 Interest Rate Protection Agreement. Within 90 days (or such later date as may be agreed to by the Administrative Agent) of any Advance of Term Loans, the Borrower shall enter into an interest rate hedge with the Administrative Agent, or another financial institution reasonably acceptable to the Administrative Agent, for the remaining term of and for the entire outstanding principal balance owed in connection with the Term Loans (an "Interest Rate Protection Agreement"), the form, substance, strike price, interest rate and other aspects of which shall be reasonably acceptable to the Administrative Agent.

10.16 Field Exams and Asset Based Examinations. Reimburse the Administrative Agent for all charges, costs, and expenses of the Administrative Agent and its agents in connection with (i) field examinations of the Borrower or any Subsidiary's books and records or any other financial or Collateral matters as the Administrative Agent deems appropriate, up to one time per Loan Year and (ii) appraisals of Inventory up to one time per Loan Year; provided, however, that if an examination or appraisal is

initiated during the existence and continuance of an Event of Default all charges, costs, and expenses therefor shall be reimbursed by the Borrower without regard to such limits. Subject to and without limiting the foregoing, the Borrower specifically agrees to pay the standard charges of the Administrative Agent's internal field examination group or any unrelated third party field examiners selected by the Administrative Agent (including the Administrative Agent's or its Affiliates or such third party firm's then standard per-person charges for each day that an employee or agent of the Administrative Agent or its Affiliates or such third party firm is engaged in any field examination activities). This Section 10.16 shall not be construed to limit the Administrative Agent's right to conduct field examinations, obtain appraisals at any time in its discretion, or use third parties for such purposes (regardless of whether such field examination is performed by the Administrative Agent or any Affiliate of the Administrative Agent or an unrelated third party).

10.17 Use of Proceeds. Use the proceeds of the (1) Real Estate Term Loans only to finance the construction of Improvements, (2) New Equipment Term Advances solely to purchase Eligible Equipment, other than any Eligible Equipment purchased in connection with the Chowchilla Acquisition or the ARO Acquisition, to be located at the Plant Properties and used in connection with operations of the Plant Properties, (3) Acquisition Equipment Term Advances as follows: (A) in the case of an Acquisition Equipment Term Advance (Chowchilla) solely to consummate the Chowchilla Acquisition and (B) in the case of Acquisition Equipment Term Advance (Tulare) solely to consummate the ARO Acquisition, and (4) Revolving Loans (a) to refinance any existing Debt of the Borrower and its Subsidiaries that is not otherwise permitted hereunder (the "Refinancing") and for purposes of repaying and relocating outstanding Loans on the Amendment No. ~~2~~6 Effective Date to be in accordance with the Applicable Percentages as described in Amendment No. ~~2~~6, (b) for the payment of fees and expenses incurred in connection with the Refinancing and the other transactions described in clause (a) above and the closing of Amendment No. ~~2~~6 (clauses (a) and (b) of this Section 10.17, collectively, the "Transactions") and (c) to provide ongoing working capital and for other general corporate purposes of the Borrower and its Subsidiaries.

10.18 Further Negative Pledges. Not enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its Property to secure the Secured Obligations, or (b) the ability of any Subsidiary to make distributions to make or repay loans or advances to the Borrower or any other Subsidiary or to guarantee Debt of the Borrower or Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by Applicable Law, or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the Original Closing Date and identified on Schedule 10.18 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Debt permitted by this Agreement if such restrictions or conditions apply only to the Property securing such Debt and (iv) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof.

10.19 ARO PSA, Chowchilla Lease and Option and Chowchilla PSA. Not amend, restate, supplement or otherwise modify any of the ARO PSA, the Chowchilla Lease and Option or the Chowchilla PSA without the consent of the Administrative Agent (such consent not to be unreasonably withheld) if such amendment, restatement, supplement or other modification could reasonably be expected to be materially adverse to the Administrative Agent or the Lenders.

10.20 Lien Priority. At the Borrower's own cost and expense, the Borrower shall maintain each Mortgage as a first lien on the applicable Plant Property.

10.21 Construction Start and Completion.

(a) The Borrower shall not commence construction of the Improvements, including, but not limited to, grading and site clearance, and shall not undertake any other act on the Fresno Plant Real Property prior to recordation of the Fresno Deed of Trust, the result of which would cause any mechanics' or materialmen's lien thereafter filed to take priority over the lien of the Fresno Deed of Trust, unless prior arrangements satisfactory to both the Administrative Agent and Title Insurer have been made.

(b) The Borrower shall cause construction of the Improvements to be commenced not more than thirty (30) days after the recordation of the Fresno Deed of Trust.

(c) The Borrower shall cause (i) the Improvements to be constructed in a good and workmanlike manner and in accordance with the Project Plans, Governmental Requirements and sound building and engineering practices, (ii) the construction of the Improvements to be prosecuted with diligence and continuity and completed in accordance with the Project Plans on or before the Completion Date, free and clear of liens or claims for liens, except as expressly permitted hereunder and (iii) all licenses and permits necessary for the construction, occupancy, use or sale of the Improvements to be issued and to be maintained in full force and effect.

10.22 Change Orders.

(a) The Borrower shall not permit any change in the Project Plans without the Administrative Agent's prior consent if any such change (i) constitutes a material change in material or equipment specifications, architectural or structural design, or the value or quality of the Improvements, or (ii) would result in an increase or decrease in the cost of construction of the Improvements in excess of $250,000 for any single change, or in excess of $500,000 for all changes.

(b) The Borrower shall submit any proposed change in the Project Plans to the Administrative Agent not later than ten (10) Business Days (or such shorter period consented to by the Administrative Agent) prior to the commencement of construction relating to such change.

(c) The Borrower shall deliver to the Administrative Agent in connection with any proposed change requiring the Administrative Agent's prior written consent (i) a written request therefor, together with, to the extent applicable, working drawings and a written description of the proposed change, submitted on a change order form reasonably acceptable to the Administrative Agent and executed by the Borrower, Architect and Contractor, and (ii) evidence reasonably satisfactory to the Administrative Agent as to the cost and time necessary to complete the proposed change.

10.23 Detailed Cost Breakdown. The Borrower shall not modify the Project Budget or the Detailed Cost Breakdown without the Administrative Agent's prior written consent, which consent may be conditioned upon, among other things, (a) the Administrative Agent's receipt of evidence reasonably satisfactory to the Administrative Agent that the change in the Project Budget or the Detailed Cost Breakdown is reasonably necessary, and (b) confirmation that sufficient funds remain in the undisbursed proceeds of the Real Estate Term Loan to pay for all remaining direct or indirect costs to complete construction of the Improvements.

10.24 Contractor Covenants. The Borrower shall (a) require from the Contractor (i) covenants similar to the covenants made by the Borrower in Sections 10.21, 10.22 and 10.23, and (ii) a covenant that Contractor will, promptly following reasonable request, deliver to the Administrative Agent the names of all Persons with whom Contractor has contracted or intends to contract for construction of the

Improvements or for furnishing of labor or materials therefor, (b) cause the Contractor (or if there is no Contractor, the subcontractors) to cooperate with the Administrative Agent and (c) to the extent that any Person that was not a Contractor on the Amendment No. 2 Effective Date becomes a Contractor, promptly after such Person becomes a Contractor, deliver to the Administrative Agent a duly executed Assignment of Construction Contract and cause such Contractor to consent to the same.

10.25 Construction Contract Only. The Borrower shall not execute any contract or become party to any arrangement for the performance of construction or similar work on the Fresno Plant Real Property with any Person except Contractor, if there is one and if there is no Contractor, the Borrower shall contract only with major subcontractors approved by the Administrative Agent for the performance of work on the Fresno Plant Real Property.

10.26 Paid Vouchers. The Borrower shall deliver to the Administrative Agent, promptly following the reasonable request therefor, any contracts, bills of sale, statements, receipted vouchers or agreements under which the Borrower claims title to any materials, fixtures or articles incorporated in the Improvements.

10.27 Defect Corrections. Upon the reasonable demand of the Administrative Agent, the Borrower shall correct any defect in the Improvements or any departure from the Project Plans not approved by the Administrative Agent.

10.28 Application of Disbursements of Real Estate Term Loans. The Borrower shall receive the disbursements of the Real Estate Term Loan to be made hereunder in trust, strictly for the purpose of paying the costs identified in the request for such disbursement.

10.29 Foundation Completion. The Borrower shall notify the Administrative Agent immediately upon completion of the foundation of the Improvements and, if required by the Administrative Agent, deliver to the Administrative Agent, promptly after completion of the foundation, a foundation survey in form and substance reasonably satisfactory to the Administrative Agent and Title Insurer.

10.30 Restricted Payments. The Borrower and its Subsidiaries shall not declare or make any Restricted Payments; provided that subject to the last paragraph of this Section:

(a) any Subsidiary of the Borrower may make Restricted Payments to the Borrower or any Subsidiary Guarantor; and

(b) the Borrower may make Tax Distributions.

Notwithstanding the foregoing, the Borrower shall not be permitted to make any such distributions at any time any Loan is classified, or that might cause any such Loan to be reclassified as (i) a High Volatility Commercial Real Estate Loan and (ii) an HVCRE ADC Loan; provided, however:

(w) so long as (A) the Borrower's Equity Contribution in the Project remains equal to or greater than fifteen percent (15%) of the "as completed" Appraised Value (Fresno) of the Project (the "Minimum Equity Contribution"), (B) no Event of Default then exists, (C) the Borrower deposits all Borrower's Funds and any other funds as required by this Agreement, the Project Budget and the other Loan Documents, and (D) the Borrower complies with such other applicable conditions that may be required to prevent such Loan from being classified as a High Volatility Commercial Real Estate Loan and an HVCRE ADC Loan, in each case as reasonably determined by the Administrative Agent, the Borrower may distribute (1) any internally

generated capital or cash flow or (2) such portion of the Borrower's Equity Contribution in excess of the Minimum Equity Contribution in accordance with this Section 10.30, regardless of how any such distributions are classified (e.g., preferential returns, interest payments, deferred equity or otherwise);

(x) notwithstanding the foregoing, the restriction on distributions set forth in clause (w) of this Section 10.30 shall not apply if the Administrative Agent and the Lenders confirm in writing that (A) construction of the Project has been substantially completed, and (B) cash flow is being generated by the Project in an amount sufficient to support the debt service and expenses of the Project in accordance with the Administrative Agent's and such Lenders' underwriting criteria for permanent financings, in each case as reasonably determined by the Administrative Agent and each Lender;

(y) the Borrower shall, within five (5) Business Days of the Administrative Agent's written request, provide a certification to the Administrative Agent, in form and substance reasonably acceptable to the Administrative Agent, confirming the Borrower's compliance with the provisions of this Section 10.30, which certification shall be accompanied by appropriate calculations and documentation demonstrating such compliance; and

(z) in the event the Administrative Agent determines that Borrower has breached the prohibitions contained in this Section 10.30, the Borrower shall, within five (5) Business Days of the Administrative Agent's written demand, make additional capital contributions to the Project, in an amount and in form reasonably satisfactory to the Administrative Agent such that no Loan is classified as a High Volatility Commercial Real Estate Loan and an HVCRE ADC.

10.31 Approval of Easements and Other Documents. The Borrower shall submit to the Administrative Agent for the Administrative Agent's approval all prospective easements, private or public dedications, and declarations of covenants, conditions and restrictions intended to affect the Fresno Plant Real Property and the Administrative Agent's approval shall be obtained in writing prior to the execution or granting thereof by the Borrower. The Borrower's request for approval of any prospective easement or private or public dedication shall be accompanied by a drawing or survey showing the precise location of such prospective easement or private or public dedication. The Borrower's request for approval of any prospective declaration of covenants, conditions and restrictions shall be accompanied by a description of the property affected thereby.

10.32 Stop Notices; Mechanic's Liens. If (a) a bonded stop notice is received by the Administrative Agent, which the Administrative Agent believes requires the withholding of funds from any Advance, or (b) a mechanics' lien, material supplier's lien or other construction lien is recorded against the Fresno Plant Real Property, then the Borrower shall within twenty (20) days of such receipt or recordation or within five (5) days of the Administrative Agent's written demand (whichever first occurs):

(a) pay and discharge the same;

(b) effect the release of the same through a court proceeding or by recording a surety bond in sufficient form and amount issued by an acceptable surety; or

(c) provide the Administrative Agent with such other assurance as the Administrative Agent, reasonably deems to be satisfactory for the payment of, and protection of the Administrative Agent from, such lien or bonded stop notice.

10.33 Set Aside Letters. In the event the Administrative Agent issues, at the Borrower's request, any Set Aside Letter, the Borrower represents, warrants and agrees as follows:

(a) the sum which the Borrower requests the Administrative Agent to allocate for Bonded Work shall be sufficient to pay for the costs of construction and completion of the Bonded Work in accordance with any agreement between the Borrower and the Governmental Authority and a copy of such agreement shall be furnished to the Administrative Agent by the Borrower as a condition precedent to the issuance by the Administrative Agent of any Set Aside Letter;

(b) the Administrative Agent is irrevocably and unconditionally authorized to disburse to the Governmental Authority or Surety all or any portion of proceeds of the Real Estate Term Loan upon a demand of the Governmental Authority or Surety made in accordance with the terms and conditions of the Set Aside Letter;

(c) any disbursement or payments which the Administrative Agent makes or may be obligated to make under any Set Aside Letter, whether made directly to the Governmental Authority, Surety, or to others for completion of all or part of the Bonded Work, shall be deemed an Advance of Real Estate Term Loans to or for the benefit of the Borrower; and

(d) the Administrative Agent shall have no obligation to release any security under the Loan Documents unless and until the Administrative Agent has received a full and final written release of its obligations under each Set Aside Letter.

10.34 Management of Property. The Borrower shall not enter into any agreement providing for the management or operation of the Fresno Plant Real Property or the Improvements without the prior written consent of the Administrative Agent.

10.35 Further Assurances. Promptly, upon reasonable demand by the Administrative Agent, take such further action and execute all such additional documents, instruments and agreements in connection with this Agreement as the Administrative Agent in the Administrative Agent's reasonable discretion deems necessary, and promptly furnish the Administrative Agent with such other information concerning the Borrower's affairs as the Administrative Agent may reasonably request from time to time.

10.36 Required Occupancy.

(a) Occupy all rentable portions of the Fresno Plant Real Property itself or use its best efforts to keep all rentable portions of the Fresno Plant Real Property not so occupied leased to others and maintain the mix of tenants such that the portion of the net rentable area of the Fresno Plant Real Property occupied by itself and Affiliated Tenants is at all times one hundred percent (100%) of the total net rentable area of the Fresno Plant Real Property (such occupancy defined herein as "Owner-Occupied"). "Affiliated Tenants" means persons or entities controlled and owned (or under common control and ownership with), directly or indirectly, thirty-five percent (35%) or more by the Borrower or any Subsidiary Guarantor.

(b) In the event the Borrower wishes to reduce the percentage of the Fresno Plant Real Property occupied by itself and Affiliated Tenants to less than that required to qualify as Owner Occupied, the Borrower shall submit such request to the Administrative Agent in writing, including all financial and other information which the Administrative Agent may require. Although the Administrative Agent may consider the request in its sole discretion, and may ask the Borrower to submit additional information, the Administrative Agent shall not be obligated to

consent to the request. If the Administrative Agent consents, such consent must be in writing and may include additional covenants and conditions which the Administrative Agent may require, in its sole discretion.

10.37 Leases.

(a) Notwithstanding the provisions of the Fresno Deed of Trust, all Leases (if any) shall be entered into with tenants acceptable to the Administrative Agent. The Borrower shall not (i) accept any tenant's payment of more than one month's rent in advance (except that the Borrower may collect the last month's rent for residential property in advance), (ii) grant any tenant any rights or options to purchase all or any portion of the Fresno Plant Real Property or (iii) if the Fresno Plant Real Property is commercial property, release any tenant or guarantor from any obligation. The Borrower shall perform all of its obligations under any Lease.

(b) Notwithstanding the provisions of the Fresno Deed of Trust, and provided that the Borrower is not in default hereunder, for any Lease which is less than twenty percent (20%) of the Fresno Plant Real Property's net rentable area or is for an initial term of less than ten (10) years, the Borrower may: (i) cancel, terminate or consent to the surrender of such Lease, (ii) modify or alter the terms of such Lease (except as otherwise expressly provided for in subparagraph (a) above), (iii) assign or sublet such Lease and (iv) enter into any new Lease. The Borrower shall submit to the Administrative Agent, within ten (10) days after the execution thereof, all new Leases, and all modifications, amendments, consents to assignment or subletting of existing Leases, and shall promptly notify the Administrative Agent of the termination or surrender of any Lease.

(c) The Borrower shall cause the tenancies of all Affiliated Tenants to be unconditionally subordinated to the lien of the Fresno Deed of Trust without right of attornment by causing such Affiliated Tenants to execute and deliver to the Administrative Agent such forms of subordination as the Administrative Agent may in its sole discretion require. Borrower shall cause the tenancies of any non-Affiliated Tenants to be: (i) unconditionally subordinated to the lien of the Fresno Deed of Trust without right of attornment; or (ii) subordinated by a subordination and non-disturbance agreement, as determined by the Administrative Agent in its discretion on a case-by-case basis. Borrower shall cause all tenants to execute and deliver to the Administrative Agent such estoppel certificates as the Administrative Agent may in its discretion require.

10.38 Additional Subsidiary Guarantors and Collateral. Promptly notify the Administrative Agent of the creation or acquisition (including by division) of a Person that becomes a Subsidiary and, within thirty (30) days after such event, as such time period may be extended by the Administrative Agent in its sole discretion, cause such Subsidiary to (A) become a Subsidiary Guarantor by delivering to the Administrative Agent a duly executed joinder agreement or such other document as the Administrative Agent shall deem appropriate for such purpose, (B) grant a security interest in all Collateral (subject to the exceptions specified in the Security Agreement) owned by such Subsidiary by delivering to the Administrative Agent a duly executed joinder agreement and a supplement to each applicable Security Document or such other document as the Administrative Agent shall deem appropriate for such purpose and comply with the terms of each applicable Security Document, (C) deliver to the Administrative Agent such opinions, documents and certificates of the type referred to in Section 3 of Amendment No. 2 as may be reasonably requested by the Administrative Agent, (D) if such Equity Interests are certificated, deliver to the Administrative Agent such original certificated Equity Interests or other certificates and stock or other transfer powers evidencing the Equity Interests of such Person, (E) deliver to the Administrative Agent such updated Schedules to the Security Documents or a

revised Collateral Disclosure Certificate as requested by the Administrative Agent with respect to such Subsidiary, and (F) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent, all in form, content and scope reasonably satisfactory to the Administrative Agent.

10.39 Additional Non-Subsidiary Guarantors. Within thirty (30) days after any Crop Line Entity becomes a borrower or a guarantor of the credit facility evidenced by the Crop Line Credit Agreement or any credit facility that refinances, replaces, restates or extends such credit facility, as such time period may be extended by the Administrative Agent in its sole discretion, cause such Crop Line Entity to (A) become a Non-Subsidiary Guarantor by delivering to the Administrative Agent a duly executed joinder agreement or such other document as the Administrative Agent shall deem appropriate for such purpose (including, without limitation, documentation joining such Crop Line Entity to the Grower Subordination Agreement), (B) deliver to the Administrative Agent such opinions, documents and certificates of the type referred to in Section 3 of Amendment No. 2 as may be reasonably requested by the Administrative Agent, and (C) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent, all in form, content and scope reasonably satisfactory to the Administrative Agent.

**SECTION 11**

**[RESERVED]**

**SECTION 12**

**EVENTS OF DEFAULT; REMEDIES UPON DEFAULT**

12.1 Events of Default. The term "Event of Default" means the following:

(a) the use of the proceeds of any of the Loans in violation of Section 10.17; or

(b) the failure of the Borrower to make any principal payment required under this Agreement or any other Loan Document when due or the failure of the Borrower to make any other payment required under this Agreement or any other Loan Document within three Business Days of when due; or

(c) any representation or warranty made by or on behalf of any Credit Party in this Agreement or any other Loan Document, that (i) is subject to a materiality or Material Adverse Effect qualification shall be untrue, incorrect, or misleading when made or deemed made or (ii) is not subject to a materiality or Material Adverse Effect qualification shall be untrue, incorrect, or misleading in any material respect when made or deemed made, or subject to Section 12.7, any breach of (A) any of the covenants or obligations described above in Section 1.9, 10.1, 10.2, 10.3, 10.14, 10.15 or 10.18 of this Agreement or any of Sections 10.7 through 10.13 or 10.19 through ~~10.37~~10.39, or in Section 13 of Amendment No. 6 or (B) any ground lease, if the Fresno Plant Real Property is a leasehold estate and such breach would permit the relevant ground lessor to terminate such ground lease, and, with respect to any default under subclause (A) of this clause (c) resulting solely from a breach of any of the covenants or obligations described in ~~Section~~Sections 1.9 or 10.2(h) due to any inaccuracy or error in any Borrowing Base Certificate, such default continued for a period of five (5) Business Days after (i) the date that the Administrative Agent provides written notice to the Borrower of such breach or default or (ii) the first day on which an officer of the Borrower or any Credit Party has knowledge of such breach or default; or

(d) other than as provided above in Section 12(c), any breach or other default by any Credit Party under any term or provision of this Agreement or any other Loan Document which continues for a period of thirty (30) days after (i) the date that the Administrative Agent provides written notice to the Borrower or (ii) the first day on which an officer of the Borrower or any Credit Party has knowledge of such breach or default; or

(e) the insolvency of the Borrower or any Guarantor, or the failure of the Borrower or any Guarantor generally to pay debts of the Borrower, or such Guarantor, as such debts become due (except as otherwise provided herein); or

(f) the Borrower or any Guarantor shall (i) commence a voluntary case under any Debtor Relief Laws, (ii) file a petition seeking to take advantage of any Debtor Relief Laws, (iii) consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under any Debtor Relief Laws, (iv) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign, (v) make a general assignment for the benefit of creditors, or (vi) take any corporate or other organizational action for the purpose of authorizing any of the foregoing; or

(g) a case or other proceeding shall be commenced against the Borrower or any Guarantor in any court of competent jurisdiction seeking (i) relief under any Debtor Relief Laws, or (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for the Borrower or any Guarantor or for all or any substantial part of its assets, domestic or foreign, and such case or proceeding shall continue without dismissal or stay for a period of sixty (60) consecutive days, or an order granting the relief requested in such case or proceeding under such Debtor Relief Laws shall be entered; or

(h) [Reserved]; or

(i) [Reserved]; or

(j) any Credit Party or Subsidiary shall fail to make payment in respect of outstanding Debt (other than (x) the Obligations or (y) the alleged default by Assemi Brothers, LLC on its obligations in effect as of the Original Closing Date as a result of an alleged acceleration of that certain Third Amended and Restated Revolving Promissory Note, dated November 30, 2016, and payable to Independent Financing Services, LLC, a California limited liability company (without giving effect to any amendments, modifications or supplements thereto)) having an aggregate outstanding principal amount in excess of $5,000,000 (determined singly or in the aggregate with other Debt) when due after the expiration of any applicable grace period, or any event or condition shall occur which results in the acceleration of the maturity of such Debt (including any required mandatory prepayment or “put” of such Debt to any such Person) or enables (or with the giving of notice or passing of time or both, would enable) the holders of such Debt or a commitment related to such Debt (or any Person acting on such holders’ behalf) to accelerate the maturity thereof or terminate any such commitment before its normal expiration (including any required mandatory prepayment or “put” of such Debt to such Person), or there shall occur any default under any Hedging Agreement (after the expiration of any applicable cure period set forth therein); or

(k) a change of ownership (as determined as of the Original Closing Date) of the equity interests or voting interests of the Borrower of fifty percent (50%) or more unless the owners of equity interests or voting interests, as applicable, of the Borrower on the Original

Closing Date continue to hold a majority of the equity interests or voting interests, as applicable, of the Borrower; or

(l) (i) a judgment, order, or award for the payment of money shall be entered against any Credit Party or Subsidiary in an amount which exceeds, individually or cumulatively with all unsatisfied judgments, orders, or awards against all the Credit Parties and Subsidiaries, $5,000,000 in excess of insurance coverage therefor (as provided by a financially sound and reputable insurer that has been informed of such judgment, order or award in writing and has not denied or disputed coverage thereof) and the same shall remain undischarged, undismissed, and unstayed for more than 30 days or any Person shall issue, order, or institute any levy upon, or attachment, garnishment, or other seizure of any portion of the Collateral or other assets of any such Person in excess of $5,000,000; or

(m) (i) any Credit Party shall repudiate, revoke, or attempt to revoke, in whole or in part, any of its obligations hereunder or under any other Loan Document or (ii) any Credit Party shall deny or contest the validity or enforceability of this Agreement or any other Loan Document or all or any part of the Secured Obligations or the perfection or priority of any Lien granted to Administrative Agent; or

(n) (i) this Agreement or any other Loan Document shall cease to be in full force or effect for any reason (other than a waiver or release by Administrative Agent, a Lender, or the applicable Bank Service Provider or counterparty to a Hedging Agreement, as applicable); (ii) any Security Document shall for any reason fail or cease to create a valid, perfected, and, except to the extent permitted by the terms hereof or thereof, first-priority Lien in favor of Administrative Agent, for the benefit of the Secured Parties, on any Collateral purported to be covered thereby; or (iii) any Hedging Agreement entered into between any Credit Party or a Subsidiary, on the one hand, and the Administrative Agent or any Lender (or any of their respective Affiliates), on the other hand, shall be terminated as a result of a default or event of default by such Credit Party or Subsidiary; or

(o) any Person obtains an order or decree in any court of competent jurisdiction prohibiting the construction of the Improvements or the Borrower, the Administrative Agent, the Collateral Agent or any Lender from performing this Agreement, and such order or decree is not vacated within thirty (30) days after the granting thereof; or

(p) except as expressly permitted hereunder, the imposition, voluntary or involuntary, of any lien or encumbrance upon the Fresno Plant Property without the Administrative Agent's written consent, unless an adequate counter bond is provided and such lien is accordingly released within ten (10) days of the imposition of such lien.

12.2 Remedies upon Default. Upon the occurrence of any Event of Default, the Administrative Agent may (and, at the written direction of the Required Lenders, shall) do one or more of the following from time to time:

(a) (i) cease making Loans or making other extensions of credit to the Borrower, (ii) terminate, reduce, or condition any Commitment; (iii) make any adjustment to the Borrowing Base (including by instituting Availability Reserves); and (iv) require the Borrower to cash collateralize Secured Bank Services Obligations, and other Obligations that are contingent or not yet due and payable (and, if the Borrower does not, for whatever reason, promptly provide such cash collateral, the Administrative Agent may provide such cash collateral with the proceeds of a Revolving Loan and each Revolving Lender shall fund its Applicable Revolving Percentage

thereof regardless of whether any condition precedent to the making of any Revolving Loan has not been satisfied);

(b) declare any Obligations immediately due and payable (other than Obligations under any Hedging Agreements between any Credit Party and the Administrative Agent, the Collateral Agent or any Lender (or any of their respective Affiliates), all of which shall be due in accordance with and governed by the provisions of such Hedging Agreements), whereupon they shall be due and payable without diligence, presentment, demand, protest, or notice of any kind, all of which are hereby waived by the Borrower to the fullest extent permitted by law;

(c) (i) take possession of any Collateral; (ii) require the Borrower to assemble Collateral, at the Borrower's expense, and make it available to the Collateral Agent at a time and place designated by the Administrative Agent; (iii) enter any premises where Collateral is located and store Collateral on such premises until sold (and if the premises are owned or leased by the Borrower, the Borrower shall not charge for such storage); (iv) sell, lease, or otherwise dispose of any Collateral in its then condition or after the refurbishing, restoration, repair, or further manufacturing or processing thereof, at public or private sale, with such notice as may be required by Applicable Law, in lots or in bulk, at such locations, all as the Administrative Agent, in its discretion, deems advisable and at such prices or terms as the Administrative Agent may deem reasonable, for cash, upon credit, or for future delivery; (v) demand, collect, invoice, and sue for all amounts owed pursuant to Accounts, General Intangibles, Chattel Paper, Instruments, or Documents or for proceeds of any Collateral (either in the Borrower's name or the Collateral Agent's or any Lender's name, at Administrative Agent's option), with the right to enforce, compromise, settle, or discharge any such amounts; and (vi) require or cause all invoices and statements sent to any Account Debtor to state that the Accounts and such other obligations have been assigned to the Collateral Agent and are payable directly and only to the Collateral Agent and the Borrower shall deliver to the Collateral Agent such originals of documents evidencing the sale and delivery of Goods or the performance of services giving rise to any Accounts as the Administrative Agent may require;

(d) in its sole discretion, to enter the Fresno Plant Real Property and take possession of it, whether in person, by agent or by court-appointed receiver, to perform any and all work and labor necessary to complete the Improvements substantially in accordance with the Project Plans, and to collect rents and otherwise protect its collateral and exercise its rights and remedies under the Loan Documents; and

(e) exercise such other rights and remedies which may be available to it under this Agreement, the other Loan Documents, and agreements relating to Bank Services, or Applicable Law (including the rights of a secured party under the UCC), all of which shall be cumulative;

provided, however, upon the occurrence of any Event of Default described in subsections (e), (f) or (g) of Section 12.1, all Commitments shall, automatically and without notice to any Person, terminate and all Obligations (other than Obligations under any Hedging Agreements between any Credit Party and the Administrative Agent, the Collateral Agent or any Lender (or any of their respective Affiliates), all of which shall be due in accordance with and governed by the provisions of such Hedging Agreements) shall, automatically and without notice to any Person, become immediately due and payable, without diligence, presentment, demand, protest, or notice of any kind, all of which are hereby waived by the Borrower to the fullest extent permitted by Applicable Law.

No Agent shall be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in the applicable Agent's actual possession), for any diminution in the value thereof, or for any act or default of any

warehouseman, carrier, forwarding agency, or other Person whatsoever, but the same shall be at the Borrower's sole risk.

If the Administrative Agent exercises any of the rights or remedies provided in this Section, that exercise shall not make the Administrative Agent a partner or joint venturer of the Borrower. All sums which are expended by the Administrative Agent in completing the Improvements or in preserving the Collateral shall be considered an additional loan to the Borrower secured by the Mortgages and the other Security Documents and shall bear interest at the Default Rate.

12.3 License. The Borrower hereby grants to the Administrative Agent and the Collateral Agent an irrevocable, non-exclusive license or other right to use, license, or sublicense (without payment of any royalty or other compensation to any Person) any or all of the Borrower's Intellectual Property, computing hardware, brochures, promotional and advertising materials, labels, packaging materials, and other Property in connection with the advertising for sale or lease, marketing, selling, leasing, liquidating, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof. The Borrower's rights and interests in and to any Intellectual Property shall inure to Administrative Agent's and the Collateral Agent's benefit.

12.4 Receiver. In addition to any other remedy available to it, Administrative Agent, upon the request of the Required Lenders, shall have the absolute right, during the existence of an Event of Default, to seek and obtain the appointment of a receiver to take possession of and operate and/or dispose of the business and assets of the Borrower and any Subsidiaries, and the Borrower hereby consents (for themselves and on behalf of the Subsidiaries) to such rights and such appointment and hereby waive any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent or any Lender in connection therewith.

12.5 Deposits; Insurance. The Borrower (a) authorizes the Administrative Agent to, during the existence of an Event of Default, settle, collect, and apply against the Obligations any refund of insurance premiums or any insurance proceeds payable to the Borrower on account of any Loss or otherwise and (b) irrevocably appoints the Administrative Agent as its attorney-in-fact to indorse any check or draft or take other action necessary to obtain such funds.

12.6 Remedies Cumulative. All rights and remedies of Administrative Agent, the Collateral Agent or any Lender contained in the Loan Documents, the UCC, and Applicable Law are cumulative and not in derogation or substitution of each other. In particular, the rights and remedies of Administrative Agent, the Collateral Agent and the Lenders may be exercised at any time and from time to time, concurrently or in any order, and shall not be exclusive of any other rights or remedies that Administrative Agent, the Collateral Agent and the Lenders may have, whether under any Loan Document, the UCC, Applicable Law, and shall include the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by the Borrower of this Agreement or any of the other Loan Documents. The Administrative Agent may, and at the direction of the Required Lenders shall, at any time or times, proceed directly against the Borrower to collect the Obligations without prior recourse to the Collateral. All rights and remedies shall continue in full force and effect until Payment in Full of all Obligations.

12.7 Borrower's Right to Cure. Notwithstanding anything to the contrary contained in Section 12.1, in the event of any Event of Default for failure to comply with Section 10.14(b) at the end of any fiscal year, until the expiration of the fifteenth (15th) Business Day after the day on which the financial statements and Compliance Certificate are required to be delivered for such fiscal year (the "Cure Expiration Date"), the Net Proceeds from any cash contribution (which shall be in the form of

Equity Interests or AGI Subordinated Debt, in each case that are not subject to mandatory prepayment or repurchase and are otherwise on terms and conditions reasonably acceptable to the Administrative Agent) made to the Borrower by AGI after the end of such fiscal year but prior to the Cure Expiration Date will, at the written request of the Borrower, be included in the calculation of "Cash Flow" (as defined in Section 10.14(b)) solely for the purpose of determining compliance with Section 10.14(b) at the end of such fiscal year (any such contribution so included in the calculation of "Cash Flow", a "Specified Contribution"); provided that (a) no more than two (2) Specified Contributions may be made during the term of this Agreement, (b) the amount of any Specified Contribution shall be no more than the amount required to cause the Borrower to be in pro forma compliance with the financial covenant set forth in Section 10.14(b) for the fiscal year with respect to which such Specified Contribution is made, (c) any Debt (including Loans) repaid with the proceeds of any Specified Contribution shall be disregarded for purposes of calculating the financial covenants set forth in Section 10.14 for the fiscal quarter or fiscal year in which such Specified Contribution is made and for each of the subsequent four (4) fiscal quarters that includes such fiscal quarter, and (d) such Specified Contribution is Not Otherwise Applied.  The Borrower shall, on or prior to the making of any Specified Contribution, give the Administrative Agent a written notice identifying the type of Specified Contribution to be made and the aggregate amount of such Specified Contribution.  Upon the making of a Specified Contribution, the financial covenant set forth in Section 10.14(b) shall be recalculated giving effect to the increase in "Cash Flow"; provided that nothing in this Section 12.7 shall waive any Default or Event of Default that exists pursuant to Section 10.14(b) until such recalculation.  If, after giving effect to such recalculation, the Borrower is in compliance with the financial covenant set forth in Section 10.14(b) as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, then the applicable Default or Event of Default that had occurred shall be deemed cured and not to have occurred for all purposes of this Agreement and the other Loan Documents.  Notwithstanding anything to the contrary contained in Section 12, the Lenders may not exercise any rights or remedies under Section 12.2 (or under any other Loan Document) on the basis of any actual or purported Event of Default for failure to comply with the applicable financial covenant set forth in Section 10.14(b) from the date that the Administrative Agent receives written notice from the Borrower of its intent to cure such Event of Default until the earliest to occur of (x) the applicable Cure Expiration Date has occurred without a Specified Contribution having been contributed and designated, (y) the occurrence of another Event of Default and (z) the Borrower's determination that no Specified Contribution will be made; provided that during the period set forth in this sentence, an Event of Default shall nevertheless be deemed to have occurred and be continuing for all other purposes under the Loan Documents (including Sections 7.2 through 7.5 and restrictions on further Advances).

## SECTION 13

## AGENTS

13.1    Appointment, Authority and Duties of Agents; Professionals.

(a)    Appointment and Authority.

(i)    Each of the Collateral Agent and the Lenders hereby irrevocably appoints MUFG Union Bank to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to (i) take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto and (ii) enter into all Loan Documents to which the Administrative Agent is intended to be a party and accept all Security Documents for the Administrative Agent's benefit and the ratable benefit of the

Lenders, all of which shall be binding upon the Lenders. Without limiting the generality of the foregoing, the Administrative Agent shall have the sole and exclusive (except to the extent of the rights of the Collateral Agent as set forth herein) authority to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents; (ii) execute and deliver as the Administrative Agent each Loan Document, including any subordination agreement, and accept delivery of each Loan Document from the Borrower or other Person; (iii) manage, supervise, or otherwise deal with Collateral; and (iv) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral under the Loan Documents, Applicable Law, or otherwise. Subject to Section 17.2(a)(v), the Administrative Agent alone shall be authorized to determine whether any Accounts, Inventory or Equipment constitute Eligible Accounts, Eligible Inventory or Eligible Equipment, or whether to impose or release any Availability Reserve and to exercise its Permitted Discretion therewith, which determinations and judgments, if exercised in good faith, shall exonerate the Administrative Agent from liability to any Lender or other Person for any error in judgment.

(ii) Each of the Administrative Agent and the Lenders hereby irrevocably appoints and authorizes MUFG Union Bank to act on its behalf as the Collateral Agent for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 13.1(e) for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent, shall be entitled to the benefits of all provisions of this Section 13 and Section 17 (including Section 17.3 as though such co-agents, sub-agents and attorneys-in-fact were the Collateral Agent under the Loan Documents) as if set forth in full herein with respect thereto.

(b) Duties. The duties of the Agents shall be ministerial and administrative in nature and no Agent shall have any duties or obligations except those expressly set forth in this Agreement and the other Loan Documents. The conferral upon any Agent of any right shall not imply a duty on such Agent's part to exercise such right, unless instructed to do so by Required Lenders in accordance with this Agreement. Without limiting the generality of the foregoing, the Agents:

(i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the applicable Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the applicable Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief

Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or the Collateral Agent or any of their respective Affiliates in any capacity.

(c) No Liability. The Agents shall not be liable for any action taken or not taken by either of them (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the applicable Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 12.2 and 17.2), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. Each Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the applicable Agent in writing by the Borrower or a Lender.

(d) No Duty to Inquire. The Administrative Agent and the Collateral Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith (including any electronic message, facsimile, Internet or intranet website posting, or other distribution), (iii) any statement made to such Agent orally or by telephone believed by such Agent to be genuine and to have been made, signed, sent, or otherwise authenticated, as applicable, by the proper Person, (iv) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (v) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (vi) the satisfaction of any condition set forth in Section 7 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the applicable Agent. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received notice to the contrary from such Lender before the making of such Loan.

(e) Agent Professionals; Related Parties. Each Agent may perform its respective duties through agents and employees and may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by any Agent Professional. No Agent shall be responsible for the negligence or misconduct of any agents, employees, or Agent Professionals selected by it with reasonable care. Each Agent and any such agents or employees may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. Section 13.1(b) shall apply to any such agent or employee and to the Related Parties of an Agent and any such agent or employee and shall apply to their respective activities in connection with the syndication of the credit facilities described herein as well as activities as an Agent.

(f) Instructions of Required Lenders. The rights and remedies conferred upon the Agents under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by Applicable Law. The Agents may request instructions from Required Lenders with respect to any act (including the failure to act) in connection with this Agreement

or any other Loan Document, and may seek assurances to its satisfaction from Lenders of their indemnification obligations under Section 13.4 against all Claims which could be incurred by the Agents in connection with any act (or failure to act). Each Agent shall be entitled to refrain from any act until it has received such instructions or assurances, and such Agent shall not incur liability to any Person by reason of so refraining. Instructions of the Required Lenders shall be binding upon all Lenders, and no Lender or any other Person shall have any right of action whatsoever against any Agent as a result of such Agent's acting or refraining from acting in accordance with the instructions of the Required Lenders. Notwithstanding the foregoing, instructions by and consent of all Lenders shall be required in the circumstances described in Section 17.2(a)(iv). The Required Lenders, without the prior written consent of each Lender, may not direct the Administrative Agent to accelerate and demand payment of Loans held by one Lender without accelerating and demanding payment of all other Loans or terminate the Commitments of one Lender without terminating the Commitments of all Lenders. No Agent shall be required to take any action which, in its opinion, is contrary to Applicable Law or any Loan Document or could subject any Agent Indemnitee to liability.

13.2 Agreements Regarding Collateral and Field Examination Reports.

(a) Lien Releases; Care of Collateral. Each Lender authorizes the Agents to (i) release any Lien with respect to any Collateral (A) upon Payment in Full of the Obligations or (B) that is the subject of an Asset Disposition which is expressly permitted hereunder and (ii) subordinate its Liens in any Collateral in favor of any other Lien if such other Lien is a Permitted Lien entitled to priority over Collateral Agent's Liens. No Agent shall have any obligation whatsoever to any Lenders to assure that any Collateral exists or is owned by the Borrower or any other Person, or is cared for, protected, insured, or encumbered, nor to assure that any Liens have been properly created, perfected, or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.

(b) Possession of Collateral. The Agents and the Lenders appoint each Lender as agent (for the benefit of Secured Parties) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control. If any Lender obtains possession or control of any Collateral, it shall notify the Agents thereof and, promptly upon the Collateral Agent's request, deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(c) Reports. The Administrative Agent shall promptly forward to each Lender (upon any such Person's request therefor), when complete, copies of any field audit, field examination, or appraisal report prepared by or for the Administrative Agent with respect to any Credit Party or Subsidiary or any Collateral (each, a "Report"). Each Lender agrees (i) that none of MUFG Union Bank, the Collateral Agent nor the Administrative Agent makes any representation or warranty as to the accuracy or completeness of any Report and shall not be liable for any information contained in or omitted from any Report; (ii) that the Reports are not intended to be comprehensive audits or examinations of any Person, thing, or matter and that any Agent or any other Person performing any such audit, examination, or appraisal will inspect only specific information regarding the subject matter thereof and will rely significantly upon the books and records, as well as upon representations of, the Persons (and their officers and employees) subject to such audit, examination, or appraisal; and (iii) to keep all Reports confidential and strictly for such Lender's internal use and not to distribute any Report (or the contents thereof) to any Person (except to such Person's Participants, attorneys, and accountants) or use any Report in any manner other than administration of the Loans and other Obligations.

Each Lender agrees to indemnify and hold harmless the Agents and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Report, as well as from any Claims arising in connection with any third parties that obtain any information contained in a Report through such Lender.

(d) Transaction Statements from Collateral Agent. To the extent amounts are held and/or invested by the Collateral Agent under this Agreement or any other Loan Document, the Collateral Agent shall furnish the Borrower periodic cash transaction statements which shall include detail for all investment transactions effected by the Collateral Agent. Upon the Borrower's election, such statements will be delivered via the Collateral Agent providing the Borrower with online access to the Collateral Agent's system with respect to this Agreement or such other Loan Document and upon electing such service, paper statements will be provided only upon request. The Borrower waives the right to receive brokerage confirmations of security transactions effected by the Collateral Agent as they occur, to the extent permitted by law. The Borrower further understands that trade confirmations for securities transactions effected by the Collateral Agent will be available upon request and at no additional cost and other trade confirmations may be obtained from the applicable broker.

13.3 Action Upon Default. Each Agent shall be entitled to assume that no Default has occurred and is continuing and shall not be deemed to have knowledge of any Default unless, in its capacity as a Lender it has actual knowledge thereof, or it has received written notice from any other Lender or the Borrower specifying the occurrence and nature thereof. If any Lender acquires knowledge of a Default, it shall promptly notify the Agents and the other Lenders thereof in writing specifying in detail the nature thereof. Each Lender agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Agents and Required Lenders, it will not take any Enforcement Action, accelerate Obligations under any Loan Documents, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales, or other similar dispositions of Collateral. Notwithstanding the foregoing, however, a Lender may take action to preserve or enforce its rights against the Borrower where a deadline or limitation period is applicable that would, absent such action, bar enforcement of Obligations held by such Lender, including the filing of proofs of claim in an Insolvency Proceeding.

13.4 Indemnification of Agent Indemnitees. EACH LENDER SHALL INDEMNIFY AND HOLD HARMLESS THE AGENT INDEMNITEES, TO THE EXTENT NOT REIMBURSED BY THE BORROWER (BUT WITHOUT LIMITING THE INDEMNIFICATION OBLIGATIONS OF THE BORROWER UNDER ANY LOAN DOCUMENTS) AGAINST ALL "CLAIMS" THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY AGENT INDEMNITEE, PROVIDED SUCH CLAIM RELATES TO OR ARISES FROM AN AGENT INDEMNITEE'S ACTING AS OR FOR THE ADMINISTRATIVE AGENT (IN ITS CAPACITY AS THE ADMINISTRATIVE AGENT) OR THE COLLATERAL AGENT (IN ITS CAPACITY AS COLLATERAL AGENT). In no event shall any Lender have any obligation under this Section 13.4 to indemnify or hold harmless any Agent Indemnitee for any Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Agent Indemnitee. In the applicable Agent's reasonable judgment, it may reserve for any such Claims made against an Agent Indemnitee and may satisfy any judgment, order, or settlement relating thereto, from proceeds of Collateral before making any distribution of Collateral proceeds to Lenders. If any Agent is sued by any receiver, bankruptcy trustee, debtor-in-possession, or other Person for any alleged preference or fraudulent transfer, then any monies paid by such Agent in settlement or satisfaction of such proceeding, together with all interest, costs, and expenses (including attorneys' fees) incurred in the defense of same, shall be reimbursed to such Agent by each Lender to the extent of its Applicable Percentage of the Total Credit Exposure (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought). All payment obligations under this Section 13.4 shall be due and payable **ON DEMAND**.

13.5 Limitation on Responsibilities of Agents. No Agent shall be liable for any action taken or not taken by it under any Loan Document (a) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the applicable Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 17.2) or (b) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgement. The Agents do not assume any responsibility for any failure or delay in performance or any breach by the Borrower or any Lender of any obligations under the Loan Documents. The Agents do not make to Lenders any express or implied warranty, representation, or guarantee with respect to any Obligations, Collateral, Loan Documents, or the Borrower. No Agent Indemnitee shall be responsible to the Lenders for (a) any recitals, statements, information, representations, or warranties contained in any Loan Documents; (b) the execution, validity, genuineness, effectiveness, or enforceability of any Loan Documents; (c) the genuineness, enforceability, collectability, value, sufficiency, location, or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; (d) the validity, enforceability or collectability of any Obligations; or (e) the assets, liabilities, financial condition, results of operations, business, creditworthiness, or legal status of the Borrower or any Account Debtor. No Agent Indemnitee shall have any obligation to any Lender to ascertain or inquire into the existence of any Default, the observance or performance by the Borrower of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

13.6 Resignation; Successor Agents.

(a) Subject to the appointment and acceptance of a successor to the Administrative Agent or the Collateral Agent, as applicable, as provided below, each of the Administrative Agent and the Collateral Agent may at any time give notice of its resignation to the Lenders, the other Agent and the Borrower. Upon receipt of such notice, the Required Lenders shall have the right, in consultation with the Borrower and the other Agent, to appoint a successor the Administrative Agent or the Collateral Agent, as applicable, which shall be (i) a Lender or an Affiliate of a Lender with an office in the United States or (ii) a commercial bank, or an Affiliate of such commercial bank that is organized under the laws of the United States or any state or district thereof, with an office in the United States and a combined capital surplus of at least $200,000,000. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent or retiring Collateral Agent, as applicable, gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent or retiring Collateral Agent, as applicable, may (but shall not be obligated to), on behalf of the Lenders, appoint a successor to the Administrative Agent or the Collateral Agent, as applicable, meeting the qualifications set forth above. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b) If the Person serving as the Administrative Agent or the Collateral Agent, as applicable, is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by Applicable Law, by notice in writing to the Borrower and such Person remove such Person as the Administrative Agent or the Collateral Agent, as applicable, and, in consultation with the Borrower and the other Agent, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (2) except for any indemnity payments owed to the retiring or removed Administrative Agent or Collateral Agent, as applicable, all payments, communications and determinations provided to be made by, to or through the Administrative Agent or the Collateral Agent, as applicable, shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent or successor Collateral Agent, as applicable, as provided for above.  Upon the acceptance of a successor's appointment as the Administrative Agent or the Collateral Agent, as applicable, hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Agent (other than any rights to indemnity payments owed to the retiring or removed Agent), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  The fees payable by the Borrower to a successor Administrative Agent or successor Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Section 13 and Section 17.3 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as the Administrative Agent or the Collateral Agent, as applicable.

13.7     Due Diligence and Non-Reliance.  Each Lender acknowledges and agrees that it has, independently and without reliance upon any Agent or any other Lenders, and based upon such documents, information, and analyses as it has deemed appropriate, made its own credit analysis of the Borrower and its own decision to enter into this Agreement and to fund Loans.  Each Lender has made such inquiries concerning the Loan Documents, the Collateral, and the Borrower as such Lender believes necessary.  Each Lender further acknowledges and agrees that the other Lenders and the Agents have made no representations or warranties concerning any Credit Party or Subsidiary, any Collateral, or the legality, validity, sufficiency, or enforceability of any Loan Documents or Obligations.  Each Lender will, independently and without reliance upon the other Lenders or the Agents, and based upon such financial statements, documents, and information as it deems appropriate at the time, continue to make and rely upon its own credit decisions in making Loans and in taking or refraining from any action under any Loan Documents.  Except as expressly required hereby and except for notices, reports, and other information expressly requested by a Lender, no Agent shall have any duty or responsibility to provide any Lender with any notices, reports, or certificates furnished to such Agent by any Credit Party or Subsidiary or any credit or other information concerning the affairs, financial condition, business, or Properties of any Credit Party or Subsidiary which may come into possession of such Agent or any of its Affiliates.

13.8     Remittance of Payments.

(a)     Remittances Generally.  All payments by any Lender to the Agents shall be made by the time and on the day set forth in this Agreement, in immediately available funds.  If no time for payment is specified or if payment is due on demand by the applicable Agent and request for payment is made by such Agent by 11:00 a.m. on a Business Day, payment shall be made by such Lender not later than 2:00 p.m. on such day, and if request is made after 11:00 a.m., then payment shall be made by 11:00 a.m. on the next Business Day.  Payment by any Agent to any

Lender shall be made by wire transfer, in the type of funds received by such Agent, by no later than 11:00 a.m. on the second Business Day following such Agent's receipt of the same.  Any such payment shall be subject to the applicable Agent's right of offset for any amounts due from such Lender under the Loan Documents.

(b)     Failure to Pay.  If any Lender fails to pay any amount when due by it to any Agent pursuant to the terms hereof, such amount shall bear interest from the due date until paid at the rate determined by such Agent as customary in the banking industry for interbank compensation.  In no event shall the Borrower be entitled to receive credit for any interest paid by a Lender to any Agent.

(c)     Recovery of Payments.  If any Agent pays any amount to a Lender in the expectation that a related payment will be received by such Agent from the Borrower and such related payment is not received, then such Agent may recover such amount from each Lender that received it.  If any Agent determines at any time that an amount received under any Loan Document must be returned to the Borrower or paid to any other Person pursuant to Applicable Law or otherwise, then, notwithstanding any other term of any Loan Document, such Agent shall not be required to distribute such amount to any Lender.  If any amounts received and applied by any Agent to any Obligations are later required to be returned by such Agent pursuant to Applicable Law, each Lender shall pay to such Agent, on demand, such Lender's Applicable Percentage of the amounts required to be returned.

13.9     Rights as a Lender.  Each Person serving in the capacity of the Administrative Agent or the Collateral Agent, as applicable, hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent or the Collateral Agent, as applicable, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent or the Collateral Agent, as applicable, hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, maintain deposits or credit balances for, invest in, lend money to, be a Bank Service Provider to, act as trustee under indentures of, own securities of, act as a financial or other advisor to, or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent or the Collateral Agent, as applicable, hereunder and without any duty to account therefor (including any fees or other consideration received in connection therewith) to the Lenders.

13.10     Agent Titles.  The Sole Lead Arranger and Book Manager shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as Collateral Agent, a Lender, or the Swingline Lender hereunder, nor shall it have or be deemed to have any fiduciary relationship with any Lender as a result of this Agreement.

13.11     Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Swingline Lender, the Collateral Agent and the Administrative Agent (including

any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Swingline Lender and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Swingline Lender, the Collateral Agent and the Administrative Agent under clauses (a), (b) and (c) of Sections 3.1 and Section 17.3) allowed in such judicial proceeding;

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by the Collateral Agent, each Lender and the Swingline Lender to make such payments to the Administrative Agent (and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Collateral Agent, the Lenders and the Swingline Lender, then directly to the Collateral Agent, the Lenders and the Swingline Lender) to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 3.1 and 17.3.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of the Collateral Agent, any Lender or the Swingline Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any the Collateral Agent or Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding

13.12 No Third Party Beneficiaries. This Section 13 is an agreement solely among the Agents and the Lenders and shall survive Payment in Full of the Obligations. This Section 13 does not confer any rights or benefits upon the Borrower or any other Person, and the Borrower shall not have any standing to enforce this Section 13. As between the Borrower and any Agent, any action that any Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by the Lenders, as applicable.

## SECTION 14

## ASSIGNMENTS AND PARTICIPATIONS; REPLACEMENT OF LENDERS

14.1 Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent, the Collateral Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (a) to an assignee in accordance with the provisions of Section 14.2, (b) by way of participation in accordance with the provisions of Section 14.4 or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 14.5 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 14.4 and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

14.2 Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(a) Minimum Amounts.

(i) in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment, Equipment Term Loan Commitment. Real Estate Term Loan Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in paragraph (a)(ii) of this Section 14.2 in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(ii) in any case not described in paragraph (a)(i) of this Section 14.2, the aggregate amount of the applicable Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if the "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 in the case of any assignment in respect of any Loans or any unfunded Commitments unless the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed).

(b) Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (b) shall not apply to the Swingline Lender's rights and obligations in respect of Swingline Loans.

(c) Required Consents. No consent shall be required for any assignment except to the extent required by Section 14.2(a)(ii) and, in addition:

(i) the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 5 Business Days after having received notice thereof;

(ii) the consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) shall be required for assignments in respect of (A) any Revolving Loans or any Revolving Commitments if such assignment is to a Person that is not a Lender with a Revolving Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (B) any Term Loans or any unfunded Term Loan Commitments if such assignment is to a Person that is not a Lender holding a Term Loan or with an unfunded Term Loan Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(iii) the consent of the Swingline Lender (such consent not to be unreasonably withheld, conditioned or delayed) shall be required for any assignment in respect of the Revolving Loans and Revolving Commitments.

(d) Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(e) No Assignment to Certain Persons. No such assignment shall be made to (i) the Borrower or any Subsidiaries or Affiliates of the Borrower or (ii) to any Defaulting Lender or any of its Subsidiaries or any of its Affiliates or Approved Funds, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (e).

(f) No Assignment to Natural Persons. No such assignment shall be made to a natural Person.

(g) Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the Applicable Percentage of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to each Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its Applicable Percentage of all Loans and participations in Swingline Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 14.3, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 5.7, 15.1, 15.3, 15.5 and 17.3 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 14.2 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in

accordance with Section 14.4. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender with respect to the Commitments and Loans assigned.

14.3 Register. The Administrative Agent, acting solely for this purpose as an agent of the Borrower for tax purposes, shall maintain at the Administrative Agent's office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The Administrative Agent shall promptly enter into the Register all assignments made in conformity with the terms of this Agreement and the entries in the Register shall be conclusive, absent manifest error. The Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and the Swingline Lender at any reasonable time and from time to time upon reasonable prior notice. In addition, at any time that a request for a consent for a material or substantive change to the Loan Documents is pending, any Lender may request and receive from the Administrative Agent a copy of the Register applicable to such Lender.

14.4 Participations.

(a) Permitted Participants; Effect. Any Lender may at any time, without the consent of, or notice to, the Borrower or any Agent, sell participations to any Person (other than (i) a natural person, (ii) the Borrower or any of the Borrower's Subsidiaries or Affiliates or (iii) a Defaulting Lender) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitments and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

(b) Participation Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (iv) and (v) of the first proviso to Section 17.2. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 5.7, 15.3 and 15.5 (subject to the requirements and limitations therein, including the requirements under Section 5.7(g) (it being understood that the documentation required under Section 5.7(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 14.2; provided that such Participant (A) agrees to be subject to the provisions of Section 15.4 as if it were an assignee under Section 14.2; and (B) shall not be entitled to receive any greater payment under Sections 5.7 or 15.3, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 15.4 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 17.6 as though it were a Lender; provided that such Participant agrees to be subject to Section 5.6 as

though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower for tax purposes, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as the Administrative Agent) shall have no responsibility for maintaining a Participant Register.

14.5 Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

14.6 Replacement of Lenders. If any Lender requests compensation under Section 15.3, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.7 and, in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with Section 15.4, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 14), all of its interests, rights (other than its existing rights to payments pursuant to Section 15.3 or Section 5.7) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(a) the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 14.2(d);

(b) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 15.5 from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts)));

(c) in the case of any such assignment resulting from a claim for compensation under Section 15.3 or payments required to be made pursuant to Section 5.7, such assignment will result in a reduction in such compensation or payments thereafter;

(d) such assignment does not conflict with Applicable Law; and

(e) in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

14.7 Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**SECTION 15**

**YIELD PROTECTION**

15.1 Illegality. If any Lender determines that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make, maintain, or fund ~~LIBOR~~SOFR Loans, or to determine or charge interest rates based upon ~~LIBOR~~SOFR, ~~or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market~~Daily Floating SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, then, on notice thereof by such Lender to the Borrower (through the Administrative Agent) (an "Illegality Notice"), any obligation of ~~such Lender~~the Lenders to make or continue ~~LIBOR~~SOFR Loans or to convert Reference Rate Loans to ~~LIBOR~~SOFR Loans shall be suspended and the interest rate on which Reference Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Reference Rate", in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon ~~delivery~~receipt of ~~such notice~~an Illegality Notice, the Borrower shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all ~~LIBOR~~SOFR Loans of such Lender to Reference Rate Loans (the interest rate on which Reference Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Reference Rate"), either on the last day of the Interest Period therefor, if ~~such Lender~~all affected Lenders may lawfully continue to maintain such ~~LIBOR~~SOFR Loans to such day, or immediately, if ~~such~~any affected Lender may not lawfully continue to maintain such ~~LIBOR~~SOFR Loans, in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, Daily Floating SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 15.5.

15.2 Inability to Determine Rates.

(a) *Temporary Inability*. ~~If~~ Subject to Section 15.2(b) through (g), if, on or prior to the first day of any Interest Period for any Term SOFR Loan, (i) the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that Term SOFR cannot be determined pursuant to the definition thereof, or (ii) the Required Lenders notify the Administrative Agent for any reason in connection with a request for a Borrowing of, or conversion to or continuation of, a ~~LIBOR~~SOFR Loan that (~~a) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period (if applicable) of such Loan; (b~~A) adequate and reasonable means do not exist for determining ~~LIBOR~~SOFR, Term SOFR, Adjusted Term SOFR or Daily Floating SOFR for the requested Interest Period or otherwise; or (~~c~~B) ~~LIBOR~~SOFR, Adjusted Term SOFR or Term

~~152434621_2~~
152434621_7

SOFR for the requested Interest Period (if applicable) or otherwise does not adequately and fairly reflect the cost to such Lenders of funding such Loan, then the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (a) the obligation of Lenders to make or maintain ~~LIBOR~~SOFR Loans, and the right of the Borrower to continuate SOFR Loans or convert Reference Rate Loans to SOFR Loans, shall be suspended until the Administrative Agent (in the case of clause (ii) above, upon written instruction by the Required Lenders) revokes such notice (which the Administrative Agent agrees to do promptly upon receipt of such instruction from the Required Lenders) and (b) all ~~LIBOR~~SOFR Loans shall automatically (and without notice to any Person) be converted to Reference Rate Loans. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to, or continuation of a ~~LIBOR~~SOFR Loan and, if any such request is not revoked by the Borrower, the requested Loan will be made as a Reference Rate Loan and (ii) any outstanding affected Term SOFR Loans will be deemed to have been converted into Reference Rate Loans at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 15.5. Subject to Section 15.2(b) through (g), if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that " Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Reference Rate Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "Reference Rate" until the Administrative Agent revokes such determination.

(b) *Benchmark Replacement*. ~~(i)~~ Notwithstanding anything to the contrary herein or in any other Loan Document, ~~if~~upon the occurrence of a Benchmark Transition Event ~~or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of~~, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark~~, then (x) if~~ with a Benchmark Replacement ~~is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (3) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting~~. Any such amendment with respect to a Benchmark Transition Event will become effective at ~~or after~~ 5:00 p.m. (~~Pacific~~New York City time) on the fifth (5th) Business Day after the ~~date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document~~Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such ~~Benchmark Replacement~~amendment from Lenders comprising the Required Lenders.

~~(ii) Notwithstanding anything to the contrary herein or in any other Loan Document, if a Term SOFR Transition Event and its related~~ No replacement of a Benchmark with a Benchmark Replacement ~~Date have occurred~~pursuant to this Section 15.2(b) will occur prior to the ~~Reference Time in respect of any setting of the then-current Benchmark, then the~~ applicable Benchmark ~~Replacement will replace the then-current Benchmark for all purposes hereunder or under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this~~

Agreement or any other Loan Document; provided that this clause (ii) shall not be effective unless the Administrative Agent has delivered to the Lenders and the Borrower a Term SOFR Notice. For the avoidance of doubt, the Administrative Agent shall not be required to deliver a Term SOFR Notice after a Term SOFR Transition Event and may do so in its sole discretionStart Date.

(c) *Benchmark Replacement Conforming Changes*. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d) *Notices; Standards for Decisions and Determinations*. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any occurrence of a Benchmark Transition Event, a Term SOFR Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date,and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of anya Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes,. The Administrative Agent will notify the Borrower of (ivx) the removal or reinstatement of any tenor of a Benchmark pursuant to clause Section 15.2(e) below and (vy) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 15.2, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 15.2.

(e) *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR or USD LIBORReference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will no longernot be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f) *Benchmark Unavailability Period*. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBORSOFR Loans to be made,

converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Reference Rate Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Reference Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Reference Rate.

(g) *Certain Defined Terms*. As used in this Section 15.2:

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark ~~or~~(or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark~~, as applicable,~~ (or component thereof) that is or may be used for determining ~~the length of an Interest Period~~any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of this Section 15.2.

"Benchmark" means, initially, ~~USD LIBOR~~the Term SOFR Reference Rate; provided that if a Benchmark Transition Event~~, a Term SOFR Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have~~ has occurred with respect to ~~USD LIBOR~~the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of this Section 15.2.

"Benchmark Replacement" means, ~~for any Available Tenor, (a)~~ with respect to any Benchmark Transition Event ~~or Early Opt-in Election~~, the ~~first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:~~

~~(1) the~~ sum of: (~~A) Term SOFR and (B) the related Benchmark Replacement Adjustment;~~

~~(2) the sum of: (A) Daily Simple SOFR and (B) the related Benchmark Replacement Adjustment;~~

~~(3) the sum of: (A~~a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower ~~as the replacement for the then-current Benchmark for the applicable Corresponding Tenor~~ giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated syndicated credit facilities at such time and (~~B) the related Benchmark Replacement Adjustment; or~~

~~(~~b~~) with respect to any Term SOFR Transition Event, the sum of (i) Term SOFR and (ii~~) the related Benchmark Replacement Adjustment; provided that, ~~in the case of clause (a)(1) or clause (b) of this definition,~~if such ~~Unadjusted~~ Benchmark Replacement ~~is displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion. If the Benchmark Replacement as determined pursuant to clause (a)(1), (2) or (3) or clause (b) of this definition~~as so determined would be less than the Floor, ~~the~~such Benchmark

Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement:

(1) for purposes of clauses (a)(1) and (2) and (b) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by the Administrative Agent:

(a) , the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor;

(b) the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

(2) for purposes of clause (a)(3) of the definition of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (ia) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (iib) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities;

provided that, in the case of clause (1) of this definition, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Administrative Agent in its reasonable discretion at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Reference Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market

~~practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).~~

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a) ~~(1)~~ in the case of clause (~~1~~a) or (~~2~~b) of the definition of "Benchmark Transition Event," the later of (~~a~~i) the date of the public statement or publication of information referenced therein and (~~b~~ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b) ~~(2)~~ in the case of clause (~~3~~c) of the definition of "Benchmark Transition Event~~,~~", the first date ~~of~~on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the ~~public~~most recent statement or publication ~~of information~~ referenced ~~therein; (3)~~ in ~~the case of a Term SOFR Transition Event, the date that is thirty (30) days after the Administrative Agent has provided a Term SOFR Notice to the Lenders and the Borrower pursuant to clause (b)(ii) of this Section 15.2; or~~such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

~~(4) in the case of an Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (Pacific time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election is provided to the Lenders, written notice of objection to such Early Opt-in Election from Lenders comprising the Required Lenders.~~

For the avoidance of doubt, ~~(i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii)~~ the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (~~1~~a) or (~~2~~b) ~~of this definition~~ with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) ~~(1)~~ a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation

thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) (2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) (3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longernot, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this Section 15.2 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this Section 15.2.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Early Opt-in Election" means, if the then-current Benchmark is USD LIBOR, the occurrence of:

(1) a notification by the Administrative Agent to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least five (5) currently outstanding U.S. dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(2) the joint election by the Administrative Agent and the Borrower to trigger a fallback from USD LIBOR and the provision by the Administrative Agent of written notice of such election to the Lenders.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to USD LIBOR.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"Reference Time" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is USD LIBOR, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such setting, and (2) if such Benchmark is not USD LIBOR, the time determined by the Administrative Agent in its reasonable discretion.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"SOFR" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the SOFR Administrator on the SOFR Administrator's Website on the immediately succeeding Business Day.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for

the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Term SOFR" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Term SOFR Notice" means a notification by the Administrative Agent to the Lenders and the Borrower of the occurrence of a Term SOFR Transition Event.

"Term SOFR Transition Event" means the determination by the Administrative Agent that (a) Term SOFR has been recommended for use by the Relevant Governmental Body and is determinable for each Available Tenor, (b) the administration of Term SOFR is administratively feasible for the Administrative Agent and (c) a Benchmark Transition Event or an Early Opt-in Election, as applicable, has previously occurred resulting in the replacement of the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this Section 15.2 with a Benchmark Replacement that is not comprised of Term SOFR.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"USD LIBOR" means the London interbank offered rate for U.S. dollars.

15.3 Increased Costs.

(a) Increased Costs, Generally. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D)), special deposit, compulsory loan, insurance charge, or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any Reserve Percentage);

(ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on any Lender or the London interbank market any other condition, cost, or expense (other than Taxes) affecting this Agreement or any Loan or Loan Document;

and the result thereof shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest, or any other amount) then, upon request of such Lender or

other Recipient, the Borrower shall pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or holding company's capital as a consequence of this Agreement, or such Lender's Commitments or Loans, to a level below that which such Lender or holding company could have achieved but for such Change in Law (taking into consideration such Lender's and holding company's policies with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate it or its holding company for any such reduction suffered.

(c) Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 15.3 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d) Delay In Requests. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 15.3 shall not constitute a waiver of its right to demand such compensation, but the Borrower shall not be required to compensate a Lender for any increased costs incurred or reductions suffered more than nine months before the date that the Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

15.4 Mitigation. If any Lender requests compensation under Section 15.3, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority under Section 5.7, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different Lending Office or to assign its rights and obligations hereunder to another of its offices, branches, or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate the need for such notice or reduce amounts payable or to be withheld pursuant to Section 15.3 or Section 5.7, as the case may be, in the future, and (b) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower shall pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

15.5 Funding Losses. If for any reason (other than default by a Lender) (a) any Borrowing of, or conversion to or continuation of, a ~~LIBOR~~SOFR Loan does not occur on the date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn); (b) any repayment or conversion of a ~~LIBOR~~SOFR Loan occurs on a day other than the end of its Interest Period (including as a result of the replacement of a Lender pursuant to Section 14.6); or (c) the Borrower fails to repay a ~~LIBOR~~SOFR Loan when required hereunder, then the Borrower shall pay to the Administrative Agent its customary administrative charge and to each Lender all losses and expenses that it sustains (or a reasonable estimate thereof) as a consequence thereof, including loss of anticipated profits and any loss or expense arising from liquidation or redeployment of funds or from fees payable~~ to terminate deposits of matching funds. Lenders shall not be required to purchase Dollar deposits in the~~

London interbank market or any other offshore Dollar market to fund any LIBOR Loan, but the provisions hereof shall be deemed to apply as if each Lender had purchased such deposits to fund its LIBOR Loans.

**SECTION 16**

**[RESERVED]**

**SECTION 17**

**MISCELLANEOUS**

17.1 Notices.

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (c) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(i) if to the Borrower or any other Credit Party, to it at 1306 West Herndon5620 N. Palm Ave., Suite 101421, Mail Stop M, Fresno, CA 93711-718393704, Attention of Jennifer D. Reisz (Facsimile No. (559) 432-2214; Liz Steinhauer Clark (Telephone No. (559) 440-8350284-5110);

(ii) if to the Administrative Agent, to MUFG Union Bank at MUFG Union Bank, N.A., 1980 Saturn Street, Monterey Park, CA 91755, Attention of Agency Commercial Loan Operations (E-Mail: cld.sf@unionbank.com; David.Taing@unionbank.comSiev.Te@unionbank.com);

with a copy to:

MUFG Union Bank, N.A. at 1221 Avenue of the Americas, 6th Floor, New York, NY 10020, Attention of Lawrence Blat (Facsimile No. (212) 782-4934; Telephone No. (212) 405-6621); and

MUFG Union Bank, N.A. at 7108 N. Fresno Street, Suite 200, Fresno, CA 93720, Attention of Scott Lisle (Facsimile No. (559) 436-2713; Telephone No. (559) 436-2747);

(iii) if to the Collateral Agent, to MUFG Union Bank, N.A. at 350 California Street, 17th Floor, San Francisco, CA 94104, Attention of Corporate Trust (Facsimile No. (415) 273-2492; Email: SFCT@unionbank.com);

with a copy to:

MUFG Union Bank, N.A. at 7108 N. Fresno Street, Suite 200, Fresno, CA 93720, Attention of Scott Lisle (Facsimile No. (559) 436-2713; Telephone No. (559) 436-2747); and

(iv) if to a Lender, to it at its address (or facsimile number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications, to the extent provided in paragraph (c) below, shall be effective as provided in said paragraph (c).

(b) Change of Address, etc. Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(c) Telephonic and Electronic Communications. Notices and other communications to Lenders hereunder may be delivered or furnished by telephonic or electronic communication (including telephone, e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent, provided that, except as otherwise provided in Section 17.1(d), the foregoing shall not apply to notices to any Lender pursuant to Section 2 if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Section by telephonic or electronic communication. The Administrative Agent, the Collateral Agent or the Borrower may, in their reasonable judgment, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by them, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(d) Loan Mechanics. The Borrower authorizes the Administrative Agent and the Lenders to extend, convert, or continue Loans, effect selections of interest rates, and transfer funds to or on behalf of the Borrower based on instructions sent telephonically or by electronic mail. The Borrower shall confirm each such request by prompt delivery to the Administrative Agent of a Notice of Borrowing or Notice of Conversion/Continuation, if applicable, but if the foregoing differs in any material respect from the action taken by the Administrative Agent or the Lenders, the records of the Administrative Agent and the Lenders shall govern.

(e) Privacy. The Administrative Agent and the Lenders make no assurances as to the privacy and security of telephonic or electronic communications.

(f) Routine Communications. Electronic mail and internet websites may be used for delivery of financial statements, Borrowing Base Certificates, and other information required by Section 1.9 or 10.2 (other than notices), administrative matters, and distribution of Loan Documents for execution, pursuant to procedures approved by the Administrative Agent or as otherwise determined by the Administrative Agent. Anything herein to the contrary notwithstanding, except as expressly provided Section 17.1(d), notices delivered telephonically or by electronic mail may not be used as effective notice under the Loan Documents.

(g) Limitation of Liability; Indemnification. None of the Administrative Agent, the Collateral Agent nor any Lender shall have any liability for any loss suffered by the Borrower as a result of the Administrative Agent, the Collateral Agent or any Lender acting upon its understanding of telephonic or electronic mail requests or instructions from a person believed in good faith by such Person to be a person authorized to give such requests or instructions on the Borrower's behalf. The Borrower shall indemnify and hold harmless each Indemnitee from any Claims arising from any telephonic or electronic communication purportedly given by or on behalf of the Borrower.

(h) Suspension of Telephonic and Electronic Communications. The Borrower acknowledges that communication by telephone or electronic mail as provided in this Section 17.1 is a courtesy extended by the Administrative Agent to the Borrower and, therefore, the Administrative Agent may, in its discretion and upon notice to the Borrower, (A) cease or suspend any actual or implied obligation it may have to act based on such telephonic or electronic communications and (B) thereafter, disregard any such telephonic or electronic communications.

(i) Non-Conforming Communications. The Administrative Agent, the Collateral Agent and each Lender may rely upon any notices purportedly given by or on behalf of the Borrower even if such notices were not made in a manner specified in this Agreement or any other applicable Loan Document, were incomplete, or were not confirmed or if the terms thereof, as understood by the recipient, varied from a later confirmation.

(j) The Platform.

(i) Each Credit Party agrees that the Administrative Agent and/or the Collateral Agent may, but shall not be obligated to, make the Communications (as defined below) available to Lenders by posting the Communications on Debt Domain, Intralinks, SyndTrak or a substantially similar electronic transmission system (the "Platform").

(ii) THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. In no event shall Administrative Agent, the Collateral Agent or any of their Related Parties (collectively, the "Agent Parties") have any liability to any Credit Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of Communications through the Platform, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed

to direct or actual damages). "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Credit Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to Administrative Agent, the Collateral Agent or any Lender by means of electronic communications pursuant to this Section 17.1, including through the Platform.

(k) Electronic Execution. The words "execute," "execution," "signed," "signature," "delivery" and words of like import in or related to this Agreement, any other Loan Document or any document, amendment, approval, consent, waiver, modification, information, notice, certificate, report, statement, disclosure, or authorization to be signed or delivered in connection with this Agreement or any other Loan Document or the transactions contemplated hereby shall be deemed to include Electronic Signatures or execution in the form of an Electronic Record, and contract formations on electronic platforms approved by the Administrative Agent, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Each party hereto agrees that any Electronic Signature or execution in the form of an Electronic Record shall be valid and binding on itself and each of the other parties hereto to the same extent as a manual, original signature. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the parties of a manually signed paper which has been converted into electronic form (such as scanned into PDF format), or an electronically signed paper converted into another format, for transmission, delivery and/or retention. Notwithstanding anything contained herein to the contrary, the Administrative Agent is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; provided that without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept such Electronic Signature from any party hereto, the Administrative Agent and the other parties hereto shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of the executing party without further verification and (ii) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by an original manually executed counterpart thereof. Without limiting the generality of the foregoing, each party hereto hereby (x) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and any of the Credit Parties, electronic images of this Agreement or any other Loan Document (in each case, including with respect to any signature pages thereto) shall have the same legal effect, validity and enforceability as any paper original, and (y) waives any argument, defense or right to contest the validity or enforceability of the Loan Documents based solely on the lack of paper original copies of any Loan Documents, including with respect to any signature pages thereto.

17.2 Amendments.

(a) Consent; Amendment; Waiver. ~~Neither~~Except as otherwise expressly set forth in this Agreement (including Section 3.1(h) and Section 15.2), neither this Agreement, nor any other Loan Document, nor any term hereof or thereof may be amended orally, but only by an instrument in writing signed by the Required Lenders, or in the case of Loan Documents executed by the Administrative Agent and/or the Collateral Agent (and not the other Lenders), as applicable, signed by the Administrative Agent and/or the Collateral Agent, as applicable, and

approved by the Required Lenders and, in the case of an amendment, also by the Borrower; provided, however, that:

(i) without the prior written consent of the Administrative Agent and/or the Collateral Agent, as applicable, no modification shall be effective with respect to any provision in a Loan Document that relates to any rights, duties, or discretion of the Administrative Agent and/or the Collateral Agent, if applicable, including with respect to the making or settlement of Swingline Loans;

(ii) without the prior written consent of Swingline Lender, no modification shall be effective with respect to any provision in a Loan Document that relates to the making or settlement of Swingline Loans;

(iii) [Reserved];

(iv) without the prior written consent of each Lender (including any such Lender that is a Defaulting Lender) directly affected thereby, no modification shall be effective that would (A) increase or extend the Commitment of such Lender (or reinstate any commitment terminated pursuant to this Agreement), or (B) reduce the amount of, or waive or delay payment of, any principal, interest, or fees payable to such Lender; provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate during the continuance of an Event of Default; provided further that a waiver of a mandatory prepayment under Section 5.3(b) shall only require the consent of the Required Lenders;

(v) without the prior written consent of all Lenders (other than a Defaulting Lender) directly affected thereby, no modification shall be effective that would (A) amend, waive, or alter the pro rata sharing of payments or order of application of payments or obligations of the Administrative Agent or any Lender under Sections 5.1, 5.5 or 5.6 (except to the extent provided in Section 4.2(b)); (B) amend this Section 17.2 or the definitions of Required Lenders, Required Revolving Lenders, Required Equipment Term Loan Lenders, Required Real Estate Term Loan Lenders (or any of the defined terms used in any such definition) or any other provision of this Agreement or the other Loan Documents specifying the number or percentage of Lenders required to waive, amend, or modify any rights thereunder or make any determination or grant any consent thereunder; (C) release all or substantially all of the Collateral; (D) release the Borrower or any Guarantor with a net worth in excess of $500,000 from liability for any Obligations, except to the extent expressly permitted by the terms hereof; or (E) contractually subordinate any of Collateral Agent's Liens in and to the Collateral, except to the extent expressly permitted by the terms hereof (as in effect on the Amendment No. 6 Effective Date);

(vi) without the prior written consent of the Required Revolving Lenders, (A) amend, modify or waive any provision in Section 7.2 or waive any Default or Event of Default (or amend any Loan Document to effectively waive any Default or Event of Default) if the effect of such amendment, modification or waiver is that the Lenders with Revolving Commitments shall be required to fund Revolving Loans when such Lenders would otherwise not be required to do so or (B) amend the definitions of "Borrowing Base" to increase the amounts or percentages set forth therein to an amount or a percentage greater than set forth in such definition as of the Amendment No. 2

Effective Date (provided that the exercise by the Administrative Agent of any of its rights hereunder with respect to Availability Reserves, Eligible Accounts or Eligible Inventory shall not be deemed an amendment to the amounts and percentages), "Excess Availability," "Eligible Account," or "Eligible Inventory," to the extent doing so would cause more of any Credit Party's assets to become eligible thereunder; provided, however, that if there are only two (2) Revolving Lenders under the Loan Documents that are not Affiliates (and that are not Defaulting Lenders), then the consent of both such Lenders shall be required; or

(vii)    without the prior written consent of the Required Real Estate Term Loan Lenders, (A) amend, modify or waive any provision in Section 7.2, 7.3 or 7.4 or waive any Default or Event of Default (or amend any Loan Document to effectively waive any Default or Event of Default) if the effect of such amendment, modification or waiver is that the Lenders with outstanding Real Estate Term Loans and unfunded Real Estate Term Loan Commitments shall be required to fund Real Estate Term Loans when such Lenders would otherwise not be required to do so; or

(viii)    without the prior written consent of the Required Equipment Term Loan Lenders, (A) amend, modify or waive any provision in Section 7.2 or 7.5 or waive any Default or Event of Default (or amend any Loan Document to effectively waive any Default or Event of Default) if the effect of such amendment, modification or waiver is that the Lenders with unfunded Equipment Term Loan Commitments shall be required to fund Equipment Term Loans when such Lenders would otherwise not be required to do so; or

(ix)    without the prior written consent of the Required Equipment Term Loan Lenders amend or modify the term "Eligible Equipment" to the extent doing so would cause more of any Credit Party's assets to become eligible thereunder or the provisions hereof requiring that the outstanding amount of any applicable Advance shall not exceed the applicable percentage of the Value of Eligible Equipment required with respect to such Advance.

The foregoing notwithstanding, (1) this Agreement may be amended to increase the interest rate or any fees hereunder with the consent of the Administrative Agent and the Borrower only; (2) modifications to the Loan Documents may be made to the extent necessary to grant a security interest in additional collateral to the Collateral Agent for the benefit of the Secured Parties or join additional Persons as Credit Parties with the prior written consent of the Collateral Agent and the Borrower only pursuant to documentation satisfactory to the Collateral Agent and the Borrower without the consent of any Lender; (3) only the consent of the Administrative Agent shall be required to amend Schedule 1.1(a) to reflect assignments of the Commitments and Loans in accordance with this Agreement; (4) modifications of a Loan Document which deal solely with the rights and duties of Lenders, the Collateral Agent and/or the Administrative Agent as among themselves shall not require the consent of the Borrower; (5)  the Administrative Agent and the Borrower may amend or modify this Agreement and any other Loan Document to cure any ambiguity, omission, defect or inconsistency therein; and (6) only the consent of the parties to the Fee Letter or any agreement relating to Bank Services shall be required for any modification of such agreement, and any non-Lender which is party to any agreement relating to Bank Services shall have no right to participate in any manner in modification of any other Loan Document.

(b)    Limitations.  Notwithstanding anything contained herein to the contrary, this Agreement may be amended and restated without the consent of any Lender (but with the consent of the Borrower, the Collateral Agent and the Administrative Agent) if, upon giving

effect to such amendment and restatement, such Lender shall no longer be a party to this Agreement (as so amended and restated), the Commitments of such Lender shall have terminated (but such Lender shall be entitled to the benefit of Sections 15, 17.3, and 17.4), such Lender shall have no other Commitment or other obligation hereunder and shall have been paid in full all Obligations owing to it or accrued for its account under this Agreement.  Any waiver or consent granted by the Administrative Agent, the Collateral Agent or any Lender shall not constitute a modification of this Agreement, except to the extent expressly provided in such waiver or consent, or constitute a course of dealing by such Persons at variance with the terms of the Agreement such as to require further notice by such Persons of their intent to require strict adherence to the terms of the Agreement in the future.  The Administrative Agent, the Collateral Agent and the Lenders expressly reserve the right to require strict compliance with the terms of this Agreement.  No waiver or course of dealing shall be established by (i) the failure or delay of Administrative Agent, the Collateral Agent or any Lender to require strict performance of any Credit Party to this Agreement or any other Loan Document or to exercise any rights or remedies with respect to Collateral or otherwise; (ii) the making of any Loan during a Default, an Event of Default, or other failure to satisfy any conditions precedent; or (iii) acceptance by the Administrative Agent, the Collateral Agent or any Lender of performance by any Credit Party under this Agreement or any other Loan Document in a manner other than that specified herein or therein.

(c)     Payment for Consents.  No Credit Party will, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee, or otherwise, to any Lender (in its capacity as a Lender hereunder) as consideration for agreement by such Lender with any modification of any Loan Documents, unless such remuneration or value is concurrently paid, on the same terms, ratably to all Lenders providing their consent.

17.3   Indemnity; Expenses.   THE BORROWER SHALL INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS THE INDEMNITEES AGAINST ANY "CLAIMS" AND "EXTRAORDINARY EXPENSES" (AS SUCH TERMS ARE DEFINED IN SECTION 1.1) THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE, INCLUDING CLAIMS AND EXPENSES ARISING FROM THE NEGLIGENCE OF AN INDEMNITEE.  In no event shall any party to this Agreement or any other Loan Document have any obligation thereunder to indemnify or hold harmless an Indemnitee with respect to any Claim, Extraordinary Expense, or other loss, cost, fees, or expenses that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from (a) the gross negligence or willful misconduct of such Indemnitee or (b) a material breach by such Indemnitee of its obligations under this Agreement.

17.4   Reimbursement Obligations.  Without limiting the terms of Section 17.3, the Borrower shall reimburse the Administrative Agent and the Collateral Agent for all Extraordinary Expenses and for all reasonable and documented out of pocket legal, accounting, appraisal, consulting, and other fees, costs, and expenses incurred by it in connection with (a) negotiation and preparation of this Agreement and the other Loan Documents, including any amendment, forbearance, waiver, restatement, supplement, or other modification thereof; (b) administration of and actions relating to any Collateral, this Agreement, any Loan Document, including fees and expenses related to the review, verification and confirmation of each Borrowing Base Certificate performed by a third party and transactions contemplated hereby and thereby (including any actions taken to perfect or maintain priority of Collateral Agent's Liens in and to any Collateral, to maintain any insurance required hereunder, or to verify Collateral); and (c) subject to the limits of Section 10.5, each inspection, field audit, field examination, or appraisal with respect to the Borrower, any Subsidiary, or any Collateral, whether prepared by the Administrative Agent's or the Collateral Agent's personnel or a third party.

17.5 Performance of the Borrower's Obligations. The Administrative Agent or the Collateral Agent, as applicable, may, in its reasonable judgment at any time and from time to time, at the Borrower's expense, pay any amount or do any act required of the Borrower under any Loan Documents or otherwise lawfully requested by the Administrative Agent to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of Collateral Agent's Liens in any Collateral, including any payment of any claim by any Third Party (including any judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim), or any discharge of a Lien. All payments, costs, and expenses (including Extraordinary Expenses) of the Administrative Agent under this Section 17.5 shall be reimbursed to the Administrative Agent or the Collateral Agent, as applicable, by the Borrower, **ON DEMAND**, with interest from the date incurred to the date of payment thereof at the Default Rate applicable to Reference Rate Revolving Loans. Any payment made or action taken by the Administrative Agent under this Section 17.5 shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

17.6 Setoff. In addition to (and not in limitation of) any rights now or hereafter granted under Applicable Law to the Administrative Agent, the Collateral Agent and the Lenders, or, subject to the provisions of Section 14.4, any Participant, and each subsequent holder of any of the Obligations and each of their respective Affiliates (collectively, for purposes of this Section 17.6, the "Setoff Parties"), each of the Setoff Parties is hereby authorized by each Credit Party, after obtaining the prior written consent of the Administrative Agent and the Collateral Agent, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Setoff Party, to or for the credit or the account of the Borrower or any other Credit Party against any and all of the obligations of the Borrower or such Credit Party now or hereafter existing under this Agreement or any other Loan Document to such Setoff Party, irrespective of whether or not such Setoff Party shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Credit Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Setoff Party different from the branch, office or Affiliate holding such deposit or obligated on such Debt; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 4.2 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. In the event such Defaulting Lender fails to immediately pay over the amounts specified in the immediately preceding clause (x), then no payments shall be made to such Defaulting Lender until such time as such Defaulting Lender shall have complied with the preceding clause (x) and each Lender is the holder of its Applicable Percentage of all amounts then due and owing the Lenders. The rights of each Setoff Party under this Section 17.6 are in addition to other rights and remedies (including other rights of setoff) that such Setoff Party may have. Each Setoff Party agrees to notify the Borrower, the Collateral Agent and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

17.7 Severability. Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such manner as to be valid under Applicable Law. To the extent any such provision is found to be invalid or unenforceable under Applicable Law in a given jurisdiction, then (a) such provision shall be ineffective only to such extent; (b) the remainder of such provision and the other provisions of this Agreement and the other Loan Documents shall remain in full force and effect in such jurisdiction; and (c) such provision shall remain in full force and effect in any other jurisdiction.

17.8 Cumulative Effect; Conflict of Terms. The parties acknowledge that different provisions of this Agreement and the other Loan Documents may contain requirements, limitations, restrictions, or permissions relating to the same subject matter and, in such case, all of such provisions shall be deemed to be cumulative (rather than instead of one another) and must be satisfied or performed, as applicable. Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), to the extent any provision contained in this Agreement conflicts directly with any provision in another Loan Document, then the provision in this Agreement shall control.

17.9 Counterparts. This Agreement and any amendments, waivers, or consents relating hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which when taken together, shall constitute but one and the same instrument. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

17.10 Fax or Other Transmission. Delivery by one or more parties hereto of an executed counterpart of this Agreement via facsimile, telecopy, or other electronic method of transmission pursuant to which the signature of such party can be seen (including Adobe Corporation's Portable Document Format or PDF) shall have the same force and effect as the delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability, or binding effect of this Agreement.

17.11 Entire Agreement. This Agreement and the other Loan Documents, together with all other instruments, agreements, supplements, and certificates executed by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings negotiations, discussions, representations, warranties, commitments, proposals, offers, contracts and inducements, whether express or implied, oral or written. There are no unwritten oral agreements between the parties.

17.12 Relationship with Lenders. The obligations of each Lender hereunder are several. None of Administrative Agent, the Collateral Agent nor any Lender, on the one hand, shall be responsible for the obligations or Commitments of any other of such Persons, on the other hand. Amounts payable hereunder by Administrative Agent, the Collateral Agent or any Lender, on the one hand, to any other of such Persons, on the other hand, shall be separate and independent debts and obligations, and claims by one of such Persons against any other of such Persons may proceed between such Persons without requiring the joinder of Administrative Agent, the Collateral Agent or any Lender as an additional party. Nothing in this Agreement and no action of Administrative Agent, the Collateral Agent or Lenders pursuant to the Loan Documents shall cause Administrative Agent, the Collateral Agent and the Lenders, or any of them, to be deemed a partnership, association, joint venture, or any other kind of entity with the Borrower or to have any control of any Credit Party.

17.13 No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated by any Loan Document, the Borrower acknowledges and agrees that (a) (i) the credit facility evidenced by this Agreement and any related arranging or other services by any Agent, any Lender, any of their Affiliates, or any arranger are arm's-length commercial transactions between the Borrower and such Persons; (ii) the Borrower has consulted its own legal, accounting, regulatory, and tax advisors to the extent it has deemed appropriate; and (iii) the Borrower is capable of evaluating and understanding, and does understand and accept, the terms, risks, and conditions of the transactions contemplated by this Agreement and the other Loan Documents; (b) each of the Agents, the Lenders,

their Affiliates, and any arranger is and has been acting solely as a principal in connection with this credit facility, is not the financial advisor, agent, or fiduciary of, to, or for any Credit Party or any of their Affiliates or any other Person and has no obligation with respect to the transactions contemplated by this Agreement and the other Loan Documents except as expressly set forth herein or therein; and (c) the Agents, the Lenders, their respective Affiliates, and any arranger may be engaged in a broad range of transactions that involve interests that differ from the Credit Parties and their Affiliates and have no obligation to disclose any of such interests to any Credit Party or any such Affiliate. To the fullest extent permitted by Applicable Law, the Borrower hereby waives and releases any claims that it may have against the Agents, the Lenders, their respective Affiliates, and any arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Agreement or any other Loan Document.

17.14 Confidentiality; Credit Inquiries. The Administrative Agent, the Collateral Agent and the Lenders each agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Related Parties, (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority purporting to have jurisdiction over any Lender or over its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same, or at least as restrictive, as those of this Section 17.14, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective direct or indirect contractual counterparty (or its Related Parties) to any swap or derivative transaction relating to any Credit Party or its obligations, or (iii) any Bank Service Provider, (g) on a confidential basis to (i) any rating agency in connection with rating the Borrower or any Subsidiary or any credit facility provided under this Agreement and the other Loan Documents or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP number with respect to any such credit facilities, (h) with the consent of the Borrower, or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 17.14 or (y) becomes available to Administrative Agent, the Collateral Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower. Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent, the Collateral Agent and each Lender may, with the consent of the Borrower (such consent not to be unreasonably withheld, delayed or conditioned), publish or disseminate general information describing this credit facilities, including the names and addresses of the Borrower and a general description of the Borrower's businesses, and may use the Borrower's logos, trademarks or product photographs in advertising and marketing materials.

For purposes of this Section 17.14, "Information" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any such Subsidiary, provided that, in the case of information received from the Borrower or any Subsidiary after the Amendment No. 2 Effective Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 17.14 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Any of the foregoing to the contrary notwithstanding, the Borrower hereby

authorizes each of Administrative Agent, the Collateral Agent and the Lenders (in its reasonable judgment and without any obligation to do so) to respond to usual and customary credit inquiries from third parties concerning the Borrower or any Subsidiary.

17.15 Governing Law. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, UNLESS OTHERWISE SPECIFIED BY THE TERMS HEREOF OR THEREOF OR UNLESS THE LAWS OF ANOTHER JURISDICTION MAY, BY REASON OF MANDATORY PROVISIONS OF LAW, GOVERN THE PERFECTION, PRIORITY, OR ENFORCEMENT OF SECURITY INTERESTS IN THE COLLATERAL, SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES OR OTHER RULE OF LAW WHICH WOULD CAUSE THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE LAW OF THE STATE OF NEW YORK (BUT GIVING EFFECT TO FEDERAL LAWS RELATING TO NATIONAL BANKS).

17.16 Submission to Jurisdiction. THE BORROWER HEREBY CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, IN RESPECT OF ANY PROCEEDING, DISPUTE, OR LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF ANY PARTY WITH RESPECT HERETO OR THERETO AND AGREES THAT ANY SUCH PROCEEDING, DISPUTE, OR LITIGATION SHALL BE BROUGHT BY IT SOLELY IN SUCH COURTS. WITH RESPECT TO SUCH COURTS, THE BORROWER IRREVOCABLY WAIVES ALL CLAIMS, OBJECTIONS, AND DEFENSES IT MAY HAVE REGARDING PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE, OR INCONVENIENT FORUM. EACH PARTY HERETO WAIVES PERSONAL SERVICE OF PROCESS OF ANY AND ALL PROCESS SERVED UPON IT AND IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 17.1, SUCH SERVICE TO BE EFFECTIVE AT THE TIME SUCH NOTICE WOULD BE DEEMED DELIVERED UNDER SECTION 17.1. Nothing herein shall limit the right of Administrative Agent, the Collateral Agent or any Lender to bring proceedings against the Borrower in any other court, nor limit the right of any party to serve process in any other manner permitted by Applicable Law. Nothing in this Agreement shall be deemed to preclude enforcement by the Administrative Agent or the Collateral Agent, as applicable, of any judgment or order obtained in any forum or jurisdiction.

17.17 Waivers; Limitation on Damages; Limitation on Liability.

(a) Waiver of Jury Trial. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 17.17.

(b)    Waiver of Certain Damages.  NO PARTY TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY SUCCESSOR OR ASSIGNEE OF SUCH PERSON, OR ANY THIRD PARTY BENEFICIARY, OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH ANY SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY, SPECIAL, OR CONSEQUENTIAL DAMAGES AS A RESULT OF ANY TRANSACTION CONTEMPLATED HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT.

(c)    Other Waivers.  To the fullest extent permitted by Applicable Law, the Borrower waives (i) presentment, demand, protest, notice of presentment, notice of dishonor, default, non-payment, maturity, release, compromise, settlement, extension, or renewal of any commercial paper, accounts, documents, instruments, chattel paper, and guaranties at any time held by the Administrative Agent, the Collateral Agent or any Lender on which a Credit Party may in any way be liable; (ii) notice before taking possession or control of any Collateral; (iii) any bond or security that might be required by a court before allowing Administrative Agent, the Collateral Agent or the Lender to exercise any rights or remedies under this Agreement or the other Loan Documents; (iv) any claim against the Administrative Agent, the Collateral Agent or any Lender on any theory of liability, for special, indirect, consequential, exemplary, or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, this Agreement or the other Loan Documents, or transactions relating hereto or thereto; (v) notice of acceptance hereof; (vi) all rights to interpose any claims, deductions, setoffs, or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the other Loan Documents, the Obligations, the Collateral, or any matter arising therefrom or relating hereto or thereto; and (vii) any claim under any law or equitable principle requiring the Administrative Agent, the Collateral Agent or any Lender to marshal any assets in favor of any Credit Party or against any Obligations or otherwise attempt to realize upon any Collateral or collateral of any Guarantor, or any appraisement, evaluation, stay, extension, homestead, redemption, or exemption laws now or hereafter in force to prevent or hinder the enforcement of this Agreement.  The Borrower acknowledges that the foregoing waivers are a material inducement to the Administrative Agent, the Collateral Agent and the Lenders' entering into this Agreement and that the Administrative Agent, the Collateral Agent and the Lenders are relying upon the foregoing in their dealings with the Borrower.

(d)    Acknowledgement of Waivers.  The Borrower has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

17.18   Limitation on Liability; Presumptions.  None of the Administrative Agent, the Collateral Agent nor the Lenders shall have any liability to the Borrower (whether in tort, contract, equity, or otherwise) for losses suffered by such Person in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission, or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Administrative Agent, the Collateral Agent or Lender that the losses were the result of acts or omissions constituting gross negligence or willful misconduct.  In any such litigation, each of Administrative Agent, the Collateral Agent and the Lenders shall be entitled to the benefit of the rebuttable presumption that it acted in good faith and with the exercise of ordinary and reasonable care in the performance by it of the terms of this Agreement and the other Loan Documents.

17.19 PATRIOT Act Notice. The Administrative Agent, the Collateral Agent and the Lenders hereby notify the Borrower that pursuant to the requirements of the PATRIOT Act, the Administrative Agent, the Collateral Agent and the Lenders are required to obtain, verify, and record information that identifies the Borrower, including its legal name, address, tax ID number, and other information that will allow the Administrative Agent, the Collateral Agent and the Lenders to identify it in accordance with the PATRIOT Act. The Administrative Agent, the Collateral Agent and the Lenders will also require information regarding each Guarantor, if any, and may require information regarding the Borrower's management and owners, such as legal names, addresses, social security numbers, and dates of birth.

17.20 Powers. All powers of attorney granted to the Administrative Agent, the Collateral Agent or any Lender herein or in any other Loan Document are coupled with an interest and are irrevocable.

17.21 No Tax Advice. The Borrower acknowledges and agrees that, with respect to all tax and accounting matters relating to this Agreement, the other Loan Documents, or the transactions contemplated herein and therein, it has not relied on any representations made, consultation provided by, or advice given or rendered by any Agent or any Lender, or any of their representatives, agents, or employees, and, instead, the Borrower has sought, and relied upon, the advice of its own tax and accounting professionals with respect to all such matters.

17.22 Survival of Representations and Warranties, etc.

(a) All representations and warranties made by any Credit Party under this Agreement and the other Loan Documents shall survive, and not be waived by, the execution of this Agreement or any other Loan Document by any Agent or any Lender; any investigation or inquiry by any Agent, or any Lender; or the making of any Loan under this Agreement.

(b) Without limiting the generality of the foregoing clause (a), all of the representations, warranties, covenants, and indemnities of Section 8.11 shall survive the termination of this Agreement, Payment in Full of the Obligations, and the release of Collateral Agent's Lien on the Borrower or any Subsidiaries' Properties, if any, and shall survive the transfer of any or all right, title, and interest in and to such Properties by such Persons, whether or not the transferee thereof is an Affiliate of such Persons.

(c) The Borrower understands and acknowledges that the Agents and the Lenders are entering into this Agreement in reliance upon, and in partial consideration for, the acknowledgments in this Section and the representations in this Agreement, and agrees that such reliance is reasonable and appropriate.

17.23 Time is of the Essence. Time is of the essence of this Agreement and the other the Loan Documents.

17.24 Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

17.25 Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and, each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the FDIC under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a) In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b) As used in this Section 17.25, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**[END OF DOCUMENT]**

# EXHIBIT 2

**Execution Version**

# FORBEARANCE, WAIVER AND AMENDMENT AGREEMENT

**Dated November 17, 2023**
**by and among**

**TOUCHSTONE PISTACHIO COMPANY, LLC**
**As the Borrower**

**The undersigned GUARANTORS,**

**U.S. BANK NATIONAL ASSOCIATION**
**As Administrative Agent and Collateral Agent,**

**and**

**The undersigned LENDERS**

**relating to**

**The Credit Agreement and other Loan Documents among the Parties**

# TABLE OF CONTENTS

1. Adoption of Recitals; Definitions ..... 5

2. Loan Documents Remain in Effect ..... 6

3. General Acknowledgments ..... 6

4. Payments. ..... 7

5. Conditions Precedent; Effective Date ..... 7

6. Agreement to Forbear; Limits on Forbearance. ..... 8

7. Effect of Termination of Forbearance Period ..... 9

8. Capital Infusion ..... 9

9. Forbearance Milestones. ..... 9

10. Conditions for Waiver of Acknowledged Defaults and Release of Certain Collateral. ..... 10

11. Waiver of Default Interest ..... 10

12. Amendments, Deletions and Additions To Specific Provisions of the Credit Agreement. ..... 10

13. Limitations on Borrowing. ..... 12

14. Payment of Grower Payables. ..... 13

15. Financial and Other Reporting ..... 13

16. Bankruptcy and Relief from Stay ..... 15

17. Covenants ..... 16

18. General Release. ..... 18

19. Representations and Warranties ..... 19

20. Ratification of Loan Documents ..... 20

21. Notices ..... 20

22. Indemnity. ..... 20

23. Further Assurances ..... 21

24. Forbearance Events of Default....21

25. No Duress or Reliance....22

26. No Further Commitment to Extend, Restructure or Forbear....22

27. Dispute Resolution....22

28. Loan Parties' Understanding....23

29. Entire Agreement; Modification; Additional Provisions....23

30. USA Patriot Act Notice....24

31. Interpretation....24

32. Document Imaging....24

33. Attorneys' and Advisor's Fees....24

34. No Further Commitment to Extend, Restructure or Forbear....25

35. Reaffirmation of Guaranties....25

36. Entire Agreement....25

37. Counterpart Signatures....25

**THIS FORBEARANCE, WAIVER AND AMENDMENT AGREEMENT** (this "**Agreement**") is made by and among the following (each, a "**Party**" and together, the "**Parties**"): TOUCHSTONE PISTACHIO COMPANY, LLC, a California limited liability company ("**Borrower**"), the **Guarantors** (as defined below), the **Lenders** (as defined below), and U.S. BANK NATIONAL ASSOCIATION (as successor in interest to MUFG Union Bank, N.A.), as administrative agent and collateral agent (in such capacities, the "**Agent**") for the Lenders under the Credit Agreement (as defined below), and is made as of November 17, 2023 (the "**Agreement Date**"). Capitalized terms used herein and not otherwise defined are used as defined in the Credit Agreement.

## RECITALS

**A.** Borrower is party to that certain Credit Agreement dated as of March 20, 2020 (as amended by that certain Amendment No. 1 to Credit Agreement dated as of July 10, 2020, that certain Amendment No. 2 to Credit Agreement dated as of October 20, 2020, that certain Amendment No. 3 to Credit Agreement dated as of December 14, 2020, that certain Amendment No. 4 to Credit Agreement dated as of May 31, 2021, supplemented by that certain Limited Waiver and Consent dated as of July 26, 2021 (the "**First Waiver**"), amended by that certain Amendment No. 5 to Credit Agreement dated as of December 29, 2021, supplemented by that certain Second Limited Waiver and Consent dated as of March 15, 2022 (the "**Second Waiver**", and together with the First Waiver, the "**Waivers**"), and as further amended by that certain Amendment No. 6 to Credit Agreement dated as of October 6, 2022 (as so amended and supplemented, the "**Credit Agreement**")), by and among Borrower, the financial institutions or entities from time to time party thereto as lenders (the "**Lenders**"), the Swingline Lender, the Administrative Agent and Agent, as collateral agent (in such capacity, "**Collateral Agent**" and together with the Administrative Agent, the "**Agent**") for the Lenders, pursuant to which the Lenders made loans to Borrower (the "**Loans**").

**B.** As security for all Secured Obligations, Borrower executed and delivered to the Collateral Agent a Security Agreement dated as of March 20, 2020 (the "**Security Agreement**"), granting to the Lenders a security interest in the Collateral (as defined in the Security Agreement).

**C.** Without Agent's required consent, Borrower entered into (i) that certain Unsecured Multiple Advance Promissory Note, dated as of May 3, 2023 (the "**Maricopa Note**") in the principal amount of $50,000,000.00 made by Borrower in favor of Maricopa Orchards, LLC, a California limited liability company ("**Maricopa**"); (ii) that certain Construction Loan Agreement, dated as of May 3, 2023 (the "**Construction Loan Agreement**"), by and among Borrower, as construction lender, G & G Andrew Farms, L.P., a California limited partnership ("**G&G**") and Dry Ranch, LLC, a California limited liability company ("**Dry Ranch**", and together with G&G, the "**Dry Ranch Borrowers**"), each, as borrower; (iii) that certain Multiple Advance Promissory Note Secured by Deed of Trust, dated May 3, 2023 (the "**Construction Loan Note**") in the principal amount of $80,916,786.00 made by the Dry Ranch Borrowers, as borrowers, in favor of Borrower, as lender; (iv) that certain Assignment of Loan Documents and Purchase Agreement, dated as of May 4, 2023 (the "**Assignment**"), by and among Maricopa, Borrower and the other parties party thereto in favor of The Prudential Insurance Company of America, a New Jersey corporation ("**Prudential**"); (v) that certain Deed of Trust with Assignment of Rents dated May 3, 2023 (the "**Construction Loan Deed of Trust**", and together with the Construction Loan Agreement, the Construction Loan Note and any and all other documents executed by Dry Ranch

and/or Borrower in connection with the foregoing, the "**Construction Loan Documents**") executed by Dry Ranch for the benefit of Borrower; (vi) that certain Purchase and Sale Agreement dated November 10, 2022, (as amended, the "**Dry Ranch Purchase Agreement**"), by and among Borrower, Dry Ranch and G&G.

**D.** The transactions described in Recital C were entered to help Borrower purchase and finance construction of a new pistachio-processing plant referred to as "**Project X**." Borrower is currently engaged in a follow-on financing transaction with Prudential (the "**Prudential Financing**") to obtain funds to repay the Equipment Term Loan and the Construction Loan Note in full, close the Dry Ranch Purchase Agreement, and complete construction of Project X.

**E.** Borrower is also party to (i) that certain Subordinated Promissory Note, dated as of August 31, 2022 and effective as of August 1, 2022 (the "**AGI Note**") by Borrower, as borrower, in favor of Assemi Group, Inc., a California corporation ("**AGI**"), as subordinated lender and (ii) that certain AGI Subordination Agreement, dated as of October 6, 2022 (the "**AGI Subordination Agreement**"), by AGI, as subordinated creditor, in favor of the Administrative Agent and Collateral Agent for the benefit of the Lenders, and consented to by Borrower, as debtor.

**F.** Borrower and the entities signing this Agreement as "Guarantors" (collectively, the "**Guarantors**") entered into that certain Continuing Guaranty dated as of March 20, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "**Guaranty**" and together with the Credit Agreement, the Notes, the Security Agreement and any other reports, documents, instruments, agreements, certificates, and schedules executed or delivered pursuant to or in connection with the Credit Agreement, the "**Loan Documents**"), between the Guarantors and the Agent, whereby each Guarantor jointly and severally guaranteed the full and punctual payment of all Secured Obligations. Certain of the Guarantors became Guarantors pursuant to that certain Joinder Agreement (Guaranty) dated as of May 5, 2023 under which they joined and became subject to the Guaranty as if they had signed it as of March 20, 2020.

**G.** In addition to the Events of Default addressed by the Waivers, the following additional Events of Default have occurred and are continuing under Section 12.1(c) of the Credit Agreement, including without limitation, due to the following (collectively, the "**Section 12.1(c) Defaults**"):

- Failure of certain Guarantors to comply with Section 10.2(d) of the Credit Agreement resulting from such Guarantors' late delivery on July 12, 2023 of the statements of financial condition with respect to such Guarantors, which delivery occurred after the June 30, 2023 delivery deadline required by such Section 10.2(d).

- Borrower's failure to timely deliver a Borrowing Base Certificate for the months ending on March 31, 2023 and April 30, 2023, in violation of Section 10.2(h) of the Credit Agreement.

- Borrower's failure to comply with Section 10.2(j) of the Credit Agreement resulting from Borrower's late delivery on March 9, 2023 of the Collateral Disclosure Certificate, which delivery

occurred after the January 31, 2023 delivery deadline required by such Section 10.2(j).

- Borrower's failure to comply with Section 10.2(a) and Section 10.2(e) of the Credit Agreement resulting from Borrower's late delivery on August 15, 2023 of the financial statements for the quarter ended June 30, 2023 and related Compliance Certificate, which delivery occurred after the August 14, 2023 delivery deadline required by such Section 10.2(a) and Section 10.2(e).

- Borrower's failure to timely deliver the audited financial statements required by Section 10.2(b) of the Credit Agreement for the fiscal year ending on December 31, 2022.

- Borrower's failure to comply with Section 10.14(a) of the Credit Agreement resulting from Borrower and its Subsidiaries not achieving, on a consolidated basis, a net profit after taxes (including any Tax Distributions) of not less than one dollar ($1.00) for each of 2021 and 2022.

- Borrower's failure to comply with the requirement under Section 10.14(b) of the Credit Agreement to maintain a ratio of Cash Flow to Debt Service of not less than 1.25:1.00, measured as of the close of each fiscal year of Borrower, for the fiscal year ending on December 31, 2022.

- Borrower's failure to comply with Section 10.7 of the Credit Agreement resulting from Borrower's execution of the Construction Loan Documents, pursuant to which Borrower agreed to make loans from time to time to the Dry Ranch Borrowers.

- Borrower's failure to comply with Section 10.10(j) of the Credit Agreement resulting from Borrower's execution of the Maricopa Note, pursuant to which Borrower agreed to incur loans from time to time from Maricopa in the maximum principal amount of $50,000,000.00, which exceeds the $1,000,000.00 aggregate limit set forth in such Section 10.10(j).

- Borrower's failure to comply with Section 10.10(j) of the Credit Agreement resulting from the incurrence by Borrower of loans made by AGI in the amount of $2,730,536.00, which exceeds the $1,000,000.00 aggregate limit set forth in such Section 10.10(j) and which does not constitute permitted AGI Subordinated Debt.

- Borrower's failure to comply with Section 10.14(c) of the Credit Agreement resulting from its failure to maintain a Balance Sheet Leverage Ratio less than or equal to that required pursuant to Section

10.14(c) of the Credit Agreement for the fiscal quarter ended September 30, 2023.

**H.** Certain Defaults and Events of Default have also occurred and are continuing under Section 12.1(d) of the Credit Agreement, including without limitation, due to the following (collectively, the "**Section 12.1(d) Defaults**):

- Borrower's payment of at least $4,081,695.52 in principal and interest to AGI under the AGI Note during the occurrence and the continuance of an Event of Default under the Credit Agreement, in violation of Section 4 of the AGI Subordination Agreement.

- Borrower's removal of certain Eligible Equipment and relocation of such Eligible Equipment onto real property owned by the Dry Ranch Borrowers outside the ordinary course of business and without obtaining the prior written consent of the Collateral Agent, in violation of Section 4(f) of the Security Agreement.

- Borrower's failure to comply with Section 10.4 of the Credit Agreement and Section 4(e) of the Security Agreement due to Touchstone's relocation of Eligible Equipment onto real property owned by the Dry Ranch Borrowers, and, consequently, Borrower's failure to keep all of its insurable property (including without limitation such Eligible Equipment) fully insured by financially sound and reputable insurance companies without interruption.

- Borrower's assignment of its rights under the Construction Loan Documents without obtaining the prior written consent of the Collateral Agent, in violation of Section 4(f) of the Security Agreement.

- Borrower's delivery of a Borrowing Base Certificate for May 2023 that failed to account for applicable collateral exclusions, and Borrower's resulting Borrowings under the Revolving Loan exceeding the maximum loan amount available pursuant to the Borrowing Base, in violation of the Credit Agreement.

- Borrower's payment of $3,187,853 to Maricopa Orchards, LLC and other affiliated growers (collectively, "**Affiliated Growers**") in July 2023 during the occurrence and the continuance of an Event of Default under the Credit Agreement, in violation of the Amended and Restated Grower Subordination Agreement dated October 6, 2022 by and among Touchstone, the Affiliated Growers and the other parties thereto, for the benefit of Agent and Lenders (the "**Grower Subordination Agreement**").

- Borrower's payment of $6,000,000 to the Affiliated Growers in September 2023 during the occurrence and the continuance of an Event of Default under the Credit Agreement, in violation of the Grower Subordination Agreement.

**I.** An Event of Default has also occurred and is continuing under Section 12.1(j) of the Credit Agreement due to events of defaults existing under the Crop Line Credit Agreement that enable the lender thereunder to accelerate the maturity thereof or terminate its commitment before its normal expiration (the "**Section 12.1(j) Default**"), and together with the Section 12.1(c) Defaults and the Section 12.1(d) Defaults, the "**Specified Defaults**").

**J.** Borrower failed to notify Agent of the Specified Defaults in each subsequent Compliance Certificate, Notice of Borrowing and other Loan Document delivered to Agent, which failures were and are additional continuing Events of Default under Section 12.1(c) of the Credit Agreement (such Events of Default, collectively, the "**Related Specified Defaults**").

**K.** Borrower failed to timely deliver notice of the Specified Defaults and the Related Specified Defaults as required by Section 10.1(c) of the Credit Agreement, which was an additional Event of Default under Section 12.1(c) of the Credit Agreement (such additional Event of Default, collectively with the Specified Defaults and the Related Specified Defaults, the "**Acknowledged Defaults**").

**L.** Borrower and the Guarantors have asked the Agent to forbear from exercising its legal remedies under the Loan Documents and otherwise arising from the Acknowledged Defaults, and the Agent is willing to so forbear on the terms and conditions set forth in this Agreement, while otherwise retaining and reserving its rights and remedies under the Loan Documents.

**NOW, THEREFORE**, in consideration of the representations and promises in this Agreement, the undersigned stipulate and agree as follows:

## AGREEMENT

### A. ARTICLE A: CERTAIN GENERAL TERMS.

1. **Adoption of Recitals; Definitions.** The foregoing recitals are incorporated by reference, are affirmed as true and accurate by the undersigned, and are deemed by the undersigned to constitute a material basis for this Agreement. Various capitalized terms are defined in the Recitals and body of this Agreement. Capitalized terms that are not otherwise defined in this Agreement shall have the meanings set forth in the Loan Documents, which definitions are incorporated by reference into this Agreement. In addition, the following terms are defined as herein set forth:

1.1 "**Closing**" means the execution and delivery of this Agreement by all Parties, payment of the Closing Payments (defined below) and satisfaction of all other conditions precedent set forth in Section 5 of this Agreement.

1.2 "**Closing Payments**" means the following payments to Agent, due on or before Closing: (i) a $25,000 Agent fee; (ii) an amendment fee equal to 15 basis points of the aggregate Commitments, which shall be shared among the Lenders that affirmatively consent to this Agreement pro-rata based on their Commitments; (iii) reimbursement for the cost of equipment and real estate appraisals obtained by Agent; and (iv) all of Agent's fees, expenses and costs incurred to date of Closing in connection with the Acknowledged Defaults, including legal fees and financial advisory fees incurred in negotiating and documenting this Agreement, the earlier Term Sheet, and related agreements and in connection with the collateral releases,

intercreditor agreement and other matters related to the Prudential Financing and Equipment Loan Payoff, in each case under this clause (iv), to the extent invoiced to Borrower at least one (1) Business Day prior to Closing.

1.3 **"Effective Date"** is defined in Section 5 below.

1.4 **"Equipment Term Loan Payoff"** means payment in full of (i) the Equipment Term Loan, (ii) any then-outstanding Overadvance of the Revolving Loan, and (iii) all of Agent's unreimbursed fees of counsel, financial advisors and other professional advisors incurred in connection with the Agent's negotiation and preparation of this Agreement, the Agent's administration and oversight contemplated by this Agreement, and the Agent's enforcement of this Agreement or other Loan Documents.

1.5 **"Financial Consultant"** means RPA Advisors, LLC or a replacement acceptable to the Agent as Borrower's financial consultant.

**2.** **Loan Documents Remain in Effect**. All Loan Documents shall remain in full force and effect and enforceable in accordance with their terms, except as expressly modified by this Agreement. In the event of a conflict or inconsistency between this Agreement and the Loan Documents, this Agreement shall control.

**3.** **General Acknowledgments**. Borrower and each Guarantor (together, the **"Loan Parties"**) confirm and acknowledge the following:

3.1 On October 26, 2023, the unpaid principal balance owing under the Revolving Note was $30,783,149.04 and the unpaid principal balance owing under the Equipment Term Note was $82,499,999.48. The foregoing amounts do not include interest, fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Credit Agreement and other Loan Documents.

3.2 The Loan Parties waive the right, if any, to receive further notice from Agent of the Acknowledged Defaults. Any grace periods applicable to the cure of the Acknowledged Defaults have expired or are hereby waived by the Loan Parties.

3.3 The Loan Parties agree that as a result of the Acknowledged Defaults, Agent is entitled to demand immediate payment in full of all obligations owing under the Credit Agreement, Guaranty and other Loan Documents, and to exercise various rights and remedies pursuant to the Loan Documents and applicable law, and that the Loan Parties have no offsets, defenses, deductions or counterclaims of any kind or character whatsoever to enforcement of those rights and remedies.

3.4 Agent has, and shall continue to have, valid, enforceable and perfected first priority liens upon and security interests in the Collateral (subject only to the Permitted Liens).

3.5 Agent's acceptance of any payment or performance by the Borrower, whether pursuant to the Loan Documents, this Agreement or otherwise, shall not constitute a waiver of the Acknowledged Defaults, any other defaults or of any rights or remedies available to Agent under the Loan Documents or applicable law, except as expressly provided herein.

3.6     No delay on the part of Agent in the exercise of any power, right or remedy available to it under this Agreement, the Loan Documents or applicable law at any time shall operate as a course of dealing or waiver thereof, and no partial exercise by Agent of any power, right or remedy shall preclude other or further exercise of such powers, rights and remedies.

3.7     The consideration the Loan Parties receive from Agent under this Agreement constitutes fair and reasonable value in exchange for the execution, delivery and performance of the Loan Parties' obligations under this Agreement (including the payment of any fees) and that such consideration will provide substantial benefit to the Borrower.

**4.     Payments.**

4.1     Borrower shall continue to make all payments required under the Revolving Loans.

4.2     In consideration of the forbearance granted hereunder, Borrower shall pay a $500,000 fee, which is deemed fully earned upon Closing indefeasibly, but shall not be due until November 30, 2023; provided, that such fee shall be forgiven if, on or before November 30, 2023, Agent receives the Equipment Loan Payoff, and the Dry Ranch Purchase Agreement closes. This fee shall be shared among the Lenders that affirmatively consent to this Agreement pro-rata based on their Commitments.

4.3     Borrower shall pay all other fees, costs, expenses as and when due under the Loan Documents and this Agreement.

**5.     Conditions Precedent; Effective Date**. This Agreement shall be effective only on the date upon which all of the following conditions precedent have been satisfied or waived in writing by Agent in Agent's sole discretion (the date on which the last of the conditions and requirements in this Section has been satisfied or waived in writing by Agent is the "**Effective Date**" of this Agreement):

5.1     All Parties have executed and delivered this Agreement to one-another;

5.2     Loan Parties have taken any and all actions and executed and delivered to Agent any and all documents necessary or appropriate in Agent's sole discretion to effectuate this Agreement;

5.3     Borrower has paid all Closing Payments to Agent;

5.4     Borrower has delivered to Agent a full comprehensive list of all deposit accounts and securities accounts, including the account numbers and a certification by one of Borrower's Senior Officers that the list is accurate and up to date;

5.5     No Default or Event of Default has occurred or is continuing under the Loan Documents (other than the Acknowledged Defaults);

5.6 A Senior Officer of the Borrower has executed and delivered to Agent a Solvency Certificate confirming Borrower's solvency and a Financial Covenant Compliance Certificate certifying Borrower's compliance with the financial covenants in the Credit Agreement, (except it will show Borrower's failure to comply with Section 10.14(c) of the Credit Agreement), in each case, in form reasonably satisfactory to Agent;

5.7 Each Guarantor that is a trust has executed and delivered to Agent current updated trust certificates dated not earlier than October 29, 2023 and all Guarantors have signed an Amendment to Guaranty in form and substance acceptable to Agent; and

5.8 Borrower has closed all bank and securities accounts with any institution other than Agent and moved the funds from those accounts to its accounts with Agent or, for any non-U.S. Bank account with less than $1,000, instructed the applicable deposit bank(s) to close such account and issue a check with the balance for prompt deposit into an account at U.S. Bank.

## B. ARTICLE B FORBEARANCE AND CONDITIONAL WAIVER TERMS.

**The following provisions describe Agent's agreement to temporarily forbear the enforcement of its rights and remedies for the Acknowledged Defaults and to waive those defaults if specified conditions are met.**

### 6. Agreement to Forbear; Limits on Forbearance.

6.1 Subject to the terms and conditions set forth herein, effective as of the Effective Date, Agent agrees to forbear from exercising its default-related rights or remedies under the Loan Documents and applicable law that arise exclusively from the Acknowledged Defaults from the Effective Date until the earliest to occur of the following (each a "**Forbearance Termination Event**," and the time period between the Effective Date and the date on which a Forbearance Termination Event occurs being the "**Forbearance Period**"):

6.1.1 a Forbearance Event of Default (defined in Section 24 below) occurs or is continuing under this Agreement. For the avoidance of doubt, this includes a Forbearance Event of Default under any provision of this Agreement, not just those in this ARTICLE B of this Agreement;

6.1.2 waiver by Agent of the Acknowledged Defaults in writing pursuant to Section 10 of this Agreement (in which case further forbearance with respect to such defaults will become moot); or

6.1.3 December 31, 2023.

6.2 The Borrower acknowledges and agrees that Agent's agreement herein to forbear from exercising its rights and remedies as described in this Agreement does not relate or extend to any actions that Agent may take under the Loan Documents or applicable law regarding the administration of the Credit Agreement or the protection, preservation or perfection of Agent's interest in the Collateral.

6.3 Agent's agreement to forbear is for the limited purpose set forth herein, shall be limited to the precise meaning of the words as written herein, and shall not be deemed to (i) be a consent to any waiver or modification of any term or condition of the Loan Documents, or (ii) prejudice any right or remedy that Agent may now have or may have in the future under or in connection with the Loan Documents, except as expressly provided herein. The Borrower acknowledges that Agent has no obligation to extend the Forbearance Period, or to grant any other forbearance.

6.4 Nothing herein shall restrict, impair or otherwise affect Agent's rights and remedies under any agreements containing subordination provisions in favor of Agent (including, without limitation, any rights or remedies available to the Agent as a result of the occurrence or continuation of any of the Acknowledged Defaults or any other Event of Default or Forbearance Event of Default) or amend or modify any provision thereof.

**7. Effect of Termination of Forbearance Period**. Upon the occurrence of a Forbearance Termination Event (other than in connection with Agent's waiver of the Acknowledged Defaults pursuant to Section 10 of this Agreement), Agent shall be entitled to immediately and unconditionally exercise any and all rights and remedies available under this Agreement, the Loan Documents, any other agreement between the Borrower and Agent, or at law or in equity, in each case without demand, presentment, protest or further notice to the Borrower of any kind, all of which the Borrower hereby waives. Nothing in this Agreement limits the right of Agent at any time on or after the occurrence of a Forbearance Termination Event to foreclose on any Collateral.

**8. Capital Infusion**. Borrower represents that since October 12, 2023 it has received capital contributions totaling approximately $17,500,000 from its equity owners Farid Assemi, as Trustee of the Farid Assemi Revocable Trust, Darius Assemi, as Trustee of the Amended and Restated Darius Assemi Revocable Trust and Farshid and Sonia Rosemary Assemi, as Co-Trustees of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust (the "Capital Infusion").

**9. Forbearance Milestones.** Borrower must meet the following Milestones by the deadline dates listed below, with time being of the essence and no grace or cure period:

| ***Deadline*** | ***Forbearance Milestone*** |
|---|---|
| 1. Prior to Closing | Borrower must (a) close all non-U.S. Bank accounts and transfer the funds from them into its accounts at U.S. Bank (or, for any non-U.S. Bank account with less than $1,000, instructed the applicable deposit bank(s) to close such account and issue a check with the balance for prompt deposit into an account at U.S. Bank); and (b) deliver to Agent a certification, signed by a Senior Officer of the Borrower, confirming compliance with this milestone. |
| 2. Ongoing upon Receipt by Borrower | Borrower must promptly deliver to Agent all drafts of any Prudential Financing Term Sheet (including drafts reflecting material changes from prior provided drafts) and the final Prudential Term Sheet |

| *Deadline* | *Forbearance Milestone* |
|---|---|
| | demonstrating new money from Prudential sufficient to repay the balance of the Equipment Term Loan. |
| 3. Five business days after Closing | Borrower must deliver to Agent a monthly 2024 cash flow forecast with a Borrowing Base forecast acceptable to Agent |
| 4. 11/30/23 | Deadline to close the Project X purchase and Equipment Loan Payoff |

10. **Conditions for Waiver of Acknowledged Defaults and Release of Certain Collateral.** Upon and subject to receipt of the Equipment Loan Payoff, and provided that Borrower has met all other Forbearance Milestones, and is otherwise in compliance with this Agreement and the Loan Documents, Agent, with authorization from the Lenders (such authorization being evidenced by the execution and delivery of this Agreement), hereby agrees to waive the Acknowledged Defaults and release its existing security interests in and liens on Borrower's equipment and real property. For the avoidance of doubt, Agent will retain its perfected first priority security interest in Borrower's accounts, inventory and all other personal property other than equipment (the "Touchstone Collateral"). If requested by Prudential, Agent will enter an intercreditor agreement with Prudential on terms acceptable to Agent and the Required Lenders in its reasonable discretion, memorializing Agent's and Prudential's respective collateral priorities and rights in Touchstone's assets.

**11. Waiver of Default Interest**. Effective on waiver of the Acknowledged Defaults, Agent and the Lenders waive Borrower's obligation to pay interest on the Loans at the Default Rate, to the extent it would otherwise apply as a consequence of the Acknowledged Defaults.

## C. ARTICLE C: ADDITIONAL TERMS AMENDING AND SUPPLEMENTING THE LOAN DOCUMENTS.

**The following provisions amend and/or supplement the Loan Documents. Except as otherwise provided, these provisions apply not only during the Forbearance Period, but thereafter until Payment in Full of the Obligations and termination of the Commitments.**

**12. Amendments, Deletions and Additions To Specific Provisions of the Credit Agreement.**

12.1 The definition of "Applicable Margin" in Section 1 of the Credit Agreement is hereby amended and restated in its entirety to read as follows: ""Applicable Margin" means as to (a) any Revolving Loan, or portion thereof, that is a Daily Floating SOFR Loan, 3.5%, (b) any Revolving Loan, or portion thereof, that is a Reference Rate Loan, 2.5%, (c) any portion of the Term Loan that is a Term SOFR Loan, 3.75% to and including November 30, 2023 and 6.75% thereafter, and (d) any portion of the Term Loan that is a Reference Rate Loan, 2.75% to and including November 30, 2023 and 5.75% thereafter."

12.2 The definition of "Borrowing Base Certificate" in Section 1 of the Credit Agreement is hereby amended and restated in its entirety to read as follows: ""Borrowing Base Certificate" means a borrowing base certificate signed and certified by a Senior Officer of the

Borrower, including the information on Exhibit F with supporting worksheets, in form and substance acceptable to Administrative Agent from time to time in its discretion."

12.3 The definition of "Equipment Term Loan Maturity Date" in Section 1 of the Credit Agreement is hereby amended and restated in its entirety to read as follows: ""Equipment Term Loan Maturity Date" means November 30, 2023."

12.4 The definition of "Eligible Inventory" in Section 1 of the Credit Agreement is hereby amended to add the following clause to the end of subparagraph (k): "or which is stored in any location not covered by blanket property insurance reasonably acceptable to Agent."

12.5 Section 2.1(a) of the Credit Agreement is hereby amended and restated in its entirety to read as follows: "Revolving Loans. Subject to the terms and conditions of this Agreement, each Revolving Lender agrees to make Revolving Loans to the Borrower from time to time on any Business Day from the Effective Date hereof to the Revolving Commitment Termination Date in an aggregate principal amount that will not result in (i) such Revolving Lender's Revolving Credit Exposure exceeding 80% of such Revolving Lender's Revolving Commitment or (ii) the Total Revolving Exposure exceeding the lesser of (A) 80% of the Borrowing Base and (B) 80% of the aggregate Revolving Commitments of all Revolving Lenders. Subject to the terms and conditions of this Agreement, the Revolving Loans may be repaid and reborrowed."

12.6 Exhibit F to the Credit Agreement is amended and restated in its entirety to read as set forth on Exhibit 1 hereto.

12.7 Section 2.3(b) of the Credit Agreement regarding the Real Estate Term Loan is deleted.

12.8 Section 5.2(c) of the Credit Agreement is hereby amended and restated in its entirety to read as follows: "Any amount by which of the Total Revolving Exposure exceeds the lesser of 80% of the Borrowing Base and 80% of the Revolving Commitments (an "Overadvance") shall (A) be due and payable by wire or other electronic funds transfer initiated by 2:00 p.m. Pacific Time on the next Business Day after delivery of a Borrowing Base Certificate showing such Overadvance, without any requirement of notice or demand from the Administrative Agent and, once paid to the Administrative Agent, shall be applied, first, to the payment of any Swingline Loans; second, to all other Revolving Loans which are Reference Rate Loans; and third to Revolving Loans which are Daily Floating SOFR Loans; (B) constitute Obligations secured by the Collateral; and (C) be entitled to all benefits of the Loan Documents."

12.9 Section 10.2(a) is hereby amended and restated in its entirety to read as follows: "As soon as practicable, and in any event within thirty (30) days after the end of each fiscal month (except within sixty (60) days after the last fiscal month in the fiscal year), the consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month and the related consolidated and consolidating statements of income and cash flows for such fiscal month, all in reasonable detail (together, the "Financial Statements"). In addition, within sixty (60) days after the end of Borrower's fiscal year, Borrower shall deliver its annual Financial Statements for such year. The monthly and the annual Financial Statements shall be certified by a Senior Officer of the Borrower as fairly presenting the financial condition and

results of operations of the Borrower and its Subsidiaries in accordance with GAAP (other than footnote disclosures), consistently applied, as at such date and for such periods, subject only to Borrower's customary year-end accruals and audit adjustments."

12.10   Section 10.2(h) of the Credit Agreement is hereby amended and restated in its entirety to read as follows: "Semi-monthly Borrowing Base Certificates, delivered in respect of the 15th and last day of each fiscal month, accurately reporting the amounts of the Borrower's Accounts, Eligible Accounts, Ineligible Accounts, Inventory and Eligible Inventory as of the Certificate date, signed by a Senior Officer of the Borrower, together with a copy of Borrower's detailed accounts receivable aging report and accounts payable report in each case in a form reasonably acceptable to the Administrative Agent. Borrowing Base Certificates dated as of 15th day of each month shall be delivered to Agent within four Business Days after that day, by 5:00 p.m. Pacific Time. Borrowing Base Certificates dated as of last day of each month shall be delivered to Agent within fifteen days of that day, by 5:00 p.m. Pacific Time. Each month-end Borrowing Base Certificate shall include a reconciliation to the prior Borrowing Base Certificate and tie-in to the concurrent monthly financial statement."

12.11   A new covenant is added as Section 10.2(m) to the Credit Agreement as follows:   "Concurrently with the delivery of the monthly and annual Financial Statements, Borrower and each Guarantor shall deliver a Liquidity Certificate detailing: (i) his/her/its cash and cash equivalents' and (ii) all lines of credit maintained by him/her/it (identifying the associated lenders and the outstanding balances on such lines of credit). The Borrower's Liquidity Certificate shall be certified by a Senior Officer;  Guarantors' Liquidity Certificates shall be certified, as applicable, by an authorized officer or trustee or by the individual Guarantor."

12.12   A new covenant is added as Section 10.14(d) to the Credit Agreement as follows: "Borrower must maintain at all times greater than 20% Borrowing Base Availability (as set forth on the Borrowing Base Certificate) measured as of each semimonthly Borrowing Base Certificate."

12.13   Section 12.1(h) to the Credit Agreement is hereby amended and restated in its entirety to read as follows: "any event of default by the Borrower or any other Loan Party (including Guarantors) in the payment of any indebtedness to any third party in excess of $100,000.00 after the expiration of any applicable grace period; or".

12.14   Section 12.1(i) to the Credit Agreement is hereby amended and restated in its entirety to read as follows: "the issuance by a court or any other adjudicator of competent jurisdiction of a final non-appealable order, ruling, or adjudication against TPC, any Guarantor, or any Assemi entity in favor of The Wonderful Company or any affiliate that could reasonably be expected to have a Material Adverse Effect; or".

**13.   Limitations on Borrowing.**   Borrower's right to make Borrowings on the Revolving Loan remains subject to existing limitations and conditions in the Loan Documents and this Agreement (other than the absence of the Acknowledged Defaults) and to the following additional limitations:

13.1   Cash hoarding limitation.   At any time that Borrower's aggregate amount of cash and Cash Equivalents exceeds $5,000,000.00 (excluding the amount of outstanding checks

as reported to the Agent), Borrower must initiate payment of such excess amount to Agent within one Business Day after it arises, to be applied to the Revolving Loan. Borrower may not make Borrowings on the Revolving Loan until such excess amount is paid.

13.2 Reduction in Borrowing. Borrowings are reduced as set forth in the foregoing amendment to Section 2.1(a) of the Credit Agreement. Correspondingly, Borrower's new borrowings will be limited to the "Excess Availability" set forth on the Borrowing Base Certificate (Line 21 of amended Exhibit F to the Credit Agreement).

13.3 Limitation on use of Borrowings. In addition to any other limitations on use of Borrowings in the Credit Agreement, Borrower may not use Borrowings on the Revolving Loan to pay (i) Project X (defined above) closing costs, (ii) Project X construction capital expenses or (iii) any other capital expenses, except maintenance capital expenses not to exceed: (a) the pro-rated portion of a $3,000,000 annual limit for the period between the Effective Date and 12/31/2023 and (b) $3,000,000 per year for 2024 and subsequent years. On and after the Effective Date, Borrower may use Borrowings on the Revolving Loan to reimburse its equity owners for any portion of the Capital Infusion that has been used to fund payment of Borrower's operating expenses, including, without limitation, non-Affiliated Grower payables (but not capital expenses), as of the date of such reimbursement (the "**Reimbursement Amount**"). For the avoidance of doubt, payment of the Reimbursement Amount may be in the form of a distribution or return of capital. All of the above maximum borrowing limitations apply to borrowings for the purpose of paying the Reimbursement Amount.

13.4 Borrowing Limits during specified periods. Subject to the foregoing limitations and other applicable provisions of the Credit Agreement and Loan Documents:

13.4.1 During the period from the Effective Date until the Equipment Loan Payoff, the Lenders' combined Revolving Credit Exposure may not exceed $43 million.

13.5 During the period (if any) between the Equipment Loan Payoff and November 30, 2023, the Lenders' combined Revolving Credit Exposure may not exceed $62 million plus 15% of any "Grower Draws" as supported by crop inventory reports and notice to Agent. "**Grower Draws**" means draws prior to November 30, 2023 used to pay Borrower's grower payables (for the avoidance of doubt, Borrower may not pay payables owed to the Affiliated Growers unless and until the timely occurrence of the Equipment Loan Payoff and waiver of the Acknowledged Defaults).

**14. Payment of Grower Payables.**

14.1 Borrower may pay its non-affiliated grower payables, but may not pay any amounts owed to the Affiliated Growers unless and until the timely occurrence of the Equipment Loan Payoff and waiver of the Acknowledged Defaults.

14.2 For the avoidance of doubt, Borrower reaffirms the limitations on its right to pay amounts owed to the Affiliated Growers set forth in the Grower Subordination Agreement.

**15. Financial and Other Reporting**. In addition to all financial reports required by Section 10.2 of the Credit Agreement and otherwise by the Loan Documents, Borrower shall provide the following projections, financial information and reports (the "**Reports**") to Agent.

Failure to provide the Reports when due results in a Forbearance Event of Default, without any requirement of prior notice from Lender or any grace or cure period.

15.1     Plan.  On or before January 15, 2024, Borrower must deliver to Agent a 3-year monthly financial plan acceptable to Agent.

15.2     Forecasts.  Borrower shall provide Agent with rolling 13-week forecasts of Borrower's Borrowing Base and projected cash flows, together with a report comparing the actual cash flow during the preceding weekly (or monthly, once applicable) forecast period to the forecast for such period, and cumulative (along with an explanation for any variances), in each case on a line-by-line basis. Each forecast shall include sales, account receivable and inventory roll-forwards, tracked on a weekly (or monthly, once applicable) basis showing actual versus budget. These forecasts shall be in reasonable detail and form acceptable to Agent, and certified by Borrower's Chief Financial Officer as being the most accurate projections available (the "**Projections**"). Borrower shall deliver the Projections: (i) initially weekly beginning on the first Wednesday of the first week after the Effective Date, and continuing on each Wednesday thereafter until the Equipment Loan Payoff; and (ii) after the Equipment Loan Payoff, on a monthly basis, by the fifth Business Day following the end of the month, in each case no later than 12:00 p.m. Pacific Time.

15.3     Accounts Payable Aging ("A/P Aging") and Grower Payable Aging Reports.

15.3.1  Prior to the Equipment Loan Payoff, Borrower shall provide Agent with weekly A/P Aging and Grower Payable Aging schedules as of the last day of the week, delivered by the following Wednesday, no later than 12:00 p.m. Pacific Time.

15.3.2  After the Equipment Loan Payoff, Borrower shall provide Agent with monthly A/P Aging and Grower Payable Aging schedules as of the last day of the month, delivered by the fifth Business Day following the end of the month, no later than 12:00 p.m. Pacific Time.

15.3.3  In addition, Borrower shall provide Agent month-end A/P Aging schedules and Grower Payable Aging schedules in each case matched to the general ledger (i.e., matching to the month-end financial statements), delivered by the fifth Business Day following the end of the month, no later than 12:00 p.m. Pacific Time.

15.4     Accounts Receivable.

15.4.1  Prior to the Equipment Loan Payoff, Borrower shall provide to Agent weekly a list of all accounts receivable, including amounts owing (with aging schedule), contact information for each such account receivable, and an analysis of all past-due accounts receivable, on a rolling basis, delivered by Wednesday of the following week, no later than 12:00 p.m. Pacific Time.

15.4.2  After the Equipment Loan Payoff, Borrower shall provide to Agent monthly a list of all accounts receivable, including amounts owing (with aging schedule) and contact information for each such account receivable  and an analysis of all past-due accounts

receivable, on a rolling basis, delivered by the fifth Business Day of the following month, no later than 12:00 p.m. Pacific Time.

15.5 Project X / Dry Ranch.

15.5.1 Commencing on November 22, 2023, and thereafter on the first and fifteenth day of each month, Borrower shall provide Agent with:

(a) a written summary analysis and status update, incorporating narrative descriptions, of all material developments (favorable and unfavorable) relating to Project X construction and financing from Prudential, including a report of variances comparing actual expenditures versus the Project X construction budget and an analysis of change orders;

(b) pending the foregoing written reports, prompt updates of material developments with respect to the proposed takeout loan from Prudential, whether such discussions and developments are favorable or unfavorable;

(c) promptly upon receipt thereof, drafts of all final term sheets, letters of intent, and any other material final documentation, whether executed or unexecuted, relating to Project X financing or Equipment Loan refinancing from Prudential;

(d) on or before November 30, 2023, if the Equipment Term Loan Payoff has not been made, a schedule of all equipment moved from the plants subject to Agent's deeds of trust, listing the equipment's original location, explaining the rationale for such relocation, and identifying the new location of such equipment (if requested by Agent, Borrower shall execute such documents as Agent may request to further perfect a first priority security interest in such equipment); and

(e) copies of all appraisals, whether for equipment, real property or other assets, obtained by any party (including without limitation Prudential) in connection with Project X / Dry Ranch or any proposed takeout financing thereof. Agent and Lenders agree they shall have no right to rely on the factual accuracy of any such appraisal amount.

15.6 Litigation and Threatened Claims. Borrower shall inform the Agent promptly upon the occurrence of any significant developments in any existing or threatened in writing material litigation involving Borrower or any Guarantor, including the pending litigation with The Wonderful Company and/ its affiliates.

15.7 Copies of Reporting to Prudential. Borrower shall provide Agent with any financial reporting and other information of the nature covered by this Section 15 that it provides to Prudential under the terms of the final loan documents documenting the Prudential Financing, which is not already required to be provided by this Section 15, by Section 10.2 of the Credit Agreement or otherwise by the Loan Documents.

**16. Bankruptcy and Relief from Stay.** In the event that Borrower becomes the subject of any present or future insolvency, bankruptcy, receivership, dissolution, reorganization, or similar proceeding, federal or state law, whether voluntary or involuntary, Borrower shall fully cooperate with Agent (consistent with Borrower's fiduciary duties) to cause the absolute lifting of any automatic stay as to the enforcement of Agent's remedies under the Loan Documents,

including specifically, without limitation, the stay imposed by Section 362 of the United States Federal Bankruptcy Code, as amended. .

**17.** **Covenants**. The Borrower covenants and agrees, in addition to the Covenants in the Credit Agreement and notwithstanding anything to the contrary contained in the Credit Agreement or any of the other Loan Documents, as follows:

17.1 Borrower shall not exceed 120% in variance from forecast operating Disbursements on a cumulative basis (in weeks 1 through 4 following the Closing) and rolling 4-week basis thereafter, to be tested weekly after the first four weeks. "**Disbursements**" are payments to third parties for goods or services, including, but not limited to, non-affiliated growers, contract labor, processing, freight, equipment rental, utilities, repairs and maintenance, and capital expenditures (other than Project X). Additionally, Disbursements include payroll, rent, management fees and shared service reimbursements to AGI. Disbursements do not include payments to the seller of Project X, crop payables due to Affiliated Growers, fees of attorneys, financial advisors and other professional advisors to the Agent and Lenders, or debt service as projected in the agreed upon 13-week cash flow forecast provided by Borrower to Agent.

17.2 The Borrower shall deliver to Agent written notice of the occurrence of any Forbearance Termination Event promptly, and in any event within one (1) Business Day, after the Borrower has obtained actual knowledge of such event. Without limitation, (i) Borrower shall provide any notice to Agent of any default or similar communication from any third party that would reasonably be expected to lead to a default or event of default under this Agreement or the Credit Agreement as amended hereby, promptly upon receipt; (ii) Borrower or Guarantor, as the case may be, shall provide written notice to Agent promptly upon the discovery by Borrower or any Guarantor of the occurrence of any default or event of default by any of them under any indebtedness in excess of $500,000.00; and (iii) Borrower or Guarantor, as the case may be, shall provide written notice to Agent promptly upon the issuance by a court or any other adjudicator of competent jurisdiction of a final non-appealable order, ruling, or adjudication against Borrower, any Guarantor, or any Assemi entity in favor of The Wonderful Company that could reasonably be expected to have a Material Adverse Effect.

17.3 Borrower's Financial Consultant. Borrower shall continue to engage Borrower's Financial Consultant or a replacement acceptable to Agent. Borrower shall provide the Financial Consultant access to data, materials, reports, financial information, and operational information concerning its business, assets, liabilities, operations, cash flows, and properties as may be from time to time requested and not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay, the performance of the Financial Consultant's services. Borrower shall be solely responsible for the payment of any and all fees, costs, and expenses incurred by the Financial Consultant.

17.4 Financial Consultant's Monthly Meetings with Agent. Borrower shall cause the Financial Consultant to review the status of Borrower's operations, results, and other business affairs with representatives of the Agent on an ongoing basis. This paragraph of this Agreement constitutes Borrower's authorization and direction to the Financial Consultant to discuss Borrower's operations, results, and other business affairs with representatives of the Agent on the basis set forth above and Borrower's consent to the Financial Consultant's disclosure and delivery to representatives of the Agent (including its financial advisors and attorneys) of information

possessed by the Financial Consultant in respect of Borrower (including information that Borrower may consider to be confidential), to the extent such disclosure is permitted under Financial Consultant's contract and non-disclosure agreement with Borrower and/or any third-party non-disclosure agreements. Lenders and Borrower may participate in such meetings, and Borrower shall be required to participate upon Agent's request. Furthermore, Borrower hereby authorizes Agent to communicate directly with the Financial Consultant regarding Borrowers' operations, results, and other business affairs without prior notice to Borrower (and with or without a representative of Borrower being present) as frequently as Agent deems necessary or desirable.

17.5   Cooperation with Agent's Consultant.   The Borrower shall cause Borrower's Financial Consultant to promptly provide to Agent and BDO USA, P.C., or any other consultant or financial advisor engaged by Agent or its counsel ("Agent's Consultant"), with such information concerning the Borrower's financial, collateral, and operational condition, businesses, assets, liabilities, and prospects as Agent or Agent's Consultant may request from time to time. Notwithstanding any terms of the Credit Agreement or of any other Loan Document to the contrary, the Borrower will reimburse Agent by wire or other electronic funds transfer, within ten Business Days of delivery of an invoice to Borrower by e-mail to Phil.Shannon@touchstonepistachio.com and Rudy.Placencia@touchstonepistachio.com for any and all fees, costs, expenses, and other charges incurred by Agent relating to the engagement of Agent's Consultant from time to time.

17.6   Borrower shall not pay dividends or distributions to any member or equity owner, shall not pay any management fees, and shall not make any other payment of any kind to AGI or other related entity or person, provided, that such prohibition shall not apply to payments made to:

17.6.1  reimburse Borrower's payroll and customary benefits expenses paid by AGI;

17.6.2  reimburse AGI for rent and shared service expenses not to exceed $75,000/month;

17.6.3  after the Effective Date, reimburse Borrower's equity owners for the Capital Infusion to the extent permitted by this Agreement (which, for the avoidance of doubt, may be in the form of a distribution or return of capital); and

17.6.4  after the Equipment Loan Payoff and waiver of the Acknowledged Defaults, and so long as no other Event of Default is continuing or would result therefrom, (i) pay payables owed to the Affiliated Growers,  (ii) pay management fees to Assemi Group Inc., not to exceed  $25,000 per month, and (iii) resume payments on the AGI Subordinated Note; provided, that Borrower shall not make any payment on the AGI Subordinated Note without 5 days' prior written notice to Agent specifying the amount of such payment (breaking out principal and interest) and certifying that Borrower is then neither in default under this Agreement or the Credit Agreement, nor aware of  facts and circumstances that, with the giving of notice, the passage of time, or both, will constitute an Event of Default under the Credit Agreement.

17.7   Borrower hereby reaffirms its obligations under the AGI Subordination Agreement and acknowledges that it cannot make any payments on the AGI Subordinated Note

until the Equipment Loan is paid in full, the Acknowledged Defaults are waived, and Borrower is not in default of any obligation under the Credit Agreement, any other Loan Documents, or this Agreement. Any breach by Borrower is an immediate Forbearance Event of Default hereunder.

17.8    Without prior written consent from the Agent and the Required Lenders, Borrower shall not (i) enter into any new lending arrangements, whether as Borrower, Lender or Guarantor, and whether with affiliates or otherwise, (ii) grant any new pledges, liens or security interests, (iii) make or take any new loans, (iv) make any new guarantees, or (v) make any investments in new projects or third-party entities; provided, however, that the Prudential Financing, the Equipment Loan Takeout and the granting of liens and security interests to Prudential in connection with the Prudential Financing (with which Agent has agreed to cooperate as provided above), is hereby permitted under this Section 17.9 and under Section 10.9 and 10.10 of the Credit Agreement.

17.8.1    Within 30 days of Closing, Borrower shall deliver to Agent schedules (plus true copies of related promissory notes, loan agreements and other documentation) for any and all: (i) intercompany obligations owed by Borrower to AGI, any of the Affiliated Growers (except for grower payables owed to them), and other affiliated entities, with a representation of (a) when the transaction occurred, (b) when the documents were in fact executed and delivered, and (c) an accounting of amounts due, and (ii) of Borrower's existing pledges, liens and security interests on Borrower's assets granted for the benefit of any affiliate or third-party, loans owed to any third party, loans taken from any third party, guarantees given to any third party, and investments in projects with third parties or in third-party entities.

17.9    Except as consented by Agent in writing, Borrower shall maintain all of its bank and securities accounts at Agent.

18.    **General Release.**

18.1    Each Loan Party, for and on behalf of itself and its legal representatives, successors and assigns, fully, unconditionally, and irrevocably waives, releases, relinquishes and forever discharges Agent, Lenders, and each of their parents, subsidiaries, and affiliates, its and their respective past, present and future directors, officers, managers, agents, employees, insurers, attorneys, representatives and all of their respective heirs, successors and assigns, (collectively, the "**Released Parties**"), of and from any and all manner of action or causes of action, suits, claims, liabilities, losses, costs, expenses, demands, judgments, damages (including compensatory and punitive damages), levies and executions of whatsoever kind, nature and/or description arising on or before the Effective Date, in each case whether known or unknown, asserted or unasserted, liquidated or unliquidated, joint or several, fixed or contingent, direct or indirect, contractual or tortious, which said Loan Party, or its legal representatives, successors or assigns, ever had or now has or may claim to have against any of the Released Parties, with respect to any matter whatsoever, including, without limitation, the Loan Documents, the administration of any Loan Documents, the negotiations relating to this Agreement and the other Loan Documents executed in connection herewith and any other instruments and agreements executed by the Loan Party in connection therewith or herewith, arising on or before the Effective Date.

18.2    Each Loan Party acknowledges that it has been informed of its rights under and the provisions of Section 1542 of the Civil Code of the State of California and expressly waives

and relinquishes all rights and benefits that it has or may have had under such statute, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

18.3 Each Loan Party covenants and agrees not to sue any Released Party or in any way assist any other person in suing a Released Party with respect to any claim released herein. Each Loan Party understands, acknowledges and agrees that the release set forth in this Section 18 may be pled as a full and complete defense to any claim described above and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provision of this release.

18.4 Each Loan Party acknowledges that Agent and Lenders are specifically relying on the release provisions contained in this Section as a material inducement in entering into this Agreement. It is the express intent of the Loan Parties that the release provisions set forth in this Section be construed as broadly as possible in favor of the Released Parties so as to forever foreclose the assertion by the Loan Parties of any claims released hereby. The provision of this release shall survive and continue to be in full force and effective irrespective of any termination of this Agreement (provided the Effective Date occurred) or the end of the Forbearance Period has occurred.

18.5 Borrower irrevocably waives, to the extent permissible under law, any and all rights of redemption, the right to notice of any proposed sale of any of the Collateral consisting of personal property (the "**Personal Property Collateral**"), or of any other disposition of any Personal Property Collateral, and any other rights with respect to the Personal Property Collateral under the Uniform Commercial Code or other laws of any state.

**19. Representations and Warranties**. The Borrower represents and warrants that on and as of the Effective Date of this Agreement and after giving effect to this Agreement, other than the Acknowledged Defaults there will exist no default under any Loan Document, or any other instruments executed by the Borrower in connection herewith or therewith, or circumstances that with the giving of notice, the passage of time or both will constitute an event of default under any Loan Document on such date. Each Loan Party represents and warrants that said Loan Party has the power and legal right and authority to enter into, deliver and perform this Agreement, and that neither this Agreement, nor the agreements contained herein, contravene or constitute a default under any agreement, instrument or indenture to which said Loan Party is a party or signatory or any provision of said Loan Party's organizational documents or any other agreement or requirement of law. Each Loan Party represents and warrants that this Agreement has been duly executed and delivered by said Loan Party and constitutes the legal, valid and binding obligation of said Loan Party, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity; and no consent, approval or authorization of or registration or declaration with any party, including but not limited to any

governmental authority, is required in connection with the execution and delivery by said Loan Party of this Agreement, or the performance of the obligations of the Loan Party herein described.

**20. Ratification of Loan Documents**. The Parties acknowledge that the Credit Agreement and the other Loan Documents, subject to the terms of this Agreement, remain in full force and effect. Without limiting the generality of the foregoing, the Borrower represents and warrants that the Security Agreement and the Trust Deeds continue to secure the obligations of the Borrower under the Loan Documents. The Borrower shall continue to perform each and every of its obligations under the Loan Documents.

**21. Notices**. Any notice or other communication to any Party in connection with this Agreement or any Loan Document shall be in writing and shall be sent by United States mail (postage prepaid), overnight courier or manual delivery. addressed to such party at the address specified below, or at such other or additional address as such party shall have specified to the other party in writing, with copies sent by email as indicated below. All periods of notice (if any) shall be measured from the date of delivery thereof if manually delivered, from the first Business Day after the date of sending if sent by overnight courier, or from four days after the date of mailing if mailed. Each notice or other communication should be addressed as follows:

If to Agent:

U.S. Bank National Association
Karen.boyer@usbank.com
Karen E. Boyer
1095 Avenue of the Americas, 15th Floor
New York, New York 10036
Fax: 612-303- 4660

If to the Borrower:

Touchstone Pistachio Company, LLC
5620 N. Palm Ave., Suite 421
Mail Stop M
Fresno, CA 93704
Attn: Liz Steinhauer Clark
Fax: (559) 284-5110

The parties agree that the notice addresses set forth in this Agreement supersede and replace all prior notice addresses.

**22. Indemnity.**

22.1 Each Loan Party shall indemnify Agent, Lenders, and each of their directors, officers, employees, agents and advisors (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (a) the execution or delivery of this Agreement, the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the transactions contemplated hereby, (b) administration of the Loan or the use of the proceeds, or (c) any actual

or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

22.2 To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives and acknowledges that no other person shall have, any claim against any Indemnitee, on any theory of liability, for lost profits or special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, the Loan Documents, or any agreement or instrument contemplated hereby, the transactions contemplated hereunder, the Loan, or the use of the proceeds thereof.

22.3 All amounts due under this Section 22 shall be payable within ten (10) Business Days after written demand therefor.

**23. Further Assurances**. From time to time upon Agent's request, each Loan Party shall promptly and duly execute, acknowledge and deliver any and all such further instruments and documents as Agent may reasonably request in connection with this Agreement and the other Loan Documents, to carry out the purpose and intent hereof and thereof or to enable Agent to enforce any of its rights hereunder or thereunder. In addition, at any time, and from time to time, upon request by Agent, each Loan Party shall, at his/her/its expense, provide any and all further instruments, certificates and other documents as may be reasonably requested in order to verify his/her/its identity and background in a manner reasonably satisfactory to Agent.

**24. Forbearance Events of Default.** Any one or more of the following events shall constitute a breach of the terms of this Agreement and (subject to any applicable grace or cure period) shall allow Agent to immediately pursue all remedies under any of the Loan Documents and this Agreement (each a "**Forbearance Event of Default**"):

a. Any default by any Loan Party under this Agreement;

b. Any Event of Default by any Loan Party under the Loan Documents (other than the Acknowledged Defaults);

c. any representation or warranty of the Borrower made herein is false, misleading or incorrect in any respect when made or deemed made;

d. Borrower initiates or joins any judicial, administrative, or arbitration proceeding against Agent;

e. Borrower or any Guarantor (i) asserts that this Agreement or any other Loan Document is not an enforceable contract or (ii) repudiates its obligations under this Agreement or any other Loan Document; or

f. Any of the Loan Parties makes an assignment for the benefit of creditors, files a petition in bankruptcy, is adjudicated insolvent or bankrupt, petitions to any court for a receiver or trustee for any substantial part of its, his or her property,

commences any proceeding relating to the arrangement, readjustment, reorganization or liquidation under any bankruptcy or similar laws, or if there is commenced against such Loan Party any such proceedings which remain undismissed for a period of thirty (30) calendar days, or if such Loan Party consents or acquiesces in any such proceeding or the appointment of any such trustee or receiver.

**25.** **No Duress or Reliance**. Each Loan Party acknowledges and agrees that it has received the advice of independent counsel, appraisers and accountants, or the opportunity to obtain such advice, before entering into this Agreement and the other Loan Documents referred to herein, and has not relied upon Agent or any of its officers, directors, employees, agents or attorneys concerning any aspect of the transactions contemplated by this Agreement and the other Loan Documents referred to herein. Each Loan Party agrees that it executed and delivered this Agreement of its own free will and will execute and deliver the other instruments required herein of its own free will. Each Loan Party further acknowledges that Agent has not taken advantage of it by threats, overreaching, unconscionable conduct or other activities in negotiating this Agreement, and that it is proceeding in all transactions contemplated hereby as a volunteer and in what it perceives to be its own best interest.

**26.** **No Further Commitment to Extend, Restructure or Forbear**. EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, AGENT AND LENDERS HAVE NOT COMMITTED, AND ARE NOT COMMITTING AT THIS TIME, TO EXTEND THE MATURITY DATE OF ANY LOAN OR OTHERWISE RESTRUCTURE ANY LOAN, OR FORBEAR FROM EXERCISING ANY OF THER RIGHTS OR REMEDIES UNDER THE LOAN DOCUMENTS. NO PRIOR COURSE OF DEALING, NO USAGE OF TRADE, AND NO ORAL STATEMENTS OR COMMENTS BY AGENT, ANY LENDER, OR THEIR OFFICERS, EMPLOYEES, ATTORNEYS OR OTHER AGENTS WILL BE DEEMED TO BE A COMMITMENT BY AGENT OR LENDERS TO FORBEAR FROM EXERCISING ANY OF THEIR RIGHTS OR REMEDIES, EXCEPT AS EXPRESSLY SET FORTH HEREIN.

**27.** **Dispute Resolution**. This Agreement hereby incorporates any alternative dispute resolution agreement previously, concurrently or hereafter executed between any Loan Party and Agent. Without limitation:

27.1 THE PARTIES TO THIS AGREEMENT IRREVOCABLY, KNOWINGLY, INTENTIONALLY AND VOLUNTARILY AGREE TO WAIVE ALL RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS, OR ANY DEALINGS BETWEEN BORROWER AND AGENT RELATING TO THE LOAN AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. BORROWER AND BANK ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE PARTIES TO ENTER INTO THIS AGREEMENT, THAT THE PARTIES HAVE RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT THE PARTIES WILL CONTINUE TO RELY ON THE WAIVER IN RELATED FUTURE DEALINGS WITH

EACH OTHER. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH SUCH PARTY'S LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVES SUCH PARTY'S JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER MAY ONLY BE MODIFIED IN WRITING SIGNED BY BORROWER AND AGENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

27.2 Waiver of Special Damages. NO PARTY TO THIS AGREEMENT SHALL ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST ANY OTHER PARTY, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, THE TRANSACTIONS CONTEMPLATED THEREBY OR THE LOAN.

**28. Loan Parties' Understanding**. THE LOAN PARTIES ACKNOWLEDGE THAT: (A) THIS AGREEMENT CONTAINS A COMPLETE RELEASE OF CLAIMS AND WAIVERS OF CERTAIN RIGHTS; (B) THE LOAN PARTIES HAVE READ AND UNDERSTOOD THIS AGREEMENT IN ITS ENTIRETY PRIOR TO SIGNING AND FULLY AGREE TO EACH, ALL AND EVERY PROVISION HEREOF; AND (C) THE LOAN PARTIES HAVE RECEIVED A COPY HEREOF.

**29. Entire Agreement; Modification; Additional Provisions**. TIME IS OF THE ESSENCE WITH RESPECT TO ALL PROVISIONS OF THIS AGREEMENT. No amendment, modification or waiver of the provisions of this Agreement or any Loan Document shall be effective unless the same shall be in writing and signed by the party against whom it is to be enforced, and then such amendment, modification or waiver shall be effective only in the specific instance and for the specific purpose for which given. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THE LOAN PARTIES HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITUATED IN THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS, WITH REGARD TO ANY ACTIONS, CLAIMS, DISPUTES OR PROCEEDINGS RELATING TO THIS AGREEMENT, THE COLLATERAL, ANY OTHER LOAN DOCUMENT, OR ANY TRANSACTIONS ARISING THEREFROM, OR ENFORCEMENT AND/OR INTERPRETATION OF ANY OF THE FOREGOING. The Loan Documents and this Agreement, shall represent the entire agreement between the parties hereto with respect to the subject matter of this Agreement, shall supersede any prior oral negotiations or agreements, and shall be binding upon the parties hereto and their respective legal representatives, successors and assigns. In the event of any conflict between the provisions of this Agreement and the provisions of any Loan Document, the provisions of this Agreement shall govern. If any part of this Agreement is held to be illegal, invalid or unenforceable, (i) the remainder of this Agreement shall continue in full force and effect, notwithstanding such illegality, invalidity or unenforceability; and (ii) the judge or arbiter holding that part illegal, invalid or unenforceable shall attempt to reform that part so as to give effect to the original intent of the parties. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. This Agreement is made between the

undersigned parties hereto, and no other person shall be a direct or indirect beneficiary of this Agreement.

**30. USA Patriot Act Notice**. To help the government fight the funding of terrorism and money laundering activities, Federal law requires Agent to obtain, verify, and record information that identifies each person who opens an account. This means that Agent will ask for Loan Parties' name, Tax ID number, address, date of birth, and other information, as applicable, including identifying documents that will allow Agent to properly identify Loan Parties. Loan Parties shall provide such information and take such actions as are reasonably requested by Agent in order to assist Agent in maintaining compliance with the PATRIOT Act.

**31. Interpretation**. Each Party with the assistance of their respective counsel, has participated in the preparation and drafting of this Agreement. As such, the Parties acknowledge that any doctrine of law that might operate to imply that any ambiguity in this Agreement shall be construed against any Party as the drafter of the Agreement is not applicable to this Agreement. Accordingly, this Agreement shall be interpreted as if the Parties jointly and equally prepared and drafted each word, sentence, and paragraph hereof.

**32. Document Imaging**. Borrower hereby acknowledges and agrees that Agent may create electronic images and destroy paper originals of any imaged documents received or generated by Agent in connection with the Loan. Any such images maintained by Agent as part of its normal business processes shall be given the same legal effect as the paper original(s) thereof. Borrower hereby agrees that Agent may convert any instrument into a "transferable record" under the Uniform Electronic Transactions Act (the "UETA"), and that the image of such instrument in Agent's possession shall constitute an "authoritative copy" under the UETA.

**33. Attorneys' and Advisor's Fees.** Each Loan Party shall reimburse Agent for all reasonable and invoiced out-of-pocket costs and expenses including, without limitation, attorneys' and financial advisor's fees and disbursements, expended or incurred by Agent in connection with: (a) the negotiation, preparation, amendment, interpretation, monitoring and enforcement of this Agreement and/or the Loan Documents and including, without limitation, during the current workout, any future workout, attempted workout, and/or in connection with the rendering of legal advice as to Agent's rights, remedies and obligations under the Loan Documents; (b) collecting any sum which becomes due to Agent under any Loan Document; (c) any proceeding for declaratory relief, any counterclaim to any proceeding, or any appeal; or (d) the protection, preservation or enforcement of any rights of Agent. For the purposes of this Section, attorneys' fees shall include, without limitation, fees incurred whether or not litigation is filed, including without limitation in any arbitration, mediation, judicial reference, legal action or otherwise, and including without limitation in connection with the following: (i) contempt proceedings; (ii) discovery; (iii) any motion, proceeding or other activity of any kind in connection with a bankruptcy proceeding or case arising out of or relating to any petition under Title 11 of the United States Code, as the same shall be in effect from time to time, or any similar law; (iv) garnishment, levy, and debtor and third party examinations; and (v) post judgment motions and proceedings of any kind including, without limitation, any activity taken to collect or enforce any judgment. All of such costs and expenses shall bear interest from the tenth day following demand at the applicable interest rate under the Loan Documents.

34. **No Further Commitment to Extend, Restructure or Forbear**. EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, BANK HAS NOT COMMITTED, AND IS NOT COMMITTING AT THIS TIME, TO EXTEND THE MATURITY DATE OF THE LOAN OR OTHERWISE RESTRUCTURE THE LOAN, OR FORBEAR FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES UNDER THE LOAN DOCUMENTS. NO PRIOR COURSE OF DEALING, NO USAGE OF TRADE, AND NO ORAL STATEMENTS OR COMMENTS BY BANK, OR ITS OFFICERS, EMPLOYEES, ATTORNEYS OR OTHER AGENTS, WILL BE DEEMED TO BE A COMMITMENT BY BANK TO FORBEAR FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES, EXCEPT AS EXPRESSLY SET FORTH HEREIN.

35. **Reaffirmation of Guaranties**. Each Guarantor hereby acknowledges and confirms each such Guarantor's unconditional obligations as a guarantor of the obligations of Borrower to Agent as set forth in each Guaranty and reaffirms and restates each and every term, condition, provision, and waiver thereof. In addition, each Guarantor hereby (i) reaffirms such Guarantor's obligations under any other Loan Document to which he/she/it is a party, (ii) agrees to be bound by this Agreement and joins in the general release set forth in this Agreement, and (iii) confirms that such Guarantor's Guaranty and other agreements, including, but not limited to, any jury trial waiver, judicial reference or class action waiver provisions contained in the Loan Documents, remain in full force and effect, without defense, claim, counterclaim, or offset. Each of the undersigned Guarantors acknowledge that they have been represented or had the opportunity to be represented by counsel of their choice in connection with the execution of this Agreement.

36. **Entire Agreement**. The Loan Documents (including this Agreement) are intended by the Parties as the final expression of their agreement and therefore contain the entire agreement between the Parties and supersede all prior understandings or agreements concerning the subject matter hereof. This Agreement may only be amended in a writing signed by each Party.

37. **Counterpart Signatures**. This Agreement may be executed in any number of counterparts and all such counterparts, upon signature by all Parties, shall be deemed to constitute a single agreement and the execution of one counterpart by any Party shall have the same force and effect as if said Party signed all of the other counterparts. The Parties shall deliver original signed counterparts of this Agreement to Agent. In addition, any Party may evidence execution of this Agreement by facsimile transmission or electronic signature (as on a pdf attached to an email) to the other Party or the other Party's attorney and receipt of said facsimile or electronic signature shall be deemed receipt of an original. Notwithstanding any provision of law to the contrary, a signature evidenced by facsimile transmission shall be considered an original executed counterpart agreement. Upon demand, the original signed document which was evidenced by said facsimile transmission or electronic signature shall be delivered to the receiving Party.

[Signature Pages Follow]

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

TOUCHSTONE PISTACHIO COMPANY, LLC

By:______________________________
Name: Farid Assemi
Title: Manager

**AGENT:**

U.S. BANK NATIONAL ASSOCIATION,
as Administrative Agent

By:______________________________
Name: Karen E. Boyer
Title: Senior Vice President and
Special Loan Workout Manager

**LENDERS:**

U.S. BANK NATIONAL ASSOCIATION,
as Lender

By:______________________________
Name: Karen E. Boyer
Title: Senior Vice President and
Special Loan Workout Manager

RABO AGRIFINANCE LLC, as a Lender

By:______________________________
Name: Joe Deibner
Title: Vice President
Senior Financial Restructuring Manager

COMPEER FINANCIAL, PCA/FLCA,
as a Lender

By:______________________________
Name: Graham J. Dee
Title: Director, Capital Markets

[Signatures Continued from Prior Page]

**LENDERS:**

FIFTH THIRD BANK, NATIONAL ASSOCIATION, as a Lender

By:______________________________
Name: Jennifer Camp
Title: Vice President

AMERICAN AGCREDIT, PCA, as a Lender

By:______________________________
Name: John Finn
Title: Vice President

**GUARANTORS:**

______________________________
Farid Assemi, as an individual

______________________________
Farshid Assemi, as an individual

______________________________
Darius Assemi, as an individual

______________________________
Darius Assemi, as Trustee of the Amended and Restated Darius Assemi Revocable Trust

______________________________
Farid Assemi, as Trustee of The Farshid Assemi 1997 Ranch Trust dated June 30, 1997

______________________________
Farid Assemi as Trustee of the Farid Assemi Revocable Trust u/d/t dated January 24, 2007

______________________________
Farshid Assemi, as Co-Trustee of the Farid Assemi 1997 Ranch Trust dated June 30, 1997

[Signatures Continued from Prior Page]

**LENDERS:**

FIFTH THIRD BANK, NATIONAL ASSOCIATION, as a Lender

By:________________________________
Name: Jennifer Camp
Title: Vice President

AMERICAN AGCREDIT, PCA, as a Lender

By:________________________________
Name: John Finn
Title: Vice President

**GUARANTORS:**

________________________________
Farid Assemi, as an individual

________________________________
Farshid Assemi, as an individual

________________________________
Darius Assemi, as an individual

________________________________
Darius Assemi, as Trustee of the Amended and Restated Darius Assemi Revocable Trust

________________________________
Farid Assemi, as Trustee of The Farshid Assemi 1997 Ranch Trust dated June 30, 1997

________________________________
Farid Assemi as Trustee of the Farid Assemi Revocable Trust u/d/t dated January 24, 2007

________________________________
Farshid Assemi, as Co-Trustee of the Farid Assemi 1997 Ranch Trust dated June 30, 1997

[Signatures Continued from Prior Page]

**LENDERS:**

FIFTH THIRD BANK, NATIONAL ASSOCIATION, as a Lender

By:______________________________
Name: Jennifer Camp
Title: Vice President

AMERICAN AGCREDIT, PCA, as a Lender

By:______________________________
Name: John Finn
Title: Vice President

**GUARANTORS:**

______________________________
Farid Assemi, as an individual

______________________________
Farshid Assemi, as an individual

______________________________
Darius Assemi, as an individual

______________________________
Darius Assemi, as Trustee of the Amended and Restated Darius Assemi Revocable Trust

______________________________
Farid Assemi, as Trustee of The Farshid Assemi 1997 Ranch Trust dated June 30, 1997

______________________________
Farid Assemi as Trustee of the Farid Assemi Revocable Trust u/d/t dated January 24, 2007

______________________________
Farshid Assemi, as Co-Trustee of the Farid Assemi 1997 Ranch Trust dated June 30, 1997

[Signatures Continued from Prior Page]

**GUARANTORS:**

______________________________
Neema Eliot Assemi, as Co-Trustee of the Farid Assemi 1997 Ranch Trust dated June 30, 1997

______________________________
Neema Assemi, as Trustee of The Farid Assemi 2010 Grantor Trust dated December 30, 2010

______________________________
Melissa Layne, as Trustee of the Farshid and Sonia Assemi 2010 Grantor Trust dated December 30, 2010

______________________________
Farshid Assemi, as Co-Trustee of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust

______________________________
Sonia Rosemary Assemi, as Co-Trustee of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust

ACDF, LLC

By:______________________________
Name: Farid Assemi
Title: Manager

ASSEMI BROTHERS, LLC

By:______________________________
Name: Farid Assemi
Title: Manager

By:______________________________
Name: Farshid Assemi
Title: Manager

[Signatures Continued from Prior Page]

**GUARANTORS:**

______________________________
Neema Eliot Assemi, as Co-Trustee of the Farid Assemi 1997 Ranch Trust dated June 30, 1997

______________________________
Neema Assemi, as Trustee of The Farid Assemi 2010 Grantor Trust dated December 30, 2010

______________________________
Melissa Layne, as Trustee of the Farshid and Sonia Assemi 2010 Grantor Trust dated December 30, 2010

______________________________
Farshid Assemi, as Co-Trustee of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust

______________________________
Sonia Rosemary Assemi, as Co-Trustee of the Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust

ACDF, LLC

By:______________________________
Name: Farid Assemi
Title: Manager

ASSEMI BROTHERS, LLC

By:______________________________
Name: Farid Assemi
Title: Manager

By:______________________________
Name: Farshid Assemi
Title: Manager

[Signatures Continued from Prior Page]

**GUARANTORS:**

C & A FARMS, LLC

By:____________________________
Name: Farid Assemi
Title: Manager

CANTUA ORCHARDS, LLC

By:____________________________
Name: Farid Assemi
Title: Manager

LINCOLN GRANTOR FARMS, LLC

By:____________________________
Name: Neema Assemi
Title: Manager

MARICOPA ORCHARDS, LLC

By:____________________________
Name: Farid Assemi
Title: Manager

PANOCHE PISTACHIOS, LLC

By:____________________________
Name: Farid Assemi
Title: Manager

SAGEBERRY FARMS, LLC

By:____________________________
Name: Neema Assemi
Title: Manager

ADAMS GRANTOR LAND, LLC

By:____________________________
Name: Neema Assemi
Title: Manager

[Signatures Continued from Prior Page]

**GUARANTORS:**

GRANVILLE FARMS, LLC

By:____________________________
Name: Farid Assemi
Title: Manager

GRADON FARMS, LLC

By:____________________________
Name: Neema Assemi
Title: Manager

MANNING AVENUE PISTACHIOS, LLC

By:____________________________
Name: Farid Assemi
Title: President

ASSEMI AND SONS, INC

By:____________________________
Name: Farid Assemi
Title: President

By:____________________________
Name: John A. Bezmalinovic
Title: Secretary

WINSTON FARMS, LLC

By:____________________________
Name: Neema Assemi
Title: Manager

FFGT FARMS, LLC

By:____________________________
Name: Neema Assemi
Title: Manager

FAVIER RANCH, LLC

By:____________________________
Name: Neema Assemi
Title: Manager

[Signatures Continued from Prior Page]

**GUARANTORS:**

GRANTLAND FARMS, LLC

By:________________________________
Name: Neema Assemi
Title: Manager

WHITESBRIDGE FARMS, LLC

By:________________________________
Name: Neema Assemi
Title: Manager

ACAP FARMS, LLC

By:________________________________
Name: Farid Assemi
Title: Manager

BEAR FLAG FARMS, LLC

By:________________________________
Name: Neema Assemi
Title: Manager

COPPER AVENUE INVESTMENTS, LLC

By:________________________________
Name: Farid Assemi
Title: Manager

WILLOW AVENUE INVESTMENTS, LLC

By:________________________________
Name: Neema Assemi
Title: Manager

A&H INVESTMENTS, LLC

By:________________________________
Name: Farid Assemi
Title: Manager

# EXHIBIT 3

**SECURITY AGREEMENT**

This SECURITY AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") dated as of March 20, 2020 is made by Touchstone Pistachio Company, LLC, a California limited liability company (the "Borrower"), in favor of MUFG Union Bank, N.A. ("MUFG Union Bank"), in its capacity as collateral agent for the Lenders (in such capacity, the "Collateral Agent"), with reference to the following facts:

**RECITALS**

A. The Borrower, the Lenders, the Collateral Agent and MUFG Bank, Ltd., as administrative agent, are entering into that certain Credit Agreement dated as of the date hereof (as the same may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement") pursuant to which the Lenders will extend certain credit facilities as more particularly described therein.

B. The Credit Agreement provides, as a condition of the availability of such credit facilities, that the Borrower shall enter into this Agreement and shall grant security interests to the Collateral Agent as herein provided.

C. The Borrower expects to realize direct and indirect benefits as a result of the availability of the aforementioned credit facilities.

**AGREEMENT**

NOW, THEREFORE, in order to induce the Lenders to extend the aforementioned credit facilities to the Borrower, and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, the Borrower hereby represents, warrants, covenants, agrees, assigns and grants as follows:

1. Definitions. This Agreement is the Security Agreement referred to in the Credit Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the meanings defined for those terms in the Credit Agreement. Terms defined in the UCC and not otherwise defined in this Agreement or in the Credit Agreement shall have the meanings defined for those terms in the UCC. As used in this Agreement, the term "Collateral" shall have the meaning set forth below:

"Collateral" means and includes all present and future right, title and interest of the Borrower in or to any and all of the following property:

a. All present and future notes, deposits, accounts, Accounts receivable, agreements, contracts, leases, contract rights, rights to payment, Instruments, Documents, Chattel Paper, Supporting Obligations, security agreements, guaranties, letters of credit, Letter of Credit Rights, undertakings, surety bonds, insurance policies, notes and drafts, and all forms of obligations owing to the Borrower or in which the Borrower may have any interest, however created or arising and whether or not earned by performance;

b. All present and future General Intangibles, all tax refunds of every kind and nature to which the Borrower now or hereafter may become entitled, however arising, all other refunds, and all deposits, reserves, loans, royalties, cost savings, deferred payments, goodwill, choses in action, Commercial Tort Claims, liquidated damages, rights to indemnification, trade secrets, computer programs, software, customer lists, trademarks, trade names, patents, licenses, copyrights, technology, processes, proprietary information, other Intellectual Property and insurance proceeds of which the Borrower is a beneficiary;

c. All present and future Deposit Accounts of the Borrower, including, without limitation, any demand, time, savings, passbook or like account maintained by the Borrower with any bank, savings and loan association, credit union or like organization, and all money, cash and cash equivalents of the Borrower, whether or not deposited in any such deposit account;

d. All present and future books and records, including, without limitation, books of account and ledgers of every kind and nature, all electronically recorded data relating to the Borrower or the business thereof, all receptacles and containers for such records, and all files and correspondence;

e. All present and future Goods, including, without limitation, all consumer goods, Farm Products and crops, Inventory, Equipment, machinery, tools, molds, dies, furniture, furnishings, Fixtures, trade fixtures, motor vehicles, and all other goods used in connection with or in the conduct of the Borrower's business;

f. All present and future inventory and merchandise; including, without limitation, all present and future Goods held for sale or lease or to be furnished under a contract of service, all raw materials, work in process and finished goods, all packing materials, supplies and containers relating to or used in connection with any of the foregoing, and all bills of lading, warehouse receipts or documents of title relating to any of the, foregoing;

g. All present and future Investment Property, stocks, bonds, debentures, securities, subscription rights, options, warrants, puts, calls, certificates, partnership interests, joint venture interests, investments and/or brokerage accounts and all rights, preferences, privileges, dividends, distributions, redemption payments, or liquidation payments with respect thereto;

h. All present and future accessions, appurtenances, components, repairs, repair parts, spare parts, replacements, substitutions, additions, issue and/or improvements to or of or with respect to any of the foregoing;

i. All other tangible and intangible property of the Borrower;

j. All rights, remedies, powers and/or privileges of the Borrower with respect to any of the foregoing; and

k. Any and all Proceeds (including, without limitation, insurance proceeds) and products of any of the foregoing, including, without limitation, all money, Accounts, General Intangibles, Deposit Accounts; Documents, Instruments, Chattel Paper, Goods, insurance proceeds, and any other tangible or intangible property received upon the sale or disposition of any of the foregoing.

2. Further Assurances. At any time and from time to time at the request of the Collateral Agent exercised in its reasonable judgment, the Borrower shall execute and deliver to the Collateral Agent all such financing statements and other instruments and documents in form and substance reasonably satisfactory to the Collateral Agent and, subject to the express limitations set forth herein, take such other actions as the Collateral Agent in its reasonable judgment determines to be necessary or desirable to create, continue, preserve, fully perfect or evidence, the Collateral Agent's security interests granted pursuant to Section 3 of this Agreement or the priority thereof; provided that any enforcement actions with respect to the Collateral shall be subject to Section 9. At any time and from time to time, the Collateral Agent shall be entitled to file and/or record any or all such financing statements, instruments and documents held by it, and any or all such further financing statements, documents and instruments, and to take all such other actions, as the Collateral Agent in its reasonable judgment determines appropriate to evidence or perfect and to maintain perfected the security interests granted in Section 3 of this Agreement; provided that any

enforcement actions with respect to the Collateral shall be subject to Section 9. With respect to any Collateral consisting of certificated securities, instruments, documents, certificates of title or the like, as to which the Collateral Agent's security interest need be perfected by, or the priority thereof need be assured by, possession of such Collateral, the Borrower will upon demand of the Collateral Agent deliver possession of same in pledge to the Collateral Agent; provided, that the Borrower shall not be required to take any such action with respect to any instrument, document, certificate of title or the like with a face amount or fair market value, as applicable, of less than $100,000. With respect to any Collateral consisting of securities, instruments, partnership or joint venture interests or the like, the Borrower hereby consents and agrees that the issuers of, or obligors on, any such Collateral, or any registrar or transfer agent or trustee for any such Collateral, shall be entitled to accept the provisions of this Agreement as conclusive evidence of the right of the Collateral Agent to, in connection with the exercise of remedies under Section 9, effect any transfer or exercise any right hereunder or with respect to any such Collateral, notwithstanding any other notice or direction to the contrary heretofore or hereafter given by the Borrower or any other Person to such issuers or such obligors or to any such registrar or transfer agent or trustee.

3. Security Agreement. For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Borrower hereby grants a continuing security interest in, and pledges to the Collateral Agent, all presently existing and hereafter acquired Collateral, as security for the timely payment and performance of the Secured Obligations, and each of them. This Agreement is a continuing and irrevocable agreement and all the rights, powers, privileges and remedies hereunder shall apply to any and all Secured Obligations, including those arising under successive transactions which shall either continue the Secured Obligations, increase or decrease them, or from time to time create new Secured Obligations after all or any prior Secured Obligations have been satisfied, and notwithstanding the bankruptcy of the Borrower or any other Person or any other event or proceeding affecting any Person.

Anything herein to the contrary notwithstanding: (a) the Borrower shall remain liable to perform all of its duties and obligations under the contracts and agreements included in the Collateral to the same extent as if this Agreement had not been executed, (b) the exercise by the Collateral Agent or any other Secured Party of any of the rights hereunder shall not release the Borrower from any of its duties or obligations under the contracts and agreements included in the Collateral, (c) the Collateral Agent and each other Secured Party shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, and shall not be obligated to perform any of the obligations or duties of the Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder, and (d) neither the Collateral Agent nor any other Secured Party shall have any liability in contract or tort for the Borrower's or any of its Subsidiaries' or Affiliates' acts or omissions.

4. Borrower's Representations, Warranties and Agreements. The Borrower represents, warrants and agrees that: (a) the Borrower will pay, prior to delinquency, all taxes, charges, Liens and assessments against the portion of the Collateral owned by it, except Liens permitted under the terms of the Credit Agreement and such other Liens as are timely contested in good faith, and upon its failure to pay or so contest such taxes, charges, Liens and assessments, the Collateral Agent may, in its reasonable judgment, pay any of them, and the Collateral Agent shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same; (b) the Collateral will not be used for any unlawful purpose or in violation of any Applicable Law (except such failures or violations that could not, individually or in the aggregate reasonably be expected to result in a Material Adverse Effect or materially detract from the value of the Collateral as a whole), regulation or ordinance, nor used in any way that will void or impair any insurance required to be carried under the Credit Agreement, the other Loan Documents or Applicable Law; (c) the Borrower will, to the extent consistent with good business practice, keep the portion of the Collateral owned by it in reasonably good repair, working order and condition, and from time to time make all needful and proper repairs, renewals, replacements, additions and improvements thereto and, as appropriate and applicable, will otherwise deal with such portion of the Collateral in all such ways as are considered good

practice by owners of like property; (d) the Borrower will take all reasonable steps to preserve and protect the Collateral; (e) the Borrower will maintain, with responsible insurance companies, insurance covering the Collateral against such insurable losses as is required by the Credit Agreement and is to be consistent with sound business practice, and will cause the Collateral Agent to be designated as an additional insured, lender's loss payable and/or mortgagee, as applicable, with respect to all applicable insurance and will obtain the written agreement of the insurers that such insurance shall not be cancelled, terminated or materially modified to the detriment of the Collateral Agent or the Secured Parties without at least ten (10) days' prior written notice to the Collateral Agent, and will furnish copies of such insurance policies or certificates to the Collateral Agent promptly upon request therefor; (f) the Borrower will promptly notify the Collateral Agent in writing in the event of damage to any material portion of the Collateral from any source whatsoever, and, except for the disposition of collections and other proceeds of the Collateral permitted by Section 6 hereof, the Borrower will not remove or permit to be removed any part of the Collateral from its places of business without the prior written consent of the Collateral Agent, except for such items of the Collateral as are removed in the Ordinary Course of Business or in connection with any transaction or disposition otherwise permitted by the Credit Agreement; (g) in the event the Borrower changes its formation jurisdiction, name or address as they are set forth herein or in the Credit Agreement, the Borrower will notify the Collateral Agent of such change promptly, but in any event, within fifteen (15) days (or such later date as may be approved by the Collateral Agent in its reasonable judgment); (h) each UCC financing statement naming the Borrower as a debtor and the Collateral Agent as secured party and attached hereto as Annex A is in appropriate form for filing in the appropriate offices of the states specified on Schedule 4 of the Collateral Disclosure Certificate (as such schedule shall be updated from time to time pursuant to the Credit Agreement and this Agreement) and contains an adequate description of the Collateral for purposes of perfecting a security interest in such Collateral to the extent that a security interest therein may be perfected by filing pursuant to the UCC; and (i) the security interests granted pursuant to this Agreement constitute valid and enforceable security interests in all of the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, as collateral security for the Secured Obligations, subject only to Liens permitted under the Credit Agreement.

5. Collateral Agent's Rights Regarding the Collateral. At any time, without notice or demand and at the expense of the Borrower with regard to the portion of the Collateral owned by it, the Collateral Agent may, to the extent it may be necessary or desirable to protect the security hereunder, but the Collateral Agent shall not be obligated to: (a) (whether or not an Event of Default has occurred) at all reasonable times on reasonable notice, enter upon any premises on which Collateral is situated and examine the same; provided, that unless an Event of Default is continuing, the Borrower shall not be obligated to reimburse the Collateral Agent for the costs of more than one such examination in any fiscal year of the Borrower or (b) if an Event of Default is continuing, perform any obligation of the Borrower under this Agreement or any obligation of any other Person under the Loan Documents. At any time and from time to time, at the expense of the Borrower with regard to the portion of the Collateral owned by it, the Collateral Agent may, to the extent it may be reasonably necessary or reasonably desirable to protect the security hereunder, but the Collateral Agent shall not be obligated to, request from obligors on the Collateral, in the name of the Borrower or in the name of the Collateral Agent, information concerning the Collateral and the amounts owing thereon to the extent that the Borrower has not provided such information promptly following the Collateral Agent's reasonable demand therefor. The Borrower shall maintain books and records pertaining to the Collateral in such detail, form and scope as is customarily maintained under similar circumstances by Persons of established reputation engaged in similar business and as otherwise required by the Credit Agreement. The Borrower shall at any time at the Collateral Agent's reasonable request mark the Collateral and/or the Borrower's ledger cards, books of account and other records relating to the Collateral with appropriate notations satisfactory to the Collateral Agent disclosing that they are subject to the Collateral Agent's security interests. The Collateral Agent shall at all reasonable times on reasonable notice have full access to and the right to audit any and all of the Borrower's books and records pertaining to the Collateral, and to confirm and verify the value of the Collateral and to do whatever else the Collateral Agent reasonably

may deem necessary or desirable to protect its interests; provided, however, that any such action which involves communicating with customers of the Borrower shall be carried out by the Collateral Agent through the Borrower's independent auditors unless the Collateral Agent shall then have the right directly to notify obligors on the Collateral as provided in Section 9; provided, further, that unless an Event of Default is continuing, the Borrower's obligation to reimburse the Collateral Agent for the costs of such audit or other examination or inspection shall be limited as set forth in the Credit Agreement. The Collateral Agent shall be under no duty or obligation whatsoever to take any action to preserve any rights of or against any prior or other parties in connection with the Collateral, to exercise any voting rights or managerial rights with respect to any Collateral, whether or not an Event of Default shall have occurred, or to make or give any presentments, demands for performance, notices of non-performance, protests, notices of protests, notices of dishonor or notices of any other nature whatsoever in connection with the Collateral or the Secured Obligations. The Collateral Agent shall be under no duty or obligation whatsoever to take any action to protect or preserve the Collateral or any rights of the Borrower therein, or to make collections or enforce payment thereon, or to participate in any foreclosure or other proceeding in connection therewith.

6.      Collections on the Collateral. The Borrower shall have the right to use and to continue to make collections on and receive dividends and other proceeds of all of the Collateral in the ordinary course of business so long as no Event of Default shall have occurred and be continuing. Upon the occurrence and during the continuance of an Event of Default, at the option of the Collateral Agent, the Borrower's right to make collections on and receive dividends and other proceeds of the Collateral and to use or dispose of such collections and proceeds shall terminate, and any and all dividends, proceeds and collections, including all partial or total prepayments, then held or thereafter received on or on account of the Collateral will be held or received by the Borrower in trust for the Collateral Agent and immediately delivered in kind to the Collateral Agent. Any remittance received by the Borrower from any Person shall be presumed to relate to the Collateral and to be subject to the Collateral Agent's security interests. Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right to receive, receipt for, endorse, assign, deposit and deliver, in the name of itself or the Secured Parties or in the name of the Borrower, any and all checks, notes, drafts and other instruments for the payment of money constituting proceeds of or otherwise relating to the Collateral; and the Borrower hereby authorizes the Collateral Agent to affix, by facsimile signature or otherwise, the general or special endorsement of it, in such manner as the Collateral Agent shall deem advisable, to any such instrument in the event the same has been delivered to or obtained by the Collateral Agent without appropriate endorsement, and the Collateral Agent and any collecting bank are hereby authorized to consider such endorsement to be a sufficient, valid and effective endorsement by the Borrower, to the same extent as though it were manually executed by the duly authorized officer of the Borrower, regardless of by whom or under what circumstances or by what authority such facsimile signature or other endorsement actually is affixed, without duty of inquiry or responsibility as to such matters, and the Borrower hereby expressly waives demand, presentment, protest and notice of protest or dishonor and all other notices of every kind and nature with respect to any such instrument.

7.      Possession of Collateral by the Collateral Agent. All the Collateral now, heretofore or hereafter delivered to the Collateral Agent shall be held by the Collateral Agent in its possession, custody and control for the benefit of the Secured Parties. Any or all of the Collateral delivered to the Collateral Agent may be held in an interest-bearing or non-interest-bearing account, in the Collateral Agent's reasonable judgment, and the Collateral Agent may, in its reasonable judgment, apply any such interest to payment of the Secured Obligations. Nothing herein shall obligate the Collateral Agent to invest any Collateral or obtain any particular return thereon. Upon the occurrence and during the continuance of an Event of Default, whenever any of the Collateral is in the Collateral Agent's possession, custody or control, the Collateral Agent may use, operate and consume the Collateral, whether for the purpose of preserving and/or protecting the Collateral, or for the purpose of performing any of the Borrower's Secured Obligations with respect thereto, subject to compliance with the requirements of Applicable Laws. The Collateral Agent may at any time deliver or redeliver the Collateral or any part thereof to the Borrower, and the receipt of

any of the same by the Borrower shall be complete and full acquittance for the Collateral so delivered, and the Collateral Agent thereafter shall be discharged from any liability or responsibility therefore. So long as the Collateral Agent exercises reasonable care with respect to any Collateral in its possession, custody or control, the Collateral Agent shall have no liability for any loss of or damage to such Collateral, and in no event shall the Collateral Agent have liability for any diminution in value of Collateral occasioned by economic or market conditions or events. The Collateral Agent shall be deemed to have exercised reasonable care within the meaning of the preceding sentence if the Collateral in the possession, custody or control of the Collateral Agent is accorded treatment substantially equal to that which the Collateral Agent accords its own property, it being understood that the Collateral Agent shall not have any responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any Person with respect to any Collateral.

8.     Events of Default. There shall be an Event of Default hereunder upon the occurrence and during the continuance of an Event of Default under the Credit Agreement or other Loan Documents following the expiration of any applicable notice, cure or grace period, if any, provided for therein.

9.     Rights Upon Event of Default. Upon the occurrence and during the continuance of an Event of Default, subject to compliance with the requirements of Applicable Laws, the Collateral Agent shall have, in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies that the Collateral Agent may have under Applicable Law or in equity or under this Agreement (including, without limitation, all rights set forth in Section 6 hereof) all rights and remedies of a secured party under the UCC, and, in addition, the following rights and remedies, all of which may be exercised with or without notice to the Borrower and without affecting the Secured Obligations of the Borrower hereunder or the enforceability of the Liens and security interests created hereby: (a) to foreclose the Liens and security interests created hereunder or under any other agreement relating to any Collateral by any available judicial procedure or without judicial process; (b) to enter any premises where any Collateral may be located for the purpose of securing, protecting, inventorying, appraising, inspecting, repairing, preserving, storing, preparing, processing, taking possession of or removing the same; (c) to sell, assign, lease or otherwise dispose of any Collateral or any part thereof, either at public or private sale or at any broker's board, in lot or in bulk, for cash, on credit or otherwise, with or without representations or warranties and upon such terms as shall be acceptable to the Collateral Agent; (d) to notify obligors on the Collateral that the Collateral has been assigned to the Collateral Agent and that all payments thereon are to be made directly and exclusively to the Collateral Agent; (e) to collect by legal proceedings or otherwise all dividends, distributions, interest, principal or other sums now or hereafter payable upon or on account of the Collateral; (f) to cause the Collateral to be registered in the name of the Collateral Agent, as legal owner; (g) to enter into any extension, reorganization, deposit, merger or consolidation agreement, or any other agreement relating to or affecting the Collateral, and in connection therewith the Collateral Agent may deposit or surrender control of the Collateral and/or accept other property in exchange for the Collateral; (h) to settle, compromise or release, on terms acceptable to the Collateral Agent, in whole or in part, any amounts owing on the Collateral and/or any disputes with respect thereto; (i) to extend the time of payment, make allowances and adjustments and issue credits in connection with the Collateral in the name of the Collateral Agent or in the name of the Borrower; (j) to enforce payment and prosecute any action or proceeding with respect to any or all of the Collateral and take or bring, in the name of the Collateral Agent or in the name of the Borrower, any and all steps, actions, suits or proceedings deemed by the Collateral Agent in its reasonable judgment necessary or desirable to effect collection of or to realize upon the Collateral, including any judicial or nonjudicial foreclosure thereof or thereon, and the Borrower specifically consents to any nonjudicial foreclosure of any or all of the Collateral or any other action taken by the Collateral Agent which may release any obligor from personal liability on any of the Collateral, and the Borrower waives any right not expressly provided for in this Agreement to receive notice of any public or private judicial or

nonjudicial sale or foreclosure of any security or any of the Collateral and any money or other property received by the Collateral Agent in exchange for or on account of the Collateral, whether representing collections or proceeds of Collateral, and whether resulting from voluntary payments or foreclosure proceedings or other legal action taken by the Collateral Agent or the Borrower may be applied by the Collateral Agent without notice to the Borrower to the Secured Obligations in such order and manner as the Collateral Agent in its reasonable judgment shall determine; (k) to insure, process and preserve the Collateral; (l) to exercise all rights, remedies, powers or privileges provided under the Credit Agreement and the other Loan Documents; (m) to remove, from any premises where the same may be located, the Collateral and any and all documents, instruments, files and records, and any receptacles and cabinets containing the same, relating to the Collateral, and the Collateral Agent may, at the cost and expense of the Borrower, use such of its supplies, equipment, facilities and space at its places of business as may be necessary or appropriate to properly administer, process, store, control, prepare for sale or disposition and/or sell or dispose of the portion of the Collateral owned by the Borrower or to properly administer and control the handling of collections and realizations thereon, and the Collateral Agent shall be deemed to have a rent-free tenancy of any premises of the Borrower for such purposes and for such periods of time as reasonably required by the Collateral Agent; (n) to receive, open and dispose of all mail addressed to the Borrower and notify postal authorities to change the address for delivery thereof to such address as the Collateral Agent may designate; provided that the Collateral Agent agrees that it will promptly deliver over to the Borrower such opened mail as does not relate to the Collateral; (o) to receive any and all cash dividends, payments or distributions made in respect of any Collateral or other Proceeds paid in respect of any Collateral, and the Collateral Agent or its nominee may exercise (i) all voting, corporate and other rights pertaining to any applicable Collateral at any meeting of shareholders, partners or members of the relevant issuers thereof or otherwise and (ii) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Collateral as if it were the absolute owner thereof (including, without limitation, the right to exchange any and all of such Collateral upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate, partnership or limited liability company structure of any issuer thereof or upon the exercise by the Borrower or the Collateral Agent of any right, privilege or option pertaining to such Collateral, and in connection therewith, the right to deposit and deliver any and all of such Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it; and (p) to exercise all other rights, powers, privileges and remedies of an owner of the Collateral; all as the Collateral Agent in its reasonable judgment may deem advisable. The Borrower will, at the Collateral Agent's request, assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent may reasonably designate, whether at the premises of the Borrower or elsewhere, and will make available to the Collateral Agent, free of cost, all premises, equipment and facilities of the Borrower for the purpose of the Collateral Agent's taking possession of the Collateral or storing same or removing or putting the Collateral in salable form or selling or disposing of same.

Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent also shall have the right, without notice or demand, either in person, by agent or by a receiver to be appointed by a court (and the Borrower hereby expressly consents upon the occurrence and during the continuance of an Event of Default to the appointment of such a receiver), and without regard to the adequacy of any security for the Secured Obligations, to take possession of the Collateral or any part thereof and to collect and receive the rents, issues, profits, income and proceeds thereof. Taking possession of the Collateral shall not cure or waive any Event of Default or notice thereof or invalidate any act done pursuant to such notice. The rights, remedies and powers of any receiver appointed by a court shall be as ordered by said court.

Any public or private sale or other disposition of the Collateral may be held at any office of the Collateral Agent, or at the Borrower's places of business, or at any other place permitted by Applicable Law, and without the necessity of the Collateral's being within the view of prospective purchasers. The

Collateral Agent may direct the order and manner of sale of the Collateral, or portions thereof, as it in its reasonable judgment may determine, and the Borrower expressly waives any right to direct the order and manner of sale of any Collateral. The Collateral Agent or any Person on the Collateral Agent's behalf may bid and purchase at any such sale or other disposition. The net cash proceeds resulting from the collection, liquidation, sale, lease or other disposition of the Collateral shall be applied, first, to the expenses (including reasonable attorneys' fees and disbursements) of retaking, holding, storing, processing and preparing for sale or lease, selling, leasing, collecting, liquidating and the like, and then to the satisfaction of the Secured Obligations as set forth in the Credit Agreement. The Borrower and any other Person then obligated therefor shall pay to the Collateral Agent for the benefit of the Secured Parties on demand any deficiency with regard thereto which may remain after such sale, disposition, collection or liquidation of the Collateral.

Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Collateral Agent will send or otherwise make available to the Borrower, reasonable notice of the time and place of any public sale thereof or of the time on or after which any private sale thereof is to be made. The requirement of sending reasonable notice conclusively shall be met if such notice is mailed, first class mail, postage prepaid, to the Borrower at its address set forth in the Credit Agreement, or delivered or otherwise sent to the Borrower, at least five (5) days before the date of the sale. The Borrower expressly waives any right to receive notice of any public or private sale of any Collateral or other security for the Secured Obligations except as expressly provided for in this paragraph.

With respect to any Collateral consisting of securities, partnership interests, joint venture interests, investments or the like, and whether or not any of such Collateral has been effectively registered under the Securities Act of 1933, as amended, or other Applicable Laws, the Collateral Agent may, but shall not be obligated to, sell all or any part of such Collateral at private sale in such manner and under such circumstances as the Collateral Agent may deem necessary or advisable in order that the sale may be lawfully conducted.

Without limiting the foregoing, the Collateral Agent may (i) approach and negotiate with a limited number of potential purchasers, and (ii) restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing such Collateral for their own account for investment and not with a view to the distribution or resale thereof. In the event that any such Collateral is sold at private sale, the Borrower agrees that if such Collateral is sold for a price which the Collateral Agent in good faith believes to be reasonable under the circumstances then existing, then (a) the sale shall be deemed to be commercially reasonable in all respects, (b) the Borrower shall not be entitled to a credit against the Secured Obligations in an amount in excess of the purchase price and (c) the Collateral Agent shall not incur any liability or responsibility to the Borrower in connection therewith, notwithstanding the possibility that a substantially higher price might have been realized at a public sale. The Borrower recognizes that a ready market may not exist for such Collateral if it is not regularly traded on a recognized securities exchange, and that a sale by the Collateral Agent of any such Collateral for an amount substantially less than a pro rata share of the fair market value of the issuer's assets minus liabilities may be commercially reasonable in view of the difficulties that may be encountered in attempting to sell a large amount of such Collateral or Collateral that is privately traded.

Upon consummation of any sale of Collateral hereunder, the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the Collateral so sold absolutely free from any claim or right upon the part of the Borrower or any other Person, and the Borrower hereby waives (to the extent permitted by Applicable Laws) all rights of redemption, stay and appraisal which it now has or may at any time in the future have under any rule of Applicable Law or statute now existing or hereafter enacted. If the sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral Agent shall not be required to apply any portion of the sale price to the Secured Obligations until such amount actually is

received by the Collateral Agent, and any Collateral so sold may be retained by the Collateral Agent until the sale price is paid in full by the purchaser or purchasers thereof. The Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to pay for the Collateral so sold, and, in case of any such failure, the Collateral may be sold again.

The Borrower hereby irrevocably constitutes and appoints each of the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, for the purpose of carrying out the terms of this Agreement and the other Loan Documents, effective upon the occurrence and during the continuation of an Event of Default, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement and the other Loan Documents, and, without limiting the generality of the foregoing, the Borrower hereby gives each of the Collateral Agent and any officer or agent thereof the power and right, on behalf of the Borrower, without notice to or assent by the Borrower, to do any or all of the following upon the occurrence and during the continuance of an Event of Default:

(i)      in the name of the Borrower or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Account or contract subject to the security interest created hereby or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Account or contract subject to such security interest or with respect to any other Collateral whenever payable;

(ii)     in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may request to evidence the Collateral Agent's and the Secured Parties' security interest in such Intellectual Property and the goodwill and General Intangibles of the Borrower relating thereto or represented thereby;

(iii)    pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement or any other Loan Document and pay all or any part of the premiums therefor and the costs thereof;

(iv)     execute, in connection with any sale provided for in this Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral;

(v)      (A) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct; (B) ask or make demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (D) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (E) defend any suit, action or proceeding brought against the Borrower with respect to any Collateral; (F) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; (G) license or assign any Intellectual Property (along with the goodwill of the business

to which any such Intellectual Property pertains), for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine; and (H) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent was the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and the Borrower's expense, at any time, or from time to time, all acts and things that the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's and the other Secured Parties' security interests therein and to effect the intent of this Agreement and the other Loan Documents, all as fully and effectively as the Borrower might do;

   (vi) take possession of the Pistachio Plant Property and complete the Improvements;

   (vii) use any of Borrower's Funds and any undisbursed proceeds of the Real Estate Term Loan for the purpose of completing the Improvements and for other costs related thereto;

   (viii) make such additions and changes and corrections in the Project Plans as may be necessary or desirable, as the Collateral Agent or the Administrative Agent, deems proper to complete the Improvements;

   (ix) employ such contractors, subcontractors, agents, architects, engineers and inspectors as are required to complete the Improvements;

   (x) employ security personnel to protect the Pistachio Plant Property from damage;

   (xi) pay, settle or compromise all existing bills and claims against Borrower's Funds or any undisbursed proceeds of the Real Estate Term Loan as may be necessary or desirable or as the Collateral Agent or the Administrative Agent deems proper, for the completion of the Improvements, or for the protection or clearance of title to the Pistachio Plant Property, or for the protection of the interests of the Secured Parties with respect thereto;

   (xii) prosecute and defend all actions and proceedings in connection with the construction of the Improvements;

   (xiii) record any notices of completion, cessation of labor and other notices that the Collateral Agent or the Administrative Agent deems necessary to protect any interest of the Secured Parties under the provisions of this Agreement, the Credit Agreement, the Deed of Trust, any of the Security Documents, or any other Loan Document; and

   (xiv) execute, acknowledge, and deliver all instruments and documents in the name of the Borrower which may be necessary or desirable or as the Collateral Agent or the Administrative Agent deems proper, and to perform any and every act with respect to the construction of the Improvements which the Borrower might perform on the Borrower's own behalf.

If the Borrower fails to perform or comply with any of its agreements contained herein, the Collateral Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement in accordance with the provisions of this Section.

The reasonable documented out of pocket expenses of the Collateral Agent incurred in connection with actions taken pursuant to the terms of this Agreement shall be payable by the Borrower in accordance with Section 17.3 of the Credit Agreement.

The Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof in accordance with this Section. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

10. Counsel Fees and Costs. The Collateral Agent shall be entitled to reasonable documented out of pocket attorneys' fees and all other costs and expenses which it incurs in connection with the enforcement or preservation of its rights under, or defense of, this Agreement or in connection with any other dispute or proceeding relating to this Agreement, whether or not incurred in any insolvency proceeding, arbitration, litigation or other proceeding.

11. Statute of Limitations and Other Laws. Until the Secured Obligations shall have been paid and performed in full, the power of sale and all other rights, privileges, powers and remedies granted to the Collateral Agent hereunder shall continue to exist and may be exercised by the Collateral Agent at any time and from time to time irrespective of the fact that any of the Secured Obligations may have become barred by any statute of limitations. The Borrower expressly waives the benefit of any and all statutes of limitation, and any and all Applicable Laws providing for exemption of property from execution or for valuation and appraisal upon foreclosure, to the maximum extent permitted by Applicable Law.

12. Other Agreements. Nothing herein shall in any way modify or limit the effect of terms or conditions set forth in any other security or other agreement executed by the Borrower or in connection with the Secured Obligations, but each and every term and condition hereof shall be in addition thereto.

13. Condition of the Borrower and its Subsidiaries. The Borrower represents and warrants to the Collateral Agent that the Borrower has established adequate means of obtaining from the Borrower and any Subsidiaries, on a continuing basis, financial and other information pertaining to the businesses, operations and condition (financial and otherwise) of the Borrower and any Subsidiaries and their Properties, and the Borrower now is and hereafter will be completely familiar with the businesses, operations and condition (financial and otherwise) of the Borrower and any Subsidiaries and their Properties. The Borrower hereby expressly waives and relinquishes any duty on the part of the Collateral Agent or any Secured Party (should any such duty exist) to disclose to the Borrower any matter, fact or thing related to the businesses, operations or condition (financial or otherwise) of the Borrower or any Subsidiaries or their Properties, whether now known or hereafter known by the Collateral Agent of any Secured Party during the life of this Agreement. With respect to any of the Secured Obligations, the Collateral Agent need not inquire into the powers of the Borrower or any Subsidiaries thereof or the officers or employees acting or purporting to act on their behalf, and all Secured Obligations made or created in good faith reliance upon the professed exercise of such powers shall be secured hereby.

14. Liens on Real Estate. In the event that all or any part of the Secured Obligations at any time are secured directly or indirectly by any one or more deeds of trust or mortgages or other instruments creating or granting Liens on any interests in Real Estate, the Borrower authorizes the Collateral Agent, upon the occurrence of and during the continuance of any Event of Default, at the Collateral Agent's reasonable judgment, without notice or demand and without affecting any Secured Obligations of the Borrower, the enforceability of this Agreement, or the validity or enforceability of any Liens of the Collateral Agent on any Collateral, to foreclose any or all of such deeds of trust or mortgages or other instruments by judicial or nonjudicial sale. Insofar as the Liens created herein secure the obligations of other Persons, (i) the Borrower expressly waives any defenses to the enforcement of this Agreement or any Liens created or granted hereby or to the recovery by the Collateral Agent against any guarantor or any other Person liable therefore of any deficiency after a judicial or nonjudicial foreclosure or sale, even though such a foreclosure or sale may impair the subrogation rights of the Borrower and may preclude the Borrower from obtaining reimbursement or contribution from any of the other Credit Parties and (ii) the Borrower

expressly waives any defenses or benefits that may be derived from California Code of Civil Procedure §§ 580a, 580b, 580d or 726, or comparable provisions of the Applicable Laws of any other jurisdiction, and all other suretyship defenses it otherwise might or would have under any Applicable Law. The Borrower expressly waives any right to receive notice of any judicial or nonjudicial foreclosure or sale of any Real Estate or interest therein subject to any such deeds of trust or mortgages or other instruments and the Borrower's failure to receive any such notice shall not impair or affect the Borrower's Secured Obligations or the enforceability of this Agreement or any Liens created or granted hereby.

15. Waiver of Rights of Subrogation. Notwithstanding anything to the contrary elsewhere contained herein or in any other document to which the Borrower is a party, the Borrower hereby waives with respect to any Person, any and all rights at Applicable Law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to setoff or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker and which the Borrower may have or hereafter acquire in connection with or as a result of the Borrower's execution, delivery and/or performance of this Agreement or any document to which the Borrower is a party. The Borrower agrees that it shall not have or assert any such rights against any Person or its successors and assigns or any other attempted setoff to any action commenced against the Borrower or any Person. The Borrower hereby acknowledges and agrees that this waiver is intended to benefit the Collateral Agent and shall not limit or otherwise affect the Borrower's liability hereunder, under any other document to which the Borrower is a party, or the enforceability hereof or thereof.

16. Understandings with Respect to Waivers and Consents. The Borrower warrants and agrees that each of the waivers and consents set forth herein are made after consultation with legal counsel and with full knowledge of their significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which the Borrower otherwise may have against the Collateral Agent or others, or against Collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or Applicable Law. If any of the waivers or consents herein are determined to be contrary to any Applicable Law or public policy, such waivers and consents shall be effective to the maximum extent permitted by Applicable Law.

17. Continuing Effect. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Borrower for liquidation or reorganization, should the Borrower become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Borrower's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to Applicable Law, rescinded or reduced in amount, or must otherwise be restored or returned by the Collateral Agent, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment or any part thereof is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

18. Release of the Borrower. This Agreement and all Secured Obligations of the Borrower hereunder shall be released when all Secured Obligations have been paid in full in cash or otherwise performed in full. Upon such release of the Borrower's Secured Obligations hereunder, the Collateral Agent promptly shall return any pledged Collateral to the Borrower, or to the Person or Persons legally entitled thereto, and promptly shall endorse, execute, deliver, record and file all instruments and documents, and do all other acts and things, reasonably required for the return of the Collateral to the Borrower, or to the Person or Persons legally entitled thereto, and to evidence or document the release of the Collateral Agent's

interests arising under this Agreement, all as reasonably requested by, and at the sole expense of, the Borrower.

19. Grant of License to Use Intellectual Property. For the purpose of enabling the Collateral Agent to exercise rights and remedies under Section 9 hereof (including, without limiting the terms of Section 9 hereof, in order to take possession of, hold, preserve, process, assemble, prepare for sale, market for sale, sell or otherwise dispose of Collateral) at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, the Borrower hereby grants to the Collateral Agent, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Borrower) to use, license or sublicense any Intellectual Property now owned or hereafter acquired by the Borrower, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

20. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same agreement.

21. Additional Powers and Authorization. Notwithstanding anything contained herein to the contrary, the Collateral Agent may employ agents, trustees, or attorneys-in-fact and may vest any of them with any property (including, without limitation, any Collateral pledged hereunder), title, right or power deemed necessary for the purposes of such appointment.

22. Governing Law, Jurisdiction and Venue. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES OR OTHER RULE OF LAW WHICH WOULD CAUSE THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE LAW OF THE STATE OF NEW YORK (BUT GIVING EFFECT TO FEDERAL LAWS RELATING TO NATIONAL BANKS). THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. THE PARTIES EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN ANY SUCH COURT, AND THE PARTIES HEREBY WAIVE ANY OBJECTION THEY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION AND HEREBY CONSENT TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY ANY SUCH COURT. FURTHERMORE, THE PARTIES HEREBY WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO ASSERT THAT ANY SUCH COURT IS AN INCONVENIENT FORUM OR OTHERWISE TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 22. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT OR ANY OTHER SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION, LITIGATION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

23. UCC-1 Financing Statement. The parties further agree that the Collateral Agent may file such UCC-1 financing statements and take such other actions as the Collateral Agent may reasonably deem

necessary to perfect the Collateral Agent's security interest in the Collateral. Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of Collateral that describes such property in any other manner as the Collateral Agent may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted herein, including, without limitation, describing such property as "all assets" or "all personal property."

24. Powers of Attorney and other Authorizations. All powers of attorney and other authorizations granted to the Secured Parties, the Collateral Agent, the Administrative Agent and any Persons designated by the Collateral Agent, the Administrative Agent or any other Secured Party pursuant to any provisions of this Agreement shall be deemed coupled with an interest and shall be irrevocable so long as any of the Secured Obligations (other than (1) contingent indemnification obligations and (2) Secured Hedging Obligations and Secured Bank Services Obligations as to which arrangements satisfactory to the applicable Secured Bank Service Provider or applicable counterparty, as applicable shall have been made) remain unpaid or unsatisfied, any of the Commitments remain in effect or the credit facility has not been terminated.

25. Appointment of the Collateral Agent. Each Secured Party not a party to the Credit Agreement who obtains the benefit of this Agreement shall be deemed to have acknowledged and accepted the appointment of the Collateral Agent pursuant to the terms of the Credit Agreement, and that with respect to the actions and omissions of the Collateral Agent hereunder or otherwise relating hereto that do or may affect such Secured Party, the Collateral Agent and each of its Affiliates and Related Parties shall be entitled to all of the rights, benefits and immunities conferred under Section 13 of the Credit Agreement.

IN WITNESS WHEREOF, the Borrower and the Collateral Agent have executed this Agreement by their duly authorized officers as of the date first written above.

"Borrower"

**TOUCHSTONE PISTACHIO COMPANY, LLC, a California limited liability company**

By: ____________________________
Name: Farid Assemi
Title: Manager

"Collateral Agent"

**MUFG UNION BANK, N.A.**

By: ____________________________
Name:
Title:

IN WITNESS WHEREOF, the Borrower and the Collateral Agent have executed this Agreement by their duly authorized officers as of the date first written above.

"Borrower"

**TOUCHSTONE PISTACHIO COMPANY, LLC**, a California limited liability company

By: ______________________________
Name:
Title:

"Collateral Agent"

**MUFG UNION BANK, N.A.**

By: ______________________________
Name: Keith Sevigny
Title: Vice President

<u>Annex A</u>

UCC Financing Statements

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Corporation Service Company 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

F-186351
Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: CA
Secretary Of State

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: Touchstone Pistachio Company, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1306 W. Herndon Avenue, Suite 101 | Fresno | CA | 93711 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: MUFG Union Bank, N.A., as Collateral Agent

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 350 California Street, 17th Floor | San Francisco | CA | 94104 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor now owned or at any time hereafter acquired or in which Debtor now has or at any time in the future may acquire any interest and all proceeds thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: [2066057-0033]

# EXHIBIT 4

EPN

2020-0083035

RECORDING REQUESTED BY

Old Republic Title Company

Escrow No.: 1411017848
APN: 319-130-022

WHEN RECORDED MAIL TO

MUFG Union Bank, N.A.
ATTN: Collateral Management (T-83E-5122)
P.O. Box 29235
Phoenix, AZ 85038-9235

Recorded | REC FEE 104.00
Official Records
County of
Tulare
ROLAND P. HILL
Clerk Recorder

NB
03:00PM 18-Dec-2020 | Page 1 of 17

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

# Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

1 ☒ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2 ☐ Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4 ☐ Exempt from fee per GC27388.1(a)(1); fee cap of $225 reached

5 ☐ Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

11 ☐ Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

12 ☐ Exempt from fee per GC27388.1(a)(2); executed or recorded by the federal government in accordance with the Uniform Federal Lien Registration Act (Title 7 (commencing with Section 2100) of Part 4 of the Code of Civil Procedure)

DB/ls

RECORDING REQUESTED BY:
**MUFG UNION BANK, N.A.**

AND WHEN RECORDED MAIL TO:

MUFG UNION BANK, N.A.
Attn: Collateral Management (T-83E-5122)
P. O. Box 29235
Phoenix, AZ 85038-9235

Instructions to County Recorder:
Index this document as:
(1) a deed of trust, and
(2) a fixture filing.

---

Space Above This Line For Recorder's Use

## DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THE DEBT INSTRUMENT SECURED BY THIS DEED OF TRUST CONTAINS A PROVISION ALLOWING OBLIGOR TO BORROW, REPAY AND REBORROW THEREUNDER, SO LONG AS THE TOTAL AMOUNT OUTSTANDING AT ANY ONE TIME DOES NOT EXCEED THE STATED PRINCIPAL AMOUNT OF THE DEBT INSTRUMENT.

**THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this "Deed of Trust") is made as of the 18th day of December, 2020, by TOUCHSTONE PISTACHIO COMPANY, LLC, a California limited liability company, as Trustor, whose mailing address is 1306 West Herndon Ave., Suite 101, Fresno, CA 93711-7183, in favor of UnionBanCal Mortgage Corporation, a California corporation, as Trustee, whose mailing address is 9885 Towne Centre Drive, San Diego, California 92121, for the benefit of MUFG UNION BANK, N.A., in its capacity as collateral agent under the Debt Instrument (as defined in the "SECURED OBLIGATIONS" Section below), as Beneficiary, whose mailing address is 350 California Street, 17th Floor, San Francisco, CA 94104.

**1. GRANT IN TRUST.** For the purpose of securing payment and performance of the Secured Obligations (as defined in the "SECURED OBLIGATIONS" Section below), Trustor hereby irrevocably and unconditionally grants, conveys, transfers and assigns to Trustee, its successors and assigns, IN TRUST, WITH POWER OF SALE TOGETHER WITH THE RIGHT OF ENTRY AND POSSESSION, for the benefit and security of Beneficiary, all present and future rights, titles, interests, estates, powers and privileges that Trustor now has or may hereafter acquire in or to the following property and any interest therein (collectively, the "Trust Estate"):

**1.1** The real property located in the County of Tulare, State of California, more particularly described in Exhibit "A" attached hereto (the "Real Property");

**1.2** All buildings and other improvements and structures now or hereafter located on the Real Property (collectively, the "Improvements" and together with the Real Property shall sometimes be referred to as "Property");

**1.3** All existing and future leases, subleases, subtenancies, licenses, agreements and concessions relating to the use, occupancy or enjoyment of all or any part of the Property, together with any and all guaranties and other agreements relating to or made in connection with any of the foregoing (individually, a "Lease", and collectively, the "Leases");

**1.4** All rents, issues, income, revenues, royalties, profits, proceeds and earnings now or hereafter payable with respect to or otherwise derived from the ownership, use, management, operation, leasing or occupancy of the Property, including, without limitation, cash or security deposited under any of the Leases to secure the performance by the lessees of their obligations thereunder (collectively, the "Rents");

**1.5** All tenements, hereditaments, appurtenances, privileges, choses in action, options to purchase all or any part of the Property or any interest therein (and any greater estate in the Property now owned or hereafter acquired by Trustor pursuant thereto), and other rights and interests now or in the future benefiting or otherwise relating to the Property, including, without limitation, easements, rights-of-way, sidewalks, alleys and strips and gores of land adjacent to or used in connection with the Property, development rights, oil, gas or other mineral rights and all royalty, leasehold and other rights of Trustor pertaining thereto;

**1.6** All water and water rights pertaining to the Real Property, and shares of stock evidencing the same, and all deposits made with or other security given to utility companies by Trustor with respect to the Property;

**1.7** All policies of insurance and all claims, demands or proceeds relating to such insurance or condemnation awards, recoveries or settlements which Trustor now has or may hereafter acquire with respect to the Property, including all advance payments of insurance premiums made by Trustor with respect thereto;

**1.8** All inventory, furnishings, fixtures, equipment, supplies, construction materials, goods and other articles of personal property, which are now or hereafter owned by Trustor and located at, placed upon or about, or affixed or attached to or installed in or on the Property or any part thereof, and used or to be used in connection with or otherwise relating to the Property or the ownership, use, development, construction, maintenance, management, operation, marketing, leasing or occupancy thereof, and all accessories, attachments, parts, or repairs of or to any of such property;

**1.9** All (a) accounts, general intangibles, chattel paper, letter of credit rights, deposit accounts, money, investment property, documents, certificates of title and instruments (whether negotiable or nonnegotiable), contract rights, insurance policies, and all rights to payment of any kind relating to or otherwise arising in connection with or derived from the Property or any other part of the Trust Estate, (b) accounts, general intangibles and all rights to payment of any kind relating to or otherwise arising in connection with or derived from any Hedging Agreement or Swap Obligation (each as defined in the Debt Instrument), (c) refunds, rebates, reserves, deferred payments, deposits, cost savings and payments of any kind due from or payable by (i) any federal, state, municipal or other governmental or quasi-governmental agency, authority or district (individually, a "Governmental Agency"), or (ii) any insurance or utility company, in either case relating to any or all of the Trust Estate, (d) refunds, rebates and payments of any kind due from or payable by any Governmental Agency for any taxes, assessments, or governmental or quasi-governmental charges or levies imposed upon Trustor with respect to or upon any or all of the Trust Estate, and (e) cash collateral accounts maintained pursuant to any of the Loan Documents (as defined in the "Inspections" Section below); and

**1.10** All supporting obligations for, additions, accessions, improvements and accretions to, substitutions and replacements for, and proceeds and products of, any of the foregoing.

**2. SECURED OBLIGATIONS.** Trustor makes the grant, conveyance, transfer and assignment set forth in the "GRANT IN TRUST" Section above FOR THE PURPOSE OF SECURING the following obligations (collectively, the "Secured Obligations") in such order of priority as Beneficiary may elect:



**2.1** Payment of all sums at any time owing and the performance of all other obligations arising under that certain Credit Agreement in the original aggregate principal amount of Two Hundred Million and No/100 Dollars ($200,000,000) dated March 20, 2020 (as amended by Amendment No. 1 to Credit Agreement dated as of July 10, 2020, Amendment No. 2 to Credit Agreement dated as of October 20, 2020 and Amendment No. 3 to Credit Agreement dated December 14, 2020) executed by, inter alia, Trustor, as borrower ("Obligor") and the Beneficiary, as collateral agent and any and all modifications, replacements, extensions and renewals thereof (collectively, the "Debt Instrument"), whether hereafter evidenced by the Debt Instrument or otherwise;

**2.2** Payment of interest on such sums according to the terms of the Debt Instrument Documents (including any interest on pre-petition obligations accruing after the commencement of any insolvency or similar proceeding by or against the Trustor, whether or not allowable in such proceeding);

**2.3** Payment of all other sums, including late charges and any reasonable and documented attorney's fees and other advances made by Beneficiary hereunder as hereinafter provided, with interest thereon as hereinafter provided, which are due or payable to Trustee or Beneficiary under the provisions hereof;

**2.4** Due, prompt and complete observance, performance and discharge of each and every obligation, covenant and agreement of Trustor contained herein, of Obligor in the Debt Instrument or in the Loan other Loan Documents (as such term is defined in the Debt Instrument) executed by Trustor or Obligor, as the case may be, in connection with the indebtedness evidenced by the Debt Instrument, and all supplements, amendments and modifications thereto and all extensions and renewals thereof, or in any other instrument or document heretofore or hereafter executed by Trustor or Obligor having reference to or arising out of the indebtedness evidenced by the Debt Instrument which recites that the obligations thereunder are secured hereby;

**2.5** Payment of such additional sums as may be hereafter borrowed from Beneficiary by Trustor or Obligor (or guaranteed by Trustor) when evidenced by a debt instrument or instruments (or guaranty or guaranties, as the case may be) which are by the terms thereof (or by the terms of any other instrument executed by Trustor or Obligor, as the case may be, in connection therewith) secured by this Deed of Trust, together with interest and late charges thereon according to the terms of such debt instrument or instruments;

**2.6** All of the "Secured Obligations" (as such term is defined in the Debt Instrument); and

**2.7** Performance of such future obligations which Trustor or Obligor may agree to perform for the benefit of Beneficiary when Trustor or Obligor executes a document or documents reciting that such obligations are secured hereby.

**3. AFFIRMATIVE COVENANTS OF TRUSTOR.** Trustor hereby agrees as follows:

**3.1 Performance of Obligations.** To pay, perform, observe and discharge each and every condition, obligation, covenant and agreement for which this Deed of Trust has been given as security as provided above.

**3.2 Maintenance, Repair and Alterations.** To keep the Trust Estate in good condition and repair; not to remove, demolish or substantially alter any of the Improvements without the prior written consent of Beneficiary, such consent not to be unreasonably withheld, conditioned or delayed; to notify Beneficiary in writing of any material damage or destruction to the Trust Estate or any portion thereof promptly upon Trustor obtaining knowledge of same, whether or not covered by insurance; to complete or restore promptly and in good and workmanlike manner any Improvements which may be constructed, damaged or destroyed on the Real Property and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws, ordinances, regulations, covenants, conditions and restrictions (including, without limitation, the directives of any Governmental Agency) now or hereafter affecting the

Trust Estate or any part thereof or requiring any alterations, improvements or additions to be made thereon; not to commit or permit any waste or deterioration of the Trust Estate; to keep and maintain abutting grounds, sidewalks, roads, parking and landscape areas in good and neat order and repair; to perform, in the event all or any portion of the Trust Estate constitutes a leasehold estate, each and every obligation of Trustor under the terms of the agreements creating such leasehold estate; and not commit, suffer or permit any act to be done in or upon the Trust Estate in violation of any law, ordinance or regulation.

**3.3 Insurance**

**(a) Coverage.** To keep Improvements insured at all times against loss or damage with property hazard insurance in an amount at least equal to the full insurable value of the Improvements (including tenant improvements) on a replacement cost basis, as determined by Beneficiary (as such insurable value may change from time to time) and against any other risk or hazard which in the reasonable opinion of Beneficiary should be insured against or which is required to be insured against under the terms of the Debt Instrument including, without limitation, earthquake, flood and business interruption (including rent loss and/or extra expense or as appropriate). Trustor shall also carry public liability insurance with coverage amounts as determined by Beneficiary (as such coverage amounts may change from time to time). All insurance policies shall (i) be in such form and with such endorsements as may be required by Beneficiary, (ii) provide a lender's loss payable endorsement or be endorsed with a standard non-contributory mortgage clause, as appropriate, in favor of Beneficiary, (iii) be underwritten by insurance providers acceptable to Beneficiary, and (iv) provide Beneficiary at least thirty (30) days' prior notice of cancellation, non-renewal or modification. The policy or policies evidencing all insurance required hereunder (or certificates of such insurance) shall be delivered to and held by Beneficiary. Trustor shall pay premiums on such insurance as they become due, and shall not permit any condition to exist on or with respect to the Property which would wholly or partially invalidate any insurance.

**(b) Application of Proceeds.** To pay to Beneficiary, promptly upon Trustor's receipt of same, any proceeds received by Trustor under any such insurance policy on account of any damage or destruction to the Improvements. Beneficiary shall have the right to join Trustor in adjusting any loss covered by any such insurance, and all loss under all such insurance shall be payable directly to Beneficiary, and Trustor hereby authorizes and empowers Beneficiary, at Beneficiary's sole option and in Beneficiary's sole discretion as attorney-in-fact for Trustor, to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Beneficiary's expenses incurred in the collection thereof. If Beneficiary elects not to exercise such right, Beneficiary shall be under no obligation to question the amount of any compensation, award, recovery, settlement, proceeds, damages, claims, rights of action or payments received under any policy of insurance on account of any damage or destruction to the Improvements, and may accept the same in the amount paid. In the event of any damage to or destruction of the Improvements, Beneficiary shall have the option, in its sole discretion, to: (i) apply, in the event Beneficiary determines that the security for the repayment of the indebtedness secured hereby has been impaired on account of such damage or destruction, all or any part of such proceeds to any indebtedness secured hereby in such order as Beneficiary may determine, whether or not such indebtedness is then due, (ii) release all or any part of such proceeds to Trustor, or (iii) hold the balance of such proceeds to be used to reimburse Trustor for the cost of reconstruction of the Improvements. In the event Beneficiary elects to so hold such insurance proceeds, the Improvements shall be promptly and diligently restored by Trustor to the equivalent of their condition immediately prior to such damage, destruction or casualty or to such other condition as Beneficiary may approve in writing, and the disbursement of such insurance proceeds shall be in accordance with disbursement procedures acceptable to Beneficiary. If Beneficiary elects to apply the insurance proceeds to the payment of the sums secured hereby,

and after doing so Beneficiary reasonably determines that the remaining security is inadequate to secure the remaining indebtedness, Trustor shall, upon written demand from Beneficiary, prepay on principal such amount as will reduce the remaining indebtedness to a balance for which adequate security is present. Moreover, such application shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

**3.4 Taxes.** To (a) pay (unless Beneficiary impounds funds for payment of same, in which event Beneficiary shall pay) prior to delinquency, all real property taxes and assessments, general and special, and all other taxes, assessments and charges of any kind or nature whatsoever, which are imposed upon, assessed against or affect the Trust Estate or any part thereof, (b) pay when due all encumbrances, charges or liens of any kind or nature whatsoever, which create or may create a lien upon the Trust Estate or any part thereof or any interest therein, whether prior and superior or subject and subordinate to the lien hereof, and (c) deliver, upon Beneficiary's request, to Beneficiary, within fifteen (15) days after the date upon which any such tax, assessment, encumbrance, charge or lien is due and payable by Trustor, official receipts of the appropriate taxing authority (or other proof satisfactory to Beneficiary) evidencing the payment thereof.

**3.5 Condemnation.** Trustor, upon obtaining knowledge of the institution of any proceedings for the condemnation of the Trust Estate or any portion thereof, shall promptly notify Beneficiary of such fact in writing. Beneficiary shall have the right, but not the obligation, to participate in any such proceedings, to control same and to be represented therein by counsel of its choice at Trustor's expense, and Trustor shall deliver, or cause to be delivered, to Beneficiary such instruments as may be requested by it from time to time to permit such participation. All compensation, awards, recoveries, settlement, proceeds, damages, claims, rights of action and payments to which Trustor may become entitled to on account of such proceedings shall be paid to Beneficiary. Any sums so collected by Beneficiary shall first be applied to reimburse Trustee and Beneficiary for all costs and expenses, including reasonable and documented attorneys' fees, incurred in connection with the collection of such sums, and the balance shall be applied, in the event Beneficiary determines that the security for the repayment of the indebtedness secured hereby has been impaired on account of such condemnation, to any indebtedness secured hereby in such order as Beneficiary may determine, whether or not such indebtedness is then due. Any surplus remaining after payment and satisfaction of any indebtedness secured hereby shall be paid to Trustor as its interest may then appear. If Beneficiary elects to apply the condemnation proceeds to the payment of the sums secured hereby, and after doing so Beneficiary reasonably determines that the remaining security is inadequate to secure the remaining indebtedness, Trustor shall, upon written demand from Beneficiary, prepay on principal such amount as will reduce the remaining indebtedness to a balance for which adequate security is present. Such application shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice. Beneficiary shall be under no obligation to question the amount of any compensation, awards, recoveries, settlement, proceeds, damages, claims, rights of action or payments received in any such condemnation proceeding, and may accept the same in the amount paid.

**3.6 CC&Rs.** To promptly and completely observe, perform and discharge in all material respects each and every condition, obligation, covenant and agreement affecting the Property, whether the same is prior and superior or subject and subordinate hereto, including, without limitation, if the Property is or will be a condominium, community apartment or part of a planned development project, each and every provision to be performed by Trustor under any declaration of covenants, conditions and restrictions or the like pertaining thereto.

**3.7 Actions Affecting Trust Estate.** To appear in and defend, at Trustor's expense, any action or proceeding purporting to affect the Trust Estate, the security hereof or the rights or powers of Beneficiary or Trustee hereunder; and to pay all costs and expenses incurred by Beneficiary or Trustee, including reasonable and documented attorneys' fees, in any such action or proceeding in which Beneficiary or Trustee may appear and in any suit brought by Beneficiary to foreclose this Deed of Trust or to exercise the power of sale hereunder.

**3.8 Actions by Beneficiary to Preserve Trust Estate.** Should Trustor fail to perform any of its obligations under this Deed of Trust, beyond any applicable notice and cure periods (if any), then Beneficiary, in its discretion, without obligation to do so and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereunder, may make or do the same. In connection therewith, and without limiting its general powers, Beneficiary shall have and is hereby given the right, but not the obligation: (a) to enter upon and take possession of the Trust Estate or any part thereof, (b) to make additions, alterations, repairs and improvements to the Trust Estate or any part thereof which Beneficiary may consider necessary or proper to keep the Trust Estate in good condition and repair, (c) to commence, maintain, appear and participate in any action or proceeding affecting or which may affect, or which is necessary to protect, the security hereof or the rights or powers of Beneficiary or Trustee hereunder, (d) to pay, purchase, contest or compromise any encumbrance, claim, charge or lien which in the judgment of Beneficiary may affect or appears to affect the security of this Deed of Trust or which create or may create a lien upon the Trust Estate or any part thereof or interest therein, whether prior and superior or subject and subordinate to the lien hereof, and (e) in exercising such powers, to pay necessary expenses incurred in connection therewith, to employ counsel and other consultants, and to pay such counsel's or consultants' fees and expenses. Immediately upon demand therefor by Beneficiary, Trustor shall pay all costs and expenses incurred by Beneficiary in connection with the exercise by Beneficiary of the foregoing rights, together with interest thereon according to the terms of the Debt Instrument, and all such sums shall be secured by this Deed of Trust.

**3.9 Inspections.** Beneficiary, through its agents, representatives or employees, is authorized to enter during normal business hours (or, in the case of an emergency, as reasonably determined by the Beneficiary at any other reasonable time) upon or in any part of the Property for the purpose of (a) inspecting same, and (b) performing any of the acts it is authorized to perform hereunder or under the terms of this Deed of Trust, the Debt Instrument, any guaranty thereof and any other instrument or agreement given to evidence or further secure the payment and performance of any obligation secured hereby (collectively, the "Loan Documents"). In the case of a request to transfer the Trust Estate or any part thereof in accordance with the terms hereof, Trustor shall pay all appraisal fees and related reasonable expenses incurred by Beneficiary in evaluating such request.

**3.10 Books and Records.** Trustor shall keep and maintain, or cause to be kept and maintained, proper and accurate books, records and accounts of the Trust Estate and of its own financial affairs to permit the preparation of financial statements therefrom. Beneficiary, through its agents, representative or employees, shall have the right, from time to time, at any time and at all times, (or, in the case of an emergency, as reasonably determined by the Beneficiary at any other reasonable time), to examine, copy and audit such books, records and accounts. If the Property is at any time used for commercial or residential income purposes, Trustor shall deliver to Beneficiary, upon request, certified financial statements and profit-and-loss statements for Trustor and the Trust Estate prepared in accordance with generally accepted accounting principles.

**3.11 Personal Property.** Trustor shall not remove from the Property any Personal Property (as defined in the "SECURITY AGREEMENT" Section below) except in the ordinary course of business and then only if such removed property is replaced with similar property of comparable quality.

**4. NEGATIVE COVENANTS OF TRUSTOR.** Trustor hereby agrees as follows:

**4.1 Other Financing.** Trustor shall not create or permit to continue in existence any mortgage, pledge, security interest, lien, charge or encumbrance of any kind upon the Trust Estate or any part thereof or any interest therein except for: (a) the lien of this Deed of Trust, (b) liens for taxes and assessments not yet delinquent, and (c) such other liens or charges as are specifically approved in writing by Beneficiary. Trustor shall, at Trustor's expense, take all action necessary to promptly secure releases of all liens and encumbrances which in the opinion of Beneficiary are or may be prior and superior to Beneficiary's security interest.

**4.2 Transfers.**

**(a) Transfer of Trust Estate.** Except as expressly provided for in the Debt Instrument, Trustor shall not, directly or indirectly, sell, convey, assign, further encumber, transfer, alienate or otherwise dispose of the Trust Estate or any part thereof or any interest therein, including, without limitation, air rights or development rights, whether voluntarily, involuntarily, by operation of law or otherwise, or lease all or any portion thereof or an undivided interest therein, or enter into an agreement so to do, without the prior written consent of Beneficiary. Any consent by Beneficiary permitting a transaction otherwise prohibited under this Section shall not constitute a consent to or waiver of any right of Beneficiary to withhold its consent on any subsequent occasion to a transaction not otherwise permitted by the provisions hereof.

**(b) [Reserved].**

**(c) Transfer of Duties.** Trustor shall not transfer or delegate the duties of managing the Property under any management agreement, if any, to any person, firm, corporation, partnership, limited liability company or other entity without the prior written consent of Beneficiary.

**5. ASSIGNMENT OF RENTS AND PERFORMANCE OF LEASES.**

**5.1 Assignment of Rents and Leases.** Trustor hereby irrevocably absolutely and unconditionally assigns and transfers to Beneficiary all of Trustor's right, title and interest in and to the Leases and the Rents; provided, however, that so long as no Event of Default (as defined in the "Events of Default" Section below) has occurred and is continuing, Trustor shall have the right under a license granted hereby to collect and receive all Rents as trustee for the benefit of Beneficiary and to apply the amounts so collected first to the payment of costs and expenses associated with the ownership maintenance, operation and leasing of the Property, including, principal, interest and all other amounts required to be paid under the Loan Documents, before using or applying such Rents for any other purpose. No Rents or such other income shall be distributed or paid to Trustor, unless such costs and expenses which are then due have been paid in full. Thereafter, so long as no Event of Default has occurred, the balance may be distributed to Trustor. If an Event of Default has occurred and is continuing, Trustor's right to collect and receive the Rents under the license granted hereby shall cease and the license shall be revoked automatically and, pursuant to the "Termination of License" Section below, Beneficiary shall have the sole right, with or without taking possession of the Property, to collect all Rents. This is an absolute assignment and not an assignment for security only.

**5.2 Negative Covenants Regarding Leases.** Trustor shall not, without the prior written consent of Beneficiary, (a) cancel, terminate or consent to the surrender of any Lease, if the Property is used for commercial purposes, (b) modify or in any way alter the material terms of any Lease, (c) release any lessee or guarantor from any obligations or conditions to be performed by any lessee or guarantor under any Lease, if the Property is used for commercial purposes, (d) collect any rent from any lessee for a period of more than one (1) month in advance, or (e) execute any further assignment of any of its right, title and interest in the Leases and the Rents.

**5.3 Affirmative Covenants Regarding Leases.** Trustor shall (a) observe, perform and discharge in all material respects each and every obligation, term, covenant, condition and agreement of Trustor under the Leases, (b) enforce the performance of each and every obligation, term, covenant, condition and agreement in the Leases to be performed by any lessee or guarantor thereof, (c) keep the Property leased at a good and sufficient rental and on such other terms and conditions as are reasonably acceptable to Beneficiary, (d) execute and deliver to Beneficiary upon demand, at any time and from time to time, any and all assignments and other instruments which Beneficiary may deem advisable to carry out the true purposes and intent of the assignment set forth in the "Assignment of Rents and Leases" Section above, and (e) at the request of Beneficiary, cause any or all tenants under a Lease to execute a

subordination, nondisturbance and attornment agreement and estoppel certificate in form and substance reasonably satisfactory to Beneficiary, if the Property is used for commercial purposes.

6. **SECURITY AGREEMENT.** This Deed of Trust shall constitute a security agreement as that term is used in the Uniform Commercial Code as adopted in the state in which the Property is located (the "UCC") and Trustor hereby pledges and grants to Beneficiary, as additional collateral for the Secured Obligations, a security interest in all of the property described in the "GRANT IN TRUST" Section above which may be personal property (collectively, the "Personal Property"). Trustor shall procure any documents, including, without limitation, mortgagee or landlord waivers or subordination agreements, in form and substance satisfactory to Beneficiary, with respect to any and all Personal Property (or fixtures which are a part of the Trust Estate), deliver to Beneficiary any instrument, mark any chattel paper, give any notice and take any other actions which are necessary or desirable to perfect or to continue the perfection and priority of the security interest created hereunder, or to protect the Personal Property or fixtures against the rights, claims or interests of third parties, and to pay all costs incurred in connection therewith. Trustor hereby appoints Beneficiary as Trustor's true attorney-in-fact, coupled with an interest, to perform (but without any obligation to do so) any of the foregoing acts should Trustor fail to do so, irrevocable until such time as the Secured Obligations have been indefeasibly satisfied, to be exercised from time to time and at any time by Beneficiary following an Event of Default hereunder. Notwithstanding anything to the contrary contained in this Deed of Trust, Trustor agrees that Beneficiary is, and shall be deemed to be, the "secured party" as that term is defined in the UCC, and Beneficiary shall have all of the rights and remedies of a secured party under the UCC as well as any and all other rights and remedies available at law or in equity. Trustor, upon demand of Beneficiary, shall assemble the Personal Property and make it available to Beneficiary at the Property or a place which is reasonably convenient to Beneficiary, and Beneficiary's expense in retaking, holding, preparing for sale, selling or the like shall be borne by Trustor, such expenses to include Beneficiary's and Trustee's attorneys' fees incurred in connection therewith. Trustor agrees not to change Trustor's name or state of organization or residence, as the case may be, without Beneficiary's prior written consent.

## 7. EVENTS OF DEFAULT AND REMEDIES.

7.1 **Events of Default.** The occurrence of an Event of Default under, and as defined in, the Debt Instrument or default hereunder or under any other Loan Documents that shall not have been cured within the applicable notice and/or cure period (if any) provided therefor shall be an event of default (an "Event of Default") under this Deed of Trust.

7.2 **Remedies.** Upon the occurrence of any Event of Default, Beneficiary may, at its option:

(a) **Acceleration.** Declare all indebtedness secured hereby, and the same shall thereupon become, immediately due and payable without any presentment, demand, protest or notice of any kind.

(b) **Termination of License.** Terminate Trustor's right and license to collect the Rents, and either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Trust Estate or any part thereof, in its own name or in the name of Trustee, and do any acts which it deems necessary or desirable to preserve the value, marketability or rentability of the Trust Estate, or any part thereof or interest therein, make, modify, enforce, cancel or accept the surrender of any Lease, increase the income therefrom or protect the security hereof and, with or without taking possession of the Trust Estate, sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including, without limitation, reasonable and documented attorneys' fees, upon any indebtedness secured hereby, all in such order as Beneficiary may determine. The entering upon and taking possession of all or any portion of the Trust Estate, the

collection of such Rents and the application thereof as aforesaid, or any of such acts, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default and, notwithstanding the continuance in possession of all or any portion of the Trust Estate or the collection, receipt and application of Rents, Trustee or Beneficiary shall be entitled to exercise every right provided for in any of the Loan Documents or by law upon occurrence of any Event of Default, including the right to exercise the power of sale. Failure of Beneficiary at any time, or from time to time, to collect the Rents shall not in any manner affect the subsequent enforcement of Beneficiary of the right to collect the same.

**(c) Appointment of Receiver.** As a matter of right and without notice to Trustor or anyone claiming under Trustor, and without regard to the then value of the Trust Estate or the interest of Trustor therein, to apply to any court having jurisdiction to appoint a receiver or receivers of the Trust Estate, and Trustor hereby irrevocably consents to such appointment and waives notice of any application therefor. Any such receiver or receivers shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Beneficiary in case of entry as provided in this Deed of Trust and shall continue as such and exercise all such powers until the later of (i) the date of confirmation of sale of the Trust Estate, (ii) the disbursement of all proceeds of the Trust Estate collected by such receiver and the payment of all expenses incurred in connection therewith, and (iii) the termination of such receivership with the consent of Beneficiary or pursuant to an order by a court of competent jurisdiction.

**(d) UCC Remedies.** Exercise any and all remedies available to a secured party under the UCC in such order and in such manner as Beneficiary, in its sole discretion, may determine; provided, however, that the expenses of retaking, holding, preparing for sale or the like, shall include reasonable and documented attorneys' fees and other expenses of Beneficiary and Trustee and be secured by this Deed of Trust.

**(e) Judicial Foreclosure of Deed of Trust.** Commence an action to foreclose this Deed of Trust as a mortgage, or specifically enforce any of the covenants hereof.

**(f) Power of Sale.** Deliver to Trustee a written declaration of default and demand for sale, and a written notice of default and election to cause Trustor's interest in the Trust Estate or any portion thereof to be sold, which notice Trustee or Beneficiary shall cause to be transmitted and recorded, if applicable, in accordance with governing law.

> **(i)** Upon receipt of such notice from Beneficiary, Trustee shall cause to be recorded, published and delivered to Trustor such Notice of Default and Election to Sell as then required by law and by this Deed of Trust. Trustee shall, without demand on Trustor or Obligor, after lapse of such time as may then be required by law and after recordation of such Notice of Default and after Notice of Sale having been given as required by law, sell the Trust Estate at the time and place of sale fixed by it in said Notice of Sale, either as a whole, or in separate lots or parcels or items as Beneficiary shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustor hereby expressly waives any right which it may have to direct the order in which any of the Trust Estate may be sold when it consists of more than one lot or parcel, and such order of sale, whether in a single sale or in multiple sales held on different days or at different times, shall be at the sole discretion of Beneficiary. Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Trustor, Trustee or Beneficiary, may purchase at such sale to the extent permitted by law.

**(ii)** After deducting all costs, fees and expenses of Trustee and of this Deed of Trust, including costs of evidence of title and reasonable and documented attorneys' fees of Trustee and Beneficiary in connection with such sale, and subject to applicable law, Trustee shall apply, in the following priority, the proceeds of sale to payment of: (A) first, all sums expended under the terms hereof, not then repaid, with interest thereon according to the terms of the Debt Instrument, (B) second, all other sums then secured hereby, in such order of priority and in such proportion as Beneficiary in its sole discretion may elect, and (C) the remainder, if any, to the person or persons legally entitled thereto.

**(iii)** Subject to applicable law, Trustee may postpone the sale of all or any portion of the Trust Estate by public announcement at the time and place of such sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

**(g)** **Other Remedies.** Exercise all other rights and remedies provided herein, in any Loan Document or other document or agreement now or hereafter securing all or any portion of the obligations secured hereby, or provided by law. Upon the occurrence of an Event of Default hereunder, Beneficiary may proceed in any sequence to exercise its rights hereunder with respect to all or any portion of the Trust Estate and all or any portion of the Personal Property, and to exercise its rights under the "SECURITY AGREEMENT" Section above with respect to all or any portion of the Personal Property in accordance with the provisions of the UCC.

**7.3** **Remedies Not Exclusive; Waiver.** No remedy herein conferred upon or reserved to Trustee or Beneficiary is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every power or remedy given by any of the Loan Documents to Trustee or Beneficiary, or to which either of them may be otherwise entitled, may be exercised concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Beneficiary. If there exists additional security for the obligations secured hereby, Beneficiary, at its sole option, and without limiting or affecting any of the rights or remedies hereunder, may exercise any of the rights or remedies to which it may be entitled hereunder either concurrently with whatever rights it may have in connection with such other security or in such order and in such manner as Beneficiary may deem fit without waiving any rights with respect to such other security.

**8. NONBORROWER TRUSTOR.**

**8.1** **Authority of Beneficiary.** If any Trustor is not an obligor under the Debt Instrument (hereinafter, "Nonborrower Trustor"), Nonborrower Trustor hereby authorizes Beneficiary to perform any of the following acts at any time and from time to time, all without notice to Nonborrower Trustor and without affecting Beneficiary's rights or Nonborrower Trustor's obligations under this Deed of Trust: (a) alter any terms of the Debt Instrument or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Debt Instrument or any part of it, (b) take and hold security for the Debt Instrument, accept additional or substituted security for the Debt Instrument, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such security, (c) apply any security now or later held for the Debt Instrument in any order that Beneficiary in its sole discretion may choose, and direct the order and manner of any sale of all or any part of it and bid at any such sale, (d) release Obligor of its liability for the Debt Instrument or any part of it, and (e) substitute, add or release any one or more guarantors or endorsers of the Debt Instrument. For purposes of this Section, all references to the Debt Instrument shall also include any instrument or agreement executed by Obligor currently with or subsequent to the date of this Deed of Trust which is secured by this Deed of Trust in accordance with

the terms hereof. For purposes of this Section 8, all references to "Debt Instrument" shall also be deemed to include all instruments, documents and agreements evidencing or governing any Hedging Obligation (as defined in the Debt Instrument).

**8.2 Waivers of Nonborrower Trustor.** Nonborrower Trustor hereby waives: (a) any right it may have to require Beneficiary to proceed against Obligor, proceed against or exhaust any security held from Obligor, or pursue any other remedy in Beneficiary's power to pursue, (b) any defense based on any legal disability of Obligor, any discharge or limitation of the liability of Obligor to Beneficiary, whether consensual or arising by operation of law or any bankruptcy reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Nonborrower Trustor's obligations exceed or are more burdensome than those of Obligor, (c) all presentments, demands for performance, notices of nonperformance, protests, notice of protest, notices of dishonor, notices of acceptance of this Deed of Trust and of the existence, creation or incurring of new or additional indebtedness of Obligor, and demands and notices of every kind, (d) any defense based on or arising out of any defense that Obligor may have to the payment or performance of the Secured Obligations or any part thereof, and (e) all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code (Title 11 of the U.S. Code) or any successor statute, all rights to enforce any remedy that the Beneficiary may have against Obligor, and all rights to participate in any security now or later held by Beneficiary for the Debt Instrument. Nonborrower Trustor understands that if Beneficiary forecloses by trustee's sale on any other deed of trust (other than this deed of trust) securing the Secured Obligations, Nonborrower Trustor would then have a defense preventing Beneficiary from thereafter enforcing Beneficiary's rights and remedies against the Trust Estate. This defense arises because the trustee's sale under such other deed of trust would eliminate Nonborrower Trustor's right of subrogation, and therefore Nonborrower Trustor would be unable to obtain reimbursement from Obligor. Nonborrower Trustor specifically waives this defense and all rights and defenses that Nonborrower Trustor may have because the Secured Obligations are secured by real property. This means, among other things: (i) Beneficiary may exercise any rights or remedies which Beneficiary has or may have against the Trust Estate without first foreclosing on any real or personal property collateral pledged by Obligor; and (ii) if Beneficiary forecloses on any real property collateral pledged by Obligor: (A) the amount of the Secured Obligations may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (B) Beneficiary may exercise its rights and remedies against the Trust Estate even if Beneficiary, by foreclosing on any real property collateral pledged by Obligor, has destroyed any right Nonborrower Trustor may have to collect from Obligor. This is an unconditional and irrevocable waiver of any rights and defenses Nonborrower Trustor may have because the Secured Obligations are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure or similar laws in other states.

**8.3 Obligor's Financial Condition.** Nonborrower Trustor assumes full responsibility for keeping informed of Obligor's financial condition and business operations and all other circumstances affecting Obligor's ability to pay and perform its obligations to Beneficiary, and agrees that Beneficiary shall have no duty to disclose to Nonborrower Trustor any information which Beneficiary may receive about Obligor's financial condition, business operations or any other circumstances bearing on Obligor's ability to perform.

**8.4 Dispute Resolution.** This Deed of Trust hereby incorporates any alternative dispute resolution agreement previously, concurrently or hereafter executed between Nonborrower Trustor and Beneficiary.

**9. SITE VISITS, APPRAISALS, OBSERVATION AND TESTING.** Beneficiary, through its agents, representatives or employees, is authorized to enter during normal business hours (or, in the case of an emergency, as reasonably determined by the Beneficiary at any other reasonable time) upon or any part of the Property for the purpose of performing appraisals, observing the condition thereof, taking and removing soil, groundwater or other material samples, and conducting tests on any part thereof. Trustor agrees to cooperate with Beneficiary and its agents, representatives or employees (and use best efforts

to cause the tenants on the Property to cooperate with same) in permitting access to the Property and in obtaining samples, operating and other relevant information for the Property. Beneficiary shall have no obligation or duty to so, however, and no site visit, observation or testing by Beneficiary shall impose any liability on Beneficiary. In no event shall any site visit, observation or testing by Beneficiary be a representation that Hazardous Substances (as defined below) are or are not present in, on or under the Property, or that there has been or shall be compliance with any law, regulation or ordinance pertaining to Hazardous Substances or any other applicable governmental law. Neither Trustor nor any other party is entitled to rely on any site visit, observation or testing by Beneficiary. Beneficiary owes no duty of care to protect Trustor or any other party against, or to inform Trustor or any other party of, any Hazardous Substances or any other adverse condition affecting the Property. Beneficiary shall (a) give Trustor reasonable notice to avoid interfering with Trustor's use of the Property in exercising any rights provided for in this Section, and (b) reimburse Trustor for the cost of repair of any physical injury to the Property caused by Beneficiary in exercising such rights. For purposes of this Section, "Hazardous Substance" means any substance, material or waste which is or becomes designated, classified or regulated as being "toxic" or "hazardous" or which is or becomes similarly designated, classified or regulated under any federal, state or local law, regulation or ordinance.

**10. MISCELLANEOUS.**

**10.1 Governing Law.** This Deed of Trust is to be governed and construed in accordance with the laws of the state in which the Property is located and federal law as applicable, except with respect to any portion of the Property located in another state, in which case the laws of the state in which such portion of the Property is located (and federal law as applicable) shall be applicable hereto, but only to the extent required for Trustee or Beneficiary to enforce or realize upon the rights and remedies hereunder with respect thereto.

**10.2 Severability.** In the event any one or more of the provisions contained in this Deed of Trust, in the Debt Instrument or in any of the other Loan Documents shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

**10.3 Amendment.** This Deed of Trust cannot be modified, waived, discharged or terminated orally, but only by a written instrument signed by the party against whom enforcement of the modification, waiver, discharge or termination is asserted.

**10.4 Waiver of Remedies.** By accepting payment of any amount secured hereby after its due date, or an amount which is less than the amount then due, or the performance of any obligation required hereunder after the date required for such performance, Beneficiary does not waive its rights either to require prompt payment or performance when due of all other amounts or obligations so secured, or to declare a default as herein provided for the failure to so pay or perform.

**10.5 No Implied Waiver.** No waiver by Beneficiary of any default or breach by Trustor hereunder shall be implied from any omission by Beneficiary to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default identified in the waiver and such waiver shall be operative only for the time and to the extent therein stated. Waivers of any covenant, term or condition contained herein shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition. The consent or approval by Beneficiary to or of any act by Trustor requiring further consent or approval shall not be deemed to waive or render unnecessary the consent or approval to or of any subsequent similar act. No delay or omission of Trustee or Beneficiary in the exercising of any right or remedy available upon an Event of Default shall impair such right or remedy or any other right or remedy nor shall the same be construed to be a waiver of any Event of Default or any acquiescence therein, and no custom or practice which may develop between Trustor and Beneficiary during the term hereof shall be deemed a waiver of or any way affect the right of Beneficiary

to insist upon the performance by Trustor of the obligations secured hereby in strict accordance with the terms hereof or of any other Loan Document.

**10.6     Full Reconveyance.**  Upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed of Trust and the Debt Instrument to Trustee for cancellation and retention and upon payment by Trustor of Trustee's fees, Trustee shall reconvey to Trustor, or the person or persons legally entitled thereto, without warranty, any portion of the Trust Estate then held hereunder.  The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.  The grantee in any reconveyance may be described as "the person or persons legally entitled thereto."

**10.7     Notices.**  Whenever Beneficiary, Trustor or Trustee shall desire to give or serve any notice, demand, request or other communication with respect to this Deed of Trust, each such notice, demand, request or other communication (including communications by facsimile transmission or electronic mail) shall be in writing and shall be effective only if the same is delivered by personal service, mailed (postage prepaid, return receipt requested), or telegraphed, telexed or transmitted addressed to the address set forth herein.  Any such notice if so mailed shall be deemed to have been received by the addressee on the third day following the date of such mailing.  Any party may at any time change its address for such notices by delivering or mailing to the other parties hereto, as aforesaid, a notice of such change.

**10.8     Acceptance by Trustee.**  Trustee accepts this trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**10.9     Certain Actions of Trustee.**  At any time or from time to time without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed of Trust and the Debt Instrument for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby or the effect of this Deed of Trust upon the remainder of the Trust Estate, Trustee may (a) reconvey any part of the Trust Estate, (b) consent in writing to the making of any map or plat thereof, (c) join in granting any easement thereon, or (d) join in any extension agreement or any agreement subordinating the lien or charge hereof.

**10.10   Successor Trustee.**  Beneficiary acting alone may, from time to time, by written instrument executed and acknowledged by Beneficiary, mailed to Trustor and recorded in the County in which the Property is located, substitute a successor or successors to the Trustee named herein or acting hereunder.

**10.11   Successors and Assigns.**  This Deed of Trust applies to and shall be binding on and enure to the benefit of all parties to this Deed of Trust and their respective successors and assigns.

**10.12   Interpretation.**  In this Deed of Trust, whenever the context so requires, the masculine gender shall include the feminine and/or neuter and the singular number shall include the plural and conversely in each case.  The word "include(s)" means "include(s) without limitation," and the word "including" means "including, but not limited to."  No listing of specific instances, items or matters shall in any way limit the scope or generality of any language in this Deed of Trust.

**10.13   [Reserved].**

**10.14   Headings.**  Headings are for convenience only and are not intended as a limitation on the content of the paragraph following or as an aid to the construction thereof.

**10.15   Waiver.**  To the fullest extent permitted by law, Trustor waives the pleading of any statute of limitations as a defense to any and all obligations secured by this Deed of Trust.

**10.16 Merger.** No merger shall occur as a result of Beneficiary's acquiring any other estate in or any other lien on the Trust Estate unless Beneficiary consents to such merger in writing.

**10.17 [Reserved].**

**10.18 Request for Notice.** Trustor hereby requests that a copy of any notice of default and any notice of sale hereunder be mailed to it at the address set forth herein or at such other address as Trustor may designate pursuant to this Section. That address is also the mailing address of Trustor as debtor under the UCC. Beneficiary's address given herein is the address for Beneficiary as secured party under the UCC.

**10.19 Fixture Filing.** This Deed of Trust constitutes a financing statement filed as a fixture filing pursuant to the UCC, as amended or recodified from time to time, covering any portion of the Trust Estate which now is or later may become a fixture attached to the Property.

**10.20 Counterparts/Electronic Signatures.** This document may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same document. Delivery of a signature page to, or an executed counterpart of, this document by facsimile, email transmission of a scanned image, or other electronic means, shall be effective as delivery of an originally executed counterpart. The words "execution," "signed," "signature," and words of like import in this document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity, or enforceability as a manually executed signature or the use of a paper-based record keeping system, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, Electronic Signatures in Global and National Commerce Act, any other similar state laws based on the Uniform Electronic Transactions Act or the Uniform Commercial Code, and the parties hereto hereby waive any objection to the contrary.

[SIGNATURE AND NOTARY ACKNOWLEDGEMENT(S) ON FOLLOWING PAGE(S)]

Non-Order Search Page 15 of 17 Requested By: james.holly, Printed: 3/11/2021 11:41 AM
Doc: TU:2020 00083035

Trustor has caused this Deed of Trust to be executed as of the day and year first above written.

**TRUSTOR:**

TOUCHSTONE PISTACHIO COMPANY, LLC,
a California limited liability company

By: ______________________
Name: Farid Assemi
Title: Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
)ss
COUNTY OF Fresno )

On December 14, 2020, before me, L. Diaz, Notary Public, personally appeared Farid Assemi, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

L. DIAZ
NOTARY PUBLIC . CALIFORNIA
COMMISSION # 2235602
FRESNO COUNTY
My Comm. Exp. April 20, 2022

WITNESS my hand and official seal.

______________________
Signature of Notary Public

Place Notary Seal Above

**ORDER NO. :** 1411017848

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Tulare, State of California, and is described as follows:

Parcel 1: APN 319-130-022

The Southwest Quarter of the Southeast Quarter of Section 2, Township 23 South, Range 26 East, M.D.B.&M., in the County of Tulare, State of California, according to the Official Plat thereof, pursuant to that certain Certificate of Compliance recorded May 29, 2013 as Instrument No. 2013-0034139 of Official Records.

Excepting therefrom one half of all oil, gas, minerals and other hydrocarbon substances in and under said land as reserved in deed dated January 5, 1976, executed by Evelyn G. Hall and recorded March 11, 1976 as Document No. 11002 of Official Records.

Parcel 2:

A non-exclusive easement on the terms and conditions as contained in that certain "Encroachment Easement Agreement" by and among Kamm Pistachios, LLC, a California limited liability company(Grantor) and Touchstone Pistachio Company, LLC, a California limited liability company(Grantee), Recording Concurrently Herewith.

Described as follows:

An "Easement Strip" lying in the Southeast Quarter of the Southeast Quarter of Section 2, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the County of Tulare, State of California, according to the Official Plat thereof and being more particularly described as follows:

Commencing at the southeast corner of said Section 2; thence North 89°40'32" West along the South line of said Section 2, a distance of 1260.83 feet to the **True Point of Beginning;** thence continuing North 89°40'32" West along the said South line of Section 2, a distance of 60.89 feet to the southwest corner of said Southeast Quarter of the Southeast Quarter of Section 2, said corner bears South 89°40'32" East a distance of 1321.72 feet from the southwest corner of said Southeast Quarter of Section 2; thence North 02°24'42" East along the West line of said Southeast Quarter of the Southeast Quarter of Section 2, a distance of 1326.74 feet to the northwest corner of said Southeast Quarter of the Southeast Quarter of Section 2; thence South 89°44'18" East along the North line of said Southeast Quarter of the Southeast Quarter of Section 2, a distance of 61.00 feet; thence South 02°24'42" West along a line being parallel with said West line of the Southeast Quarter of the Southeast Quarter of Section 2, a distance of 1326.92 feet to the **True Point of Beginning.**

# EXHIBIT 5



December 1, 2023

**VIA OVERNIGHT COURIER**

Touchstone Pistachio Company, LLC
5620 N. Palm Ave., Suite 421, Mail Stop M
Fresno, CA 93704
Attn: Elizabeth A. Steinhauer-Clark, Esq.

   Re: Notice of Events of Default; Reservation of Rights Letter

   Reference is made to that certain Credit Agreement dated as of March 20, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Touchstone Pistachio Company, LLC, a California limited liability company ("Touchstone"), as Borrower, the lenders party thereto from time to time (the "Lenders"), U.S. Bank National Association (as successor in interest to MUFG Union Bank, N.A. ("U.S. Bank")), in its capacity as administrative agent and collateral agent for the Lenders (in such capacity, the "Agent").

   Reference is also made to that certain Forbearance, Waiver and Amendment Agreement dated November 17, 2023, by and among the Agent, Touchstone, the Lenders, and the Guarantors (the "Forbearance Agreement"). Capitalized terms appearing herein and not otherwise defined herein are used as defined in the Forbearance Agreement.

   In the Forbearance Agreement, Borrower and Guarantors acknowledged the existence of a number of Defaults and Events of Default by Borrower under the Credit Agreement, which were defined in the Forbearance Agreement (and are referenced in this Notice) as the "Acknowledged Defaults." Under the Forbearance Agreement, Agent agreed, on certain conditions and limitations, to forbear from the exercise of its remedies under the Credit Agreement and related Loan Documents with respect to the Acknowledged Defaults, during a limited "Forbearance Period." Except as set forth in the Forbearance Agreement, each of the Acknowledged Defaults is continuing and has not been waived, cured or limited in any respect.

   Pursuant to Section 6 of the Forbearance Agreement, the Forbearance Period ends upon a Forbearance Event of Default. Section 24 of the Forbearance Agreement defines a Forbearance Event of Default to include a default by any Loan Party under the Forbearance Agreement and/or the Loan Documents.

   You are hereby notified that the following Forbearance Events of Default have occurred and are continuing (all references to "Sections" are to Sections in the Forbearance Agreement):

1. Touchstone's failure to repay the Equipment Loan in full by the Equipment Loan Maturity Date. (See Section 12.3, defining the Equipment Loan Maturity Date under the Credit Agreement to mean November 30, 2023.)

2. Touchstone's failure to close the Project X purchase and make the Equipment Loan Payoff by November 30, 2023 as required by Section 9, Milestone 4.

3. Touchstone's failure to pay the $500,000 forbearance fee due on November 30, 2023 as required by Section 4.2.

4. Touchstone's failure to provide the list and location of equipment required by Section 15.5(d).

As a result of the occurrence of the Forbearance Events of Default, the Forbearance Period has terminated and the Agent, on behalf of the Lenders, is entitled, in its sole discretion, as applicable, to exercise rights and remedies under the Credit Agreement, the Forbearance Agreement, and any other Loan Document, and applicable law, in equity or otherwise.

Furthermore, the Acknowledged Defaults constitute Events of Default for purposes of determining whether Touchstone has satisfied the conditions to obtaining additional Loans under the terms of the Credit Agreement. The Agent and the Lenders reserve the right to cease making additional Loans under the Credit Agreement from and after the date hereof.

Touchstone and Guarantors are hereby notified that the Acknowledged Defaults trigger provisions under the Credit Agreement and the other Loan Documents determining whether or not certain actions may be taken or omitted to be taken or otherwise acquiesced to by or on behalf of Touchstone or any Guarantor, as set forth therein. Accordingly, any action taken or omitted to be taken or acquiesced in, as applicable, by Touchstone or any Guarantor in violation of any such provision while any Event of Default exists will constitute an additional Event of Default under the Credit Agreement and the other Loan Documents.

Termination of the Forbearance Period does not serve to terminate the Forbearance Agreement and Touchstone remains obligated to perform all of its covenants and obligations thereunder. Among other things, pursuant to Sections 14.1 and 17.6, this means that Touchstone is not permitted to pay any Affiliated Grower payables or to make payments on the AGI Subordinated Note without the Agent's prior written consent, to be delivered in accordance with the requirements of Section 17.1 of the Credit Agreement.

The Agent and the Lenders are presently evaluating whether to exercise their rights and remedies under the Credit Agreement, the other Loan Documents, and applicable law, in equity or otherwise, in respect of the Acknowledged Defaults. This Notice shall not be deemed (a) to prejudice any right or rights which the Agent or the Lenders may now have or may have in the future under or in connection with the Acknowledged Defaults, the Forbearance Agreement, the Credit Agreement or the other Loan Documents or any of the instruments or agreements referred to therein, as the same may be amended, restated, supplemented or otherwise modified from time to time, (b) to be a commitment or any other undertaking or expression of any willingness to engage in any further discussion with Touchstone, any Guarantor or any other Person with respect to any waiver, amendment, modification or any other change to the Forbearance Agreement, the

Credit Agreement or the Loan Documents or any rights or remedies arising in favor of the Lenders, the Agent, or any of them, under or with respect to any such documents, or (c) to be a waiver of, or consent to, or a modification or amendment of, any other term or condition of any other agreement by and among Touchstone or any Guarantor, on the one hand, and the Agent or any other Lender, on the other hand.

Please be advised that the Agent and the Lenders hereby expressly reserve all of their rights and remedies with respect to the Forbearance Events of Default, the Acknowledged Defaults and any other Defaults or Events of Default which may now or hereafter exist under the Credit Agreement or the other Loan Documents, including, without limitation, (i) the right to accrue interest on all outstanding Obligations at the Default Rate as provided in Section 3.1(a) of the Credit Agreement, (ii) the right to decline to fund any Loans, make any Advance or grant any other financial accommodation to or for the benefit of Touchstone as provided in Section 7.2 of the Credit Agreement, and (iii) the right to declare that no Loan may be made, converted, or continued as a Term SOFR Loan or Daily Floating SOFR Loan as provided in Section 3.1(e)(i) of the Credit Agreement.

Neither Agent's acceptance of a payment from Borrower hereafter, nor any provision in this Notice shall be deemed to constitute (i) an establishment of a course of dealing or (ii) a waiver by the Agent or the Lenders of any rights or remedies under the Credit Agreement, the other Loan Documents, or applicable law (including, without limitation, acceleration of debt, realization on any collateral and enforcement of any of the Security Documents), including any such right or remedy of the Agent or the Lenders arising out of the Acknowledged Defaults or any other Default or Event of Default, nor shall it be deemed to constitute a waiver, estoppel, or forbearance by the Agent or the Lenders with respect to their rights or remedies at a later date. Nothing herein shall be deemed to constitute a commitment or agreement to enter into any other agreement or arrangement as to the Forbearance Events of Default, the Acknowledged Defaults or otherwise.

Any agreement by the Agent or the Lenders to waive or forbear from exercising their rights and remedies is required to be in writing and executed and delivered in accordance with the requirements of Section 17.1 of the Credit Agreement. Nothing contained in this Notice shall confer on Touchstone, any Guarantor, or any other Person any right to notice or cure periods with respect to any Forbearance Event of Default, Default or Event of Default, including without limitation the Acknowledged Defaults.

Very truly yours,

U.S. BANK NATIONAL ASSOCIATION (as successor in interest to MUFG UNION BANK, N.A.), as the Administrative Agent and the Collateral Agent

By: Karen Boyer
Name: Karen Boyer
Title: Senior Vice President

cc: Davis Wright Tremaine LLP

50 California Street, 23rd Floor
San Francisco, CA 94111-6533
Attn:   Harvey Schochet
Email: harveyschochet@dwt.com

# EXHIBIT 6



September 13, 2024

**VIA U.S. MAIL to:**

Touchstone Pistachio Company, LLC
5620 N. Palm Ave., Suite 421, Mail Stop M
Fresno, CA 93704
Attn: Elizabeth A. Steinhauer-Clark, Esq.

and to the following persons ("Guarantors"):

Farid Assemi, as an individual; Farshid Assemi, as an individual; Darius Assemi, as an
individual; Darius Assemi, as Trustee of the Amended and Restated Darius Assemi Revocable
Trust; Farid Assemi, as Trustee of The Farshid Assemi 1997 Ranch Trust dated June 30, 1997;
Farid Assemi as Trustee of the Farid Assemi Revocable Trust u/d/t dated January 24, 2007;
Farshid Assemi, as Co-Trustee of the Farid Assemi 1997 Ranch Trust dated June 30, 1997;
Neema Eliot Assemi, as Co-Trustee of the Farid Assemi 1997 Ranch Trust dated June 30, 1997;
Neema Assemi, as Trustee of The Farid Assemi 2010 Grantor Trust dated December 30, 2010;
Melissa Layne, as Trustee of the Farshid and Sonia Assemi 2010 Grantor Trust dated December
30, 2010; Farshid Assemi, as Co-Trustee of the Amended and Restated Farshid Assemi and
Sonia Rosemary Assemi Revocable Trust; Sonia Rosemary Assemi, as Co-Trustee of the
Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust; ACDF,
LLC; ASSEMI BROTHERS, LLC; C & A FARMS, LLC; ANTUA ORCHARDS, LLC;
LINCOLN GRANTOR FARMS, LLC; MARICOPA ORCHARDS, LLC; PANOCHE
PISTACHIOS, LLC; SAGEBERRY FARMS, LLC; ADAMS GRANTOR LAND, LLC;
GRANVILLE FARMS, LLC; GRADON FARMS, LLC; MANNING AVENUE PISTACHIOS,
LLC; ASSEMI AND SONS, INC; WINSTON FARMS, LLC; FFGT FARMS, LLC; FAVIER
RANCH, LLC; GRANTLAND FARMS, LLC; WHITESBRIDGE FARMS, LLC; ACAP
FARMS, LLC; BEAR FLAG FARMS, LLC; COPPER AVENUE INVESTMENTS, LLC;
WILLOW AVENUE INVESTMENTS, LLC; A&H INVESTMENTS, LLC

1306 W. Herdon Avenue, Suite 101
Fresno, CA 93704

    Re:    **Notice of Acceleration and Demand for Payment**

      Reference is made to that certain Credit Agreement dated as of March 20, 2020 (as
amended, restated, supplemented or otherwise modified from time to time, the "Credit
Agreement"), by and among Touchstone Pistachio Company, LLC, a California limited liability
company ("Borrower"), as borrower, the lenders party thereto from time to time (the "Lenders"),
U.S. Bank National Association (as successor in interest to MUFG Union Bank, N.A. ("U.S.

Bank")), in its capacity as administrative agent and collateral agent for the Lenders (in such capacity, the "Agent").

Borrower defaulted on certain of its obligations under the Credit Agreement, resulting in multiple Events of Default that were defined as the "Acknowledged Defaults" in that certain Forbearance, Waiver and Amendment Agreement (the "Forbearance Agreement") between the Parties dated November 17, 2023. Capitalized terms appearing herein and not otherwise defined herein are used as defined in the Forbearance Agreement.

Agent sent Borrower Notices of Forbearance Events of Default and Reservation of Rights Letters dated December 1, 2023 and April 12, 2024, outlining certain post-November 17, 2023 Events of Default and Forbearance Events of Default existing as those respective dates and reserving rights and remedies with respect thereto, including but not limited to Borrower's failure to repay the Equipment Term Loan in full at maturity on November 30, 2023 (collectively, the "**Noticed Defaults**").

Further Events of Default have occurred under the Credit Agreement and/or the Forbearance Agreement due to (i) Borrower's failure to deliver borrowing base certificates due on May 31, June 15, June 30, and August 15, 2024, and thereafter; (ii) Borrower's late delivery of the borrowing base certificates due on May 31, 2024 and July 15, 2024; (iii) failure to pay-down overadvances on the Revolving Loans beginning with the 7/15 Borrowing Base (the amount by which the aggregate Revolving Loan balance exceeded the applicable Borrowing Base), as required by Sections 2.1(a) and 5.2(c) of the Credit Agreement; (iv) Borrower's payment of $1.5 million to Prudential on or about June 26, 2024 on behalf of Maricopa Orchards, LLC in violation of the Forbearance Agreement; (v) failure by Guarantors, including Maricopa Orchards, LLC, to pay its Crop Loan to U.S. Bank after acceleration and of any Guarantor to make payment any related guarantee, in violation of Section 12.1(h) and 12.1(j) of the Credit Agreement, (vi) the failure of any Guarantor to make payment in respect of any outstanding Debt of Guarantors, including Maricopa Orchards, LLC, causing the occurrence of events or conditions that have resulted in the acceleration of such Debt, or permitted the holders of such Debt to accelerate the maturity thereof before its normal expiration, in each case, in violation of Section 12.1(h) and 12.1(j) of the Credit Agreement, (vii) failure to comply with financial covenants under Section 10.14 of the Credit Agreement for applicable measurement periods in 2023 and 2024, (viii) failure to timely comply with reporting covenants in the Credit Agreement and Forbearance Agreement (including, without limitation, Section 15 of the Forbearance Agreement), (ix) failure to comply with cash hoarding limitations in Section 13.1 of the Forbearance Agreement, and (x) failure to comply with a 120% maximum variance from forecast operating Disbursements on a cumulative basis under Section 17.1 of the Forbearance Agreement (the "**Recent Defaults**").

Borrower failed to notify Agent of certain of the Noticed Defaults and the Recent Defaults in each subsequent Compliance Certificate, Notice of Borrowing and other Loan Document delivered to Agent, which failures were and are additional continuing Events of Default under Section 12.1(c) of the Credit Agreement (such Events of Default, collectively, the "**Further Defaults**").

The Acknowledged Defaults, Noticed Defaults, Recent Defaults and Further Defaults are referred to collectively as the "**Combined Defaults**."

**A. Acceleration and Termination of Commitments**

As you know, the Equipment Term Loan matured on November 30, 2023. All amounts thereon were due and payable in full at that time, but have not been paid. **YOU ARE HEREBY NOTIFIED** that as a result of the outstanding Combined Defaults, the Agent, on behalf of the Lenders, hereby elects to accelerate all other amounts due under the Credit Agreement, including all principal, accrued interest, reimbursable expenses, and other amounts owing and outstanding under the Credit Agreement, and declare all such amounts immediately due and payable in full. The total of all amounts owed by Borrower and Guarantors under the Loan Documents is referred to as the "Indebtedness." Agent terminates the Revolving Commitments and any other commitment Lenders might have to extend any further credit under any of the Loan Documents.

**As of 2:00 p.m. (Pacific time) on September 13, 2024**, the Indebtedness included the following amounts:

| **Equipment Term Loan** | |
|---|---|
| Principal: | $41,250,000.00 |
| Interest: | $450,490.10 |
| Total: | $41,700,490.10 |

| **Revolving Loans** | |
|---|---|
| Principal: | $30,500,000.00 |
| Interest: | $103,919.66 |
| Total: | $30,607,857.16 |

The Indebtedness also includes reimbursable costs and expenses (including financial advisors' and attorneys' fees) under the Loan Documents, the amount of which will be furnished upon request.

The amount of the Indebtedness is subject to change because of, among other things, the continued accrual of interest, fees, charges, and other expenses. Please call Agent on the date you intend to make payment to confirm the aggregate amount of the Indebtedness on that date. Agent reserves the right to reject partial or imperfect tenders.

**B. Default Interest**

As you know, since March 5, 2024, interest has been accruing on the unpaid balance of the Equipment Term Loan at the default rate as specified in the Loan Documents. Beginning today, the default rate of interest will be applied to all unpaid Indebtedness in accordance with the Loan Documents.

**C. Guarantor Obligations**

Each of the Guarantors listed above guaranteed payment of the Indebtedness and performance of Borrower's Obligations to Agent and the Lenders pursuant to a written guarantee. Agent hereby demands that each guarantor pay, in full, all Indebtedness to Agent. Under the terms of the guarantee, each guarantor is jointly and severally liable for the entire amount of the Indebtedness.

**D. Payments**

Payments should be sent by wire transfer of immediately available funds as follows:

U.S. BANK NATIONAL ASSOCIATION
U.S. Bancorp Center, BC-MN-H22A
800 Nicollet Mall
Minneapolis, Minnesota 55402

ABA #: 091 000 022
CREDIT: SPECIAL ASSETS WIRE CLEARING ACCOUNT
ACCOUNT #: 160234528703
Customer Name:
Loan Number:
Atten: Karen Boyer

Note that even after payment in full of all outstanding, accelerated Indebtedness, the Borrower and its Guarantors will remain liable for any and all indemnification and other obligations under the Loan Documents that are not satisfied by that payment, including, without limitation, contingent, unliquidated, and unmatured obligations, such as obligations to indemnify Agent against unknown or future costs, expenses, and losses.

**E. Pursuit of Rights and Remedies**

If the Indebtedness is not paid in full by September 16, 2024, Agent intends to exercise, without further notice and at any time, its rights, remedies, and powers arising under the Loan Documents and applicable law, including rights with respect to Agent's Collateral, rights to obtain a money judgment against Borrower and Guarantors for all Indebtedness then due, foreclosure on its collateral, and the right to obtain appointment of a receiver over Borrower's assets.

No delay, failure, or discontinuance of Agent in exercising any right, power, or remedy under any Loan Document will affect or operate as a waiver of such right, power, or remedy. Nor

will any single or partial exercise of any such right, power, or remedy preclude, waive, or otherwise affect any other or further exercise thereof or the exercise of any other right, power, or remedy.

Any agreement by the Agent or the Lenders to waive or forbear from exercising their rights and remedies is required to be in writing and executed and delivered in accordance with the requirements of Section 17.1 of the Credit Agreement. Nothing contained in this Notice shall confer on Borrower, any Guarantor, or any other Person any right to notice or cure periods with respect to any of the Combined Defaults.

Sincerely yours,

U.S. BANK NATIONAL ASSOCIATION (as successor in interest to MUFG UNION BANK, N.A.), as the Administrative Agent and the Collateral Agent

By: Karen Boyer
Name: Karen Boyer
Title: Senior Vice President

ORIGIN ID:MRIA (503) 241-2300
JOSEPH VANLEUVEN
DAVIS WRIGHT TREMAINE, LLP
560 SW TENTH AVENUE, SUITE 700

PORTLAND, OR 97205
UNITED STATES US

SHIP DATE: 13SEP24
ACTWGT: 0.50 LB
CAD: 253835980/WSXI3600

BILL SENDER

TO ELIZABETH STEINHAUER CLARK ESQ
TOUCHSTONE PISTACHIO CO LLC
5620 N PALM AVE
STE 421
FRESNO CA 93704
(503) 778-5349 REF: 0017787.000562-4820
INV:
PO: DEPT:

583J2/4EF9/9AE3

FedEx Express

E

REL#
3785346

MON - 16 SEP 10:30A
PRIORITY OVERNIGHT

TRK# 0201 2794 7332 2605

93704
CA-US FAT

WC TRMA

Do not ship liquids, blood, or clinical specimens in this packaging.

Extremely Urgent



ORIGIN ID:MRIA (503) 241-2300
JOSEPH VANLEUVEN
DAVIS WRIGHT TREMAINE, LLP
560 SW TENTH AVENUE, SUITE 700

PORTLAND, OR 97205
UNITED STATES US

SHIP DATE: 13SEP24
ACTWGT: 0.50 LB
CAD: 253835980/WSXI3600

BILL SENDER

TO
**ASSEMI BROTHERS LLC ET AL**
**1306 W HERNDON AVE STE 101**

**FRESNO CA 93711**
(503) 241-2300 REF: 0017787.000562-4820
INV:
PO: DEPT:

FedEx Express

E

REL#
3785346

**MON - 16 SEP 10:30A**
**PRIORITY OVERNIGHT**

TRK# 0201 **2794 7364 3370**

**WC TRMA**

**93711**
CA-US **FAT**

Do not ship liquids, blood, or clinical specimens in this packaging.

Extremely Urgent

TO EXPOSE ADHESIVE REMOVE LINER TO EXPOSE ADHESIVE REMOVE LINER TO EXPOSE ADHESIVE REMOVE LINER TO EXPOSE ADHESIVE REMOVE LINER





560 SW 10th Avenue, Suite 700
Portland, OR 97205

quadient
FIRST-CLASS MAIL
IMI
$000.97
09/13/2024 ZIP 97205
043M31256675
US POSTAGE

Touchstone Pistachio Company, LLC
Attn: Elizabeth A. Steinhauer-Clark, Esq.
5620 N. Palm Ave., Suite 421, Mail Stop M
Fresno, CA 93704



Davis Wright
Tremaine LLP

560 SW 10th Avenue, Suite 700
Portland, OR 97205

quadient
FIRST-CLASS MAIL
IMI
$000.97 º
09/13/2024 ZIP 97205
043M31256675
US POSTAGE

Assemi Brothers LLC, et. al.
1306 W. Herdon Avenue, Suite 101
Fresno, CA 93704