MARY H. HAAS (State Bar No. 149770)
 maryhaas@dwt.com
JOHN D. FREED (State Bar No. 261518)
 jakefreed@dwt.com
MATTHEW E. LADEW (State Bar No. 318215)
 mattladew@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

JOSEPH VANLEUVEN (*admitted pro hac vice*)
 joevanleuven@dwt.com
DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon  97205
Telephone:  (503) 778-5325
Fax:  (503) 701-0023

Attorneys for Plaintiff
U.S. BANK NATIONAL ASSOCIATION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| U.S. BANK NATIONAL ASSOCIATION, | Case No. 1:24-cv-01105-JLT-SKO |
|---|---|
| Plaintiff, | **DECLARATION OF EVAN BLUM IN SUPPORT OF U.S. BANK NATIONAL ASSOCIATION'S *EX PARTE* MOTION FOR ORDER APPOINTING RECEIVER, TEMPORARY RESTRAINING ORDER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| vs. | |
| TOUCHSTONE PISTACHIO COMPANY, LLC; FARSHID ASSEMI; FARID ASSEMI; DARIUS ASSEMI; NEEMA ASSEMI; MELISSA LAYNE; SONIA ROSEMARY ASSEMI; MARICOPA ORCHARDS, LLC; C&A FARMS, LLC; ACDF, LLC; CANTUA ORCHARDS, LLC; LINCOLN GRANTOR FARMS, LLC; PANOCHE PISTACHIOS, LLC; ADAMS GRANTOR LAND, LLC; GRANVILLE FARMS, LLC; SAGEBERRY FARMS, LLC; GRADON FARMS, LLC; MANNING AVENUE PISTACHIOS, LLC; ASSEMI AND SONS, INC.; WINSTON FARMS, LLC; FFGT FARMS, LLC; FAVIER RANCH, LLC; GRANTLAND FARMS, LLC; WHITESBRIDGE FARMS, LLC; ACAP FARMS, LLC; BEAR FLAG FARMS, LLC; COPPER AVNEUE INVESETMENTS, LLC; WILLOW AVENUE INVESTMENTS, LLC; ASHLAN & HAYES INVESTMENTS, LLC; ASSEMI BROTHERS, LLC, | Action Filed : September 18, 2024 |
| Defendants. | |

**DECLARATION OF EVAN BLUM**

I, Evan Blum, under penalty of perjury, make the following declaration in support of U.S. Bank U.S. Bank, National Association's ("**U.S. Bank**") [1] *ex-parte* motion for an order appointing a receiver in this case:

1. I am a Managing Director at BDO Consulting Group, LLC ("BDO"). BDO was engaged in August, 2023 as financial advisor to U.S. Bank, in U.S. Bank's capacity as Administrative Agent for the Lenders in connection with the defaulted loans to Touchstone at issue in this case. (the "**Loans**").[2] BDO also advises the bank with respect to its $145 million crop loan to the Assemi Brothers farming entities (collectively, "**Maricopa**"), which is also in default. The Declaration of Karen Boyer explains the nature of Touchstone's and Maricopa's businesses and the relationship between them. Briefly, Maricopa grows pistachios and sells them to Touchstone, which processes and sells them.

2. I have over 20 years of experience as a restructuring adviser, and my roles have included CRO, financial adviser and investment banker. I have experience in both in-court and out-of-court matters across a wide variety of industries as an adviser to companies, lenders, indenture trustees, and unsecured creditor committees. I have been involved in multiple restructurings during my career with family-owned enterprises. Prior to BDO, I was a Managing Director at Alvarez & Marsal and a Principal at GlassRatner. Previous to my restructuring career, I spent over a decade as an investment banker and lender.

3. I am generally familiar with the history and structure of the Loans. My team and I have engaged in extensive analysis of Touchstone's asset values, liabilities, operating results, and financial reporting. We have worked directly both with Touchstone staff and Touchstone's own financial advisor, RPA Advisors, LLC, to gain an in-depth understanding of Touchstone's financials. I assisted U.S. Bank and its attorneys in constructing the financial reporting

---

[1] By a bank merger in 2022, U.S. Bank National Association succeeded to the interest of MUFG Union Bank, National Association both as a Lender and as administrative and collateral agent under the Credit Agreement and other loan documents described below. In referring to "U.S. Bank" in this declaration, I mean either U.S. Bank or MUFG Union Bank, as the context requires.
[2] The Lenders include U.S. Bank, Rabo Agrifinance LLC, Compeer Financial, PCA/FLCA, Fifth Third Bank, N.A., and American Agcredit, PCA.

requirements for Touchstone set forth in the Forbearance Agreement described in the bank's complaint and I and my team review that reporting as it is received.  I have engaged in thousands of calls and meetings with Touchstone's key management and advisors.  The following facts are of my own personal knowledge, and if called upon to testify, I would competently testify to the facts set forth herein.

I.    **THE LOANS**.

4.    Karen Boyer's declaration describes the two secured loans made by the Lenders to Touchstone:  a term loan (the "**Equipment Loan**") and asset-based line of credit (the "**Revolving Loan**," and together with the Equipment Loan, the "**Loans**").  Both Loans are in default and are due and payable in full.

II.   **TOUCHSTONE IS IN DISTRESS**.

5.    Touchstone is in extreme financial distress.  On a call in which I participated with Touchstone's counsel on Sunday, September 8, we were advised that Touchstone would "run out of money" in roughly a week unless the Conterra refinancing discussed in Karen Boyer's declaration closed during that week.  My team has been monitoring Touchstone's cash flows and counsel's advice is consistent with what we are seeing.  For example, on Friday, September 20, Touchstone's bank account held only about $21,300.  (For context, its bi-weekly payroll is approximately $450,000).

6.    For the past two weeks, I, my team, U.S. Bank, and its counsel have been working diligently to help close the Conterra transaction, which is described in some detail in the Boyer declaration.  As late as September 11 and the morning of September 12, we were preparing execution copies of all of our side's closing documents.  We even received "in escrow" signature pages from Touchstone and the Loan guarantors on our closing documents.  We were told the Conterra transactions "had to" close on Thursday September 12.

7.    It was a shock, then, when I learned later on September 12 that the Conterra transaction had reached an impasse.  Counsel for Prudential (Maricopa's largest real estate lender) advised me and U.S. Bank's counsel on a call that day that despite what we had been told the day before, the Conterra transaction was not going to close.  Conterra's counsel also advised in an

DECLARATION OF EVAN BLUM IN SUPPORT OF *EX PARTE* MOTION
Case No.: 1:24-cv-01105-JLT-SKO

1    email on September 12 that his client "has sent a communication to the Assemis (Darius, Farshid,

2    and Jason Hollrah) declining to move forward with the proposed loan transaction."

3         8.      The passage of time makes it increasingly certain that the Conterra transaction will

4    not be revived.  I was told repeatedly by Touchstone and Maricopa's financial advisors and

5    counsel that unless Maricopa's 2024 crop was delivered to Touchstone, Conterra would not go

6    forward with the refinance, because Conterra's financial models are based on lending into a

7    vertically integrated farming/processing business that would use the profits from the 2024 crop to

8    service the Conterra loan.  As discussed below, the harvest has started and Maricopa is delivering

9    its 2024 crop to third-party processors, foreclosing any realistic possibility that the Conterra

10    transaction can be revived.[3]

11         9.      Absent funding from Conterra, Touchstone has no money to purchase new 2024

12    inventory from Maricopa or anyone else.  Without new inventory it is out of business as a

13    practical matter.

14         10.      Maricopa is itself in extreme financial distress and is likely heading quickly into a

15    receivership or bankruptcy, as discussed in more detail below.  On September 16, 2024,

16    Prudential, Maricopa's largest real estate lender, filed suit in this Court seeking to put Maricopa's

17    "Prudential Orchards" into receivership.

18         11.      Maricopa's difficulties have been devastating for Touchstone.  In prior years,

19    Touchstone purchased most of its pistachios from Maricopa. Maricopa's delivery of its 2024

20    pistachios to processors other than Touchstone has essentially ended Touchstone's normal

21    business operations.

22         12.      In sum, Touchstone has no realistic prospect of obtaining pistachios from

23    Maricopa this year.  It has no realistic source of funding to buy replacement inventory from other

24    growers, or to process any such inventory.  It is, for all practical purposes, out of business,  and it

25

26    [3] It is worth noting that Touchstone currently owes Maricopa approximately $112 million for the
     2022 and 2023 crops, of which about $86 million is now past-due.  (Under the terms of a "Grower

27    Subordination Agreement" with U.S. Bank, Touchstone is not permitted to pay Maricopa until the
     Loans here at issue are paid in full, but even if Touchstone were contractually permitted to pay

28    Maricopa, it does not have the money to do so.  There is no way Prudential and other Maricopa
     lenders with liens on the 2024 crop would allow that crop to go to Touchstone without assurance
     it would be paid for.)

either needs to be sold as soon as possible to someone with the resources to enable it to operate, or its assets need to be otherwise liquidated for the benefit of its creditors.

13.     Touchstone has been operating since last fall only by using (a) the Lenders' cash collateral – i.e., receipts from inventory sales and (b) cash infusions from outside asset sales by its owners.  Use of cash collateral has been possible only because U.S. Bank permitted it.  As described in Karen Boyer's declaration, if a receiver is not appointed (or a restraining order issued), U.S. Bank will "turn off the spigot" of cash collateral by sending notices to Touchstone's customers requiring them to make all future payments to the bank.  In my long experience, when customers receive such notices, they either pay the lender or they do not pay anyone, because they know if they pay their vendor, they remain liable to the lender for the amount of the invoice.

14.     Owner cash infusions have ceased.  Touchstone's owners are the Defendant Guarantors.  To the extent they have been selling assets, they have been using the proceeds to prop up Maricopa and AGI, not Touchstone.

15.     In sum, Touchstone has insufficient funding to remain in business.  If a receiver is appointed, U.S. Bank would allow the receiver to use cash collateral to operate under an agreed budget during the receivership as Touchstone's assets are being sold.

### III.     <u>**TOUCHSTONE'S FAILED SALES EFFORT**</u>.

16.     In December of 2023, the Assemi Brothers engaged an investment banker to sell Touchstone's and Maricopa's assets.  Few letters of intent were received.  The highest offer by far was from a large competitor ("**Competitor**").

17.     The Competitor proposal would have paid Touchstone's Loans from U.S. Bank and its "outside" growers in full, with money left over to partially pay its debt to Maricopa.  The purchase price under the Competitor proposal would have increased if Maricopa had been willing to enter a supply agreement with Competitor.  Touchstone refused to sell its assets to Competitor and the Defendant Assemi Brothers and their trusts, which own both Touchstone and Maricopa, refused to allow Maricopa to enter any supply agreement with Competitor.

18.     While the Assemis appeased the Lenders by ostensibly running a process to sell Touchstone's and Maricopa's assets, they focused their real efforts pursuing a refinance of the

DECLARATION OF EVAN BLUM IN SUPPORT OF *EX PARTE* MOTION
Case No.: 1:24-cv-01105-JLT-SKO

Loans.  Initially, they told me they would have a refinancing proposal by mid-January of this year, but the lender they were working with then declined to make a loan.  They eventually obtained a financing proposal from Conterra.  As it evolved, the Conterra transaction would have included a crop loan to Maricopa, an operating loan to Touchstone, and a discounted purchase of both U.S. Bank's operating loan to Touchstone and its crop loan to Maricopa.

19.   The Assemis spent months trying to close the Conterra refinance, while burning through all available cash to keep Touchstone and Maricopa afloat.  They gambled their creditors' money and the future of their business on the hope that Conterra would close, with no "plan B."

20.   The Conterra refinance has failed.  Touchstone is effectively out of business.  It is vital that a receiver be appointed as soon as possible, to try to salvage whatever going concern value remains, and otherwise to liquidate the assets.

### IV.   **FURTHER FACTS SUPPORTING THE NEED FOR A RECEIVER**.

21.   Touchstone has used sales proceeds (the Lenders' cash collateral) to pay expenses of sister companies, in violation of the Forbearance Agreement.  For example:

    a.   Touchstone has already paid approximately $6.5 million in professional fees in the first quarter of this year.  Touchstone has admitted that a substantial portion of those fees are for services rendered to sister companies, not Touchstone.  We have repeatedly asked for the details as to what fees are properly chargeable to Touchstone, but it has failed to provide that information.

    b.   In 2023, Touchstone paid $3.5 million in interest on a loan it owes Maricopa.  Maricopa made the loan with funds it borrowed from Prudential.  Touchstone has paid an additional $3.1 million in interest directly to Prudential on the Maricopa loan so far in 2024.

22.   Touchstone is insolvent.  It cannot pay its debts as they come due, as evidenced by its failure to repay the approximate $72 million balance due to U.S. Bank and the Lenders, and an additional $112 million payable to Maricopa.

DECLARATION OF EVAN BLUM IN SUPPORT OF *EX PARTE* MOTION
Case No.: 1:24-cv-01105-JLT-SKO

23.     Touchstone has no money to buy nuts from the 2024 crop, and its remaining inventory is past-years' nuts that have relatively little value unless they can be sold to another processor who can blend them with fresh 2024 nuts.  Now, with the 2024 crop being harvested,  is the time for a receiver to begin discussions with other processors who may be interested in buying the remaining inventory.

24.     My team has done a liquidation analysis for Touchstone.  While that analysis suggests that the Loans are fully-secured at the present time, the market is uncertain and there is not much cushion.

25.     Touchstone has been able to operate since the fall of 2023 only because U.S. Bank has been allowing Touchstone to use the Bank's cash collateral.  As noted above, if a receiver is not appointed, the Bank will exercise its legal and contractual right to require customers to pay the Bank directly.  This hastens the need for Touchstone to close its business, although I want to emphasize that for the reasons discussed above, that closure is imminent in any event because Touchstone is effectively out of inventory.

26.     The need for a receiver to take charge is compounded by the fact that Touchstone has lost key employees, including Rudy Placencia (Chief Operations Officer), Phil Shannon (Executive Director of Finance) and  Kiersten Alvarado (Chief Financial Officer).  In addition, Scott Rhodes, Chief Operating Officer at Maricopa, who was also heavily involved with Touchstone, left his position in February of this year.  These losses are even more significant because the Assemi Brothers, themselves, are not providing capable leadership to Touchstone. Farid Assemi, who led the company from inception, is no longer actively involved in the business. Neither Darius nor Farshid Assemi was actively involved in running Touchstone in the past. Farshid Assemi has not played an active role since Farid Assemi's role has diminished.  Darius Assemi has become the de-facto leader, but has a steep learning curve.

27.     The Loan documents require Touchstone to provide certified semi-monthly borrowing base reports summarizing its accounts receivable, inventory, and other financial information.  We have received intermintent reports for months.  This means U.S. Bank is being deprived of current information on the state of its collateral.

28.    Touchstone dramatically slowed the pace of its account receivable collections in anticipation of the new loan from Conterra (since U.S. Bank had agreed to sell the Revolving Loan at a small discount, it was in Touchstone and Conterra's interest NOT to pay that loan down through collections, in order to maximize the gross amount of the discount).  As accounts receivable get stale, collection becomes less certain.  This is particularly concerning because the bulk of the receivables are with foreign customers.  U.S. Bank needs a receiver to pursue the collection of the receivables as soon as possible.

29.    If a receiver is not appointed, U.S. Bank will have no choice but to send direction letters to Touchstone's customers, sweep its bank accounts, and foreclose on its plant, equipment and other collateral.  Based on my experience, sale of the business or orderly wind-down and liquidation in a receivership is almost certain to realize more net proceeds for the creditors, with much less delay.

30.    There is an urgent need for a receiver that supports *ex-parte* relief. Touchstone's counsel advised us that if  the Conterra refinance failed, he expected that Touchstone would be willing to stipulate to the appointment of a receiver.  However, Darius Assemi refuses to stipulate to a receiver.

///

///

///

///

///

///

///

///

///

///

///

DECLARATION OF EVAN BLUM IN SUPPORT OF *EX PARTE* MOTION
Case No.: 1:24-cv-01105-JLT-SKO

1      I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct, and that this declaration was executed on this 20th day of

3  September, 2024 at _____Seattle, Washington_____

4

5                                             Evan Blum

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF EVAN BLUM IN SUPPORT OF *EX PARTE* MOTION
Case No.: 1:24-cv-01105-JLT-SKO