1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>TOUCHSTONE PISTACHIO COMPANY, LLC; FARSHID ASSEMI; FARID ASSEMI; DARIUS ASSEMI; NEEMA ASSEMI; MELISSA LAYNE; SONIA ROSEMARY ASSEMI; MARICOPA ORCHARDS, LLC; C&A FARMS, LLC; ACDF, LLC; CANTUA ORCHARDS, LLC; LINCOLN GRANTOR FARMS, LLC; PANOCHE PISTACHIOS, LLC; ADAMS GRANTOR LAND, LLC; GRANVILLE FARMS, LLC; SAGEBERRY FARMS, LLC; GRADON FARMS, LLC; MANNING AVENUE PISTACHIOS, LLC; ASSEMI AND SONS, INC.; WINSTON FARMS, LLC; FFGT FARMS, LLC; FAVIER RANCH, LLC; GRANTLAND FARMS, LLC; WHITESBRIDGE FARMS, LLC; ACAP FARMS, LLC; BEAR FLAG FARMS, LLC; COPPER AVENUE INVESTMENTS, LLC; WILLOW AVENUE INVESTMENTS, LLC; ASHLAN & HAYES INVESTMENTS, LLC; ASSEMI BROTHERS, LLC,<br><br>Defendants. | Case No. 1:24-cv-01105-KES-SAB<br><br>**ORDER APPROVING BIDDING PROCEDURES AND BID PROTECTIONS FOR THE SALE OF CERTAIN REAL AND PERSONAL PROPERTY**<br><br><u>Bidding Procedures Hearing</u>:<br>Date:      March 17, 2025<br>Time:      1:30 p.m. PT<br>Location:  Courtroom 6, 7th floor<br>           2500 Tulare Street<br>           Fresno, CA 93721<br>Judge:     Hon. Kirk E. Sherriff<br><br><u>Sale Confirmation Hearing</u>:<br>Date:      April 21, 2025<br>Time:      1:30 p.m. PT<br>Location:  Courtroom 6, 7th floor<br>           2500 Tulare Street<br>           Fresno, CA 93721<br>Judge:     Hon. Kirk E. Sherriff<br><br>(Docs. 131, 147) |

Upon due consideration of Receiver David P. Stapleton's Notice of Motion and Motion for Orders Approving Certain Bidding Procedures and Bid Protections and Confirming the Sale of Certain Real and Personal Property (the "Motion"),[1] the declarations of David P. Stapleton and Scott Porter, all responses to the Motion, and the arguments of counsel at the hearing regarding the Bidding Procedures set forth in the Motion, the Court hereby finds that:

A.    On September 28, 2024, the Court entered the Receivership Order in above-captioned matter at Docket No. 32.

B.    The Receivership Order authorizes the Receiver to sell the Assets "as is" and "with all faults," free and clear of liens, claims and encumbrances, without representations or warranties, and without recourse.

C.    Subject to the those conditions and requirements, the Receivership Order permits the Receiver to employ such sale procedures that the Receiver decides to employ in the exercise of the Receiver's discretion, provided that the sale of the Terra Bella Real Property must comply with 28 U.S.C. § 2001.

D.    A sale of the Assets pursuant to the Bidding Procedures proposed in the Motion is commercially reasonable, provides the public a full and fair opportunity to submit bids for the Assets, and satisfies the requirements for a public sale under 28 U.S.C. § 2001(a).

E.    A sale of the Assets pursuant to the Bidding Procedures proposed in the Motion satisfies the requirements set forth in the Receivership Order.

F.    The proposed Publication Notice provides due and proper notice of the Bid Deadline and Auction for the sale of the Assets, and satisfies the notice requirements for a public sale under 28 U.S.C. § 2002.

G.    The Motion and Bidding Procedures provide due and proper notice of the Auction, if any, and a Sale Hearing to be held on April 21, 2025 to approve the sale of the Assets.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

H.    The proposed Bidding Procedures and Break-Up Fees are fair and reasonable, and good cause exists to enter an order approving the Bidding Procedures and the Break-Up Fees and granting related relief.

Having found the foregoing,

**IT IS ORDERED:**

1.    The Motion is **GRANTED** to the extent provided herein.

2.    The Bidding Procedures attached hereto as **<u>Exhibit A</u>** are hereby approved in their entirety and incorporated by reference as if fully set forth herein.  The Bidding Procedures shall govern all bids, deadlines and further proceedings in this Action relating to the sale of the Assets.

3.    The terms and conditions of the Break-Up Fees set forth in the Stalking Horse PSA attached hereto as **<u>Exhibit B</u>** are hereby approved, and the Receiver is authorized to perform his obligations, if any, with respect thereto in accordance with the terms of the Stalking Horse PSA. The Receiver's entry into the Stalking Horse PSA, subject to compliance with this Order, the Bidding Procedures and the other conditions thereof, is authorized and approved.

4.    The Receiver and his agents are authorized to take all actions contemplated by the Bidding Procedures in furtherance of a sale of the Assets, including, without limitation:

a.    Conditioning Potential Bidders' participation in due diligence on the Assets on a Potential Bidder (i) entering into a Confidentiality Agreement, and (ii) providing information concerning the identity of the Potential Bidder and financial qualifications that the Receiver may reasonably request and which the Receiver finds sufficient and satisfactory;

b.    Requiring Potential Bidders to adhere to the Bid Requirements in submitting a Bid, including payment of a Good Faith Deposit as set forth in the Bid Requirements;

c.    Publishing the Publication Notice in the manner set forth in the Bidding Procedures;

d.    Communicating and negotiating with Potential Bidders and U.S. Bank following the Bid Deadline as set forth in the Bidding Procedures;

e.    Selecting Opening Bid(s) for the Auction, in the Receiver's sole discretion

after consultation with the Consultation Parties;

  f. Considering Bids for less than all of the Assets comprising Lot 2 and determining, in his sole discretion, whether such Bid constitutes a Qualified Bid, and whether Lot 2 should be subdivided at the Auction for separate overbidding to maximize the value of Assets comprising Lot 2;

  g. Cancelling the Auction pursuant to the procedure in the Bidding Procedures, and deeming the Stalking Horse PSA the Successful Bid if the Stalking Horse PSA is the only Qualified Bid;

  h. Conducting the Auction in a manner the Receiver deems appropriate in his business judgment, including (i) formulating auction instructions and procedures, (ii) continuing or adjourning the Auction as necessary or appropriate, and (iii) selecting the Successful Bid(s) and Back-Up Bid(s), if any; and

  i. Extending the Bid Deadline, modifying the Bid Requirements, including, without limitation, by waiving certain Bid Requirements or imposing additional terms and conditions with respect to any or all Potential Bidders, or modifying the timing of providing the Auction Instructions to the Qualified Bidders at or prior to the Auction, in each case without further order of the Court, subject to consultation with the Consultation Parties, if the Receiver determines in his business judgment that such modification is in the best interest of the Receivership estate.

 5. The Receiver shall submit his Supplemental Submission (as defined in the Motion) on or before **April 18, 2025**, which shall include (i) the Notice of Successful Bid(s), which will identify the Successful Bid(s) and, if applicable, the Back-Up Bid(s) and will include a form of Proposed Sale Approval Order for each Successful Bid, with a copy of the signed purchase agreement constituting such Successful Bid (and a copy of the respective Back-Up Bid purchase agreement, if applicable) attached thereto, and (ii) any supplemental briefing and evidence in support of approval of such Successful Bid(s) and, if applicable, the Back-Up Bid(s).

 6. The Court shall convene the Sale Hearing on **April 21, 2025, at 1:30 p.m. PT**, at which time the Court will consider confirmation of the sale of the applicable Assets pursuant to

each Successful Bid (and each Back-Up Bid, if applicable) for the Assets (the "Sale Hearing"); *provided* that if the Stalking Horse PSA is the only Qualified Bid, and such Stalking Horse PSA has been accepted as the Successful Bid (and the Auction has therefore been cancelled), the Receiver may seek an earlier Sale Hearing date.

7.    Any objections to the approval of a Successful Bid and/or Back-Up Bid or the form of a Proposed Sale Approval Order, and any response thereto by the Receiver, may be raised and presented at or before the Sale Hearing.

8.    The Receiver and his agents shall have no liability under any circumstances to any Potential Bidder for acts or omissions in connection with the Receiver's pursuit of a sale of Assets pursuant to the Bidding Procedures and this Order.

9.    All objections to the entry of this Order or to the relief provided herein that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled.

10.    The Court reserves exclusive jurisdiction with respect to all matters relating to or arising from or under this Order, including any matters related to the implementation, interpretation, or enforcement of this Order.


IT IS SO ORDERED.

Dated:   March 17, 2025   

_____
UNITED STATES DISTRICT JUDGE

## Exhibit A

### Bidding Procedures[1]

- **Due Diligence**: To access the data room established by the Receiver and receive the form of stalking horse purchase and sale agreement for the Assets[2] (the "Stalking Horse PSA") and/or a form of purchase and sale agreement for Assets in Lot 2 only (the "Equipment PSA"; together with the Stalking Horse PSA, the "PSAs"), and to otherwise participate in due diligence regarding the Assets,[3] a potential bidder must (i) enter into a confidentiality agreement in form and substance satisfactory to the Receiver (a "Confidentiality Agreement") and (ii) provide the Receiver with information concerning the identity of the potential bidder and financial qualifications that the Receiver may reasonably request and which the Receiver finds sufficient and satisfactory. Each person or entity that enters into a Confidentiality Agreement and satisfies the foregoing requirements is hereinafter referred to as a "Potential Bidder." The Receiver will accommodate Potential Bidders' reasonable requests for additional information and property access for purposes of inspection and reasonable due diligence. All diligence requests by Potential Bidders shall be directed to Scott Porter at sporter@cascadiacapital.com.

- **Bid Deadline**: **April 15, 2025 at 5:00 p.m. PT** (the "Bid Deadline").

- **Bid Requirements**: A bid from a Potential Bidder (each, a "Bid") must be submitted in the form of a purchase and sale agreement, reflecting the terms and conditions of the Bid (each, a

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in *Receiver David P. Stapleton's Notice of Motion and Motion for Orders Approving Certain Bidding Procedures and Bid Protections and Confirming the Sale of Certain Real and Personal Property* (the "Motion") or the Stalking Horse PSA attached to the Proposed Bid Procedures Order as Exhibit B, as applicable.

[2] The term "Assets" used herein shall mean the "Acquired Assets," as that term is defined in the Stalking Horse PSA. The Assets include, among other things, (i) the real property consisting of that certain property identified in the Tulare County real property records as Assessor Parcel Numbers 319-130-25 and 319-130-26, inclusive of the real property located at 19570 Ave. 88, Terra Bella, CA 93270 in Tulare County, California, together with (a) the pistachio processing facility and all other buildings, structures, improvements and fixtures located thereon and (b) all rights, privileges, easements, rights and rights-of-way appurtenant thereto or used in connection therewith (collectively, the "Real Property"), (ii) personal property located at the Real Property that is owned by Touchstone and currently used by Touchstone in its operations thereon (the "Terra Bella Personal Property"), (iii) the personal property identified in Schedule 2.1.1(a)(vi) to the Stalking Horse PSA (the "Lot 1 Additional Equipment"; together with the Real Property and Terra Bella Personal Property, "Lot 1"), and (iv) the personal property identified in Schedule 2.1.1(b) to the Stalking Horse PSA ("Lot 2"; together with Lot 1, the "Lots" and each a "Lot"). Potential Bidders should refer to the description of "Acquired Assets" in the Stalking Horse PSA for a full description of the Assets.

[3] For the avoidance of doubt, the Assets shall not include any "Excluded Assets," as that term is defined in the Stalking Horse PSA. The Excluded Assets include, among others, Touchstone's (i) cash, (ii) prepayments, deposits, and similar rights, (iii) any Good Faith Deposits (defined below) held by the Receiver, (iv) accounts receivable, (v) crop inventory, (vi) computers, monitors, tablets, and other technology unrelated to the Assets, (vii) leased personal property, (viii) books and records, (ix) intellectual property, (x) claims and causes of action, and (xi) insurance policies. Potential Bidders should refer to the description of "Excluded Assets" in the Stalking Horse PSA for a full description of such assets which are not subject to these Bidding Procedures.

"Proposed PSA"), along with a redline against the form Stalking Horse PSA or Equipment PSA, as applicable, provided by the Receiver.  The Proposed PSA shall (a) be duly authorized and executed; (b) be based on the form Stalking Horse PSA or Equipment PSA, as applicable, provided by the Receiver; (c) to the extent the Bid is for all Assets, specify the allocation of proposed purchase price between Lot 1 and Lot 2; and (d) include all exhibits and schedules contemplated by the Proposed PSA.  The Proposed PSA must contain or be accompanied by the following (the "Bid Requirements"):

- o  Purchase Price:  The amount of the proposed cash purchase price must equal or exceed (i) $30,905,000 for all Assets, (ii) $25,577,500 for all of Lot 1 only, or (iii) $5,327,500 for all of Lot 2 only (i.e., the purchase price set forth in the Stalking Horse PSA, *plus* the Break-Up Fee(s) (as defined in the Stalking Horse PSA), *plus* an overbid of at least $100,000 for all Assets, $75,000 for Lot 1 only, and $25,000 for Lot 2 only).

- o  No Other Material Alterations to Form PSA:  The Proposed PSA must include all material terms in the form PSA provided by the Receiver, including the following:

  - ▪  No Representations and Warranties by the Receiver: The Proposed PSA shall provide that (i) the sale will be "as is" and "with all faults," without representations or warranties, and without recourse, and (ii) the Potential Bidder has relied solely on its independent diligence, and not on any representations of the Receiver or his agents, in formulating and submitting its Bid.

  - ▪  No Diligence or Financing Conditions:  The Proposed PSA shall provide that the Potential Bidder has had sufficient opportunity to conduct all necessary due diligence regarding the applicable Assets prior to submitting its Bid, and no further due diligence is necessary or required.  The Proposed PSA shall provide for payment of the purchase price in cash, and that the Potential Bidder's obligations under the Proposed PSA, including payment of the purchase price thereunder, are not subject to any financing or similar contingency.

  - ▪  Free and Clear: The Proposed PSA shall provide that the sale will be free and clear of liens, claims and encumbrances, other than easements, rights of way and other encumbrances running with the land, to the fullest extent permitted by applicable law.[4]

- o  Good Faith Deposit: A Potential Bidder making a Bid must make a deposit in the amount of ten percent (10%) of the proposed purchase price in its Bid (a "Good Faith Deposit") into a Receiver trust account to be identified and established by the Receiver, which Good Faith Deposit the Potential Bidder will forfeit if its Bid is selected as the Successful Bid or, if applicable, the Back-Up Bid (each defined below) and the Potential Bidder does not close by the Outside Date or Back-Up Closing Date, as applicable (for a reason other than non-approval by the Court, default by the seller, or mutual termination of the sale).

- o  Proof of Funds / Authority: The Potential Bidder must provide sufficient information, as reasonably requested by the Receiver, for the Receiver to verify the Potential

---

[4] Each Proposed Sale Approval Order will provide for all liens on the applicable Assets to attach to the proceeds of the sale to the same extent, priority and validity as exist at the time of sale. Potential Bidders are advised that the Assets are part of the collateral securing Touchstone's loan obligations to U.S. Bank, and sale of the Assets free and clear of U.S. Bank's liens and encumbrances is subject to U.S. Bank's consent.

Bidder's ability to consummate the transaction contemplated by the Proposed PSA. Among other things, the Potential Bidder must provide (i) information demonstrating (in the Receiver's reasonable business judgment) that the Potential Bidder has the financial capacity to consummate a purchase of the applicable Assets at the purchase price proposed in the Bid and (ii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission, execution, and delivery of its Bid, participation in the Auction (defined below), and closing of the transaction contemplated by the Proposed PSA.

o  <u>Other Information</u>:  The Potential Bidder must commit to closing the transaction contemplated by the Proposed PSA in the event it is selected as the Back-Up Bid at the conclusion of the Auction.  The Potential Bidder must also provide a mailing address, email address and direct phone number for the person(s) authorized to discuss the Bid with the Receiver or his agents.

o  <u>Outside Date</u>: The Potential Bidder must commit to closing the contemplated transaction by no later than the later of fourteen (14) calendar days after entry of the order approving the sale and (ii) April 8, 2025 (the "<u>Outside Date</u>").

o  <u>Acknowledgement by Potential Bidder</u>: By submitting a Bid, each Potential Bidder shall be deemed to acknowledge that: (i) it understands and is bound by the terms of these Bidding Procedures; (ii) the Potential Bidder is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by the Receiver, Touchstone, U.S. Bank, or their respective agents and representatives, regarding any Assets subject to its Bid, these Bidding Procedures or any information provided in connection therewith; (iii) all due diligence regarding the assets which are the subject of its Bid must be completed prior to the Bid Deadline; and (iv) it submits its Bid of its own volition and with full knowledge of the potential consequences associated therewith.  Each Potential Bidder shall bear its own costs and expenses in connection with the submission of its Bid, the Auction, the sale process and preparation of those documents necessary to effectuate the transaction contemplated by its Bid, whether or not such Potential Bidder becomes a Qualified Bidder (defined below) and whether or not the transaction contemplated by its Bid is ultimately approved by the Court and/or consummated.

•  **Publication Notice**: In addition to the Receiver's marketing and other outreach efforts, the Receiver will publish the following notice at least once per week during the weeks beginning March 16, March 23, March 30, and April 6, 2025 in at least one of either The Fresno Bee or The Visalia Times-Delta (the "<u>Publication Notice</u>"):

NOTICE OF SALE OF REAL AND PERSONAL PROPERTY

PLEASE TAKE NOTICE that in that certain action entitled *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (the "Action"), pending in U.S. District Court for the Eastern District of California (the "Court"), Case No. 1:24-cv-01105-KES-SAB, the Court-appointed receiver, David P. Stapleton (the "Receiver") intends to conduct an auction to sell (i) the real property owned by Touchstone Pistachio Company, LLC ("Touchstone"), located at 19570 Ave. 88, Terra Bella, CA 93270 in Tulare County, California (APNs: 319-130-025 and 319-130-026), together with the pistachio processing facility

and other buildings, structures, improvements, and fixtures located thereon, and the rights, privileges, easements, rights and rights-of-way appurtenant thereto, (ii) the personal property owned by Touchstone used in connection with operations thereon, and (iii) certain additional machinery and equipment owned by Touchstone (collectively, the "Property"). The Property will be sold pursuant to 28 U.S.C. § 2001(a), free and clear of monetary liens, claims and encumbrances, in "as is, where is" condition, and with no representations or warranties by the Receiver. Sale of the Property is subject to Court confirmation after the auction has completed.

On March 17, 2025, the Court entered an order approving bidding and sale procedures for the Property (the "Bidding Procedures"), including specific requirements that interested parties must meet to submit a qualified bid and participate in the auction. A complete copy of the Bidding Procedures can be obtained from the Receiver's marketing agent, Scott Porter of Cascadia Capital, LLC at sporter@cascadiacapital.com. Interested parties are urged to contact Mr. Porter and request a copy of the Bidding Procedures as soon as practicable.

To participate in the auction, interested parties must comply with the Bidding Procedures and submit a qualifying bid, good faith deposit and other documentation and information, in conformance with the Bidding Procedures, so that they are received by the Receiver no later than 5:00 p.m. PT on April 15, 2025 (the "Bid Deadline").

In the event the Receiver receives more than one acceptable, qualifying bid on Property prior to the Bid Deadline, the Receiver may select a bid to serve as the opening bid at an auction, at which qualified bidders will have the opportunity to submit overbids based on the purchase price and terms of the opening bid.

In the event the Receiver proceeds with the auction, such auction will take place April 17, 2025, beginning at 9:00 a.m. PT, at Regus, 265 East River Park Circle (1st Floor), Fresno, CA 93720. At the conclusion of the auction, the Receiver will select the winning bidder and the back-up bidder.

The Court has scheduled a hearing to confirm the sale to the winning bidder on April 21, 2025, at 1:30 p.m., at the Robert E. Coyle United States Courthouse, Courtroom 6, 7th Floor, 2500 Tulare Street, Fresno, California, 93721.

Any questions about the Property, the Bidding Procedures, the auction or the sale process should be directed to Mr. Porter using the contact information above.

- **Selection of Opening Bids and Qualification of Bidders**: After the Bid Deadline, the Receiver may, in his sole discretion, after consultation with U.S. Bank and U.S. Bank's counsel and/or other professional advisors (collectively, the "Consultation Parties"), select the highest

or otherwise best Bid(s) for the Assets (each, an "Opening Bid" and, collectively, the "Opening Bids").  A Bid will be valued by the Receiver based upon any and all factors that the Receiver deems pertinent in his reasonable business judgment, including, among others, (i) the proposed purchase price attributable to the applicable Assets in the Bid, (ii) the risks and timing associated with consummating the transaction with the Potential Bidder, and (iii) any other factors that the Receiver may reasonably deem relevant.  The Receiver may select an Opening Bid that includes all of the Assets, or may select separate Opening Bids for Lot 1 and Lot 2.[5] Following the Bid Deadline, the Receiver is authorized to communicate and negotiate with Potential Bidders and U.S. Bank to (a) clarify, modify, or improve the terms of their Bids in connection with selecting the Opening Bid(s), (b) cure any defects that would prevent such Potential Bidder from becoming a Qualified Bidder (defined below), and/or (c) otherwise promote a more competitive bidding and auction process with the ultimate goal of maximizing the value of the Assets.

Only those Bids and Potential Bidders that (i) comply with the Bid Requirements by the Bid Deadline and (ii) confirm in writing that (a) the Potential Bidder has not engaged in any collusion with respect to the bidding process, (b) its Bid is a good faith bona fide offer that it intends to consummate if its Bid is selected as the Successful Bid or Back-Up Bid (each defined below), and (c) it consents to the Receiver sharing its Bid with all other Qualified Bidders will constitute, respectively, "Qualified Bids" and "Qualified Bidders" and be permitted to participate in the Auction (defined below).[6]

If the Stalking Horse PSA is the only Qualified Bid, the Receiver may cancel the Auction, and the Stalking Horse PSA shall then be the Successful Bid, and the Stalking Horse Bidder shall be the Successful Bidder (each as defined below).

- **Auction Instructions or Cancellation**: By **April 16, 2025,** the Receiver will:

  - (i) if at least one Qualified Bid, in addition to the Stalking Horse PSA, is received, provide Auction instructions and procedures, which will include a copy of any Opening Bid(s) (the "Auction Instructions") to all Qualified Bidders; or

  - (ii) if the Stalking Horse PSA is the only Qualified Bid received, file a notice with the Court and notify the Potential Bidders that the Auction is cancelled, and the Stalking Horse PSA has been deemed the Successful Bid (defined below).

- **Auction**: If multiple Qualified Bids are received, the Receiver will conduct an auction on **April 17, 2025 at 9:00 a.m. PT** at Regus, 265 East River Park Circle (1st Floor), Fresno, CA 93720 (the "Auction").  Only Qualified Bidders and representatives of the Receiver and U.S. Bank are permitted to attend the Auction.  Each Qualified Bidder must appear in person or through a duly-authorized representative in person, who must be identified to the Receiver at least twenty-four (24) hours prior to the start of the Auction.

---

[5] For the avoidance of doubt, the Receiver is authorized to consider Bids for less than all of the Assets comprising Lot 2, and can exercise his reasonable business judgment, in his sole discretion, to determine whether such Bid constitutes a Qualified Bid, and whether Lot 2 should be subdivided at the Auction for separate overbidding to maximize the value of Assets comprising Lot 2.

[6] For the avoidance of doubt, the Stalking Horse PSA submitted by Zamora Pistachio, LLC (the "Stalking Horse Bidder") shall constitute a Qualified Bid.  Potential Bidders can only become Qualified Bidders on the Assets which are the subject of their Bid, any may not participate in the Auction, if any, of Assets which were not included in their Bid.

At the commencement of the Auction, the starting bid(s) shall be the Opening Bid(s). Overbidding at the Auction will proceeds in increments of at least (i) $100,000 for Qualified Bids that include all Assets, (ii) $75,000 for Qualified Bids that include all of Lot 1 only, and (iii) $25,000 for Qualified Bids that include all of Lot 2 only.[7]  All bids at the Auction are binding on the party submitting the bid and may not be withdrawn or modified once announced, must be all cash bids, and cannot be subject to any contingencies, including financing or due diligence contingencies, unless specifically provided for in these Bidding Procedures or the Opening Bid.

If the Receiver deems necessary or appropriate, the Receiver may continue or adjourn the Auction from time to time with the announcement of the first adjournment to be made to all Qualified Bidders no later than the original Auction date.

At the conclusion of the Auction, the Receiver, in consultation with the Consultation Parties, will select the highest or otherwise best offer for the Assets (or a subset thereof) as the "Successful Bid," and such offer shall be the "Successful Bidder" with respect to the applicable Assets.  The Receiver, in consultation with the Consultation Parties, will select the next highest or otherwise best offer for such Assets after the Successful Bid as the "Back-Up Bid," and such bidder shall be the "Back-Up Bidder."  The Successful Bidder(s) and Back-Up Bidder(s) for the Assets, as applicable, shall, within two (2) business days after completion of the Auction, increase their respective Good Faith Deposits such that the respective amount on deposit by such bidder is equivalent to ten percent (10%) of the Successful Bid(s) and Back-Up Bid(s), respectively.

- **Modification of Certain Bidding Procedures**: Notwithstanding any of the foregoing, the Receiver shall have the right to extend the Bid Deadline, modify the Bid Requirements, modify the overbid increments, modify the Assets included in Lot 2, and/or modify the timing of providing the Auction Instructions to the Qualified Bidders at or prior to the Auction (as defined below), including, without limitation, by waiving certain Bid Requirements or imposing additional terms and conditions with respect to any or all Potential Bidders, without further order of the Court, subject to consultation with the Consultation Parties, if the Receiver determines in his business judgment that such modification is in the best interest of the Receivership estate.

- **Notice of Successful Bid(s) and Proposed Sale Approval Order(s)**: By **April 18, 2025**, the Receiver will file (i) a notice with the Court (the "Notice of Successful Bid(s)") identifying (a) the Successful Bid(s) for the Assets, as applicable, and (b) if applicable, the Back-Up Bid(s) for such Assets, and (ii) any supplemental briefing and evidence in support of approval of such Successful Bid(s) and, if applicable, such Back-Up Bid(s).  The Notice of Successful Bid(s) will include a form of Proposed Sale Approval Order for each Successful Bid, with a copy of the signed purchase agreement constituting such Successful Bid (and a copy of the respective Back-Up Bid purchase agreement, if applicable) attached thereto.

  o  If a Potential Bidder's Bid is not selected as a Qualified Bid, a Successful Bid or a Back-Up Bid for the Asset(s) which are the subject of its Bid, the Receiver will return such Potential Bidder's Good Faith Deposit as soon as practicable, but no later than seven (7) business days following the filing of the Notice of Successful Bid(s).  The Receiver shall retain the Good Faith Deposit(s) submitted in connection with each

---

[7]  To the extent the Receiver determines, in his discretion, to subdivide Lot 2 for overbidding at the Auction, the Receiver shall identify that subdivision to all Qualified Bidders for Lot 2.  The Receiver will set the amount of any minimum overbids and bidding increments on the subdivided lots in his discretion before or during the Auction.

Successful Bid and, if applicable, each Back-Up Bid until the closing of the sale of the respective Asset(s) which are the subject of such Bids. At the closing of the sale of such Asset(s) pursuant to a Successful Bid (or the Back-Up Bid, if applicable), the purchaser will be entitled to a credit against the purchase price in the amount of its Good Faith Deposit with respect to such Asset(s). If a Potential Bidder that submitted a Successful Bid (and/or a Back-Up Bid, if applicable) fails to close by the Outside Date or Back-Up Closing Date, as applicable (for a reason other than non-approval by the Court, default of the seller under the applicable Proposed PSA, or mutual termination of the applicable Proposed PSA), the corresponding Good Faith Deposit(s) will become Receivership Property. If a Successful Bid closes prior to the Outside Date, the Receiver will return the Good Faith Deposit for the Back-Up Bid as soon as practicable thereafter, but no later than seven (7) business days after the closing date of the sale to the Successful Bidder.

- **Sale Hearing:** On **April 21, 2025 at 1:30 p.m. PT**, the Court will conduct a hearing to approve each Successful Bid (and each Back-Up Bid, if applicable) for the Assets (the "<u>Sale Hearing</u>"); provided that if the Stalking Horse PSA is the only Qualified Bid for the Assets, and such Stalking Horse PSA has been accepted as the Successful Bid (and the Auction has therefore been cancelled), the Receiver may seek an earlier Sale Hearing date. Any objections to the approval of a Successful Bid and/or Back-Up Bid or the form of a Proposed Sale Approval Order, and any response thereto by the Receiver, may be raised and presented at or before the Sale Hearing.

- **Closing; Notice of Closing**: If a Successful Bid fails to close by the Outside Date, the Receiver may proceed to consummate the Back-Up Bid for such Asset(s) (if any) without need for a further hearing or further order of the Court, by providing written notice to the Back-Up Bidder for such Asset(s). The Back-Up Bidder will be required to close no later than seven (7) business days of receipt of written notice from the Receiver that the Successful Bid has failed to close (the "<u>Back-Up Closing Date</u>"); provided that the Receiver may, in his discretion, extend the Back-Up Closing Date. Promptly after the closing of the sale pursuant to a Successful Bid (or a Back-Up Bid, if applicable), the Receiver will file a notice of such closing with the Court.

*Execution Version*

<br><br>

**PURCHASE AND SALE AGREEMENT**

BY AND BETWEEN

DAVID P. STAPLETON, RECEIVER
FOR TOUCHSTONE PISTACHIO COMPANY, LLC ("**SELLER**")

AND

ZAMORA PISTACHIO, LLC ("**BUYER**")

DATED FEBRUARY 28, 2025

*Execution Version*

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made as of February 28, 2025 (the "**Agreement Date**"), by and between David P. Stapleton ("**Seller**"), solely in his capacity as receiver (the "**Receiver**") of the assets and operations of Touchstone Pistachio Company, LLC, a California limited liability company ("**Touchstone**") in the matter captioned *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (Case No. 1:24-cv-01105-KES-SAB) (the "**Action**") pending in the United States District Court for the Eastern District of California (the "**Court**"), and Zamora Pistachio, LLC, a California limited liability company ("**Buyer**", and with Seller, each a "**Party**" and together the "**Parties**")).  This Agreement is made with reference to the following recitals:

## RECITALS

WHEREAS, on September 30, 2024, the Court entered a stipulation and order appointing David Stapleton as the Receiver in the Action (the "**Receivership Order**");

WHEREAS, pursuant to the Receivership Order, the Receiver has the express authority to sell substantially all of Touchstone's tangible and intangible real and personal property, subject to the terms of the Receivership Order;

WHEREAS, the Receiver intends to sell certain assets of Touchstone pursuant certain bidding and auction procedures to be approved by a Court order (the "**Bid Procedures Order**").

WHEREAS, subject to the Bid Procedures Order, an overbid process and modification of this Agreement in connection therewith, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to and of the Acquired Assets and the Assumed Liabilities (each as defined below), subject to the terms and conditions set forth herein, including approval of this Agreement and the transaction contemplated herein (the "**Transaction**") by the Court (the "**Sale Approval Order**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

## ARTICLE 1

## DEFINITIONS

1.1     For purposes of this Agreement, the following definitions shall apply to terms not defined elsewhere in this Agreement:

1.1.1    The term "**Auction**" shall have the meaning set forth in the Bid Procedures Order.

1.1.2    The term "**Back-Up Bid**" shall have the meaning set forth in the Bid Procedures Order.

1.1.3    The term "**Back-Up Bidder**" shall have the meaning set forth in the Bid Procedures Order.

1.1.4    The terms "**Back-Up Closing Date**" shall have the meaning set forth in the Bid Procedures Order.

1.1.5    The term "**Bid Deadline**" shall have the meaning set forth in the Bid Procedures Order.

1.1.6    The term "**Business Day**" shall mean any day other than a Saturday or Sunday on which banks in California are authorized or required to be open for business.

1.1.7    The term "**Encumbrance**" shall mean any lien, encumbrance, Claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, hypothecations, and rights of first refusal.

1.1.8    The term "**Environmental Documents**" shall mean that certain Phase I Environmental Site Assessment (with Exhibits), dated January 31, 2025, and all other environmental reports, permits, and material correspondence made available to Buyer by Seller and his agents related to the Real Property and/or Touchstone's operations thereon.

1.1.9    The term "**Environmental Law**" shall mean any federal, state, or local statute, regulation, code, rule, ordinance, order, judgment, decree, injunction, or common law, pertaining in any way to the protection of human health, safety, water quality, or any other aspect of the environment, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.*; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, their respective rules and regulations, and any laws concerning above ground or underground storage tanks.

1.1.10    The term "**Law**" shall mean any federal, state, local, municipal, foreign or international, multinational or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any governmental entity, in each case as of the Closing Date.

1.1.11    The term "**Liability**" or "**Liabilities**" shall mean and include any debt, claim, liability, responsibility, obligation, cost, expense, loss, expenditure, charge, fee, penalty, fine, or fee of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when incurred or asserted.

1.1.12    The terms "**Person**" and "**Persons**" shall mean a natural person, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, governmental entity, or other entity or group.

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

1.1.13  The term "**Pollutant**" shall mean any hazardous substance, dangerous waste, solid waste, pollutant, contaminant, or other material that now or in the future becomes regulated or defined under any local, state, or federal Environmental Law.

1.1.14  The term "**Qualified Bidder**" shall have the meaning set forth in the Bid Procedures Order.

1.1.15  The term "**Successful Bid**" shall have the meaning set forth in the Bid Procedures Order.

1.1.16  The term "**Successful Bidder**" shall have the meaning set forth in the Bid Procedures Order.

ARTICLE 2

PURCHASE AND SALE OF ACQUIRED ASSETS AND ASSUMPTION OF ASSUMED LIABILITIES

2.1  <u>Assets</u>.

2.1.1  <u>Acquired Assets</u>.  Upon the terms and conditions set forth herein and in the Sale Approval Order, at the Closing, Buyer shall buy from Seller and Seller shall sell to Buyer all of Touchstone's right, title, and interest in and to the Acquired Assets.  "**Acquired Assets**" are comprised of the following and are divided into two lots, "**Lot 1**" and "**Lot 2**", as described below (each, a "**Lot**"):

(a)     Lot 1 is comprised of:

(i)     The real property described on <u>Exhibit A</u>, consisting of that certain property identified in the Tulare County real property records as Assessor Parcel Numbers 319-130-25 and 319-130-26, inclusive of the real property located at 19570 Ave. 88, Terra Bella, CA 93270 in Tulare County, California (collectively, the "**Terra Bella Real Property**");

(ii)     The pistachio processing facility, and all other buildings, structures, improvements and fixtures located on the Terra Bella Real Property (collectively, the "**Improvements**");

(iii)     All rights, privileges, easements, rights and rights-of-way appurtenant to or used in connection with the Terra Bella Real Property, including without limitation all minerals, oil, gas and other hydrocarbon substances on or under the Terra Bella Real Property owned by Touchstone (if any), air rights, water, water rights and water stock relating to the Terra Bella Real Property (if any), and any and all other appurtenances and rights of Touchstone in and to public streets, walkways, driveways, parking, and any land lying in the bed of any existing or proposed public ways adjacent to the Terra Bella Real Property (all of which are collectively referred to as the "**Appurtenances**"; together with the Terra Bella Real Property and Improvements, the "**Real Property**");

*Execution Version*

(iv)    All easement agreements benefitting the Real Property to the extent identified in Schedule 2.1.1(a)(iv) to this Agreement;

(v)    All personal property owned by Touchstone and located at and used, at or prior to Closing, in the operation of the Real Property, but not including any Excluded Assets (the "**Operating Personal Property**"; together with the Real Property, the "**Terra Bella Assets**");

(vi)    The personal property identified in Schedule 2.1.1(a)(vi) to this Agreement (collectively the "**Lot 1 Additional Equipment**"); and

(vii)    All manuals, written warranties, and similar documents related to ownership or operation of the Improvements or Lot 1 Additional Equipment that are requested or identified by Buyer no later than thirty (30) days prior to Closing, but only to the extent such documents are in Seller's possession.

(b)    Lot 2 is comprised of:

(i)    the personal property identified in Schedule 2.1.1(b) to this Agreement (such personal property, together with the Operating Personal Property and the Lot 1 Additional Equipment, the "**Personal Property**"); and

(ii)    All manuals, written warranties, and similar documents related to ownership or operation of the personal property identified in Schedule 2.1.1(b) to this Agreement that are requested or identified by Buyer no later than thirty (30) days prior to Closing, but only to the extent such documents are in Seller's possession.

For purposes of clarity, any Excluded Assets shall not constitute Acquired Assets. If Buyer becomes the Successful Bidder or Back-Up Bidder with respect less than all of the assets set forth in this Section 2.1.1, all references to Acquired Assets herein shall mean the assets comprising Buyer's Successful Bid or Back-Up Bid as of the conclusion of the Auction (or upon cancellation thereof), and all other assets shall become Excluded Assets.

2.1.2    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign or convey, and Seller and Touchstone, as applicable, shall retain all right, title and interest to, in and under, the Excluded Assets. "**Excluded Assets**" are comprised of the following:

(a)    All cash and cash equivalents;

(b)    All prepaid expenses, prepayments, refunds, deposits (including, for the avoidance of doubt, professional, legal and other fee retainers, cash

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

collateral security, security deposits, and deposits in the possession of utility companies (if any)), and all related rights to recover the same;

(c)      Any Good Faith Deposits (as defined in the Bid Procedures Order) held by the Seller in accordance with the terms and conditions of the Bid Procedures Order in connection with the Auction;

(d)      All trade accounts receivable and other accounts or notes receivable;

(e)      Any asset of Touchstone that otherwise would constitute an Acquired Asset but for the fact that it is sold or otherwise disposed of in conformity with the terms and conditions of this Agreement and/or the Bid Procedures Order, or Buyer otherwise agrees to such disposition;

(f)      All pistachio crop inventory, product and byproduct, whether or not located on the Terra Bella Real Property;

(g)      All computers, monitors, tablets, electronic devices, hardware, software, software rights, and other technology and technology rights used in operation of the Real Property, unless incorporated into, indivisible from, necessary to operate, or a component part of the Improvements or Personal Property;

(h)      All personal property leased by Touchstone;

(i)      All documents, books, and records of Touchstone or Seller, except as identified in Sections 2.1.1(a)(vii) or 2.1.1(b)(ii);

(j)      All intellectual property rights owned by or licensed to or from Touchstone, except such intellectual property that is (1) necessary to operate the Improvements or Personal Property, (2) identified by Buyer prior to Closing, (3) in the possession of Seller, and (4) transferrable by Seller without the consent of, and without breaching any obligation owed to, any third-party with rights to such intellectual property;

(k)      All claims, causes of action, and rights of Touchstone of any kind, at law or in equity;

(l)      All insurance policies of Touchstone, and all rights of any nature with respect thereto, including all recoveries thereunder and rights to assert claims with respect thereto, for any policy period which falls, in whole or in part, prior to the Closing; and

(m)      All assets identified in Schedule 2.1.2(m).

2.2    <u>Liabilities</u>.

2.2.1    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth herein and in the Sale Approval Order, at the Closing, Buyer shall assume (and pay, perform, discharge or otherwise satisfy in accordance with their terms) all Liabilities related to ownership and operation of the Acquired Assets that arise on and after the Closing (collectively, the "**Assumed Liabilities**").

2.2.2    <u>Excluded Liabilities</u>.  Buyer shall assume only the Assumed Liabilities, and shall not assume nor be deemed to have assumed, any other Liabilities of Touchstone of any nature, whether absolute, accrued, contingent, unliquidated, matured, unmatured, direct, or indirect, and Touchstone shall be exclusively liable for all such Liabilities relating to the Acquired Assets which are not Assumed Liabilities, including those relating to, arising out of, or in connection with the ownership and operation of the Acquired Assets at any time prior to the Closing.

ARTICLE 3

CONSIDERATION

3.1    <u>Consideration</u>.  The aggregate consideration to be paid for the Acquired Assets shall be: (i) the payment of the Purchase Price, in cash; and (ii) the assumption of the Assumed Liabilities.  The total Purchase Price that shall be paid by Buyer, in cash, is $30,500,000.00 (the "**Purchase Price**").  The Purchase Price shall be allocated among the Acquired Assets as follows: (i) $25,250,000.00 for Lot 1, and (ii) $5,250,000.00 for Lot 2.  Buyer shall have the right to increase the Purchase Price for the Acquired Assets, for a particular Lot, or for a specific portion of the Acquired Assets to the extent and in the manner provided in the Bid Procedures Order.  If Buyer becomes the Successful Bidder with respect to one Lot only, all references to Purchase Price herein shall mean the amount allocated to the applicable Lot as of the conclusion of the Auction (or upon cancellation thereof).  The Purchase Price shall be payable in cash in the form of the Good Faith Deposit, as provided in <u>Section 3.2.1</u> below, and the balance of the Purchase Price payable in good and immediately available funds at the Closing.  The Purchase Price shall be subject to prorations and closing adjustments at Closing as contemplated under this Agreement.

3.2    <u>Good Faith Deposit</u>.

3.2.1    Within three (3) days of executing this Agreement, Buyer shall deposit in cash with Seller a good faith deposit (the "**Good Faith Deposit**") in a total amount equal to $3,050,000.00.  The Good Faith Deposit shall be allocated among the Acquired Assets as follows: (i) $2,525,000.00 for Lot 1 and (ii) $525,000.00 for Lot 2.  The Good Faith Deposit shall be made by wire transfer to Seller (in accordance with wiring instructions provided by Seller), and will be held and/or disbursed by Seller in accordance with the terms and conditions of the Bid Procedures Order and this Agreement; *provided* that, in the event of a conflict between the Bid Procedures Order and this Agreement, the former shall supersede and control.

3.2.2    The Good Faith Deposit, together with all interest thereon, if any, shall be fully applicable to the Purchase Price at Closing in the event the Buyer is the Successful Bidder; *provided* that in the event the Transaction is consummated with respect to only one Lot, only the Good Faith Deposit amount allocated to that Lot shall be credited towards the Purchase Price at

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

Closing.  To the extent the Buyer increases its Purchase Price for a Lot at the Auction, and is selected as the Successful Bidder or Back-Up Bidder at the Auction for that Lot, Buyer shall increase its Good Faith Deposit as necessary within two (2) Business Days after completion of the Auction such that the amount of the Good Faith Deposit for that Lot is equal to ten percent (10%) of the increased Purchase Price allocated to that Lot.

3.2.3    The Good Faith Deposit for each Lot, together with all interest accrued thereon, if any, shall be nonrefundable to Buyer except in the event (i) this Agreement is terminated pursuant to Section 9.1.1, 9.1.2, 9.1.3, 9.1.6, or 9.1.7, (ii) one or more of the termination conditions set forth in Section 9.1.1, 9.1.2, or 9.1.3 occurs with respect to such Lot and the Transaction is terminated with respect to such Lot, or (iii) this Agreement is terminated pursuant to Section 9.1.4 for a reason other than Buyer's breach or default.  For the avoidance of doubt, if Buyer is the Successful Bidder or the Back-Up Bidder on less than all of Lot 2 at the conclusion of the Auction, Buyer shall not be entitled to a reduction of the Good Faith Deposit allocated to Lot 2 as a result of any decrease in the Purchase Price allocated to Lot 2, except in the event and to the extent such Good Faith Deposit for Lot 2 exceeds the full Purchase Price allocated to the applicable portion of Lot 2 at the conclusion of the Auction.

3.3    Payments on the Closing Date.

3.3.1    Not later than three (3) Business Days prior to the Closing Date, Seller shall deliver to Buyer a written statement, reasonably satisfactory to Buyer, showing application of the Good Faith Deposit, or the applicable portion thereof pursuant to Section 3.2.2, against the Purchase Price, the allocation of the closing costs pursuant to Section 4.4 and other prorations and closing adjustments contemplated in this Agreement, all consistent with the terms and conditions of this Agreement, the Bid Procedures Order and the Sale Approval Order (the "**Closing Statement**").

3.3.2    Should Buyer object to any of the amounts or calculations in the Closing Statement, Buyer and Seller shall cooperate in a diligent good faith manner to resolve such objections prior to the Closing, and the Closing Statement shall be adjusted prior to the Closing to reflect any changes agreed to by Buyer and Seller.

3.3.3    At the Closing, Buyer shall pay to Seller the Purchase Price pursuant to Section 3.1, less the Good Faith Deposit (or applicable portion thereof if the Transaction is terminated with respect to one Lot), as adjusted pursuant to Section 4.4.3, and such other amounts as may be due from Buyer pursuant to the Closing Statement (including the amounts set forth in Section 4.4.2), in immediately available funds (the "**Closing Cash Payment**").

ARTICLE 4

CLOSING

4.1    Time and Place of Closing.  Subject to the terms and conditions herein, the Transaction shall be consummated (the "**Closing**", and the date on which Closing occurs, the "**Closing Date**") as soon as practicable following the satisfaction or waiver of all conditions of this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), but no later than (i) if the Buyer is

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

selected as the Successful Bidder, the later of (a) fourteen (14) calendar days after entry of the Sale Approval Order and (b) April 8, 2025, or such later date and time as the Parties agree in writing or (ii) in the event Buyer is selected as the Back-Up Bidder, the Back-Up Closing Date, or such earlier date as the Parties may agree in writing (the "**Outside Date**").  For purposes hereof, the Closing shall be deemed to occur at 12:01 a.m. Pacific Time on the Closing Date.

4.2    Escrow Instructions.  Seller shall select a title company reasonably acceptable to Buyer (the "**Title Company**") to serve as escrow agent with respect to the Transaction.  In the event that (i) no Auction is scheduled pursuant to the Bid Procedures Order and Buyer is designated as the Successful Bidder with respect to one or more Lots; (ii) Buyer is selected as the Successful Bidder at the Auction with respect to one or more Lots; or (iii) if Buyer is selected as the Back-Up Bidder with respect to one or more Lots at the Auction and the Successful Bidder fails to close the applicable transaction, then within three (3) Business Days thereafter, Seller shall deposit an executed counterpart of this Agreement with the Title Company, and this Agreement shall serve as the instructions to the Title Company.  Seller and Buyer agree to execute such reasonable additional and supplementary escrow instructions as may be appropriate to enable the Title Company to comply with the terms of this Agreement, the Bid Procedures Order and the Sale Approval Order; *provided*, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall supersede and control.

4.3    Deliveries at Closing.

4.3.1    Seller's Deliveries.  At Closing, Seller shall deliver the following:

(a)    provided the Real Property constitutes an Acquired Asset, a duly executed and acknowledged Grant Deed in recordable form, conveying title to the Real Property to Buyer (the "**Deed**"), in a form reasonably satisfactory to the Title Company, Buyer and Seller;

(b)    an Internal Revenue Service Form W-9, or such other evidence as Buyer and Title Company may require showing that Buyer is not required to withhold taxes from the Purchase Price under Section 1445(a) of the Internal Revenue Code of 1986, as amended ("**Code**");

(c)    a duly executed Bill of Sale, in the form attached hereto as Exhibit B, assigning to Buyer Touchstone's rights with respect to the Personal Property, or such portion thereof, as constitutes Acquired Assets (the "**Bill of Sale**");

(d)    a duly executed Closing Statement;

(e)    a certified copy of the Sale Approval Order;

(f)    UCC termination statements, reconveyances of deeds of trust, and such other documents as are reasonably necessary to release liens against the Acquired Assets to the extent required by Section 7.1.2, in a form reasonably satisfactory to Buyer;

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

(g)　　such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer, Title Company, and/or escrow officer may reasonably request to vest in Buyer all of Touchstone's right, title and interest in any of the Acquired Assets.

4.3.2　<u>Buyer's Deliveries</u>.  At Closing, Buyer shall deliver the following:

(a)　　the Closing Cash Payment;

(b)　　such authorizing documents of Buyer as shall be reasonably required by the Title Company to evidence Buyer's authority to consummate the Transaction;

(c)　　an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in <u>Sections 7.1.1 and 7.1.2</u> have been satisfied and that the representations and warranties set forth in <u>Section 5.2</u> are true and correct;

(d)　　a duly executed Bill of Sale;

(e)　　a duly executed Closing Statement;

(f)　　provided the Real Property constitutes an Acquired Asset, a duly executed Preliminary Change of Ownership Report;

(g)　　provided the Real Property constitutes an Acquired Asset, a duly executed Natural Hazard Disclosure Statement; and

(h)　　all other certificates, agreements, and other documents required by this Agreement (or as Seller may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the Transaction) to be delivered by Buyer at or prior to the Closing in connection with the Transaction.

4.4　<u>Closing Costs</u>.

4.4.1　<u>Seller's Costs at Closing</u>.  At Closing, Seller shall pay one-half of Title Company's escrow fees and charges.

4.4.2　<u>Buyer's Costs at Closing</u>.  At Closing, Buyer shall pay (i) the premium for the Title Policy, to the extent Buyer obtains a Title Policy, (ii) one-half of Title Company's escrow fees and charges, and (iii) the costs of any city, county and/or state transfer taxes associated with the transfer of the Acquired Assets, and recording charges or taxes.

4.4.3　<u>Prorations</u>.  All real property taxes, special taxes, any similar taxes and assessments imposed on the Acquired Assets, utilities, and any income or expense related to the Acquired Assets shall be apportioned as of 12:01 a.m. prevailing Pacific Time on the Closing Date, as if Buyer were vested with title to the Acquired Assets during the entire Closing Date, such that Buyer shall have the benefit of the income and the burden of expenses for the Closing Date. Any

expenses (including utility expenses) attributable to operation of the Acquired Assets, including payment or other obligations to third parties attendant to ownership and operation of the Real Property, shall be prorated based upon the expenses paid or payable for the month in which Closing occurs. In the event the Parties are unable to apportion or pro rate an amount contemplated by this Section 4.4.3 at or before Closing, the Parties shall work in good faith after the Closing to account to each other for such amounts and take such steps as necessary to effectuate the apportionment and proration contemplated in this Agreement, including, without limitation, a Party reimbursing the other Party for amounts incurred or paid by such other Party that should have been incurred or paid by the first Party.

    4.5    Title.

        4.5.1    Preliminary Commitment and Title Insurance. To the extent Lot 1 constitutes Acquired Assets, Buyer may purchase a standard form ALTA Standard Coverage Owner's Policy of Title Insurance issued by the Title Company in the amount of the Purchase Price attributable to the Real Property, showing title to the Real Property vested in Buyer (the "**Title Policy**"), subject to the standard printed exceptions for standard coverage policies and any encumbrances, restrictions, easements or other matters whether or not of record or reflected on the Survey. The Title Policy may also include such endorsements as Buyer may reasonably request, provided that Seller shall have no obligation to assist Buyer in obtaining any such endorsements. The failure of Buyer to obtain a Title Policy, the disclosure of any encumbrances, restrictions, easements or other matters in the Title Policy, and/or the failure of Buyer to receive any such endorsements shall not affect Buyer's obligations hereunder.

        4.5.2    Survey. If Seller possesses a survey for the Real Property ("**Survey**"), Seller shall provide Buyer with a copy of any Survey upon request, which Buyer may review prior to the Bid Deadline. Buyer may, at Buyer's sole cost and expense, seek to update such Survey or recertify such Survey. Nothing disclosed by the Survey or an update to the Survey, nor any inability of Buyer to have the Survey recertified, shall affect Buyer's obligations under this Agreement. If Buyer elects to update the Survey or have it recertified, Buyer shall have the same certified to Seller.

        4.5.3    Pre-Closing Inspection. After entry of the Sale Approval Order and before Closing, Seller shall grant reasonable access to all Acquired Assets during regular business hours to inspect the Acquired Assets.

ARTICLE 5

REPRESENTATIONS AND WARRANTIES

    5.1    Representations and Warranties of Seller. Seller represents and warrants to Buyer as follows:

        5.1.1    Authority; No Conflicts or Consents. Subject to entry and compliance with the Bid Procedures Order and Sale Approval Order, and the results of the Bid Procedures and Auction, Seller has the full power and authority to execute, deliver and perform Seller's obligations

under this Agreement and the documents to be delivered hereunder, and to consummate the Transaction.

      5.1.2   <u>Brokers and Finders</u>.  Except as set forth on <u>Schedule 5.1.2</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Transaction, and Buyer is not or will not become obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Transaction based upon any arrangement made by or on behalf of Seller.

      5.1.3   <u>No Other Representations and Warranties</u>.  Except for the representations and warranties contained herein, neither Seller nor its agents and professionals has made or makes any other express or implied representation or warranty, either written or oral, for or on behalf of Seller.

      5.1.4   <u>Termination of Seller's Representations and Warranties at Closing</u>.  All of the representations and warranties of Seller set forth in this Agreement shall terminate at Closing or upon termination of this Agreement.

      5.2   <u>Representations and Warranties of Buyer</u>.  Buyer represents and warrants to Seller as follows:

      5.2.1   <u>Organization and Authority of Buyer; Enforceability</u>.  Buyer is duly organized and in good standing under the laws of its state of organization, with full power and authority to enter into and perform its obligations under this Agreement.  Buyer has complied with all corporate formalities and procedures necessary to authorize the execution, delivery and performance of this Agreement.  This Agreement has been, and at or prior to the Closing, each document to be executed by Buyer pursuant to <u>Section 4.3.2</u> will be, duly executed and delivered by the Buyer.  This Agreement constitutes, and each document to be executed by Buyer pursuant to <u>Section 4.3.2</u> will constitute, a binding obligation of Buyer enforceable in accordance with its respective terms.  Buyer has sufficient funds to pay the Purchase Price.

      5.2.2   <u>No Conflicts; Consents</u>.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the Transaction, do not and will not: (i) violate or conflict with the certificate of formation or other organizational documents of Buyer; or (ii) violate or conflict with any judgment, order, decree, statute, law, ordinance, contract, rule or regulation applicable to Buyer.  No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the Transaction.

      5.2.3   <u>Brokers and Finders</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the Transaction, and Seller is not or will not become obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Transaction based upon any arrangement made by or on behalf of Buyer.

      5.2.4   <u>OFAC</u>.  Neither Buyer nor any of its affiliates, and none of its respective employees, officers, or directors, is a Person with whom U.S. Persons are restricted from doing

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

business under regulations of the Office of Foreign Asset Control of the Department of the Treasury ("**OFAC**") (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

        5.2.5   <u>California Health & Safety Code Section 78700 Disclosure</u>.  Section 78700 of the California Health & Safety Code requires owners of nonresidential real property who know, or have reasonable cause to believe, that any release of any hazardous substance has come to be located on or beneath the real property to provide written notice of such to a buyer of the real property.  Buyer acknowledges and agrees that the sole inquiry and investigation Seller has conducted in connection with the environmental condition of the Real Property is to obtain and review the Environmental Documents.  Buyer: (a) acknowledges Buyer's receipt of the foregoing notice given pursuant to Section 78700 of the California Health and Safety Code; (b) has reviewed the matters disclosed in the Environmental Documents; and (c) after receiving advice of Buyer's legal counsel, waives any and all rights Buyer may have to assert that Seller has not complied with the requirements of Section 78700 of the California Health and Safety Code.  The representations, warranties, and agreements in this <u>Section 5.2.5</u> shall survive the Closing or the termination of this Agreement indefinitely.

        5.2.6   <u>Natural Hazard Disclosures</u>.  Buyer acknowledges that Seller is required to disclose if any of the Real Property lies within the following natural hazard areas or zones (the "**Natural Hazard Area**"): (a) a special flood hazard area designated by the Federal Emergency Management Agency; (b) an area of potential flooding; (c) a very high fire hazard severity zone; (d) a wild land area that may contain substantial forest fire risks and hazards; (e) an earthquake fault or special studies zone; or (f) a seismic hazard zone.  Buyer acknowledges that Seller has employed the services of a consultant (the "**Natural Hazard Expert**") to examine the maps and other information specifically made available to the public by government agencies, and Buyer acknowledges that Seller has provided a natural hazard disclosure statement prepared by the Natural Hazard Expert (the "**Natural Hazard Disclosure Statement**") and the report of the Natural Hazard Expert (the "**Natural Hazard Report**") containing the results of its examination to Buyer prior to the Bid Deadline.  Buyer acknowledges that Buyer's receipt of the Natural Hazard Disclosure Statement and the Natural Hazard Report fully and completely discharges Seller from its disclosure obligations referred to in the first sentence of this <u>Section 5.2.6</u>, and, for the purposes of this Agreement, the provisions of California Civil Code Section 1103.4 regarding the non-liability of Seller for errors and/or omissions not within its personal knowledge shall be deemed to apply, and the Natural Hazard Expert shall be deemed to be an expert dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above.  Buyer acknowledges and agrees that nothing contained in the Natural Hazard Disclosure Statement releases Buyer from its obligation to fully investigate and satisfy itself with the condition of the Acquired Assets, including, without limitation, whether the Real Property is located in any Natural Hazard Area.  Buyer also agrees that nothing contained in the Natural Hazard Disclosure Statement shall entitle or give Buyer the right to terminate this Agreement.  Buyer further acknowledges and agrees that the matters set forth in the Natural Hazard Disclosure Statement may change on or prior to the Closing and that Seller has no obligation to

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

update, modify, or supplement the Natural Hazard Disclosure Statement except to the extent Seller is required by law or regulation to do so.

5.2.7    Due Diligence; No Representations by Seller.

(a)    EXCEPT AS OTHERWISE PROVIDED IN <u>SECTION 5.1</u>, IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR OTHER REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ACQUIRED ASSETS, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(b)    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT, UPON THE CLOSING, SELLER SHALL SELL AND CONVEY TO BUYER, AND BUYER SHALL ACCEPT, THE PURCHASED ASSETS **AS IS, WHERE IS, WITH ALL FAULTS**. BUYER AGREES AND ACKNOWLEDGES THAT SELLER HAS NO OBLIGATION TO DELIVER THE ACQUIRED ASSETS, INCLUDING THE REAL PROPERTY AND IMPROVEMENTS THEREON, TO SELLER IN ANY PARTICULAR CONDITION (E.G., BROOMSWEPT CONDITION, WORKING CONDITION), AND THAT SELLER HAS NO OBLIGATION TO CLEAN, SANITIZE, FUMIGATE, REPAIR, OR OTHERWISE ALTER, MODIFY OR IMPROVE THE NATURE OR CONDITION OF THE ACQUIRED ASSETS PRIOR TO DELIVERY OF THE SAME TO BUYER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER HAS NO OBLIGATION TO REMOVE REMNANT PISTACHIO PRODUCT OR BYPRODUCT FROM THE SILOS, EQUIPMENT, MACHINERY, STORAGE, OR OTHER AREAS OF THE REAL PROPERTY PRIOR TO CLOSING. BUYER HAS NOT RELIED ON, AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ACQUIRED ASSETS OR RELATING THERETO, WHETHER OR NOT MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE ACQUIRED ASSETS ARE BEING SOLD AS IS, WHERE IS, WITH ALL FAULTS.

(c)    Buyer acknowledges that Seller has made available to Buyer certain review materials related to the Acquired Assets, AND BUYER HAS REVIEWED ALL SUCH MATERIALS. BUYER FURTHER ACKNOWLEDGES TO SELLER THAT BUYER HAS HAD THE OPPORTUNITY TO CONDUCT, AND DID CONDUCT, SUCH INSPECTIONS AND INVESTIGATIONS OF THE ACQUIRED ASSETS AND ASSUMED LIABILITIES AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES,

13

AND ITS ACQUISITION AND ASSUMPTION THEREOF. BUYER HEREBY ASSUMES ALL RISKS THAT ADVERSE MATTERS, INCLUDING WITHOUT LIMITATION LATENT OR PATENT DEFECTS, AND ADVERSE PHYSICAL OR OTHER MATTERS, MAY NOT HAVE BEEN REVEALED BY BUYER'S REVIEW, INSPECTIONS, AND INVESTIGATIONS.

(d)    <u>RELEASE</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, BUYER ACKNOWLEDGES AND AGREES THAT SELLER WOULD NOT ENTER INTO THIS AGREEMENT TO SELL THE ACQUIRED ASSETS FOR THE PURCHASE PRICE UNLESS BUYER AGREED TO THE FOLLOWING:

**UPON CLOSING, BUYER RELEASES SELLER AND ALL SELLER PARTIES FROM ANY AND ALL CLAIMS (WHETHER KNOWN OR UNKNOWN, AND WHETHER CONTINGENT OR LIQUIDATED) ARISING FROM OR RELATED TO (I) THE ACQUIRED ASSETS AND ASSUMED LIABILITIES; AND (II) ANY OTHER CONDITIONS (INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL CONDITIONS OR LEGAL COMPLIANCE) AFFECTING THE ACQUIRED ASSETS, WHETHER THE SAME ARE A RESULT OF NEGLIGENCE OR OTHERWISE. THIS RELEASE IS INTENDED TO BE GIVEN THE BROADEST SCOPE, APPLICATION AND INTERPRETATION ALLOWABLE BY LAW. BUYER COVENANTS NOT TO SUE SELLER OR ANY SELLER PARTIES WITH REGARD TO ACQUIRED ASSETS OR ASSUMED LIABILITIES.**

**BUYER HAS READ, AND UNDERSTANDS, THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 ("SECTION 1542"), WHICH PROVIDES:**

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

**BUYER EXPRESSLY, KNOWINGLY, AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS, BENEFITS, AND PROTECTIONS OF SECTION 1542 AND OF ANY OTHER APPLICABLE STATE OR FEDERAL STATUTE OR COMMON LAW PRINCIPLE LIMITING THE SCOPE OF A GENERAL OR SPECIFIC RELEASE. BUYER HEREBY SPECIFICALLY ACKNOWLEDGES THAT: (i) BUYER HAS CAREFULLY REVIEWED THIS <u>SECTION 5.2.7</u> AND THE WAIVER OF SECTION 1542; (ii) BUYER HAS DISCUSSED ITS IMPORT WITH LEGAL COUNSEL; AND (iii) THE PROVISIONS OF THIS <u>SECTION 5.2.7</u> AND THE WAIVER OF SECTION 1542 ARE A MATERIAL PART OF THIS AGREEMENT AND OF THE CONSIDERATION RECEIVED BY SELLER UNDER THIS AGREEMENT.**

**Buyer's Initials:** _HLL_.

14

*Execution Version*

# ARTICLE 6

## RECEIVERSHIP MATTERS

6.1    Bidding Procedures Milestones.

    6.1.1    Within three (3) Business Days after execution hereof, Seller shall file a motion (the "**Bid Procedures Motion**") for approval of bidding procedures governing, among other things, overbids and a potential Auction of the Acquired Assets (the "**Bid Procedures**"), and approval of the Breakup Fees (defined below).  Seller shall request a hearing on the Bid Procedures Motion (the "**Bid Procedures Hearing**") on shortened time, which request shall propose a hearing date within seven calendar days after the filing of the Bid Procedures Motion.  The proposed Bid Procedures shall be shared with Buyer prior to Seller filing the Bid Procedures Motion, and shall be in a form consistent with the terms of this Agreement.

    6.1.2    No later than four (4) Business Days after entry of the Bid Procedures Order, Seller shall publish the first notice of the sale of the Acquired Assets, subject to overbid, in the form and manner approved by the Court as consistent with sections 2001 and 2002 of title 28 of the United States Code.

    6.1.3    The Bid Procedures Motion shall request that the Court schedule a hearing within thirty-five (35) days after the Bid Procedures Hearing to confirm the sale of the Acquired Assets to the Successful Bidder(s) and Back-Up Bidder(s), if any, following the Auction (or cancellation thereof), and enter the Sale Approval Order.  If Buyer is selected as the Successful Bidder or Back-Up Bidder with respect to any of the Acquired Assets, Seller shall request the Court include in the Sale Approval Order a finding that Buyer is a good faith purchaser, and Seller and/or Buyer, as applicable, shall submit reasonable evidence appropriate to support such a finding.

6.2    Competing Bid and Related Matters.

    6.2.1    This Agreement and the Transaction are subject to Seller's absolute right and ability to consider higher or better competing bids with respect to the Acquired Assets, including Lot 1 only, Lot 2 only, or any portion of Lot 2, pursuant to the Bid Procedures Order (each a "**Competing Bid**").  Following completion of the Auction (or cancellation thereof, if Buyer is the only Qualified Bidder), if Buyer is the Successful Bidder with respect to any of the Acquired Assets and is not in breach of this Agreement, unless otherwise ordered by the Court, Seller shall not initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any sale or other disposition of such Acquired Assets.

    6.2.2    If an Auction is conducted, and Buyer is not the Successful Bidder with respect to any Acquired Assets, Buyer shall, if its bid is determined to be the next highest bid with respect to the applicable Acquired Assets, serve as the Back-Up Bidder with respect to such Acquired Assets and keep Buyer's bid to consummate the Transaction with respect to such Acquired Assets on the terms and conditions set forth in this Agreement (as the same may be modified or improved upon during the Auction) open and irrevocable until the earlier of (i) the

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

date of closing the purchase and sale of the applicable Acquired Assets with the Successful Bidder, or (ii) the Back-Up Closing Date; *provided*, however, that:

(a)     in the event Buyer (i) is neither the Successful Bidder nor the Back-Up Bidder for Lot 1 or (ii) Buyer is the Back-Up Bidder for Lot 1 and Seller consummates a sale of Lot 1 to the Successful Bidder, Buyer shall be entitled to revoke its bid with respect to Lot 2 upon written notice to Seller (provided such notice is delivered to Seller within fourteen (14) days of entry of the Sale Approval Order), and Buyer shall not be required to serve as the Successful Bidder or the Back-Up Bidder with respect to Lot 2 following such revocation; and

(b)     in the event Seller accepts a bid for a portion of Lot 2, Buyer shall not be required to serve as the Successful Bidder or the Back-Up Bidder with respect to the remaining Lot 2 assets if Buyer does not elect to submit a revised bid for such assets.

6.2.3    Following entry of the Sale Approval Order and prior to the Back-Up Closing Date, if Buyer is designated as the Back-Up Bidder and the Successful Bidder fails to consummate the purchase of the applicable Acquired Assets, Buyer will be deemed to have the new prevailing bid with respect to such Acquired Assets, and Seller will be authorized (and Buyer will be obligated), without further order of the Court, to consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be modified or improved upon during the Auction), the Sale Approval Order and the Bid Procedures Order; *provided* that in the event Buyer is the Back-Up Bidder with respect to Lot 1, Buyer will not be obligated to consummate the purchase of Lot 2 if Buyer timely delivers the revocation notice specified in Section 6.2.2(a).

## ARTICLE 7

## CONDITIONS TO CLOSING

7.1    Conditions Precedent to the Obligations of Buyer and Seller.  The respective obligations of each Party to this Agreement to consummate the Transaction are subject to the satisfaction or written waiver by each of Seller and Buyer of each of the following conditions:

7.1.1    There shall not be in effect any order, writ, injunction, judgment or decree entered by a court of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal, or otherwise prohibiting the consummation of the Transaction or the documents to be entered into pursuant to this Agreement; and

7.1.2    The Court shall have entered the Sale Approval Order in form reasonably satisfactory to Seller and Buyer, which order shall not have been stayed and shall authorize Seller to deliver clear, clean and marketable title to the Acquired Assets, free and clear of all Liabilities or Encumbrances of, against, or created by Touchstone, to the fullest extent permitted by

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

applicable Law, except to the extent such Liabilities or Encumbrances constitute Assumed Liabilities or constitute easements, rights of way and other Encumbrances running with the land.

7.2    <u>Conditions Precedent to the Obligations of Seller</u>.  The obligations of Seller to consummate the Transaction are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Seller in its sole discretion:

7.2.1    The representations and warranties of Buyer in this Agreement or any document to be executed by Buyer pursuant to this Agreement shall be true and correct in all material respects, in each case as of the Agreement Date and the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be true and correct only as of such other specified date).

7.2.2    Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or before the Closing Date.

7.2.3    Buyer shall have delivered or caused to be delivered to Seller all of the items set forth in <u>Section 4.3.2</u>.

7.3    <u>Conditions Precedent to the Obligations of Buyer</u>.  The obligations of Buyer to consummate the Transaction are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

7.3.1    The representations and warranties of Seller in this Agreement or any document to be executed by Seller pursuant to this Agreement shall be true and correct in all material respects, in each case as of the Agreement Date and the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be true and correct only as of such other specified date).

7.3.2    Subject to the terms of the Bid Procedures Order and Sale Approval Order, Seller shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Seller on or before the Closing Date.

7.3.3    Seller shall have delivered or caused to be delivered to Buyer all of the items set forth in <u>Section 4.3.1</u>.

## ARTICLE 8

## INDEMNIFICATION

8.1    <u>Indemnification for Entry on the Real Property</u>.  Buyer hereby indemnifies and agrees to defend and hold harmless Seller, Touchstone, and their respective employees, licensees, contractors, consultant, agents, attorneys, brokers, and representatives (each, a "**Seller Party**" and collectively, the "**Seller Parties**") from and against any and all obligations, losses, injuries,

*Execution Version*

damages, claims, liens, costs, expenses, demands, Liabilities, penalties and investigation costs, including reasonable attorneys' fees and costs (collectively, "**Claims**"), incurred in connection with or arising out of any entry on the Real Property by Buyer or any of Buyer's partners, employees, licensees, contractors, agents, consultants, invitees, directors, officers, managers, attorneys, brokers, and representatives, except to the extent caused by Seller or the Seller Parties' gross negligence or willful misconduct. The provisions of this Section shall survive the termination of this Agreement or Closing indefinitely.

       8.2   <u>Indemnification Post-Closing</u>. Subject to the occurrence of the Closing and subject to the representations and warranties of Seller in <u>Section 5.1</u> of this Agreement, Buyer hereby agrees to indemnify, defend, and hold harmless Seller, Touchstone, and the Seller Parties from and against any and all Claims, relating to or arising out of, directly or indirectly, the Acquired Assets and Assumed Liabilities, including, without limitation, those Claims relating to the actual or threatened release, discharge, disposal, deposit, seepage, migration, or escape of any Pollutant at, from, into, or underneath the Real Property, and the compliance or noncompliance of the Real Property with applicable federal, state, county, and local laws and regulations including, without limitation, Environmental Laws and regulations. For avoidance of doubt, Buyer's obligation to indemnify, defend, and hold harmless includes Claims arising from or related to the Assumed Liabilities. The provisions of this Section shall survive Closing indefinitely.

ARTICLE 9

TERMINATION

       9.1   <u>Termination</u>. This Agreement may be terminated only in accordance with this <u>Section 9.1</u>. This Agreement may be terminated at any time prior to the Closing, as follows:

       9.1.1   by the mutual written consent of Seller and Buyer;

       9.1.2   automatically if (a) Buyer is not selected as the Successful Bidder or Back-Up Bidder for any Acquired Assets, or (b) the Court denies Seller's request to enter the Sale Approval Order confirming Buyer as the Successful Bidder or Back-Up Bidder for any Acquired Assets;

       9.1.3   automatically, with respect to a Lot, if Buyer is selected as the Back-Up Bidder for such Lot and Seller consummates a sale of such Lot to the Successful Bidder;

       9.1.4   automatically if the Closing does not occur on or before the Outside Date (if Buyer is the Successful Bidder with respect to such Acquired Assets) or Back-Up Closing Date (if Buyer is the Back-Up Bidder with respect to such Acquired Assets);

       9.1.5   by written notice from Seller to Buyer, if Buyer breaches or fails to perform in any respect any of its obligations, representations, warranties or covenants in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in

*Execution Version*

ARTICLE 7, and (ii) cannot be or has not been cured within five (5) days following delivery of notice to Buyer of such breach or failure to perform; or

9.1.6    by written notice from Buyer to Seller, if Seller breaches or fails to perform in any respect any of its obligations, representations, warranties or covenants in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in ARTICLE 7, and (ii) cannot be or has not been cured within five (5) days following delivery of notice to Seller of such breach or failure to perform; or

9.1.7    by written notice from Buyer to Seller, if (i) Buyer (a) is not the Successful Bidder or Back-Up Bidder for Lot 1 or (b) is the Back-Up Bidder for Lot 1 and the Seller consummates the sale of Lot 1 to the Successful Bidder, and (ii) Buyer is or would be the Successful Bidder or the Back-Up Bidder for Lot 2.

Each basis for termination set forth in this Section 9.1 shall be considered separate and distinct from each other such basis.  If more than one of the termination conditions set forth in this Section 9.1 is applicable, the applicable Party shall have the right to choose the basis for termination.  If one or more termination conditions occur with respect to one Lot only, the Transaction with respect to the other Lot shall not be terminated under this Section 9.1 *except* as set forth in Section 9.1.7.

9.2    Procedures Upon Termination.  In the event of a termination by Buyer or Seller pursuant to Section 9.1, written notice thereof shall be delivered to the other Party, and this Agreement shall terminate with respect to the applicable Lot(s) without further action by Buyer or Seller as provided herein.

9.3    Effect of Termination.

9.3.1    In the event of termination of this Agreement by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of a Party to the other Party, except those provision that expressly survive termination of this Agreement and as otherwise provided in this Section 9.3.  The provisions of Sections 5.2.5, 8.1 and 8.2 shall expressly survive Closing, the expiration, or termination of this Agreement.

9.3.2    Notwithstanding Section 9.3.1, in the event (i) this Agreement is terminated pursuant to Section 9.1.4 due to Buyer's breach or default or (ii) this Agreement is terminated pursuant to Section 9.1.5, Seller shall be entitled to retain the Good Faith Deposit (or the applicable portion thereof if the termination occurs with respect to one Lot only), as liquidated damages as its sole and exclusive remedy against Buyer in all respects for any claim against Buyer arising under this Agreement (or as liquidated damages as its sole remedy for any claim against Buyer arising under this Agreement with respect to the applicable Lot, if the termination occurs with respect to one Lot only).

SELLER AND BUYER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES SELLER MAY SUFFER UPON A BREACH OF THIS AGREEMENT BY BUYER AND THAT THE GOOD FAITH DEPOSIT REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON SUCH BREACH.  SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

APPLICABLE LAW, BUT ARE INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676, AND 1677. BY PLACING ITS INITIALS BELOW, EACH PARTY SPECIFICALLY CONFIRMS THE ACCURACY OF THE STATEMENTS MADE ABOVE AND THE FACT THAT EACH PARTY WAS REPRESENTED BY LEGAL COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE MEANING, THE EFFECT, AND THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION.

**Seller's Initials:** ___DPS___   **Buyer's Initials:** ___HU___

     9.3.3   <u>Break-Up Fee(s)</u>.  To compensate Buyer for agreeing to serve as a stalking horse bidder in connection with the Bid Procedures and Auction, should one or both of the termination conditions set forth <u>Sections 9.1.2(a)</u> and <u>9.1.3</u> occur with respect to a particular Lot, and Seller consummates a sale of that Lot to another Person following the Auction (each, an "**Alternative Transaction**"), then Seller shall pay to Buyer a breakup fee of 1% of the original Purchase Price allocated by Buyer to such Lot from the proceeds of such Alternative Transaction (each, a "**Break-Up Fee**").  For the avoidance of doubt, Buyer shall not be entitled to a Break-Up Fee for Lot 2 if (i) Buyer elects to withdraw its bid for Lot 2 pursuant to <u>Section 6.2.2(a)</u> and/or terminates the Agreement pursuant to Section <u>9.1.7</u> or (ii) Buyer is selected as the Successful Bidder for a portion of Lot 2, even if Seller consummates a sale of the other portion of Lot 2 to another party pursuant to an Alternative Transaction.  Seller's obligation to pay the Break-Up Fee, if any, shall survive the termination of this Agreement.

    9.4   <u>Default by Seller</u>.  If Seller fails without legal excuse to complete the sale of the Acquired Assets in accordance with the terms of this Agreement, the Bid Procedures Order, and the Sale Approval Order, as its sole and exclusive remedy, Buyer may either (i) pursue specific performance of Seller's obligations under this Agreement or (ii) terminate this Agreement with respect to such Acquired Assets and be refunded its Good Faith Deposit with respect to such Acquired Assets.  From and after the Closing, provided Buyer is not in breach of this Agreement, Buyer shall be entitled to seek specific performance of Seller of its obligations, if any, to be performed after the Closing.

## ARTICLE 10

## MISCELLANEOUS

    10.1   <u>Negotiation and Construction</u>.   This Agreement and each of the terms and provisions hereof are deemed to have been explicitly negotiated between the Parties, and the language in all parts of this Agreement shall, in all cases, be construed according to its fair meaning and not strictly for or against either Party.

    10.2   <u>Governing Law</u>. This Agreement shall be construed according to the internal laws of the State of California. The Parties agree that any action or proceeding related to this Agreement, the Transaction, or any document executed pursuant to this Agreement shall be brought only in the Court.  Each Party (a) consents to the jurisdiction of the Court and waives all objections and

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

defenses based upon lack of personal jurisdiction of the Court, (b) waives any objection to venue in the Court, and (c) waives any objection that the Court is an inconvenient forum.

10.3    <u>Attorney's Fees</u>.  Each Party shall be responsible for its own legal, accounting, and consultant fees in connection with the negotiation of this Agreement and the consummation of the Transaction.  In the event of litigation relating to this Agreement, the prevailing Party in such litigation as determined by the Court in a final, non-appealable judgment shall be entitled to receive from the non-prevailing Party the reasonable attorney's fees and costs which such prevailing Party has incurred in connection with such litigation, including any appeal therefrom.

10.4    <u>Notices</u>.  All notices, demands, requests, consents and approvals that may, or are required to, be given by any Party to any other Party hereunder shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) sent by a nationally recognized overnight delivery service, (c) electronically transmitted via email, or (d) if mailed or deposited in the United States mail and sent by registered or certified mail, return receipt requested, postage prepaid to:

SELLER:

David P. Stapleton,
Receiver for Touchstone Pistachio Company, LLC
515 S. Flower St.
18th Floor
Los Angeles, CA 90071
Telephone: (213) 235-0600
Email: david@stapletoninc.com

With a copy (which shall not constitute notice) to:

Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Attn: Joseph R. Dunn
Telephone: (424) 332-4825
Email: jdunn@cov.com

BUYER:

Zamora Pistachio, LLC
9370 Road 234
Terra Bella, CA 93720
Attention: Harris Lee Cohen, General Manager
Telephone: (559) 535-6050
Email: hcohen@settonfarms.com

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

With a copy (which shall not constitute notice) to:

Saul Ewing LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
Attn: Zev M. Shechtman
Telephone: (310) 255-6130
Email: zev.shechtman@saul.com

Either Party hereto may by proper notice made by the other Party designate such other address for giving of notices. All notices shall be deemed given on the day such notice is delivered (or if refused, the date of such refusal) or transmitted by email (provided that confirmation of email transmission is before 5:00 p.m. prevailing Pacific Time on a Business Day, and, if after such time, then on the next Business Day). An attorney may provide notices on behalf of its client.

10.5    <u>Assignment</u>. Buyer shall not assign any right, interest or obligation under this Agreement, other than an assignment to an affiliate of Buyer with Seller's express prior written consent, which consent shall not be unreasonably withheld. Any purported unauthorized assignment shall be void. No permitted assignment by Buyer shall reduce Buyer's obligations hereunder and Buyer shall remain primarily liable for Buyer's obligations hereunder.

10.6    <u>Cooperation; Further Assurances</u>. Subject to the terms of the Bid Procedures Order and the Sale Approval Order, from the date hereof until the Closing, the Parties shall reasonably cooperate with one another in connection with any steps required to be taken by either of them to carry out or otherwise fulfill the intent of this Agreement. Upon the request of the other Party, each Party shall also furnish upon request any further information, execute and deliver any other documents, and do other acts and things as are reasonably necessary for the purpose of carrying out the intent of this Agreement.

10.7    <u>Post-Closing Reasonable Access to Real Property</u>. In the event Seller consummates a sale of Lot 1 to Buyer under this Agreement, for a period of sixty (60) days after the Closing Date, Buyer shall afford Seller and his agents reasonable access to the Real Property during normal business hours upon reasonable advance notice for sixty (60) days after Closing for the purpose of removing any Excluded Assets not removed therefrom prior to Closing. Buyer shall not seek any compensation from Seller in exchange for providing such access or based on the existence of Excluded Assets on the Real Property on and after the Closing Date.

10.8    <u>Entire Agreement</u>. This Agreement, together with the exhibits and schedules hereto, contains the entire understanding between the Parties and supersedes any prior agreements between them respecting the subject matter hereof.

10.9    <u>No Recording</u>. Neither this Agreement nor any memorandum of this Agreement shall be recorded.

10.10    <u>Time of the Essence</u>. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

10.11   <u>Counterparts</u>.  This Agreement may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the Parties hereto, notwithstanding that all the Parties are not signatory to the original or to the same counterpart.  Any such counterpart shall be admissible into evidence as an original hereof against the Person who executed it.

10.12   <u>Amendment, Waiver</u>.   No modification, termination or amendment of this Agreement may be made except by written agreement of the Parties.  No failure by Seller or Buyer to insist upon the strict performance of any covenant, agreement, or condition of this Agreement or to exercise any right or remedy shall constitute a waiver of any such breach or any other covenant, agreement, term or condition.  No waiver shall affect or alter this Agreement, and each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

10.13   <u>Waiver of Jury Trial</u>.   IN ANY LAWSUIT OR OTHER PROCEEDING INITIATED BY A PARTY HERETO UNDER OR WITH RESPECT TO THIS AGREEMENT, SELLER AND BUYER EACH WAIVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

10.14   <u>Headings</u>.   The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

10.15   <u>Cumulative Remedies</u>.  The rights and remedies of the Parties that are specified in this Agreement are cumulative and not exclusive of any other rights and remedies available at law or in equity.

10.16   <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such provisions had not been contained herein.

10.17   <u>Third Party Beneficiaries</u>.  Except as set forth in the Bid Procedures Order and Sale Approval Order, or as otherwise ordered by the Court, no third party shall be entitled to enforce or otherwise shall acquire any right, remedy or benefit by reason of this Agreement.

10.18   <u>Electronic Signatures</u>.  This Agreement may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  For these purposes, "electronic signature" shall mean electronically scanned and transmitted versions (e.g., via pdf file) of an original signature, signatures electronically inserted and verified by software such as DocuSign and Adobe Sign, or faxed versions of an original signature.

*(Signature page follows)*

*Execution Version*

DATED as of the day and year first above written.

**SELLER:** _David P. Stapleton_,
86A136ABFC9641D

David P. Stapleton, solely in his capacity as receiver of
Touchstone Pistachio Company, LLC

**BUYER:** **ZAMORA PISTACHIO, LLC, a CALIFORNIA LIMITED
LIABILITY COMPANY**

By: _Harris Lee Cohen_

Name: Harris Lee Cohen

Title: General Manager

**Exhibits**

| Exhibit A | Legal Description of the Real Property |
| Exhibit B | Bill of Sale |

**Schedules**

| 2.1.1(a)(iv) | Easement Agreements |
| 2.1.1(a)(vi) | Lot 1 Additional Equipment |
| 2.1.1(b) | Lot 2 |
| 2.1.2(m) | Additional Excluded Assets |
| 5.1.2 | Brokers and Finders |

*[Signature Page to Purchase and Sale Agreement]*

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

<u>EXHIBIT A</u>

**Legal Description of the Real Property**

**APNs 319-130-25 and 319-130-26:**

The South Half of the Southeast Quarter of Section 2, Township 23 South, Range 26 East, Mount Diablo Base and Meridian in the County of Tulare, State of California, according to the Official Plat thereof.

EXCEPTING, all oil, gas, minerals and other hydrocarbon substances herein and hereunder, as reserved by Sue-Mar Vineyards Co., Inc., a corporation, in Deed recorded March 4, 1953, in Book 1656, at Page 532, of Official Records, as Document No. 6931.

The above description is pursuant to the Certificate of Merger No. SVM 21-002, recorded on January 13, 2022 as Instrument No.2022-0002880 of Official Records in said County.

<u>EXHIBIT B</u>

**BILL OF SALE**

       This Bill of Sale (the "**Bill of Sale**") is made and entered into on [MONTH] [DAY], 2025, by and between David P. Stapleton ("**Assignor**"), solely in his capacity as receiver of the assets and operations of Touchstone Pistachio Company, LLC ("<u>Touchstone</u>"), a California limited liability company in the matter captioned *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (Case No. 1:24-cv-01105-KES-SAB) pending in the United States District Court for the Eastern District of California, and Zamora Pistachio, LLC, a California limited liability company **("Assignee")**. Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement (as defined below).

       In consideration of the sum of $[•] and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby unconditionally, absolutely and irrevocably assign, transfer, convey and deliver to Assignee, its successors and assigns, all of Touchstone's rights, title and interest in the Personal Property (as defined in the Agreement referred to below and more particularly described on **Exhibit 1** attached hereto and made a part hereof for all purposes).

       ASSIGNEE ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THAT CERTAIN AGREEMENT OF PURCHASE AND SALE DATED [MONTH] [DAY], 2025, BY AND BETWEEN ASSIGNOR AND ASSIGNEE (THE "**AGREEMENT**"), ASSIGNOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITIONS OF THE PERSONAL PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PERSONAL PROPERTY, (C) THE SUITABILITY OF THE PERSONAL PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PERSONAL PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE QUALITY, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OF THE PERSONAL PROPERTY, OR (F) ANY OTHER MATTER WITH RESPECT TO THE PERSONAL PROPERTY. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PERSONAL PROPERTY, ASSIGNEE IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PERSONAL PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY ASSIGNOR, EXCEPT AS SPECIFICALLY PROVIDED IN THE AGREEMENT. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PERSONAL PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT ASSIGNOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PERSONAL PROPERTY AS

PROVIDED FOR HEREIN IS MADE ON AN "**AS IS, WHERE IS**" CONDITION AND BASIS "**WITH ALL FAULTS,**" EXCEPT AS SPECIFICALLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THE AGREEMENT.

      The obligations of Assignor are intended to be binding only on the property of Touchstone and shall not be personally binding upon, nor shall any resort be had to, the private properties of Assignor or any of the other Seller Parties (as defined in the Agreement) other than Touchstone.

      IN WITNESS WHEREOF, Assignor and Assignee have caused this Bill of Sale to be executed on the date and year first above written.

*Assignor*:

      _____,
      David P. Stapleton, solely in his capacity as receiver of Touchstone Pistachio Company, LLC

*Assignee*:

      _____,
      a _____

      By:_____
      Name:_____
      Title:_____

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

<u>EXHIBIT 1 TO BILL OF SALE</u>

**PERSONAL PROPERTY**

<u>SCHEDULE 2.1.1(a)(iv)</u>

**EASEMENT AGREEMENTS**

*[Intentionally left blank]*

####

<u>SCHEDULE 2.1.1(a)(vi)</u>

**LOT 1 ADDITIONAL EQUIPMENT**

*[Attached]*

####

| Item # | Sale Lots | Qty | Supplier or Mfg'r | Model | Serial Number | Age (Date MFG) | Original Equipment Detail | Site Location | Asset No. | Tag Lot No. | Asset Tag No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | 1 | 1 | Pattyn | | 2121P102 | ~ 4 Yrs (3/30/2021) | Combination case erector and bag inserter automatically inserts made-to-measure bags from a roll into boxes. Standard equipped with Nordson hot melt device, hot melt nearly finished, multicolor warning light and color touch panel for easy operation. Also includes buzzer alarm, communication to control system, double active seal bars, carton magazine nearly empty, long carton magazine, film roll trolley, reject mechanism, mechanical bag in box detection, and integrated air plunger. | Maple Warehouse | T3085 | D | T3085 |
| 8 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 2500mm and includes drive package (SEW drive, motor controls, fully wired) and pneumatic separator. | Maple Warehouse | | D | |
| 9 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 1200mm and includes 2x-drive packages (Interoll EC5000 drive, motor controls, fully wired) and pneumatic pop-up stop | Maple Warehouse | | D | |
| 10 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Functioning as a shaker conveyor, and includes: 2 drive packages (vibratory motors), Length 750mm (automatically shakes/settles product using a vibratory pan with two offset mounted motors with weights to adjust the amplitude/ frequency), and stainless steel execution. | Maple Warehouse | T3035 | D | T3035 |
| 11 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 600mm and includes drive packages (Interoll EC5000 drive, motor controls, fully wired), and pneumatic pop-up stop. | Maple Warehouse | | D | |
| 12 | 1 | 1 | Pattyn | CW-11 | 2021P103 | ~ 4 Yrs (3/30/2021) | Equipped with a multicolor warning light, stainless steel frame, reject mechanism, buzzer alarm, and communication to control system | Maple Warehouse | T3086 | D | T3086 |
| 13 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006 Width 400mm, Length 1000mm and includes drive package (SEW drive, motor controls, fully wired). | Maple Warehouse | | D | |
| 14 | 1 | 1 | Pattyn | DS-21-HE | 2021P104 | ~ 4 Yrs (3/30/2021) | A mono case footprint with variable heights: (Min. 280 (L) x 240 (W) x 190 (H), Max. 600 (L) x 400 (W) // 650 (D)), all stainless steel construction, buzzer alarm, communication to control system, and vacuum & gas flush installations. | Maple Warehouse | T3084 | D | T3084 |
| 15 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | With pneumatic pop-up stop | Maple Warehouse | | D | |
| 16 | 1 | 1 | Pattyn | CC-31 | 2021P105 | ~ 4 Yrs (3/30/2021) | Automatically folds the top case flaps and closes them with tape. Equipped with in- and outfeed guarding and multicolor warning light. Standard painted steel execution. Also includes buzzer alarm, communication to control system, flaps control section, and complete detection set tape. | Maple Warehouse | T3083 | D | T3083 |
| 17 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 1100mm and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 18 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA case metal detector that includes: reject head = 400mm H, 450mm W conveyor 400mm wide x 2400mm long, and stainless steel execution | Maple Warehouse | T3087 | D | T3087 |
| 19 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1400mm and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 20 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | FoxJet Solo Series Marksman HHL 0.5 - 1" print height, capable of printing barcodes, text & logos, and includes general black ink. | Maple Warehouse | T3113 | D | T3113 |
| 21 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° curve + Length 800mm + 90° curve, and includes 2x-drive packages (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 22 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Model 252 Print & Apply Labeler, and includes a swing arm tamper max 6" x 6" label | Maple Warehouse | T3113 | D | T3113 |
| 23 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 1500mm, and includes drive package (SEW, motor controls, fully wired) | Maple Warehouse | | D | |
| 24 | 1 | 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 2600mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 25 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Trappo Tipping Conveyor / Knockdown conveyor - driven belt conveyor Width 700mm, Length 2200mm | Maple Warehouse | | D | |
| 26 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Fischbein model 400NS sewing machine, with thread break detection and oil sensor package. | Maple Warehouse | | D | |
| 27 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 28 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Loma CW3 stainless steel loadcell, multispeed, color touch screen with ethernet and USB connection, warning light on foot, potential free contacts. Stainlesssteel frame (non-painted parts, bearings, linear guides and chains are not in stainless steel). Includes buzzer alarm, and communication to control system. | Maple Warehouse | | D | |
| 29 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 500mm, Length 2000mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA Metal Detector, no reject head =300mm high, 550mm wide, conveyor 600mm wide, 2700mm long, and stainless steel execution | Maple Warehouse | | D | |
| 31 | 1 | 3 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 2300mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 32 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006 | Maple Warehouse | | D | |
| 33 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Includes: set of box and bag conveyors, palletizer, pallet conveyors, layer card deposit station, safety cell, electrical & hmi and engineering | Maple Warehouse | | D | |
| 34 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Lantech S Series Automatic - 15 RPM - system includes pallet grip and load seeking clamp, (3) discrete wrap patterns for customer use, visual alarms and faults, alarm history, password protection for sensitive settings, a panel mounted beacon light and horn, and following conveyor sections: Infeed Conveyor - 5' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb maximum load capacity, and 30 FPM conveyor speed via motor starter. Wrap Zone Conveyor - 10' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb. maximum load capacity, and 30 FPM conveyor speed via motor starter. Exit Conveyor - 5' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb. maximum load capacity, and 30 FPM conveyor speed via motor starter. | Maple Warehouse | | D | |
| 35 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | CEFLEX-41 combination case erector and bag inserter and MTM60 hotmelt. Automatically inserts made-to-measure bags from a roll into boxes. Standard equipped with Nordson hot melt device, hot melt nearly finished, multicolor warning light and color touch panel for easy operation. Standard painted execution. Also includes buzzer alarm, communication to control system, double active seal bars, carton magazine nearly empty, long carton magazine, film roll trolley, reject mechanism, mechanical bag in box detection, and integrated air plunger. | Maple Warehouse | T3081 | D | T3081 |
| 36 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 1200mm, and includes 2x-drive packages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3110 | D | T3110 |
| 37 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 500mm, and includes drive packages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3110.1 | D | T3110.1 |
| 38 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° cruve + Length 1600mm lift gate, includes 2x-drive packages (SEW drive, motor controls, fully wired), and pneumatic pop-up stop. | Maple Warehouse | T3110.2 | D | T3110.2 |
| 39 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1200mm, and includes 2x-drive pPackages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3108 | D | T3108 |
| 40 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Functioning as a shaker conveyor, and includes: 2 drive packages (vibratory motors), Length 750mm (automatically shakes/settles product using a vibratoy pan with two offset mounted motors with weights to adjust the amplitude/ frequency), and stainless steel execution. | Maple Warehouse | T3111 | D | T3111 |
| 41 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 600mm, including drive packages (Interoll EC5000 drive, motor controls, fully wired), and pneumatic pop-up stop | Maple Warehouse | T3108.1 | D | T3108.1 |
| 42 | 1 | 1 | Pattyn | CW-11 | 2021P108 | ~ 4 Yrs (3/30/2021) | Equipped with a multicolor warning light, stainless steel frame, reject mechanism, buzzer alarm, and communication to control system | Maple Warehouse | | D | |
| 43 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° curve + Length 500mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3079.1 | D | T3079.1 |
| 44 | 1 | 1 | Pattyn | DS-21-HE | 2021P109 | ~ 4 Yrs (3/30/2021) | A mono case footprint with variable heights: (Min. 280 (L) x 240 (W) x 190 (H), Max. 600 (L) x 400 (W) // 650 (D)), all stainless steel construction, buzzer alarm, communication to control system, and vacuum & gas flush installations. | Maple Warehouse | T3080 | D | T3080 |
| 45 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL9006, Width 400mm, Length 1600mm, including drive packages (SEW drive, motor controls, fully wired), pneumatic pop-up stop, and safety fencing (length 1700mm + door) | Maple Warehouse | T3079 | D | T3079 |
| 46 | 1 | 1 | Pattyn | CC-31 | 2021P110 | ~ 4 Yrs (3/30/2021) | Automatically folds the top case flaps and closes them with tape. Equipped with in- and outfeed guarding and multicolor warning light. Standard painted steel execution. Also includes buzzer alarm, communication to control system, flaps control section, and complete detection set tape. | Maple Warehouse | T3078 | D | T3078 |
| 47 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1100mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3079.2 | D | T3079.2 |

| 48 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA case metal detector that includes: reject head = 400mm H, 450mm W conveyor 400mm wide x 2400mm long, and stainless steel execution | Maple Warehouse | T3082 T3111.1 | D | T3082 T3111.1 |
| 49 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1000mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3108.2 | D | T3108.2 |
| 50 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Foxjet Solo Series Marksman HHI - 0.5 - 1" print height, capable of printing barcodes, text & logos, and includes general black ink | Maple Warehouse | T3114 | D | T3114 |
| 51 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Model 252 and includes a swing arm tamper, max 6" x 6" label | Maple Warehouse | T3114 | D | T3114 |
| 111 | 1 | 1 | Beeler | | | | Includes equipment items listed below (Item # 112 thru 140) | Terra Bella | | C | |
| 141 | 1 | 1 | Beeler | | | | Includes equipment items listed below (Item # 142 thru 164) | Terra Bella | | C | |
| 145 | 1 | | Beeler | | | | (5) FLOAT TANKS FT-60-EXT | Panoche | T1214 T1215 T1216 T1217 T1218 | C | T1214 T1215 T1216 T1217 T1218 |
| 174 | 1 | 4 | Industrial Design & Construction | 4024-04811 | | ~ 5 Yrs | GSI 48 Ft Dia x 11-ring high silos, with (2) - 40 Hp. 1750rpm double inlet GSI centrifugal fans with 480 volt motors w/ controls, downstream natural gas heater, and 6ft wide catwalks. | Mt. Whitney | | I | |
| 178 | 1 | 1 | Beeler | | | ~ 4 Yrs (2021) | Includes: palletizer cell, and pallet conveyors. | Maple Warehouse | | D | |
| 181 | 1 | 1 | Gardner Denver | L7-11D | D202610 | | | Mt. Whitney | T1246 | D | T1246 |
| 184 | 1 | 24 | Cablevey Conveyor | Various | Various | | | Mt. Whitney | No Tag | N | No Tag |
| 186 | 1 | 1 | Magnetic Products, Inc | 150MM | | | | Maple Warehouse | No Tag | D | No Tag |
| 187 | 1 | 1 | Magnetic Products, Inc | 100MM | | | | Maple Warehouse | No Tag | D | No Tag |
| 188 | 1 | 2 | Syntron Electromagnetic | BF-3S | | | | Maple Warehouse | No Tag | D | No Tag |
| 192 | 1 | 1 | LMC | 8420D | 210000126 | ~ 4 Yrs (2021) | 84" wide and 20 screens. | Panoche | T1047 | J | T1047 |
| 193 | 1 | 1 | LMC | 7208P | 210000128 | ~ 4 Yrs (2021) | 72" wide and 8 screens. | Panoche | T1049 | J | T1049 |
| 194 | 1 | 1 | LMC | 8410P | 210000124 | ~ 4 Yrs (2021) | 84" wide and 10 screens. | Panoche | T1048 | J | T1048 |
| 196 | 1 | 2 | LMC | 3540 | 210000131 210000129 | ~ 4 Yrs (2021) | Includes bottom portions that consists of S/N's 2100000130 and 210000129 | Panoche | T1050 T1051 T1053 T1052 | M | T1050 T1051 T1053 T1052 |
| 199 | 1 | 11 | Eaton | | | | | Maple Warehouse | | K | |
| 200 | 1 | 87 | Allen-Bradley | Centerline 2100 | | | Largely consists of AB PowerFlex 525 VFD's | Maple Warehouse | | K | |
| 201 | 1 | 47 | Allen-Bradley | Centerline 2101 | | | Largely consists of AB PowerFlex 525 VFD's | Maple Warehouse | | K | |
| 202 | 1 | 2 | Deamco | BEM-12P-T-X | 24384BEM-01 24384BEM-02 | | "S" shape configuration. | Mt. Whitney | | M | |
| 203 | 1 | 6 | Deamco | BEM-18P-T-X | 24384BEM-03 24384BEM-04 24384BEM-05 24384BEM-06 24384BEM-07 24384BEM-08 | | "C" shape configuration. | Mt. Whitney | | M | |
| 204 | 1 | 16 | Eaton | V48M28T7516 | Various | | 75 kVA, 3-phase, 60 Hz, and 480V delta to 208Y/120V | Kamm Plant | | K | |
| 205 | 1 | 4 | Eaton | V48M28T4516 | Various | | 45 kVA, 3-phase, 60 Hz, and 480V delta to 208Y/120V | Kamm Plant | | K | |
| 206 | 1 | 4 | Eaton | | Various | | Includes (3) 20-amp, (3) 30-amp, and (3) 100-amp circuit breakers, and (1) 400-amp main breaker. | Maple Warehouse | | K | |
| 207 | 1 | 7 | Eaton | | Various | | Includes (6) 20-amp circuit breakers, and (1) 200-amp main breaker. | Maple Warehouse | | K | |
| 208 | 1 | 3 | Eaton | | Various | | Includes (1) 60-amp and (1) 20-amp circuit breakers, and (1) 100-amp main breaker. | Maple Warehouse | | K | |
| 209 | 1 | 4 | Eaton | | Various | | Includes (1) 100-amp, (1) 50-amp, (3) 30-amp, and (4) 20-amp circuit breakers, and (1) 200-amp main breaker. | Maple Warehouse | | K | |
| 210 | 1 | 12 | Eaton | Pow-R-Way III | Various | | 4000 amp Pow-R-Way III entry point flange | Maple Warehouse | | K | |
| 211 | 1 | 28 | Eaton | | Various | | Includes (6) 20-amp circuit breakers, and (1) 200-amp main breaker. | Kamm Plant | | K | |

<u>SCHEDULE 2.1.1(b)</u>

**LOT 2 ASSETS**

*[Attached]*

####

| Item # | Sale Lots | Qty | Supplier or Mfg'r | Model | Serial Number | Age (Date MFG) | Original Equipment Detail | Site Location | Asset No. | Tag Lot No. | Asset Tag No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 2 | Steel Structures | | | ~ 5 Yrs (3/23/2020) | 12'0" x 12'0" x 22'0" Nominal Bin Capacity 40,000 lbs (inshell pistachios) Nominal top deck size 12' wide x 26' long Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 2 | 2 | 1 | Steel Structures | | | ~ 5 Yrs (3/23/2020) | 8'0" x 8'0" x 17'0" Nominal Bin Capacity 12,800 lbs (inshell pistachios) Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 3 | 2 | 6 | Steel Structures | | | ~ 5 Yrs (3/23/2020) | 12'0" x 12'0" x 22'0" Nominal Bin Capacity 40,000 lbs (inshell pistachios) Nominal top deck size 12' wide x 82' long Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 4 | 2 | 3 | Steel Structures | | | ~ 5 Yrs (3/23/2020) | 12'0" x 12'0" x 22'0" Nominal Bin Capacity 50,000 lbs (kernel pistachios) Nominal top deck size 12' wide x 40'-6" long Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 5 | 2 | 1 | Steel Structures | | | ~ 5 Yrs (3/23/2020) | 8'0" x 8'0" x 17'0" Includes 36" x 18" wide crossover to ladder for access to top of #5 bins Nominal Bin Capacity 16,000 lbs (kernel pistachios) Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 6 | 2 | 3 | Steel Structures | | | ~ 5 Yrs (3/23/2020) | 12'0" x 12'0" x 22'0" Nominal top deck size 12' wide x 39' – 6" long Nominal Bin Capacity 40,000 lbs (inshell pistachios) Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 52 | 2 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Includes: palletizer cell, pallet conveyors, and engineering | Maple Warehouse | T3002 T3002a T3002b T3002c | D | T3002 T3002a T3002b T3002c |
| 53 | 2 | 1 | Wolverine Proctor | SCF 1.5 | | 4 Yrs (12/14/2020) | 87' (L) X 14' 10" (W) conveyorized and gas fired oven, 200 degree F rated temperature with (3) drying and (1) cooling zones. | Maple Warehouse | See Oven Detail Schd | E | See Oven Detail Schd |
| 54 | 2 | 1 | Beeler | | | | Includes equipment items listed below (Item # 55 thru 83) | Terra Bella | See Below | B | See Below |
| 55 | 2 | | Beeler | | | | (1) BI RCVG PIT #1 NORTH, 8X10 HI-CAP | Terra Bella | T1153 | B | T1153 |
| 56 | 2 | | Beeler | | | | (1) BI METERING CONV. # 1 NORTH  SBSR 3618.5 W/ 3/4" CLEAT | | | B | |
| 57 | 2 | | Beeler | | | | (1) BI RCVG PIT #1 SOUTH, 8X9 HI-CAP | Terra Bella | T1154 | B | T1154 |
| 58 | 2 | | Beeler | | | | (1) BI METERING CONV. # 1 SOUTH  SBSR 3618.5 W/ 3/4" CLEAT | | | B | |
| 59 | 2 | | Beeler | | | | (1) BI PIT COLLECTION CONV.  SBSR 3635.5 | | | B | |
| 60 | 2 | | Beeler | | | | (1) BI PRECLEANER FEED CONVEYOR SBSR 4860 W/3" CLEAT | Terra Bella | T1270 | B | T1270 |
| 61 | 2 | | Beeler | | | | (1) BI/DCI PRIMARY ASPIRATOR 4810P | Terra Bella | T1146 | B | T1146 |
| 62 | 2 | | Beeler | | | | (1) DCI ASPIRATOR CYCLONE  HE60 | Terra Bella | T1144 | B | T1144 |
| 63 | 2 | | Beeler | | | | (1) DCI AIRLOCK  FT24 WM | | | B | |
| 64 | 2 | | Beeler | | | | (1) DCI/FE  SYSTEM FAN 5 1/2 BCS 40HP | | | B | |
| 65 | 2 | | Beeler | | | | (1) BI PRECLEANER BI 60XL | Terra Bella | T1191 | B | T1191 |
| 66 | 2 | | Beeler | | | | (1) BI PRECLEANER SUPER STRUCTURE PLATFORM BI STRUCTURE/ACCESS | | | B | |
| 67 | 2 | | Beeler | | | | (1) BI PRECLEANER DISCH. CONV. SBSR 3614 | Terra Bella | T1266 | B | T1266 |
| 68 | 2 | | Beeler | | | | (1) BI PREHULLER MODEL 10 | Terra Bella | T1260 | B | T1260 |
| 69 | 2 | | Beeler | | | | (1) BI ASPIRATOR FEED CONVEYOR SBSR 6008 | | | B | |
| 70 | 2 | | Beeler | | | | (1) BI/DCI DISCHARGE ASPIRATOR 6012P | Terra Bella | T1155 | B | T1155 |
| 71 | 2 | | Beeler | | | | (1) DCI ASPIRATOR CYCLONE HE 84 | | | B | |
| 72 | 2 | | Beeler | | | | (1) DCI AIRLOCK FT24 WM | | | B | |
| 73 | 2 | | Beeler | | | | (1) DCI/FE System Fan 5 1/2 BCS 50HP | Terra Bella | T1071 | B | T1071 |
| 74 | 2 | | Beeler | | | | (1) BI HULLER FEED CONVEYOR TI 36148 | | | B | |
| 75 | 2 | | Beeler | | | | (1) BI TRASH CONVEYOR #2 SBRR 2433 | | | B | |
| 76 | 2 | | Beeler | | | | (1) BI TRASH CONVEYOR, SCALE FEED DRIVE & CLUTCH SBRR 2410 | | | B | |
| 77 | 2 | | Beeler | | | | (1) BI WEIGH HOPPER, TRASH BI | Terra Bella | T1189 | B | T1189 |
| 78 | 2 | | Beeler | | | | (1) BI TRASH CONVEYOR #3 SBRR 2437 | | | B | |
| 79 | 2 | | Beeler | | | | (1) BI HULLS CROSS CONVEYOR SBRR 2454 | | | B | |
| 80 | 2 | | Beeler | | | | (1) BI TRASH COLLECTION CONVEYOR #B SBRR 24132 | | | B | |
| 81 | 2 | | Beeler | | | | (1) Sample Conveyors #1 SBRR 1214 | | | B | |
| 82 | 2 | | Beeler | | | | (1) Sample Conveyors #2 SBRR 1224 | | | B | |
| 83 | 2 | | Beeler | | | | (1) Sample Diverter Pneumatic Y-Gate | | | B | |
| 84 | 2 | 1 | Beeler | | | | Includes equipment items listed below (Item # 85 thru 108) | Terra Bella | See Below | B | See Below |
| 85 | 2 | | Beeler | | | | (1) HULLER DISTRIBUTION AUGER 43' | | | B | |
| 86 | 2 | | Beeler | | | | (1) HULLER/AUGER SUPPORT STRUCTURE ACCESS STAIRS AND CATWALKS | | | B | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 87 | 2 | | Beeler | | | (1) WATER MANIFOLD LOT | | | | B | |
| 88 | 2 | | Beeler | | | (6) FLOAT TANKS FT-60-EXT | Terra Bella | T1147<br>T1148<br>T1149<br>T1150<br>T1151<br>T1152 | B | | T1147<br>T1148<br>T1149<br>T1150<br>T1151<br>T1152 |
| 89 | 2 | | Beeler | | | (3) SINKER COLL CONVEYOR REX 2464 | Terra Bella | T1264 | B | | T1264 |
| 90 | 2 | | Beeler | | | (1) SINKER ASPIRATOR #1 488 OPT B ALL SS | Terra Bella | T1157 | B | | T1157 |
| 91 | 2 | | Beeler | | | (1) DEWATERING SHAKER NF5414 | | | B | | |
| 92 | 2 | | Beeler | | | (1) ASPIRATOR #2 606 OPT A ALL SS | | | B | | |
| 93 | 2 | | Beeler | | | (1) DRYER FEED CONVEYOR REX 2478 W/ FLIGHTS | | | B | | |
| 94 | 2 | | Beeler | | | (1) FLOATER COLL. CONVEYOR REX 1852.5 | | | B | | |
| 95 | 2 | | Beeler | | | (1) CYCLONE HP56 | Terra Bella | T1145 | B | | T1145 |
| 96 | 2 | | Beeler | | | (1) AIRLOCK FT-16 | | | B | | |
| 97 | 2 | | Beeler | | | (1) FAN 5 1/2 BCS 50 HP | Terra Bella | T1073 | B | | T1073 |
| 98 | 2 | | Beeler | | | (1) DUCT SYSTEM LOT | | | B | | |
| 99 | 2 | | Beeler | | | (1) MISC STEEL, PANNING & SPOUTING LOT | | | B | | |
| 100 | 2 | | Beeler | | | (1) DECK FEED ASPIRATOR MC487 TANDEM | | | B | | |
| 101 | 2 | | Beeler | | | (1) FLOATER SCALP DECK A6008 | Terra Bella | T1262 | B | | T1262 |
| 102 | 2 | | Beeler | | | (1) FLOATER INCLINE AUGER. 14" X 31'-6" | | | B | | |
| 103 | 2 | | Beeler | | | (1) FLOATER DRYER FEED CONVEYOR (NEEDS LEGS) REX 2460.5W/ FLIGHTS.X | | | B | | |
| 104 | 2 | | Beeler | | | (1) TRASH COLL. CONV. #3 SBRR 2479.5 | | | B | | |
| 105 | 2 | | Beeler | | | (1) TRASH COLL. CONV. #4 1819.5 REVERSIBLE | | | B | | |
| 106 | 2 | | Beeler | | | (1) MISC STEEL, PANNING & SPOUTING LOT | | | B | | |
| 107 | 2 | | Beeler | | | (1) SAMPLE DRYER 40 CELL | Terra Bella | T1142 | B | | T1142 |
| 108 | 2 | | Beeler | | | (1) Silo Feed Conveyor | | | B | | |
| 109 | 2 | 6 | Magnusson | NF-24 | ~ 5 Yrs<br>(12/17/ 2019) | HULLER | Terra Bella | T1075<br>T1076<br>T1077<br>T1078<br>T1079<br>T1080 | B | | T1075<br>T1076<br>T1077<br>T1078<br>T1079<br>T1080 |
| 110 | 2 | 6 | Magnusson | LHR | ~ 5 Yrs<br>(12/17/ 2019) | LOOSE HULL REMOVER | Terra Bella | T1081<br>T1082<br>T1083<br>T1084<br>T1085<br>T1086 | B | | T1081<br>T1082<br>T1083<br>T1084<br>T1085<br>T1086 |
| 112 | 2 | | Beeler | | | (1) BI RCVG PIT #1 NORTH, 8X10 HI-CAP | | | B | | |
| 113 | 2 | | Beeler | | | (1) BI METERING CONV. # 1 NORTH  SBSR 3618.5 W/ 3/4" CLEAT | | | B | | |
| 114 | 2 | | Beeler | | | (1) BI RCVG PIT #1 SOUTH, 8X9 HI-CAP | | | B | | |
| 115 | 2 | | Beeler | | | (1) BI METERING CONV. # 1 SOUTH  SBSR 3618.5 W/ 3/4" CLEAT | | | B | | |
| 116 | 2 | | Beeler | | | (1) BI PIT COLLECTION CONV.  SBSR 3635.5 | | | B | | |
| 117 | 2 | | Beeler | | | (1) BI PRECLEANER FEED CONVEYOR  SBSR 4860 W/3" CLEAT | | | B | | |
| 118 | 2 | | Beeler | | | (1) BI/DCI PRIMARY ASPIRATOR  4810P | | | B | | |
| 119 | 2 | | Beeler | | | (1) DCI ASPIRATOR CYCLONE  HE60 | | | B | | |
| 120 | 2 | | Beeler | | | (1) DCI AIRLOCK  FT24 WM | | | B | | |
| 121 | 2 | | Beeler | | | (1) DCI/FE  SYSTEM FAN 5 1/2 BCS 40HP | | | B | | |
| 122 | 2 | | Beeler | | | (1) BI PRECLEANER BI 60XL | | | B | | |
| 123 | 2 | | Beeler | | | (1) BI PRECLEANER SUPER STRUCTURE PLATFORM BI STRUCTURE/ACCESS | | | B | | |
| 124 | 2 | | Beeler | | | (1) BI PRECLEANER DISCH. CONV. SBSR 3614 | | | B | | |
| 125 | 2 | | Beeler | | | (1) BI PREHULLER MODEL 10 | | | B | | |
| 126 | 2 | | Beeler | | | (1) BI ASPIRATOR FEED CONVEYOR SBSR 6008 | | | B | | |
| 127 | 2 | | Beeler | | | (1) BI/DCI DISCHARGE ASPIRATOR 6012P | | | B | | |
| 128 | 2 | | Beeler | | | (1) DCI ASPIRATOR CYCLONE HE 84 | | | B | | |
| 129 | 2 | | Beeler | | | (1) DCI AIRLOCK FT24 WM | | | B | | |
| 130 | 2 | | Beeler | | | (1) DCI/FE System Fan 5 1/2 BCS 50HP | | | B | | |
| 131 | 2 | | Beeler | | | (1) BI HULLER FEED CONVEYOR TI 36148 | | | B | | |
| 132 | 2 | | Beeler | | | (1) BI TRASH CONVEYOR #2 SBRR 2433 | | | B | | |
| 133 | 2 | | Beeler | | | (1) BI TRASH CONVEYOR, SCALE FEED DRIVE & CLUTCH SBRR 2410 | | | B | | |
| 134 | 2 | | Beeler | | | (1) BI WEIGH HOPPER, TRASH BI | | | B | | |
| 135 | 2 | | Beeler | | | (1) BI TRASH CONVEYOR #3 SBRR 2437 | | | B | | |
| 136 | 2 | | Beeler | | | (1) BI HULLS CROSS CONVEYOR SBRR 2454 | | | B | | |
| 137 | 2 | | Beeler | | | (1) BI TRASH COLLECTION CONVEYOR #B SBRR 24132 | | | B | | |
| 138 | 2 | | Beeler | | | (1) Sample Conveyors #1 SBRR 1214 | | | B | | |

| # | | Qty | Manufacturer | Model | Serial | Age | Description | Location | Tag | Col | Tag |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 139 | 2 | | Beeler | | | | (1) Sample Conveyors #2 SBRR 1224 | | | B | |
| 140 | 2 | | Beeler | | | | (1) Sample Diverter Pneumatic Y-Gate | | | B | |
| 142 | 2 | | Beeler | | | | (1) HULLER DISTRIBUTION AUGER 43' | | | B | |
| 143 | 2 | | Beeler | | | | (1) HULLER/AUGER SUPPORT STRUCTURE ACCESS STAIRS AND CATWALKS | | | B | |
| 144 | 2 | | Beeler | | | | (1) WATER MANIFOLD LOT | | | B | |
| 146 | 2 | | Beeler | | | | (3) SINKER COLL CONVEYOR REX 2464 | | | B | |
| 147 | 2 | | Beeler | | | | (1) SINKER ASPIRATOR #1 488 OPT B ALL SS | | | B | |
| 148 | 2 | | Beeler | | | | (1) DEWATERING SHAKER NF5414 | | | B | |
| 149 | 2 | | Beeler | | | | (1) ASPIRATOR #2 606 OPT A ALL SS | | | B | |
| 150 | 2 | | Beeler | | | | (1) DRYER FEED CONVEYOR REX 2478 W/ FLIGHTS | | | B | |
| 151 | 2 | | Beeler | | | | (1) FLOATER COLL. CONVEYOR REX 1852.5 | | | B | |
| 152 | 2 | | Beeler | | | | (1) CYCLONE HP56 | | | B | |
| 153 | 2 | | Beeler | | | | (1) AIRLOCK FT-16 | | | B | |
| 154 | 2 | | Beeler | | | | (1) FAN 5 1/2 BCS 50 HP | | | B | |
| 155 | 2 | | Beeler | | | | (1) DUCT SYSTEM LOT | | | B | |
| 156 | 2 | | Beeler | | | | (1) MISC STEEL, PANNING & SPOUTING LOT | | | B | |
| 157 | 2 | | Beeler | | | | (1) DECK FEED ASPIRATOR MC487 TANDEM | | | B | |
| 158 | 2 | | Beeler | | | | (1) FLOATER SCALP DECK A6008 | | | B | |
| 159 | 2 | | Beeler | | | | (1) FLOATER INCLINE AUGER. 14" X 31'-6" | | | B | |
| 160 | 2 | | Beeler | | | | (1) FLOATER DRYER FEED CONVEYOR (NEEDS LEGS) REX 2460.5W/ FLIGHTS X | | | B | |
| 161 | 2 | | Beeler | | | | (1) TRASH COLL. CONV. #3 SBRR 2479.5 | | | B | |
| 162 | 2 | | Beeler | | | | (1) TRASH COLL. CONV. #4 1819.5 REVERSIBLE | | | B | |
| 163 | 2 | | Beeler | | | | (1) MISC STEEL, PANNING & SPOUTING LOT | | | B | |
| 164 | 2 | | Beeler | | | | (1) Silo Feed Conveyor | | | B | |
| 165 | 2 | 6 | Magnusson | NF-24 | | ~5 Yrs (12/17/2019) | HULLER | Mt. Whitney | T1162 T1163 T1164 T1165 T1166 T1167 | B | T1162 T1163 T1164 T1165 T1166 T1167 |
| 166 | 2 | 4 | Magnusson | LHR | | ~5 Yrs (12/17/2019) | LOOSE HULL REMOVER | Mt. Whitney | T1170 T1171 T1172 T1173 | B | T1170 T1171 T1172 T1173 |
| 167 | 2 | 1 | Beeler | | | ~5 Yrs | (3) sorter machines, triple stack support structure, service platforms, access stairwells, surge hoppers and feeders. | Mt. Whitney | T3051 T3052 | F | T3051 T3052 |
| 171 | 2 | 1 | Multiscan Technologies | S60SP | 3266 | ~4 Yrs (2021) | Scan capabilities include external quality, color, size, shape and open/close. | Maple Warehouse | T3026 | H | T3026 |
| 172 | 2 | 1 | Multiscan Technologies | S60SP | 3133 | ~4 Yrs (2021) | Scan capabilities include external quality, color, size, shape and open/close. | Maple Warehouse | T3027 | H | T3027 |
| 173 | 2 | 1 | Multiscan Technologies | S60SP | 3143 | ~4 Yrs (2021) | Scan capabilities include external quality, color, size, shape and open/close. | Maple Warehouse | T3028 | H | T3028 |
| 175 | 2 | 4 | LMC | 7210P | 190000575 190000576 190000577 190000578 | ~4 Yrs (2021) | 72" wide and 10 screens. | Kamm Plant | T1058 T1059 T1056 T1057 | J | T1058 T1059 T1056 T1057 |
| 176 | 2 | 1 | Satake | RNEZX-7500 | S41900158 | ~4 Yrs (2021) | Includes (3) Evolution 8 and (1) Evolution 4 sorters, and associated spare parts. | Maple Warehouse | T3092 | S | T3092 |
| 177 | 2 | 1 | Satake | RNEZX-7500 | S41900159 | ~4 Yrs (2021) | Includes (2) Evolution 8 and (1) Evolution 8 II MIR sorters, and associated spare parts. | Maple Warehouse | T3093 | S | T3093 |
| 179 | 2 | 1 | Donaldson Torit | 312-LP-12 | 13847250-L4-1 | ~5 Yrs | Includes baghouse, fan (50,000 CFM), FT16 airlock and Boss Products explosion protection equipment (no-return isolation valve and high-speed abort gate), and 5-piece auger assembly. | Mt. Whitney | | T | |
| 180 | 2 | 1 | Donaldson Torit | 594-LP-12 | 14615277-L1-1 | ~5 Yrs | Includes baghouse, fan (90,000 CFM), FT24 airlock and Boss Products explosion protection equipment (no-return isolation valve and high-speed abort gate), 40 yrd bin-house and associated auger screws. | Panoche | | T | |
| 182 | 2 | 2 | Magnetic Products, Inc | DSH-1212 | 20900-029 20900-230 | | | Mt. Whitney | No Tag | P | No Tag |
| 183 | 2 | 2 | Magnetic Products, Inc | DSH-1218 | 20900-098 20900-079 | | | Mt. Whitney | No Tag | P | No Tag |
| 185 | 2 | 1 | Express Scale | CM-780-GV V8-10 | 122025 122023 122024 122026 | ~5 Yrs (2020) | Includes (2) triplex and (1) duplex system and model V8-10 belt conveyor | Maple Warehouse | T3043 T3042 T3014 T3044 | D | T3043 T3042 T3014 T3044 |
| 189 | 2 | 1 | South-Tek Systems | 490S-2P5 | 64208 | | | Mt. Whitney | T3115 | T | T3115 |
| 190 | 2 | 3 | Beeler | Custom | | | Each sheller is equipped with (8) hoppers and (8) individual sheller mechanisms. | Mt. Whitney | No Tag | F | No Tag |

| 191 | 2 | 1 | LMC | 7208P | 210000127 | ~ 4 Yrs (2021) | 72" wide and 8 screens. | Mt. Whitney | T1064 | | J | | T1064 |
| 195 | 2 | 1 | LMC | 8410P | 210000125 | ~ 4 Yrs (2021) | 84" wide and 10 screens. | Terra Bella | T1069 | | J | | T1069 |
| 197 | 2 | 1 | Cassel Inspection | TBD | | | Possible model is a XD35-L1-Bulk (former XBD20+BF) | Maple Warehouse | | | D | | |
| 198 | 2 | 4 | Custom | Unknown | | | Stainless steel construction and bin hopper measures approximately 58" X 58" square X 42" deep with a 24" tappered bottom | Mt. Whitney | | | L | | |

<u>SCHEDULE 2.1.2(m)</u>

**ADDITIONAL EXCLUDED ASSETS**

*[Attached]*

*####*

**Terra Bella Plant Sale**
**Excluded Assets Schedule**

| | Excluded Asset | Description | Quantity |
|---|---|---|---|
| 1 | Diesel Air Pressure Generators | M171 Kaeser Air Compressor, see VINs below | 3 |
| 2 | 2019 Chevy Silverado 1500 | 3GCPWCED7KG209180 | 1 |
| 3 | 2019 Chevy Silverado 1500 | 3GCUYDED3KG298202 | 1 |
| 4 | 2019 Chevy Tahoe | 1GNSKAKC1KR237070 | 1 |
| 5 | 2019 Ford F150 | 1FTEW1EP4KKF29281 | 1 |
| 6 | Macrobin Plastic Storage Bins | 2k lbs capacity, (quantity approximate) | 5,000 |
| 7 | Dissolved Air Flotation System | Leased from World Water Works, Inc. | 1 |
| 8 | Toyota Forklifts and Accessories | See serial numbers below | 17 |
| 9 | 2-MW Gas Generator Systems | Units and switch gear located at Maple Ave | 3 |
| 10 | All property located at Terra Bella and owned by Persons other than Touchstone | Various | N/A |
| 11 | All property located at Terra Bella and leased or rented by Touchstone | Various | N/A |

**M171 Kaesar Air Compressor VINs**

WKA0F3001N8761375
WKA0F3001N8784908
WKA0F3001N8787299

**Toyota Forklift Serial Numbers**

MODEL #8FBCU20 SERIAL #85661
MODEL #8FBCU20 SERIAL #85604
MODEL #8FBCU20 SERIAL #85610
MODEL #8FBCU20 SERIAL #85652
MODEL #8FBCU20 SERIAL #85720
MODEL #8FBCU20 SERIAL #85721
MODEL #8FBCU25 SERIAL #85722
MODEL #8FBCU25 SERIAL #85730
MODEL #05-8FBM30T SERIAL #10081
MODEL #05-8FBM30T SERIAL #10082
MODEL #8FBE20U SERIAL #10445
MODEL #8FGU25 SERIAL #74878
MODEL #8FGU25 SERIAL #74899
MODEL #8FGU25 SERIAL #16486
MODEL #7FBEU20 SERIAL #19454
MODEL #7FBEU20 SERIAL #19457
MODEL # 8FGU25 SERIAL #30763

<u>SCHEDULE 5.1.2</u>

**BROKERS AND FINDERS**

Cascadia Capital, LLC, in its capacity as marketing agent for the Receiver

###