UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>TOUCHSTONE PISTACHIO COMPANY, LLC; FARSHID ASSEMI; FARID ASSEMI; DARIUS ASSEMI; NEEMA ASSEMI; MELISSA LAYNE; SONIA ROSEMARY ASSEMI; MARICOPA ORCHARDS, LLC; C&A FARMS, LLC; ACDF, LLC; CANTUA ORCHARDS, LLC; LINCOLN GRANTOR FARMS, LLC; PANOCHE PISTACHIOS, LLC; ADAMS GRANTOR LAND, LLC; GRANVILLE FARMS, LLC; SAGEBERRY FARMS, LLC; GRADON FARMS, LLC; MANNING AVENUE PISTACHIOS, LLC; ASSEMI AND SONS, INC.; WINSTON FARMS, LLC; FFGT FARMS, LLC; FAVIER RANCH, LLC; GRANTLAND FARMS, LLC; WHITESBRIDGE FARMS, LLC; ACAP FARMS, LLC; BEAR FLAG FARMS, LLC; COPPER AVENUE INVESTMENTS, LLC; WILLOW AVENUE INVESTMENTS, LLC; ASHLAN & HAYES INVESTMENTS, LLC; ASSEMI BROTHERS, LLC,<br><br>Defendants. | Case No. 1:24-cv-01105-KES-SAB<br><br>**ORDER CONFIRMING THE SALE OF CERTAIN REAL AND PERSONAL PROPERTY AND GRANTING RELATED RELIEF** |

Upon due consideration of Receiver David P. Stapleton's Notice of Motion and Motion for Orders Approving Certain Bidding Procedures and Bid Protections and Confirming the Sale of

Certain Real and Personal Property, Doc. 131 (the "Motion"),[1] the declarations of David P. Stapleton, Doc. 131-1, and Scott Porter, Doc. 131-2, in support thereof, the arguments of counsel at the hearing to approve bidding procedures on March 17, 2025 at 1:30 p.m. (the "Bidding Procedures Hearing"), the Court's prior Order Approving Bidding Procedures and Bid Protections for the Sale of Certain Real and Personal Property, Doc. 157 (the "Bidding Procedures Order"), including those certain bidding procedures attached thereto as Exhibit A (the "Bidding Procedures"), the Notice of Cancellation of Auction for Lot 1 Assets and Designation of Stalking Horse Bidder as Successful Bidder for Lot 1 Assets, Doc. 179 ("Lot 1 Cancellation Notice"), the Notice of Receiver's Supplemental Submission Regarding Successful Bid, Back-Up Bid, and Proposed Sale Approval Order, Doc. 182, the supplemental declarations of David P. Stapleton, Docs. 145, 182-2, and Scott Porter, Doc. 182-3, the declarations of Jake Diiorio, Doc. 182-4, Justin Telles, Doc. 182-5, and Harris Lee Cohen, Doc. 182-6, the Declaration of Adam Orandi in Opposition to Motion for Order Confirming the Sale of Certain Real and Personal Property, Doc. 184 (the "Orandi Declaration"), Receiver David P. Stapleton's Reply in Support of the Motion, Doc. 187 (the "Reply", along with the declarations of David P. Stapleton, Doc. 187-1, Scott Porter, Doc. 187-2, Joseph R. Dunn, Doc. 187-3, and Bernard Gudorf, Doc. 187-4, in support of the Reply (collectively, the "Reply Declarations")), and the arguments of counsel and Bitta Toor and Nader Malakan, who appeared pro se, at the hearing to confirm the sale of the Assets, held on April 21, 2025 at 1:30 p.m. (the "Sale Hearing"), the Court hereby finds that:

A. **Jurisdiction and Venue**: This Court has jurisdiction to consider the Motion and the relief requested therein, and to order the relief herein, pursuant to 28 U.S.C. §§ 1331 and/or 1332(a)(2). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

B. **Statutory Predicates**: This Court has authority to approve that certain Purchase and Sale Agreement, dated as of February 28, 2025, between the Stalking Horse Bidder and the Receiver (as may be amended from time to time, the "Stalking Horse PSA"), that certain Purchase and Sale Agreement, dated as of April 16, 2025, between California Pistachio Orchards, LLC ("CPO") and the Receiver (as may be amended from time to time, the "CPO PSA"), and the respective

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

transactions contemplated therein (each, the "Sale Transaction") pursuant to 28 U.S.C. §§ 2001 and 2004 and Rule 66 of the Federal Rules of Civil Procedure.

C. **Notice**: The Receiver gave proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures Hearing, the Bidding Procedures, the Lot 2 Auction (defined below), and the Sale Hearing. No other or further notice is required.

D. **Opportunity to be Heard**: A reasonable opportunity to object or be heard regarding the relief requested in the Motion and in this Order, and the transactions proposed pursuant thereto, has been afforded to all interested persons and entities, including, without limitation, the following: (i) each party who has filed an appearance in this matter; and (ii) all parties who are known to assert any monetary lien, claim, interest or encumbrance in or upon the Assets, including applicable taxing authorities. Objections to the Motion and the Sale Transaction have been withdrawn or resolved, or, to the extent not withdrawn or resolved, are hereby overruled.

E. **Conduct of Sale Process in Compliance with Bidding Procedures Order**: As demonstrated by the evidence proffered or adduced at or before the Sale Hearing and in the Reply Declarations, and by the representations of counsel at the Sale Hearing, the Receiver has complied in all material respects with the Bidding Procedures and the Bidding Procedures Order. The Receiver and his professionals have adequately and appropriately marketed the Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Receiver's duties under the Receivership Order. Based upon the record of these proceedings, creditors, other parties in interest, and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Assets. Bitta Toor and Nader Malakan, the parties who appeared pro se to object at the Sale Hearing, and Adam Orandi and the AOK Group had sufficient and fair notice of the opportunity to bid for purchase the Assets. *See, e.g.*, Doc. 182-3 ¶ 13; Doc. 187-1 ¶¶ 5–6, 8 & Ex. 1. The Bidding Procedures were non-collusive, formulated and implemented in good faith, were substantively and procedurally fair to all parties and all potential bidders, and afforded notice and a full, fair, and reasonable opportunity for any person to conduct due diligence and make a higher or otherwise better offer to purchase the Assets.

ORDER CONFIRMING THE SALE OF CERTAIN REAL AND PERSONAL PROPERTY AND GRANTING RELATED RELIEF

F.      The Receiver conducted the sale process for Lot 1 without engaging in any collusion and in accordance with the Bidding Procedures and Bidding Procedures Order. Following the Bid Deadline, the Receiver determined, in consultation with the Consultation Parties, that the Stalking Horse Bidder had submitted the highest and best offer for Lot 1, pursuant to the terms of the Stalking Horse PSA. Other than the Stalking Horse Bidder, no Bidder submitted a Qualified Bid for Lot 1. In the absence of any Qualified Bidders for Lot 1 other than the Stalking Horse Bidder, the Auction for Lot 1 was cancelled in accordance with the Bidding Procedures and Bidding Procedures Order and in a non-collusive, fair and good faith manner by filing the Lot 1 Cancellation Notice. A reasonable opportunity was given to any Potential Bidders to make a higher and better offer for Lot 1. The Receiver's determination that the Stalking Horse PSA constituted the only Qualified Bid for Lot 1 and his decision not to designate a Back-Up Bid for Lot 1 complied in all material respects with the Bidding Procedures and the Bidding Procedures Order and constituted a sound exercise of his business judgement.

G.      Adam Orandi asserts that the Receiver cancelled the auction for the Lot 1 Assets without allowing him and his group to place a bid.  To the extent the Orandi Declaration constitutes an objection to the cancellation of the Auction for Lot 1 or the Receiver's compliance with the Bidding Procedures or Bidding Procedures Order, such objection is overruled.  On April 11, 2025, the Receiver's counsel and Scott Porter of Cascadia Capital LLC spoke with Orandi and Nader Malakan.  During the call, Orandi and Malakan explained that they intended to place a joint bid but would require a significantly longer time to close—over 150 days.  Doc. 187-1 ¶ 9; Doc. 187-2 ¶ 3.  After the call, the Receiver provided Malakan and Orandi with a list of requirements to place a bid and specifically noted that a Good Faith Deposit and fourteen-day closing were required.  Doc. 187-1 ¶ 10.  On April 14, 2025, a group of individuals – Orandi, Bitta Toor, Alex Samoylovich, and Gregory Palivos – sent a letter of intent to the Receiver to purchase the Lot 1 Assets for $50 million but stated in that letter that they required 150 days to close and requested that the Receiver abandon the public sale process.  Doc. 187-1 ¶ 11.  The next day, Toor and a group comprised of Orandi, Samoylovich, and Palivos (the "AOK Group") sent separate purchase and sale agreements for the Lot 1 Assets.  *Id.* ¶ 12.  Both agreements required 150 days to close, which they had been informed

was not acceptable.  *Id.*, Exs. 4, 5.  Importantly, the AOK Group never submitted a Good Faith Deposit and never provided proof of funds or ability to close the transaction despite the Receiver's request that they do so.  *Id.* ¶ 14.  On April 17, 2025, the Receiver determined that the AOK Group had not submitted a Qualified Bid and cancelled the Auction for the Lot 1 Assets.  *Id.* ¶¶ 17–18.  Courts routinely defer to receivers when they exercise reasonable business judgment in liquidating the assets of an insolvent company, *see, e.g.*, *Lawsky v. Condor Cap. Corp.*, 154 F. Supp. 3d 9, 23 (S.D.N.Y. 2015); *Fleet Nat. Bank v. H & D Ent., Inc.*, 926 F. Supp. 226, 234 (D. Mass. 1996), *aff'd sub. nom.* 96 F.3d 532 (1st Cir. 1996), and in light of these deficiencies in the AOK Group's bid, the Receiver reasonably declined to permit the AOK Group to participate in an auction for the Lot 1 Assets.

      H.     The objection of Bitta Toor, who appeared pro se at the Sale Hearing, is also overruled.  The Receiver exercised reasonable business judgment in determining that Toor's bid did not constitute a Qualified Bid.  While Toor was the only objecting party who submitted a Good Faith Deposit, he did not provide sufficient proof of funds to purchase the Lot 1 Assets.  Doc. 187-1 ¶¶ 13, 15–17.  For example, Toor relied on a letter from PACT Capital which indicated that PACT had "pre-approved" a loan for Toor.  Doc. 187-1 ¶ 13.  However, when the Receiver asked PACT Capital for proof of its ability to finance the sale, PACT did not provide the requested information.  Doc. 182-3 ¶ 15.  Other parties associated with Toor, such as Bikram Hundal, communicated to the Receiver that Toor had "silent partners" whose identities could not be disclosed, and proof of financial ability was therefore not forthcoming.  *See* Doc. 187-1 ¶¶ 15, 19; Doc. 187-1, Ex. 8.  In addition, the purchase and sale agreement that Toor submitted along with his bid provided for a 150-day closing window and a right to take possession within thirty days (with no compensation to the receivership estate other than the interest that would accrue on the purchase price), terms that were inconsistent with the Stalking Horse PSA.  Doc. 187-1 ¶ 14; Doc. 187-1, Ex. 4.  In light of these deficiencies in Toor's bid, the Receiver exercised reasonable business judgment when he declined to permit Toor to participate in an auction for the Lot 1 Assets.  *Culp v. Stanziale*, 545 B.R. 827, 844 (D. Del. 2016) ("Where the trustee articulates a reasonable basis for the business decision, courts will generally not entertain objections. If a valid business justification exists, then

a strong presumption follows that the agreement was negotiated in good faith and is in the best interests of the estate.").

I.    Any objection of Nader Malakan, who appeared pro se at the Sale Hearing, is also overruled.  The Receiver gave Malakan a site visit to inspect equipment in January 2025 and provided a copy of the proposed Bidding Procedures Order on March 4, 2025, but did not hear from Malakan again until April 4, 2025. Doc. 187-1 ¶ 8.  On April 11, 2025, the Receiver's counsel and Scott Porter of Cascadia Capital LLC spoke with Malakan and learned that he and Orandi were preparing a joint bid but would require a significantly longer time to close—over 150 days.  Doc. 187-2 ¶ 3; Doc. 187-1 ¶ 9.  After the call, the Receiver provided Malakan and Orandi with a list of requirements to place a bid and specifically noted that a Good Faith Deposit and fourteen-day closing were required.  Doc. 187-1 ¶ 10.  After that discussion, Malakan never followed up with a bid nor did he submit a Good Faith Deposit.  Doc. 187-1 ¶ 8; Doc. 187-2 ¶ 3.  At the Sale Hearing, Malakan claimed that the bid from Toor was a joint bid also by him.  *Id.* ¶ 19.  However, the bid Toor submitted to the Receiver does not reference Malakan, and even if it did, the Toor bid was deficient, as addressed above.

J.    The Receiver conducted the sale process for Lot 2 without engaging in any collusion and in accordance with the Bidding Procedures and Bidding Procedures Order. The Auction for Lot 2, which commenced and concluded on April 17, 2025 (the "Lot 2 Auction"), was conducted in accordance with the Bidding Procedures and Bidding Procedures Order and in a non-collusive, fair and good faith manner, and a reasonable opportunity was given to any Qualified Bidders to make a higher and better offer for Lot 2. No party in interest has filed an objection with respect to the conduct of the Lot 2 Auction or the Receiver's compliance with the Bidding Procedures or Bidding Procedures Order. At the close of the Lot 2 Auction, the Receiver determined, in consultation with the Consultation Parties, that (i) the Stalking Horse Bidder had submitted the highest and best offer for Lot 2, pursuant to the terms of the Stalking Horse PSA as adjusted through bidding at the Lot 2 Auction, and (ii) CPO had submitted the next highest and best offer for certain portions of Lot 2 identified in the CPO PSA (the "Specified Lot 2 Assets"), pursuant to the terms of the CPO PSA, as adjusted through bidding at the Lot 2 Auction.

K.      The Stalking Horse Bidder is the designated Successful Bidder,[2] and the Stalking Horse PSA is designated the Successful Bid for the Assets enumerated therein in accordance with the Bidding Procedures and Bidding Procedures Order. The Stalking Horse Bidder has complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Stalking Horse PSA. The Stalking Horse PSA and transactions contemplated therein comply with the Bidding Procedures, the Bidding Procedures Order and all other applicable orders of this Court.

L.      CPO is the designated Back-Up Bidder for the Specified Lot 2 Assets (the "Lot 2 Back-Up Bidder"),[3] and the CPO PSA is designated as the Back-Up Bid for the Specified Lot 2 Assets in accordance with the Bidding Procedures and Bidding Procedures Order. The Lot 2 Back-Up Bidder has complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the CPO PSA. The CPO PSA and transactions contemplated therein comply with the Bidding Procedures, the Bidding Procedures Order, and all other applicable orders of this Court.

M.      **Compliance with 28 U.S.C. §§ 2001 and 2002**: The Receiver's (i) publication of notice of the opportunity to purchase the Assets, the Bidding Procedures, and solicitation of bids for the Assets in The Fresno Bee and The Visalia Times-Delta, (ii) solicitation of bids for the Assets through the Receiver's and his professionals' efforts to market the Assets, and (iii) conduct of the Auction in Fresno, California, establish the Receiver's satisfaction of the public sale requirements in 28 U.S.C. §§ 2001 and 2002.

N.      **Highest and Best Offer**: The Stalking Horse PSA attached hereto as **Exhibit A**, including the form and total consideration to be realized by the Receivership estate pursuant to the Stalking Horse PSA, (i) is the highest and best offer received by the Receiver for the Assets

---

[2] References in this Order to the "Stalking Horse Bidder" or the "Successful Bidder" refer to Zamora Pistachio, LLC, or such other entity to whom Zamora Pistachio, LLC may assign its rights under the Stalking Horse PSA prior to the closing date of the Sale Transaction under the Stalking Horse PSA (the "Successful Bid Closing Date"), in compliance with the provisions of the Stalking Horse PSA, including the Receiver's advance written consent.

[3] References in this Order to the "Back-Up Bidder" or "Lot 2 Back-Up Bidder" refer to CPO, or such other entity to whom CPO may assign its rights under the CPO PSA prior to the closing date of the Sale Transaction under the CPO PSA (the "Back-Up Bid Closing Date") in compliance with the provisions of the CPO PSA, including the Receiver's advance written consent.

ORDER CONFIRMING THE SALE OF CERTAIN REAL AND PERSONAL PROPERTY AND GRANTING RELATED RELIEF

enumerated therein in, (ii) is fair and reasonable, and (iii) is in the best interests of the Receivership estate, its creditors and all other parties in interest. There is no legal or equitable reason to delay entry into the Stalking Horse PSA and the Sale Transaction contemplated therein. The Receiver's determination that the Stalking Horse PSA constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Receiver's business judgment.

O.     The CPO PSA attached hereto as **Exhibit B**, including the form and total consideration to be realized by the Receivership estate pursuant to the CPO PSA, (i) is the next highest and best offer received by the Receiver for the Specified Lot 2 Assets, (ii) is fair and reasonable, and (iii) is in the best interests of the Receivership estate, its creditors and all other parties in interest. The Receiver's determination that the CPO PSA constitutes the next highest and best offer for the Specified Lot 2 Assets constitutes a valid and sound exercise of the Receiver's business judgment.

P.     **Receiver Authority**: Pursuant to the Receivership Order and this Order, the Receiver (i) has full power and authority to execute, deliver and perform the obligations under the Stalking Horse PSA, the CPO PSA, and all other documents and transactions contemplated thereby, and (ii) has full power and authority necessary to consummate the Sale Transaction contemplated by the Stalking Horse PSA and CPO PSA, as applicable. No consents or approvals, other than those expressly provided for herein or in the Stalking Horse PSA or CPO PSA, as applicable, are required for the Receiver to consummate such Sale Transaction. The transfer of the Assets to the Stalking Horse Bidder will be, on the Successful Bid Closing Date, a legal, valid and effective transfer of the Assets, and will vest the Stalking Horse Bidder with all rights, title, and interests of Touchstone to the Assets, free and clear of Monetary Encumbrances (defined below). If applicable, the transfer of the Specified Lot 2 Assets to the Lot 2 Back-Up Bidder will be, on the Back-Up Bid Closing Date, a legal, valid and effective transfer of the Specified Lot 2 Assets, and will vest the Lot 2 Back-Up Bidder with all rights, title, and interests of Touchstone to the Specified Lot 2 Assets, free and clear of Monetary Encumbrances (defined below).

Q.     **Arms-length Sale; Adequate Consideration**: The consideration to be paid by the Stalking Horse Bidder under the Stalking Horse PSA, or by the Lot 2 Back-Up Bidder under the

CPO PSA, constitutes reasonably equivalent value, and fair and adequate consideration, for the Assets. The terms and conditions set forth in the Stalking Horse PSA and the CPO PSA are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Receivership estate or its creditors under any applicable laws.

R.    **Good Faith**:  The Stalking Horse Bidder, the Lot 2 Back-Up Bidder, the Receiver and their respective equity holders, officers, directors, employees, agents and representatives actively participated in the bidding process and acted in good faith in that, *inter alia*: (i) the Stalking Horse Bidder and the Lot 2 Back-Up Bidder recognized that the Receiver was free to deal with any other party interested in acquiring the Assets; (ii) the Stalking Horse Bidder and the Lot 2 Back-Up Bidder complied with the provisions in the Bidding Procedures Order; (iii) the Stalking Horse Bidder and the Lot 2 Back-Up Bidder agreed to subject their bids to the competitive Bidding Procedures set forth in the Bidding Procedures Order; (iv) the Stalking Horse Bidder and the Lot 2 Back-Up Bidder in no way induced or caused the commencement of this Receivership case; (v) all payments to be made by the Stalking Horse Bidder or the Lot 2 Back-Up Bidder and other agreements or arrangements entered into by the Stalking Horse Bidder or the Lot 2 Back-Up Bidder in connection with the Stalking Horse PSA or the CPO PSA, respectively, have been disclosed; (vi) no common identity of directors or controlling stockholders exists between the Stalking Horse Bidder, the Lot 2 Back-Up Bidder, Touchstone, the Receiver or any other party to this Receivership case; (vii) neither the Stalking Horse Bidder nor the Lot 2 Back-Up Bidder is an "insider" of Touchstone, the Receiver or any other party to this Receivership case; and (viii) the Stalking Horse PSA and the CPO PSA, and any other agreements or instruments related thereto, were negotiated and executed at arm's length, without collusion and in good faith. The Stalking Horse Bidder's or the Lot 2 Back-Up Bidder's consummation of the Sale Transaction and performance of the obligations owing under the Stalking Horse PSA or the CPO PSA, respectively, will be in good faith and for valid business purposes and uses.

S.    **Sale Free and Clear**: A sale of the Assets, or the Specified Lot 2 Assets if applicable, free and clear of all monetary liens, claims, encumbrances and interests (other than

easements, rights of way and other encumbrances running with the land), including, without limitation, security interests, mortgages, pledges, deeds of trust, hypothecations, debts, charges, rights-of-recovery, judgments, taxes (including foreign, state, and local taxes), and other monetary liabilities or claims (collectively, "Monetary Encumbrances"), to the fullest extent of the law, will enable the Receiver to obtain the highest and best consideration for the Assets, or the Specified Lot 2 Assets if applicable, as provided for in the Stalking Horse PSA or in the CPO PSA, respectively. A sale of the Assets, or the Specified Lot 2 Assets if applicable, other than free and clear of Monetary Encumbrances, and without the protections of this Order, would impact materially and adversely the value the Receiver would be able to obtain for the Assets or the Specified Lot 2 Assets, as applicable. But for the protections afforded to the Stalking Horse Bidder and the Lot 2 Back-Up Bidder under this Order, the Stalking Horse Bidder and the Lot 2 Back-Up Bidder would not have offered to pay the consideration contemplated in the Stalking Horse PSA and CPO PSA. In addition, to the extent the Assets, including the Specified Lot 2 Assets, are part of the collateral securing Touchstone's loan obligations to U.S. Bank, U.S. Bank has consented to the sale of such Assets free and clear of U.S. Bank's Monetary Encumbrances. Other holders of Monetary Encumbrances were provided with sufficient notice of the sale of the Assets and did not object, or withdrew their objections, to the Motion, and are deemed to have consented. Docs. 145, 146. Therefore, approval of the Stalking Horse PSA and CPO PSA, and the consummation of the sale of the Assets or the Specified Lot 2 Assets, as applicable, free and clear of Monetary Encumbrances is appropriate pursuant to 28 U.S.C. §§ 2001 and 2004, the Receivership Order and the interest of equity, and is in the best interests of the Receivership estate, creditors and other parties in interest.

T.    **No Successor Liability**:  Neither the Stalking Horse Bidder, the Lot 2 Back-Up Bidder, nor any of their respective affiliates are a successor or mere continuation of Touchstone or the Receivership estate and none of the transactions contemplated by the Stalking Horse PSA or the CPO PSA, including, without limitation, the Sale Transaction, amounts to a consolidation, merger, or de facto merger of the Stalking Horse Bidder, the Lot 2 Back-Up Bidder, or any of their respective affiliates with or into Touchstone or the Receivership estate. Other than to the extent expressly provided in the Stalking Horse PSA or the CPO PSA, as applicable, or this Order, neither the

Stalking Horse Bidder, the Lot 2 Back-Up Bidder, nor any of their respective affiliates shall assume or in any way be responsible for any liability or obligation of Touchstone or the Receivership estate as a result of entry into the Stalking Horse PSA or the CPO PSA, or the consummation of the transactions contemplated therein, including the Sale Transaction, under any laws, including, without limitation, any bulk-sale or bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories.

U.    **Time is of the Essence**: Based on the legal and factual bases set forth in the Motion, the supporting declarations, other evidence in the record, and the representations and arguments of counsel presented at the Sale Hearing, time is of the essence in effectuating the Stalking Horse PSA or the CPO PSA and proceeding with the Sale Transaction contemplated therein, and compelling circumstances and sound business justification exist to enter into the Stalking Horse PSA and the CPO PSA. Such business justifications include, but are not limited to, the facts that (i) there is a risk of deterioration of the value of the Assets, including the Specified Lot 2 Assets, and increased risk and expense to the Receivership estate if a sale of the Assets, or the Specified Lot 2 Assets if applicable, is not consummated as soon as possible, (ii) the Stalking Horse PSA constitutes the highest and otherwise best offer for the Assets and the CPO PSA constitutes the next highest or otherwise best offer for the Specified Lot 2 Assets, (iii) no other person or entity has made an acceptable offer to purchase the Assets for greater economic value to the Receivership estate than the Stalking Horse Bidder and, other than the Stalking Horse Bidder, no other person or entity has offered to purchase the Specified Lot 2 Assets for greater economic value to the Receivership estate than the Lot 2 Back-Up Bidder, and (iv) the sale to the Stalking Horse Bidder, or the Lot 2 Back-Up Bidder as applicable, presents the best opportunity to realize the value of the Assets or the Specified Lot 2 Assets, as applicable. The Receiver and the Stalking Horse Bidder are authorized to close the Sale Transaction contemplated by the Stalking Horse PSA beginning on the first business day following entry of this Order to maximize the value that the Receiver may realize from the sale and from entering into the Stalking Horse PSA. In the event the Sale Transaction contemplated by the Stalking Horse PSA cannot or does not close with respect to the Specified Lot

2 Assets, the Receiver and the Lot 2 Back-Up Bidder are authorized to close the Sale Transaction contemplated by the CPO PSA beginning on the first business day following entry of this Order, subject to the provisions of the CPO PSA and the Bidding Procedures Order, to maximize the value that the Receiver may realize from the sale and from entering into the CPO PSA. Accordingly, good cause exists to permit this Order to be a final order immediately upon entry.

Having found the foregoing,

**IT IS ORDERED:**

1. The Motion is **GRANTED** to the extent provided herein.

2. All objections to entry of this Order, or to the relief provided herein, that have not been withdrawn, waived, resolved, or settled are hereby overruled on the merits with prejudice. All persons and entities who received notice of the Motion and/or the Sale Hearing that failed to timely object thereto are deemed to have consented to the relief sought in the Motion and set forth in this Order.

3. The Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

4. The Stalking Horse PSA attached hereto as **<u>Exhibit A</u>**, and the Receiver's request to consummate the Sale Transaction contemplated thereby, are hereby approved in their entirety.

5. The CPO PSA attached hereto as **<u>Exhibit B</u>**, and Receiver's request to consummate the Sale Transaction contemplated thereby in the event the Sale Transaction contemplated by the Stalking Horse PSA does not close, are hereby approved in their entirety.

6. The Receiver is authorized and empowered to enter into and perform each of his obligations under the Stalking Horse PSA and the CPO PSA, and to consummate and close the applicable Sale Transaction pursuant to the terms thereof without further order of the Court. The Receiver may execute all further documentation required or contemplated by the Stalking Horse PSA or CPO PSA, as applicable, including any bills of sale, grant deeds or other instruments necessary to convey the Assets to the Stalking Horse Bidder, or to convey the Specified Lot 2 Assets to the Lot 2 Back-Up Bidder, and may perform any obligations specified in the Stalking Horse PSA or CPO PSA remaining after the Successful Bid Closing Date or Back-Up Bid Closing Date,

ORDER CONFIRMING THE SALE OF CERTAIN REAL AND PERSONAL PROPERTY AND GRANTING RELATED RELIEF

respectively. The terms of the Stalking Horse PSA and CPO PSA are hereby incorporated by reference as if fully set forth herein. Failure to include specifically any particular provision of the Stalking Horse PSA or CPO PSA in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Stalking Horse PSA and the CPO PSA and all of their respective provisions, payments and transactions, and ancillary documents referenced therein, as applicable, be authorized and approved in their entirety.

7. The Receiver is authorized to act on behalf of Touchstone, including as its attorney-in-fact, in connection with the sale and conveyance of title to the Assets to the Stalking Horse Bidder, or title to the Specified Lot 2 Assets to the Lot 2 Back-Up Bidder, and no other consents or approvals are necessary or required for the Receiver to carry out either such sale and conveyance, and to effectuate the Stalking Horse PSA or the CPO PSA and each of the transactions and related actions contemplated or set forth therein.

8. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Receiver to sell and transfer the Assets to the Stalking Horse Bidder, or the Specified Lot 2 Assets to Lot 2 Back-Up Bidder, in accordance with the terms of the Stalking Horse PSA or the CPO PSA, respectively, and this Order.

9. Upon the Successful Bid Closing Date or the Back-Up Bid Closing Date, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Assets to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse PSA, or of the Specified Lot 2 Assets to the Lot 2 Back-Up Bidder pursuant to the terms of the CPO PSA, respectively.

10. This Order and the terms and provisions of the Stalking Horse PSA and the CPO PSA shall be binding on Touchstone, all of Touchstone's creditors (whether known or unknown), the Stalking Horse Bidder, the Lot 2 Back-Up Bidder and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all persons asserting any interest in the Receivership Property. The provisions of this Order and the terms and provisions of the Stalking Horse PSA and the CPO PSA, and any actions taken pursuant hereto or thereto shall survive the entry of any order for relief under title 11 of the United States Code, and shall be binding

on Touchstone, its successors and assigns, including any debtor-in-possession or any trustee appointed under title 11 of the United States Code, or similar custodian or fiduciary appointed over Touchstone or its assets.

11.    As of the Successful Bid Closing Date or the Back-Up Bid Closing Date, all of Touchstone's right, title and interest in and to, and possession of, the Assets or the Specified Lot 2 Assets, respectively, shall be immediately vested in the Stalking Horse Bidder or the Lot 2 Back-Up Bidder, respectively, free and clear of any and all Monetary Encumbrances. Such transfer (i) shall constitute a legal, valid, binding and effective transfer of, and shall vest the Stalking Horse Bidder with good and marketable title to, the Assets or (ii) shall constitute a legal, valid, binding and effective transfer of, and shall vest the Lot 2 Back-Up Bidder with good and marketable title to, the Specified Lot 2 Assets, in either case free and clear of all Monetary Encumbrances to the fullest extent of the law, with all such Monetary Encumbrances to attach to the proceeds of the Sale Transaction with the same validity, force, priority and effect that such Monetary Encumbrances now have as against the Assets or Specified Lot 2 Assets, as applicable, subject to any rights, claims and defenses Touchstone, the Receiver, or the Receivership estate may possess with respect thereto. Those holders of Monetary Encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction are deemed to have consented to the sale of the Assets, including the Specified Lot 2 Assets, free and clear of all Monetary Encumbrances.

12.    All entities that are presently in possession of some or all of the Assets, including the Specified Lot 2 Assets, or other property in which Touchstone holds an interest and that are or may be subject to the Stalking Horse PSA or the CPO PSA, are hereby directed to surrender possession of (i) such Assets or other property to the Stalking Horse Bidder immediately on or after the Successful Bid Closing Date or (ii) such Specified Lot 2 Assets to the Lot 2 Back-Up Bidder immediately on or after the Back-Up Bid Closing Date, as applicable.

13.    On or before the Successful Bid Closing Date or Back-Up Bid Closing Date, as applicable, any person or entity that has filed or recorded a financing statement, mortgage, construction or mechanic's lien, lis pendens, or other documents or agreement evidencing liens on or interests in the Assets or the Specified Lot 2 Assets, respectively, shall deliver to the Receiver,

ORDER CONFIRMING THE SALE OF CERTAIN REAL AND PERSONAL PROPERTY AND
GRANTING RELATED RELIEF

in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, reconveyances or releases of any Monetary Encumbrances which the person or entity has with respect to the Assets or Specified Lot 2 Assets. The Receiver is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity asserting the same, including as such person or entity's attorney-in-fact. Each and every federal, state and local governmental unit is hereby authorized and directed to accept any and all documents and instruments necessary or appropriate to give effect to the sale of the Assets or the Specified Lot 2 Assets, as applicable, and related transactions free and clear of Monetary Encumbrances.

14.    This Order is and shall be binding upon and shall govern the acts of all entities, including, without limitation, all escrow agents, filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets or the Specified Lot 2 Assets. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the obligations, liens, interests, claims, liabilities or encumbrances constituting Monetary Encumbrances.

15.    Except as otherwise expressly provided in the Stalking Horse PSA or the CPO PSA, as applicable, or this Order, all persons and entities (and their respective successors and assigns), including, but not limited to, any and all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, former employees, trade creditors, litigation claimants and other creditors holding Monetary Encumbrances (i) against the Assets arising under or out of, in connection with, or in any way relating to the ownership, sale or operation of the Assets prior to the Successful Bid Closing Date or the transfer of the Assets to the Stalking Horse Bidder or (ii) against the Specified Lot 2 Assets arising under or out of, in connection with, or in any way relating to the ownership,

sale or operation of the Specified Lot 2 Assets prior to the Back-Up Bid Closing Date, or the transfer of the Specified Lot 2 Assets to the Lot 2 Back-Up Bidder, as applicable, are hereby forever barred, estopped and permanently enjoined from asserting or prosecuting any cause of action or any process or other act or seeking to collect, offset, or recover on account of such Monetary Encumbrances against the Stalking Horse Bidder or the Lot 2 Back-Up Bidder, as applicable, their respective successors or assigns, their respective property, or the Assets or the Specified Lot 2 Assets, as applicable. Following the Successful Bid Closing Date, no holder of any Monetary Encumbrance against the Assets shall interfere with the Stalking Horse Bidder's title to or use and enjoyment of the Assets based on or related to any such Monetary Encumbrance, or based on any action or omission of Touchstone or the Receiver. Alternatively, following the Back-Up Bid Closing Date, no holder of any Monetary Encumbrance against the Specified Lot 2 Assets shall interfere with the Lot 2 Back-Up Bidder's title to or use and enjoyment of the Specified Lot 2 Assets based on or related to any such Monetary Encumbrance, or based on any action or omission of Touchstone or the Receiver.

16.     Neither the Stalking Horse Bidder nor the Lot 2 Back-Up Bidder shall be liable for any liabilities of or claims against Touchstone, the Receiver or the Receivership estate on account of their ownership and operation of the Assets prior to the Successful Bid Closing Date or Back-Up Bid Closing Date, as applicable, and Touchstone, the Receiver and the Receivership estate shall not be liable for any liabilities of or claims against the Stalking Horse Bidder or the Lot 2 Back-Up Bidder on account of its purchase, ownership and operation of the Assets or the Specified Lot 2 Assets, respectively, on and after the Successful Bid Closing Date or Back-Up Bid Closing Date, respectively, in each case, other than as expressly provided for in the Stalking Horse PSA or CPO PSA, as applicable. Neither the Stalking Horse Bidder nor the Lot 2 Back-Up Bidder shall have any successor liability whatsoever with respect to any Monetary Encumbrances, liabilities or claims of any nature that may exist against Touchstone, the Receiver, or the Receivership estate, including, without limitation, neither the Stalking Horse Bidder nor the Lot 2 Back-Up Bidder shall be, or be deemed to be: (i) a successor in interest or within the meaning of any law, including any revenue, successor liability, pension, labor, ERISA, bulk-transfer, products liability, tax or environmental

law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories; or (ii) a joint employer, co-employer or successor employer with Touchstone, the Receiver, or the Receivership estate, and shall have no obligation to pay Touchstone's, the Receiver's, or the Receivership estate's wages, bonuses, severance pay, vacation pay, WARN act claims (if any), benefits or any other payments to employees or other personnel of Touchstone, the Receiver, or the Receivership estate, including pursuant to any collective bargaining agreement, employee pension plan, or otherwise, except as expressly set forth in the Stalking Horse PSA or CPO PSA, respectively.

17.     Except as explicitly set forth in the Stalking Horse PSA or CPO PSA, as applicable, or this Order, the Assets or Specified Lot 2 Assets are being sold, assigned, conveyed and transferred to Stalking Horse Bidder or the Lot 2 Back-Up Bidder, respectively, without any express or implied representations or warranties of any kind whatsoever, AS IS, WHERE IS, WITH ALL FAULTS, and WITHOUT RECOURSE, and without any warranty as to the condition or use of the Assets or the Specified Lot 2 Assets, as applicable. Except as explicitly set forth in the Stalking Horse PSA or CPO PSA, upon and after the Successful Bid Closing Date or Back-Up Bid Closing Date, respectively, neither the Stalking Horse Bidder nor the Lot 2 Back-Up Bidder shall have any recourse against Touchstone, the Receiver or the Receivership estate in connection with its purchase, possession, use or operation of the Assets or the Specified Lot 2 Assets.

18.     To the greatest extent available under applicable law, the Stalking Horse Bidder or the Lot 2 Back-Up Bidder shall be authorized, as of the Successful Bid Closing Date or Back-Up Bid Closing Date, respectively, to operate under any license, permit, registration and any other governmental authorization or approval of Touchstone or the Receiver with respect to the Assets or Specified Lot 2 Assets, as applicable, that is transferrable without governmental or third party consent, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are transferred to the Stalking Horse Bidder as of the Successful Bid Closing Date, or to the Lot 2 Back-Up Bidder as of the Back-Up Bid Closing Date, as applicable. For the avoidance of doubt, nothing in this Order, the Stalking Horse PSA, or the CPO PSA authorizes the transfer or assignment of any governmental (a) license, (b) permit,

(c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.

19. The Receiver shall have no obligation to proceed with closing the Sale Transaction with the Stalking Horse Bidder or the Lot 2 Back-Up Bidder unless and until all conditions precedent to his obligations to do so, as set forth in the Stalking Horse PSA or CPO PSA, as applicable, have been met, satisfied, or waived in accordance with the terms thereof.

20. Nothing contained in any subsequent order of this Court in these proceedings shall alter, conflict with, or derogate from, the provisions of the Stalking Horse PSA, the CPO PSA, or the terms of this Order.

21. The Stalking Horse PSA, the CPO PSA, and any instruments, documents, agreements or related documents referenced or contemplated therein may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.

22. This Court shall retain exclusive jurisdiction with respect to all matters relating to or arising from this Order, the Stalking Horse PSA, or the CPO PSA, including, but not limited to, protecting Touchstone, the Receiver, the Receivership estate, the Stalking Horse Bidder, and/or the Lot 2 Back-Up Bidder against any assertions of Monetary Encumbrances and any other matters related to the implementation, interpretation, or enforcement of this Order. This Court shall hear any matters relating to or arising from this Order, the Stalking Horse PSA, or the CPO PSA on an expedited basis, as may be appropriate under the circumstances.

//

///

///

///

///

///

///

ORDER CONFIRMING THE SALE OF CERTAIN REAL AND PERSONAL PROPERTY AND GRANTING RELATED RELIEF

23.    There being no reason for delay, and time being of the essence, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, (i) Touchstone, the Receiver and the Stalking Horse Bidder are free to perform under the Stalking Horse PSA at any time, subject to the terms of the Stalking Horse PSA, and (ii) if the sale of the Assets to the Stalking Horse Bidder does not close, Touchstone, the Receiver and the Lot 2 Back-Up Bidder are free to perform under the CPO PSA at any time, subject to the terms of the CPO PSA.

IT IS SO ORDERED.

Dated:    April 25, 2025

UNITED STATES DISTRICT JUDGE

ORDER CONFIRMING THE SALE OF CERTAIN REAL AND PERSONAL PROPERTY AND
GRANTING RELATED RELIEF

# EXHIBIT A

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

# PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

DAVID P. STAPLETON, RECEIVER
FOR TOUCHSTONE PISTACHIO COMPANY, LLC ("**SELLER**")

AND

ZAMORA PISTACHIO, LLC ("**BUYER**")

DATED FEBRUARY 28, 2025

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made as of February 28, 2025 (the "**Agreement Date**"), by and between David P. Stapleton ("**Seller**"), solely in his capacity as receiver (the "**Receiver**") of the assets and operations of Touchstone Pistachio Company, LLC, a California limited liability company ("**Touchstone**") in the matter captioned *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (Case No. 1:24-cv-01105-KES-SAB) (the "**Action**") pending in the United States District Court for the Eastern District of California (the "**Court**"), and Zamora Pistachio, LLC, a California limited liability company ("**Buyer**", and with Seller, each a "**Party**" and together the "**Parties**").  This Agreement is made with reference to the following recitals:

## RECITALS

WHEREAS, on September 30, 2024, the Court entered a stipulation and order appointing David Stapleton as the Receiver in the Action (the "**Receivership Order**");

WHEREAS, pursuant to the Receivership Order, the Receiver has the express authority to sell substantially all of Touchstone's tangible and intangible real and personal property, subject to the terms of the Receivership Order;

WHEREAS, the Receiver intends to sell certain assets of Touchstone pursuant certain bidding and auction procedures to be approved by a Court order (the "**Bid Procedures Order**").

WHEREAS, subject to the Bid Procedures Order, an overbid process and modification of this Agreement in connection therewith, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to and of the Acquired Assets and the Assumed Liabilities (each as defined below), subject to the terms and conditions set forth herein, including approval of this Agreement and the transaction contemplated herein (the "**Transaction**") by the Court (the "**Sale Approval Order**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

## ARTICLE 1

## DEFINITIONS

1.1     For purposes of this Agreement, the following definitions shall apply to terms not defined elsewhere in this Agreement:

1.1.1    The term "**Auction**" shall have the meaning set forth in the Bid Procedures Order.

1.1.2    The term "**Back-Up Bid**" shall have the meaning set forth in the Bid Procedures Order.

1.1.3    The term "**Back-Up Bidder**" shall have the meaning set forth in the Bid Procedures Order.

1.1.4    The terms "**Back-Up Closing Date**" shall have the meaning set forth in the Bid Procedures Order.

1.1.5    The term "**Bid Deadline**" shall have the meaning set forth in the Bid Procedures Order.

1.1.6    The term "**Business Day**" shall mean any day other than a Saturday or Sunday on which banks in California are authorized or required to be open for business.

1.1.7    The term "**Encumbrance**" shall mean any lien, encumbrance, Claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, hypothecations, and rights of first refusal.

1.1.8    The term "**Environmental Documents**" shall mean that certain Phase I Environmental Site Assessment (with Exhibits), dated January 31, 2025, and all other environmental reports, permits, and material correspondence made available to Buyer by Seller and his agents related to the Real Property and/or Touchstone's operations thereon.

1.1.9    The term "**Environmental Law**" shall mean any federal, state, or local statute, regulation, code, rule, ordinance, order, judgment, decree, injunction, or common law, pertaining in any way to the protection of human health, safety, water quality, or any other aspect of the environment, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.*; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, their respective rules and regulations, and any laws concerning above ground or underground storage tanks.

1.1.10    The term "**Law**" shall mean any federal, state, local, municipal, foreign or international, multinational or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any governmental entity, in each case as in effect as of the Closing Date.

1.1.11    The term "**Liability**" or "**Liabilities**" shall mean and include any debt, claim, liability, responsibility, obligation, cost, expense, loss, expenditure, charge, fee, penalty, fine, or fee of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when incurred or asserted.

1.1.12    The terms "**Person**" and "**Persons**" shall mean a natural person, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, governmental entity, or other entity or group.

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

1.1.13  The term "**Pollutant**" shall mean any hazardous substance, dangerous waste, solid waste, pollutant, contaminant, or other material that now or in the future becomes regulated or defined under any local, state, or federal Environmental Law.

1.1.14  The term "**Qualified Bidder**" shall have the meaning set forth in the Bid Procedures Order.

1.1.15  The term "**Successful Bid**" shall have the meaning set forth in the Bid Procedures Order.

1.1.16  The term "**Successful Bidder**" shall have the meaning set forth in the Bid Procedures Order.

ARTICLE 2

PURCHASE AND SALE OF ACQUIRED ASSETS AND ASSUMPTION OF ASSUMED LIABILITIES

2.1  <u>Assets</u>.

2.1.1  <u>Acquired Assets</u>.  Upon the terms and conditions set forth herein and in the Sale Approval Order, at the Closing, Buyer shall buy from Seller and Seller shall sell to Buyer all of Touchstone's right, title, and interest in and to the Acquired Assets.  "**Acquired Assets**" are comprised of the following and are divided into two lots, "**Lot 1**" and "**Lot 2**", as described below (each, a "**Lot**"):

(a)  Lot 1 is comprised of:

(i)  The real property described on <u>Exhibit A</u>, consisting of that certain property identified in the Tulare County real property records as Assessor Parcel Numbers 319-130-25 and 319-130-26, inclusive of the real property located at 19570 Ave. 88, Terra Bella, CA 93270 in Tulare County, California (collectively, the "**Terra Bella Real Property**");

(ii)  The pistachio processing facility, and all other buildings, structures, improvements and fixtures located on the Terra Bella Real Property (collectively, the "**Improvements**");

(iii)  All rights, privileges, easements, rights and rights-of-way appurtenant to or used in connection with the Terra Bella Real Property, including without limitation all minerals, oil, gas and other hydrocarbon substances on or under the Terra Bella Real Property owned by Touchstone (if any), air rights, water, water rights and water stock relating to the Terra Bella Real Property (if any), and any and all other appurtenances and rights of Touchstone in and to public streets, walkways, driveways, parking, and any land lying in the bed of any existing or proposed public ways adjacent to the Terra Bella Real Property (all of which are collectively referred to as the "**Appurtenances**"; together with the Terra Bella Real Property and Improvements, the "**Real Property**");

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

(iv)     All easement agreements benefitting the Real Property to the extent identified in Schedule 2.1.1(a)(iv) to this Agreement;

(v)     All personal property owned by Touchstone and located at and used, at or prior to Closing, in the operation of the Real Property, but not including any Excluded Assets (the "**Operating Personal Property**"; together with the Real Property, the "**Terra Bella Assets**");

(vi)     The personal property identified in Schedule 2.1.1(a)(vi) to this Agreement (collectively the "**Lot 1 Additional Equipment**"); and

(vii)     All manuals, written warranties, and similar documents related to ownership or operation of the Improvements or Lot 1 Additional Equipment that are requested or identified by Buyer no later than thirty (30) days prior to Closing, but only to the extent such documents are in Seller's possession.

(b)     Lot 2 is comprised of:

(i)     the personal property identified in Schedule 2.1.1(b) to this Agreement (such personal property, together with the Operating Personal Property and the Lot 1 Additional Equipment, the "**Personal Property**"); and

(ii)     All manuals, written warranties, and similar documents related to ownership or operation of the personal property identified in Schedule 2.1.1(b) to this Agreement that are requested or identified by Buyer no later than thirty (30) days prior to Closing, but only to the extent such documents are in Seller's possession.

For purposes of clarity, any Excluded Assets shall not constitute Acquired Assets. If Buyer becomes the Successful Bidder or Back-Up Bidder with respect less than all of the assets set forth in this Section 2.1.1, all references to Acquired Assets herein shall mean the assets comprising Buyer's Successful Bid or Back-Up Bid as of the conclusion of the Auction (or upon cancellation thereof), and all other assets shall become Excluded Assets.

2.1.2   Excluded Assets.   Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign or convey, and Seller and Touchstone, as applicable, shall retain all right, title and interest to, in and under, the Excluded Assets. "**Excluded Assets**" are comprised of the following:

(a)     All cash and cash equivalents;

(b)     All prepaid expenses, prepayments, refunds, deposits (including, for the avoidance of doubt, professional, legal and other fee retainers, cash

*Execution Version*

collateral security, security deposits, and deposits in the possession of utility companies (if any)), and all related rights to recover the same;

(c)      Any Good Faith Deposits (as defined in the Bid Procedures Order) held by the Seller in accordance with the terms and conditions of the Bid Procedures Order in connection with the Auction;

(d)      All trade accounts receivable and other accounts or notes receivable;

(e)      Any asset of Touchstone that otherwise would constitute an Acquired Asset but for the fact that it is sold or otherwise disposed of in conformity with the terms and conditions of this Agreement and/or the Bid Procedures Order, or Buyer otherwise agrees to such disposition;

(f)      All pistachio crop inventory, product and byproduct, whether or not located on the Terra Bella Real Property;

(g)      All computers, monitors, tablets, electronic devices, hardware, software, software rights, and other technology and technology rights used in operation of the Real Property, unless incorporated into, indivisible from, necessary to operate, or a component part of the Improvements or Personal Property;

(h)      All personal property leased by Touchstone;

(i)      All documents, books, and records of Touchstone or Seller, except as identified in Sections 2.1.1(a)(vii) or 2.1.1(b)(ii);

(j)      All intellectual property rights owned by or licensed to or from Touchstone, except such intellectual property that is (1) necessary to operate the Improvements or Personal Property, (2) identified by Buyer prior to Closing, (3) in the possession of Seller, and (4) transferrable by Seller without the consent of, and without breaching any obligation owed to, any third-party with rights to such intellectual property;

(k)      All claims, causes of action, and rights of Touchstone of any kind, at law or in equity;

(l)      All insurance policies of Touchstone, and all rights of any nature with respect thereto, including all recoveries thereunder and rights to assert claims with respect thereto, for any policy period which falls, in whole or in part, prior to the Closing; and

(m)      All assets identified in Schedule 2.1.2(m).

    2.2    <u>Liabilities</u>.

      2.2.1    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth herein and in the Sale Approval Order, at the Closing, Buyer shall assume (and pay, perform, discharge or otherwise satisfy in accordance with their terms) all Liabilities related to ownership and operation of the Acquired Assets that arise on and after the Closing (collectively, the "**Assumed Liabilities**").

      2.2.2    <u>Excluded Liabilities</u>.  Buyer shall assume only the Assumed Liabilities, and shall not assume nor be deemed to have assumed, any other Liabilities of Touchstone of any nature, whether absolute, accrued, contingent, unliquidated, matured, unmatured, direct, or indirect, and Touchstone shall be exclusively liable for all such Liabilities relating to the Acquired Assets which are not Assumed Liabilities, including those relating to, arising out of, or in connection with the ownership and operation of the Acquired Assets at any time prior to the Closing.

## ARTICLE 3

## CONSIDERATION

    3.1    <u>Consideration</u>.  The aggregate consideration to be paid for the Acquired Assets shall be: (i) the payment of the Purchase Price, in cash; and (ii) the assumption of the Assumed Liabilities.  The total Purchase Price that shall be paid by Buyer, in cash, is $30,500,000.00 (the "**Purchase Price**").  The Purchase Price shall be allocated among the Acquired Assets as follows: (i) $25,250,000.00 for Lot 1, and (ii) $5,250,000.00 for Lot 2.  Buyer shall have the right to increase the Purchase Price for the Acquired Assets, for a particular Lot, or for a specific portion of the Acquired Assets to the extent and in the manner provided in the Bid Procedures Order.  If Buyer becomes the Successful Bidder with respect to one Lot only, all references to Purchase Price herein shall mean the amount allocated to the applicable Lot as of the conclusion of the Auction (or upon cancellation thereof).  The Purchase Price shall be payable in cash in the form of the Good Faith Deposit, as provided in <u>Section 3.2.1</u> below, and the balance of the Purchase Price payable in good and immediately available funds at the Closing.  The Purchase Price shall be subject to prorations and closing adjustments at Closing as contemplated under this Agreement.

    3.2    <u>Good Faith Deposit</u>.

      3.2.1    Within three (3) days of executing this Agreement, Buyer shall deposit in cash with Seller a good faith deposit (the "**Good Faith Deposit**") in a total amount equal to $3,050,000.00.  The Good Faith Deposit shall be allocated among the Acquired Assets as follows: (i) $2,525,000.00 for Lot 1 and (ii) $525,000.00 for Lot 2.  The Good Faith Deposit shall be made by wire transfer to Seller (in accordance with wiring instructions provided by Seller), and will be held and/or disbursed by Seller in accordance with the terms and conditions of the Bid Procedures Order and this Agreement; *provided* that, in the event of a conflict between the Bid Procedures Order and this Agreement, the former shall supersede and control.

      3.2.2    The Good Faith Deposit, together with all interest thereon, if any, shall be fully applicable to the Purchase Price at Closing in the event the Buyer is the Successful Bidder; *provided* that in the event the Transaction is consummated with respect to only one Lot, only the Good Faith Deposit amount allocated to that Lot shall be credited towards the Purchase Price at

Closing. To the extent the Buyer increases its Purchase Price for a Lot at the Auction, and is selected as the Successful Bidder or Back-Up Bidder at the Auction for that Lot, Buyer shall increase its Good Faith Deposit as necessary within two (2) Business Days after completion of the Auction such that the amount of the Good Faith Deposit for that Lot is equal to ten percent (10%) of the increased Purchase Price allocated to that Lot.

3.2.3    The Good Faith Deposit for each Lot, together with all interest accrued thereon, if any, shall be nonrefundable to Buyer except in the event (i) this Agreement is terminated pursuant to Section 9.1.1, 9.1.2, 9.1.3, 9.1.6, or 9.1.7, (ii) one or more of the termination conditions set forth in Section 9.1.1, 9.1.2, or 9.1.3 occurs with respect to such Lot and the Transaction is terminated with respect to such Lot, or (iii) this Agreement is terminated pursuant to Section 9.1.4 for a reason other than Buyer's breach or default. For the avoidance of doubt, if Buyer is the Successful Bidder or the Back-Up Bidder on less than all of Lot 2 at the conclusion of the Auction, Buyer shall not be entitled to a reduction of the Good Faith Deposit allocated to Lot 2 as a result of any decrease in the Purchase Price allocated to Lot 2, except in the event and to the extent such Good Faith Deposit for Lot 2 exceeds the full Purchase Price allocated to the applicable portion of Lot 2 at the conclusion of the Auction.

3.3    Payments on the Closing Date.

3.3.1    Not later than three (3) Business Days prior to the Closing Date, Seller shall deliver to Buyer a written statement, reasonably satisfactory to Buyer, showing application of the Good Faith Deposit, or the applicable portion thereof pursuant to Section 3.2.2, against the Purchase Price, the allocation of the closing costs pursuant to Section 4.4 and other prorations and closing adjustments contemplated in this Agreement, all consistent with the terms and conditions of this Agreement, the Bid Procedures Order and the Sale Approval Order (the "**Closing Statement**").

3.3.2    Should Buyer object to any of the amounts or calculations in the Closing Statement, Buyer and Seller shall cooperate in a diligent good faith manner to resolve such objections prior to the Closing, and the Closing Statement shall be adjusted prior to the Closing to reflect any changes agreed to by Buyer and Seller.

3.3.3    At the Closing, Buyer shall pay to Seller the Purchase Price pursuant to Section 3.1, less the Good Faith Deposit (or applicable portion thereof if the Transaction is terminated with respect to one Lot), as adjusted pursuant to Section 4.4.3, and such other amounts as may be due from Buyer pursuant to the Closing Statement (including the amounts set forth in Section 4.4.2), in immediately available funds (the "**Closing Cash Payment**").

## ARTICLE 4

## CLOSING

4.1    Time and Place of Closing. Subject to the terms and conditions herein, the Transaction shall be consummated (the "**Closing**", and the date on which Closing occurs, the "**Closing Date**") as soon as practicable following the satisfaction or waiver of all conditions of this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), but no later than (i) if the Buyer is

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

selected as the Successful Bidder, the later of (a) fourteen (14) calendar days after entry of the Sale Approval Order and (b) April 8, 2025, or such later date and time as the Parties agree in writing or (ii) in the event Buyer is selected as the Back-Up Bidder, the Back-Up Closing Date, or such earlier date as the Parties may agree in writing (the "**Outside Date**").  For purposes hereof, the Closing shall be deemed to occur at 12:01 a.m. Pacific Time on the Closing Date.

4.2     Escrow Instructions.  Seller shall select a title company reasonably acceptable to Buyer (the "**Title Company**") to serve as escrow agent with respect to the Transaction.  In the event that (i) no Auction is scheduled pursuant to the Bid Procedures Order and Buyer is designated as the Successful Bidder with respect to one or more Lots; (ii) Buyer is selected as the Successful Bidder at the Auction with respect to one or more Lots; or (iii) if Buyer is selected as the Back-Up Bidder with respect to one or more Lots at the Auction and the Successful Bidder fails to close the applicable transaction, then within three (3) Business Days thereafter, Seller shall deposit an executed counterpart of this Agreement with the Title Company, and this Agreement shall serve as the instructions to the Title Company.  Seller and Buyer agree to execute such reasonable additional and supplementary escrow instructions as may be appropriate to enable the Title Company to comply with the terms of this Agreement, the Bid Procedures Order and the Sale Approval Order; *provided*, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall supersede and control.

4.3     Deliveries at Closing.

4.3.1     Seller's Deliveries.  At Closing, Seller shall deliver the following:

(a)     provided the Real Property constitutes an Acquired Asset, a duly executed and acknowledged Grant Deed in recordable form, conveying title to the Real Property to Buyer (the "**Deed**"), in a form reasonably satisfactory to the Title Company, Buyer and Seller;

(b)     an Internal Revenue Service Form W-9, or such other evidence as Buyer and Title Company may require showing that Buyer is not required to withhold taxes from the Purchase Price under Section 1445(a) of the Internal Revenue Code of 1986, as amended ("**Code**");

(c)     a duly executed Bill of Sale, in the form attached hereto as Exhibit B, assigning to Buyer Touchstone's rights with respect to the Personal Property, or such portion thereof, as constitutes Acquired Assets (the "**Bill of Sale**");

(d)     a duly executed Closing Statement;

(e)     a certified copy of the Sale Approval Order;

(f)     UCC termination statements, reconveyances of deeds of trust, and such other documents as are reasonably necessary to release liens against the Acquired Assets to the extent required by Section 7.1.2, in a form reasonably satisfactory to Buyer;

*Execution Version*

(g)    such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer, Title Company, and/or escrow officer may reasonably request to vest in Buyer all of Touchstone's right, title and interest in any of the Acquired Assets.

4.3.2    <u>Buyer's Deliveries</u>.  At Closing, Buyer shall deliver the following:

(a)    the Closing Cash Payment;

(b)    such authorizing documents of Buyer as shall be reasonably required by the Title Company to evidence Buyer's authority to consummate the Transaction;

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in <u>Sections 7.1.1 and 7.1.2</u> have been satisfied and that the representations and warranties set forth in <u>Section 5.2</u> are true and correct;

(d)    a duly executed Bill of Sale;

(e)    a duly executed Closing Statement;

(f)    provided the Real Property constitutes an Acquired Asset, a duly executed Preliminary Change of Ownership Report;

(g)    provided the Real Property constitutes an Acquired Asset, a duly executed Natural Hazard Disclosure Statement; and

(h)    all other certificates, agreements, and other documents required by this Agreement (or as Seller may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the Transaction) to be delivered by Buyer at or prior to the Closing in connection with the Transaction.

4.4    <u>Closing Costs</u>.

4.4.1    <u>Seller's Costs at Closing</u>.  At Closing, Seller shall pay one-half of Title Company's escrow fees and charges.

4.4.2    <u>Buyer's Costs at Closing</u>.  At Closing, Buyer shall pay (i) the premium for the Title Policy, to the extent Buyer obtains a Title Policy, (ii) one-half of Title Company's escrow fees and charges, and (iii) the costs of any city, county and/or state transfer taxes associated with the transfer of the Acquired Assets, and recording charges or taxes.

4.4.3    <u>Prorations</u>.  All real property taxes, special taxes, any similar taxes and assessments imposed on the Acquired Assets, utilities, and any income or expense related to the Acquired Assets shall be apportioned as of 12:01 a.m. prevailing Pacific Time on the Closing Date, as if Buyer were vested with title to the Acquired Assets during the entire Closing Date, such that Buyer shall have the benefit of the income and the burden of expenses for the Closing Date. Any

expenses (including utility expenses) attributable to operation of the Acquired Assets, including payment or other obligations to third parties attendant to ownership and operation of the Real Property, shall be prorated based upon the expenses paid or payable for the month in which Closing occurs.  In the event the Parties are unable to apportion or pro rate an amount contemplated by this Section 4.4.3 at or before Closing, the Parties shall work in good faith after the Closing to account to each other for such amounts and take such steps as necessary to effectuate the apportionment and proration contemplated in this Agreement, including, without limitation, a Party reimbursing the other Party for amounts incurred or paid by such other Party that should have been incurred or paid by the first Party.

      4.5    Title.

      4.5.1    Preliminary Commitment and Title Insurance.  To the extent Lot 1 constitutes Acquired Assets, Buyer may purchase a standard form ALTA Standard Coverage Owner's Policy of Title Insurance issued by the Title Company in the amount of the Purchase Price attributable to the Real Property, showing title to the Real Property vested in Buyer (the "**Title Policy**"), subject to the standard printed exceptions for standard coverage policies and any encumbrances, restrictions, easements or other matters whether or not of record or reflected on the Survey.  The Title Policy may also include such endorsements as Buyer may reasonably request, provided that Seller shall have no obligation to assist Buyer in obtaining any such endorsements. The failure of Buyer to obtain a Title Policy, the disclosure of any encumbrances, restrictions, easements or other matters in the Title Policy, and/or the failure of Buyer to receive any such endorsements shall not affect Buyer's obligations hereunder.

      4.5.2    Survey.  If Seller possesses a survey for the Real Property ("**Survey**"), Seller shall provide Buyer with a copy of any Survey upon request, which Buyer may review prior to the Bid Deadline.  Buyer may, at Buyer's sole cost and expense, seek to update such Survey or recertify such Survey.  Nothing disclosed by the Survey or an update to the Survey, nor any inability of Buyer to have the Survey recertified, shall affect Buyer's obligations under this Agreement.  If Buyer elects to update the Survey or have it recertified, Buyer shall have the same certified to Seller.

      4.5.3    Pre-Closing Inspection.  After entry of the Sale Approval Order and before Closing, Seller shall grant reasonable access to all Acquired Assets during regular business hours to inspect the Acquired Assets.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

      5.1    Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

      5.1.1    Authority; No Conflicts or Consents.  Subject to entry and compliance with the Bid Procedures Order and Sale Approval Order, and the results of the Bid Procedures and Auction, Seller has the full power and authority to execute, deliver and perform Seller's obligations

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

under this Agreement and the documents to be delivered hereunder, and to consummate the Transaction.

      5.1.2   <u>Brokers and Finders</u>.  Except as set forth on <u>Schedule 5.1.2</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Transaction, and Buyer is not or will not become obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Transaction based upon any arrangement made by or on behalf of Seller.

      5.1.3   <u>No Other Representations and Warranties</u>.  Except for the representations and warranties contained herein, neither Seller nor its agents and professionals has made or makes any other express or implied representation or warranty, either written or oral, for or on behalf of Seller.

      5.1.4   <u>Termination of Seller's Representations and Warranties at Closing</u>.  All of the representations and warranties of Seller set forth in this Agreement shall terminate at Closing or upon termination of this Agreement.

      5.2   <u>Representations and Warranties of Buyer</u>.  Buyer represents and warrants to Seller as follows:

      5.2.1   <u>Organization and Authority of Buyer; Enforceability</u>.  Buyer is duly organized and in good standing under the laws of its state of organization, with full power and authority to enter into and perform its obligations under this Agreement.  Buyer has complied with all corporate formalities and procedures necessary to authorize the execution, delivery and performance of this Agreement.  This Agreement has been, and at or prior to the Closing, each document to be executed by Buyer pursuant to <u>Section 4.3.2</u> will be, duly executed and delivered by the Buyer.  This Agreement constitutes, and each document to be executed by Buyer pursuant to <u>Section 4.3.2</u> will constitute, a binding obligation of Buyer enforceable in accordance with its respective terms.  Buyer has sufficient funds to pay the Purchase Price.

      5.2.2   <u>No Conflicts; Consents</u>.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the Transaction, do not and will not: (i) violate or conflict with the certificate of formation or other organizational documents of Buyer; or (ii) violate or conflict with any judgment, order, decree, statute, law, ordinance, contract, rule or regulation applicable to Buyer.  No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the Transaction.

      5.2.3   <u>Brokers and Finders</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the Transaction, and Seller is not or will not become obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Transaction based upon any arrangement made by or on behalf of Buyer.

      5.2.4   <u>OFAC</u>.  Neither Buyer nor any of its affiliates, and none of its respective employees, officers, or directors, is a Person with whom U.S. Persons are restricted from doing

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

business under regulations of the Office of Foreign Asset Control of the Department of the Treasury ("**OFAC**") (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

       5.2.5   <u>California Health & Safety Code Section 78700 Disclosure</u>.  Section 78700 of the California Health & Safety Code requires owners of nonresidential real property who know, or have reasonable cause to believe, that any release of any hazardous substance has come to be located on or beneath the real property to provide written notice of such to a buyer of the real property.  Buyer acknowledges and agrees that the sole inquiry and investigation Seller has conducted in connection with the environmental condition of the Real Property is to obtain and review the Environmental Documents.  Buyer: (a) acknowledges Buyer's receipt of the foregoing notice given pursuant to Section 78700 of the California Health and Safety Code; (b) has reviewed the matters disclosed in the Environmental Documents; and (c) after receiving advice of Buyer's legal counsel, waives any and all rights Buyer may have to assert that Seller has not complied with the requirements of Section 78700 of the California Health and Safety Code.  The representations, warranties, and agreements in this <u>Section 5.2.5</u> shall survive the Closing or the termination of this Agreement indefinitely.

       5.2.6   <u>Natural Hazard Disclosures</u>.  Buyer acknowledges that Seller is required to disclose if any of the Real Property lies within the following natural hazard areas or zones (the "**Natural Hazard Area**"): (a) a special flood hazard area designated by the Federal Emergency Management Agency; (b) an area of potential flooding; (c) a very high fire hazard severity zone; (d) a wild land area that may contain substantial forest fire risks and hazards; (e) an earthquake fault or special studies zone; or (f) a seismic hazard zone.  Buyer acknowledges that Seller has employed the services of a consultant (the "**Natural Hazard Expert**") to examine the maps and other information specifically made available to the public by government agencies, and Buyer acknowledges that Seller has provided a natural hazard disclosure statement prepared by the Natural Hazard Expert (the "**Natural Hazard Disclosure Statement**") and the report of the Natural Hazard Expert (the "**Natural Hazard Report**") containing the results of its examination to Buyer prior to the Bid Deadline.  Buyer acknowledges that Buyer's receipt of the Natural Hazard Disclosure Statement and the Natural Hazard Report fully and completely discharges Seller from its disclosure obligations referred to in the first sentence of this <u>Section 5.2.6</u>, and, for the purposes of this Agreement, the provisions of California Civil Code Section 1103.4 regarding the non-liability of Seller for errors and/or omissions not within its personal knowledge shall be deemed to apply, and the Natural Hazard Expert shall be deemed to be an expert dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above.  Buyer acknowledges and agrees that nothing contained in the Natural Hazard Disclosure Statement releases Buyer from its obligation to fully investigate and satisfy itself with the condition of the Acquired Assets, including, without limitation, whether the Real Property is located in any Natural Hazard Area.  Buyer also agrees that nothing contained in the Natural Hazard Disclosure Statement shall entitle or give Buyer the right to terminate this Agreement.  Buyer further acknowledges and agrees that the matters set forth in the Natural Hazard Disclosure Statement may change on or prior to the Closing and that Seller has no obligation to

update, modify, or supplement the Natural Hazard Disclosure Statement except to the extent Seller is required by law or regulation to do so.

      5.2.7   <u>Due Diligence; No Representations by Seller</u>.

      (a)    EXCEPT AS OTHERWISE PROVIDED IN <u>SECTION 5.1</u>, IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR OTHER REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ACQUIRED ASSETS, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

      (b)    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT, UPON THE CLOSING, SELLER SHALL SELL AND CONVEY TO BUYER, AND BUYER SHALL ACCEPT, THE PURCHASED ASSETS **AS IS, WHERE IS, WITH ALL FAULTS**. BUYER AGREES AND ACKNOWLEDGES THAT SELLER HAS NO OBLIGATION TO DELIVER THE ACQUIRED ASSETS, INCLUDING THE REAL PROPERTY AND IMPROVEMENTS THEREON, TO SELLER IN ANY PARTICULAR CONDITION (E.G., BROOMSWEPT CONDITION, WORKING CONDITION), AND THAT SELLER HAS NO OBLIGATION TO CLEAN, SANITIZE, FUMIGATE, REPAIR, OR OTHERWISE ALTER, MODIFY OR IMPROVE THE NATURE OR CONDITION OF THE ACQUIRED ASSETS PRIOR TO DELIVERY OF THE SAME TO BUYER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER HAS NO OBLIGATION TO REMOVE REMNANT PISTACHIO PRODUCT OR BYPRODUCT FROM THE SILOS, EQUIPMENT, MACHINERY, STORAGE, OR OTHER AREAS OF THE REAL PROPERTY PRIOR TO CLOSING. BUYER HAS NOT RELIED ON, AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ACQUIRED ASSETS OR RELATING THERETO, WHETHER OR NOT MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE ACQUIRED ASSETS ARE BEING SOLD AS IS, WHERE IS, WITH ALL FAULTS.

      (c)    Buyer acknowledges that Seller has made available to Buyer certain review materials related to the Acquired Assets, AND BUYER HAS REVIEWED ALL SUCH MATERIALS. BUYER FURTHER ACKNOWLEDGES TO SELLER THAT BUYER HAS HAD THE OPPORTUNITY TO CONDUCT, AND DID CONDUCT, SUCH INSPECTIONS AND INVESTIGATIONS OF THE ACQUIRED ASSETS AND ASSUMED LIABILITIES AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES,

AND ITS ACQUISITION AND ASSUMPTION THEREOF. BUYER HEREBY ASSUMES ALL RISKS THAT ADVERSE MATTERS, INCLUDING WITHOUT LIMITATION LATENT OR PATENT DEFECTS, AND ADVERSE PHYSICAL OR OTHER MATTERS, MAY NOT HAVE BEEN REVEALED BY BUYER'S REVIEW, INSPECTIONS, AND INVESTIGATIONS.

(d)    <u>RELEASE</u>.    NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, BUYER ACKNOWLEDGES AND AGREES THAT SELLER WOULD NOT ENTER INTO THIS AGREEMENT TO SELL THE ACQUIRED ASSETS FOR THE PURCHASE PRICE UNLESS BUYER AGREED TO THE FOLLOWING:

**UPON CLOSING, BUYER RELEASES SELLER AND ALL SELLER PARTIES FROM ANY AND ALL CLAIMS (WHETHER KNOWN OR UNKNOWN, AND WHETHER CONTINGENT OR LIQUIDATED) ARISING FROM OR RELATED TO (I) THE ACQUIRED ASSETS AND ASSUMED LIABILITIES; AND (II) ANY OTHER CONDITIONS (INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL CONDITIONS OR LEGAL COMPLIANCE) AFFECTING THE ACQUIRED ASSETS, WHETHER THE SAME ARE A RESULT OF NEGLIGENCE OR OTHERWISE. THIS RELEASE IS INTENDED TO BE GIVEN THE BROADEST SCOPE, APPLICATION AND INTERPRETATION ALLOWABLE BY LAW. BUYER COVENANTS NOT TO SUE SELLER OR ANY SELLER PARTIES WITH REGARD TO ACQUIRED ASSETS OR ASSUMED LIABILITIES.**

**BUYER HAS READ, AND UNDERSTANDS, THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 ("SECTION 1542"), WHICH PROVIDES:**

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

**BUYER EXPRESSLY, KNOWINGLY, AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS, BENEFITS, AND PROTECTIONS OF SECTION 1542 AND OF ANY OTHER APPLICABLE STATE OR FEDERAL STATUTE OR COMMON LAW PRINCIPLE LIMITING THE SCOPE OF A GENERAL OR SPECIFIC RELEASE. BUYER HEREBY SPECIFICALLY ACKNOWLEDGES THAT: (i) BUYER HAS CAREFULLY REVIEWED THIS <u>SECTION 5.2.7</u> AND THE WAIVER OF SECTION 1542; (ii) BUYER HAS DISCUSSED ITS IMPORT WITH LEGAL COUNSEL; AND (iii) THE PROVISIONS OF THIS <u>SECTION 5.2.7</u> AND THE WAIVER OF SECTION 1542 ARE A MATERIAL PART OF THIS AGREEMENT AND OF THE CONSIDERATION RECEIVED BY SELLER UNDER THIS AGREEMENT.**

**Buyer's Initials:** _HLL_

# ARTICLE 6

## RECEIVERSHIP MATTERS

6.1    Bidding Procedures Milestones.

6.1.1    Within three (3) Business Days after execution hereof, Seller shall file a motion (the "**Bid Procedures Motion**") for approval of bidding procedures governing, among other things, overbids and a potential Auction of the Acquired Assets (the "**Bid Procedures**"), and approval of the Breakup Fees (defined below).  Seller shall request a hearing on the Bid Procedures Motion (the "**Bid Procedures Hearing**") on shortened time, which request shall propose a hearing date within seven calendar days after the filing of the Bid Procedures Motion.  The proposed Bid Procedures shall be shared with Buyer prior to Seller filing the Bid Procedures Motion, and shall be in a form consistent with the terms of this Agreement.

6.1.2    No later than four (4) Business Days after entry of the Bid Procedures Order, Seller shall publish the first notice of the sale of the Acquired Assets, subject to overbid, in the form and manner approved by the Court as consistent with sections 2001 and 2002 of title 28 of the United States Code.

6.1.3    The Bid Procedures Motion shall request that the Court schedule a hearing within thirty-five (35) days after the Bid Procedures Hearing to confirm the sale of the Acquired Assets to the Successful Bidder(s) and Back-Up Bidder(s), if any, following the Auction (or cancellation thereof), and enter the Sale Approval Order.  If Buyer is selected as the Successful Bidder or Back-Up Bidder with respect to any of the Acquired Assets, Seller shall request the Court include in the Sale Approval Order a finding that Buyer is a good faith purchaser, and Seller and/or Buyer, as applicable, shall submit reasonable evidence appropriate to support such a finding.

6.2    Competing Bid and Related Matters.

6.2.1    This Agreement and the Transaction are subject to Seller's absolute right and ability to consider higher or better competing bids with respect to the Acquired Assets, including Lot 1 only, Lot 2 only, or any portion of Lot 2, pursuant to the Bid Procedures Order (each a "**Competing Bid**").  Following completion of the Auction (or cancellation thereof, if Buyer is the only Qualified Bidder), if Buyer is the Successful Bidder with respect to any of the Acquired Assets and is not in breach of this Agreement, unless otherwise ordered by the Court, Seller shall not initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any sale or other disposition of such Acquired Assets.

6.2.2    If an Auction is conducted, and Buyer is not the Successful Bidder with respect to any Acquired Assets, Buyer shall, if its bid is determined to be the next highest bid with respect to the applicable Acquired Assets, serve as the Back-Up Bidder with respect to such Acquired Assets and keep Buyer's bid to consummate the Transaction with respect to such Acquired Assets on the terms and conditions set forth in this Agreement (as the same may be modified or improved upon during the Auction) open and irrevocable until the earlier of (i) the

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

date of closing the purchase and sale of the applicable Acquired Assets with the Successful Bidder, or (ii) the Back-Up Closing Date; *provided*, however, that:

> (a)    in the event Buyer (i) is neither the Successful Bidder nor the Back-Up Bidder for Lot 1 or (ii) Buyer is the Back-Up Bidder for Lot 1 and Seller consummates a sale of Lot 1 to the Successful Bidder, Buyer shall be entitled to revoke its bid with respect to Lot 2 upon written notice to Seller (provided such notice is delivered to Seller within fourteen (14) days of entry of the Sale Approval Order), and Buyer shall not be required to serve as the Successful Bidder or the Back-Up Bidder with respect to Lot 2 following such revocation; and

> (b)    in the event Seller accepts a bid for a portion of Lot 2, Buyer shall not be required to serve as the Successful Bidder or the Back-Up Bidder with respect to the remaining Lot 2 assets if Buyer does not elect to submit a revised bid for such assets.

6.2.3    Following entry of the Sale Approval Order and prior to the Back-Up Closing Date, if Buyer is designated as the Back-Up Bidder and the Successful Bidder fails to consummate the purchase of the applicable Acquired Assets, Buyer will be deemed to have the new prevailing bid with respect to such Acquired Assets, and Seller will be authorized (and Buyer will be obligated), without further order of the Court, to consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be modified or improved upon during the Auction), the Sale Approval Order and the Bid Procedures Order; *provided* that in the event Buyer is the Back-Up Bidder with respect to Lot 1, Buyer will not be obligated to consummate the purchase of Lot 2 if Buyer timely delivers the revocation notice specified in <u>Section 6.2.2(a)</u>.

ARTICLE 7

CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Buyer and Seller</u>.  The respective obligations of each Party to this Agreement to consummate the Transaction are subject to the satisfaction or written waiver by each of Seller and Buyer of each of the following conditions:

> 7.1.1    There shall not be in effect any order, writ, injunction, judgment or decree entered by a court of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal, or otherwise prohibiting the consummation of the Transaction or the documents to be entered into pursuant to this Agreement; and

> 7.1.2    The Court shall have entered the Sale Approval Order in form reasonably satisfactory to Seller and Buyer, which order shall not have been stayed and shall authorize Seller to deliver clear, clean and marketable title to the Acquired Assets, free and clear of all Liabilities or Encumbrances of, against, or created by Touchstone, to the fullest extent permitted by

applicable Law, except to the extent such Liabilities or Encumbrances constitute Assumed Liabilities or constitute easements, rights of way and other Encumbrances running with the land.

7.2     <u>Conditions Precedent to the Obligations of Seller</u>.  The obligations of Seller to consummate the Transaction are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Seller in its sole discretion:

7.2.1     The representations and warranties of Buyer in this Agreement or any document to be executed by Buyer pursuant to this Agreement shall be true and correct in all material respects, in each case as of the Agreement Date and the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be true and correct only as of such other specified date).

7.2.2     Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or before the Closing Date.

7.2.3     Buyer shall have delivered or caused to be delivered to Seller all of the items set forth in <u>Section 4.3.2</u>.

7.3     <u>Conditions Precedent to the Obligations of Buyer</u>.  The obligations of Buyer to consummate the Transaction are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

7.3.1     The representations and warranties of Seller in this Agreement or any document to be executed by Seller pursuant to this Agreement shall be true and correct in all material respects, in each case as of the Agreement Date and the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be true and correct only as of such other specified date).

7.3.2     Subject to the terms of the Bid Procedures Order and Sale Approval Order, Seller shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Seller on or before the Closing Date.

7.3.3     Seller shall have delivered or caused to be delivered to Buyer all of the items set forth in <u>Section 4.3.1</u>.

## ARTICLE 8

## INDEMNIFICATION

8.1     <u>Indemnification for Entry on the Real Property</u>.  Buyer hereby indemnifies and agrees to defend and hold harmless Seller, Touchstone, and their respective employees, licensees, contractors, consultant, agents, attorneys, brokers, and representatives (each, a "**Seller Party**" and collectively, the "**Seller Parties**") from and against any and all obligations, losses, injuries,

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

damages, claims, liens, costs, expenses, demands, Liabilities, penalties and investigation costs, including reasonable attorneys' fees and costs (collectively, "**Claims**"), incurred in connection with or arising out of any entry on the Real Property by Buyer or any of Buyer's partners, employees, licensees, contractors, agents, consultants, invitees, directors, officers, managers, attorneys, brokers, and representatives, except to the extent caused by Seller or the Seller Parties' gross negligence or willful misconduct.  The provisions of this Section shall survive the termination of this Agreement or Closing indefinitely.

8.2    <u>Indemnification Post-Closing</u>.  Subject to the occurrence of the Closing and subject to the representations and warranties of Seller in <u>Section 5.1</u> of this Agreement, Buyer hereby agrees to indemnify, defend, and hold harmless Seller, Touchstone, and the Seller Parties from and against any and all Claims, relating to or arising out of, directly or indirectly, the Acquired Assets and Assumed Liabilities, including, without limitation, those Claims relating to the actual or threatened release, discharge, disposal, deposit, seepage, migration, or escape of any Pollutant at, from, into, or underneath the Real Property, and the compliance or noncompliance of the Real Property with applicable federal, state, county, and local laws and regulations including, without limitation, Environmental Laws and regulations.  For avoidance of doubt, Buyer's obligation to indemnify, defend, and hold harmless includes Claims arising from or related to the Assumed Liabilities.  The provisions of this Section shall survive Closing indefinitely.

## ARTICLE 9

## TERMINATION

9.1    <u>Termination</u>.  This Agreement may be terminated only in accordance with this <u>Section 9.1</u>.  This Agreement may be terminated at any time prior to the Closing, as follows:

9.1.1    by the mutual written consent of Seller and Buyer;

9.1.2    automatically if (a) Buyer is not selected as the Successful Bidder or Back-Up Bidder for any Acquired Assets, or (b) the Court denies Seller's request to enter the Sale Approval Order confirming Buyer as the Successful Bidder or Back-Up Bidder for any Acquired Assets;

9.1.3    automatically, with respect to a Lot, if Buyer is selected as the Back-Up Bidder for such Lot and Seller consummates a sale of such Lot to the Successful Bidder;

9.1.4    automatically if the Closing does not occur on or before the Outside Date (if Buyer is the Successful Bidder with respect to such Acquired Assets) or Back-Up Closing Date (if Buyer is the Back-Up Bidder with respect to such Acquired Assets);

9.1.5    by written notice from Seller to Buyer, if Buyer breaches or fails to perform in any respect any of its obligations, representations, warranties or covenants in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

ARTICLE 7, and (ii) cannot be or has not been cured within five (5) days following delivery of notice to Buyer of such breach or failure to perform; or

9.1.6    by written notice from Buyer to Seller, if Seller breaches or fails to perform in any respect any of its obligations, representations, warranties or covenants in this Agreement and such breach or failure to perform:  (i) would give rise to the failure of a condition set forth in ARTICLE 7, and (ii) cannot be or has not been cured within five (5) days following delivery of notice to Seller of such breach or failure to perform; or

9.1.7    by written notice from Buyer to Seller, if (i) Buyer (a) is not the Successful Bidder or Back-Up Bidder for Lot 1 or (b) is the Back-Up Bidder for Lot 1 and the Seller consummates the sale of Lot 1 to the Successful Bidder, and (ii) Buyer is or would be the Successful Bidder or the Back-Up Bidder for Lot 2.

Each basis for termination set forth in this Section 9.1 shall be considered separate and distinct from each other such basis.  If more than one of the termination conditions set forth in this Section 9.1 is applicable, the applicable Party shall have the right to choose the basis for termination.  If one or more termination conditions occur with respect to one Lot only, the Transaction with respect to the other Lot shall not be terminated under this Section 9.1 *except* as set forth in Section 9.1.7.

9.2     Procedures Upon Termination.  In the event of a termination by Buyer or Seller pursuant to Section 9.1, written notice thereof shall be delivered to the other Party, and this Agreement shall terminate with respect to the applicable Lot(s) without further action by Buyer or Seller as provided herein.

9.3     Effect of Termination.

9.3.1    In the event of termination of this Agreement by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of a Party to the other Party, except those provision that expressly survive termination of this Agreement and as otherwise provided in this Section 9.3.  The provisions of Sections 5.2.5, 8.1 and 8.2 shall expressly survive Closing, the expiration, or termination of this Agreement.

9.3.2    Notwithstanding Section 9.3.1, in the event (i) this Agreement is terminated pursuant to Section 9.1.4 due to Buyer's breach or default or (ii) this Agreement is terminated pursuant to Section 9.1.5, Seller shall be entitled to retain the Good Faith Deposit (or the applicable portion thereof if the termination occurs with respect to one Lot only), as liquidated damages as its sole and exclusive remedy against Buyer in all respects for any claim against Buyer arising under this Agreement (or as liquidated damages as its sole remedy for any claim against Buyer arising under this Agreement with respect to the applicable Lot, if the termination occurs with respect to one Lot only).

SELLER AND BUYER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES SELLER MAY SUFFER UPON A BREACH OF THIS AGREEMENT BY BUYER AND THAT THE GOOD FAITH DEPOSIT REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON SUCH BREACH.  SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF

APPLICABLE LAW, BUT ARE INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676, AND 1677. BY PLACING ITS INITIALS BELOW, EACH PARTY SPECIFICALLY CONFIRMS THE ACCURACY OF THE STATEMENTS MADE ABOVE AND THE FACT THAT EACH PARTY WAS REPRESENTED BY LEGAL COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE MEANING, THE EFFECT, AND THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION.

**Seller's Initials:** DPS          **Buyer's Initials:** HLL

9.3.3    <u>Break-Up Fee(s)</u>.  To compensate Buyer for agreeing to serve as a stalking horse bidder in connection with the Bid Procedures and Auction, should one or both of the termination conditions set forth <u>Sections 9.1.2(a)</u> and <u>9.1.3</u> occur with respect to a particular Lot, and Seller consummates a sale of that Lot to another Person following the Auction (each, an "**Alternative Transaction**"), then Seller shall pay to Buyer a breakup fee of 1% of the original Purchase Price allocated by Buyer to such Lot from the proceeds of such Alternative Transaction (each, a "**Break-Up Fee**").  For the avoidance of doubt, Buyer shall not be entitled to a Break-Up Fee for Lot 2 if (i) Buyer elects to withdraw its bid for Lot 2 pursuant to <u>Section 6.2.2(a)</u> and/or terminates the Agreement pursuant to Section <u>9.1.7</u> or (ii) Buyer is selected as the Successful Bidder for a portion of Lot 2, even if Seller consummates a sale of the other portion of Lot 2 to another party pursuant to an Alternative Transaction.  Seller's obligation to pay the Break-Up Fee, if any, shall survive the termination of this Agreement.

9.4    <u>Default by Seller</u>.  If Seller fails without legal excuse to complete the sale of the Acquired Assets in accordance with the terms of this Agreement, the Bid Procedures Order, and the Sale Approval Order, as its sole and exclusive remedy, Buyer may either (i) pursue specific performance of Seller's obligations under this Agreement or (ii) terminate this Agreement with respect to such Acquired Assets and be refunded its Good Faith Deposit with respect to such Acquired Assets.  From and after the Closing, provided Buyer is not in breach of this Agreement, Buyer shall be entitled to seek specific performance of Seller of its obligations, if any, to be performed after the Closing.

ARTICLE 10

MISCELLANEOUS

10.1    <u>Negotiation and Construction</u>.    This Agreement and each of the terms and provisions hereof are deemed to have been explicitly negotiated between the Parties, and the language in all parts of this Agreement shall, in all cases, be construed according to its fair meaning and not strictly for or against either Party.

10.2    <u>Governing Law</u>. This Agreement shall be construed according to the internal laws of the State of California. The Parties agree that any action or proceeding related to this Agreement, the Transaction, or any document executed pursuant to this Agreement shall be brought only in the Court.  Each Party (a) consents to the jurisdiction of the Court and waives all objections and

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

defenses based upon lack of personal jurisdiction of the Court, (b) waives any objection to venue in the Court, and (c) waives any objection that the Court is an inconvenient forum.

10.3    <u>Attorney's Fees</u>.  Each Party shall be responsible for its own legal, accounting, and consultant fees in connection with the negotiation of this Agreement and the consummation of the Transaction.  In the event of litigation relating to this Agreement, the prevailing Party in such litigation as determined by the Court in a final, non-appealable judgment shall be entitled to receive from the non-prevailing Party the reasonable attorney's fees and costs which such prevailing Party has incurred in connection with such litigation, including any appeal therefrom.

10.4    <u>Notices</u>.  All notices, demands, requests, consents and approvals that may, or are required to, be given by any Party to any other Party hereunder shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) sent by a nationally recognized overnight delivery service, (c) electronically transmitted via email, or (d) if mailed or deposited in the United States mail and sent by registered or certified mail, return receipt requested, postage prepaid to:

| | |
|---|---|
| SELLER: | David P. Stapleton, |
| | Receiver for Touchstone Pistachio Company, LLC |
| | 515 S. Flower St. |
| | 18th Floor |
| | Los Angeles, CA 90071 |
| | Telephone: (213) 235-0600 |
| | Email: david@stapletoninc.com |
| | |
| | With a copy (which shall not constitute notice) to: |
| | |
| | Covington & Burling LLP |
| | 1999 Avenue of the Stars |
| | Los Angeles, CA 90067 |
| | Attn: Joseph R. Dunn |
| | Telephone: (424) 332-4825 |
| | Email: jdunn@cov.com |
| | |
| BUYER: | Zamora Pistachio, LLC |
| | 9370 Road 234 |
| | Terra Bella, CA 93720 |
| | Attention: Harris Lee Cohen, General Manager |
| | Telephone: (559) 535-6050 |
| | Email: hcohen@settonfarms.com |

*Execution Version*

With a copy (which shall not constitute notice) to:

Saul Ewing LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
Attn: Zev M. Shechtman
Telephone: (310) 255-6130
Email: zev.shechtman@saul.com

Either Party hereto may by proper notice made by the other Party designate such other address for giving of notices. All notices shall be deemed given on the day such notice is delivered (or if refused, the date of such refusal) or transmitted by email (provided that confirmation of email transmission is before 5:00 p.m. prevailing Pacific Time on a Business Day, and, if after such time, then on the next Business Day). An attorney may provide notices on behalf of its client.

10.5    <u>Assignment</u>. Buyer shall not assign any right, interest or obligation under this Agreement, other than an assignment to an affiliate of Buyer with Seller's express prior written consent, which consent shall not be unreasonably withheld. Any purported unauthorized assignment shall be void. No permitted assignment by Buyer shall reduce Buyer's obligations hereunder and Buyer shall remain primarily liable for Buyer's obligations hereunder.

10.6    <u>Cooperation; Further Assurances</u>. Subject to the terms of the Bid Procedures Order and the Sale Approval Order, from the date hereof until the Closing, the Parties shall reasonably cooperate with one another in connection with any steps required to be taken by either of them to carry out or otherwise fulfill the intent of this Agreement. Upon the request of the other Party, each Party shall also furnish upon request any further information, execute and deliver any other documents, and do other acts and things as are reasonably necessary for the purpose of carrying out the intent of this Agreement.

10.7    <u>Post-Closing Reasonable Access to Real Property</u>. In the event Seller consummates a sale of Lot 1 to Buyer under this Agreement, for a period of sixty (60) days after the Closing Date, Buyer shall afford Seller and his agents reasonable access to the Real Property during normal business hours upon reasonable advance notice for sixty (60) days after Closing for the purpose of removing any Excluded Assets not removed therefrom prior to Closing. Buyer shall not seek any compensation from Seller in exchange for providing such access or based on the existence of Excluded Assets on the Real Property on and after the Closing Date.

10.8    <u>Entire Agreement</u>. This Agreement, together with the exhibits and schedules hereto, contains the entire understanding between the Parties and supersedes any prior agreements between them respecting the subject matter hereof.

10.9    <u>No Recording</u>. Neither this Agreement nor any memorandum of this Agreement shall be recorded.

10.10    <u>Time of the Essence</u>. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

*Execution Version*

10.11    Counterparts.  This Agreement may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the Parties hereto, notwithstanding that all the Parties are not signatory to the original or to the same counterpart.  Any such counterpart shall be admissible into evidence as an original hereof against the Person who executed it.

10.12    Amendment, Waiver.    No modification, termination or amendment of this Agreement may be made except by written agreement of the Parties.  No failure by Seller or Buyer to insist upon the strict performance of any covenant, agreement, or condition of this Agreement or to exercise any right or remedy shall constitute a waiver of any such breach or any other covenant, agreement, term or condition.  No waiver shall affect or alter this Agreement, and each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

10.13    Waiver of Jury Trial.    IN ANY LAWSUIT OR OTHER PROCEEDING INITIATED BY A PARTY HERETO UNDER OR WITH RESPECT TO THIS AGREEMENT, SELLER AND BUYER EACH WAIVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

10.14    Headings.    The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

10.15    Cumulative Remedies.  The rights and remedies of the Parties that are specified in this Agreement are cumulative and not exclusive of any other rights and remedies available at law or in equity.

10.16    Severability.  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such provisions had not been contained herein.

10.17    Third Party Beneficiaries.  Except as set forth in the Bid Procedures Order and Sale Approval Order, or as otherwise ordered by the Court, no third party shall be entitled to enforce or otherwise shall acquire any right, remedy or benefit by reason of this Agreement.

10.18    Electronic Signatures.  This Agreement may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  For these purposes, "electronic signature" shall mean electronically scanned and transmitted versions (e.g., via pdf file) of an original signature, signatures electronically inserted and verified by software such as DocuSign and Adobe Sign, or faxed versions of an original signature.

*(Signature page follows)*

*Execution Version*

DATED as of the day and year first above written.

**SELLER:**

David P. Stapleton

86A136ABFC9644D ,

David P. Stapleton, solely in his capacity as receiver of
Touchstone Pistachio Company, LLC

**BUYER:**     **ZAMORA PISTACHIO, LLC, a CALIFORNIA LIMITED
LIABILITY COMPANY**

By: Harris Lee Cohen

Name: Harris Lee Cohen

Title: General Manager

**Exhibits**

Exhibit A     Legal Description of the Real Property
Exhibit B     Bill of Sale

**Schedules**

2.1.1(a)(iv)     Easement Agreements
2.1.1(a)(vi)     Lot 1 Additional Equipment
2.1.1(b)         Lot 2
2.1.2(m)         Additional Excluded Assets
5.1.2            Brokers and Finders

*[Signature Page to Purchase and Sale Agreement]*

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

<u>EXHIBIT A</u>

**Legal Description of the Real Property**

**APNs 319-130-25 and 319-130-26:**

The South Half of the Southeast Quarter of Section 2, Township 23 South, Range 26 East, Mount Diablo Base and Meridian in the County of Tulare, State of California, according to the Official Plat thereof.

EXCEPTING, all oil, gas, minerals and other hydrocarbon substances herein and hereunder, as reserved by Sue-Mar Vineyards Co., Inc., a corporation, in Deed recorded March 4, 1953, in Book 1656, at Page 532, of Official Records, as Document No. 6931.

The above description is pursuant to the Certificate of Merger No. SVM 21-002, recorded on January 13, 2022 as Instrument No.2022-0002880 of Official Records in said County.

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

<u>EXHIBIT B</u>

**BILL OF SALE**

This Bill of Sale (the "**Bill of Sale**") is made and entered into on [MONTH] [DAY], 2025, by and between David P. Stapleton ("**Assignor**"), solely in his capacity as receiver of the assets and operations of Touchstone Pistachio Company, LLC ("Touchstone"), a California limited liability company in the matter captioned *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (Case No. 1:24-cv-01105-KES-SAB) pending in the United States District Court for the Eastern District of California, and Zamora Pistachio, LLC, a California limited liability company ("**Assignee**"). Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement (as defined below).

In consideration of the sum of $[•] and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby unconditionally, absolutely and irrevocably assign, transfer, convey and deliver to Assignee, its successors and assigns, all of Touchstone's rights, title and interest in the Personal Property (as defined in the Agreement referred to below and more particularly described on **Exhibit 1** attached hereto and made a part hereof for all purposes).

ASSIGNEE ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THAT CERTAIN AGREEMENT OF PURCHASE AND SALE DATED [MONTH] [DAY], 2025, BY AND BETWEEN ASSIGNOR AND ASSIGNEE (THE "**AGREEMENT**"), ASSIGNOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITIONS OF THE PERSONAL PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PERSONAL PROPERTY, (C) THE SUITABILITY OF THE PERSONAL PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PERSONAL PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE QUALITY, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OF THE PERSONAL PROPERTY, OR (F) ANY OTHER MATTER WITH RESPECT TO THE PERSONAL PROPERTY. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PERSONAL PROPERTY, ASSIGNEE IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PERSONAL PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY ASSIGNOR, EXCEPT AS SPECIFICALLY PROVIDED IN THE AGREEMENT. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PERSONAL PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT ASSIGNOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PERSONAL PROPERTY AS

PROVIDED FOR HEREIN IS MADE ON AN "**AS IS, WHERE IS**" CONDITION AND BASIS "**WITH ALL FAULTS,**" EXCEPT AS SPECIFICALLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THE AGREEMENT.

      The obligations of Assignor are intended to be binding only on the property of Touchstone and shall not be personally binding upon, nor shall any resort be had to, the private properties of Assignor or any of the other Seller Parties (as defined in the Agreement) other than Touchstone.

      IN WITNESS WHEREOF, Assignor and Assignee have caused this Bill of Sale to be executed on the date and year first above written.

*Assignor*:

_____,
David P. Stapleton, solely in his capacity as receiver of Touchstone Pistachio Company, LLC

*Assignee*:

_____,
a _____

By:_____
Name:_____
Title:_____

2

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

<u>EXHIBIT 1 TO BILL OF SALE</u>

**PERSONAL PROPERTY**

<u>SCHEDULE 2.1.1(a)(iv)</u>

**EASEMENT AGREEMENTS**

*[Intentionally left blank]*

####

<u>SCHEDULE 2.1.1(a)(vi)</u>

**LOT 1 ADDITIONAL EQUIPMENT**

*[Attached]*

####

| Item # | Sale Lots | Qty | Supplier or Mfg'r | Model | Serial Number | Age (Date MFG) | Original Equipment Detail | Site Location | Asset No. | Tag Lot No. | Asset Tag No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | 1 | 1 | Pattyn | | 2121P102 | ~ 4 Yrs (3/30/2021) | Combination case erector and bag inserter automatically inserts made-to-measure bags from a roll into boxes. Standard equipped with Nordson hot melt device, hot melt nearly finished, multicolor warning light and color touch panel for easy operation. Also includes buzzer alarm, communication to control system, double active seal bars, carton magazine nearly empty, long carton magazine, film roll trolley, reject mechanism, mechanical bag in box detection, and integrated air plunger. | Maple Warehouse | T3085 | D | T3085 |
| 8 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 2500mm and includes drive package (SEW drive, motor controls, fully wired) and pneumatic separator. | Maple Warehouse | | D | |
| 9 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 1200mm and includes 2x-drive packages (Interoll EC5000 drive, motor controls, fully wired) and pneumatic pop-up stop | Maple Warehouse | | D | |
| 10 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Functioning as a shaker conveyor, and includes: 2 drive packages (vibratory motors), Length 750mm (automatically shakes/settles product using a vibratory pan with two offset mounted motors with weights to adjust the amplitude/ frequency), and stainless steel execution. | Maple Warehouse | T3035 | D | T3035 |
| 11 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 600mm and includes drive packages (Interoll EC5000 drive, motor controls, fully wired), and pneumatic pop-up stop. | Maple Warehouse | | D | |
| 12 | 1 | 1 | Pattyn | CW-11 | 2021P103 | ~ 4 Yrs (3/30/2021) | Equipped with a multicolor warning light, stainless steel frame, reject mechanism, buzzer alarm, and communication to control system | Maple Warehouse | T3086 | D | T3086 |
| 13 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006 Width 400mm, Length 1000mm and includes drive package (SEW drive, motor controls, fully wired). | Maple Warehouse | | D | |
| 14 | 1 | 1 | Pattyn | DS-21-HE | 2021P104 | ~ 4 Yrs (3/30/2021) | A mono case footprint with variable heights: (Min. 280 (L) x 240 (W) x 190 (H), Max. 600 (L) x 400 (W) // 650 (D)), all stainless steel construction, buzzer alarm, communication to control system, and vacuum & gas flush installations. | Maple Warehouse | T3084 | D | T3084 |
| 15 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | With pneumatic pop-up stop | Maple Warehouse | | D | |
| 16 | 1 | 1 | Pattyn | CC-31 | 2021P105 | ~ 4 Yrs (3/30/2021) | Automatically folds the top case flaps and closes them with tape. Equipped with in- and outfeed guarding and multicolor warning light. Standard painted steel execution. Also includes buzzer alarm, communication to control system, flaps control section, and complete detection set tape. | Maple Warehouse | T3083 | D | T3083 |
| 17 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 1100mm and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 18 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA case metal detector that includes: reject head = 400mm H, 450mm W conveyor 400mm wide x 2400mm long, and stainless steel execution | Maple Warehouse | T3087 | D | T3087 |
| 19 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1400mm and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 20 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Foxjet Solo Series Marksman HHL, 0.5 - 1" print height, capable of printing barcodes, text & logos, and includes general black ink. | Maple Warehouse | T3113 | D | T3113 |
| 21 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° curve + Length 800mm + 90° curve, and includes 2x-drive packages (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 22 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Model 252 Print & Apply Labeler, and includes a swing arm tamper max 6" x 6" label | Maple Warehouse | T3113 | D | T3113 |
| 23 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 1500mm, and includes drive package (SEW, motor controls, fully wired) | Maple Warehouse | | D | |
| 24 | 1 | 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 2600mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 25 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Trappo Tipping Conveyor / Knockdown conveyor - driven belt conveyor Width 700mm, Length 2200mm | Maple Warehouse | | D | |
| 26 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Fischbein model 400NS sewing machine, with thread break detection and oil sensor package. | Maple Warehouse | | D | |
| 27 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 28 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Loma CW3 stainless steel loadcell, multispeed, color touch screen with ethernet and USB connection, warning light on foot, potential free contacts. Stainlessteel frame (non-painted parts, bearings, linear guides and chains are not in stainless steel). Includes buzzer alarm, and communication to control system. | Maple Warehouse | | D | |
| 29 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 500mm, Length 2000mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |

| 30 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA Metal Detector, no reject head =300mm high, 550mm wide, conveyor 600mm wide, 2700mm long, and stainless steel execution | Maple Warehouse | | D | |
| 31 | 1 | 3 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 2300mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 32 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006 | Maple Warehouse | | D | |
| 33 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Includes: set of box and bag conveyors, palletizer, pallet conveyors, layer card deposit station, safety cell, electrical & hmi and engineering | Maple Warehouse | | D | |
| 34 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Lantech S Series Automatic - 15 RPM - system includes pallet grip and load seeking clamp, (3) discrete wrap patterns for customer use, visual alarms and faults, alarm history, password protection for sensitive settings, a panel mounted beacon light and horn, and following conveyor sections: Infeed Conveyor - 5' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb maximum load capacity, and 30 FPM conveyor speed via motor starter. Wrap Zone Conveyor - 10' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb. maximum load capacity, and 30 FPM conveyor speed via motor starter. Exit Conveyor - 5' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb. maximum load capacity, and 30 FPM conveyor speed via motor starter. | Maple Warehouse | | D | |
| 35 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | CEFLEX-41 combination case erector and bag inserter and MTM60 hotmelt. Automatically inserts made-to-measure bags from a roll into boxes. Standard equipped with Nordson hot melt device, hot melt nearly finished, multicolor warning light and color touch panel for easy operation. Standard painted execution. Also includes buzzer alarm, communication to control system, double active seal bars, carton magazine nearly empty, long carton magazine, film roll trolley, reject mechanism, mechanical bag in box detection, and integrated air plunger. | Maple Warehouse | T3081 | D | T3081 |
| 36 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 1200mm, and includes 2x-drive packages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3110 | D | T3110 |
| 37 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 500mm, and includes drive packages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3110.1 | D | T3110.1 |
| 38 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° cruve + Length 1600mm lift gate, includes 2x-drive packages (SEW drive, motor controls, fully wired), and pneumatic pop-up stop. | Maple Warehouse | T3110.2 | D | T3110.2 |
| 39 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1200mm, and includes 2x-drive pPackages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3108 | D | T3108 |
| 40 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Functioning as a shaker conveyor, and includes: 2 drive packages (vibratory motors), Length 750mm (automatically shakes/settles product using a vibratory pan with two offset mounted motors with weights to adjust the amplitude/ frequency), and stainless steel execution. | Maple Warehouse | T3111 | D | T3111 |
| 41 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 600mm, including drive packages (Interoll EC5000 drive, motor controls, fully wired), and pneumatic pop-up stop | Maple Warehouse | T3108.1 | D | T3108.1 |
| 42 | 1 | 1 | Pattyn | CW-11 | 2021P108 | ~ 4 Yrs (3/30/2021) | Equipped with a multicolor warning light, stainless steel frame, reject mechanism, buzzer alarm, and communication to control system | Maple Warehouse | | D | |
| 43 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° curve + Length 500mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3079.1 | D | T3079.1 |
| 44 | 1 | 1 | Pattyn | DS-21-HE | 2021P109 | ~ 4 Yrs (3/30/2021) | A mono case footprint with variable heights: (Min. 280 (L) x 240 (W) x 190 (H), Max. 600 (L) x 400 (W) // 650 (D)), all stainless steel construction, buzzer alarm, communication to control system, and vacuum & gas flush installations. | Maple Warehouse | T3080 | D | T3080 |
| 45 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL9006, Width 400mm, Length 1600mm, including drive packages (SEW drive, motor controls, fully wired), pneumatic pop-up stop, and safety fencing (length 1700mm + door) | Maple Warehouse | T3079 | D | T3079 |
| 46 | 1 | 1 | Pattyn | CC-31 | 2021P110 | ~ 4 Yrs (3/30/2021) | Automatically folds the top case flaps and closes them with tape. Equipped with in- and outfeed guarding and multicolor warning light. Standard painted steel execution. Also includes buzzer alarm, communication to control system, flaps control section, and complete detection set tape. | Maple Warehouse | T3078 | D | T3078 |
| 47 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1100mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3079.2 | D | T3079.2 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 48 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA case metal detector that includes: reject head = 400mm H, 450mm W conveyor 400mm wide x 2400mm long, and stainless steel execution | Maple Warehouse | T3082 T3111.1 | D | T3082 T3111.1 |
| 49 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1000mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3108.2 | D | T3108.2 |
| 50 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Foxlet Solo Series Marksman HHI - 0.5 - 1" print height, capable of printing barcodes, text & logos, and includes general black ink | Maple Warehouse | T3114 | D | T3114 |
| 51 | 1 | 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Model 252 and includes a swing arm tamper, max 6" x 6" label | Maple Warehouse | T3114 | D | T3114 |
| 111 | 1 | 1 | Beeler | | | | Includes equipment items listed below (Item # 112 thru 140) | Terra Bella | | C | |
| 141 | 1 | 1 | Beeler | | | | Includes equipment items listed below (Item # 142 thru 164) | Terra Bella | | C | |
| 145 | 1 | | Beeler | | | | (5) FLOAT TANKS FT-60-EXT | Panoche | T1214 T1215 T1216 T1217 T1218 | C | T1214 T1215 T1216 T1217 T1218 |
| 174 | 1 | 4 | Industrial Design & Construction | 4024-04811 | | ~ 5 Yrs | GSI 48 Ft Dia x 11-ring high silos, with (2) - 40 Hp. 1750rpm double inlet GSI centrifugal fans with 480 volt motors w/ controls, downstream natural gas heater, and 6ft wide catwalks. | Mt. Whitney | | I | |
| 178 | 1 | 1 | Beeler | | | ~ 4 Yrs (2021) | Includes: palletizer cell, and pallet conveyors. | Maple Warehouse | | D | |
| 181 | 1 | 1 | Gardner Denver | L7-11D | D202610 | | | Mt. Whitney | T1246 | D | T1246 |
| 184 | 1 | 24 | Cablevey Conveyor | Various | Various | | | Mt. Whitney | No Tag | N | No Tag |
| 186 | 1 | 1 | Magnetic Products, Inc | 150MM | | | | Maple Warehouse | No Tag | D | No Tag |
| 187 | 1 | 1 | Magnetic Products, Inc | 100MM | | | | Maple Warehouse | No Tag | D | No Tag |
| 188 | 1 | 2 | Syntron Electromagnetic | BF-3S | | | | Maple Warehouse | No Tag | D | No Tag |
| 192 | 1 | 1 | LMC | 8420D | 210000126 | ~ 4 Yrs (2021) | 84" wide and 20 screens. | Panoche | T1047 | J | T1047 |
| 193 | 1 | 1 | LMC | 7208P | 210000128 | ~ 4 Yrs (2021) | 72" wide and 8 screens. | Panoche | T1049 | J | T1049 |
| 194 | 1 | 1 | LMC | 8410P | 210000124 | ~ 4 Yrs (2021) | 84" wide and 10 screens. | Panoche | T1048 | J | T1048 |
| 196 | 1 | 2 | LMC | 3540 | 210000131 210000129 | ~ 4 Yrs (2021) | Includes bottom portions that consists of S/N's 2100000130 and 210000129 | Panoche | T1050 T1051 T1053 T1052 | M | T1050 T1051 T1053 T1052 |
| 199 | 1 | 11 | Eaton | | | | | Maple Warehouse | | K | |
| 200 | 1 | 87 | Allen-Bradley | Centerline 2100 | | | Largely consists of AB PowerFlex 525 VFD's | Maple Warehouse | | K | |
| 201 | 1 | 47 | Allen-Bradley | Centerline 2101 | | | Largely consists of AB PowerFlex 525 VFD's | Maple Warehouse | | K | |
| 202 | 1 | 2 | Deamco | BEM-12P-T-X | 24384BEM-01 24384BEM-02 | | "S" shape configuration. | Mt. Whitney | | M | |
| 203 | 1 | 6 | Deamco | BEM-18P-T-X | 24384BEM-03 24384BEM-04 24384BEM-05 24384BEM-06 24384BEM-07 24384BEM-08 | | "C" shape configuration. | Mt. Whitney | | M | |
| 204 | 1 | 16 | Eaton | V48M28T7516 | Various | | 75 kVA, 3-phase, 60 Hz, and 480V delta to 208Y/120V | Kamm Plant | | K | |
| 205 | 1 | 4 | Eaton | V48M28T4516 | Various | | 45 kVA, 3-phase, 60 Hz, and 480V delta to 208Y/120V | Kamm Plant | | K | |
| 206 | 1 | 4 | Eaton | | Various | | Includes (3) 20-amp, (3) 30-amp, and (3) 100-amp circuit breakers, and (1) 400-amp main breaker. | Maple Warehouse | | K | |
| 207 | 1 | 7 | Eaton | | Various | | Includes (6) 20-amp circuit breakers, and (1) 200-amp main breaker. | Maple Warehouse | | K | |
| 208 | 1 | 3 | Eaton | | Various | | Includes (1) 60-amp and (1) 20-amp circuit breakers, and (1) 100-amp main breaker. | Maple Warehouse | | K | |
| 209 | 1 | 4 | Eaton | | Various | | Includes (1) 100-amp, (1) 50-amp, (1) 30-amp, and (1) 20-amp circuit breakers, and (1) 200-amp main breaker. | Maple Warehouse | | K | |
| 210 | 1 | 12 | Eaton | Pow-R-Way III | Various | | 4000 amp Pow-R-Way III entry point flange | Maple Warehouse | | K | |
| 211 | 1 | 28 | Eaton | | Various | | Includes (6) 20-amp circuit breakers, and (1) 200-amp main breaker. | Kamm Plant | | K | |

<u>SCHEDULE 2.1.1(b)</u>

**LOT 2 ASSETS**

*[Attached]*

####

| Item # | Sale Lots | Qty | Supplier or Mfg'r | Model | Serial Number | Age (Date MFG) | Original Equipment Detail | Site Location | Asset No. | Tag Lot No. | Asset Tag No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 2 | Steel Structures | | | ~5 Yrs (3/23/2020) | 12'0" x 12'0" x 22'0"<br>Nominal Bin Capacity 40,000 lbs (inshell pistachios)<br>Nominal top deck size 12' wide x 26' long<br>Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 2 | 2 | 1 | Steel Structures | | | ~5 Yrs (3/23/2020) | 8'0" x 8'0" x 17'0"<br>Nominal Bin Capacity 12,800 lbs (inshell pistachios)<br>Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 3 | 2 | 6 | Steel Structures | | | ~5 Yrs (3/23/2020) | 12'0" x 12'0" x 22'0"<br>Nominal Bin Capacity 40,000 lbs (inshell pistachios)<br>Nominal top deck size 12' wide x 82' long<br>Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 4 | 2 | 3 | Steel Structures | | | ~5 Yrs (3/23/2020) | 12'0" x 12'0" x 22'0"<br>Nominal Bin Capacity 50,000 lbs (kernel pistachios)<br>Nominal top deck size 12' wide x 40'-6" long<br>Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 5 | 2 | 1 | Steel Structures | | | ~5 Yrs (3/23/2020) | 8'0" x 8'0" x 17'0"<br>Includes 36" x 18" wide crossover to ladder for access to top of #5 bins<br>Nominal Bin Capacity 16,000 lbs (kernel pistachios)<br>Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 6 | 2 | 3 | Steel Structures | | | ~5 Yrs (3/23/2020) | 12'0" x 12'0" x 22'0"<br>Nominal top deck size 12' wide x 39' – 6" long<br>Nominal Bin Capacity 40,000 lbs (inshell pistachios)<br>Bin and Legs Constructed of 304 Stainless Steel | Vendor's Site (Steel Stur.) | Unassigned | A | Unassigned |
| 52 | 2 | 1 | Pattyn | | | ~4 Yrs (3/30/2021) | Includes: palletizer cell, pallet conveyors, and engineering | Maple Warehouse | T3002<br>T3002a<br>T3002b<br>T3002c | D | T3002<br>T3002a<br>T3002b<br>T3002c |
| 53 | 2 | 1 | Wolverine Proctor | SCF 1.5 | | 4 Yrs (12/14/2020) | 87' (L) X 14' 10" (W) conveyorized and gas fired oven, 200 degree F rated temperature with (3) drying and (1) cooling zones. | Maple Warehouse | See Oven Detail Schd | E | See Oven Detail Schd |
| 54 | 2 | 1 | Beeler | | | | Includes equipment items listed below (Item # 55 thru 83) | Terra Bella | See Below | B | See Below |
| 55 | 2 | | Beeler | | | | (1) BI RCVG PIT #1 NORTH, 8X10 HI-CAP | Terra Bella | T1153 | B | T1153 |
| 56 | 2 | | Beeler | | | | (1) BI METERING CONV. # 1 NORTH  SBSR 3618.5 W/ 3/4" CLEAT | | | B | |
| 57 | 2 | | Beeler | | | | (1) BI RCVG PIT #1 SOUTH, 8X9 HI-CAP | Terra Bella | T1154 | B | T1154 |
| 58 | 2 | | Beeler | | | | (1) BI METERING CONV. # 1 SOUTH  SBSR 3618.5 W/ 3/4" CLEAT | | | B | |
| 59 | 2 | | Beeler | | | | (1) BI PIT COLLECTION CONV.  SBSR 3635.5 | | | B | |
| 60 | 2 | | Beeler | | | | (1) BI PRECLEANER FEED CONVEYOR SBSR 4860 W/3" CLEAT | Terra Bella | T1270 | B | T1270 |
| 61 | 2 | | Beeler | | | | (1) BI/DCI PRIMARY ASPIRATOR 4810P | Terra Bella | T1146 | B | T1146 |
| 62 | 2 | | Beeler | | | | (1) DCI ASPIRATOR CYCLONE  HE60 | Terra Bella | T1144 | B | T1144 |
| 63 | 2 | | Beeler | | | | (1) DCI AIRLOCK  FT24 WM | | | B | |
| 64 | 2 | | Beeler | | | | (1) DCI/FE  SYSTEM FAN 5 1/2 BCS 40HP | | | B | |
| 65 | 2 | | Beeler | | | | (1) BI PRECLEANER BI 60XL | Terra Bella | T1191 | B | T1191 |
| 66 | 2 | | Beeler | | | | (1) BI PRECLEANER SUPER STRUCTURE PLATFORM BI STRUCTURE/ACCESS | | | B | |
| 67 | 2 | | Beeler | | | | (1) BI PRECLEANER DISCH. CONV. SBSR 3614 | Terra Bella | T1266 | B | T1266 |
| 68 | 2 | | Beeler | | | | (1) BI PREHULLER MODEL 10 | Terra Bella | T1260 | B | T1260 |
| 69 | 2 | | Beeler | | | | (1) BI ASPIRATOR FEED CONVEYOR SBSR 6008 | | | B | |
| 70 | 2 | | Beeler | | | | (1) BI/DCI DISCHARGE ASPIRATOR 6012P | Terra Bella | T1155 | B | T1155 |
| 71 | 2 | | Beeler | | | | (1) DCI ASPIRATOR CYCLONE HE 84 | | | B | |
| 72 | 2 | | Beeler | | | | (1) DCI AIRLOCK FT24 WM | | | B | |
| 73 | 2 | | Beeler | | | | (1) DCI/FE System Fan 5 1/2 BCS 50HP | Terra Bella | T1071 | B | T1071 |
| 74 | 2 | | Beeler | | | | (1) BI HULLER FEED CONVEYOR TI 36148 | | | B | |
| 75 | 2 | | Beeler | | | | (1) BI TRASH CONVEYOR #2 SBRR 2433 | | | B | |
| 76 | 2 | | Beeler | | | | (1) BI TRASH CONVEYOR, SCALE FEED DRIVE & CLUTCH SBRR 2410 | | | B | |
| 77 | 2 | | Beeler | | | | (1) BI WEIGH HOPPER, TRASH BI | Terra Bella | T1189 | B | T1189 |
| 78 | 2 | | Beeler | | | | (1) BI TRASH CONVEYOR #3 SBRR 2437 | | | B | |
| 79 | 2 | | Beeler | | | | (1) BI HULLS CROSS CONVEYOR SBRR 2454 | | | B | |
| 80 | 2 | | Beeler | | | | (1) BI TRASH COLLECTION CONVEYOR #8 SBRR 24132 | | | B | |
| 81 | 2 | | Beeler | | | | (1) Sample Conveyors #1 SBRR 1214 | | | B | |
| 82 | 2 | | Beeler | | | | (1) Sample Conveyors #2 SBRR 1224 | | | B | |
| 83 | 2 | | Beeler | | | | (1) Sample Diverter Pneumatic Y-Gate | | | B | |
| 84 | 2 | 1 | Beeler | | | | Includes equipment items listed below (Item # 85 thru 108) | Terra Bella | See Below | B | See Below |
| 85 | 2 | | Beeler | | | | (1) HULLER DISTRIBUTION AUGER 43' | | | B | |
| 86 | 2 | | Beeler | | | | (1) HULLER/AUGER SUPPORT STRUCTURE ACCESS STAIRS AND CATWALKS | | | B | |

| 87 | 2 | | Beeler | | | (1) WATER MANIFOLD  LOT | | | B | |
| 88 | 2 | | Beeler | | | (6) FLOAT TANKS FT-60-EXT | Terra Bella | T1147 T1148 T1149 T1150 T1151 T1152 | B | T1147 T1148 T1149 T1150 T1151 T1152 |
| 89 | 2 | | Beeler | | | (3) SINKER COLL CONVEYOR REX 2464 | Terra Bella | T1264 | B | T1264 |
| 90 | 2 | | Beeler | | | (1) SINKER ASPIRATOR #1 488 OPT B ALL SS | Terra Bella | T1157 | B | T1157 |
| 91 | 2 | | Beeler | | | (1) DEWATERING SHAKER NF5414 | | | B | |
| 92 | 2 | | Beeler | | | (1) ASPIRATOR #2 606 OPT A ALL SS | | | B | |
| 93 | 2 | | Beeler | | | (1) DRYER FEED CONVEYOR REX 2478 W/ FLIGHTS | | | B | |
| 94 | 2 | | Beeler | | | (1) FLOATER COLL. CONVEYOR REX 1852.5 | | | B | |
| 95 | 2 | | Beeler | | | (1) CYCLONE HP56 | Terra Bella | T1145 | B | T1145 |
| 96 | 2 | | Beeler | | | (1) AIRLOCK FT-16 | | | B | |
| 97 | 2 | | Beeler | | | (1) FAN 5 1/2 BCS 50 HP | Terra Bella | T1073 | B | T1073 |
| 98 | 2 | | Beeler | | | (1) DUCT SYSTEM LOT | | | B | |
| 99 | 2 | | Beeler | | | (1) MISC STEEL, PANNING & SPOUTING LOT | | | B | |
| 100 | 2 | | Beeler | | | (1) DECK FEED ASPIRATOR MC487 TANDEM | | | B | |
| 101 | 2 | | Beeler | | | (1) FLOATER SCALP DECK A6008 | Terra Bella | T1262 | B | T1262 |
| 102 | 2 | | Beeler | | | (1) FLOATER INCLINE AUGER. 14" X 31'-6" | | | B | |
| 103 | 2 | | Beeler | | | (1) FLOATER DRYER FEED CONVEYOR (NEEDS LEGS) REX 2460.5W/ FLIGHTS.X | | | B | |
| 104 | 2 | | Beeler | | | (1) TRASH COLL. CONV. #3  SBRR 2479.5 | | | B | |
| 105 | 2 | | Beeler | | | (1) TRASH COLL. CONV. #4 1819.5 REVERSIBLE | | | B | |
| 106 | 2 | | Beeler | | | (1) MISC STEEL, PANNING & SPOUTING  LOT | | | B | |
| 107 | 2 | | Beeler | | | (1) SAMPLE DRYER 40 CELL | Terra Bella | T1142 | B | T1142 |
| 108 | 2 | | Beeler | | | (1) Silo Feed Conveyor | | | B | |
| 109 | 2 | 6 | Magnusson | NF-24 | ~5 Yrs (12/17/ 2019) | HULLER | Terra Bella | T1075 T1076 T1077 T1078 T1079 T1080 | B | T1075 T1076 T1077 T1078 T1079 T1080 |
| 110 | 2 | 6 | Magnusson | LHR | ~5 Yrs (12/17/ 2019) | LOOSE HULL REMOVER | Terra Bella | T1081 T1082 T1083 T1084 T1085 T1086 | B | T1081 T1082 T1083 T1084 T1085 T1086 |
| 112 | 2 | | Beeler | | | (1) BI RCVG PIT #1 NORTH, 8X10 HI-CAP | | | B | |
| 113 | 2 | | Beeler | | | (1) BI METERING CONV. # 1 NORTH  SBSR 3618.5 W/ 3/4" CLEAT | | | B | |
| 114 | 2 | | Beeler | | | (1) BI RCVG PIT #1 SOUTH, 8X9 HI-CAP | | | B | |
| 115 | 2 | | Beeler | | | (1) BI METERING CONV. # 1 SOUTH  SBSR 3618.5 W/ 3/4" CLEAT | | | B | |
| 116 | 2 | | Beeler | | | (1) BI PIT COLLECTION CONV.  SBSR 3635.5 | | | B | |
| 117 | 2 | | Beeler | | | (1) BI PRECLEANER FEED CONVEYOR  SBSR 4860 W/3" CLEAT | | | B | |
| 118 | 2 | | Beeler | | | (1) BI/DCI PRIMARY ASPIRATOR  4810P | | | B | |
| 119 | 2 | | Beeler | | | (1) DCI ASPIRATOR CYCLONE  HE60 | | | B | |
| 120 | 2 | | Beeler | | | (1) DCI AIRLOCK  FT24 WM | | | B | |
| 121 | 2 | | Beeler | | | (1) DCI/FE  SYSTEM FAN 5 1/2 BCS 40HP | | | B | |
| 122 | 2 | | Beeler | | | (1) BI PRECLEANER BI 60XL | | | B | |
| 123 | 2 | | Beeler | | | (1) BI PRECLEANER SUPER STRUCTURE PLATFORM BI STRUCTURE/ACCESS | | | B | |
| 124 | 2 | | Beeler | | | (1) BI PRECLEANER DISCH. CONV. SBSR 3614 | | | B | |
| 125 | 2 | | Beeler | | | (1) BI PREHULLER MODEL 10 | | | B | |
| 126 | 2 | | Beeler | | | (1) BI ASPIRATOR FEED CONVEYOR SBSR 6008 | | | B | |
| 127 | 2 | | Beeler | | | (1) BI/DCI DISCHARGE ASPIRATOR 6012P | | | B | |
| 128 | 2 | | Beeler | | | (1) DCI ASPIRATOR CYCLONE HE 84 | | | B | |
| 129 | 2 | | Beeler | | | (1) DCI AIRLOCK FT24 WM | | | B | |
| 130 | 2 | | Beeler | | | (1) DCI/FE System Fan 5 1/2 BCS 50HP | | | B | |
| 131 | 2 | | Beeler | | | (1) BI HULLER FEED CONVEYOR TI 36148 | | | B | |
| 132 | 2 | | Beeler | | | (1) BI TRASH CONVEYOR #2 SBRR 2433 | | | B | |
| 133 | 2 | | Beeler | | | (1) BI TRASH CONVEYOR, SCALE FEED DRIVE & CLUTCH SBRR 2410 | | | B | |
| 134 | 2 | | Beeler | | | (1) BI WEIGH HOPPER, TRASH BI | | | B | |
| 135 | 2 | | Beeler | | | (1) BI TRASH CONVEYOR #3 SBRR 2437 | | | B | |
| 136 | 2 | | Beeler | | | (1) BI HULLS CROSS CONVEYOR SBRR 2454 | | | B | |
| 137 | 2 | | Beeler | | | (1) BI TRASH COLLECTION CONVEYOR #B SBRR 24132 | | | B | |
| 138 | 2 | | Beeler | | | (1) Sample Conveyors #1 SBRR 1214 | | | B | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 139 | 2 | | Beeler | | | | (1) Sample Conveyors #2 SBRR 1224 | | | B | |
| 140 | 2 | | Beeler | | | | (1) Sample Diverter Pneumatic Y-Gate | | | B | |
| 142 | 2 | | Beeler | | | | (1) HULLER DISTRIBUTION AUGER 43' | | | B | |
| 143 | 2 | | Beeler | | | | (1) HULLER/AUGER SUPPORT STRUCTURE ACCESS STAIRS AND CATWALKS | | | B | |
| 144 | 2 | | Beeler | | | | (1) WATER MANIFOLD LOT | | | B | |
| 146 | 2 | | Beeler | | | | (3) SINKER COLL CONVEYOR REX 2464 | | | B | |
| 147 | 2 | | Beeler | | | | (1) SINKER ASPIRATOR #1 488 OPT B ALL SS | | | B | |
| 148 | 2 | | Beeler | | | | (1) DEWATERING SHAKER NF5414 | | | B | |
| 149 | 2 | | Beeler | | | | (1) ASPIRATOR #2 606 OPT A ALL SS | | | B | |
| 150 | 2 | | Beeler | | | | (1) DRYER FEED CONVEYOR REX 2478 W/ FLIGHTS | | | B | |
| 151 | 2 | | Beeler | | | | (1) FLOATER COLL. CONVEYOR REX 1852.5 | | | B | |
| 152 | 2 | | Beeler | | | | (1) CYCLONE HP56 | | | B | |
| 153 | 2 | | Beeler | | | | (1) AIRLOCK FT-16 | | | B | |
| 154 | 2 | | Beeler | | | | (1) FAN S 1/2 BCS 50 HP | | | B | |
| 155 | 2 | | Beeler | | | | (1) DUCT SYSTEM LOT | | | B | |
| 156 | 2 | | Beeler | | | | (1) MISC STEEL, PANNING & SPOUTING LOT | | | B | |
| 157 | 2 | | Beeler | | | | (1) DECK FEED ASPIRATOR MC487 TANDEM | | | B | |
| 158 | 2 | | Beeler | | | | (1) FLOATER SCALP DECK A6008 | | | B | |
| 159 | 2 | | Beeler | | | | (1) FLOATER INCLINE AUGER. 14" X 31'-6" | | | B | |
| 160 | 2 | | Beeler | | | | (1) FLOATER DRYER FEED CONVEYOR (NEEDS LEGS) REX 2460.5W/ FLIGHTS X | | | B | |
| 161 | 2 | | Beeler | | | | (1) TRASH COLL. CONV. #3 SBRR 2479.5 | | | B | |
| 162 | 2 | | Beeler | | | | (1) TRASH COLL. CONV. #4 1819.5 REVERSIBLE | | | B | |
| 163 | 2 | | Beeler | | | | (1) MISC STEEL, PANNING & SPOUTING LOT | | | B | |
| 164 | 2 | | Beeler | | | | (1) Silo Feed Conveyor | | | B | |
| 165 | 2 | 6 | Magnusson | NF-24 | | ~ 5 Yrs (12/17/ 2019) | HULLER | Mt. Whitney | T1162 T1163 T1164 T1165 T1166 T1167 | B | T1162 T1163 T1164 T1165 T1166 T1167 |
| 166 | 2 | 4 | Magnusson | LHR | | ~ 5 Yrs (12/17/ 2019) | LOOSE HULL REMOVER | Mt. Whitney | T1170 T1171 T1172 T1173 | B | T1170 T1171 T1172 T1173 |
| 167 | 2 | 1 | Beeler | | | ~ 5 Yrs | (3) sorter machines, triple stack support structure, service platforms, access stairwells, surge hoppers and feeders. | Mt. Whitney | T3051 T3052 | F | T3051 T3052 |
| 171 | 2 | 1 | Multiscan Technologies | S60SP | 3266 | ~ 4 Yrs (2021) | Scan capabilities include external quality, color, size, shape and open/close. | Maple Warehouse | T3026 | H | T3026 |
| 172 | 2 | 1 | Multiscan Technologies | S60SP | 3133 | ~ 4 Yrs (2021) | Scan capabilities include external quality, color, size, shape and open/close. | Maple Warehouse | T3027 | H | T3027 |
| 173 | 2 | 1 | Multiscan Technologies | S60SP | 3143 | ~ 4 Yrs (2021) | Scan capabilities include external quality, color, size, shape and open/close. | Maple Warehouse | T3028 | H | T3028 |
| 175 | 2 | 4 | LMC | 7210P | 190000575 190000576 190000577 190000578 | ~ 4 Yrs (2021) | 72" wide and 10 screens. | Kamm Plant | T1058 T1059 T1056 T1057 | J | T1058 T1059 T1056 T1057 |
| 176 | 2 | 1 | Satake | RNEZX-7500 | S41900158 | ~ 4 Yrs (2021) | Includes (3) Evolution 8 and (1) Evolution 4 sorters, and associated spare parts. | Maple Warehouse | T3092 | S | T3092 |
| 177 | 2 | 1 | Satake | RNEZX-7500 | S41900159 | ~ 4 Yrs (2021) | Includes (2) Evolution 8 and (1) Evolution 8 II MIR sorters, and associated spare parts. | Maple Warehouse | T3093 | S | T3093 |
| 179 | 2 | 1 | Donaldson Torit | 312-LP-12 | 13847250-L4-1 | ~ 5 Yrs | Includes baghouse, fan (50,000 CFM), FT16 airlock and Boss Products explosion protection equipment (no-return isolation valve and high-speed abort gate), and 5-piece auger assembly. | Mt. Whitney | | T | |
| 180 | 2 | 1 | Donaldson Torit | 594-LP-12 | 14615277-L1-1 | ~ 5 Yrs | Includes baghouse, fan (90,000 CFM), FT24 airlock and Boss Products explosion protection equipment (no-return isolation valve and high-speed abort gate), 40 yrd bin-house and associated auger screws. | Panoche | | T | |
| 182 | 2 | 2 | Magnetic Products, Inc | DSH-1212 | 20900-029 20900-230 | | | Mt. Whitney | No Tag | P | No Tag |
| 183 | 2 | 2 | Magnetic Products, Inc | DSH-1218 | 20900-098 20900-079 | | | Mt. Whitney | No Tag | P | No Tag |
| 185 | 2 | 1 | Express Scale | CM-780-GV V8-10 | 122025 122023 122024 122026 | ~ 5 Yrs (2020) | Includes (2) triplex and (1) duplex system and model V8-10 belt conveyor | Maple Warehouse | T3043 T3042 T3014 T3044 | D | T3043 T3042 T3014 T3044 |
| 189 | 2 | 1 | South-Tek Systems | 490S-2P5 | 64208 | | | Mt. Whitney | T3115 | T | T3115 |
| 190 | 2 | 3 | Beeler | Custom | | | Each sheller is equipped with (8) hoppers and (8) individual sheller mechanisms. | Mt. Whitney | No Tag | F | No Tag |

| 191 | 2 | 1 | LMC | 7208P | 210000127 | ~ 4 Yrs (2021) | 72" wide and 8 screens. | Mt. Whitney | T1064 | J | T1064 |
| 195 | 2 | 1 | LMC | 8410P | 210000125 | ~ 4 Yrs (2021) | 84" wide and 10 screens. | Terra Bella | T1069 | J | T1069 |
| 197 | 2 | 1 | Cassel Inspection | TBD | | | Possible model is a XD35-L1-Bulk (former XBD20+BF) | Maple Warehouse | | D | |
| 198 | 2 | 4 | Custom | Unknown | | | Stainless steel construction and bin hopper measures approximately 58" X 58" square X 42" deep with a 24" tappered bottom | Mt. Whitney | | L | |

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

<u>SCHEDULE 2.1.2(m)</u>

**ADDITIONAL EXCLUDED ASSETS**

*[Attached]*

####

Docusign Envelope ID: DEE8A71F-3F59-4450-9B81-32690EE82712

**Terra Bella Plant Sale**
**Excluded Assets Schedule**

| | Excluded Asset | Description | Quantity |
|---|---|---|---|
| 1 | Diesel Air Pressure Generators | M171 Kaeser Air Compressor, see VINs below | 3 |
| 2 | 2019 Chevy Silverado 1500 | 3GCPWCED7KG209180 | 1 |
| 3 | 2019 Chevy Silverado 1500 | 3GCUYDED3KG298202 | 1 |
| 4 | 2019 Chevy Tahoe | 1GNSKAKC1KR237070 | 1 |
| 5 | 2019 Ford F150 | 1FTEW1EP4KKF29281 | 1 |
| 6 | Macrobin Plastic Storage Bins | 2k lbs capacity, (quantity approximate) | 5,000 |
| 7 | Dissolved Air Flotation System | Leased from World Water Works, Inc. | 1 |
| 8 | Toyota Forklifts and Accessories | See serial numbers below | 17 |
| 9 | 2-MW Gas Generator Systems | Units and switch gear located at Maple Ave | 3 |
| 10 | All property located at Terra Bella and owned by Persons other than Touchstone | Various | N/A |
| 11 | All property located at Terra Bella and leased or rented by Touchstone | Various | N/A |

**M171 Kaesar Air Compressor VINs**

WKA0F3001N8761375
WKA0F3001N8784908
WKA0F3001N8787299

**Toyota Forklift Serial Numbers**

MODEL #8FBCU20 SERIAL #85661
MODEL #8FBCU20 SERIAL #85604
MODEL #8FBCU20 SERIAL #85610
MODEL #8FBCU20 SERIAL #85652
MODEL #8FBCU20 SERIAL #85720
MODEL #8FBCU20 SERIAL #85721
MODEL #8FBCU25 SERIAL #85722
MODEL #8FBCU25 SERIAL #85730
MODEL #05-8FBM30T SERIAL #10081
MODEL #05-8FBM30T SERIAL #10082
MODEL #8FBE20U SERIAL #10445
MODEL #8FGU25 SERIAL #74878
MODEL #8FGU25 SERIAL #74899
MODEL #8FGU25 SERIAL #16486
MODEL #7FBEU20 SERIAL #19454
MODEL #7FBEU20 SERIAL #19457
MODEL # 8FGU25 SERIAL #30763

<u>SCHEDULE 5.1.2</u>

**BROKERS AND FINDERS**

Cascadia Capital, LLC, in its capacity as marketing agent for the Receiver

###

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This First Amendment to Purchase and Sale Agreement (this "**Amendment**") is made as of April 17, 2025, by and between David P. Stapleton ("**Seller**"), solely in his capacity as receiver (the "**Receiver**") of the assets and operations of Touchstone Pistachio Company, LLC, a California limited liability company ("**Touchstone**") in the matter captioned *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (Case No. 1:24-cv-01105-KES-SAB) (the "**Action**") pending in the United States District Court for the Eastern District of California (the "**Court**"), and Zamora Pistachio, LLC, a California limited liability company ("**Buyer**", and with Seller, each a "**Party**" and together the "**Parties**").  This Amendment is made with reference to the following recitals:

### RECITALS

WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement, dated February 28, 2025 (the "**Agreement**"), pursuant to which Seller agreed to sell and Buyer agreed to purchase certain real and personal property more particularly described in the Agreement (the "**Acquired Assets**"), subject to certain bidding and auction procedures (the "**Bidding Procedures**"), to be approved by a Court order (the "**Bid Procedures Order**") and the potential overbid process and modification of the Agreement in connection therewith;

WHEREAS, on March 18, 2025, the Court entered the Bid Procedures Order approving, among other things, the Bidding Procedures;

WHEREAS, in accordance with the terms of the Bid Procedures Order and Bidding Procedures, an auction (the "**Auction**") for Lot 2 (as defined in the Agreement) was held on April 17, 2025;

WHEREAS, at the conclusion of the Auction, Seller designated Buyer as the Successful Bidder (as defined in the Agreement) for Lot 2 as a result of the bids placed by Buyer during the Auction, during which Buyer increased the purchase price for Lot 2 of the Acquired Assets; and

WHEREAS**,** Seller and Purchaser wish to amend the Agreement on the terms and conditions hereinafter set forth to reflect the updated purchase price and to address other items the Parties identified between execution of the Agreement and completion of the Auction.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

### AMENDMENT

1.  <u>Amendment to Purchase Price</u>.  The Purchase Price to be paid by Buyer in cash set forth in Section 3.1 of the Agreement is hereby increased from $30,500,000.00 to $31,757,000.00, with the entirety of that $1,257,000.00 increase allocated to Lot 2. Accordingly, the Purchase Price shall be allocated among the Acquired Assets as follows: (i) $25,250,000.00 for Lot 1 and (ii) $6,507,500.00 for Lot 2.

2.  <u>Allocation of Lot 1 Purchase Price</u>.  The Buyer shall provide an allocation of the $25,250,000.00 Purchase Price for Lot 1 between (i) the Operating Personal Property and Lot 1 Additional Equipment, collectively, and (ii) the Real Property to the Title Company no later than two (2) Business Days prior to the Closing Date in a manner acceptable to the Title Company and the Receiver.

3.  <u>Amendment of Section 3.3.1</u>.  Section 3.3.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

3.3.1  No later than one (1) Business Day prior to the Closing Date, Seller and Buyer shall agree on a written statement, reasonably satisfactory to both Seller and Buyer, showing application of the Good Faith Deposit, or the applicable portion thereof pursuant to <u>Section **Error! Reference source not found.**</u>, against the Purchase Price, the allocation of the closing costs pursuant to <u>Section **Error! Reference source not found.**</u> and other prorations and closing adjustments contemplated in this Agreement, all consistent with the terms and conditions of this Agreement, the Bid Procedures Order and the Sale Approval Order (the "**Closing Statement**").

4.  <u>Additional Seller Representations</u>.  In addition to the representations and warranties of Seller set forth in Section 5.1 of the Agreement, Seller represents and warrants to Buyer as follows:

i.  <u>Water Heater Compliance</u>.  To Seller's actual knowledge, the water heaters located on the Real Property comply with the requirements of California Health & Safety Code Section 19211, to the extent applicable.

ii.  <u>Plumbing Fixtures</u>.  To Seller's actual knowledge, the plumbing fixtures located on the Real Property comply with California Civil Code Section 1101.5(a) and (e), to the extent applicable.

5.  <u>Replacement of Schedule 2.1.1(a)(vi)</u>.  Schedule 2.1.1(a)(vi) to the Agreement is hereby replaced with the version attached hereto, which has been modified solely (i) to reflect the full list of such personal property (and in particular items 112 through 140 and 142 through 164, which were included only by reference in the original version) and (ii) to correct and update the listed "Site Location" and item numbers for two items of such personal property (specifically, items 165 and 166 in the attached version, which were items 109 and 110, respectively, in the original, now reflect the correct "Site Location" of "Mt. Whitney," which was erroneously listed as "Terra Bella" in the original version).

6.  <u>Delivery of Assets</u>.  The Acquired Assets shall be delivered to Buyer in their "as is, where is" condition immediately upon Closing, including possession of the Real Property.  Buyer shall have immediate access, upon reasonable notice to Seller and during normal business hours, to the locations outside of the Real Property (the "**Offsite Locations**") where certain Acquired Assets are located, solely for the purpose of removing such Acquired Assets from the Offsite Locations.  Seller shall have the right to have a representative accompany Buyer or its employees or contractors at the Offsite Locations.  Buyer hereby indemnifies and agrees to defend and hold harmless the Seller Parties from and against any and all Claims incurred in connection with or

arising out of Buyer's entry onto the Offsite Locations or removal of such Acquired Assets therefrom, including all damage caused by the removal of such Acquired Assets, by Buyer or any of Buyer's partners, employees, licensees, contractors, agents, consultants, invitees, directors, officers, managers, attorneys, brokers, and representatives, except to the extent caused by Seller or the Seller Parties' gross negligence or willful misconduct. The provisions of this Section shall survive the termination of the Agreement or Closing indefinitely.

7. <u>Miscellaneous</u>

i. <u>Relationship to Agreement; Limited Effect</u>. Except as expressly modified herein, all terms and conditions set forth in the Agreement remain unchanged and in full force and effect. Any conflict between the Agreement and this Amendment shall be resolved in favor of this Amendment.

ii. <u>References Generally</u>. References in the Agreement to "this Agreement" (and indirect references such as "hereunder," "hereby," "herein," and "hereof") shall be deemed to be references to the Agreement as amended hereby.

iii. <u>Binding Effect</u>. This Amendment shall be binding on and inure to the benefit of the Parties and their respective successors and assigns, to the extent permitted by the Agreement.

iv. <u>Definitions; Interpretation</u>. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement, as amended by this Amendment. The rules of construction set forth in the Agreement shall apply to this Amendment.

v. <u>Governing Law</u>. This Amendment shall be construed according to the internal laws of the State of California.

vi. <u>Counterparts</u>. This Amendment may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the Parties hereto, notwithstanding that all the Parties are not signatory to the original or to the same counterpart. Any such counterpart shall be admissible into evidence as an original hereof against the Person who executed it.

vii. <u>Severability</u>. In case any one or more of the provisions contained in this Amendment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Amendment shall be construed as if such provisions had not been contained herein.

viii. <u>Electronic Signatures</u>. This Amendment may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. For these purposes, "electronic signature" shall mean electronically scanned and transmitted versions (e.g., via pdf file) of an original signature, signatures electronically inserted and verified by software such as DocuSign and Adobe Sign, or faxed versions of an original signature.

*(Signature page follows)*

DATED as of the day and year first above written.

**SELLER:**          _____,
                     David P. Stapleton, solely in his capacity as receiver of
                     Touchstone Pistachio Company, LLC

**BUYER:**           **ZAMORA PISTACHIO, LLC, a CALIFORNIA LIMITED
                     LIABILITY COMPANY**

                     By: *Justin Telles*
                     Name: Justin Telles
                     Title: Authorized Agent

**Schedules**
2.1.1(a)(vi)     Lot 1 Additional Equipment

Docusign Envelope ID: F9A735A2-4E0E-4423-8A04-40B4DE6B19AE

SCHEDULE 2.1.1(a)(vi)

**LOT 1 ADDITIONAL EQUIPMENT**

*[Attached]*

###

| Item # | Sale Lots | Qty | Process Line Ref | Supplier or Mfg'r | Model | Serial Number | Age (Date MFG) | Original Equipment Detail | Site Location | Asset No. | Tag Lot No. | Asset Tag No. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | 1 | 1 | Line 1 | Pattyn | | 2121P102 | ~ 4 Yrs (3/30/2021) | Combination case erector and bag inserter automatically inserts made-to-measure bags from a roll into boxes. Standard equipped with Nordson hot melt device, hot melt nearly finished, multicolor warning light and color touch panel for easy operation. Also includes buzzer alarm, communication to control system, double active seal bars, carton magazine nearly empty, long carton magazine, film roll trolley, reject mechanism, mechanical bag in box detection, and integrated air plunger. | Maple Warehouse | T3085 | D | T3085 |
| 8 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 2500mm and includes drive package (SEW drive, motor controls, fully wired) and pneumatic separator. | Maple Warehouse | | D | |
| 9 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 1200mm and includes 2x-drive packages (Interoll EC5000 drive, motor controls, fully wired) and pneumatic pop-up stop | Maple Warehouse | | D | |
| 10 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Functioning as a shaker conveyor, and includes: 2 drive packages (vibratory motors), Length 750mm (automatically shakes/settles product using a vibratory pan with two offset mounted motors with weights to adjust the amplitude/ frequency), and stainless steel execution. | Maple Warehouse | T3035 | D | T3035 |
| 11 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 600mm and includes drive packages (Interoll EC5000 drive, motor controls, fully wired), and pneumatic pop-up stop. | Maple Warehouse | | D | |
| 12 | 1 | 1 | Line 1 | Pattyn | CW-11 | 2021P103 | ~ 4 Yrs (3/30/2021) | Equipped with a multicolor warning light, stainless steel frame, reject mechanism, buzzer alarm, and communication to control system | Maple Warehouse | T3086 | D | T3086 |
| 13 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006 Width 400mm, Length 1000mm and includes drive package (SEW drive, motor controls, fully wired). | Maple Warehouse | | D | |
| 14 | 1 | 1 | Line 1 | Pattyn | DS-21-HE | 2021P104 | ~ 4 Yrs (3/30/2021) | A mono case footprint with variable heights: (Min. 280 (L) x 240 (W) x 190 (H), Max. 600 (L) x 400 (W) // 650 (D)), all stainless steel construction, buzzer alarm, communication to control system, and vacuum & gas flush installations. | Maple Warehouse | T3084 | D | T3084 |
| 15 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | With pneumatic pop-up stop | Maple Warehouse | | D | |

| 16 | 1 | 1 | Line 1 | Pattyn | CC-31 | 2021P105 | ~ 4 Yrs (3/30/2021) | Automatically folds the top case flaps and closes them with tape. Equipped with in- and outfeed guarding and multicolor warning light. Standard painted steel execution. Also includes buzzer alarm, communication to control system, flaps control section, and complete detection set tape. | Maple Warehouse | T3083 | D | T3083 |
| 17 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006 Width 400mm, Length 1100mm and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 18 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA case metal detector that includes: reject head = 400mm H, 450mm W conveyor 400mm wide x 2400mm long, and stainless steel execution | Maple Warehouse | T3087 | D | T3087 |
| 19 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1400mm and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 20 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | FoxJet Solo Series Marksman HHI, 0.5 - 1" print height, capable of printing barcodes, text & logos, and includes general black ink. | Maple Warehouse | T3113 | D | T3113 |
| 21 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° curve + Length 800mm + 90° curve, and includes 2x-drive packages (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 22 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Model 252 Print & Apply Labeler, and includes a swing arm tamper max 6" x 6" label | Maple Warehouse | T3113 | D | T3113 |
| 23 | 1 | 1 | Line 1 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 1500mm, and includes drive package (SEW, motor controls, fully wired) | Maple Warehouse | | D | |
| 24 | 1 | 2 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 2600mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 25 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Trappo Tipping Conveyor / Knockdown conveyor - driven belt conveyor Width 700mm, Length 2200mm | Maple Warehouse | | D | |
| 26 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Fischbein model 400NS sewing machine, with thread break detection and oil sensor package. | Maple Warehouse | | D | |
| 27 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 28 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Loma CW3 stainless steel loadcell, multispeed, color touch screen with ethernet and USB connection, warning light on foot, potential free contacts. Stainlesssteel frame (non-painted parts, bearings, linear guides and chains are not in stainless steel). Includes buzzer alarm, and communication to control system. | Maple Warehouse | | D | |

| 29 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 500mm, Length 2000mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 30 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA Metal Detector, no reject head =300mm high, 550mm wide, conveyor 600mm wide, 2700mm long, and stainless steel execution | Maple Warehouse | | D | |
| 31 | 1 | 3 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 2300mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | | D | |
| 32 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006 | Maple Warehouse | | D | |
| 33 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Includes: set of box and bag conveyors, palletizer, pallet conveyors, layer card deposit station, safety cell, electrical & hmi and engineering | Maple Warehouse | | D | |
| 34 | 1 | 1 | Line 2 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Lantech S Series Automatic - 15 RPM - system includes pallet grip and load seeking clamp, (3) discrete wrap patterns for customer use, visual alarms and faults, alarm history, password protection for sensitive settings, a panel mounted beacon light and horn, and following conveyor sections: Infeed Conveyor - 5' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb maximum load capacity, and 30 FPM conveyor speed via motor starter. Wrap Zone Conveyor - 10' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb. maximum load capacity, and 30 FPM conveyor speed via motor starter. Exit Conveyor - 5' X 52" effective width standard spaced conveyor(s) - 2-1/2" rollers on 3-3/4" centers, 4000 lb. maximum load capacity, and 30 FPM conveyor speed via motor starter. | Maple Warehouse | | D | |
| 35 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | CEFLEX-41 combination case erector and bag inserter and MTM60 hotmelt. Automatically inserts made-to-measure bags from a roll into boxes. Standard equipped with Nordson hot melt device, hot melt nearly finished, multicolor warning light and color touch panel for easy operation. Standard painted execution. Also includes buzzer alarm, communication to control system, double active seal bars, carton magazine nearly empty, long carton magazine, film roll trolley, reject mechanism, mechanical bag in box detection, and integrated air plunger. | Maple Warehouse | T3081 | D | T3081 |

| 36 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 1200mm, and includes 2x-drive packages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3110 | D | T3110 |
| 37 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 500mm, Length 500mm, and includes drive packages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3110.1 | D | T3110.1 |
| 38 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° cruve + Length 1600mm lift gate, includes 2x-drive packages (SEW drive, motor controls, fully wired), and pneumatic pop-up stop. | Maple Warehouse | T3110.2 | D | T3110.2 |
| 39 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1200mm, and includes 2x-drive pPackages (Interoll EC5000 drive, motor controls, fully wired) | Maple Warehouse | T3108 | D | T3108 |
| 40 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Functioning as a shaker conveyor, and includes: 2 drive packages (vibratory motors), Length 750mm (automatically shakes/settles product using a vibratory pan with two offset mounted motors with weights to adjust the amplitude/ frequency), and stainless steel execution. | Maple Warehouse | T3111 | D | T3111 |
| 41 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted Steel Execution - RAL 9006, Width 400mm, Length 600mm, including drive packages (Interoll EC5000 drive, motor controls, fully wired), and pneumatic pop-up stop | Maple Warehouse | T3108.1 | D | T3108.1 |
| 42 | 1 | 1 | Line 6 | Pattyn | CW-11 | 2021P108 | ~ 4 Yrs (3/30/2021) | Equipped with a multicolor warning light, stainless steel frame, reject mechanism, buzzer alarm, and communication to control system | Maple Warehouse | | D | |
| 43 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, 90° curve + Length 500mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3079.1 | D | T3079.1 |
| 44 | 1 | 1 | Line 6 | Pattyn | DS-21-HE | 2021P109 | ~ 4 Yrs (3/30/2021) | A mono case footprint with variable heights: (Min. 280 (L) x 240 (W) x 190 (H), Max. 600 (L) x 400 (W) // 650 (D)), all stainless steel construction, buzzer alarm, communication to control system, and vacuum & gas flush installations. | Maple Warehouse | T3080 | D | T3080 |
| 45 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL9006, Width 400mm, Length 1600mm, including drive packages (SEW drive, motor controls, fully wired), pneumatic pop-up stop, and safety fencing (length 1700mm + door) | Maple Warehouse | T3079 | D | T3079 |
| 46 | 1 | 1 | Line 6 | Pattyn | CC-31 | 2021P110 | ~ 4 Yrs (3/30/2021) | Automatically folds the top case flaps and closes them with tape. Equipped with in- and outfeed guarding and multicolor warning light. Standard painted steel execution. Also includes buzzer alarm, communication to control system, flaps control section, and complete detection set tape. | Maple Warehouse | T3078 | D | T3078 |
| 47 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1100mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3079.2 | D | T3079.2 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 48 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | LOMA case metal detector that includes: reject head = 400mm H, 450mm W conveyor 400mm wide x 2400mm long, and stainless steel execution | Maple Warehouse | T3082 T3111.1 | D | T3082 T3111.1 |
| 49 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Painted steel execution - RAL 9006, Width 400mm, Length 1000mm, and includes drive package (SEW drive, motor controls, fully wired) | Maple Warehouse | T3108.2 | D | T3108.2 |
| 50 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | FoxJet Solo Series Marksman HHI - 0.5 - 1" print height, capable of printing barcodes, text & logos, and includes general black ink | Maple Warehouse | T3114 | D | T3114 |
| 51 | 1 | 1 | Line 6 | Pattyn | | | ~ 4 Yrs (3/30/2021) | Model 252 and includes a swing arm tamper, max 6" x 6" label | Maple Warehouse | T3114 | D | T3114 |
| 111 | 1 | 1 | Huller 2 | Beeler | | | | Includes equipment items listed below (Item # 112 thru 140) | Mt. Whitney / Panoche | | C | |
| 112 | 1 | | Huller 2 | Beeler | | | | (1) BI RCVG PIT #1 NORTH, 8X10 HI-CAP | Mt. Whitney / Panoche | | C | |
| 113 | 1 | | Huller 2 | Beeler | | | | (1) BI METERING CONV. # 1 NORTH  SBSR 3618.5 W/ 3/4" CLEAT | Mt. Whitney / Panoche | | C | |
| 114 | 1 | | Huller 2 | Beeler | | | | (1) BI RCVG PIT #1 SOUTH, 8X9 HI-CAP | Mt. Whitney / Panoche | | C | |
| 115 | 1 | | Huller 2 | Beeler | | | | (1) BI METERING CONV. # 1 SOUTH  SBSR 3618.5 W/ 3/4" CLEAT | Mt. Whitney / Panoche | | C | |
| 116 | 1 | | Huller 2 | Beeler | | | | (1) BI PIT COLLECTION CONV.  SBSR 3635.5 | Mt. Whitney / Panoche | | C | |
| 117 | 1 | | Huller 2 | Beeler | | | | (1) BI PRECLEANER FEED CONVEYOR  SBSR 4860 W/3" CLEAT | Mt. Whitney / Panoche | | C | |
| 118 | 1 | | Huller 2 | Beeler | | | | (1) BI/DCI PRIMARY ASPIRATOR  4810P | Mt. Whitney / Panoche | | C | |
| 119 | 1 | | Huller 2 | Beeler | | | | (1) DCI ASPIRATOR CYCLONE  HE60 | Mt. Whitney / Panoche | | C | |
| 120 | 1 | | Huller 2 | Beeler | | | | (1) DCI AIRLOCK  FT24 WM | Mt. Whitney / Panoche | | C | |
| 121 | 1 | | Huller 2 | Beeler | | | | (1) DCI/FE  SYSTEM FAN 5 1/2 BCS 40HP | Mt. Whitney / Panoche | | C | |
| 122 | 1 | | Huller 2 | Beeler | | | | (1) BI PRECLEANER BI 60XL | Mt. Whitney / Panoche | | C | |
| 123 | 1 | | Huller 2 | Beeler | | | | (1) BI PRECLEANER SUPER STRUCTURE PLATFORM BI STRUCTURE/ACCESS | Mt. Whitney / Panoche | | C | |
| 124 | 1 | | Huller 2 | Beeler | | | | (1) BI PRECLEANER DISCH. CONV. SBSR 3614 | Mt. Whitney / Panoche | | C | |
| 125 | 1 | | Huller 2 | Beeler | | | | (1) BI PREHULLER MODEL 10 | Mt. Whitney / Panoche | | C | |
| 126 | 1 | | Huller 2 | Beeler | | | | (1) BI ASPIRATOR FEED CONVEYOR SBSR 6008 | Mt. Whitney / Panoche | | C | |

| 127 | 1 | | Huller 2 | Beeler | | | | (1) BI/DCI DISCHARGE ASPIRATOR 6012P | Mt. Whitney / Panoche | | C | |
|-----|---|---|----------|--------|---|---|---|---|---|---|---|---|
| 128 | 1 | | Huller 2 | Beeler | | | | (1) DCI ASPIRATOR CYCLONE HE 84 | Mt. Whitney / Panoche | | C | |
| 129 | 1 | | Huller 2 | Beeler | | | | (1) DCI AIRLOCK FT24 WM | Mt. Whitney / Panoche | | C | |
| 130 | 1 | | Huller 2 | Beeler | | | | (1) DCI/FE System Fan 5 1/2 BCS 50HP | Mt. Whitney / Panoche | | C | |
| 131 | 1 | | Huller 2 | Beeler | | | | (1) BI HULLER FEED CONVEYOR TI 36148 | Mt. Whitney / Panoche | | C | |
| 132 | 1 | | Huller 2 | Beeler | | | | (1) BI TRASH CONVEYOR #2 SBRR 2433 | Mt. Whitney / Panoche | | C | |
| 133 | 1 | | Huller 2 | Beeler | | | | (1) BI TRASH CONVEYOR, SCALE FEED DRIVE & CLUTCH SBRR 2410 | Mt. Whitney / Panoche | | C | |
| 134 | 1 | | Huller 2 | Beeler | | | | (1) BI WEIGH HOPPER, TRASH BI | Mt. Whitney / Panoche | | C | |
| 135 | 1 | | Huller 2 | Beeler | | | | (1) BI TRASH CONVEYOR #3 SBRR 2437 | Mt. Whitney / Panoche | | C | |
| 136 | 1 | | Huller 2 | Beeler | | | | (1) BI HULLS CROSS CONVEYOR SBRR 2454 | Mt. Whitney / Panoche | | C | |
| 137 | 1 | | Huller 2 | Beeler | | | | (1) BI TRASH COLLECTION CONVEYOR #B SBRR 24132 | Mt. Whitney / Panoche | | C | |
| 138 | 1 | | Huller 2 | Beeler | | | | (1) Sample Conveyors #1 SBRR 1214 | Mt. Whitney / Panoche | | C | |
| 139 | 1 | | Huller 2 | Beeler | | | | (1) Sample Conveyors #2 SBRR 1224 | Mt. Whitney / Panoche | | C | |
| 140 | 1 | | Huller 2 | Beeler | | | | (1) Sample Diverter Pnuematic Y-Gate | Mt. Whitney / Panoche | | C | |
| 141 | 1 | 1 | Huller 2 | Beeler | | | | Includes equipment items listed below (Item # 142 thru 164) | Mt. Whitney / Panoche | | C | |
| 142 | 1 | | Huller 2 | Beeler | | | | (1) HULLER DISTRIBUTION AUGER 43' | Mt. Whitney / Panoche | | C | |
| 143 | 1 | | Huller 2 | Beeler | | | | (1) HULLER/AUGER SUPPORT STRUCTURE ACCESS STAIRS AND CATWALKS | Mt. Whitney / Panoche | | C | |
| 144 | 1 | | Huller 2 | Beeler | | | | (1) WATER MANIFOLD  LOT | Mt. Whitney / Panoche | | C | |
| 145 | 1 | | Huller 2 | Beeler | | | | (5) FLOAT TANKS FT-60-EXT | Panoche | T1214 T1215 T1216 T1217 T1218 | | T1214 T1215 T1216 T1217 T1218 |
| 146 | 1 | | Huller 2 | Beeler | | | | (3) SINKER COLL CONVEYOR REX 2464 | Mt. Whitney / Panoche | | C | |
| 147 | 1 | | Huller 2 | Beeler | | | | (1) SINKER ASPIRATOR #1 488 OPT B ALL SS | Mt. Whitney / Panoche | | C | |

| 148 | 1 | | Huller 2 | Beeler | | | | (1) DEWATERING SHAKER NF5414 | Mt. Whitney / Panoche | | C | |
| 149 | 1 | | Huller 2 | Beeler | | | | (1) ASPIRATOR #2 606 OPT A ALL SS | Mt. Whitney / Panoche | | C | |
| 150 | 1 | | Huller 2 | Beeler | | | | (1) DRYER FEED CONVEYOR REX 2478 W/ FLIGHTS | Mt. Whitney / Panoche | | C | |
| 151 | 1 | | Huller 2 | Beeler | | | | (1) FLOATER COLL. CONVEYOR REX 1852.5 | Mt. Whitney / Panoche | | C | |
| 152 | 1 | | Huller 2 | Beeler | | | | (1) CYCLONE HP56 | Mt. Whitney / Panoche | | C | |
| 153 | 1 | | Huller 2 | Beeler | | | | (1) AIRLOCK FT-16 | Mt. Whitney / Panoche | | C | |
| 154 | 1 | | Huller 2 | Beeler | | | | (1) FAN 5 1/2 BCS 50 HP | Mt. Whitney / Panoche | | C | |
| 155 | 1 | | Huller 2 | Beeler | | | | (1) DUCT SYSTEM LOT | Mt. Whitney / Panoche | | C | |
| 156 | 1 | | Huller 2 | Beeler | | | | (1) MISC STEEL, PANNING & SPOUTING LOT | Mt. Whitney / Panoche | | C | |
| 157 | 1 | | Huller 2 | Beeler | | | | (1) DECK FEED ASPIRATOR MC487 TANDEM | Mt. Whitney / Panoche | | C | |
| 158 | 1 | | Huller 2 | Beeler | | | | (1) FLOATER SCALP DECK A6008 | Mt. Whitney / Panoche | | C | |
| 159 | 1 | | Huller 2 | Beeler | | | | (1) FLOATER INCLINE AUGER. 14" X 31'-6" | Mt. Whitney / Panoche | | C | |
| 160 | 1 | | Huller 2 | Beeler | | | | (1) FLOATER DRYER FEED CONVEYOR (NEEDS LEGS) REX 2460.5 W/ FLIGHTS X | Mt. Whitney / Panoche | | C | |
| 161 | 1 | | Huller 2 | Beeler | | | | (1) TRASH COLL. CONV. #3 SBRR 2479.5 | Mt. Whitney / Panoche | | C | |
| 162 | 1 | | Huller 2 | Beeler | | | | (1) TRASH COLL. CONV. #4 1819.5 REVERSIBLE | Mt. Whitney / Panoche | | C | |
| 163 | 1 | | Huller 2 | Beeler | | | | (1) MISC STEEL, PANNING & SPOUTING LOT | Mt. Whitney / Panoche | | C | |
| 164 | 1 | | Huller 2 | Beeler | | | | (1) Silo Feed Conveyor | Mt. Whitney / Panoche | | C | |
| 165 | 1 | 6 | Huller 2 | Magnusson | NF-24 | ~ 5 Yrs (12/17/2019) | HULLER | Mt. Whitney | T1162 T1163 T1164 T1165 T1166 T1167 | C | T1162 T1163 T1164 T1165 T1166 T1167 |
| 166 | 1 | 4 | Huller 2 | Magnusson | LHR | ~ 5 Yrs (12/17/2019) | LOOSE HULL REMOVER | Mt. Whitney | T1170 T1171 T1172 T1173 | C | T1170 T1171 T1172 T1173 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 174 | 1 | 4 | N/A | Industrial Design & Construction | 4024-04811 | | ~ 5 Yrs | GSI 48 Ft Dia x 11-ring high silos, with (2) - 40 Hp. 1750rpm double inlet GSI centrifugal fans with 480 volt motors w/ controls, downstream natural gas heater, and 6ft wide catwalks. | Mt. Whitney | | I | |
| 178 | 1 | 1 | Unknown | Beeler | | | ~ 4 Yrs (2021) | Includes: palletizer cell, and pallet conveyors. | Maple Warehouse | | D | |
| 181 | 1 | 1 | Unknown | Gardner Denver | L7-11D | D202610 | | | Mt. Whitney | T1246 | D | T1246 |
| 184 | 1 | 24 | Unknown | Cablevey Conveyor | Various | Various | | | Mt. Whitney | No Tag | N | No Tag |
| 186 | 1 | 1 | Unknown | Magnetic Products, Inc | 150MM | | | | Maple Warehouse | No Tag | D | No Tag |
| 187 | 1 | 1 | Unknown | Magnetic Products, Inc | 100MM | | | | Maple Warehouse | No Tag | D | No Tag |
| 188 | 1 | 2 | Unknown | Syntron Electromagnetic | BF-3S | | | | Maple Warehouse | No Tag | D | No Tag |
| 192 | 1 | 1 | Unknown | LMC | 8420D | 210000126 | ~ 4 Yrs (2021) | 84" wide and 20 screens. | Panoche | T1047 | J | T1047 |
| 193 | 1 | 1 | Unknown | LMC | 7208P | 210000128 | ~ 4 Yrs (2021) | 72" wide and 8 screens. | Panoche | T1049 | J | T1049 |
| 194 | 1 | 1 | Unknown | LMC | 8410P | 210000124 | ~ 4 Yrs (2021) | 84" wide and 10 screens. | Panoche | T1048 | J | T1048 |
| 196 | 1 | 2 | Unknown | LMC | 3540 | 210000131 210000129 | ~ 4 Yrs (2021) | Includes bottom portions that consists of S/N's 2100000130 and 210000129 | Panoche | T1050 T1051 T1053 T1052 | M | T1050 T1051 T1053 T1052 |
| 199 | 1 | 11 | Unknown | Eaton | | | | | Maple Warehouse | | K | |
| 200 | 1 | 87 | Unknown | Allen-Bradley | Centerline 2100 | | | Largely consists of AB PowerFlex 525 VFD's | Maple Warehouse | | K | |
| 201 | 1 | 47 | Unknown | Allen-Bradley | Centerline 2101 | | | Largely consists of AB PowerFlex 525 VFD's | Maple Warehouse | | K | |
| 202 | 1 | 2 | | Deamco | BEM-12P-T-X | 24384BEM-01 24384BEM-02 | | "S" shape configuration. | Mt. Whitney | | M | |

| 203 | 1 | 6 | | Deamco | BEM-18P-T-X | 24384BEM-03 24384BEM-04 24384BEM-05 24384BEM-06 24384BEM-07 24384BEM-08 | "C" shape configuration. | Mt. Whitney | | M | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 204 | 1 | 16 | | Eaton | V48M28T7516 | Various | 75 kVA, 3-phase, 60 Hz, and 480V delta to 208Y/120V | Kamm Plant | | K | |
| 205 | 1 | 4 | | Eaton | V48M28T4516 | Various | 45 kVA, 3-phase, 60 Hz, and 480V delta to 208Y/120V | Kamm Plant | | K | |
| 206 | 1 | 4 | | Eaton | | Various | Includes (3) 20-amp, (3) 30-amp, and (3) 100-amp circuit breakers, and (1) 400-amp main breaker. | Maple Warehouse | | K | |
| 207 | 1 | 7 | | Eaton | | Various | Includes (6) 20-amp circuit breakers, and (1) 200-amp main breaker. | Maple Warehouse | | K | |
| 208 | 1 | 3 | | Eaton | | Various | Includes (1) 60-amp and (1) 20-amp circuit breakers, and (1) 100-amp main breaker. | Maple Warehouse | | K | |
| 209 | 1 | 4 | | Eaton | | Various | Includes (1) 100-amp, (1) 50-amp, (3) 30-amp, and (4) 20-amp circuit breakers, and (1) 200-amp main breaker. | Maple Warehouse | | K | |
| 210 | 1 | 12 | | Eaton | Pow-R-Way III | Various | 4000 amp Pow-R-Way III entry point flange | Maple Warehouse | | K | |
| 211 | 1 | 28 | | Eaton | | Various | Includes (6) 20-amp circuit breakers, and (1) 200-amp main breaker. | Kamm Plant | | K | |

# EXHIBIT B

**PURCHASE AND SALE AGREEMENT**

BY AND BETWEEN

DAVID P. STAPLETON, RECEIVER
FOR TOUCHSTONE PISTACHIO COMPANY, LLC ("**SELLER**")

AND

CALIFORNIA PISTACHIO ORCHARDS, LLC ("**BUYER**")

DATED APRIL 16, 2025

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is made as of April 16, 2025 (the "**Agreement Date**"), by and between David P. Stapleton ("**Seller**"), solely in his capacity as receiver (the "**Receiver**") of the assets and operations of Touchstone Pistachio Company, LLC, a California limited liability company ("**Touchstone**") in the matter captioned *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (Case No. 1:24-cv-01105-KES-SAB) (the "**Action**") pending in the United States District Court for the Eastern District of California (the "**Court**"), and [California Pistachio Orchards, LLC, a California limited liability company ("**Buyer**", and with Seller, each a "**Party**" and together the "**Parties**"). This Agreement is made with reference to the following recitals:

## RECITALS

WHEREAS, on September 30, 2024, the Court entered a stipulation and order appointing David Stapleton as the Receiver in the Action (the "**Receivership Order**");

WHEREAS, pursuant to the Receivership Order, the Receiver has the express authority to sell substantially all of Touchstone's tangible and intangible real and personal property, subject to the terms of the Receivership Order;

WHEREAS, on March 18, 2025, the Court entered an order approving *Receiver David P. Stapleton's Notice of Motion and Motion for Orders Approving Certain Bidding Procedures and Bid Protections and Confirming the Sale of Certain Real and Personal Property* and those certain bidding and auction procedures set forth therein (such order, the "**Bid Procedures Order**," and such bidding and auction procedures, "**Bid Procedures**");

WHEREAS, the Receiver intends to sell certain assets of Touchstone pursuant to the Bid Procedures Order; and

WHEREAS, subject to the Bid Procedures Order, including an overbid process and modification of this Agreement in connection therewith, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to and of the Acquired Assets and the Assumed Liabilities (each as defined below), subject to the terms and conditions set forth herein, including approval of this Agreement and the transaction contemplated herein (the "**Transaction**") by the Court (the "**Sale Approval Order**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# AGREEMENT

## ARTICLE 1

## DEFINITIONS

1.1    For purposes of this Agreement, the following definitions shall apply to terms not defined elsewhere in this Agreement:

1.1.1    The term "**Auction**" shall have the meaning set forth in the Bid Procedures Order.

1.1.2    The term "**Back-Up Bid**" shall have the meaning set forth in the Bid Procedures Order.

1.1.3    The term "**Back-Up Bidder**" shall have the meaning set forth in the Bid Procedures Order.

1.1.4    The terms "**Back-Up Closing Date**" shall have the meaning set forth in the Bid Procedures Order.

1.1.5    The term "**Bid Deadline**" shall have the meaning set forth in the Bid Procedures Order.

1.1.6    The term "**Business Day**" shall mean any day other than a Saturday or Sunday on which banks in California are authorized or required to be open for business.

1.1.7    The term "**Encumbrance**" shall mean any lien, encumbrance, Claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, hypothecations, and rights of first refusal.

1.1.8    The term "**Law**" shall mean any federal, state, local, municipal, foreign or international, multinational or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any governmental entity, in each case as in effect as of the Closing Date.

1.1.9    The term "**Liability**" or "**Liabilities**" shall mean and include any debt, claim, liability, responsibility, obligation, cost, expense, loss, expenditure, charge, fee, penalty, fine, or fee of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when incurred or asserted.

1.1.10    The terms "**Person**" and "**Persons**" shall mean a natural person, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, governmental entity, or other entity or group.

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

1.1.11  The term "**Qualified Bidder**" shall have the meaning set forth in the Bid Procedures Order.

1.1.12  The term "**Real Property**" shall mean the certain real property identified in the Tulare County real property records as Assessor Parcel Numbers 319-130-25 and 319-130-26, inclusive of the real property located at 19570 Ave. 88, Terra Bella, CA 93270 in Tulare County, California and all buildings, structures, improvements and fixtures located thereon.

1.1.13  The term "**Successful Bid**" shall have the meaning set forth in the Bid Procedures Order.

1.1.14  The term "**Successful Bidder**" shall have the meaning set forth in the Bid Procedures Order.

ARTICLE 2

PURCHASE AND SALE OF ACQUIRED ASSETS AND ASSUMPTION OF ASSUMED LIABILITIES

2.1   Assets.

2.1.1   Acquired Assets.  Upon the terms and conditions set forth herein and in the Sale Approval Order, at the Closing, Buyer shall buy from Seller and Seller shall sell to Buyer all of Touchstone's right, title, and interest in and to the Acquired Assets.  "**Acquired Assets**" are comprised of the following:

(a)    The personal property identified in Schedule 2.1.1 to this Agreement (the "**Personal Property**"); and

(b)    All manuals, written warranties, and similar documents related to ownership or operation of the Personal Property that are requested or identified by Buyer no later than the Bid Deadline, but only to the extent such documents are in Seller's possession.

If Buyer becomes the Successful Bidder or Back-Up Bidder with respect to less than all of the assets set forth in this Section 2.1.1, all references to Acquired Assets herein shall mean the assets comprising Buyer's Successful Bid or Back-Up Bid as of the conclusion of the Auction.

2.2   Liabilities.

2.2.1   Assumption of Liabilities.  On the terms and subject to the conditions set forth herein and in the Sale Approval Order, at the Closing, Buyer shall assume (and pay, perform, discharge or otherwise satisfy in accordance with their terms) all Liabilities related to ownership and operation of the Acquired Assets that arise on and after the Closing (collectively, the "**Assumed Liabilities**").

2.2.2   Excluded Liabilities.  Buyer shall assume only the Assumed Liabilities, and shall not assume nor be deemed to have assumed, any other Liabilities of Touchstone of any nature,

whether absolute, accrued, contingent, unliquidated, matured, unmatured, direct, or indirect, and Touchstone shall be exclusively liable for all such Liabilities relating to the Acquired Assets which are not Assumed Liabilities, including those relating to, arising out of, or in connection with the ownership and operation of the Acquired Assets at any time prior to the Closing.

ARTICLE 3

CONSIDERATION

3.1     Consideration.  The aggregate consideration to be paid for the Acquired Assets shall be: (i) the payment of the Purchase Price, in cash; and (ii) the assumption of the Assumed Liabilities.  The total Purchase Price that shall be paid by Buyer, in cash, is three million fifty thousand and 00/100 dollars ($3,050,000.00) (the "**Purchase Price**").  Buyer shall have the right to increase the Purchase Price in the manner provided in the Bid Procedures Order.  The Purchase Price shall be payable in cash in the form of the Good Faith Deposit, as provided in Section 3.2.1 below, and the balance of the Purchase Price payable in good and immediately available funds at the Closing.

3.2     Good Faith Deposit.

3.2.1     Within three (3) days of executing this Agreement, but not later than the Bid Deadline, Buyer shall deposit in cash with Seller a good faith deposit (the "**Good Faith Deposit**") in a total amount equal to ten percent (10%) of the Purchase Price.  The Good Faith Deposit shall be made by wire transfer to Seller (in accordance with wiring instructions provided by Seller), and will be held and/or disbursed by Seller in accordance with the terms and conditions of the Bid Procedures Order and this Agreement; provided that, in the event of a conflict between the Bid Procedures Order and this Agreement, the former shall supersede and control.

3.2.2     The Good Faith Deposit shall be fully applicable to the Purchase Price at Closing in the event Buyer is the Successful Bidder.  To the extent Buyer increases its Purchase Price at the Auction, and is selected as the Successful Bidder or Back-Up Bidder at the Auction, Buyer shall increase its Good Faith Deposit as necessary within two (2) Business Days after completion of the Auction such that the amount of the Good Faith Deposit is equal to ten percent (10%) of the increased Purchase Price.

3.2.3     The Good Faith Deposit, together with all interest accrued thereon, if any, shall be nonrefundable to Buyer except in the event (i) this Agreement is terminated pursuant to Section 9.1.1, 9.1.2, 9.1.3, or 9.1.6 or (ii) this Agreement is terminated pursuant to Section 9.1.4 for a reason other than Buyer's breach or default.  For the avoidance of doubt, if Buyer is the Successful Bidder or the Back-Up Bidder on less than all of the assets set forth in Section 2.1.1 at the conclusion of the Auction, Buyer shall not be entitled to a reduction of the Good Faith Deposit as a result of any decrease in the Purchase Price, except in the event and to the extent such Good Faith Deposit exceeds the full Purchase Price of the Acquired Assets at the conclusion of the Auction.

3.3     Payments on the Closing Date.

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

3.3.1    Not later than three (3) Business Days prior to the Closing Date, Seller shall deliver to Buyer a written statement, reasonably satisfactory to Buyer, showing application of the Good Faith Deposit against the Purchase Price, the allocation of the closing costs pursuant to <u>Section 4.3</u> and other prorations and closing adjustments contemplated in this Agreement, if any, all consistent with the terms and conditions of this Agreement, the Bid Procedures Order and the Sale Approval Order (the "**Closing Statement**").

3.3.2    Should Buyer object to any of the amounts or calculations in the Closing Statement as being inconsistent with this Agreement, Buyer and Seller shall cooperate in a diligent good faith manner to resolve such objections prior to the Closing, and the Closing Statement shall be adjusted prior to the Closing to reflect any changes agreed to by Buyer and Seller.

3.3.3    At the Closing, Buyer shall pay to Seller the Purchase Price pursuant to <u>Section 3.1</u>, receiving credit for the Good Faith Deposit, as adjusted pursuant to <u>Section 4.3.2</u>, and such other amounts as may be due from Buyer pursuant to the Closing Statement (including the amounts set forth in <u>Section 4.3.1</u>), in immediately available funds (the "**Closing Cash Payment**").

ARTICLE 4

CLOSING

4.1    <u>Time and Place of Closing</u>.    Subject to the terms and conditions herein, the Transaction shall be consummated (the "**Closing**", and the date on which Closing occurs, the "**Closing Date**") as soon as practicable following the satisfaction or waiver of all conditions of this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), but no later than (i) if the Buyer is selected as the Successful Bidder, fourteen (14) calendar days after entry of the Sale Approval Order, or such later date and time as the Parties each agree in writing, or (ii) in the event Buyer is selected as the Back-Up Bidder, the Back-Up Closing Date, or such earlier date as the Parties may agree in writing (the "**Outside Date**").    For purposes hereof, the Closing shall be deemed to occur at 12:01 a.m. Pacific Time on the Closing Date.

4.2    <u>Deliveries at Closing</u>.

4.2.1    <u>Seller's Deliveries</u>.

(a)    At Closing, Seller shall deliver the following:

(i)    an Internal Revenue Service Form W-9, or such other evidence as Buyer may require showing that Buyer is not required to withhold taxes from the Purchase Price under Section 1445(a) of the Internal Revenue Code of 1986, as amended;

(ii)    a duly executed Bill of Sale, in the form attached hereto as <u>Exhibit A</u>, assigning to Buyer Touchstone's rights with respect to the Personal Property, or such portion thereof, as constitutes Acquired Assets (the "**Bill of Sale**");

(iii)    UCC termination statements, and such other documents as are reasonably necessary to release liens against the Acquired Assets to the extent required by Section 7.1.2, in a form reasonably satisfactory to Buyer; and

(iv)    such other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of Touchstone's right, title and interest in any of the Acquired Assets.

(b)    To the extent the Acquired Assets include Personal Property located on or at the Real Property, Buyer agrees and acknowledges that it shall be solely responsible for making all arrangements necessary to collect such Acquired Assets from the Real Property on or after the Closing Date.  To the extent (but only to the extent) Seller remains in possession of the Real Property on and after the Closing Date, Seller shall provide Buyer with reasonable access to the Real Property during normal business hours upon reasonable advance notice to collect the applicable Acquired Assets sold to Buyer; provided that (i) Buyer shall collect such Acquired Assets as soon as practicable and (ii) if Buyer fails to collect such Acquired Assets within three (3) days after the Closing Date, then, unless the parties agree in writing otherwise, Buyer shall be deemed to have abandoned such Acquired Assets and shall forfeit all right, title, and interest in and to such Acquired Assets upon the fourth (4th) calendar day following the Closing Date, and Seller shall have no liability or further obligation to Buyer with respect to such Acquired Assets and may dispose of the Acquired Assets in any manner Seller may select.  In the event Seller is or becomes no longer in possession of the Real Property at any point on or after the Closing Date and Buyer has not collected such Acquired Assets from the Real Property, (i) Buyer shall be responsible for making all arrangements necessary with the owner of such Real Property to collect such Acquired Assets, and (ii) Seller shall have no responsibility to assist Buyer, or incur any expense or obligation, in connection with such collection.

4.2.2    Buyer's Deliveries.  At Closing, Buyer shall deliver the following:

(a)    the Closing Cash Payment;

(b)    such authorizing documents of Buyer as shall be reasonably required by Seller to evidence Buyer's authority to consummate the Transaction;

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in Sections 7.1.1 and 7.1.2 have been satisfied and that the representations and warranties set forth in Section 5.3 are true and correct;

(d)    a duly executed Bill of Sale; and

(e)    all other certificates, agreements, and other documents required by this Agreement (or as Seller may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the Transaction) to be delivered by Buyer at or prior to the Closing in connection with the Transaction.

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

4.3     <u>Closing Costs</u>.

4.3.1     <u>Buyer's Costs at Closing</u>.  At Closing, Buyer shall pay the costs of any city, county and/or state transfer taxes associated with the transfer of the Acquired Assets, and recording charges or taxes, if any.

4.3.2     <u>Prorations</u>.  All special taxes, any similar taxes and assessments imposed on the Acquired Assets, and any income or expense related to the Acquired Assets shall be apportioned as of 12:01 a.m. prevailing Pacific Time on the Closing Date, as if Buyer were vested with title to the Acquired Assets during the entire Closing Date, such that Buyer shall have the benefit of the income and the burden of expenses for the Closing Date. Any expenses attributable to operation of the Acquired Assets shall be prorated based upon the expenses paid or payable for the month in which Closing occurs.  In the event the Parties are unable to apportion or pro rate an amount contemplated by this <u>Section 4.3.2</u> at or before Closing, the Parties shall work in good faith after the Closing to account to each other for such amounts and take such steps as necessary to effectuate the apportionment and proration contemplated in this Agreement, including, without limitation, a Party reimbursing the other Party for amounts incurred or paid by such other Party that should have been incurred or paid by the first Party.

4.4     <u>Pre-Closing Inspection</u>.  After entry of the Sale Approval Order and before Closing, Seller shall grant reasonable access to all Acquired Assets during regular business hours to inspect the Acquired Assets.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

5.1     <u>Representations and Warranties of Seller</u>.  Seller represents and warrants to Buyer as follows:

5.1.1     <u>Authority; No Conflicts or Consents</u>.  Subject to (i) compliance with the Bid Procedures Order and (ii) entry and compliance with the Sale Approval Order, and the results of the Bid Procedures and Auction, Seller has the full power and authority to execute, deliver and perform Seller's obligations under this Agreement and the documents to be delivered hereunder, and to consummate the Transaction.

5.1.2     <u>Brokers and Finders</u>.  Except as set forth on <u>Schedule 5.1.2</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Transaction, and Buyer is not or will not become obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Transaction based upon any arrangement made by or on behalf of Seller.

5.1.3     <u>No Other Representations and Warranties</u>.  Except for the representations and warranties contained herein, neither Seller nor its agents and professionals has made or makes any other express or implied representation or warranty, either written or oral, for or on behalf of Seller.

    5.2    <u>Termination of Seller's Representations and Warranties at Closing</u>.  All of the representations and warranties of Seller set forth in this Agreement shall terminate at Closing or upon termination of this Agreement.

    5.3    <u>Representations and Warranties of Buyer</u>.  Buyer represents and warrants to Seller as follows:

    5.3.1    <u>Organization and Authority of Buyer; Enforceability</u>.  Buyer is duly organized and in good standing under the laws of its state of organization, with full power and authority to enter into and perform its obligations under this Agreement.  Buyer has complied with all corporate formalities and procedures necessary to authorize the execution, delivery and performance of this Agreement.  This Agreement has been, and at or prior to the Closing, each document to be executed by Buyer pursuant to <u>Section 4.2.2</u> will be, duly executed and delivered by the Buyer.  This Agreement constitutes, and each document to be executed by Buyer pursuant to <u>Section 4.2.2</u> will constitute, a binding obligation of Buyer enforceable in accordance with its respective terms.  Buyer has sufficient funds to pay the Purchase Price.

    5.3.2    <u>No Conflicts; Consents</u>.  The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the Transaction, do not and will not: (i) violate or conflict with the certificate of formation or other organizational documents of Buyer; or (ii) violate or conflict with any judgment, order, decree, statute, law, ordinance, contract, rule or regulation applicable to Buyer.  No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the Transaction.

    5.3.3    <u>Brokers and Finders</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the Transaction, and Seller is not or will not become obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Transaction based upon any arrangement made by or on behalf of Buyer.

    5.3.4    <u>OFAC</u>.  Neither Buyer nor any of its affiliates, and none of its respective employees, officers, or directors, is a Person with whom U.S. Persons are restricted from doing business under regulations of the Office of Foreign Asset Control of the Department of the Treasury ("**OFAC**") (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

    5.3.5    <u>Due Diligence; No Representations by Seller</u>.

    (a)    EXCEPT AS OTHERWISE PROVIDED IN <u>SECTION 5.1</u>, IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR OTHER REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ACQUIRED ASSETS,

INCLUDING WITHOUT LIMITATION ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(b)    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT, UPON THE CLOSING, SELLER SHALL SELL AND CONVEY TO BUYER, AND BUYER SHALL ACCEPT, THE ACQUIRED ASSETS **AS IS, WHERE IS, WITH ALL FAULTS**. BUYER AGREES AND ACKNOWLEDGES THAT SELLER HAS NO OBLIGATION TO DELIVER THE ACQUIRED ASSETS, TO SELLER IN ANY PARTICULAR CONDITION (E.G., WORKING CONDITION), AND THAT SELLER HAS NO OBLIGATION TO CLEAN, SANITIZE, FUMIGATE, REPAIR, OR OTHERWISE ALTER, MODIFY OR IMPROVE THE NATURE OR CONDITION OF THE ACQUIRED ASSETS PRIOR TO DELIVERY OF THE SAME TO BUYER. BUYER HAS NOT RELIED ON, AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ACQUIRED ASSETS OR RELATING THERETO, WHETHER OR NOT MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE ACQUIRED ASSETS ARE BEING SOLD AS IS, WHERE IS, WITH ALL FAULTS.

(c)    BUYER ACKNOWLEDGES THAT SELLER HAS MADE AVAILABLE TO BUYER CERTAIN REVIEW MATERIALS RELATED TO THE ACQUIRED ASSETS, AND BUYER HAS REVIEWED ALL SUCH MATERIALS. BUYER FURTHER ACKNOWLEDGES TO SELLER THAT BUYER HAS HAD THE OPPORTUNITY TO CONDUCT, AND DID CONDUCT, SUCH INSPECTIONS AND INVESTIGATIONS OF THE ACQUIRED ASSETS AND ASSUMED LIABILITIES AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES, AND ITS ACQUISITION AND ASSUMPTION THEREOF. BUYER HEREBY ASSUMES ALL RISKS THAT ADVERSE MATTERS, INCLUDING WITHOUT LIMITATION LATENT OR PATENT DEFECTS, AND ADVERSE PHYSICAL OR OTHER MATTERS, MAY NOT HAVE BEEN REVEALED BY BUYER'S REVIEW, INSPECTIONS, AND INVESTIGATIONS.

(d)    <u>RELEASE</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, BUYER ACKNOWLEDGES AND AGREES THAT SELLER WOULD NOT ENTER INTO THIS AGREEMENT TO SELL THE ACQUIRED ASSETS FOR THE PURCHASE PRICE UNLESS BUYER AGREED TO THE FOLLOWING:

**UPON CLOSING, BUYER RELEASES SELLER AND ALL SELLER PARTIES FROM ANY AND ALL CLAIMS (WHETHER KNOWN OR UNKNOWN, AND**

WHETHER CONTINGENT OR LIQUIDATED) ARISING FROM OR RELATED TO (I) THE ACQUIRED ASSETS AND ASSUMED LIABILITIES; AND (II) ANY OTHER CONDITIONS (INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL CONDITIONS OR LEGAL COMPLIANCE) AFFECTING THE ACQUIRED ASSETS, WHETHER THE SAME ARE A RESULT OF NEGLIGENCE OR OTHERWISE.  THIS RELEASE IS INTENDED TO BE GIVEN THE BROADEST SCOPE, APPLICATION AND INTERPRETATION ALLOWABLE BY LAW.  BUYER COVENANTS NOT TO SUE SELLER OR ANY SELLER PARTIES WITH REGARD TO ACQUIRED ASSETS OR ASSUMED LIABILITIES.

BUYER HAS READ, AND UNDERSTANDS, THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 ("SECTION 1542"), WHICH PROVIDES:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

BUYER EXPRESSLY, KNOWINGLY, AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS, BENEFITS, AND PROTECTIONS OF SECTION 1542 AND OF ANY OTHER APPLICABLE STATE OR FEDERAL STATUTE OR COMMON LAW PRINCIPLE LIMITING THE SCOPE OF A GENERAL OR SPECIFIC RELEASE. BUYER HEREBY SPECIFICALLY ACKNOWLEDGES THAT: (i) BUYER HAS CAREFULLY REVIEWED THIS <u>SECTION 5.3.5</u> AND THE WAIVER OF SECTION 1542; (ii) BUYER HAS DISCUSSED ITS IMPORT WITH LEGAL COUNSEL; AND (iii) THE PROVISIONS OF THIS <u>SECTION 5.3.5</u> AND THE WAIVER OF SECTION 1542 ARE A MATERIAL PART OF THIS AGREEMENT AND OF THE CONSIDERATION RECEIVED BY SELLER UNDER THIS AGREEMENT.

Buyer's Initials: GLH

ARTICLE 6

RECEIVERSHIP MATTERS

6.1    <u>Competing Bid and Related Matters</u>.

6.1.1    This Agreement and the Transaction are subject to Seller's absolute right and ability to consider higher or better competing bids with respect to all or any portion of the assets set forth in <u>Section 2.1.1</u> pursuant to the Bid Procedures Order.

6.1.2    If Buyer is not the Successful Bidder with respect to the Acquired Assets, Buyer shall, if its bid is determined to be the next highest bid with respect to the Acquired Assets, serve as the Back-Up Bidder with respect to the Acquired Assets and keep Buyer's bid to consummate the Transaction with respect to such Acquired Assets on the terms and conditions set forth in this Agreement (as the same may be modified or improved upon during the Auction) open

and irrevocable until the earlier of (i) the date of closing the purchase and sale of the Acquired Assets with the Successful Bidder, or (ii) the Back-Up Closing Date; *provided*, however, that in the event Seller accepts a bid for a portion of the assets set forth in Section 2.1.1, Buyer shall not be required to serve as the Successful Bidder or the Back-Up Bidder with respect to the remaining assets set forth in Section 2.1.1 if Buyer does not elect to submit a revised bid for such assets.

6.1.3   Following entry of the Sale Approval Order and prior to the Back-Up Closing Date, if Buyer is designated as the Back-Up Bidder and the Successful Bidder fails to consummate the purchase of the applicable Acquired Assets, Buyer will be deemed to have the new prevailing bid with respect to such Acquired Assets, and Seller will be authorized (and Buyer will be obligated), without further order of the Court, to consummate the Transaction on the terms and conditions set forth in this Agreement (as the same may be modified or improved upon during the Auction), the Sale Approval Order and the Bid Procedures Order.

ARTICLE 7

CONDITIONS TO CLOSING

7.1   Conditions Precedent to the Obligations of Buyer and Seller.   The respective obligations of each Party to this Agreement to consummate the Transaction are subject to the satisfaction or written waiver by each of Seller and Buyer of each of the following conditions:

7.1.1   There shall not be in effect any order, writ, injunction, judgment or decree entered by a court of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal, or otherwise prohibiting the consummation of the Transaction or the documents to be entered into pursuant to this Agreement; and

7.1.2   The Court shall have entered the Sale Approval Order (which may remain subject to appeal on and after the Closing Date) in form reasonably satisfactory to Seller and Buyer, which order shall not have been stayed and shall authorize Seller to deliver clear, clean and marketable title to the Acquired Assets, free and clear of all Liabilities or Encumbrances of, against, or created by Touchstone, to the fullest extent permitted by applicable Law, except to the extent such Liabilities or Encumbrances constitute Assumed Liabilities.

7.2   Conditions Precedent to the Obligations of Seller.   The obligations of Seller to consummate the Transaction are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Seller in its sole discretion:

7.2.1   The representations and warranties of Buyer in this Agreement or any document to be executed by Buyer pursuant to this Agreement shall be true and correct in all material respects, in each case as of the Agreement Date and the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be true and correct only as of such other specified date).

7.2.2   Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or before the Closing Date.

7.2.3    Buyer shall have delivered or caused to be delivered to Seller all of the items set forth in <u>Section 4.2.2</u>.

7.3    <u>Conditions Precedent to the Obligations of Buyer</u>.  The obligations of Buyer to consummate the Transaction are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

7.3.1    The representations and warranties of Seller in this Agreement or any document to be executed by Seller pursuant to this Agreement shall be true and correct in all material respects, in each case as of the Agreement Date and the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be true and correct only as of such other specified date).

7.3.2    Subject to the terms of the Bid Procedures Order and Sale Approval Order, Seller shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Seller on or before the Closing Date.

7.3.3    Seller shall have delivered or caused to be delivered to Buyer all of the items set forth in <u>Section 4.2.1</u>.

ARTICLE 8

INDEMNIFICATION

8.1    <u>Indemnification for Entry on the Real Property</u>.  Buyer hereby indemnifies and agrees to defend and hold harmless Seller, Touchstone, and their respective employees, licensees, contractors, consultant, agents, attorneys, brokers, and representatives (each, a "**Seller Party**" and collectively, the "**Seller Parties**") from and against any and all obligations, losses, injuries, damages, claims, liens, costs, expenses, demands, Liabilities, penalties and investigation costs, including reasonable attorneys' fees and costs (collectively, "**Claims**"), incurred in connection with or arising out of any entry on the Real Property by Buyer or any of Buyer's partners, employees, licensees, contractors, agents, consultants, invitees, directors, officers, managers, attorneys, brokers, and representatives, except to the extent caused by Seller or the Seller Parties' gross negligence or willful misconduct.  The provisions of this Section shall survive the termination of this Agreement or Closing indefinitely.

8.2    <u>Indemnification Post-Closing</u>.  Subject to the occurrence of the Closing and subject to the representations and warranties of Seller in <u>Section 5.1</u> of this Agreement, Buyer hereby agrees to indemnify, defend, and hold harmless Seller, Touchstone, and the Seller Parties from and against any and all Claims, relating to or arising out of, directly or indirectly, the Acquired Assets and Assumed Liabilities.  For avoidance of doubt, Buyer's obligation to indemnify, defend, and hold harmless includes Claims arising from or related to the Assumed Liabilities.  The provisions of this Section shall survive Closing indefinitely.

ARTICLE 9

TERMINATION

9.1     Termination.  This Agreement may be terminated only in accordance with this Section 9.1.  This Agreement may be terminated at any time prior to the Closing, as follows:

9.1.1    by the mutual written consent of Seller and Buyer;

9.1.2    automatically if (a) Buyer is not selected as the Successful Bidder or Back-Up Bidder for the Acquired Assets, or (b) the Court denies Seller's request to enter the Sale Approval Order confirming Buyer as the Successful Bidder or Back-Up Bidder for any Acquired Assets;

9.1.3    automatically, if Buyer is selected as the Back-Up Bidder for the Acquired Assets and Seller consummates a sale of the Acquired Assets to the Successful Bidder;

9.1.4    automatically if the Closing does not occur on or before the Outside Date (if Buyer is the Successful Bidder) or Back-Up Closing Date (if Buyer is the Back-Up Bidder);

9.1.5    by written notice from Seller to Buyer, if Buyer breaches or fails to perform in any respect any of its obligations, representations, warranties or covenants in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in ARTICLE 7, and (ii) cannot be or has not been cured within five (5) days following delivery of notice to Buyer of such breach or failure to perform; or

9.1.6    by written notice from Buyer to Seller, if Seller breaches or fails to perform in any respect any of its obligations, representations, warranties or covenants in this Agreement and such breach or failure to perform:  (i) would give rise to the failure of a condition set forth in ARTICLE 7, and (ii) cannot be or has not been cured within five (5) days following delivery of notice to Seller of such breach or failure to perform.

Each basis for termination set forth in this Section 9.1 shall be considered separate and distinct from each other such basis.  If more than one of the termination conditions set forth in this Section 9.1 is applicable, the applicable Party shall have the right to choose the basis for termination.

9.2     Procedures Upon Termination.  In the event of a termination by Buyer or Seller pursuant to Section 9.1, written notice thereof shall be delivered to the other Party, and this Agreement shall terminate without further action by Buyer or Seller as provided herein.

9.3     Effect of Termination.

9.3.1    In the event of termination of this Agreement by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of a Party to the other Party, except those provision that expressly survive termination of this Agreement and as otherwise provided in this Section 9.3.  The provisions of Sections 8.1 and 8.2 shall expressly survive Closing, the expiration, or termination of this Agreement.

9.3.2    Notwithstanding <u>Section 9.3.1</u>, in the event (i) this Agreement is terminated pursuant to <u>Section 9.1.4</u> due to Buyer's breach or default or (ii) this Agreement is terminated pursuant to <u>Section 9.1.5</u>, Seller shall be entitled to retain the Good Faith Deposit as liquidated damages as its sole and exclusive remedy against Buyer in all respects for any claim against Buyer arising under this Agreement.

SELLER AND BUYER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES SELLER MAY SUFFER UPON A BREACH OF THIS AGREEMENT BY BUYER AND THAT THE GOOD FAITH DEPOSIT REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON SUCH BREACH.  SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW, BUT ARE INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676, AND 1677. BY PLACING ITS INITIALS BELOW, EACH PARTY SPECIFICALLY CONFIRMS THE ACCURACY OF THE STATEMENTS MADE ABOVE AND THE FACT THAT EACH PARTY WAS REPRESENTED BY LEGAL COUNSEL WHO EXPLAINED, AT THE TIME THIS AGREEMENT WAS MADE, THE MEANING, THE EFFECT, AND THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION.

**Seller's Initials: _____      Buyer's Initials:** _GUH_

9.4    <u>Default by Seller</u>.  If Seller fails without legal excuse to complete the sale of the Acquired Assets in accordance with the terms of this Agreement, the Bid Procedures Order, and the Sale Approval Order, as its sole and exclusive remedy, Buyer may either (i) pursue specific performance of Seller's obligations under this Agreement or (ii) terminate this Agreement with respect to such Acquired Assets and be refunded its Good Faith Deposit with respect to such Acquired Assets.  From and after the Closing, provided Buyer is not in breach of this Agreement, Buyer shall be entitled to seek specific performance of Seller of its obligations, if any, to be performed after the Closing.

ARTICLE 10

MISCELLANEOUS

10.1    <u>Negotiation and Construction</u>.    This Agreement and each of the terms and provisions hereof are deemed to have been explicitly negotiated between the Parties, and the language in all parts of this Agreement shall, in all cases, be construed according to its fair meaning and not strictly for or against either Party.

10.2    <u>Governing Law</u>. This Agreement shall be construed according to the internal laws of the State of California. The Parties agree that any action or proceeding related to this Agreement, the Transaction, or any document executed pursuant to this Agreement shall be brought only in the Court.  Each Party (a) consents to the jurisdiction of the Court and waives all objections and defenses based upon lack of personal jurisdiction of the Court, (b) waives any objection to venue in the Court, and (c) waives any objection that the Court is an inconvenient forum.

      10.3   <u>Attorney's Fees</u>.  Each Party shall be responsible for its own legal, accounting, and consultant fees in connection with the negotiation of this Agreement and the consummation of the Transaction.  In the event of litigation relating to this Agreement, the prevailing Party in such litigation as determined by the Court in a final, non-appealable judgment shall be entitled to receive from the non-prevailing Party the reasonable attorney's fees and costs which such prevailing Party has incurred in connection with such litigation, including any appeal therefrom.

      10.4   <u>Notices</u>.  All notices, demands, requests, consents and approvals that may, or are required to, be given by any Party to any other Party hereunder shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) sent by a nationally recognized overnight delivery service, (c) electronically transmitted via email, or (d) if mailed or deposited in the United States mail and sent by registered or certified mail, return receipt requested, postage prepaid to:

SELLER:

David P. Stapleton,
Receiver for Touchstone Pistachio Company, LLC
515 S. Flower St.
18th Floor
Los Angeles, CA 90071
Telephone: (213) 235-0600
Email: david@stapletoninc.com


With a copy (which shall not constitute notice) to:

Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Attn: Joseph R. Dunn
Telephone: (424) 332-4825
Email: jdunn@cov.com


BUYER:

California Pistachio Orchards, LLC
7585 N. Colonial Ave, Suite 101
Fresno, CA 93711
Attention: George L. Holland III and Jim Lowe
Telephone: (559) 351-1739
Email: george@hollandnutcompany.com


With a copy (which shall not constitute notice) to:

California Pistachio Orchards, LLC
7585 N. Colonial Ave, Suite 101
Fresno, CA 93711
Attn: Jim Lowe

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

Telephone: (559) 269-0484
Email: jim@executivesedge.net

Harvey Tatsumura
7585 N. Colonial Ave, Suite 101
Fresno, CA 93711
Telephone: (559) 905-1871
Email: harvey@hollandnutcompany.com

Either Party hereto may by proper notice made by the other Party designate such other address for giving of notices.  All notices shall be deemed given on the day such notice is delivered (or if refused, the date of such refusal) or transmitted by email (provided that confirmation of email transmission is before 5:00 p.m. prevailing Pacific Time on a Business Day, and, if after such time, then on the next Business Day).  An attorney may provide notices on behalf of its client.

10.5    <u>Assignment</u>.  Buyer shall not assign any right, interest or obligation under this Agreement, other than an assignment to an affiliate of Buyer with Seller's express prior written consent, which consent shall not be unreasonably withheld.  Any purported unauthorized assignment shall be void.  No permitted assignment by Buyer shall reduce Buyer's obligations hereunder and Buyer shall remain primarily liable for Buyer's obligations hereunder.

10.6    <u>Cooperation; Further Assurances</u>.  Subject to the terms of the Bid Procedures Order and the Sale Approval Order, from the date hereof until the Closing, the Parties shall reasonably cooperate with one another in connection with any steps required to be taken by either of them to carry out or otherwise fulfill the intent of this Agreement.  Upon the request of the other Party, each Party shall also furnish upon request any further information, execute and deliver any other documents, and do other acts and things as are reasonably necessary for the purpose of carrying out the intent of this Agreement.

10.7    <u>Entire Agreement</u>.  This Agreement, together with the exhibits and schedules hereto, contains the entire understanding between the Parties and supersedes any prior agreements between them respecting the subject matter hereof.

10.8    <u>No Recording</u>.  Neither this Agreement nor any memorandum of this Agreement shall be recorded.

10.9    <u>Time of the Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.10    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the Parties hereto, notwithstanding that all the Parties are not signatory to the original or to the same counterpart.  Any such counterpart shall be admissible into evidence as an original hereof against the Person who executed it.

10.11    <u>Amendment, Waiver</u>.   No modification, termination or amendment of this Agreement may be made except by written agreement of the Parties.  No failure by Seller or Buyer to insist upon the strict performance of any covenant, agreement, or condition of this Agreement

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

or to exercise any right or remedy shall constitute a waiver of any such breach or any other covenant, agreement, term or condition.  No waiver shall affect or alter this Agreement, and each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

10.12   _Waiver of Jury Trial_.   IN ANY LAWSUIT OR OTHER PROCEEDING INITIATED BY A PARTY HERETO UNDER OR WITH RESPECT TO THIS AGREEMENT, SELLER AND BUYER EACH WAIVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

10.13   _Headings_.   The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

10.14   _Cumulative Remedies_.   The rights and remedies of the Parties that are specified in this Agreement are cumulative and not exclusive of any other rights and remedies available at law or in equity.

10.15   _Severability_.   In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such provisions had not been contained herein.

10.16   _Third Party Beneficiaries_.   Except as set forth in the Bid Procedures Order and Sale Approval Order, or as otherwise ordered by the Court, no third party shall be entitled to enforce or otherwise shall acquire any right, remedy or benefit by reason of this Agreement.

10.17   _Electronic Signatures_.   This Agreement may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.   For these purposes, "electronic signature" shall mean electronically scanned and transmitted versions (e.g., via pdf file) of an original signature, signatures electronically inserted and verified by software such as DocuSign and Adobe Sign, or faxed versions of an original signature.

(_Signature page follows_)

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

*Execution Version*

DATED as of the day and year first above written.

**SELLER:**       _____,
David P. Stapleton, solely in his capacity as receiver of Touchstone Pistachio Company, LLC

**BUYER:**       **California Pistachio Orchards, LLC**

By: *George L. Holland III*
Name: George L. Holland III
Title: Manager

**Exhibits**
Exhibit A      Bill of Sale

**Schedules**
2.1.1      Acquired Assets
5.1.2      Brokers and Finders

*[Signature Page to Purchase and Sale Agreement]*

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

<u>EXHIBIT A</u>

**BILL OF SALE**

This Bill of Sale (the "**Bill of Sale**") is made and entered into on April 16, 2025, by and between David P. Stapleton ("**Assignor**"), solely in his capacity as receiver of the assets and operations of Touchstone Pistachio Company, LLC ("**Touchstone**"), a California limited liability company in the matter captioned *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (Case No. 1:24-cv-01105-KES-SAB) pending in the United States District Court for the Eastern District of California, and California Pistachio Orchards, LLC, a California limited liability company ("**Assignee**"). Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement (as defined below).

In consideration of the sum of three million fifty thousand and 00/100 dollars ($3,050,000.00) and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby unconditionally, absolutely and irrevocably assign, transfer, convey and deliver to Assignee, its successors and assigns, all of Touchstone's rights, title and interest in the Personal Property (as defined in the Agreement referred to below and more particularly described on **<u>Exhibit 1</u>** attached hereto and made a part hereof for all purposes).

ASSIGNEE ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THAT CERTAIN AGREEMENT OF PURCHASE AND SALE DATED APRIL 16, 2025, BY AND BETWEEN ASSIGNOR AND ASSIGNEE (THE "**AGREEMENT**"), ASSIGNOR HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITIONS OF THE PERSONAL PROPERTY, (B) THE INCOME TO BE DERIVED FROM THE PERSONAL PROPERTY, (C) THE SUITABILITY OF THE PERSONAL PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH ASSIGNEE MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PERSONAL PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE QUALITY, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY OF THE PERSONAL PROPERTY, OR (F) ANY OTHER MATTER WITH RESPECT TO THE PERSONAL PROPERTY. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PERSONAL PROPERTY, ASSIGNEE IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PERSONAL PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY ASSIGNOR, EXCEPT AS SPECIFICALLY PROVIDED IN THE AGREEMENT. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PERSONAL PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT ASSIGNOR HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION. ASSIGNEE FURTHER

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PERSONAL PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "**AS IS, WHERE IS**" CONDITION AND BASIS "**WITH ALL FAULTS,**" EXCEPT AS SPECIFICALLY PROVIDED IN, AND SUBJECT TO THE LIMITATIONS CONTAINED IN, THE AGREEMENT.

The obligations of Assignor are intended to be binding only on the property of Touchstone and shall not be personally binding upon, nor shall any resort be had to, the private properties of Assignor or any of the other Seller Parties (as defined in the Agreement) other than Touchstone.

IN WITNESS WHEREOF, Assignor and Assignee have caused this Bill of Sale to be executed on the date and year first above written.

*Assignor*:

_____,
David P. Stapleton, solely in his capacity as receiver of Touchstone Pistachio Company, LLC

*Assignee*:

California Pistachio Orchards, LLC,
a California limited liability company

By: *George L. Holland III*
Name: George L. Holland III
Title: Manager

2

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

<u>EXHIBIT 1 TO BILL OF SALE</u>

**PERSONAL PROPERTY**

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

## SCHEDULE 2.1.1

## ACQUIRED ASSETS

| Sale Lots | Tag Lots | Category | Location | California Pistachio Orchards LLC Bid Amount: |
|---|---|---|---|---|
| 2 | B | Huller 1 | Terra Bella | $2,500,000 |
| 2 | A | Hoppers | Steel Structures (Madera) | $150,000 |
| 2 | F | Needle Sorter Complex | Mt. Whitney | $200,000 |
| 2 | L | Shelling Equipment | Mt. Whitney | $200,000 |
| | | | | $3,050,000 |

####

Docusign Envelope ID: 2DDDAF6E-BBFF-4DDF-9346-B946CD8DD6DF

<u>SCHEDULE 5.1.2</u>

**BROKERS AND FINDERS**

Cascadia Capital, LLC, in its capacity as marketing agent for the Receiver

###

Docusign Envelope ID: 56FB916C-0288-48B9-9073-BAADC677B92B

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

This First Amendment to Purchase and Sale Agreement (this "**Amendment**") is made as of April 17, 2025, by and between David P. Stapleton ("**Seller**"), solely in his capacity as receiver (the "**Receiver**") of the assets and operations of Touchstone Pistachio Company, LLC, a California limited liability company ("**Touchstone**") in the matter captioned *U.S. Bank National Association v. Touchstone Pistachio Company, LLC, et al.* (Case No. 1:24-cv-01105-KES-SAB) (the "**Action**") pending in the United States District Court for the Eastern District of California (the "**Court**"), and California Pistachio Orchards, LLC, a California limited liability company ("**Buyer**", and with Seller, each a "**Party**" and together the "**Parties**"). This Amendment is made with reference to the following recitals:

### RECITALS

WHEREAS, Seller and Purchaser entered into that certain Purchase and Sale Agreement, dated April 16, 2025 (the "**Agreement**"), pursuant to which Seller agreed to sell and Buyer agreed to purchase certain personal property more particularly described in the Agreement (the "**Acquired Assets**"), subject to certain bidding and auction procedures (the "**Bidding Procedures**") approved by a Court order (the "**Bid Procedures Order**") and the potential overbid process and modification of the Agreement in connection therewith;

WHEREAS, in accordance with the terms of the Bid Procedures Order and Bidding Procedures, an auction (the "**Auction**") for the Acquired Assets was held on April 17, 2025;

WHEREAS, at the conclusion of the Auction, Seller designated Buyer as the Back-Up Bidder (as defined in the Agreement) for the Acquired Assets as a result of the bids placed by Buyer during the Auction, during which Buyer increased the purchase price for the Acquired Assets; and

WHEREAS**,** Seller and Purchaser wish to amend the Agreement on the terms and conditions hereinafter set forth to reflect the updated purchase price.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

### AMENDMENT

1. <u>Amendment to Purchase Price</u>. The Purchase Price to be paid by Buyer in cash set forth in Section 3.1 of the Agreement is hereby increased from $3,050,000.00 to $3,949,700.00.

2. <u>Miscellaneous</u>

    i. <u>Relationship to Agreement; Limited Effect</u>. Except as expressly modified herein, all terms and conditions set forth in the Agreement remain unchanged and in full force and

Docusign Envelope ID: 56FB916C-0288-48B9-9073-BAADC677B92B

effect. Any conflict between the Agreement and this Amendment shall be resolved in favor of this Amendment.

      ii.   <u>References Generally</u>.  References in the Agreement to "this Agreement" (and indirect references such as "hereunder," "hereby," "herein," and "hereof") shall be deemed to be references to the Agreement as amended hereby.

      iii.   <u>Binding Effect</u>.  This Amendment shall be binding on and inure to the benefit of the Parties and their respective successors and assigns, to the extent permitted by the Agreement.

      iv.   <u>Definitions; Interpretation</u>.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement, as amended by this Amendment. The rules of construction set forth in the Agreement shall apply to this Amendment.

      v.   <u>Governing Law</u>.  This Amendment shall be construed according to the internal laws of the State of California.

      vi.   <u>Counterparts</u>.  This Amendment may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the Parties hereto, notwithstanding that all the Parties are not signatory to the original or to the same counterpart.  Any such counterpart shall be admissible into evidence as an original hereof against the Person who executed it.

      vii.   <u>Severability</u>.  In case any one or more of the provisions contained in this Amendment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Amendment shall be construed as if such provisions had not been contained herein.

      viii.   <u>Electronic Signatures</u>. This Amendment may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. For these purposes, "electronic signature" shall mean electronically scanned and transmitted versions (e.g., via pdf file) of an original signature, signatures electronically inserted and verified by software such as DocuSign and Adobe Sign, or faxed versions of an original signature.

*(Signature page follows)*

Docusign Envelope ID: 56FB916C-0288-48B9-9073-BAADC677B92B

DATED as of the day and year first above written.


**SELLER:**          _____,
                    David P. Stapleton, solely in his capacity as receiver of
                    Touchstone Pistachio Company, LLC




**BUYER:**          **California Pistachio Orchards, LLC**

                    By: _____
                    Name: George L. Holland III
                    Title: Manager

*[Signature Page to First Amendment to Purchase and Sale Agreement]*